Samuel Richard Rubin, ID Bar No. 5126
Federal Public Defender
Bruce D. Livingston, MO Bar No. 34444
Jonah J. Horwitz, WI Bar No. 1090065
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone: (208) 331-5530
Facsimile:  (208) 331-5559
ECF:   Bruce_Livingston@fd.org
          Jonah_Horwitz@fd.org

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| AZAD HAJI ABDULLAH,<br>          Petitioner,<br><br>v.<br><br>AL RAMIREZ,<br>Warden, Idaho Maximum Security<br>Institution,<br>          Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 1:15-mc-8251-BLW<br><br>**CAPITAL CASE**<br><br>PETITION UNDER 28 U.S.C. § 2254<br>FOR WRIT OF HABEAS CORPUS<br>BY A PERSON IN STATE CUSTODY |

# Table of Contents

I.   Introduction ................................................................................................. 1

II.  Background And Procedural History .......................................................... 3

III. Challenges To The State Courts' Presumption Of Correctness ................. 7

IV.  Aedpa Is Unconstitutional ......................................................................... 7

V.   Need For Discovery And Fact Development ............................................... 9

VI.  Grounds For Relief ..................................................................................... 9

   Claim 1: Mr. Abdullah Received Ineffective Assistance Of Trial Counsel ................. 13

      A.  Trial Counsel Rendered Ineffective Assistance At The Guilt Phase ................. 13

         i. Misconduct In Getting Retained ........................................................ 13

         ii. Entering Into An Improper Contract With The Abdullahs .............................. 17

         iii. Failure To Present Any Theory Of The Case .................................................. 18

         iv. Conceding Mr. Abdullah's Presence In Boise .................................................. 23

         v. Failure To Argue That Mr. Abdullah Could Not Have Been Responsible For The Prozac That Ms. Abdullah Ingested Due To The State's Own Timeline ...... 24

         vi. Failure To Present An Alibi Defense .............................................................. 25

         vii. Failure To Adequately Develop And Present Evidence That Someone Other Than Mr. Abdullah Was Responsible For The Crimes ......................................... 28

         viii. Failure To Adequately Present A Suicide Defense And Challenge The State's Nonsensical Cause-Of-Death Theory .................................................................... 30

         ix. Failure To Adequately Present A Slow Metabolizer Defense ......................... 36

         x. Failure To Adequately Deal With Gasoline Evidence ..................................... 37

         xi. Failure To Adequately Deal With Dna Evidence ............................................. 37

         xii. Failure To Adequately Deal With Hair Evidence ........................................... 38

         xiii. Failure To Adequately Deal With Computer Evidence ................................. 38

         xiv. Failure To Adequately Challenge The Police Investigation .......................... 40

         xv. Failure To Discover Evidence ........................................................................ 42

         xvi. Failure To Adequately Deal With Eyewitness Identification Evidence ........ 42

         xvii. Failure To Adequately Deal With Child Interview Evidence ....................... 43

         xviii. Failure To Interview Redear Abdullah ........................................................ 46

xix. Failure To Move To Suppress Confrontation Call ......................................... 46

xx. Failure To Exclude Unintelligible Police Interview ....................................... 47

xxi. Failure To Adequately Deal With Honor Killings In Kurdistan ................... 47

xxii. Failure To Adequately Deal With The Cape And Mask ............................... 48

xxiii. Failure To Move To Sequester The Jury During The Guilt Phase Of The Trial ..................................................................................................................... 49

xxiv. Failure To Adequately Move For A Change Of Venue ............................... 49

xxv. Failure To Move To Disqualify Judge Copsey And To Move For Her Recusal .................................................................................................................. 50

xxvi. Failure To Deal With Prejudicial Publicity ................................................. 51

xxvii. Failure To Adequately Deal With The Letter Found By The Acpd At The Siesta Residence ................................................................................................... 52

xxviii. Failure To Admit A Letter From Ms. Abdullah Regarding The Vending Machines ............................................................................................................... 54

xxix. Improperly Influencing Mr. Abdullah Into Not Testifying ........................ 54

xxx. Attempting To Persuade Mr. Abdullah To Waive His Rights ..................... 55

xxxi. Failure To Stand Up For Defense Arguments And Maintaining A Prosecution-Oriented Outlook .............................................................................. 56

xxxii. Failing To Request A Jury Instruction On The Unreliability Of Eyewitness Identifications ....................................................................................................... 57

xxxiii. Failure To Adequately Deal With Instructions On Willfulness And Deliberateness ....................................................................................................... 57

xxxiv. Failure To Object To Instruction That Failed To Include Intent To Kill As An Element Of All Attempted First-Degree Murder Offenses ............................. 58

xxxv. Failure To Object To Trial Court's Instruction Defining Reasonable Doubt In Both Guilt And Penalty Phases Of Mr. Abdullah's Trial ................................. 58

xxxvi. Failure To Object To Definition Of Willful On The Injury-To-A-Child Charge .................................................................................................................. 58

xxxvii. Failure To Challenge For Lack Of Evidence Charge Of Committing An Injury To A Child .................................................................................................. 59

xxxviii. Failure To Adequately Deal With Prosecutorial Misconduct ................. 59

xxxix. Disclosure Of Privileged Information ........................................................ 60

xl. Failure To Object To Deborah Kristal's Testimony ........................................ 61

xli. Failure To Establish That Divorce Is Permissible In Islam ............................ 61

xlii. Failure To Rebut The Assertion That Mr. Abdullah Converted Ms. Abdullah To Islam ........................................................................................................ 62

xliii. Failure To Adequately Deal With Evidence Relating To Mr. Abdullah's Relationship To Other Women .......................................................................... 63

xliv. Failure To Adequately Deal With Evidence Concerning The Nashville Trip ...................................................................................................... 64

xlv. Failure To Rebut The State's False Assertion That Naim Abdullah Was Mr. Abdullah's Favorite Child .......................................................................... 64

xlvi. Failure To Provide Mr. Abdullah With Discovery ...................................... 65

xlvii. Failure To Challenge The Unconstitutional Closure Of The Court To The Public ......................................................................................................... 65

xlviii. Failure To Behave Appropriately In Court .............................................. 65

xlix. Failure To Seek Assistance From Iraqi And Kurdish Entities ................... 66

l. Failure To Object To Unlawful Number Of Peremptory Challenges ............... 66

li. Failure To Act Promptly ............................................................................... 66

B. Trial Counsel Rendered Ineffective Assistance At The Capital Sentencing Phase ........................................................................................... 68

i. Failure To Adequately Investigate And Present Mitigating Evidence .............. 68

ii. Failure To Adequately Deal With Allocution .................................................. 79

iii. Failure To Adequately Challenge Steven Bankhead's Testimony ................. 80

iv. Stipulating To Strike Jurors On The Sole Basis Of Their Juror Questionnaires ............................................................................................ 81

v. Failure To Remove Jurors ............................................................................. 86

vi. Failure To Adequately Voir Dire Death-Leaning Jurors ................................ 90

vii. Failure To Adequately Voir Dire Life-Leaning Venire Members ................. 98

viii. Failure To Adequately Prepare Life-Leaning Jurors For Capital Jury Service ..................................................................................................... 101

ix. Failure To Adequately Voir Dire Jurors Whose Opinions About The Death Penalty Were Unknown ......................................................................... 102

x. Failure To Combat Premature Juror Decision-Making Through Effective Voir Dire ........................................................................................... 103

xi. General Ineffectiveness On Sentencing Instructions ..................................... 103

xii. Requesting An Incorrect Instruction On The Great-Risk Aggravator That Allowed The Prosecution To Prove The Aggravator ........................................... 104

xiii. Failure To Challenge For Lack Of Evidence The Great Risk Aggravator .. 104

xiv. Failure To Request An Instruction Regarding Evidence Relating To Multiple Aggravators ...................................................................................... 105

xv. Failure To Object To Instruction Regarding Juror Unanimity And Duty To Consult ............................................................................................. 105

xvi. Failure To Request Instruction Defining The Weighing Process Consistent With Idaho Law ...................................................................................... 105

xvii. Proposing An Instruction That Removed Reference To The Sentence That Would Be Imposed If The Jury Did Not Vote Unanimously For Death ............. 106

xviii. Failure To Challenge Death Penalty Statute For Containing Conflicting Standards Regarding Consideration Of Mitigation And Aggravation ............... 107

xix. Failure To Argue That The Instruction On How To Measure Mitigation Against Aggravation Violated The Ex Post Facto Clause ................................. 109

xx. Failure To Argue That Mr. Abdullah Was A Constitutionally Unsuitable Candidate For Death ........................................................................... 109

xxi. Failure To Request An Instruction Requiring A Finding That The Aggravation Outweighed The Mitigation Beyond A Reasonable Doubt ........... 109

xxii. Eliciting Testimony That Murder Is A Capital Offense Under Islamic Law ....................................................................................... 109

C. Trial Counsel Rendered Ineffective Assistance With Respect To His Sentencing For The Non-Capital Crimes ................................................................. 111

i. Failure To Present Mitigating Evidence ....................................................... 111

ii. Failure To Adequately Challenge The Non-Capital Pre-Sentencing Report .. 111

Claim 2: Trial Counsel Labored Under An Insurmountable Conflict ......................... 112

Claim 3: Mr. Abdullah's Counsel Violated His Right To A Fair Trial And His Right To Hold The State To Its Burden Of Proving All Elements Of The Offenses Beyond A Reasonable Doubt ................................................................................. 117

Claim 4: Mr. Abdullah Was Deprived Of His Right To Present A Defense Of His Own Choosing .......................................................................................... 118

Claim 5: Holding The Trial In Boise Was Unconstitutional ....................................... 119

Claim 6: Mr. Abdullah's Trial Judge Was Biased ...................................... 123

Claim 7: The Prosecution Committed Misconduct ...................................... 132

Claim 8: The Prosecution Presented False Testimony ................................. 141

Claim 9: The State Lost, Destroyed, And Failed To Preserve Evidence ................... 142

Claim 10: The State Suppressed Evidence ................................................. 145

Claim 11: The State Used Unduly Suggestive Identification Techniques ................. 149

Claim 12: The State Interrogated Mr. Abdullah Without Advising Him Of His Rights And In The Absence Of Counsel ........................................................ 150

Claim 13: The State Reinitiated Interrogation Of Mr. Abdullah With No Counsel Present After He Invoked His Right To A Defense Attorney .................................. 151

Claim 14: Death Qualification Biased The Jury To Convict And Deprived Mr. Abdullah Of His Right To A Jury Drawn From A Fair Cross-Section Of The Community .................................................................................... 153

Claim 15: Mr. Abdullah Was Not Present At All Stages Of His Trial ...................... 155

Claim 16: The Requirement That Voir Dire Be Performed Was Not Satisfied .......... 155

Claim 17: The State Used Faulty And Outdated Forensic Science ........................... 156

Claim 18: Mr. Abdullah Was Denied Access To Experts ........................................... 157

Claim 19: Mr. Abdullah Was Prevented From Putting On A Defense ...................... 160

Claim 20: The State Court's Evidentiary Rulings Rendered The Trial Fundamentally Unfair ........................................................................................ 162

Claim 21: The State Infringed Mr. Abdullah's Confrontation Rights ........................ 166

Claim 22: The Trial Was Unconstitutionally Closed To The Public ......................... 168

Claim 23: Mr. Abdullah Was Coerced Into Not Testifying ....................................... 169

Claim 24: The Jury Was Wrongly Instructed On Willfulness ................................... 172

Claim 25: The Jury Was Wrongly Instructed On Malice ........................................... 173

Claim 26: The Jury Instruction On Endangering Children Improperly Reduced The State's Burden Of Proof ................................................................... 174

Claim 27: The Trial Court Gave A Constitutionally Improper Definition Of Reasonable Doubt In Both Guilt And Penalty Jury Instructions................................. 175

Claim 28: There Was Insufficient Evidence Of First-Degree Murder ....................... 176

Claim 29: There Was Insufficient Evidence Of First-Degree Arson .......................... 177

Claim 30: The Idaho Supreme Court Violated Mr. Abdullah's Rights By Retroactively Altering The Elements Of Arson................................................................... 178

Claim 31: There Was Insufficient Evidence Of Attempted First-Degree Murder ...... 179

Claim 32: There Was Insufficient Evidence Of Injury To A Child ............................ 180

Claim 33: Cumulative Guilt-Phase Error ................................................................... 181

Claim 34: Mr. Abdullah Is Not A Constitutionally Suitable Candidate For Death .... 181

Claim 35: Death Qualification Of The Jury Was Per Se Unconstitutional ................. 183

Claim 36: The Trial Court Improperly Excused Jurors Who Had Reservations About The Death Penalty ....................................................................................... 184

Claim 37: The Trial Court Failed To Allow Or Conduct Adequate Voir Dire Of Death-Prone Jurors ................................................................................................ 188

Claim 38: The Trial Court Empaneled Biased Jurors ................................................ 191

Claim 39: Striking Prospective Jurors On The Basis Of Their Race, Skin Color, Gender, And Religion Violated The United States Constitution ............................... 194

Claim 40: The Jury Engaged In Misconduct .............................................................. 194

Claim 41: Mr. Abdullah Is Innocent Of Murder ....................................................... 195

Claim 42: The Great Risk Of Death Aggravator Is Unconstitutionally Vague .......... 195

Claim 43: There Was Insufficient Evidence To Find The Great Risk Of Death Aggravator ............................................................................................................ 196

Claim 44: Mr. Abdullah's Right To Allocute Was Violated ....................................... 198

Claim 45: Mr. Abdullah's Right To Present Lingering Doubt Evidence At Sentencing Was Violated ................................................................................................ 199

Claim 46: The Introduction Of Victim Impact Evidence Without Instructions Was Unconstitutional........................................................................................... 200

Claim 47: The Burden Of Proof On Mitigation Was Unconstitutionally Shifted To Mr. Abdullah ...................................................................................................... 201

Claim 48: The Trial Court Unconstitutionally Refused To Instruct Jurors On The Types Of Mitigation They Could Consider .................................................... 202

Claim 49: The Jury Was Unconstitutionally Not Required To Find Beyond A Reasonable Doubt That The Aggravation Outweighed The Mitigation .................... 203

Claim 50: The Instruction On How To Measure Mitigation Against Aggravation Violated The Ex Post Facto Clause .............................................................. 206

Claim 51: The Instruction On What Would Happen If The Jury Voted For Life Was Unconstitutional .................................................................................... 206

Claim 52: The Absence Of Written Jury Findings On Mitigation And Weighing Was Unconstitutional .................................................................................... 208

Claim 53: Unanimity And Consultation Were Improperly Required On Mitigation And Weighing ............................................................................................ 209

Claim 54: There Was No Death Penalty In Effect At The Time Of The Crime ........ 211

Claim 55: The Aggravators Were Not Charged By Indictment, Not Subject To A Finding Of Probable Cause, And Not Supported By Facts ........................................ 212

Claim 56: The Delay Between The Imposition Of Mr. Abdullah's Death Sentence And Any Ultimate Execution Renders The Execution Unconstitutional ........................... 213

Claim 57: Executing Mr. Abdullah After The Time That He Will Spend On Death Row Violates The Double Jeopardy Clause Of The Fifth Amendment By Imposing Two Punishments For One Offense .............................................................. 214

Claim 58: The Death Penalty Is Unconstitutionally Arbitrary .................................... 215

Claim 59: The Death Penalty Deprives Defendants Of Dignity ................................. 219

Claim 60: Evolving Standards Of Decency Render The Death Penalty *Per Se* Unconstitutional .................................................................................... 220

Claim 61: Cumulative Penalty-Phase Error .............................................................. 225

Claim 62: Mr. Abdullah Was Denied Effective Assistance Of Direct-Appeal Counsel .................................................................................................... 226

Claim 63: Direct-Appeal Counsel Operated Under A Conflict Of Interest ............... 229

Claim 64: The Page Limits Imposed On Mr. Abdullah's Appellate Briefing Were Unconstitutional .................................................................................... 231

Claim 65: The Destruction Of Jury Questionnaires Was Unconstitutional ............... 232

Claim 66: The Idaho Supreme Court's Novel Standard For Reviewing Capital Sentencing Errors Was Unconstitutionally Applied To Mr. Abdullah ...................... 233

Claim 67: Cumulative Direct-Appeal Error ............................................................. 234

Claim 68: Mr. Abdullah's Attorneys In His Initial Post-Conviction Action Rendered Ineffective Assistance Of Counsel ............................................................. 235

Claim 69: The Attorney Who Advised Mr. Abdullah On His Conflict With The Sapd Rendered Ineffective Assistance Of Counsel ............................................... 238

Claim 70: Initial Post-Conviction Counsel Operated Under A Conflict Of Interest .. 239

Claim 71: First Successive Post-Conviction Counsel Were Ineffective ..................... 244

Claim 72: The Idaho Post-Conviction Scheme Violates Due Process And The Equal Protection Clause .............................................................................. 244

Claim 73: The Post-Conviction Court Unconstitutionally Denied Mr. Abdullah Access To Evidence ...................................................................................... 245

Claim 74: Cumulative Post-Conviction Error ......................................................... 246

VII. Conclusion And Prayer For Relief ...................................................................... 247

## I.    Introduction

1.      The State's theory of this case at trial was nonsensical.  It accused Mr. Abdullah of killing his wife through the administration of Prozac, even though its own timeline showed that he was not with her at the time she ingested that Prozac and even though the State presented not one shred of evidence about how Mr. Abdullah was responsible for the ingestion.  Instead of accounting for that gaping hole in its narrative, the State wrote off the problem at closing as a "side issue" and something the jury did not need to "think about."  So that it could prosecute a man for capital murder despite having no coherent explanation for how he caused his victim's death, the State approached this case with tunnel vision, focusing on Mr. Abdullah and ignoring the substantial evidence of his innocence.  To that end, the police managed to "lose" a statement from a credible alibi witness with law enforcement training.  They also refused to collect videotape that the witness told them would support the alibi, allowing it to be destroyed.

2.      Given the fatal flaw at the heart of the State's case, and the serious misconduct its officers committed during the investigation, this trial would have given competent defense attorneys numerous opportunities to win over the jury.  Unfortunately, Mr. Abdullah's attorneys were not competent defense attorneys.  They were unqualified, unprepared, prosecution-oriented disasters, whose only desire was to settle the case at all costs.  When they failed to do so, they were thrown into a trial for which they had no plan and no theory whatsoever, leading them to effectively abandon their client and yield entirely to prosecutors who wanted to kill him.  As a result, trial counsel botched every possible aspect of the case, beginning with jury selection, during which they agreed with the prosecution to strike the most promising jurors for the defense without making any effort to qualify them for service through voir dire, all while receiving nothing from the State in return.  Defense counsel's blunders continued through the

PETITION FOR WRIT OF HABEAS CORPUS - 1

guilt phase, where they catastrophically conceded that Mr. Abdullah was present in Boise at the time of the crime, against his wishes and in the face of powerful alibi evidence. The fiasco of a defense concluded at the sentencing, which counsel were woefully unready for, having unnecessarily pulled the plug on their mitigation investigation months earlier in an act of supreme hubris. Forced to present a mitigation case without having done any meaningful legwork in advance, and working with a client and his family whose trust they had destroyed through their perpetual errors, defense counsel made a halfhearted and wholly unpersuasive argument for life. They failed despite Mr. Abdullah's uniquely compelling mitigation story, which involved him helping his family flee from Saddam Hussein's genocidal persecution. Rather than telling that story with enough vividness and detail to capture the attention of the jury and move it toward mercy, defense counsel called a small handful of ill-prepared witnesses, and examined them briefly and incompletely. Defense counsel's lack of interest in saving their client's life is perfectly illustrated by his attorney's decision to cut his mother off at the most emotional point of her testimony, object to the heartfelt statement that she was giving in response to his own questioning, and abruptly terminate the testimony. Having gotten no real defense from his advocates, Mr. Abdullah was inevitably sentenced to death.

3.      In short, Mr. Abdullah is on death row because of prosecutors who never explained his guilt, police who assumed it, and defense attorneys who did nothing to contest it, or to fight for his life at sentencing. To remedy those serious constitutional violations, as well as numerous others, Mr. Abdullah files the instant petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254, seeking vacatur of his convictions and his death sentence.

## II.   Background And Procedural History

4.      Azad Haji Abdullah[1] is an indigent petitioner under sentence of death.  He is currently confined at Idaho Maximum Security Institution ("IMSI") in Kuna, Idaho, as Prisoner Number 76321.  Al Ramirez is the Warden of IMSI and therefore has custody over Mr. Abdullah.  Mr. Abdullah's conviction and death sentence were imposed by the District Court of the Fourth Judicial District of Idaho, in the city of Boise and County of Ada.  The case number for Mr. Abdullah's trial was H0201384.  On February 23, 2004, Mr. Abdullah was charged by amended indictment with the following offenses:

-   Count I (murder in the first degree, in violation of Idaho Code § 18-4001–03);

-   Count II (arson in the first degree, in violation of Idaho Code § 18-802);

-   Count III (attempted murder in the first degree, in violation of Idaho Code § 18-4001 and § 18-306);

-   Count IV (attempted murder in the first degree, in violation of Idaho Code § 18-4001 and § 18-306);

-   Count V (attempted murder in the first degree, in violation of Idaho Code § 18-4001 and § 18-306);

-   Count VI (injury to children, in violation of Idaho Code § 18-1501(1)).

5.      Mr. Abdullah pled not guilty to each count and a jury trial was held to assess his guilt or innocence.  He did not testify at any pretrial hearings, at trial, or at any post-trial hearings.

6.      Mr. Abdullah was found guilty by a jury of all counts on November 19, 2004.  On November 23, 2004, the jury determined that death was the appropriate sentence for Count I.

---

[1] Azad Haji Abdullah will be referred to in this petition as "Mr. Abdullah."  The victim, Angela Abdullah, will be referred to as "Ms. Abdullah."  All other members of the Abdullah family will be identified with reference to their first names.

PETITION FOR WRIT OF HABEAS CORPUS - 3

7.      The trial court entered judgment on all counts on March 4, 2005, and imposed a death

sentence on Count I.  On the same day, the trial court rendered the following sentences for

Counts II–VI:

- Count II: a minimum period of twenty-five years in prison fixed, running consecutively
  with the death sentence;

- Count III: a minimum period of fifty years in prison fixed, running consecutively with the
  sentence imposed for Count II;

- Count IV: a minimum period of fifteen years fixed, running consecutively with the
  sentence imposed for Count III;

- Count V: a minimum period of fifteen years fixed, running consecutively with the
  sentence imposed for Count IV;

- Count VI: a minimum period of ten years fixed, running consecutively with the sentence
  imposed for Count V.

8.      On March 11, 2005, Mr. Abdullah appealed his convictions and sentence to the Idaho

Supreme Court.[2]  The court assigned case number 31659 to his direct appeal.  On April 15, 2005,

Mr. Abdullah filed a petition for post-conviction relief ("PCR") in the state trial court.  The court

assigned case number CR-FE-2002-1384 and SPOT 05-00308 to the PCR action.  A final

amended PCR petition was filed on August 29, 2008, with an additional amended petition adding

one last claim filed on August 11, 2011, and accepted on August 23, 2011.[3]  On various days

---

[2] The claims raised on direct appeal are too numerous to recite here.  A copy of Mr. Abdullah's
final opening brief is available at Dkt. 11, State's Lodging C-10.

[3] The claims raised in the final amended PCR petition are too numerous to recite here.  A copy of
the petition is available at Dkt. 11, State's Lodging B-7.

between September 2 and September 21, 2010, an evidentiary hearing was held on the PCR petition. The state trial court denied the PCR petition on October 14, 2011. On November 25, 2011, Mr. Abdullah appealed the denial of the PCR petition to the Idaho Supreme Court, later assigned case number 39417.[4]

9.      The Idaho Supreme Court consolidated Mr. Abdullah's direct appeal with his appeal from the denial of post-conviction relief. It affirmed the judgment of the trial court in all regards on March 2, 2015, in a decision reported at 348 P.3d 1. Mr. Abdullah filed a petition for certiorari with the U.S. Supreme Court in case number 15-6669. The Court denied certiorari on February 29, 2016. *See Abdullah v. Idaho*, 136 S. Ct. 1161 (2016).

10.     Mr. Abdullah filed a successive PCR petition in the state trial court on July 15, 2013, in case number CV-PC-1312579. He filed a second amended petition on July 1, 2016.[5] The petition is still pending in the trial court at this time. No evidentiary hearing has yet been held.

11.     For each claim in this petition that was not presented to the Idaho state courts, Mr. Abdullah reserves the right to argue that the lack of exhaustion is excused. His excuses for non-exhaustion will likely include, but are not limited to, ineffective assistance of counsel in post-conviction and on direct appeal, the State's destruction and suppression of evidence, inadequate fact-finding procedures in state court, insufficient funding in state court, overly restrictive briefing rules in state court, new facts that could not have been discovered earlier, and new cases that did not exist earlier.

---

[4] The claims raised on direct appeal are too numerous to recite here. A copy of the opening brief is available to Dkt. 11, State's Lodging C-10.

[5] The claims raised in the second amended successive PCR petition are too numerous to recite here. Mr. Abdullah anticipates that the lodgings will be supplemented with the pleadings from the successive PCR action after the proceeding has concluded.

PETITION FOR WRIT OF HABEAS CORPUS - 5

12.     Mr. Abdullah has not previously filed any petition, application, or motion in a federal court regarding the convictions and sentence challenged in this petition.

13.     At his arraignment, Mr. Abdullah was represented by August Cahill, of the Ada County Public Defender, who is currently retired.  The Ada County Public Defender is located at 200 W. Front St., Boise, ID 83702.

14.     At trial and at sentencing, Mr. Abdullah was represented by Kim and Mitchell Toryanski. Mr. Abdullah believes that Mr. Toryanski is currently legal counsel at the Idaho Bureau of Occupational Licenses, which is located at 700 W. State St., Boise, Idaho 83702.  It appears that Ms. Toryanski is currently deputy administrator at the Idaho Division of Human Resources, whose mailing address is P.O. Box 83720, Boise, Idaho 83720-0066.

15.     On direct appeal and in the initial post-conviction action, Mr. Abdullah was represented by attorneys with the State Appellate Public Defender ("SAPD"), located at 322 E. Front Street, Suite 570, Boise, ID 83702.  While the initial post-conviction action was still ongoing at the state trial court, Judge Copsey appointed R. Keith Roark to represent Mr. Abdullah in connection with an alleged conflict between him and the SAPD, and to advise Mr. Abdullah on whether he should waive the conflict or not.  Mr. Roark's office is located at 727 Shoshone St., N. Twin Falls, ID 83301.

16.     Mr. Abdullah has had three separate attorneys in his successive state PCR action.  The first was Leo Griffard, whose office is believed to be located in Golden, Colorado.  The second was David Smethers, whose office is located at 111 N. 11th Ave., Ste. 120, Caldwell, ID 83605. Mr. Abdullah's current attorney in the successive PCR case is John Kormanik, whose office is located at 206 W. Jefferson St., Boise, ID 83702.

PETITION FOR WRIT OF HABEAS CORPUS - 6

17.     Mr. Abdullah does not have any future sentence to serve after he completes the sentence for the judgment that he is challenging.

### III.     Challenges To The State Courts' Presumption of Correctness

18.     Mr. Abdullah hereby provides notice of his intention to challenge the presumption of correctness of specific findings of fact made by the state courts in his case under 28 U.S.C. § 2254(e)(1).  These include, but are not limited to, factual findings made by the trial court at trial, sentencing, and post-conviction, and the March 2, 2015 opinion of the Idaho Supreme Court.  Many such findings are not fairly supported by the record, and subject to other exceptions to the presumption of correctness, including, but not limited to: that the procedures employed by the state courts in making findings of fact were not adequate to afford a full and fair hearing, the material facts were not adequately developed in state court, Mr. Abdullah did not receive a full, fair, and adequate hearing of his claims in state court, and he was otherwise denied due process of law in the state-court proceedings.  Mr. Abdullah will elaborate on his challenges to the state courts' presumption of correctness in subsequent briefing in this case and may add additional challenges at that time.

### IV.     AEDPA Is Unconstitutional

19.     Because of its filing date, this petition is ostensibly governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 204 (2003).  However, Mr. Abdullah asserts that AEDPA is unconstitutional and, as a result, that its strictures should not apply here.

20.     Congress cannot define prisoners' habeas rights so narrowly as to suspend the writ.  *See* U.S. Const. art. I, § 9, cl. 2.  AEDPA renders federal courts powerless, in certain circumstances,

to grant relief even when it is undisputed that the conviction or sentence was unconstitutional. As such, it suspends the writ, is unlawful, and cannot be utilized here.

21.     AEDPA strips away any assurance that state criminal processes are full, fair, and meaningful, while it also creates what is, perhaps, the most deferential standard in all of Supreme Court jurisprudence.  Even in strong cases with clear state-court error, a federal court under AEDPA will deny relief if the state-court's erroneous decision falls short of unreasonableness. By drastically expanding federal deference to state courts on constitutional errors, AEDPA erodes incentives for states to afford constitutionally adequate process to criminal defendants. The resulting system under AEDPA allows and encourages violations of defendants' rights in the state courts and prevents meaningful review in federal court.

22.     Furthermore, the writ "is designed to restrain" Congress and is "an indispensable mechanism for monitoring the separation of powers."  *Boumediene v. Bush*, 553 U.S. 723, 765–66 (2008).  By requiring courts to ignore unlawful detentions, AEDPA runs afoul of the separation of powers and cannot be applied for that reason as well.

23.     In light of AEDPA's unconstitutionality, this petition should be analyzed under pre-AEDPA law.  That law compels relief "when a state prisoner carries his burden of proving that his detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution."  *Doe v. Ayers*, 782 F.3d 425, 428–29 (9th Cir. 2015) (internal quotation marks omitted).  De novo review is used to consider the state courts' "determinations of pure questions of law and fact."  *Burton v. Davis*, 816 F.3d 1132, 1142 (9th Cir. 2016). Applying that standard, Mr. Abdullah is entitled to habeas relief.

24.     In the event the Court disagrees and regards AEDPA as constitutional, Mr. Abdullah prevails under that law too.

25.     Mr. Abdullah may elaborate on his challenges to AEDPA in subsequent briefing in this case and may add additional challenges at that time.

**V.      Need For Discovery And Fact Development**

26.     The claims recited below are based on the information currently available to Mr. Abdullah's undersigned federal habeas counsel.  Counsel believe that there are many pieces of information that they cannot discover without access to discovery and other judicially enforced mechanisms for factual development.  Mr. Abdullah cannot adequately raise all of the constitutional defects infecting his convictions and sentences until he is granted access to discovery and those mechanisms.  Once he has access, he should be permitted to amend the petition to add any facts and claims that he discovers.

27.     There are statements below regarding facts that Mr. Abdullah has not yet been able to confirm because his counsel have not yet completed their investigation and have not been given access to judicially authorized factual development.  Those facts are based on Mr. Abdullah's, and undersigned counsel's, expectation, information, and belief.  With respect to prejudice on certain claims, the petition states the consequences flowing from each error to the best of Mr. Abdullah's and counsel's ability, based on the evidence they have so far reviewed.  Upon further investigation and discovery, Mr. Abdullah anticipates expanding and specifying his allegations of prejudice.

**VI.     Grounds For Relief**

28.     Mr. Abdullah incorporates by reference each and every paragraph of this petition into each and every claim presented as if fully set forth therein.  Below, Mr. Abdullah will specifically refer to certain claims in certain other claims.  He does so for the clarity of the

reader, to illustrate the relationship between various claims. The specific references do not change the fact that all paragraphs in the petition are incorporated into all claims.

29.     Any reference herein to an "Amendment" is a reference to an Amendment to the United States Constitution. Thus, an allusion to "the Eighth Amendment," for example, is an allusion to the Eighth Amendment to the United States Constitution, which forbids—inter alia—cruel and unusual punishment. Mr. Abdullah will rely herein on Amendments that were incorporated against the States through the Fourteenth Amendment. To avoid needless repetition, Mr. Abdullah will not note each time when he is citing an Amendment that was incorporated. He is, throughout this petition, invoking the incorporation of any Amendment cited here.

30.     The following recitation of Mr. Abdullah's claims satisfies the pleading standard set forth in Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts. Mr. Abdullah will elaborate upon the claims further in subsequent pleadings, including in the merits briefing that he expects and is entitled to. *See* Idaho Loc. Civ. R. 9.2(h)(3)(B).

31.     The claims that follow are loosely organized according to the following categories: (1) those that concern errors that occurred either at both the guilt phase and the sentencing phase, or primarily at the guilt phase; (2) those that concern errors that occurred primarily at the sentencing phase; (3) those that concern errors that occurred primarily during the direct appeal; and (4) those that concern errors that occurred primarily during state post-conviction proceedings. Mr. Abdullah organizes the claims in this manner for ease of reading. By placing a claim in a certain "section," he does not concede that it relates only to that section. Many of the claims in this petition involve errors that occurred primarily at the guilt phase. However, those errors affected Mr. Abdullah at every subsequent proceeding, i.e., at his sentencing phase, at the direct appeal, and in his state post-conviction action. For instance, a number of claims related to

PETITION FOR WRIT OF HABEAS CORPUS - 10

errors that took place chiefly at the guilt phase made it more likely that Mr. Abdullah would get a death sentence because, in the absence of those errors, the jury would have harbored more doubt about his guilt at the sentencing phase and that doubt would have resulted in at least one vote against death and a subsequent life sentence. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (explaining that prejudice on an capital habeas claim is shown if "there is a reasonable probability that at least one juror would have struck a different balance" in the absence of the error).

32.     With respect to the prejudice inquiry on all guilt-phase claims, it is relevant that a juror said after the trial that until defense counsel imprudently conceded Mr. Abdullah's presence at the scene, "there was doubt as to whether" Mr. Abdullah was there at the time of the fire.

33.     With respect to the prejudice inquiry on all sentencing claims, it is relevant that a juror said after the trial that "everybody was a little bit tenuous" about the penalty phase.

34.     For every claim below, Mr. Abdullah asserts that the violation also violated his right under the Eighth Amendment to a capital trial and sentencing that met a heightened standard of reliability. *See Ford v. Wainwright*, 477 U.S. 399 (1986); *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Spaziano v. Florida*, 468 U.S. 447 (1984); *California v. Ramos*, 463 U.S. 992 (1983).

35.     In the statements of exhaustion below, Mr. Abdullah is offering a tentative comment on the potential status of each claim in light of the evidence undersigned habeas counsel have so far reviewed and in light of the current procedural posture of Mr. Abdullah's successive state post-conviction action.  By making the statements, Mr. Abdullah does not concede that any given claim is or is not exhausted, and he reserves the right to modify his position as the case progresses.

36.     Similarly, it would be incorrect to infer that Mr. Abdullah is implying, by characterizing some errors as structural, that any other errors are not.

37.     Each claim set forth below should be considered cumulatively when that claim is analyzed.  That is, prejudice on each claim comes from the collective consequences of the various errors that make up each claim.

38.     At trial, Mr. Abdullah was represented largely by Kim and Mitch Toryanski, who were retained by the Abdullah family.  Therefore, if Mr. Abdullah refers to "trial counsel" or "defense counsel," he is—unless otherwise indicated—referring to the Toryanskis.  Before the Toryanskis entered the case, Mr. Abdullah was represented by the Ada County Public Defender's Office, which was appointed as a result of his indigency.  Mr. Abdullah will refer to that agency as "ACPD."

39.     Any statement or claim below relating to Mr. Abdullah's or his family's comprehension of their rights, or lack thereof, is affected by the fact that Mr. Abdullah and his family are not native speakers of English, and as refugees from the Middle East had limited understanding of the American legal system.

40.     To the extent that the State asserts that Mr. Abdullah has waived any of the rights invoked below, the waiver was not valid, as it was not knowing, voluntary, and intelligent.

41.     The charges against Mr. Abdullah involve events that occurred at 2292 North Siesta Way, in Boise, Idaho.  When Mr. Abdullah refers to the "Siesta residence," "the Siesta home," the "crime scene," the "scene of the crime," and so forth, he is referring to that location.

PETITION FOR WRIT OF HABEAS CORPUS - 12

## CLAIM 1: MR. ABDULLAH RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

42.     Through the numerous deficiencies outlined below, trial counsel rendered ineffective assistance at both the guilt and the penalty phases, thereby violating Mr. Abdullah's rights under the Sixth Amendment.  *See Strickland v. Washington*, 466 U.S. 668 (1984).

### A.     Trial Counsel Rendered Ineffective Assistance At The Guilt Phase

43.     Trial counsel rendered ineffective assistance at the guilt phase in the following ways:

#### i.     *Misconduct In Getting Retained*

44.     Defense counsel's ineffectiveness pervaded every action they took in this case.  It began before they were even on the case, with a series of blatantly unethical moves designed to disguise how ill-equipped they were to handle a capital trial.

45.     The Toryanskis were excited to serve on a high-profile criminal case, even though they were wholly unqualified for the task.  To secure the assignment despite their lack of aptitude, training, and resources, the Toryanskis committed a series of troubling ethical breaches.

46.     To begin, when they convinced Mr. Abdullah to let them represent him, the Toryanskis had very limited experience as criminal defense attorneys, and no experience as capital defense attorneys.  Instead, they had both been prosecutors for far longer than they had been doing any defense work whatsoever.  Defense counsel were not forthcoming about their lack of relevant experience with Mr. Abdullah, his family—which hired them—or the trial court.  Instead, they took active steps to misrepresent their pasts.  For example, an early draft of the Toryanskis' notice of appearance, which effectively served as their motion for appointment as well, stated: "Ms. Toryanski is a former prosecutor with the Criminal Division of the U.S. Department of Justice in Washington, D.C. and a former staff attorney with the U.S. Senate Permanent Subcommittee on Investigations in Washington, D.C."  On this early draft, someone crossed out

"prosecutor" and wrote "trial attorney" in its place, a change that was also reflected in the final version of the notice of appearance. The revision indicates that the Toryanskis were willing to downplay their prosecutorial histories in order to convince Mr. Abdullah and his family to hire them and the trial court to allow them to work on the case despite their lack of qualifications. Similarly, the Toryanskis included the following paragraph in their notice of appearance:

47.    Mr. Abdullah was informed that Kim W. Toryanski has been practicing criminal law in federal and state courts since 1985 and she has previously co-chaired the handling of three jury trials regarding charges of murder in the first degree. In one of those first-degree murder cases, the prosecution was seeking the death penalty. Those jury trials were held in Tampa, Florida, in the Thirteenth Judicial Circuit in and for Hillsborough County, Florida. The State of Florida has a requirement for a bifurcated jury trial in criminal cases where the death penalty is sought, and the death case handled by Ms. Toryanski was presented to the jury under the bifurcated system.

48.    This passage was carefully drafted to avoid any reference to the capacity in which Ms. Toryanski was involved in the Florida murder cases, i.e., as a prosecutor. The decision to obfuscate her role in the Florida trials is particularly concerning with respect to the death penalty case. A defendant facing capital charges, and the family supporting him, is going to feel quite differently about an attorney who has tried in the past to keep individuals off death row as opposed to an attorney who has tried in the past to put them there. Throughout their time on the case, the Toryanskis actively perpetuated this false presentation by criticizing prosecutors, often passionately. Mr. Toryanski's prosecutorial career was especially damaging to his loyalty in the Abdullah case, because he had previously worked at the same office that was prosecuting Mr. Abdullah and was therefore especially deferential to his former colleagues.

49.     Aside from misrepresenting the role she played in the Florida murder cases, Ms.
Toryanski misrepresented their recency.  She stated that she had "been practicing criminal law in
federal and state courts since 1984 and she has previously co-chaired the handling of three jury
trials regarding charges of murder in the first degree."  In so doing, she suggested that the cases
had spanned the course of the prior eighteen years (1985 to 2003).  As it happens, she had not
engaged in any capital litigation in the past sixteen or seventeen years (since 1986 of 1987).

50.     These various acts of distortion and dishonesty were more harmful than they would have
been in the average case because Mr. Abdullah and his family are not native speakers of English,
and as refugees from the Middle East had limited understanding of the American legal system.
They were consequently uniquely vulnerable to the Toryanskis' deception.

51.     Because of their lack of capital experience, the Toryanskis could not satisfy several of the
criteria that they would have been forced to satisfy had they been appointed by a non-paying
client in a capital case.  And because of their inexperience, and their inability to become
proficient in the relevant areas of law for Mr. Abdullah's trial, they displayed a shocking degree
of ignorance on basic principles.  For instance, they indicated in court that they believed the
following things: the jury would make a recommendation of sentence to the court, that *Daubert
v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), applied in Idaho state court, that Mr.
Abdullah would receive a mandatory fixed life sentence if he were not sentenced to death, and
that an amendment to an indictment can be done only by a superseding indictment.  The
Toryanskis were corrected on many of these misconceptions by Judge Copsey, which damaged
Mr. Abdullah's confidence in their performance and lowered their credibility in the eyes of the
court.

PETITION FOR WRIT OF HABEAS CORPUS - 15

52.     In another unscrupulous act that helped the Toryanskis insinuate themselves into Mr. Abdullah's case, they failed to obtain the permission of appointed counsel, the ACPD, before contacting Mr. Abdullah.  That maneuver was starkly at odds with a clear rule of professional conduct, and Ms. Toryanski later admitted that the maneuver was unethical.  At the time that she was desperately trying to get retained by Mr. Abdullah, however, Ms. Toryanski actively concealed her misconduct.  The trial court specifically asked her whether she had obtained consent from the ACPD prior to contacting Mr. Abdullah.  She responded, "Your Honor, we had conversations with Mr. Chuck Peterson who was having communication with the Public Defender's Officer (sic) prior to speaking to Mr. Abdullah."  Ms. Toryanski offered no further explanation.  Her answer was at best non-responsive, and in context was quite misleading.

53.     In addition, the Toryanskis divided their fee with a lawyer outside their firm without Mr. Abdullah's consent.  They subcontracted Dennis Benjamin without informing Mr. Abdullah of the arrangement and without memorializing the agreement in the contract.  Mr. Benjamin was "hired" as an expert attorney on death penalty jurisprudence, but paid from the funds providing through the flat fee contract.  Mr. Benjamin charged his usual hourly rate, which was greater than the hourly rate for attorney fees agreed upon in the contract.  If trial counsel had informed Mr. Abdullah that they required another attorney's assistance, then Mr. Abdullah would have known that they were not qualified to represent him, and would not have retained their services.

54.     Moreover, the Toryanskis made a false promise to honor Mr. Abdullah's request for a speedy trial, which they knew or should have known would be impossible for them to keep.

55.     Finally, in order to get in the trial court's good graces and successfully substitute in to the case, the Toryanskis agreed not to withdraw even if continued representation presented a financial hardship.  The trial court instructed the Toryanskis that by taking a limited flat fee, they

PETITION FOR WRIT OF HABEAS CORPUS - 16

were proceeding at their own peril. Nevertheless, due to counsel's extreme confidence in an acquittal, their ignorance of what it takes to handle a capital case, and their desire to take the case, they assured the Court that they would be prepared to go to trial in October 2003. This created a serious potential for a conflict of interest if the case did not proceed as counsel then anticipated, which, of course, it did not.

56.     Had the Toryanskis not committed these numerous acts in violation of their professional duties, Mr. Abdullah and his family would not have hired them. The violations also caused deterioration in the attorney-client relationship and contributed to their constructive abandonment of Mr. Abdullah.

57.     Additionally, if the Toryanskis had been honest with the trial court about their lack of qualifications, and if the trial court had known about the other misconduct surveyed above, the court would not have allowed the Toryanskis to represent Mr. Abdullah and would instead have insisted that the ACPD remain on the case. This is especially true because (1) there was no disqualifying conflict of interest that would have justified removing the ACPD, (2) the ACPD were qualified under I.C.R. 44.3, and (3) Mr. Abdullah had asserted his right to a speedy trial.

>               ii.     ***Entering Into An Improper Contract With The Abdullahs***

58.     In order to represent Mr. Abdullah, the Toryanskis entered into a flat-fee arrangement with the Abdullah family, agreeing to accept $105,000 for their services. They did so despite the unequivocal denunciation of that practice by the American Bar Association ("ABA"), which has declared that "[f]lat fees . . . are improper in death penalty cases." *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, reprinted at 31 Hofstra L. Rev. 913, 933 (2003). The Toryanskis' belief that $105,000 would cover the cost of their representation was based on a gross underestimate of how long and complicated a capital trial case is, and that under-estimation in turn stemmed from their complete lack of experience in

PETITION FOR WRIT OF HABEAS CORPUS - 17

capital defense.  As a result of their misguided and unethical acceptance of a flat fee, the

Toryanskis put themselves in a position that was directly at odds with the interest of their client.

While they were, in their own words, "[e]nduring such a financial hardship" due to their flat fee

contract, the Toryanskis had every incentive to rush their work on the case and complete it

without any care or attention to detail.  That is exactly what they did, as discussed throughout

this petition.  The damage produced by the Toryanskis' unscrupulous financial arrangement was

exacerbated by Judge Copsey, who took the position that she would not allow the Toryanskis "to

withdraw before trial, period, whether . . . [they were] being paid or not."

59.   The fee agreement was also inappropriate because it created a conflict with Mr. Abdullah

because his brother was paying the Toryanskis and had an independent interest in the direction of

the defense.  *See* Claim 2.

60.   Trial counsel failed to address this conflict with either the Court or Mr. Abdullah.

### iii.   *Failure To Present Any Theory Of The Case*

61.   Trial counsel presented no real theory of the case at any point during the guilt phase,

thereby failing to perform their most basic duty.  Instead of a clear theory, the Toryanskis offered

a totally incoherent series of potential explanations, several of which were obviously inconsistent

with each other, and each of which was given in a vague, exceptionally clumsy fashion.

62.   Counsel's stumbles in this regard began at the very beginning, when they reserved giving

their opening statement until the State rested.  In so doing, they allowed the prosecution to

monopolize a huge amount of trial time with no competing narrative.  Many studies show that

the typical juror reaches a strong conclusion about guilt during the early stages of a trial.  By

yielding this ground, the defense let the prosecution have almost the entire floor during those

crucial stages.  Defense counsel could not have been delaying their opening so as to keep their

theory secret, because they never developed any real theory at all.  Nor could they have been

reasonably attempting to prevent the State from insight into potential theories, because they had already exposed one of the strongest possible theories at great length through an imprudently detailed and lengthy letter in support of a plea offer.

63.    When trial counsel finally gave its opening, it was at best a vague and cryptic statement, which did not address any evidence, give any hint of how Mr. Abdullah would explain his wife's death, and generally offered no guidance to the jury.  By failing to commit to a specific theory at the outset, counsel could not make informed and reasonable strategic decisions throughout the case.

64.    If the opening was a wasted opportunity, the closing was a spectacular act of self-sabotage.  In their closing, the Toryanskis conceded to the jury that Mr. Abdullah was present in Boise at the time of the trial.  However, they never offered any explanation as to what he was doing when Ms. Abdullah died, giving the jury no answer to the most basic question in the case, and therefore no reason to find him innocent.  This concession could only have harmed Mr. Abdullah, because—as the jury knew full well—he had already consistently told the police that he was in Salt Lake City at the time of the fire.  Furthermore, before they conceded his presence, defense counsel had cross-examined numerous witnesses who were called solely to place Mr. Abdullah in Boise at the time of the crime.  For example, they did so with Marjorie Wood regarding her identification of Mr. Abdullah at a Mountain Home gas station on the night of the fire, with Stephanie Hobbs regarding his plans for a trip to Salt Lake City the day before the fire, and with Khaja Shuab-Ud-Din regarding Mr. Abdullah's decision to stay at a motel in Salt Lake City instead of staying at the mosque there.  Given counsel's eventual abandonment of an alibi, these cross-examinations made absolutely no sense.  They would have succeeded only in convincing the jury that the defense was hapless, deceptive, and confusing.

PETITION FOR WRIT OF HABEAS CORPUS - 19

65.     Defense counsel's closing argument could be used in a textbook as an example of what *not* to do at the end of a trial.  It was essentially devoid of any real content.  There was no explanation of how Ms. Abdullah died, the fundamental issue about which the jury was soon to deliberate.  Nor was there any explanation of what Mr. Abdullah was doing in Boise at the time she died, despite counsel's concession that he was there, which then served as an invitation for the jury to find him guilty.  Indeed, counsel not only conceded that Mr. Abdullah was in Boise, they conceded that he was right outside of the crime scene.  It was therefore especially striking that counsel did not even begin to address what Mr. Abdullah was doing in the driveway of the house in the middle of the night around the time the house burst into flames with his dead wife's body inside of it.  Instead of a theory, there was a rambling series of vague, unclear statements, which either had little or no evidentiary support, often because defense counsel had failed to provide that support at trial.  By offering such a hugely damaging concession, and no theory at all to make up for it, defense counsel might as well have been offering a closing argument for the prosecution.

66.     Turning to the possible causes of death that trial counsel alluded to in their closing, if only very briefly, they intimated at times that Ms. Abdullah may have committed suicide and at other times that she may have died from an accidental overdose, while explaining neither theory fully or persuasively.  Since both could not be true, defense counsel appeared to the jury to be desperately grasping for straws.

67.     Counsel also hinted darkly in their closing that Mr. Abdullah's activities were somehow related to his wife's, though they offered nothing on what those activities might have been and how they were related.  By making statements and offering no support for them whatsoever,

PETITION FOR WRIT OF HABEAS CORPUS - 20

counsel destroyed whatever credibility they might have had left in the eyes of the jury and obliterated any chance of an acquittal.

68.     Some aspects of the closing bordered on the bizarre, and could only have alienated the jury.  Mr. Toryanski, and not his wife, freely speculated how a woman's breasts must feel when lactating and suggested that because she was found in a sports bra, she must have been pouring gas around the house.  The premise for Mr. Toryanski's argument was his apparent belief that arsonists, especially lactating arsonists, want to be comfortable when setting their house on fire and killing themselves.  It is shocking that Mr. Toryanski would make such a ludicrous point in a case overflowing with reasonable doubt, including a prosecution theory that has one cause of death occurring at a time when the defendant was, by the State's own lights, hundreds of miles away, a compelling eyewitness who supports the defendant's alibi, and an investigation riddled with the highly suspicious loss and destruction of key evidence.

69.     Needless to say, the prosecution made the most of defense counsel's train wreck of a closing, encouraging the jury to feel "shocked and outraged" at the Toryanskis' decision to concede the biggest issue of the case and offer nothing in its place, which the jury no doubt did.

70.     Counsel's failure to choose a theory and then articulate it clearly hobbled their entire defense, leading them to examine witnesses in a weak, unfocused, and incomplete way, to call a poorly selected and disjointed group of witnesses, and to give a laughably ineffectual closing statement.  Understood in those terms, the failure was a large force generating and exacerbating many of the other deficient acts outlined below.

71.     For reasons discussed elsewhere in this petition, the strongest theory of death available to the defense was that Ms. Abdullah committed suicide.  Given Ms. Abdullah's long and well-documented history of depression, the stressors in her life, and the fact that her manner of death

PETITION FOR WRIT OF HABEAS CORPUS - 21

(drugs on board and a bag over her head) resembled a textbook suicide, that theory would have been extraordinarily compelling.  However, as also discussed elsewhere, there were other theories that counsel could likewise have chosen and presented effectively, including that of an accidental drug overdose, a drug-drug interaction, Ms. Abdullah's murder by someone other than Mr. Abdullah, or simply that the State's case was shot full of reasonable doubt.  Instead of presenting any of these theories, counsel waffled between all of them, put on comprehensive evidence of none of them, vaguely gestured at them in a halting and incoherently manner at closing, and ultimately chose to essentially present no theory at all, which led to a disastrously ineffectual presentation that only ensured their client's conviction.

72.     Even years after the trial, with time to reflect, defense counsel still could not begin to articulate a theory of the case that was even remotely coherent or comprehensive.

73.     When asked what her theory of the case was in July 2007, more than two years after Mr. Abdullah was convicted, Ms. Toryanski responded as follows:

> Our theory of the case was that Azad was married to a very unstable woman who impacted him, who manipulated him.  She had ideas about doing things that she sold to him as being okay.  And he just followed right along because that's what he did.  He did what people told him to do.

74.     It is anyone's guess how that random non-sequitur of a statement, which does not even pretend to address Ms. Abdullah's death, could convince a jury to find Mr. Abdullah not-guilty of murder.

75.     The Toryanskis' inability to muster even the semblance of a theory was a special tragedy in this case, since the State's own theory was so tenuous.  According to that theory, which is elaborated upon in more detail elsewhere, *see, e.g.*, Claim 1(A)(v), Mr. Abdullah, in some unknown manner, convinced Ms. Abdullah to ingest a large quantity of Prozac in Boise at a time when he was hundreds of miles away in Salt Lake City.  Then, he traveled from Salt Lake City to

PETITION FOR WRIT OF HABEAS CORPUS - 22

Boise and entered the Siesta residence while Ms. Abdullah was incapacitated, whereupon he asphyxiated her. Then, he began spreading gasoline in the garage of the house with the intent to burn the house down, with his step-daughter Alyssa, her friend Shelby, his son Naim, and his newborn son, Malik, inside. The house caught on fire prematurely, at which point Mr. Abdullah grabbed Naim and somehow remained hidden while neighbors and firefighters descended on the house. After the firefighters completed their first tour with no sign of Mr. Abdullah, he managed to place Naim on a neatly folded blanket with toys and a flowerpot, where he was discovered by firemen who had walked through the area moments before, while Mr. Abdullah melted into the night. In the process, he presumably vaulted over a six-foot fence twice with a blanket and toys in his arms, despite his small stature, since he could not have been either in the house when it was fully engulfed in flames, or in the yard, where he would have been seen. He was able to accomplish all of this without being seen by neighbors or firefighters, and promptly returned directly to the Salt Lake City mosque, where no one he encountered that morning detected any odor of gasoline or smoke.

76.     Simply put, the State's case had innumerable holes in it. Even the barest semblance of a defense theory would have defeated it, but the Toryanskis could not meet the lowest possible bar.

### iv.     *Conceding Mr. Abdullah's Presence In Boise*

77.     As described in the preceding sub-claim, Mr. Abdullah's defense counsel stated in their closing argument that their client was in Boise on the night of the fire, without giving any explanation as to what he was doing there. In so conceding, the Toryanskis forfeited the most contested issue in the entire case, destroyed their own client's credibility in the eyes of the jury, and left them with no reason to acquit.

PETITION FOR WRIT OF HABEAS CORPUS - 23

v.      **Failure To Argue That Mr. Abdullah Could Not Have Been Responsible For The Prozac That Ms. Abdullah Ingested Due To The State's Own Timeline**

78.     One of the largest holes in the State's case was that it presented evidence that Ms. Abdullah ingested a lethal amount of Prozac at a time when, according to its own account, Mr. Abdullah was not in Boise.  Bizarrely, defense counsel never pointed out that glaring problem with the State's case.  To elaborate, according to the State's evidence, Ms. Abdullah had an acute overdose of Fluoxetine (which goes by the trade name Prozac) poisoning in her blood stream, which was a contributing factor to her death.  At the time of her death, Ms. Abdullah had a full stomach of a partially digested meal of carrots, potatoes, and other vegetables.  However, there was very little Fluoxetine in her stomach.  According to the State's forensic toxicologists, Drs. Edward Barbieri and Dr. Ronald Backer, the Fluoxetine was administered prior to Ms. Abdullah's last meal, and the last meal occurred approximately an hour and a half before her death.  The State took the position that the administration of the Fluoxetine occurred during a narrow window, sometime between 10 PM and midnight.  By the State's theory of the case, Mr. Abdullah left Salt Lake City for Boise shortly after 8:10 PM on October 4, 2002; was accurately identified by Marjorie Wood in Mountain Home on his way to Boise sometime after midnight; and arrived in Boise sometime around 1:30 AM.  Thus, taking the State's theory as true, it was impossible for Mr. Abdullah to have administered the Prozac between 10 PM and midnight because Mr. Abdullah had not yet even reached Mountain Home.  Trial counsel completely failed to identify this simple timeline, and never made the obvious argument in any shape or form that Mr. Abdullah could not have administered the Prozac based on the State's own version of events.  Because the evidence reflected that the administration of the Prozac was directly linked to Ms. Abdullah's death, the only logical conclusion is that she either committed suicide

PETITION FOR WRIT OF HABEAS CORPUS - 24

or was killed by an unknown third party.  The prosecution illuminated this fatal flaw in its theory at closing, where it described—remarkably—the question of how Mr. Abdullah was able to have Ms. Abdullah ingest the Prozac as a "side issue" on which it did not need to prove him guilty beyond a reasonable doubt.  Later, the prosecution asserted: "How he got her to drink it is not what you need to think about."  Mr. Abdullah was charged in the amended indictment with murdering his wife "by suffocating her and/or by acute Prozac (fluoxetine poisoning)."  Given that the jury was permitted to convict Mr. Abdullah of murder on the *sole* theory that he poisoned her with Prozac, it is astonishing that the State would assert that it did not have to prove that theory beyond a reasonable doubt and go so far as to discourage the jury from even considering this crucial part of the case, and even more astonishing that the defense would acquiesce to such an irresponsible maneuver on the part of the prosecution.  By not exploiting this enormous problem with the State's theory, and by conceding Mr. Abdullah's presence at the scene, defense counsel took a case riddled with reasonable doubt and turned it into a surefire win for the prosecution.

### vi.    *Failure To Present An Alibi Defense*

79.    As with the Prozac timeline discussed above, defense counsel inexplicably failed to present extremely compelling alibi evidence.  First, counsel were well-aware that Lance Donnelson, an eyewitness with law enforcement training on identifications, recalled with a high degree of confidence that Mr. Abdullah was present at a store in Utah at a time and place that would have rendered it impossible for him to have committed the alleged crimes.  Specifically, Mr. Donnelson was 90% certain that he observed Mr. Abdullah enter a Maverik Country Store in Farr West, Utah between 2:30 and 3:30 AM on October 5, 2002.

80.    Mr. Donnellson was willing and able to testify at trial and would have made an excellent witness.  Nevertheless, defense counsel failed to call him.

PETITION FOR WRIT OF HABEAS CORPUS - 25

81.     They likewise failed to present the testimony of Michael Quintana.  Mr. Quintana was identified as having spent the night at the Dream Inn in Salt Lake City on October 4, 2002, and checking out the following morning.  During a deposition, he testified at around 11 PM on October 4, he witnessed a man enter room number seven, the room next to his.  Mr. Abdullah and his son were the only registered occupants of that room.  They had checked into room seven and Mr. Abdullah had told police that he was sleeping there at the time of the fire.  In addition, Mr. Quintana further testified that he heard people speaking in a different language in room seven well into the night.  Thus, Mr. Quintana's testimony would have bolstered an alibi defense.

82.     Third, Shad Mohammad and Abdul Afridi would have testified at trial that they did not smell smoke or gas on Mr. Abdullah or believe he looked tired when they saw him at the Salt Lake City mosque on the morning of October 5, 2002, which would have added additional weight to a defense theory that had Mr. Abdullah uninvolved in the fire, as the alibi theory would have had.

83.     Finally, Mr. Abdullah himself could have corroborated the alibi with testimony, which was especially important given the Toryanskis' failure to present the other evidence that would have supported an alibi.  As noted elsewhere, the failure to call him was not reasonable, and was in fact unconstitutional for reasons other than ineffectiveness as well.  *See, e.g.*, Claims 1(A)(xxix) and 23.

84.     Instead of presenting this compelling and highly exculpatory alibi evidence, Mr. Toryanski conceded in his closing statement that Mr. Abdullah was in fact in Boise at the time of the fire.  That wildly irresponsible act did enormous damage to Mr. Abdullah's defense.  Indeed, the prosecution stated early in its closing that there was "not a single witness who has been located or produced or exists that can tell you that this man was in Salt Lake City" at the time of

the fire, a position the defense could easily have undermined if the Toryanskis had been doing their job. There can be no debate about whether the concession prejudiced Mr. Abdullah, because a juror has subsequently said that until counsel admitted their client's presence at the scene there had been "doubt as to whether he had actually come back."

85.    Counsel's post hoc accounts of why they made a concession that sabotaged their client's defense are illogical on their face, objectively unreasonable, and therefore cannot insulate them from ineffectiveness.

86.    First, Mr. Toryanski testified, outlandishly, that he conceded Mr. Abdullah's presence in Boise to preserve his credibility with the jury. It hardly preserved his credibility to offer the preposterous theory that Mr. Abdullah drove back and forth to Salt Lake City three times over the course of two days and was then innocently in his driveway for no apparent reason in the middle of the night while his wife set fire to her own house, in complete disregard for her children's safety, and then committed suicide.

87.    Second, the Toryanskis believed—wrongly—that the proffers they made during plea negotiations could be used to impeach the defense witnesses if they went with an alibi defense. As discussed in Claims 1(A)(xxxix), 2, and 23, these proffers divulged highly sensitive information to the prosecution that gave it a sizable advantage over the defense.

88.    Third, defense counsel have asserted that they did not pursue an alibi defense in part because they did not want Mr. Abdullah's son, Redear, to have to testify, which they believed would have occurred if an alibi defense had been presented. The State could have done so regardless of the alibi defense, though, just as it put on a great deal of other evidence, attempting to place Mr. Abdullah in Boise at the time of the fire. Plus, Redear's past statements were not that damaging. He had recalled earlier that he actually saw the house burning and, in an effort to

save the house, Alyssa, he, and Mr. Abdullah had all used a fire hose to put out the fire.  This far-fetched account would have greatly diminished the power of any negative testimony, by showing that any statement that Redear made about being at the house during the fire was far more likely to have resulted from a post-hoc reimagining than from his recollection.  In addition, the Toryanskis could and should have hired an expert in suggestive interview techniques, who would have informed them that the State's interview of Redear diverged sharply from best practices, and therefore that Redear's statements during that interview could either be excluded or substantially weakened through expert testimony.  *See* Claim 1(A)(xvii).

89.     The Toryanskis' abandonment of the alibi was driven by concerns that made no sense and only reaffirms the unreasonable nature of the decision.  *See* Claim 1(A)(iii).

### vii.     *Failure To Adequately Develop And Present Evidence That Someone Other Than Mr. Abdullah Was Responsible For The Crimes*

90.     There were significant pieces of evidence that someone other than Mr. Abdullah was involved in the death of Ms. Abdullah and the fire at the Siesta home.  First, the Prozac was administered to Ms. Abdullah at a time when it was impossible for it to have been given to her by Mr. Abdullah.  For instance, Laura Sanchez, a neighbor of the Abdullah's, saw a man outside her home around 2:00 AM on the night of the fire.  Ms. Sanchez testified that the man was not Mr. Abdullah.  The defense team made no attempt to interview Ms. Sanchez, even though she was obviously a key witness who could have helped support a theory that another man was the real perpetrator.  Defense counsel also made no reference to Ms. Sanchez in their closing argument or opening statement, thereby forfeiting any opportunity to argue to the jury that there was evidence another person was the culprit.

91.     A similar lapse occurred with respect to Winema Windham, another neighbor of the Abdullah's.  Ms. Windham was interviewed by the police the same day as the fire.  She told

police that she came outside the house after the explosion, at which point she spotted a man who she did not recognize from the neighborhood in a blue and red Ford Mustang 5.0.  Since the man was apparently a stranger to the neighborhood, and present in the early morning hours in a residential area, this report would have raised enormous red flags for a competent defense team, and cried out for additional investigation.  Mr. Abdullah's attorneys, however, made no attempt to follow up with Ms. Windham or determine who the mysterious stranger might have been, and therefore missed a chance to find another possible suspect and another opportunity to argue for reasonable doubt.

92.     Similarly, defense counsel never informed the jury that another neighbor, Jamie Juker, told police that she saw a man close to the Siesta residence and around the time of the fire who did not match Mr. Abdullah's description.  Nor did defense counsel present evidence that two young men in a car with a license plate that read "ARCANGL" had been behaving oddly around the time of the fire, and that yet another neighbor—David Behunin—was suspicious enough about the young men that he reported his interaction with them to the police.

93.     Defense counsel likewise made no attempt to follow up on Marjorie Wood's recollection that Mr. Abdullah was with two other men at the Mountain Home Chevron on the night of the fire.  For instance, the Toryanskis did not try to collect the receipt and/or transaction report reflecting the purchase of gas or soda that was supposedly made by the men at the Chevron.  A thorough investigation could and would have investigated those other men as the possible culprits, and defense counsel did not conduct that investigation.

94.     Aside from failing to follow up on potential alternate suspects, defense counsel failed to present other evidence that Mr. Abdullah was not the culprit.  For instance, Mr. Abdullah's certificate of nationalization was in the house when it burned down, and was damaged in the fire.

Had Mr. Abdullah been the culprit, he would have removed this extremely important document before beginning to perpetrate the arson. The fact that he did not remove it weighs in favor of another actor, and defense counsel should have so argued.

95.     These failures were particularly egregious given that the defense theory was supposedly one based on reasonable doubt, since the possibility of another murderer and arsonist was quite obviously a suggestion that the prosecution had not met its burden of proof.

    **viii.**   ***Failure To Adequately Present A Suicide Defense And Challenge The State's Nonsensical Cause-Of-Death Theory***

96.     In several respects, the Toryanskis botched a strong potential theory that Ms. Abdullah committed suicide and failed to attack an explanation of her death by the State that did not add up on its face.

97.     First, Ms. Toryanski conducted a woefully inadequate cross-examination of Dr. Glen Groben, neglecting to impeach this crucial prosecution witness with powerful information that would have substantially discredited him in the eyes of the jury. Dr. Groben was the state pathologist who conducted the autopsy of Ms. Abdullah, and testified to the cause and manner of her death. He was the only prosecution witness to testify to the manner of Ms. Abdullah's death and was consequently instrumental to the State's case. As set forth in Claim 28, Dr. Groben based his initial determination that Ms. Abdullah was murdered on his mistaken belief that her toxicology was normal. At that time, he concluded that she could not have committed suicide because there were no drugs in her system. When Dr. Groben later discovered that Ms. Abdullah in fact had a lethal amount of Prozac in her body, he simply ignored his previous statement that drugs would support a suicide theory and opined that she was murdered through some mysterious and wholly unexplained combination of poisoning and asphyxiation. As Dr. Groben explained under direct examination at the guilt phase of the trial, he was able to maintain his

position despite the tremendous shift in the evidence because of "investigative reports," which he did not describe, and unspecified "other things that I knew of that precluded anything other than homicide in my opinion." In other words, Dr. Groben dismissed evidence that even he recognized to scientifically weigh against a finding of homicide because of police documents that had nothing to do with his training and expertise as a pathologist. He was plainly altering his medical opinion to suit the prosecution's theory of the case, rather than going where the evidence took him.

98.     Despite this wealth of information calling into extreme doubt the reliability and objectivity of Dr. Groben, Ms. Toryanski accomplished virtually nothing with her cross-examination. She did not confront Dr. Groben with the obvious inconsistency between his statements to the grand jury and his testimony at trial. She did not call any attention to the fact that Dr. Groben was relying for his murder determination on law enforcement materials that had no medical significance, while discounting information that he knew to be scientifically important, and while failing to thoroughly canvass the victim's medical and mental health records. While passing over these extremely fruitful and permissible avenues for contesting Dr. Groben's testimony, Ms. Toryanski opted to ask him about a letter which the trial court had forbidden any discussion of. After being rebuked sharply by the judge for her egregious violation of a court order, Ms. Toryanski exclaimed, "I am so sorry. I am so sorry," and then abruptly ended her questioning. Thus, Ms. Toryanski not only missed a perfect window to undermine the credibility of a major prosecution witness—she used that examination to make a huge and easily avoided mistake and in the process succeeded in undermining only her own credibility.

99.     As discussed in Claim 7, Dr. Groben improperly based his medical opinion on evidence about the police investigation that had nothing to do with the supposedly scientific inquiry that he was conducting.  The Toryanskis failed to ask Dr. Groben about this information.  Had they done so, they would have exposed Dr. Groben as a severely biased witness who traded in his medical integrity to become a member of the prosecution team.

100.    At closing argument, the Toryanskis again failed to reference these blatant problems with Dr. Groben's testimony, thereby re-committing all of the same errors.  Through these numerous omissions, defense counsel left the jury with the impression that Dr. Groben's dubious conduct was normal and unsuspicious, and that his testimony was credible.  Instead, defense counsel should have taken an easy opportunity to show to the jury that this key government witness was clearly a tool of law enforcement masquerading as a neutral doctor.

101.    Second, the Toryanskis failed to adequately use toxicology evidence.  Indeed, defense counsel elected not only to ignore the toxicology evidence that was best for their case but to actively counter it.  They did so by eliciting from Dr. Ashraf Mozayani testimony that he did not believe Ms. Abdullah died of an acute overdose of Prozac, cutting off a suicide defense at the knees.  In light of the fact that Ms. Abdullah was found with a bag over her head, this was an objectively unreasonable decision that had no basis in any valid strategy.  Defense counsel could have called a witness who would have testified that suicide was a likely cause of death, and they could have done so without precluding the possibility of an accidental death, such as one caused by drug-drug interactions or by a long-term buildup of Prozac in Ms. Abdullah's body.  The error described above was compounded by the generally terrible quality of Dr. Mozayani as a witness, as described below.  *See* Claim 1(A)(ix).

102.     Given what a catastrophe Dr. Mozayani was as a witness, defense counsel could and should have called someone else to challenge the State's cause-of-death conclusions with actual coherence.  They had that person lined up in the form of Dr. Paul Herrmann, a forensic pathologist for whom the Toryanskis requested and received funding but who they never called as a witness.  Dr. Herrman could have challenged Dr. Groben's conclusion of homicide as unsupportable, and punched a large hole in the State's case.  Dr. Herman could also have rebutted Charles Backer's suggestion that a person suffering with acute levels of Prozac would necessarily have exhibited symptoms such as seizures.  The available literature indicated that such symptoms were by no means certain, although they "may occur" in some cases, and usually in combination with other drugs, none of which were present in Ms. Abdullah's case.  The Toryanskis elected not to present Dr. Herrmann because they believed he could be impeached by statements trial counsel had made to the prosecutor during the course of plea negotiations.  That belief was false, as a cursory amount of legal research would have shown.  Since the decision was based on ignorance of the law, it cannot be regarded as a tactical one shielded from ineffectiveness.  If they were not going to use Dr. Herrmann, defense counsel could instead have used another toxicologist to testify to the same opinion, who—given the dubiousness of Dr. Groben's view—would have been easy to find.  They found no one, and ended up asking questions relating to toxicology of Dr. Craig Beaver and Dr. Ward, neither of whom was qualified to opine on them.  The Toryanskis also should have had the blood tested for multiple drugs, so as to support their argument that Ms. Abdullah might have died from a drug-drug interaction.

103.     Third, the Toryanskis failed to present an adequate defense regarding Ms. Abdullah's psychiatric and psychological issues.  At trial, the State repeatedly emphasized that Ms.

Abdullah's medical health professionals had not seen indications of her being at risk of self-harm.  For instance, Gina Wolfe Seybold, a therapist for Ms. Abdullah, testified that people who harm themselves usually have a prior history of it, including previous suicide attempts and self-mutilation.  Defense counsel could and should have presented evidence, by cross-examining witnesses like Ms. Seybold, that there are also many people who commit acts of self-harm—including suicide—without having an established track record of such acts and without describing to their counselors the full extent of their depression.  The Toryanskis also could have put on this sort of suicide evidence through their own witnesses, but they failed to retain the appropriate experts to do so.  Rather, they asked Dr. Beaver to look into the issue, even though he was not qualified to do so, as he advised them.

104.    Similarly, the Toryanskis should have pursued records from Kristine Mors relating to Ms. Abdullah's mental health.  Dr. Mors treated Ms. Abdullah and prescribed her medications for her depression between 1997 and 2002.  At trial, Ms. Toryanski submitted an affidavit in support of a motion to compel Dr. Mors to produce her records, asserting that she had given Dr. Mors a subpoena and Dr. Mors had failed to respond.  However, defense counsel never asked the trial court for an order compelling Dr. Mors to disclose her records.  Had they pursued Dr. Mors' records more diligently, defense counsel would have discovered materials supporting a suicide theory.

105.    Defense counsel were also remiss in not challenging the reliability of Ms. Abdullah's counselors in their assessment of Ms. Abdullah's risk of self-harm.  They had a promising avenue to do so on the basis that the counselors had only seen her sporadically in the three years preceding her death, and had not seen her at all for more than four months at the time she died.  That gap was especially significant because it means that if Ms. Abdullah was sinking into

greater and greater despair during this period, and if she was suffering from post-partum depression, the counselors would not have known and would have been unable to prevent her from committing suicide.

106.     Along the same lines, defense counsel failed to adequately make the case that Ms. Abdullah's life experiences made her more likely to commit suicide, such as her serious depression, her significant physical pain, the fact that her ex-husband committed suicide, the fact that she had been physically and sexually abused as a child, and the fact that she had been physically and emotionally abused in previous marriages.  Although some of this evidence was presented through Dr. Clay Ward, it was presented in a weak, tentative, and unpersuasive way, and hobbled by counsel's failure to adequately prepare Dr. Ward to testify and review the bases for his opinion.  For example, Dr. Ward did not have at hand scholarly literature to support his statement that the suicide of Ms. Abdullah's ex-husband increased the risk of her committing suicide, even though such literature was available and even though the defense had long been on notice that the prosecution and trial court would be looking for such evidence.  Dr. Ward also never consulted with Ms. Abdullah's treating/prescribing physicians and never had any contact with her family members.  Obviously, these are things competent counsel would have asked an expert to do: follow up with actual care providers and be able to cite authority for the expert's opinion.  These omissions greatly undercut the power of Dr. Ward's testimony and of the Toryanskis' suicide defense, and opened Dr. Ward up to a devastating cross-examination by the prosecution.

107.     Defense counsel's failure to put on a halfway plausible suicide theory, despite its ready availability, put Mr. Abdullah in the worst of all positions: his team was blaming the victim, but doing it so poorly and unpersuasively that it was certain to blow up in their faces.  Counsel knew

of the danger that they would be perceived as vilifying Ms. Abdullah, as they were warned of it by Dr. Beaver and Rosanne Dapsauski, but they plunged ahead in their ill-prepared way nevertheless, doing their case immense damage in the process.

108.    The Toryanskis also never put on evidence that Ms. Abdullah had a troubled childhood full of trauma, which would have likewise supported a suicide defense.

### ix.    *Failure To Adequately Present A Slow Metabolizer Defense*

109.    Defense counsel put on some evidence that Ms. Abdullah may have been a slow metabolizer of Prozac as the result of a genetic defect, and died accidentally from a long-term buildup of the drug.  As referred to above, it was highly counterproductive to put this evidence on at all, since there was much stronger evidence of suicide and the slow metabolizer defense was inconsistent with that theory.  Even taken on its own terms, though, the slow metabolizer defense was horrifically botched.  As their vehicle for the testimony, the Toryanskis chose Dr. Mozayani, a terrible witness who was unresponsive, rambling, and at times borderline incoherent.  The slow metabolizer theory was summed up by Dr. Mozayani in a few sentences, with little explanation of the implication of Ms. Abdullah being a slow metabolizer.  Dr. Mozayani's testimony was hampered by the fact that trial counsel failed to provide her with all of the information necessary for her to adequately evaluate Mr. Abdullah's case, including materials that she asked them to send.  Instead of calling Dr. Mozayani, defense counsel could have gained more ground by actually challenging the State's experts, including but not limited to Drs. Groben, Barbieri, and Backer.  Indeed, this was Dr. Mozayani's opinion and her expectation.  She understood that trial counsel were going to offer the testimony of a defense pathologist to testify on Mr. Abdullah's behalf, immediately following her testimony.

110.    Given what a catastrophe Dr. Mozayani was as a witness, defense counsel could and should have called someone else to speak to the same issues, albeit with actual coherence.

####      x.      *Failure To Adequately Deal With Gasoline Evidence*

111.    The State relied on the testimony of William Colucci to establish that the gas can found in the driveway of the Siesta residence contained gasoline with the same additive as a sample obtained from a 7-11 in Salt Lake City.  This information was used to connect Mr. Abdullah to the crime scene.  As it happens, the additive was also present in numerous service stations in Boise.  In fact, there was a substantial likelihood that gasoline purchased anywhere in Boise would contain the same additive.

112.    Prior to trial, defense counsel consulted with Dr. John Thornton, an arson expert.  They asked him to determine whether gasoline had been used as an accelerant and whether the gasoline in evidence showed a marker of having been purchased in Utah.  Dr. Thornton conveyed to trial counsel well in advance of trial that he did not have sufficient information to render an opinion regarding the gasoline marker issue and requested additional discovery materials.  Defense counsel did not provide them, and informed Dr. Thornton that they would not be calling him.  Had he been given the appropriate documents, and then called, Dr. Thornton could have testified that the gas found at the Siesta house could easily have come from Boise, undermining a key component of the State's case.  Or counsel could easily have identified another expert to testify to the same effect.

113.    Defense counsel should also have moved in limine to exclude Mr. Colucci from testifying as an expert because he did not provide any documentation of the data and procedures or methodology he utilized to arrive at his conclusions.  At a minimum, defense counsel should have demanded his underlying data.

####      xi.      *Failure To Adequately Deal With DNA Evidence*

114.    Defense counsel had at their disposal a powerful counterattack to important DNA evidence offered by the State, with which they did nothing.  The problems with the State's DNA

PETITION FOR WRIT OF HABEAS CORPUS - 37

evidence are discussed in Claim 18.  Defense counsel did not highlight these problems to the

jury, either through cross-examination or through their own expert.  The latter failure stemmed

from defense counsel's inability to adequately demonstrate a need for a defense expert on DNA.

Although they sought funds for such an expert, the Toryanskis failed to submit an affidavit from

their chosen specialist, where she could have explained how Mr. Weiss's interpretation of the

DNA evidence was highly subjective, suspect, misleading and erroneous, and how she could

assist the defense in both understanding the DNA evidence and accurately explaining its

meaning to the jury, to the great benefit of Mr. Abdullah.

### xii.     *Failure To Adequately Deal With Hair Evidence*

115.     At trial, the State introduced the testimony of Dave Laycock, a forensic scientist with the

Idaho State Police lab.  Mr. Laycock testified that based on his analysis, three hairs from Mr.

Abdullah's left arm and three from his right arm had been exposed to high heat.  Defense counsel

made no attempt to exclude Mr. Laycock's testimony as lacking in scientific methodology or

foundation generally, and specifically made no attempt to exclude him as a qualified witness in

the area of hair analysis.  Given that Mr. Laycock had only been certified to conduct hair

analysis since 2003, had never testified as an expert in Idaho, and had not regularly given hair

testimony since 1992, the Toryanskis should have challenged both his qualifications and the

science underlying his conclusions.  They could have emphasized how limited his recent training

was and the remoteness of his prior experience.  At a minimum, defense counsel could and

should have retained their own expert to refute Mr. Laycock's testimony regarding his opinion

that Mr. Abdullah's arm hairs were exposed to high heat.

### xiii.     *Failure To Adequately Deal With Computer Evidence*

116.     The Toryanskis made several costly blunders in connection with computer evidence.

First, they failed to have independent testing done of the hard drives recovered from the Siesta

house.  Instead, they made arrangements with the prosecution to have testing done jointly, and to share the bill.  That was a dangerously foolish decision fully in keeping with the Toryanskis' prosecution-oriented mindset, since they had no idea what the computers would reveal and were inviting the State to be privy to that potentially damaging information.  More importantly, when the laboratory expressed the opinion that the hard drive from the living room computer was unrecoverable, the Toryanskis failed to have the hard drive tested by another organization, even though Jeffrey Gross, their own highly qualified computer expert, repeatedly advised them to have the hard drive re-tested, recommended a company that could do so, and informed them that the company had had success in the past with recovering information from computers that the first company was incapable of recovering.  The Toryanskis were also aware that they had more than enough money set aside for computer forensic work to cover a re-examination of the hard drive.  Further testing would have been successful and led to the discovery of exculpatory evidence, including evidence supporting a suicide defense, photographs of his children proving that Naim was not—as the State alleged—his favorite child but rather that he loved all of his children equally, *see* Claim 1(A)(xlv), evidence that the supposed letter from Ms. Abdullah found at the Siesta house by a defense investigator was not on the computer, and thus likely a fraud, and other evidence refuting some of the prejudicial allegations made against Mr. Abdullah at trial and supporting potential defenses.  Distressingly, the Toryanskis appear to have been under the impression that they needed the prosecution to agree to the re-testing.  That impression was false.  The Toryanskis easily could have filed an ex parte motion on their own behalf, which also would have likely lessened the danger of such testing, since they could have then tried to keep any information about the results away from the State, if that information had been negative.

PETITION FOR WRIT OF HABEAS CORPUS - 39

117.    Lastly, the Toryanskis failed to cross-examine State experts with information indicating that the police or another actor may have planted evidence indicating that there was pornography on Mr. Abdullah's home computer so that the State could impugn his character to the jury.  Even though evidence of the pornography was not supposed to be presented to the jury, it was, and the trial judge's ruling to have it struck from the record would not have erased it from the jurors' memories.  Therefore, evidence about the pornography being planted would not have harmed Mr. Abdullah and could only have helped him, by explaining its existence to the jury in a way that did not incriminate him.

**xiv.**    ***Failure To Adequately Challenge The Police Investigation***

118.    There were several opportunities for the Toryanskis to underscore for the jury troubling questions about the quality of the police investigation.  Unfortunately, they failed to sieze virtually all of them.  One example is the failure to turn Ms. Abdullah's body over at the scene of the crime.  Any capable, experienced homicide investigator would have done so in an attempt to gather information on how she died.  The investigators in Mr. Abdullah's case did not, and defense counsel never brought the issue up at trial.  Such an omission is especially damaging in this case, where the cause of death was never satisfactorily explained by the State.  Had the police turned over Ms. Abdullah's body, they would have discovered evidence tending to exculpate Mr. Abdullah.  Another example of defense counsel's failure to attack the thoroughness and reliability of the investigation is apparent in the absence of any probing questions asked of Detective Tod Littlefield.  Detective Littlefield was the lead detective in the case, even though he had never investigated another homicide and had very little training and experience to equip him for a matter of this magnitude.  Although he testified several times at trial, the Toryanskis never confronted him with his lack of qualifications, leaving the jury with the impression that he was a trustworthy source, that the investigation was conducted well, and

that it led to the right suspect.  Had the jury been informed of these facts, as well as the other evidence of State misconduct, a very different impression would have been made.

119.    Defense counsel could additionally have cast doubt on the integrity of the police investigation by pointing to evidence during their cross-examinations of officers suggesting that the investigation was influenced by the pre-existing hostility that Ms. Abdullah's family felt toward Mr. Abdullah.  That hostility was rooted in the family's resentment of Ms. Abdullah's decision to marry a Muslim from the Middle East, and her decision to convert to Islam.  Family members also had a vested financial interest in Mr. Abdullah being found guilty, because they would then have a share of her estate.  The hostility by the family toward Mr. Abdullah surfaced in the officers' early interviews of the family, in which they disparaged Mr. Abdullah's character repeatedly.  These disparaging comments influenced the police to focus on Mr. Abdullah as a suspect, and contributed to their practice of selectively preserving evidence that inculpated him while ignoring, destroying, and losing exculpatory evidence.  *See* Claims 9 and 10.

120.    That error was exacerbated by counsel's failure to aggressively question police about their decision not to follow up on compelling evidence that pointed to other individuals as the possible culprit.  *See* Claim 1(A)(vii).

121.    The Toryanskis also failed to question police officers when they testified about the egregious loss and destruction of evidence that occurred, and the evidence that was never turned over to the defense.  *See* Claims 9 and 10.  They likewise did not move to dismiss the charges on the basis of those violations.  Nor did they seek to exclude exhibits that were compromised by the loss of evidence, such as the still photographs extracted from videotape taken at the Salt Lake City 7-11, which was undermined by the fact that the tape itself went mysteriously missing along with so many other important evidentiary items.

122.    The Toryanskis did not bring to the jury's attention the fact that police had either made no effort to collect, or collected and then destroyed, the receipt and/or transaction report reflecting the purchase of gas or soda that was supposedly made by the person Marjorie Wood identified as Mr. Abdullah at the Chevron Station in Mountain Home.  The Toryanskis could have used that omission to argue that the record either existed, and was destroyed by police because it did not support their theory, or that the police were too inept to ask for such an obviously important document.  In either event, the omission could easily have been turned to the advantage of the defense.

123.    Finally, the Toryanskis did not investigate an affair between second-chair prosecutor Erika Klein and lead detective Tod Littlefield, even though the trial court granted them funds to do so.

### xv.       *Failure To Discover Evidence*

124.    The Toryanskis failed to discover any of the evidence recited in Claims 9 and 10.  An adequate investigation would have done so.  If they had been discovered, this evidence would have had substantial exculpatory value.

### xvi.       *Failure To Adequately Deal With Eyewitness Identification Evidence*

125.    Marjorie Wood was one of the State's most important witnesses, as she was the only one to supposedly see Mr. Abdullah near Boise at the time of the fire.  Any halfway competent defense attorney would have spotted serious defects with Wood's identification.  For instance, as explained in Claim 11, Ms. Wood was shown only a single photograph of Mr. Abdullah by detectives who were actively seeking to make a case out against him.  At the time of trial, it was well-known that such a methodology is unreliable, as it tends to influence the witness into identifying the suspect.  A far superior technique is to show the witness an array of photographs, ideally one at a time.  Ms. Wood's identification was made even more unreliable by the fact that

she was a Caucasian woman and Mr. Abdullah a Kurdish man of Middle Eastern descent.

Scientists have established that such cross-racial identifications are less trustworthy.  Defense

counsel obtained funding to call an expert to challenge the reliability of Ms. Wood's

identification.  However, they then inexplicably failed to call him, or another expert in the same

area, and also failed to oppose the State's motion to exclude the expert, even though eyewitness

identification science is widely accepted as legitimate, including by Idaho courts.  Counsel's ill-

fated approach to this area was made worse by their choice of expert.  They selected Charles

Honts, even though he had just recently been precluded from testifying on photo lineup issues by

a Canyon County judge, due to his lack of expertise on those issues.  Experienced criminal

defense attorneys would have been aware of that ruling, in part because they would have been

plugged in to the criminal defense community as a whole.  The Toryanskis, who were essentially

prosecutors masquerading as defense attorneys, were unaware.  Defense counsel also failed to

point out to the jury that the State never had Ms. Wood do an in-person lineup to confirm her

identification of Mr. Abdullah.

126.     Finally, defense counsel never cross-examined Ms. Wood about serious discrepancies in

the various accounts she gave of the night of the crime.  For instance, it appears that Ms. Wood

initially told police officers that the person she identified as Mr. Abdullah purchased gas from

her with cash.  However, at trial, Ms. Wood testified definitively that Mr. Abdullah and the men

who were supposedly with him that night did not buy any gas from her.  Had the Toryanskis

pointed out this difference, they would have substantially diminished Ms. Wood's credibility in

the eyes of the jury.

        **xvii.**      ***Failure To Adequately Deal With Child Interview Evidence***

127.     Redear Abdullah, Mr. Abdullah's son, was interviewed by the Children at Risk

Evaluation Services (CARES) program at the St. Luke's Regional Medical Center, regarding his

PETITION FOR WRIT OF HABEAS CORPUS - 43

recollection of the events of October 4–5, 2002.  Defense counsel did not request or consult with an expert to review the CARES interview of Redear's grand jury testimony.  Nonetheless, the Toryanskis made critical decisions regarding how to proceed in Mr. Abdullah's case based on the assumption that Redear's statements and grand jury testimony was accurate and reliable, including the decision that Mr. Abdullah would not testify in his own defense.  The assumption was wrong.  Redear's interview falls short of many standards in the field.  For example, the interviewer failed to establish rapport with Redear in a systematic way when she allowed him to engage in a coloring activity during the interview, which distracted him from the account he was supposed to be giving.  Moreover, the interviewer disregarded professional protocol and failed to establish any ground rules for the interview.  Specifically,

- She failed to instruct Redear how to respond when he did not know the answer, and she did not provide him with examples of when to say "I don't know" and when to give an answer.

- She failed to instruct Redear how to respond if he did not understand what she meant or what she was saying, and did not provide him with examples.

- She failed to instruct Redear how to respond when she, the interviewer, made a mistake, or said the wrong thing, or how to tell her she was wrong.

- She failed to instruct Redear that she did not know what happened, and that she could not tell him the answers to her questions.

- She failed to use a practice narrative, e.g., "Tell me about your last birthday.  Tell me everything that happened.  Tell me more."

128.   Instead of following the professional guidelines and establishing ground rules, the interviewer used destructive reinforcement.  In addition, the interviewer failed to establish a

PETITION FOR WRIT OF HABEAS CORPUS - 44

timeline of events at the beginning of the interview, which resulted in later confusion.  During

the interview, Redear gave a clear narrative of what happened on his trip.  However, the

interviewer often expressed her confusion to Redear when his story contradicted the version of

events she had in her mind.  Whenever Redear's comments did not meet her expectations, the

interviewer indirectly rejected his story by expressing confusion.

129.    Another suggestive technique used by the CARES interviewer is repeatedly asking the

same question once an answer has already been provided.  Such a direct rejection of his answers

pressured him to provide an alternative response more pleasing to the interviewer.  Specifically,

the interviewer, in quick succession, repeated her questions regarding issues relating to the gas

can and Redear staying in a hotel.  These questions were asked again at a later point in the

interview.  The interviewer also frequently paraphrased Redear's responses, giving him the

signal that he should adopt her gloss on the facts.

130.    Like the CARES interviewer, Detective Littlefield asked Redear a series of questions at

the airport interview on October 5, 2002, that were plainly designed to elicit from Redear

information that would incriminate his father.  These questions were not appropriately framed for

someone so young, and were likely to improperly influence Redear into providing inaccurate and

damaging information about Mr. Abdullah's movements in the previous days.  Detective

Littlefield's approach to this conversation demonstrates that even that early in the investigation,

the police had already decided—based in large measure on the hostile views of Ms. Abdullah's

family to Mr. Abdullah—that Mr. Abdullah was the culprit, and the police were intent on

creating evidence to blame him at all costs.

131.    The Toryanskis likewise failed to challenge the unfair conditions imposed on Redear's

visits after Mr. Abdullah was charged.  During that time period, Redear was allowed to visit with

Mr. Abdullah's family only in the presence of Tina Perkins, the Victim Witness Coordinator for the Boise Police Department, as well as a representative of the Idaho Department of Health and Welfare and an interpreter. By contrast, when Redear visited with Ms. Abdullah's family, they were allowed to interact with him without any supervision or observation. In this way, Ms. Abdullah's family was able to influence Redear into giving an account of October 4, 2002, that was less favorable to Mr. Abdullah.

132.    Had defense counsel retained a qualified expert in child interviews, they would have discovered this host of problems with Redear's interview and his living conditions at the time of trial. That, in turn, would have prevented them from rashly forfeiting one of their client's most precious rights—to testify in his own defense—on the basis of an erroneous belief that they would be unable to prevent or challenge Redear's testimony.

### xviii.    *Failure To Interview Redear Abdullah*

133.    Redear Abdullah was the only person who could have spoken to all of Mr. Abdullah's movements on the night of the crime. As such, he was potentially the most important witness in the case. Nevertheless, the Toryanskis did not interview him. If they had done so, Redear would have provided highly exculpatory evidence by supporting his father's account of what occurred that evening and proving that he was not at the Siesta residence at the time of the fire.

### xix.    *Failure To Move To Suppress Confrontation Call*

134.    As discussed in Claim 13, the police violated Mr. Abdullah's constitutional rights by orchestrating an interrogation through a state actor after Mr. Abdullah invoked his right to counsel. The Toryanskis should have moved to suppress the evidence obtained from that call, and they failed to do so.

PETITION FOR WRIT OF HABEAS CORPUS - 46

### xx.        *Failure To Exclude Unintelligible Police Interview*

135.     Police interviewed Mr. Abdullah in the Boise Airport on October 5, 2002.  An audio recording was made of the interview and introduced as evidence at trial, along with a transcript that ostensibly reflected the dialogue on the tape.  That recording, which contained material damaging to Mr. Abdullah's defense, was of such low quality that large portions of it were unintelligible, and the transcript was therefore exceedingly unreliable.  The Toryanskis should have moved for the tape and the transcript to be excluded.

### xxi.       *Failure To Adequately Deal With Honor Killings In Kurdistan*

136.     At trial, two of Mr. Abdullah's former co-workers at SCP Global, Rod Adams and Ed Reagles, testified for the State.  They each testified that when Mr. Abdullah was asked about differences between where he was from and the United States, in the presence of Stephanie Hobbs and Brian Holford, Mr. Abdullah said that it was legal to kill your wife in Kurdistan if she was unfaithful.  Defense counsel objected to Mr. Reagles' testimony, but not Rod Adams'.  Even in pursuing the objection, defense counsel were woefully inadequate.  They failed to make the most obvious point, namely, that there was no evidence that Ms. Abdullah *had* been unfaithful.  They also did not question either Ms. Hobbs or Mr. Holford about this alleged comment made by Mr. Abdullah in their presence.  Although the State offered Stephanie Hobbs as a witness, they never asked her about this conversation, which she apparently participated in and was a witness to.  Defense counsel could and should have elicited from Ms. Hobbs testimony that she did not recall being present for such a conversation and did not recall Mr. Abdullah ever making such a comment.  Similarly, the Toryanskis could and should have elicited from Mr. Holford testimony that he did not recall such a conversation and had not ever heard Mr. Abdullah make such a statement.  Perhaps most notably, the State did not seek to cross-examine Mr. Holford about Mr. Abdullah's alleged statement, despite the fact that two other witnesses had testified to Mr.

Holford's presence when the statement was made.  In overview, defense counsel could have introduced evidence that two of the supposed participants in this conversation did not remember it occurring.  Given how striking the supposed remark is, that lack of recollection would have strongly undermined the reliability and credibility of Mr. Reagles and Mr. Adams.  Moreover, if trial counsel had filed a motion in limine regarding this evidence, presuming they were aware of it, they could have presented Mr. Holford's and Ms. Hobbs' testimony, which may have tipped the scales in favor of excluding Mr. Reagles' and Mr. Adams' testimony, especially considering the trial court's acknowledgment that admissibility of the evidence was a close call.  The admission of this statement was highly prejudicial, as it portrayed Mr. Abdullah in a negative light purely on account of his ethnicity and cultural background, and made the jury more likely to consider him guilty just because of where he came from.

### xxii.       *Failure To Adequately Deal With The Cape And Mask*

137.    At trial, evidence was presented that Mr. Abdullah bought a cape and mask at a Halloween store in Salt Lake City on October 4, 2002.  A similar cape was discovered at the crime scene.  The prosecution suggested to the jury that Mr. Abdullah could not have purchased the costume for Halloween because religious Muslims do not dress up for the holiday and because Mr. Abdullah had forbidden his own children to celebrate the holiday.  Defense counsel could have rebutted the argument with evidence that Mr. Abdullah himself had participated in costume celebrations of Halloween in the past and had not in fact forbidden his children from doing the same, including through testimony from his supervisor Greg Burk.  They failed to do so, leaving the jury with the impression that he could only have bought the items for a nefarious purpose.  Ensuring that prejudice flowed from the error, the prosecution re-emphasized its false theory at closing, stating: "There's no reason that an adult member of the Islamic faith would ever buy anything like this."

xxiii.  **Failure To Move To Sequester The Jury During The Guilt Phase Of The Trial**

138.    Defense counsel did not move to sequester the jury despite heavy media coverage of the case.  All parties were on notice that local news outlets were covering the trial closely before the trial began.  During voir dire, almost every member of the venire had had some exposure to the case through the media.  *See* Claim 5.  Some members candidly admitted to having already judged Mr. Abdullah based on the media accounts.  Several veniremembers also admitted they were having trouble obeying the judge's orders not to follow television, radio, and newspaper coverage because it was everywhere they turned.  Knowing this, defense counsel should have moved to sequester the jury during the guilt phase to avoid a contaminated jury verdict.  Instead, during trial, the jurors were exposed to front-page newspaper headlines like "Judge won't let jury hear about suspect's affair."  Any juror who happened to see such headlines would suspect they were not getting the full facts at trial and would consider the media's "facts" in their decision-making process.  Since such exposure was inevitable, sequestering the jury was the only way to ensure that there was a fair trial.  Accordingly, defense counsel's failure deprived Mr. Abdullah of a fair trial when the jury was exposed to misleading, speculative, and prejudicial information not in evidence.

xxiv.   **Failure To Adequately Move For A Change Of Venue**

139.    The ACPD moved for a change of venue on March 26, 2003.  In his motion, Mr. Cahill provided an argument that was three sentences in length, and devoid of any legal citations or substantive analysis.  The State opposed the motion on March 31, 2003.  As the State rightly noted in its opposition, Mr. Cahill's skeletal pleading did not explain how the news coverage had prejudiced Mr. Abdullah's rights, and therefore failed entirely to support his motion.  Mr. Cahill never sought a hearing on the motion, the Toryanskis never renewed the motion or filed their

own, and it appears the court never ruled on it. In light of the extensive and highly prejudicial news coverage of the case, Mr. Cahill should have supported his motion with a legal discussion that set forth the relevant standards, applied them to the case, and explained in detail how Mr. Abdullah could not be expected to receive a fair trial in the Boise community, which was saturated with explosive and incendiary material about the charges, much of which was later deemed inadmissible at trial or found to be false. *See* Claim 5. He should also have pursued a hearing, at which he could have presented evidence from experts about how poisoned the jury pool in Boise would be against Mr. Abdullah. In light of these same concerns, the Toryanskis ought to have taken the same elemental steps. Instead, all of Mr. Abdullah's attorneys condemned him to press his cause before a group of people who had spent nearly two years immersed in tremendously negative pieces about him.

xxv. ***Failure To Move To Disqualify Judge Copsey And To Move For Her Recusal***

140. Pretrial counsel August Cahill of the ACPD failed to disqualify Judge Copsey. Idaho law at the time allowed a defendant to disqualify a trial judge without cause. Mr. Cahill had decades of criminal defense experience in Ada County and knew, or should have known, of Judge Copsey's reputation as biased against criminal defendants in general and particularly those of Middle Eastern descent. *See* Claim 6. Indeed, Mr. Abdullah himself told Mr. Cahill that Judge Copsey was considered a highly unfavorable draw by his fellow inmates at Ada County Jail, providing Mr. Cahill with yet another reason to move for her disqualification. Given Judge Copsey's reputation for inappropriate bias, Mr. Cahill was ineffective for not filing a motion for automatic disqualification.

141. The Toryanskis compounded the error by failing to move for Judge Copsey to recuse herself. Any due diligence, such as simply asking the defense bar about Judge Copsey's

reputation, would have put the Toryanskis on notice of the judge's biases and led to a motion for

recusal.  Soon after taking over the case, the Toryanskis learned of Judge Copsey's demonstrated

bias against Middle Easterners.  Judge Copsey's treatment of both the Toryanskis and Mr.

Abdullah put them on notice long before trial that the judge was biased against both the

defendant and defense counsel.  Given Judge Copsey's history of bias and her treatment of the

defendant and his counsel, the Toryanskis should have moved for the Judge Copsey's recusal.

Their failure to do so resulted in Mr. Abdullah receiving an unfair trial before a biased judge.

*See* Claim 6.

### xxvi.       *Failure To Deal With Prejudicial Publicity*

142.    Both Mr. Cahill of the ACPD and the Toryanskis had no media strategy whatsoever, and

made no effort to counter the tremendously negative press that was generated by the police and

prosecution, much of which was false and/or included information inadmissible at trial.  In a

high-profile case such as Mr. Abdullah's, competent defense counsel would have devised a

comprehensive plan for handling the media, including the issuance of statements to journalists,

press releases, and so on.  Capable defense attorneys would have emphasized the following

themes in their communications with the media: that the law presumed him innocent and that he

was in fact innocent; that the State was circulating false information about him through the

media, including the false assertion that video footage placed him in the Boise area at the time of

the crime; that the State, through the media, was maligning Mr. Abdullah through highly

speculative and prejudicial stories, including stories about the death of his first wife, and that

such coverage was based on material that might well be excluded at trial; and that after a full and

fair trial, involving the admission only of relevant evidence, Mr. Abdullah would be exonerated

by a jury of his peers.  Instead of aggressively protecting Mr. Abdullah from the harshly negative

PETITION FOR WRIT OF HABEAS CORPUS - 51

media, his attorneys did nothing, and thereby allowed the State to win the case against him in the newspapers before the actual trial had even begun.

xxvii.    **Failure To Adequately Deal With The Letter Found By The ACPD At The Siesta Residence**

143.    At trial, the prosecution admitted into evidence a tremendously damaging typewritten letter allegedly written by Ms. Abdullah and addressed to Mr. Abdullah.  This letter should not have come into the State's possession at all.  It was found by the ACPD's investigator, Glenn Elam, when Mr. Abdullah was still represented by that office.  Mr. Elam viewed the scene at Siesta after being informed it was going to be destroyed.  While there, Mr. Elam found a typewritten letter, out in the open, between the wall and a garbage can in the master bedroom.  Without reviewing the letter or consulting with Mr. Cahill, Mr. Elam picked it up and took it from the scene.  Subsequently, after the ACPD was no longer representing Mr. Abdullah, Mr. Elam disclosed the letter to the lead detective in Mr. Abdullah's case.  The ACPD were ineffective for disclosing the letter to the State.  To begin, the ACPD should not have removed the letter from the house at all.  Had they left it there, which they were ethically entitled to do, the letter would have never been used against their client.  Further, even after removing the letter, the ACPD had no obligation to disclose it.  To begin, it was not clear that the letter was evidence at all, as there was no indication it was given to Mr. Abdullah or adapted by Ms. Abdullah, and its location in fact suggests the opposite.  Even if considered evidence, the ACPD was not ethically required to turn the letter over because it was not the instrumentality of a crime.  At a minimum, the ACPD should have requested an ex parte, in camera review of the letter before handing it over to the State.

144.    Once it was turned over, the letter should not have been admitted, and it was deficient performance for the Toryanskis to allow that to happen.  In the letter, Mr. Abdullah is strongly

castigated as being deceitful and unethical, and told that Ms. Abdullah does not "want my children (including Redear) to be raised by a hypocrite." The letter was not signed or dated, and was found days after the fire between a dresser and a trash can, after the house had been thoroughly combed by numerous law enforcement officers. There were consequently patent issues with foundation, authenticity, relevance, prejudice, and the right of confrontation. In challenging the letter, defense counsel could further have pointed out that despite the enormous amount of evidence the State had in its possession regarding Ms. Abdullah's statements about her personal life to therapists, friends, and family member, not a single document reflected—and not a single witness could testify to—the existence of such a letter. Not only did defense counsel fail to raise those objections, they actually—bafflingly—stipulated to the admission of the letter. Defense counsel's misstep is especially ironic in light of the fact that a letter they themselves offered as a document written by Ms. Abdullah was excluded because it was not authenticated, further underscoring how any qualified defense attorney would have made the same objection with respect to the State's letter. The letter was highly prejudicial, portraying Mr. Abdullah as a hypocrite and liar, and as a selfish and uncaring husband.

145.    Finally, even if the letter was to be introduced, the Toryanskis dealt with its admission ineffectively. At trial, the prosecution elicited from Mr. Elam testimony about how he discovered the letter during a walk-through of the scene while he was employed as an investigator for Mr. Abdullah's former counsel, the ACPD. By failing to object to that statement, defense counsel allowed the jury to draw an inference that not only was prior counsel actively working against Mr. Abdullah in gathering evidence unfavorable to him, but also that Mr. Elam may have been tipped off about the letter's existence and placement by Mr. Abdullah. In addition, the jury would have wrongly concluded that the letter must have been reliable and

genuinely from Ms. Abdullah, since the defense itself had brought it to the authorities. It was well-established law that the prosecution was not entitled to reveal the source of the letter. An objection to the statement would accordingly have been on solid footing, had the Toryanskis been knowledgeable and zealous enough to make one.

### xxviii. *Failure To Admit A Letter From Ms. Abdullah Regarding The Vending Machines*

146. The letter referred to in the preceding claim that defense counsel failed to get admitted was written by Ms. Abdullah and sent to various people in an attempt to sell the vending machines that she and Mr. Abdullah owned. Had it been successfully introduced, the letter would have represented compelling evidence that Mr. Abdullah did not wish to destroy the vending machines for the insurance money, since he and his wife were actively involved in efforts to sell them, and that he was therefore not the person responsible for the fire and by extension the death of Ms. Abdullah. If defense counsel had contacted the relative of Mr. Abdullah's who owned the computer on which Ms. Abdullah wrote the letter, they could have obtained electronic evidence that she was the one who drafted it. Or if they had contacted recipients of the letter, they could have found versions that she signed. Instead, they did neither, and the letter was as a result excluded from evidence, and this important piece of exculpatory information never considered by the jury.

### xxix. *Improperly Influencing Mr. Abdullah Into Not Testifying*

147. Claim 23 describes how defense counsel coerced Mr. Abdullah into forfeiting his right to testify in his own defense. They did so through a series of groundless threats. *See* Claim 23. Counsel's failure to choose a theory of the case at any point in the trial also impaired Mr. Abdullah's decision about whether to testify. *See* Claim 1(A)(iii). Any waiver of Mr.

Abdullah's right to testify was rendered invalid because counsel failed to properly advise him of his right to testify and coerced him into not testifying.

### xxx.          *Attempting To Persuade Mr. Abdullah To Waive His Rights*

148.    Throughout the trial, defense counsel sought to create a record of Mr. Abdullah waiving important constitutional rights, directly harming Mr. Abdullah's legal interests for no purpose other than to insulate themselves against future ineffectiveness claims.  One striking example is a memorandum from both Kim and Mitch Toryanski, dated September 23, 2004.  In that memorandum, the Toryanskis wrote a series of statements and provided spaces after them for Mr. Abdullah to initial.  Remarkably, one statement posited:

> Today during jury selection, the State used their peremptory challenges to strike all the potential jurors that were *disinclined* to impose the death penalty.  There is no information in the record, either in the questionnaire or in the voir dire, that these prospective jurors were struck for reasons related to race, ethnicity, or religious views.

(Emphasis in original.)  Plainly, this statement was designed to elicit from Mr. Abdullah a waiver of his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986) and any corresponding ineffectiveness claims.  There was no legitimate reason for counsel to try to obtain such a waiver other than to protect their future reputation at the expense of Mr. Abdullah's constitutional rights.  Defense counsel have a duty to safeguard their clients' interests, which continues after the representation ends.  That duty is even more serious in the capital context.  It is a shocking breach of that duty for counsel to go out of their way to sabotage a client's future appellate and collateral actions purely out of fear that their reputation will suffer if a valid ineffectiveness claim is raised against them.

149.    Another statement appearing in the September 23, 2004 memo supposedly advises Mr. Abdullah that his attorneys expected him to be found guilty "because the evidence strongly indicates that you were present at the fire scene."  It is outrageous that defense attorneys would

attempt on their own to obtain such an incriminating statement from their own client, especially in a case where a powerful alibi defense could in fact have been presented.  *See* Claim 1(A)(vi).

150.     Yet another example of the Toryanskis' adversarial approach to their own client's rights comes in the form of the speedy trial debate.  On that issue, Mr. Toryanski stated of his client: "We're going to talk with him about a continuance.  Regardless of whether he wants one, he's going to get one."

151.     A final example is from a memo dated October 25, 2004, in which the Toryanskis informed Mr. Abdullah that they would not be presenting an alibi, a decision that went to the heart of the defense and thus a decision that Mr. Abdullah was entitled to make for himself.

152.     The Toryanskis also improperly pressured Mr. Abdullah into waiving his right to allocute.  *See* Claim 44.

153.     By conducting themselves in this way, the Toryanskis were acting far more like the prosecutors that both had previously been.  In so behaving, defense counsel needlessly caused and perpetuated irreparable damage to the attorney-client relationship, which led to a complete breakdown in communication and contributed to counsel's failure to present any meaningful defense at all.

### xxxi.     *Failure To Stand Up For Defense Arguments And Maintaining A Prosecution-Oriented Outlook*

154.     As a general matter, defense counsel were extremely tentative in staking out positions favorable to Mr. Abdullah and often retreated from those positions at the slightest opposition. For instance, defense counsel would constantly withdraw objections whenever the prosecution contested them, where zealous attorneys would simply have defended the objection and awaited a judicial ruling.  This excessive deference to the prosecution was likely caused in large measure by the fact that both Toryanskis had spent far more time as prosecutors than as criminal defense

attorneys.  Tellingly, Ms. Toryanski at one point referred to her adversaries in court as "the defense."  It is also noteworthy in this regard that both of the fact-investigators retained by the Toryanskis—Terry Murphy and Steven Clark—spent most of their careers as law enforcement officers, and therefore shared the prosecution-oriented perspective of the Toryanskis.

        **xxxii.**        ***Failing To Request A Jury Instruction On The Unreliability Of Eyewitness Identifications***

155.    Defense counsel did not ask the jury to be instructed that eyewitness identifications suffer from a number of serious flaws, and the jury was not so instructed.  Such an instruction would have been well-founded, as scientists had proven by the time of Mr. Abdullah's trial that eyewitness identifications are frequently faulty and have led to numerous wrongful convictions.  The instruction would have been exceptionally relevant in Mr. Abdullah's case.  For the eyewitness testimony of a single witness—Marjorie Wood—was instrumental in securing Mr. Abdullah's conviction, and that testimony was rendered even more unreliable than the average eyewitness by the unduly suggestive method the police used to persuade her into identifying Mr. Abdullah.  The Idaho Supreme Court has approved the use of instructions on facts that affect the accuracy of identifications, making it more likely that a proposed charge here would have been accepted.

        **xxxiii.**      ***Failure To Adequately Deal With Instructions On Willfulness And Deliberateness***

156.    As discussed in Claim 24, the jury was improperly instructed on willfulness.  Trial counsel should have requested a separate instruction defining "willfulness" with respect to the non-arson offenses, and should have requested—on the murder charge—an instruction indicating that willfulness and deliberateness had to be found in addition to premeditation.  If they had done so, the instruction would presumably have been granted, since it would have been consistent with established Idaho law.

PETITION FOR WRIT OF HABEAS CORPUS - 57

### xxxiv. *Failure To Object To Instruction That Failed To Include Intent To Kill As An Element Of All Attempted First-Degree Murder Offenses*

157.    Mr. Abdullah was charged with attempting the murder of the three children in the house when the fire began.  The jury was never informed with respect to these charges that it had to find beyond a reasonable doubt that Mr. Abdullah acted with the specific intent to kill the three children.  Moreover, the only instruction relating to the definition of premeditation was contained in Jury Instruction Number 16, which by its plain language applied only to the charge of first-degree murder of Ms. Abdullah.  Under these circumstances, the jury could have found Mr. Abdullah guilty of attempted murder without an intent to kill.  This argument finds support in testimony at trial by the State's witnesses that the fire began due to an accidental ignition, which suggests that the perpetrator did not intend for the children to be in the home at that moment.  Defense counsel should have objected to the instruction and held the prosecution to its burden of proof on all elements.

### xxxv. *Failure To Object To Trial Court's Instruction Defining Reasonable Doubt In Both Guilt And Penalty Phases Of Mr. Abdullah's Trial*

158.    Defense counsel could and should have made the argument raised in Claim 27, and failed to do so.

### xxxvi. *Failure To Object To Definition Of Willful On The Injury-To-A-Child Charge*

159.    As discussed, the jury requested guidance on what willful meant with respect to the arson charge.  The court responded that an individual can act willfully without intending to injure another.  That is the only definition of willful the jury ever received.  Such a definition of willful is not correct under Idaho law with respect to the crime of injury to a child.  That offense requires that a defendant willfully place a child in a dangerous situation in the sense that he specifically intends to endanger that child.  Trial counsel should have taken action to assure that

the jury received a proper instruction of what willful meant in relation to the injury-to-a-child offense, rather than allowing the jury to assume that it could apply the definition it was given on the arson charge.

### xxxvii.    *Failure To Challenge For Lack Of Evidence Charge Of Committing An Injury To A Child*

160.    Defense counsel failed to move, or to adequately move, the trial court to strike the charge of committing an injury to a child from the indictment.  As discussed in Claim 32, the prosecution failed to prove Mr. Abdullah was guilty of injury to a child beyond a reasonable doubt.  The child in question was located out of harm's way and suffered no injuries.  Defense counsel should have moved the court to dismiss this charge.  Failure to do so resulted in a finding of guilt on this charge and generally prejudiced the jury's guilt and sentencing phase verdicts.

### xxxviii.    *Failure To Adequately Deal With Prosecutorial Misconduct*

161.    Defense counsel failed to object to almost all of the acts of prosecutorial misconduct discussed in Claim 7, every one of which would have drawn an objection from competent counsel.  Nor did defense counsel request a mistrial, admonishment, and/or curative instruction with respect to the misconduct.  The Toryanskis withheld objections in large part because they were more sympathetic to the State than they were to their own client.  Defense counsel did object to the State's comments on the fact that Mr. Abdullah had been removed from the courtroom for Ms. Wood's pretrial testimony.  However, it was ineffective for them not to request a mistrial and, in the alternative, a curative instruction.

162.    As discussed in Claim 7, the prosecution committed misconduct by informing the jury that the defense requested the additional testing of Ms. Abdullah's blood, which revealed the excess of Prozac.  With respect to that issue, the Toryanskis were ineffective not only for failing

to object to the misconduct, but also for failing to object to the admission of the letter requesting the additional testing, on the ground that its prejudicial effect would outweigh any probative value it might have.

### xxxix.        *Disclosure Of Privileged Information*

163.    In late 2003, defense counsel's enthusiasm, confidence, and desire to try Mr. Abdullah's case evaporated, and they began desperately pursuing pretrial settlement negotiations with the State.  The Toryanskis took a "settle at all costs" approach and, rather than preparing for trial, began devoting all of their time, resources, and energy into negotiating a plea offer, even though Mr. Abdullah consistently made clear that he would not accept any offer that left him in prison for a substantial amount of time.  This created a vicious cycle where, because they were focused so intently on plea negotiations, they were not preparing for trial, and because they were not preparing, they more frantically sought a plea.  The attorney-client privilege and the work-product privilege were two of the things that got sacrificed in the process.

164.    The State was unwilling to settle the case without a proffer of facts from Mr. Abdullah. Defense counsel therefore began a merry-go-round of exchanges with Mr. Abdullah in an attempt to create a proffer that would be acceptable to the State.  Even though Mr. Abdullah never waived the attorney-client privilege, never gave his lawyers permission to share information about his defense with the State, and never signed any consent form, defense counsel repeatedly violated the attorney-client privilege.  In addition to the proffers, defense counsel also disclosed their theories of the case to the State.  For example, they sent a letter to the prosecutors in which they "laid out all the details" of their defense and "begged" for a plea.  The Toryanskis did all of this without any candid discussions with Mr. Abdullah, electing instead to leave their client in the dark and deceive him.  By handing over on a silver platter to the State valuable

PETITION FOR WRIT OF HABEAS CORPUS - 60

information about their case, the Toryanskis gave the prosecution a great advantage and their own client a great disadvantage.

165.    The Toryanskis also provided sensitive information about Mr. Abdullah's case to his family members, and to family friends like the Rogers.  They did so despite the fact that Mr. Abdullah refused to sign a waiver of the attorney-client privilege that would have permitted the Toryanskis to share privileged information with Mr. Abdullah's family.  As discussed in Claim 2, the relatives had different interests than Mr. Abdullah, and the imprudent sharing of information therefore created a conflict between the Toryanskis and their client.

### xl.    *Failure To Object To Deborah Kristal's Testimony*

166.    In September 2002, Ms. Abdullah sought legal advice from Deborah Kristal.  The State has acknowledged that Ms. Kristal was acting in her role as Ms. Abdullah's attorney during this meeting.  At trial, the prosecuted offered Ms. Kristal's testimony about the meeting.  Although the Toryanskis did nothing to stop it, the testimony violated the attorney-client privilege, which survives the client's death.  Ms. Kristal's testimony was extremely damaging and portrayed Mr. Abdullah in a very negative light.  Specifically, she testified about Ms. Abdullah's desire to have a will that covered all of her children, the possibility of getting a divorce, the poor financial status of her family, and Ms. Abdullah's desire to not go home to her husband that night.  Perhaps the most damaging aspect of Ms. Kristal's testimony was that it provided the basis for the State to argue that Mr. Abdullah had a motive because "Angie wanted this marriage to end."

### xli.    *Failure To Establish That Divorce Is Permissible In Islam*

167.    Furqan Mehmood, the President of the Boise Islamic Center, was called by the defense as a witness at the guilt phase.  During a side bar, Mr. Toryanski indicated that he was planning to ask Mr. Mehmood whether divorce is practiced by Muslims.  Judge Copsey stated that she would allow the question.  Despite that ruling, defense counsel never asked Mr. Mehmood, or any other

witness, whether divorce is acceptable in the Islamic faith.  Had they pursued this issue, defense counsel could have presented evidence that members of Mr. Abdullah's own family had previously gotten divorced, thereby proving that divorce was acceptable not only for Muslims generally but for Mr. Abdullah's particular community as well.  Evidence could also have been presented that Mr. Abdullah himself had been open to divorcing Ms. Abdullah if she insisted upon it, as Evelyn Whittington, Ms. Abdullah's mother, could have confirmed.  Defense counsel never provided any of this evidence regarding the permissibility of divorce, even though it could have been easily demonstrated.  Given the highly prejudicial evidence about Ms. Abdullah's dissatisfaction with her marriage and inflammatory testimony about supposed honor killings in Kurdistan, this omission on counsel's part had devastating consequences.

### xlii.   *Failure To Rebut The Assertion That Mr. Abdullah Converted Ms. Abdullah To Islam*

168.    At trial, the prosecution suggested that Mr. Abdullah took steps to ensure that Ms. Abdullah converted to Islam.  For instance, the State elicited testimony from one witness that Ms. Abdullah "felt that in order for her to maintain a relationship, perhaps to marry him, to be a part of his life, [Ms. Abdullah] needed to convert."  However, other evidence could have been presented, through other witnesses, that Ms. Abdullah was in fact the impetus not only for her own conversion to Islam, but also for Mr. Abdullah's decision to become more religious after being raised in a family that was not particularly devout or spiritual.  That evidence would have helped undercut the State's portrait of Mr. Abdullah as a domineering, overbearing husband, and would also have pushed back against the prosecution's improper effort to use Mr. Abdullah's ethnicity and religion as a tool against him.  *See* Claim 7.

PETITION FOR WRIT OF HABEAS CORPUS - 62

xliii.    *Failure To Adequately Deal With Evidence Relating To Mr. Abdullah's Relationship To Other Women*

169.    The State falsely insinuated into its case the suggestion that Mr. Abdullah went to Salt Lake City the day before the fire for a romantic assignation.  For instance, Detective Wade Spain testified that "[t]here was some question over whether Mr. Abdullah was accompanied by an adult female" and "that issue was one that we had to explore a little further."  The prosecution further exploited this incorrect notion through the testimony of Sinae Jang, a woman who worked at the hotel where Mr. Abdullah stayed in Salt Lake City.  Patrick Owen, the lead prosecutor, asked Ms. Jang several questions about the woman allegedly seen at the hotel with Mr. Abdullah, including about the color of her hair, the way she was dressed, the dynamic between her and Mr. Abdullah, and "whether they went to a room" together.  These questions were posed to Ms. Jang despite the fact that the State was never able to locate any such woman.  The only purpose and effect of such questions would be to inflame the passion of the jurors against Mr. Abdullah by implying to them that Mr. Abdullah was having an adulterous tryst the night before the fire.  In a case where Mr. Abdullah was charged with murdering a wife with whom he had children and endangering those and other children, this type of evidence is especially prejudicial.  At other times, the prosecution falsely insinuated that a brief act of infidelity Mr. Abdullah committed two years before the fire was part of an affair that was ongoing at the time of Ms. Abdullah's death.  Accordingly, the defense had a patent duty to object to the questions and statements regarding the supposed other woman on the grounds that they were irrelevant, prejudicial, speculative, and based on alleged facts not in evidence.  The Toryanskis did not do so.

xliv.     ***Failure To Adequately Deal With Evidence Concerning The Nashville Trip***

170.     There was testimony during trial that Ms. Abdullah, while visiting Mr. Abdullah's family in Nashville, experienced complications with her pregnancy.  Deborah Kristal and Charlene Javernick both suggested to the jury that Mr. Abdullah either could not afford to pay for the return of Ms. Abdullah and the children to Boise, or that he did not wish to do so.  As such, the testimony further reinforced the prosecution's portrait of Mr. Abdullah as a callous and oppressive husband who sought to control his wife and her movements, and to separate her from her own family.  In fact, Mr. Abdullah had purchased roundtrip airline tickets for Ms. Abdullah and the family which could be, and were, changed to accommodate Ms. Abdullah's desires and medical issues.  Defense counsel were ineffective for failing to either discover this document or utilize it in cross-examination.

xlv.     ***Failure To Rebut The State's False Assertion That Naim Abdullah Was Mr. Abdullah's Favorite Child***

171.     At trial, the State presented evidence that Mr. Abdullah had on his desk a photograph of Naim Abdullah, and used the evidence to suggest that Naim was Mr. Abdullah's favorite child. That suggestion was damaging to Mr. Abdullah, because Naim was removed from the Siesta residence before the fire began.  Thus, the notion that Naim was Mr. Abdullah's favorite helped support the State's theory that Mr. Abdullah was the one who removed him from the house, and therefore the one who set the fire and killed Ms. Abdullah.  However, that notion was false. Defense counsel could have pointed out that Mr. Abdullah loved all of his children equally, as demonstrated by the fact that the photograph of Naim was in fact just a sheet of paper that Mr. Abdullah printed out only two weeks earlier to test a printer, the fact that Mr. Abdullah had numerous photographs of his other children on his computer, and the fact that another son's name was in Mr. Abdullah's personal email address, which was Abu_Redear@hotmail.com, i.e.,

PETITION FOR WRIT OF HABEAS CORPUS - 64

"father of Redear."  Instead, defense counsel did nothing to challenge the State's distorted presentation of the photograph, and left that key component of its case uncontested.

> xlvi.   ***Failure To Provide Mr. Abdullah With Discovery***

172.   The Toryanskis failed to share numerous key pieces of discovery with Mr. Abdullah, despite his repeated requests for them, or only shared with him documents with illegible passages.  Kim Toryanski later testified that she was prohibited from leaving discovery with Mr. Abdullah because of jail policy, but given that Mr. Cahill did leave discovery with Mr. Abdullah, her justification was not legitimate.  Similarly, with respect to audio-visual recordings, defense counsel told Mr. Abdullah that he could not review the evidence because of the Ada County Jail's equipment, which was false.  Mr. Abdullah had a right to review the State's evidence against him, and had he been shown all of the discovery he could have contributed more to his attorneys' work and could have more meaningfully effectuated his right to make the decisions essential to his defense.

> xlvii.   ***Failure To Challenge The Unconstitutional Closure Of The Court To The Public***

173.   Defense counsel failed to object when Judge Copsey closed the court to the public during the competency hearing of Mr. Abdullah's son.  In violation of the Constitution, Judge Copsey based her decision to close the courtroom on vague, prejudicial, and wholly unsubstantiated accusations that Mr. Abdullah's family was attempting to influence the child's testimony. Defense counsel, knowing there was no evidence of any improper influence, should have objected to the judge's decision to ban the public from the courtroom.

> xlviii.   ***Failure To Behave Appropriately In Court***

174.   The Toryanskis repeatedly violated basic norms of courtroom decorum.  For example, Ms. Toryanski got emotional before the jury several times, and had to be admonished by Judge

Copsey to retain her composure.  These lapses were observed by the jury, and led the jurors to lose esteem for defense counsel.

> ### xlix.     *Failure To Seek Assistance From Iraqi And Kurdish Entities*

175.    The Toryanskis made no effort to obtain assistance from Iraqi or Kurdish entities, even though Mr. Abdullah was born in the Kurdish region of Iraq.  Had they contacted such entities, defense counsel would have received valuable additional resources, and Mr. Abdullah would personally have received valuable legal advice.

> ### l.     *Failure To Object To Unlawful Number Of Peremptory Challenges*

176.    Idaho law gave each side in the case ten peremptory challenges.  The trial court allowed the State and the defense fourteen apiece.  By not objecting to that decision, defense counsel allowed a better-prepared prosecution even more advantage, because they were able to cull the jury of even more people who expressed skepticism about the death penalty.  The vast majority of veniremembers were prejudiced in favor of the prosecution and a death sentence, and allowing the parties more peremptory challenges only gave the prosecution an extra tool to remove the few defense-leaning jurors.  *See* Claims 5, 14, 35, 38.  Defense counsel acted ineffectively by not demanding that the court abide by the Idaho Criminal Rules, which resulted in a conviction and death sentence by a biased jury.

> ### li.     *Failure To Act Promptly*

177.    Defense counsel were perennially late in almost all of the work they did, including but not limited to:

- Retaining Dr. Mozayani and providing her with necessary materials to review, leading to her disastrously unprepared performance.

- Providing an expert report to the trial court *after* Mr. Abdullah was convicted and *after* the jury voted for death, in which the expert indicated that the police may have

PETITION FOR WRIT OF HABEAS CORPUS - 66

planted pornography on Mr. Abdullah's home computer in order to impugn his

character to the jury.

- Disclosing Katherine Halek as a witness, leading to her being withdrawn.

- Obtaining clean copies of the discovery material that were legible in their entirety.

178.    The preceding errors were so pervasive that Mr. Abdullah's defense attorneys failed to

subject the prosecution's case to meaningful adversarial testing.  Therefore, Mr. Abdullah need

not show prejudice on his guilt-phase ineffectiveness claims.  *See United States v. Cronic*, 466

U.S. 648 (1984); *Holloway v. Arkansas*, 435 U.S. 475 (1978); *Geders v. United States*, 425 U.S.

80 (1976); *Powell v. Alabama*, 287 U.S. 45 (1932).  Furthermore, for any ineffective acts or

omissions that resulted in a structural error, Mr. Abdullah is not required to establish prejudice.

*See Styers v. Schriro*, 547 F.3d 1026 (9th Cir. 2008).

179.    To the extent that Mr. Abdullah is required to demonstrate prejudice, then the claims

above show that, both cumulatively and individually, he was prejudiced by the deficient

performance of his trial attorneys.  *See Harris v. Wood*, 64 F.3d 1432 (9th Cir. 1995); *Cooper v.

Fitzharris*, 586 F.2d 1325 (9th Cir. 1978).  That is, in the absence of trial counsel's errors, there

is a reasonable likelihood that Mr. Abdullah would not have been convicted of the charged

offenses, or would alternatively have been convicted of only some of them.  Many of the errors

above also prejudiced Mr. Abdullah's rights at sentencing, because they undermined viable

defenses and thereby prevented Mr. Abdullah from offering evidence regarding residual doubt at

the penalty phase, which would have been a powerful reason for the jury to exercise mercy had it

been adequately presented and argued to the jury.

**B.    Trial Counsel Rendered Ineffective Assistance At The Capital Sentencing Phase**

180.    Trial counsel rendered ineffective assistance at the capital sentencing in the following ways:

   **i.    *Failure To Adequately Investigate And Present Mitigating Evidence***

181.    Mr. Abdullah has an enormously compelling personal story, involving a childhood in which his town was destroyed by Saddam Hussein as part of an ethnic purge, family members were killed by the Iraqi army, time spent helping his family flee Hussein and live in a refugee camp under appalling conditions, and then transitioning to America where he became a proud and productive citizen and a well-respected member of the Boise community.  This story would have been of enormous benefit to Mr. Abdullah at sentencing, where it could have been used effectively to humanize him in the eyes of the jury and make a strong case for mercy.  Defense counsel utterly failed to do so, instead making a disastrous decision to suspend their mitigation investigation for a number of critical months, out of a misguided confidence in their ability to prevail, and then presenting an anemic, wholly undeveloped account of Mr. Abdullah's life to the jury at sentencing.  The Toryanskis presented an anemic mitigation case in part because they had, by sentencing, reached the false and self-defeating view that it would be impossible for them to win a life verdict given the offense with which Mr. Abdullah was charged.  That view was wildly mistaken, as many far more egregious offenses lead to life sentences after competent attorneys made adequate mitigation presentations.  One reason why the Toryanskis failed to fulfill their duties on the mitigation front is simply that they did not understand what mitigation was, and in fact never accurately described the concept, even when given the chance years later in post-conviction.  In any event, no matter what the causes of their failures were, it is clear that these egregious errors violated Mr. Abdullah's right to an adequate investigation and

presentation of mitigating evidence. *See Sears v. Upton*, 561 U.S. 945 (2010); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). Counsel's numerous failures on the mitigation front included, but are not limited to:

- *Counsel's sporadic and rushed investigation.* At the inception of this case, the ACPD retained the services of Rosanne Dapsauski, a mitigation specialist with fifteen years' experience in conducting mitigation investigations in capital cases. In contrast with Ms. Dapsauski, the Toryanskis and their two fact investigators had collectively participated in zero capital cases on the defense side. When the Toryanskis took over the case, Ms. Dapsauski had only conducted a preliminary mitigation investigation. The Toryanskis proceeded to severely limit Ms. Dapsauski's work. Based on their own misguided confidence in winning an acquittal, defense counsel minimized the importance of the mitigation case and ignored the cardinal rule that mitigation themes must be developed throughout the course of the guilt phase, so as to strengthen the themes and avoid alienating the jury with a mitigation presentation that conflicts with the guilt-phase defense. As a result of this attitude, the Toryanskis provided Ms. Dapsauski with very little guidance or direction. During this period, the Toryanskis made the catastrophic decision to tell her that they were no longer in need of her services, as Mr. Abdullah's was not a mitigation case, resulting in the loss of many months in which a comprehensive mitigation investigation could and should have been ongoing. With only a few days left before sentencing, defense counsel finally sought to remedy their colossal mistake, but by then it was too late. Ms. Toryanski approached Ms. Dapsauski at the Ada County Courthouse, where she was assisting

PETITION FOR WRIT OF HABEAS CORPUS - 69

with another trial, and told Ms. Dapsauski, "We are screwed." She asked Ms. Dapsauski to resume her work, even though there was no time at that point to adequately collect records, contact experts, interview witnesses, or prepare witnesses to testify. The Toryanskis then failed to use Ms. Dapsauski to determine which witnesses would testify and in preparing them to testify, even though she was far more qualified to do so than the attorneys.

- *Counsel's failure to weave mitigation into the guilt phase*. Counsel did nothing to begin presenting mitigation themes during the guilt phase, even though that practice is absolutely essential to capital defense and was well-established at the time.

- *Counsel's failure to adequately identify and examine family witnesses*. Although counsel called a handful of witnesses to describe Mr. Abdullah's background, defense counsel did not prepare them sufficiently and failed to ask them enough questions to elicit the rich, powerful stories that were available. Mr. Abdullah comes from a closely integrated family, bound by love, friendship, and shared experience. He is very much loved and revered by his parents, siblings, cousins, and other members of his extended family, all of whom wanted to support Mr. Abdullah and have their voices heard before the jury decided his fate. Numerous family members would have been willing to testify during the penalty phase, but were not asked to, or were told they would testify but never called. Many of the family members were interviewed by Ms. Dapsauski and presumably would have been identified as witnesses, had Ms. Dapsauski not been removed from Mr. Abdullah's case early on. The Toryanskis also failed to move for funds to conduct an investigation in the Middle East, where even more witnesses could have been found. As a result of defense counsel's lack of

preparedness for the penalty phase, only four family members testified: Haji Fetah
Abdullah (Mr. Abdullah's father); Nichivan Abdullah (cousin); Dilshad Haji
Abdullah (brother); and Rihan Mustafa (mother).  A far greater number should have
been called.

With the witnesses that were called, the Toryanskis spent a woefully small amount of
time preparing them to testify, which was especially problematic in light of their
language issues and their lack of familiarity with the American legal system.  The
Toryanskis did not bother to inform the witnesses beforehand about what questions
they would be asked.  Once the witnesses were on the stand, the Toryanskis spent less
than an hour and a half on their combined testimony, an outrageously insufficient
amount of time in any capital case and particularly so when such a wealth of powerful
mitigating testimony could have been elicited from the witnesses.  Aside from their
troubling brevity, the examinations were conducted with excruciating incompetence.
It well illustrates defense counsel's complete obliviousness to mitigation that Mr.
Toryanski went so far as to interrupt Mr. Abdullah's mother, Rihan Mustafa, at the
very point where she was beginning to offer the kind of emotional description of her
son's best qualities that would have resonated with the jury.  Mystifyingly, Mr.
Toryanski objected to his own question, and abruptly ended his examination, thereby
preventing Ms. Mustafa from elaborating on aspects of her son that would have
weighed strongly in favor of a vote for life.  Indeed, Mr. Toryanski was dead set on
keeping out the most beneficial evidence, as exemplified by the moment where he
angrily told Rihan not to cry during her testimony and warned that she would be
charged five thousand dollars if she did.  Similarly, Mr. Toryanski's examination of

Haji conveyed that he was disinterested in the responses and wanted only to get it over with.  For counsel to expect the jury to be moved by Haji's testimony, he had to at least pretend to be engaged in the exchange and to express some sympathy.

Some of the Toryanskis' questions almost seemed tailor made to harm their client. For instance, Mr. Toryanski repeatedly asked Haji questions intended to elicit an emotional response based on the death of Ms. Abdullah, which likely inflamed the jurors against the man they had just convicted of killing her, as opposed to the loss he and others would feel for Mr. Abdullah after an execution.  Along the same lines, Mr. Toryanski repeatedly asked family members about how affectionate Mr. Abdullah was with his wife.  It is impossible to fathom why he regarded that tack as helpful, given that the jury had just found Mr. Abdullah guilty of murdering her.  Remarkably, Mr. Toryanski also failed to ask either of Mr. Abdullah's parents a single question about what life was like in the refugee camp in Turkey, even though the family's experience there was the seminal, wrenching episode of Mr. Abdullah's youth.

The Toryanskis likewise failed to present evidence that Mr. Abdullah suffered from a head injury, caused in part by his sister striking him with a rock when he was a child. Nor was any evidence presented that Mr. Abdullah might have been affected by malnutrition, either caused by his mother's inability to enjoy a healthy diet while pregnant with him or by his own lack of access to resources as a child.

Defense counsel's unpreparedness was further demonstrated by Nichivan's testimony, where it became clear that Mr. Toryanski thought Nichivan was Mr. Abdullah's brother, when he was actually his cousin.

It is equally striking that at Mr. Abdullah's sentencing for the *non*-capital counts, which followed his capital penalty phase, the Toryanskis presented testimony from several siblings that had not been called earlier. By then, of course, the jury had already voted for death, and the testimony was totally useless.

- *Counsel's failure to adequately investigate and present evidence regarding Mr. Abdullah's childhood in the Middle East.* Had counsel identified more of the readily available family witnesses, and had they competently interviewed and examined them, an incredibly potent mitigation story could have been told. These witnesses could have spoken to Mr. Abdullah's childhood in Kurdistan, the near constant fear that all Kurds felt under Saddam Hussein's regime, and the horrors of living in refugee camps. It would have been a heartfelt account, full of anecdotes and striking details. For instance, the witnesses would have captivatingly described the grimness of the refugee camp, including the open pits used as toilets, the pervasive disease, and the lack of water. They also would have highlighted the profound trauma that Mr. Abdullah personally suffered. In one particularly affecting incident, he saw an uncle with whom he was very close shortly after the Iraq army shot him with over thirty rounds, causing his head to explode. As with so much, this story was not brought to the jury. And they could have talked about Mr. Abdullah's bravery and heroism as a child, when he acted with a maturity well beyond his years to protect his siblings and help his family survive a terrible ordeal. The testimony of the eldest son in the Abdullah family, Musheer, would have been particularly impactful. Musheer was diagnosed with mild intellectual disability, and could have explained how Mr.

Abdullah had always looked out for him with compassion, even under the most trying circumstances.

- *Counsel's failure to adequately investigate and present evidence regarding Mr. Abdullah's difficult transition to life in America.* Mr. Abdullah was forced to go from a rural, impoverished life in the Middle East to a middle class, small-town existence in the largely white city of Boise, Idaho. That process of assimilation was extraordinarily difficult, as it involved adjusting from one way of life to an entirely different one. It was complicated by the fact that Mr. Abdullah assumed a leadership role for his family, and helped them navigate their new surroundings in the face of daunting linguistic, cultural, and religious barriers. Counsel failed to interview and call as witnesses numerous individuals who could have testified to the disorienting nature of the Abdullah family's relocation, and to the psychological effect that it had on Mr. Abdullah. Many witnesses could also have testified to positive experiences and conduct in Boise, including his efforts to learn the language, participate and contribute to his community in and out of school, including work to support his family and to benefit his community by assisting refugees and volunteering on behalf of the Islamic Center. As on especially notable acknowledgment of Mr. Abdullah's good works, he received a Spirit of Idaho Award from United States Senator Mike Crapo, which recognized his work in sensitivity training for Boise airport police officers. Another example of Mr. Abdullah's positive influence on the community is that he gave loans to co-workers who were unable to receive them from banks. The witnesses who could have vouched for these laudable deeds were readily available had counsel and their investigators made inquiries at Mr. Abdullah's school, at his

workplaces, and at the Islamic Center, among other places.  Testimony about the traumatic nature of moving thousands of miles away as a refugee would have militated strongly in favor of life, and that testimony was not presented.

- *Counsel's failure to properly prepare and present psychologist testimony*.  Defense counsel failed to present powerful mitigating evidence that Mr. Abdullah does not present a risk of future dangerousness, and that he suffers from Post-Traumatic Stress Disorder (PTSD), attributable in part to his background as a member of a persecuted minority and refugee from extreme political violence.  The Toryanskis obtained funding from the trial court to retain Dr. Craig Beaver, a local neuropsychologist, as an expert who would present testimony about the effects of various factors on Mr. Abdullah's character, including the cruelties he suffered in Kurdistan and his experience in refugee camps.  Defense counsel consulted with Dr. Beaver but never called him, even though he was prepared to testify that Mr. Abdullah did not present a risk of future dangerousness and that his moral culpability was diminished by the fact that he suffers from PTSD.  The absence of future dangerousness constitutes valuable mitigation, as does a defendant's traumatic upbringing.  Here, trauma was directly attributable to someone that most Americans, and presumably a good number of jurors, despised: Saddam Hussein.  Indeed, one of the reasons that the U.S. declared war on Iraq was because of the atrocities that Saddam committed against the Kurds.  Instead of using Dr. Beaver to present this important testimony, the Toryanskis foolishly focused him on guilt-phase issues, several of which were outside of his expertise.  For example, he was asked to analyze Ms. Abdullah's Prozac levels, and her potentially suicidal behaviors, neither of which was he qualified to opine on.  Dr.

PETITION FOR WRIT OF HABEAS CORPUS - 75

Beaver was excluded from meetings, preventing him from playing the central role on the team that he should have and creating a disjointed and dysfunctional approach to sentencing.  To fully present Mr. Abdullah's background, Dr. Beaver recommended to defense counsel that they follow up on the interplay between his traumatic refugee experience and his cultural values.  They failed to do so.  When sentencing finally arrived, Dr. Beaver gave defense counsel an outline of the testimony he wished to give.  Nevertheless, the Toryanskis never called to the stand this most essential witness.  After the fact, Mr. Toryanski first claimed, falsely, that Dr. Beaver had in fact testified, and later indicated that Dr. Beaver had not been called because he would have testified that Mr. Abdullah was a "psychopath," which is clearly contradicted by the record.  By virtue of Dr. Beaver's absence, the jury was deprived of compelling evidence that would have illuminated the interplay between Mr. Abdullah's traumatic refugee experience and his cultural values, evidence that he suffered from PTSD, and evidence that he did not present a risk of future dangerousness.

- *Counsel's failure to properly prepare and present cultural expert testimony*.  Defense counsel retained Professor Michael Gunter to testify about Mr. Abdullah's experience in the Mardin refugee camp.  His testimony lasted twenty-one minutes.  During that testimony, he made no reference to Mr. Abdullah or his family.  Professor Gunter spent less than three minutes explaining, in the most general terms, the living conditions in the refugee camps, describing them simply as "very marginal" or "submarginal."  The Toryanskis did not elicit any details about the living conditions, and failed to elicit any example of clear human rights abuses and traumas experienced

PETITION FOR WRIT OF HABEAS CORPUS - 76

by the detainees.  Defense counsel's failure to elicit any compelling testimony from

Professor Gunter is borne out by the fact that the prosecution declined the opportunity

to cross-examine him.  Professor Gunter's testimony was hamstrung by the

Toryanskis' failure to do any substantive preparation for his time on the stand.  They

provided him with very little information about the case to give him a context for his

testimony.

While Professor Gunter had some relevant information and would have benefitted the

case had he been properly prepared and questioned, he should not have been the only

expert to testify about the refugee camp.  The Toryanskis' did not do sufficient

research to ascertain that they also needed someone who could relate personally with

the Kurdish experience and with Mr. Abdullah, and then translate that experience to

the jury.  For example, Dr. Asfandiar Shukri works with Physicians for Human Rights

(PHR).  As a PHR representative, Dr. Shukri succeeded in entering two refugee

camps, including one near the city of Mardin, in 1988.  He testified in the trial against

Saddam Hussein about the health of Kurdish refugees fleeing the 1988 Anfal

Campaign.  Significantly, he was also born and raised in Kurdistan, which gives him

personal insight into Mr. Abdullah's life in addition to professional insight.

Dr. Shukri, or another similarly situated expert, could have informed the jury about

the background of the Kurdish people and how that background shaped Mr.

Abdullah's life.  In particular, he could have spoken to the perpetual and brutal

oppression of the Kurds by the Iraqi government, which murdered them, tortured

them, and used chemical weapons against them, causing them all to live constantly in

fear.  Dr. Shukri or a peer could also have testified about what the conditions at the

Mardin refugee camp would have been like, including the despondency, helplessness, disease, and violence. His expertise in Kurdish culture would have given depth, explanation, and credibility to properly presented family member testimony about Mr. Abdullah's life in Kurdistan and the refugee camps.

Had defense counsel called someone like Dr. Shukri, and also called a psychologist such as Dr. Beaver, the psychologist could have used the testimony about Mr. Abdullah's background to make a powerful mitigation case based on PTSD. To succeed, that case would not need to have any connection to the crime the jury had convicted Mr. Abdullah of committing. But it would have been more powerful because the psychologist could have drawn such a connection. Specifically, a psychologist could have presented evidence about how a defendant's unwillingness or inability to accept responsibility may be linked to their PTSD, especially if the disorder is related to other considerations, like cultural and religious factors. PTSD patients are frequently emotionally numb as a result of these experiences, and that can affect their ability to own up to mistakes. The jury therefore could have had a solid foundation for exercising mercy, even though they had already been convinced that Mr. Abdullah committed the crimes. Because of the Toryanskis' ineffectiveness in selecting a cultural expert and preparing that witness to testify, the jury was deprived of compelling evidence of his traumatic refugee experience, his cultural history, and evidence that he suffered from PTSD.

- *Counsel's failure to adequately develop testimony about the impact Mr. Abdullah's execution would have on his family.* Had they asked Mr. Abdullah's relatives to speak about how great a wound it would inflict on the family were he to be executed,

they would have spoken up passionately to preserve his life. Many witnesses could have talked to the jury about what a loving, generous family member Mr. Abdullah had been, and what a blow it would be to lose him.

- *Other unpresented mitigation evidence.* Counsel were deficient in not investigating other compelling mitigation themes, including but not limited to evidence of good acts committed while incarcerated, such as saving the lives of two suicidal inmates, as well as evidence of brain damage, intellectual disability, mental health issues, mental illness, and physical and other abuse. Had they done so, they could have found and presented evidence supporting those themes.

### ii.   *Failure To Adequately Deal With Allocution*

182.   Defense counsel incorrectly advised and misled Mr. Abdullah regarding the scope of statements he could offer during his allocution, in an effort to prevent Mr. Abdullah from testifying. Based on the input he got from the Toryanskis, Mr. Abdullah expected that he would be permitted to give an allocution to the jury that was unlimited in scope. He intended to make statements relating to matters he would have testified to at the guilt and penalty phases of his trial, including statements that would have cast doubt on his guilt. However, according to the trial court's interpretation of the law, evidence concerning guilt was irrelevant because the jury had already convicted him. Because of these restrictions, Mr. Abdullah chose not to allocute. Moreover, by coercing Mr. Abdullah into waiving his right to testify, Mr. Abdullah unwittingly waived his right to allocute regarding guilt-phase issues, including residual doubt and innocence. Trial counsel were also ineffective for failing to advocate for a broader interpretation of Mr. Abdullah's right to allocute. Under the Supreme Court's broad understanding of what constitutes mitigating evidence, Mr. Abdullah's allocution would have qualified. Had Mr. Abdullah allocuted, he would have persuaded the jury to spare his life.

PETITION FOR WRIT OF HABEAS CORPUS - 79

### iii.      *Failure To Adequately Challenge Steven Bankhead's Testimony*

183.    The State elicited testimony from Steven Bankhead, a convicted felon who was incarcerated at the time, that Mr. Abdullah had previously attempted to hire him to rape and kill Ms. Abdullah, suggesting to the jury that Mr. Abdullah had planned to murder his wife long before her actual death.  Defense counsel failed to adequately investigate and challenge this enormously prejudicial testimony.  The Toryanskis were in possession of records that could have been used to impeach Mr. Bankhead.  Those records include, but are not limited to, evidence that Mr. Bankhead had in the past provided false statements to law enforcement.  To wit, the Toryanskis knew that Mr. Bankhead had pled guilty to Idaho Code § 18-5413, which prohibits the provision of false information to law enforcement.  Perplexingly, defense counsel made no use of this evidence, even though it was tailor-made to serve as explosive impeachment material.  A demonstrated willingness to lie to police officers would have greatly undermined Mr. Bankhead's credibility.  Other witnesses who were familiar with Mr. Bankhead could also have testified to his character for untruthfulness, including Shawna Perez, Kerry Stephen Thomas, and Dennis Edward Richardson.  Finally, Mr. Abdullah himself would have testified that he did not have any contact with Mr. Bankhead during the time of their alleged conversation and certainly never hired him to kill and rape his wife.

184.    Mr. Bankhead testified on direct examination that he was in prison for grand theft and had a sentence of "two to ten years."  Defense counsel did not inquire into how many more years in prison Mr. Bankhead would serve if he were unable to regain parole, nor did he ask him about the process for regaining parole or whether Mr. Bankhead hoped to eventually regain parole.  Likewise, defense counsel did not inquire whether Mr. Bankhead planned on bringing to the Parole Commission's attention the fact that he had provided testimony against Mr. Abdullah

PETITION FOR WRIT OF HABEAS CORPUS - 80

once the Parole Commission would reconsider him for parole.  These questions would have exposed Mr. Bankhead's reasons for wanting to curry favor with the prosecution.

185.    Mr. Bankhead testified that Mr. Abdullah taught him how to speak Arabic, a language that Mr. Abdullah—a speaker of Kurdish—is not fluent in.  The Toryanskis said nothing about the error, which would have further demonstrated Mr. Bankhead's unreliability.

186.    Had defense counsel presented these glaring problems with Mr. Bankhead's testimony, there is a reasonable probability that the trial court would not have permitted him to take the stand.  Even if it had, the material would have utterly discredited Mr. Bankhead as an opportunistic liar, and undermined the State's credibility for choosing to rely on him.  While the jury did not find that Mr. Abdullah has a propensity to commit murder, it is reasonably likely that the jury considered Mr. Bankhead's highly inflammatory testimony when weighing the remaining aggravators and reaching its decision to impose the death penalty.

### iv.    *Stipulating To Strike Jurors On The Sole Basis Of Their Juror Questionnaires*[6]

187.    Prior to trial, the prosecution emailed a list of seventeen jurors whom they proposed to be struck by stipulation.  Based only on their juror questionnaires, defense counsel stipulated to striking twelve of them.  Seven of these twelve prospective jurors were opposed to the death penalty according to their questionnaire responses.  Defense counsel made this stipulation despite the trial court cautioning both parties against it.

188.    Before the email stipulation, the trial court emphasized to counsel the importance of face-to-face voir dire over striking jurors based on their responses to a 45-page questionnaire.  Nevertheless, Judge Copsey allowed defense counsel to make this blunder.

---

[6] This jury-selection issue and those that follow affected both the guilt and penalty phases of Mr. Abdullah's trial, because they led to a jury that was predisposed both to convict and to vote for a death sentence.  *See* Claims 14 and 35.

189.   Later, during voir dire, several veniremembers admitted to being confused by the questionnaire.  It turned out that some of the responses did not accurately reflect the prospective jurors' views.  Oral voir dire was necessary to clear up any questionnaire mistakes or inaccuracies.  The stipulated strikes rendered it impossible for these jurors to clear up any misperceptions resulting from questionnaire confusion.

190.   The questionnaires did not contain all of the information necessary to make a reasoned determination about whether they could serve or not.  For instance, one item on a list of choices stated: "I am personally, morally, or religiously opposed to the death penalty, and would never vote to impose it, regardless of the facts and the law in the case."  Because on the available answers, it is not at all conclusive that a juror who circled this answer would not have chosen a subtly different, but legally significant, answer stating the following: "I am personally, morally, or religiously opposed to the death penalty, but I would base a decision whether to impose it on the circumstances of the case and the law which the court instructs must be applied by the jury." When taking the answers at face value, on a cold record, it is simply impossible to tell whether a juror was disqualified because of which letter they might have circled in a list.  In-person voir dire was desperately needed.

191.   There were many inconsistencies in the questionnaires.  As prosecutor Patrick Owen said, "I have a lot of instances, Judge, where a juror on one page says one thing and then says something completely unanticipated on another page."  Mr. Toryanski agreed and remarked: "in reviewing the questionnaire, it's not at all clear that a lot of jurors really understood the questions that were being asked."  This was borne out during the voir dire itself.  When questioned about one answer, Juror 28 stated, "I would probably have to redo that if I were to think about it some more."  Juror 5 conceded that he did not answer all the questions because he found some

confusing and had difficulty expressing his opinions for questions that called for narrative answers. This sort of confusion and inconsistency is precisely why voir dire is essential, and precisely why it was calamitous of defense counsel to forego voir dire on the jurors who were most likely to sympathize with their client.

192.    The prosecution, for their part, did not make the same mistake and refused defense counsel's request to stipulate to strike any members of the venire. Even when the defense suggested striking a potential juror who, based on media coverage, believed the defendant was guilty and should be executed, the prosecution refused and preferred oral voir dire before stipulating. Unlike the prosecution, defense counsel was content to strike jurors opposed to the death penalty without even getting confirmation that the questionnaire responses were accurate.

193.    Defense counsel relied on potentially mistaken questionnaire responses to strike jurors and, as a result, failed to effectively effectuate Mr. Abdullah's constitutional right to question jurors who voiced opposition to the death penalty.

194.    Even if some of the jurors that defense counsel stipulated to dismiss had answers on their questionnaires that might have raised concerns from the prosecution and the trial court about their fitness to serve, the Toryanskis had a duty to do their utmost to try to rehabilitate the jurors. After all, the people who had expressed skepticism of the death penalty or appeared otherwise sympathetic to the defense were the individuals that the Toryanskis should have been most eager to have on the jury. Had they questioned the individuals at voir dire, the Toryanskis could have further explored their views and made it more difficult for them to be excused. It is well-known in the capital defense community that attorneys have a duty to do whatever they can to rehabilitate potentially favorable veniremembers, and the Toryanskis failed to take the most basic step to do so: simply asking them additional questions.

PETITION FOR WRIT OF HABEAS CORPUS - 83

195.    It was not reasonable of the Toryanskis to assume that none of the jurors would have been empaneled had the Toryanskis taken the trouble to voir dire them.

196.    For instance, Juror 12 strongly disagreed that she could impose the death penalty, but indicated that her views in opposition to the death penalty would not prevent or substantially impair her ability to view the facts impartially, and would not prevent or substantially impair her ability to return a guilty verdict on first-degree murder.  This juror did, however, note that she was personally, morally, or religiously opposed to the death penalty, and would never vote to impose it, regardless of the facts and the law in the case, and further stated that she would not impose the death penalty on anyone.  While Juror 12 believed the best argument against the death penalty was that "murder is wrong even if it's the state doing the murdering," it appears that the juror's views against the death penalty are not religiously based.  Specifically, the juror expressed no opinion whether matters of life or death should be left to God, and expressed agreement that innocent people are often executed.  Based on the questionnaire alone, this juror was not a per se cause strike.  First, there is inconsistency in her answers, as she indicated that her views would not prevent or substantially impair her ability to be impartial, but also stated that she could not impose the death penalty regardless of the facts and law.  Second, based on the juror's answers, it is reasonable that the juror's personal opposition to the death penalty is based on the juror's belief that innocent people have been wrongly executed.  For this reason, it would have been imperative to ask Juror 12 at voir dire some variation of the following question: "I understand that you believe innocent people have been executed.  If, however, after hearing all the evidence in this case, you were convinced beyond a reasonable doubt of the defendant's guilt, would you be able to set aside your views and follow the law as the court instructs?"

PETITION FOR WRIT OF HABEAS CORPUS - 84

197.    The same analysis that is set forth above with respect to Juror 12 also applies to Jurors 15, 82, and 154.  It was even more foolish of defense counsel to forsake an opportunity to question Juror 82.  That juror never indicated *strong* agreement or *strong* disagreement on any of the questions relating to views on the death penalty and answered "no opinion" to a large number of questions, including whether he could vote for the death penalty in some cases if he were on the jury.  This reflects at least a certain level of ambivalence about the death penalty, which definitely should have been explored in voir dire.

198.    Under Supreme Court case law, a prospective juror's personal conscientious objection to the death penalty is not a sufficient basis for excluding that person from jury service in a capital case.  The inquiry is whether the jurors' attitudes will prevent or substantially impair the performance of the juror's duties in accordance with his instructions and oath.  Most of the jurors the Toryanskis heedlessly struck from the jury pool by stipulation indicated that their views would not constitute such an impairment.  If that were true, these jurors would have been ideal for the defense: skeptical of the death penalty and yet eligible to serve.  Defense counsel had a duty to see whether that eligibility could be shown, and they failed miserably in discharging that duty.  If the Toryanskis had managed to put a single life-leaning individual on the jury, they would likely have saved their client's life.  They did not even try, even though there was no downside to doing so and a huge potential upside.

199.    If the struck jurors could not have been rehabilitated, voir diring them still would likely have required the prosecution to use peremptories, which would have put Mr. Abdullah in a more advantageous position at jury selection.  It would also preserve any wrongful exclusions for appellate review, and would have conveyed to Mr. Abdullah that his attorneys were fighting for his rights and his life, instead of letting the prosecution roll over them.

PETITION FOR WRIT OF HABEAS CORPUS - 85

200.    Ms. Toryanski later admitted that she and her husband showed a lesser degree of zealousness by stipulating to the dismissals.  She insisted that their lack of diligence was motivated by a desire to appease the prosecution and keep open the prospect of a plea deal, but that motivation was utterly unreasonable, as Mr. Abdullah was plainly not going to take any offer deemed acceptable by the State.  *See* Claim 1(A)(xxxix).  In reality, the stipulation was driven instead by the fact that the Toryanskis were themselves biased in favor of the prosecution, were completely out of their depth and outmatched, totally unprepared to go to trial, and were conflicted in regard to giving a strong defense by their fixed fee contract.

### v.    *Failure To Remove Jurors*

201.    The Toryanskis ineffectively failed to try to remove a number of jurors, either by challenging them for cause or by exercising peremptory strikes.  These jurors ended up being seated and sentencing Mr. Abdullah to death.

- Juror 103.  Juror 103 admitted to having a social and business relationship with Leslie and Gary Beck.  The Becks were Ms. Abdullah's cousins who both testified during the guilt phase of the trial. Juror 103 stated that she had spoken to Leslie Beck on the phone and that Gary Beck had a business relationship with Juror 103's husband.  The juror noted that in addition to her family's business relationship with the Becks, she would occasionally see the Becks socially. Defense counsel neither asked Juror 103 whether her relationship with the Ms. Abdullah's family members would affect her ability to be an unbiased juror, nor did defense counsel ask how returning verdict of not guilty might affect Juror 103's and her husband's business relationship with the Becks.  Defense counsel was ineffective by allowing a juror with a potentially personal stake in the outcome of trial to serve unchallenged.

PETITION FOR WRIT OF HABEAS CORPUS - 86

- Juror 59. Defense counsel failed to challenge for cause the seated Juror 59 for bias even though he indicated partiality toward law enforcement and was in the process of becoming a police officer. Juror 59 had interned with the Moscow Police Department and was currently interviewing and testing with the Boise Police Department, the Idaho State Police, and the Meridian Police Department. As was clear from both Juror 59's voir dire and juror questionnaire, he was intent upon becoming a police officer and was biased toward law enforcement. On a scale of one to seven for honesty, one being least honest and seven most honest, Juror 59 rated police officers with a six and criminal defense attorneys with a three. During voir dire, Juror 59 also stated that he believed police officers more than other witnesses. When asked if he would consider police testimony equal to other witnesses, Juror 59 responded, "I think, yeah, if I was instructed." As noted in Claim 38, Juror 59 was never so instructed. Not only did defense counsel fail to challenge Juror 59 as a biased juror, they also failed to further explore how Juror 59's interest in a career as a police officer would affect his ability to serve impartially on the case. Defense counsel didn't ask, for example, if Juror 59 believed serving on a capital case and returning a guilty verdict and a death sentence would improve his chances of becoming a police officer. Like Juror 103, Juror 59 potentially had a personal stake in the outcome of the trial and was, as a result, unqualified to serve on the jury. Defense counsel demonstrated a complete lack of effectiveness by passing for cause Juror 59.

- Juror 83. This juror eventually served as the foreperson so counsel's failure here was highly prejudicial. In Juror 83's questionnaire, he rated himself a nine out of

PETITION FOR WRIT OF HABEAS CORPUS - 87

ten in support of the death penalty. He strongly agreed that he supported the

death penalty, disagreed that only the worst murderers should be executed,

expressed his views that society would be stronger if the death penalty was

imposed more frequently, that executions are needed to protect the public, that

those who kill once will kill again, and, perhaps most troublingly in this case, that

a murderer's childhood is irrelevant. During voir dire, Juror 83 stated:

> Well, I feel strongly in justice issues that there needs to be a notion of
> justice in all that we do and if someone takes someone's life, it is
> reasonable to expect that their life may be taken for that purpose. And
> I realize there is a lot of mitigating circumstances and that's why under
> law we have various levels, first degree, second degree, and so forth in
> which it may not be warranted, but there are some situations that I do
> believe are heinous enough and with so much malice that it's
> warranted.

Clearly, Juror 83 believed that mitigating evidence takes first-degree murder

down to manslaughter. For this juror, then, if a defendant was convicted of first-

degree murder, that would mean that no mitigation was present, and a death

sentence would automatically follow. Far from taking the obvious step of

establishing this disastrous juror as a proper for-cause challenge, defense counsel

took the bizarre step of rehabilitating him, declaring, delusionally: "what I'm

hearing you say . . . you'll listen to the aggravators, but you'll also listen to

mitigating facts and circumstances as presented by the defense." It is hard to

imagine how defense counsel heard that from this juror's responses, especially

since it is the exact opposite of what the juror actually said. Instead, this juror

made it plain that he believed mitigation only had a place at the guilt phase and

was irrelevant to sentencing. The Toryanskis took someone who practically

swore his intent was to sentence their client to death and ensured that that person

PETITION FOR WRIT OF HABEAS CORPUS - 88

sat on the jury.  Prejudice was especially strong here because Juror 83 took on a leadership role as the foreman, and no doubt swayed his peers toward death.

- Juror 92.  In her questionnaire, Juror 92 rated herself a six out of ten in favor of the death penalty, disagreed that the death penalty should only be applied to the worst murders, disagreed that it is better to let guilty people go free if it prevents innocent people from being convicted, agreed that executions are needed to protect the public, and agreed that it does not matter what kind of childhood a murderer had.  She further indicated that the best argument for the death penalty was an "eye for an eye" and "proof" would be important for her in deciding whether to impose a life or death sentence.  During voir dire, when asked specifically about her support for the death penalty, the juror stated, "Well, those are hard to answer.  I think if there's no doubt—if there's not a reasonable doubt, then the death penalty—I would not have a problem imposing, but if there is doubt or there's not enough evidence, I would not impose it."  As with Juror 83, Juror 92 was quite obviously someone who effectively has no interest in mitigation: "if there's no doubt," i.e., if the defendant is proven guilty, then the defendant gets the death penalty.  Juror 92 was a classic automatic death juror, and cried out for a challenge, though defense counsel did not move for one.  Defense counsel should also have explained what mitigating evidence was to Juror 92, as she thought it meant "an excuse" and admitted, "I don't understand" what it is.  Ms. Toryanski's brief, stumbling response shed no light on the concept, and left Juror 92 just as confused as she was when voir dire began, and just as unlikely to consider mitigation.

- Juror 1. Juror 1 stated in her questionnaire that she believed defense attorneys to be the least honest (1 of 7), while rating prosecutors and police officers as the most honest (7 of 7). She rated herself an eight out of ten in support of the death penalty, and indicated life in prison without parole is not a harsh enough punishment for murder. For this juror, the best argument for the death penalty is "guilt beyond reasonable doubt" and the best argument against it is "innocent persons wrongly convicted and executed." At voir dire, Juror 1 stated that if she were confronted with a case involving "premeditated and well thought out and children involved, yeah, I would go for the death penalty." She was a virtually certain vote for death and she acknowledged as much with trial counsel. There was no effort made to establish the juror as a for-cause challenge. Juror 1 served as an alternate, and as an automatic-death juror she presumably influenced the other jurors to adopt a similarly closed-minded attitude.

- Juror 100. For the reasons stated in Claim 38, Juror 100 was biased against Mr. Abdullah. Defense counsel should therefore have taken steps to remove her from the jury. Juror 100 served as an alternate, and as a biased juror she presumably influenced the other jurors to vote against Mr. Abdullah at both phases of trial.

- Any juror listed in the following sub-claim, Claim 1(B)(vi), who does not appear above, also should have been removed for cause for the reasons below.

### vi.    *Failure To Adequately Voir Dire Death-Leaning Jurors*

202.    Defense counsel's failure to adequately voir dire veniremembers resulted in a death-prone pool of jurors and the seating of jurors who would automatically impose the death penalty for first degree murder. Before voir dire, potential jurors filled out a questionnaire that included

PETITION FOR WRIT OF HABEAS CORPUS - 90

questions about their death penalty views.  Many venire members, including some who sat on the jury, indicated prejudice.  Several jurors stated that a life sentence was not sufficient for the crime of murder on the questionnaire—this response suggested these jurors were literally unqualified because they would automatically give a death sentence for murder.  Several jurors also stated that they would not consider a defendant's childhood in sentencing—this response should have signaled to defense counsel the need for effective voir dire since, in general, a capital defendant's childhood is one of the most compelling forms of mitigation evidence, and, in particular, Mr. Abdullah's childhood was so bleak as to be barely imaginable to the average juror.  Defense counsel, distracted from the importance of voir dire by their ill-placed focus on non-existent plea negotiations, neglected voir dire, which resulted in an unconstitutionally biased jury in violation of the Sixth, Eighth, and Fourteenth Amendments.

203.    On their distraction from voir dire, the Toryanskis admitted they had allowed their desire to pursue plea negotiations and attempts to convince Mr. Abdullah to seek a plea offer to compromise their advocacy during jury selection.  Kim Toryanski later stated that her jury selection advocacy was weakened by the defense team's fatigue and desire to appear reasonable to the prosecution.  The resulting inattention to the voir dire process resulted in a jury made up of death-prone jurors who would not hold the prosecution to its burden of proof during the guilt phase and would give an automatic death sentence regardless of any mitigation.

204.    Defense counsel also ostensibly used the Colorado Method scale to rate potential jurors according to death penalty views.  The Toryanskis rated sixteen of the first fifty jurors who were passed for cause as a "six" or "seven."  A six and a seven ranking means the potential juror will automatically give a death sentence—both rankings are subject to excusal for cause.  The difference is that a six may be willing to say hypothetically they would "perhaps" consider

mitigating evidence. Defense counsel's ineffective voir dire let these constitutionally unqualified venire members pass for cause.

205.    Defense counsel's attempt to use the Colorado Method failed in the actual questioning of death-prone jurors. The Colorado Method requires defense counsel to remove any guilt phase defenses from the juror's self-assessed penalty views. For example, if a juror says he could impose a life sentence if the murder was not provoked or premeditated, defense counsel should ask the juror to imagine the defendant committed an unprovoked, premeditated murder without any defenses whatsoever. Once such jurors realize there are no defenses in this imaginary scenario, they will truly reveal whether they believe death is the only appropriate penalty for first-degree murder. The Toryanskis utterly failed to follow what is a standard practice in capital litigation. Instead, they allowed potential jurors who would automatically impose a death sentence to remain in the jury pool and even serve on Mr. Abdullah's jury.

206.    For jurors who appear in the following list and in the list of jurors that defense counsel should have struck for cause, Mr. Abdullah argues both that they were ineligible to serve on the existing record and also that defense counsel's voir dire of them was inadequate. Jurors who defense counsel did not adequately voir dire include, but are not limited to, the following:

- Juror 59. This seated juror was interviewing to become a police officer. As noted in Claim 1(B)(v), Juror 59's questionnaire responses indicated he was extremely prone towards a death sentence. He also confessed he would believe law enforcement more than other witnesses. Defense counsel was fully aware of these responses and believed Juror 59 was a "killer." Before voir dire, in fact, the Toryanskis attempted to remove Juror 59 by stipulation based on the questionnaire responses, but the prosecution refused. During voir dire, Juror 59

gave a generalized agreement to consider mitigation, but defense counsel did not explore specifically if the juror would actually consider mitigation evidence. Therefore, not only is it concerning that defense counsel passed Juror 59 for cause after their failed attempt at voir dire, but also defense counsel did not, or forgot to, use a peremptory strike to block this biased juror from sentencing Mr. Abdullah to death.

- Juror 83.  As noted above in Claim 1(B)(v), this seated juror was fundamentally disqualified to sit on the jury.  Instead of adequately asking questions about this juror's qualifications, defense counsel surmised that he was "kind-hearted" and passed him for cause.  Asked to explain why, defense counsel provided a vague, non-responsive answer to PCR counsel on the failure to effectively voir dire, challenge, or strike this juror.

- Juror 98.  This seated juror's questionnaire indicated strong support for the death penalty, especially for a homicide that was planned against an innocent person. She also agreed that murder is murder and motives and circumstances are not important, that harsher treatment of criminals has reduced crime, that she would not consider childhood in mitigation.  The juror disagreed that only the worst murderers should be executed, disagreed that it is possible for the worst criminal to turn his life around, and disagreed that forgiveness and redemption are available to all.  In deciding on a sentence, the juror noted she would consider "how the person planned the murder, how cruel they were to the victim" important.

PETITION FOR WRIT OF HABEAS CORPUS - 93

In voir dire, it became clear Juror 98 had already formed an emotional connection to the case.  She was familiar with the case through the media and was upset because she and victim were both mothers.  She also remembered Mr. Abdullah's arrest, and stated, "when someone's arrested, you assume that there's some cause there . . .  They obviously had reason to arrest him.  They felt like—they knew that there was evidence that showed possibly he had done it."  On this basis alone, Juror 98 was unqualified to sit on the jury.  Her death penalty views also rendered her fundamentally incapable of giving Mr. Abdullah a fair trial.  On the death penalty, she stated, "But what I feel is if there are some really horrible things that people [do].  I think that is the way it should end."  She offered defense counsel a promise "to try" to keep an open mind until all the evidence was presented.  This promise was meaningless, however, from a juror who had already judged the case and would automatically impose a death sentence for murder.  As was their pattern, defense counsel failed to question the juror and reveal whether she would automatically impose the sentence or consider any mitigation.  Defense counsel recklessly and ineffectively passed this juror for cause.

- Juror 28.  This seated juror's questionnaire stated that first degree murder was the strongest argument for the death penalty and the best argument against it was innocence.  The juror's questionnaire also indicated a belief that the death penalty was too seldom used and provided "no opinion" on whether he could give meaningful consideration to mitigation.

On voir dire, defense counsel started to ask about Juror 28's death penalty views but abruptly stopped when it was becoming clear this juror would automatically

PETITION FOR WRIT OF HABEAS CORPUS - 94

give a death sentence for murder.  The juror stated his belief that murder "with aforethought" would warrant a death sentence.  This juror also indicated he would believe law enforcement more than other witnesses.  Instead of adequately pinning down this juror's death penalty and pro-prosecution views, defense counsel hurried through questioning and, as a result, was unable to challenge this unqualified juror or intelligently exercise their peremptory challenges.

- Juror 2.  This alternate juror stated that the best argument against imposing the death penalty would be if the homicide was justified by self-protection or if the defendant suffered diminished capacity.  Defense counsel failed to explore if this juror would automatically impose the death penalty for first degree murder.

- Juror 1.  This alternate juror believed in "an eye for an eye."  He stated that he would not impose the death penalty if the defendant was provoked or acting without intent.  Defense counsel failed to explore if this juror would automatically impose the death penalty for first degree murder.

- Juror 36.  This seated juror disagreed that only the worst murderers should be executed and believed a murderer's childhood was irrelevant rendering her fundamentally unqualified to serve on a capital jury.  The most important circumstance for this juror, in imposing a death penalty, would be if the defendant was aware he was killing another person.  A first degree murder conviction in this case would mean the prosecution had proved Mr. Abdullah knew what he was doing.

Juror 36 also implied during voir dire that she had already decided to give Mr. Abdullah a death sentence:  "Quite honestly, I was thinking about this.  I would—

PETITION FOR WRIT OF HABEAS CORPUS - 95

I would with great remorse go for it.  I would vote for the death penalty . . . ."

From this statement it is obvious the juror was guaranteed to give Mr. Abdullah a

death sentence and, because of defense counsel's inadequate voir dire, she did.

- Juror 44.  This seated juror's questionnaire called for vigorous voir dire.  He

  described himself as six out of ten in favor of the death penalty, did not believe a

  defendant's childhood was relevant, disagreed that only the worst murderers

  should be executed, and believed it would not be difficult to give someone a death

  sentence.  For this juror the best argument against the death penalty was wrongful

  conviction and the best argument for the penalty was "an eye for an eye."

  Defense counsel only asked the juror if he could give value to mitigation—a

  vague question to which an affirmative response leads to no insight into whether

  the juror would automatically impose the death penalty.  Defense counsel did not

  inquire further and due to their inadequate voir dire they were unable to challenge

  this juror for cause or intelligently use peremptory strikes.

- Juror 45.  This seated juror's questionnaire stated he supported the death penalty,

  but indicated he had no strong feelings.  He also stated he would want information

  about the nature of the crime and the perpetrator prior to supporting the death

  penalty in any given case.  These vague responses invited exploration on voir

  dire, especially asking which facts about the crime and the perpetrator would

  matter to this juror.  Instead, defense counsel did not ask a single question about

  the death penalty or the juror's willingness to listen to and give meaningful

  consideration to mitigation evidence.  This failure to question the juror about his

death penalty views and openness to mitigation evidence was an abdication of defense counsel's role as Mr. Abdullah's advocate.

- Juror 81.  This seated juror's questionnaire showed support for the death penalty. The juror also strongly disagreed that only the worst murderers should be executed, and did not believe jurors should be required to follow the law given in instructions.  In voir dire, the juror stated, "there are two types of murderers; one where somebody gets hot headed and loses it for a moment; they do something stupid.  And then there are people who think it through.  I think everybody feels they are going to get away with it or they wouldn't do it in the first place."  Since Mr. Abdullah was charged with first degree murder, the Toryanskis should have asked follow-up questions but failed.  Defense counsel did not ask this juror a single question about the death penalty and was, therefore, ineffective.

- Juror 29.  Juror 29 said she would automatically impose the death penalty if so instructed.  Defense counsel did not explain through voir dire that automatic, mandatory death sentences are unconstitutional.  Instead, defense counsel passed for cause a venire member who was under the mistaken impression that the judge would give her a instruction to impose an automatic death sentence.

- Juror 77.  Juror 77 affirmed that he believed the death penalty is the only appropriate sentence for murderers and would not consider absence of a criminal record in mitigation.  Without arguing that Juror 77 was mitigation impaired, defense counsel passed for cause.

- Juror 111.  Juror 111 reported he had no problem with the death penalty and could impose it if Mr. Abdullah was guilty of first degree murder.  On his questionnaire,

PETITION FOR WRIT OF HABEAS CORPUS - 97

Juror 111 rated himself eight out of ten as strongly in favor of the death penalty. Defense counsel passed for cause.

- Juror 8. Juror 8 indicated in his questionnaire that "[i]n some cases, the death penalty is required. Pre designed [sic] murder would be one example." Juror 8 stated that the best argument for the death penalty would be "murder for hire, pre design to murder some one [sic]." In addition, this juror wrote that the best argument against the death penalty would be accidents, "imparement [sic] of judgment (not drug induced)," neither of which were issues in this case, and both of which would render a homicide less than a first-degree murder in any event. Juror 8 also stated that it did not matter to him what kind of childhood a murderer had and rated himself a five out of five in favor of the death penalty. Finally, this juror indicated that the "level of intent & purpose" would be important to him in deciding whether to impose death or give a life sentence. Defense counsel failed to adequately follow up on these responses, which seem to indicate that this juror would impose the death sentence for any premeditated, first-degree murder where there is no evidence of accident or impairment. In the context of Mr. Abdullah's case, this would essentially be an automatic death juror, and therefore defense counsel should have asked the trial court to excuse Juror 8 for cause.

### vii.   *Failure To Adequately Voir Dire Life-Leaning Venire Members*

207.    In addition to stipulating to strike seven veniremembers opposed to the death penalty by email, *see* Claim 1(B)(iv), defense counsel provided ineffective assistance when they failed to adequately question prospective jurors during voir dire. Several prospective jurors who appeared opposed to the death penalty were excused for cause without any inquiry into their ability to set

PETITION FOR WRIT OF HABEAS CORPUS - 98

their beliefs aside and apply the law.  Jurors who expressed concerns about the death penalty and were inadequately questioned by defense counsel include, but are not limited to, the following:

- Juror 30 was a veteran of the Vietnam war and had voted against the death penalty when he lived in Oregon.  Nevertheless, Juror 30 indicated he was not so unalterably opposed that he couldn't consider the death penalty under any circumstances. The prosecution, during its voir dire, asked questions about Juror 30's service in Vietnam and how it would possibly affect his ability to impose the death penalty.  Although he expressed anxiety over a death sentence, Juror 30 stated that, although he did not want to be the jury foreman, he could publicly affirm a vote for the death penalty.  Defense counsel did not ask Juror 30 a single question.  Instead, defense counsel volunteered to join the prosecution in challenging Juror 30 for cause.

- Juror 48 was opposed to the death penalty.  She indicated that she could impose it in some cases, but that she believed life imprisonment was sufficient most of the time.  After the judge finished her questions, the prosecution asked no questions, stating simply that the judge had covered everything sufficiently.  Defense counsel, echoing the prosecution, also said the judge had covered everything sufficiently and joined the prosecution in moving to excuse the juror for cause. Defense counsel did not ask Juror 48 a single question.

- Juror 49 wrote that she opposed the death penalty in her questionnaire. Without questioning her, defense counsel joined the prosecution in saying she was disqualified based on the questionnaire responses.  Juror 49 indicated some hardship in serving on the jury, and instead of further questioning to clarify the

PETITION FOR WRIT OF HABEAS CORPUS - 99

extent of and identify remedies for any hardship issues, defense counsel collaborated with the prosecution in agreeing the juror was too opposed to the death penalty.  Despite the fact that defense counsel ineffectively conceded the Juror 49 was pro-life, the trial court decided to excuse Juror 49 for hardship. The judge justified the hardship excusal by pointing out that it was improper to make death-qualification rulings based simply on the questionnaires, even though that is exactly what the defense along with the prosecution were requesting.  If defense counsel had been of a similar mind as the judge and not allowed the questionnaires to be the final word from a juror, they would have actively questioned prospective jurors like Juror 49 in accordance with Supreme Court precedent.  Instead, defense counsel failed to effectively represent Mr. Abdullah by allowing the court to strike those opposed to the death penalty without any inquiry and without any challenge.

- Juror 79.  This veniremember questioned the utility of the death penalty but committed to following the judge's instructions.  He was excused for hardship although the trial court refused to dismiss veniremembers with similar employment concerns.  In fact, excusal for hardship was pretextual.  The actual reason was due to his criticisms of psychiatry and suspicions about testimony from those psychiatrists who depend on the State of Idaho for client referrals.  Despite these opinions, Juror 79 affirmed that he could be fair.  But defense counsel failed to adequately voir dire Juror 79, did not fully explore the issue of hardship, and did not request Juror 79 check with his employer for juror duty coverage as was the practice with most jurors claiming hardship.  Instead, defense

PETITION FOR WRIT OF HABEAS CORPUS - 100

counsel joined the prosecution and the trial court in not objecting to the pretextual excusal of Juror 79.

### viii.        *Failure To Adequately Prepare Life-Leaning Jurors For Capital Jury Service*

208.    Defense counsel lost a valuable opportunity to prepare life-leaning jurors when they failed to use voir dire to provide guidance and inform jurors of their right to maintain their own opinions and positions during deliberations. Due to defense counsel's failure, two life-leaning jurors were potentially subjected to having their wills overborne by other jurors.

- Juror 68's questionnaire suggested a general opposition to the death penalty but indicated she could vote for it in the right case. She wrote that "everyone deserves a second chance," and indicated a defendant's childhood would be meaningful to her. At voir dire, she promised to "consider" factors at sentencing, but was never asked precisely what it was she would consider, with the exception of the defendant being a good provider. It was also never established that Juror 68 could give *meaningful* consideration to mitigation, which is what a competent voir dire is all about. No effort was made to educate this juror about preserving her personal moral integrity through a jury verdict. She is an example of a juror who would likely be moved by mitigation, but who must be empowered to hold fast to her judgment in the face of criticism from fellow jurors. Without that empowerment, a juror like this one typically submits to the will of the majority and goes along with a death vote, especially on a jury—like this one—where defense incompetence has led to a jury highly slanted toward death. That dynamic is even more likely when defense counsel fail to emphasize to a juror that she is not required to articulate, even to herself, her reasons for voting in

PETITION FOR WRIT OF HABEAS CORPUS - 101

favor of life, as an instinctive desire to afford a defendant mercy is sufficient under the law.  Of course, defense counsel did not convey that lesson to Juror 68 either.  The Toryanskis never even tried to insulate this promising juror from the pressures of deliberations, and therefore failed to protect her as a valuable defense asset.

- Juror 96.  This seated juror's questionnaire indicated support for, but no strong views on, the death penalty.  For this juror, future dangerousness was the most important consideration in deciding whether to impose death.  In voir dire, the juror stated she believed the death penalty could be a good thing and wasn't totally against it.  Defense counsel did not take voir dire as an opportunity to ask this juror about considering mitigating evidence in relation to the potential for future dangerousness.  Doing so could have also prepared this juror for trial by informing her that she had a right to stand by her decision and deserved to be heard by other jurors.  Counsel made no effort to effectively voir dire and consequently lost the opportunity save Mr. Abdullah from a death sentence.

ix. *Failure To Adequately Voir Dire Jurors Whose Opinions About The Death Penalty Were Unknown*

209.    In addition to botching the questioning of prospective jurors who tilted toward either life or death, the Toryanskis botched the questioning of prospective jurors who were question marks.

- Juror 14.  Juror 14 failed to rank himself on a scale of one to ten in favor of the death penalty.  In his questionnaire, he indicated that in deciding between life or death, what was important to him was "[t]hat the evidence indicated beyond a reasonable doubt, person was of sound mind at the time, and crime was purposely done in hideous/heinous [sic] manner."  Overall, Juror 14 did not provide more

PETITION FOR WRIT OF HABEAS CORPUS - 102

than a surface view into his feelings on the death penalty, and voir dire did not meaningfully illuminate his position. He was a question mark, and defense counsel could not reasonably determine what action to take on him without trying to gather more information, which they failed to do.

### x. *Failure To Combat Premature Juror Decision-Making Through Effective Voir Dire*

210. Voir dire is an opportunity for defense counsel to assess a potential juror's ability to consider mitigating evidence by previewing the defense's sentencing case. Effective voir dire previewing can serve to guide juror's away from premature decision-making and signal which jurors are subject to for-cause excusal or peremptory strike. Mr. Abdullah's trial counsel, by failing to use voir dire effectively failed to combat premature juror decision-making and to prepare jurors to consider mitigating evidence in sentencing. Both death-leaning and life-leaning jurors need preparation through defense counsel's voir dire. Jurors who are adamantly pro-death often operate under the presumption that unequivocal proof of guilt will justify the death penalty. Such jurors are exceedingly likely to make a sentencing decision despite instructions to the contrary. Effective voir dire of death-prone jurors will avoid premature decision-making. Mitigation preparation is also essential in terms of preparing all jurors to suspend a sentencing decision until they've heard and considered mitigating evidence. By failing to preview mitigation through voir dire of all members of the venire, defense counsel acted ineffectively and the result was a jury that was unprepared to consider Mr. Abdullah's mitigating circumstances and resulted in an unreliable death sentence.

### xi. *General Ineffectiveness On Sentencing Instructions*

211. As a general matter, the Toryanskis' approach to instructions at sentencing was abysmal. They offered no argument for any of their proposed instructions, other than to simply assert

PETITION FOR WRIT OF HABEAS CORPUS - 103

them, and they massively over-relied on Florida law as authority for the instructions, thus

demonstrating their ignorance of Idaho capital jurisprudence.  Below are more specific acts of

ineffectiveness in connection with the sentencing instructions.

**xii.**      ***Requesting An Incorrect Instruction On The Great-Risk Aggravator That Allowed The Prosecution To Prove The Aggravator***

212.     One of the aggravators on which the State relied to pursue a death sentence was that Mr.

Abdullah knowingly created a great risk of death to many persons.  Defense counsel proposed an

instruction defining "many persons" as "more than four people."  That instruction was mistaken,

as five people would not be considered "many" in everyday speech, as confirmed by popular

dictionaries.  More to the point, the instruction was also enormously damaging to Mr. Abdullah.

The jury had already convicted Mr. Abdullah of arson.  Three people were in the Siesta residence

when the fire began, one child was found right outside of it during the fire, and one neighbor

went into the house during the fire to rescue a child.  The prosecution could therefore easily

demonstrate that the lives of five people were jeopardized by the fire.  In this way, defense

counsel suggested an instruction that was engineered to suit the State's case and harm their own

client, reflecting the same prosecution-oriented outlook and utter abandonment of Mr. Abdullah

that is discussed elsewhere in this petition.

**xiii.**      ***Failure To Challenge For Lack Of Evidence The Great Risk Aggravator***

213.     As argued in Claim 43, the prosecution did not prove the great risk of death aggravator.

By failing to challenge the prosecution's evidence, defense counsel deprived Mr. Abdullah of

effective representation and as a result the jury was allowed to credit the State's deficient proof.

The Toryanskis should have objected on the basis that there was insufficient evidence that Mr.

Abdullah knowingly created the risk, that "many persons" were endangered, and any great risk

of death had no relationship with Ms. Abdullah's cause of death.  *See* Claims 28, 29, 41.

xiv.     *Failure To Request An Instruction Regarding Evidence Relating To Multiple Aggravators*

214.    In Idaho, the jury is allowed to bring the same piece of evidence to bear on more than one aggravator, so long as no two aggravators are supported solely by the identical evidence.  Given that rule, defense counsel should have requested written findings and an instruction to prohibit improper duplication of evidence in support of multiple aggravators.  Without written findings, the record is insufficient to determine whether the jury properly considered additional aggravating evidence to support its finding of each alleged aggravator.  Mr. Abdullah was prejudiced by the failure of trial counsel to request an instruction requiring the jury to make specific findings with respect to each aggravator because the lack of findings precludes meaningful review of the jury's decision imposing a death sentence.

xv.     *Failure To Object To Instruction Regarding Juror Unanimity And Duty To Consult*

215.    As discussed in Claim 53, the jury was improperly given instructions that suggested they had to be unanimous on the presence of mitigating evidence and on the weighing of mitigation against aggravation, and on their duty to consult with one another about the penalty verdict.  Those instructions violated well-established Supreme Court law, and defense counsel should accordingly have objected to them.

xvi.     *Failure To Request Instruction Defining The Weighing Process Consistent With Idaho Law*

216.    Under well-established Idaho law, a defendant cannot be sentenced to death unless it is found that each aggravating circumstance outweighs the cumulative mitigating evidence.  Mr. Abdullah's jury was instructed: "If you find that all of the mitigating circumstances are sufficiently compelling to make the imposition of the death penalty unjust or you cannot unanimously agree on that issue, then the judge must sentence the defendant."  The court did not

define "sufficiently compelling" and did not require the jury to find that each individual aggravating circumstance outweighed the collective mitigation.  Defense counsel should have proposed an instruction informing the jury, in accordance with clear Idaho precedent, that it would have to weigh each aggravating circumstance against all of the mitigating evidence taken together.  With these instructions, the jury could have voted for a death sentence because they believed that the mitigation outweighed the aggravation, but not in such a manner as or degree as to make imposition of the death penalty unjust.  That result would be starkly at odds with Idaho law.  The Toryanskis could have attempted to bring the instructions in line with the caselaw but did not.

### xvii. *Proposing An Instruction That Removed Reference To The Sentence That Would Be Imposed If The Jury Did Not Vote Unanimously For Death*

217.    Before the sentencing instructions were given, the trial court discussed with the attorneys what the jury would be told about how the case would proceed if it did not vote unanimously for death.  The Toryanskis proposed that the court not tell the jury what sentences the court would be choosing from in that event.  Instead, they requested that the court inform the jury that if it could not decide on death, "the judge will sentence the defendant, and then ending it there."  The Toryanskis stuck with that position even though the judge reminded them that "if the jury's not sure of what the potentials are for the defendant, . . . they will err on the side of death."  The court embraced the Toryanskis' misguided understanding of the law, and instructed the jury that if the State failed to prove an aggravator, "the judge must then sentence the defendant," and if the jury could not agree on mitigation or voted against death, again, "the judge must sentence the defendant."  No instruction was given informing the jury of what possible punishments the judge could impose if no death sentence were meted out.  As it happened, the judge could have imposed a sentence with a minimum of ten years and the potential of up to life imprisonment.

Had the jury known this, it would have assumed that—if death were not imposed—Judge

Copsey would likely have given Mr. Abdullah the harshest sentence available. That assumption

would have been based on the extreme hostility that Judge Copsey manifested toward the

defense, which the jury would have seen throughout the trial. And it is an assumption that would

have almost certainly been correct, as demonstrated by the fact that Judge Copsey has in other

cases erred on the side of such draconian punishments. It is also demonstrated by the fact that in

the one area where she was given sentencing discretion—on the non-capital counts—she *did*

dole out the stiffest possible sentences. By deliberately depriving the jury of relevant

information about what would happen if it did not impose death, the Toryanskis further tipped

the scales against their client. The absence of information likely led jurors to believe that there

was a risk that if Mr. Abdullah were not sentenced to death he would be quickly released and

receive no punishment for his crimes. Such a conclusion would obviously lead jurors to find

death appropriate, rather than risk the possibility that Mr. Abdullah would quickly gain his

freedom.

> **xviii.** ***Failure To Challenge Death Penalty Statute For Containing Conflicting Standards Regarding Consideration Of Mitigation And Aggravation***

218. An Idaho defendant cannot be sentenced to death unless at least one aggravating

circumstance, considered individually, outweighs the aggregate of all of the evidence presented

in mitigation. Upon such a finding, the death penalty will only be imposed if mitigating

circumstances are not found to be "sufficiently compelling" such that death is unjust. There is

no statutory definition of the phrase "sufficiently compelling." Idaho Code § 19-2515(3)(b)

states that "[w]here a statutory aggravating circumstance is found, the defendant shall be

sentenced to death unless mitigating circumstances which may be presented are found to be

sufficiently compelling that the death penalty would be unjust." Subsection (7)(b) of the statute

then adds that a jury must be informed that if it

> finds the existence of a statutory aggravating circumstance but finds that the existence of mitigating circumstances makes the imposition of the death penalty unjust or the jury cannot unanimously agree on whether the existence of mitigating circumstances makes the imposition of the death penalty unjust, the defendant will be sentenced to a term of life imprisonment without the possibility of parole.

In subsection (8), however, the statute provides that:

> Upon the conclusion of the evidence and arguments in mitigation and aggravation: With regard to each statutory aggravating circumstance alleged by the state, the jury shall return a special verdict stating: Whether the statutory aggravating circumstance has been proven beyond a reasonable doubt; and, If the statutory aggravating circumstance has been proven beyond a reasonable doubt, whether all mitigating circumstances, when weighed against the aggravating circumstance, are sufficiently compelling that the death penalty would be unjust.

If a jury has been waived, subsection (8)(b)(iii) directs that the court shall:

> Upon weighing all mitigating circumstances against each statutory aggravating circumstance separately, determine whether mitigating circumstances are found to be sufficiently compelling that the death penalty would be unjust and detail in writing its reasons for so finding.
> In reviewing these sections, the only thing that becomes clear is that the statute provides

three different standards for considering mitigating evidence, comparing it to aggravating

circumstances, and determining whether imposition of the death penalty will be unjust. The jury

in Mr. Abdullah's case received inconsistent instructions, which reflect the inconsistencies in the

statute.

219.    Studies show that jurors often do not understand instructions regarding mitigation and

aggravating circumstances in capital cases. As a result of defense counsel's deficient

performance, his jury was erroneously instructed regarding its consideration of aggravating and

mitigating evidence, in a manner that reduced the State's burden of proof. The Toryanskis'

failure to challenge the statute resulted in the use of an improper and unconstitutional process.

PETITION FOR WRIT OF HABEAS CORPUS - 108

### xix. *Failure To Argue That The Instruction On How To Measure Mitigation Against Aggravation Violated The Ex Post Facto Clause*

220.    Defense counsel could and should have made the argument raised in Claim 50 and failed to do so.

### xx. *Failure To Argue That Mr. Abdullah Was A Constitutionally Unsuitable Candidate For Death*

221.    Defense counsel could and should have made the argument raised in Claim 34 and failed to do so.

### xxi. *Failure To Request An Instruction Requiring A Finding That The Aggravation Outweighed The Mitigation Beyond A Reasonable Doubt*

222.    Defense counsel failed to request that the jury find beyond a reasonable doubt that the aggravation outweighed the mitigation.  As discussed in Claim 49, any fact that elevates a life sentence to a death sentence must be found beyond a reasonable doubt.  Instead, the trial court instructed the jury to decide "whether all mitigating circumstances presented, when weighed against each statutory aggravating circumstance proven by the State, are sufficiently compelling to make the imposition of the death penalty unjust."  This instruction placed the burden on the defense's mitigation to render a death penalty unjust, rather than rightly placing the burden on the prosecution to prove each aggravator outweighed all mitigation beyond a reasonable doubt.  By failing to request an appropriate sentencing instruction, defense counsel's mistake allowed the jury to reach an unconstitutionally arbitrary decision to sentence Mr. Abdullah to death.

### xxii. *Eliciting Testimony That Murder Is A Capital Offense Under Islamic Law*

223.    At the guilt phase, the prosecution called as a witness Khaja Shuab-Ud-Din, the imam of a Salt Lake City mosque.  During cross-examination, defense counsel asked Mr. Shuab, "What does the Islamic faith say about killing a human being?"  Mr. Shuab responded that "the person will be punished in the hereafter by being put in the hellfire."  Defense counsel then followed up:

"Does it say anything about punishment here on earth?"  "Yes," answered Mr. Shuab, "[a]ccording to Islamic law, there is death for death, like the Taliban."  There was no conceivable strategic justification for defense counsel in a capital first-degree homicide case to seek, and continue pursuing, testimony from a religious scholar about how murder is punishable by death in the Muslim tradition.  Although this error occurred at the guilt phase, it would have been most prejudicial at sentencing, where the same jury that heard the testimony determined whether Mr. Abdullah would live or die.

224.    The preceding errors were so pervasive that Mr. Abdullah's defense attorneys failed to subject the prosecution's case to meaningful adversarial testing.  Therefore, Mr. Abdullah need not show prejudice on his penalty-phase ineffectiveness claims.  *See United States v. Cronic*, 466 U.S. 648, 659 (1984); *Holloway v. Arkansas*, 435 U.S. 475 (1978); *Geders v. United States*, 425 U.S. 80 (1976); *Powell v. Alabama*, 287 U.S. 45, 53 (1932).  Furthermore, for any ineffective acts or omissions that resulted in a structural error, Mr. Abdullah is not required to establish prejudice.  *See Styers v. Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008).  If Mr. Abdullah is required to demonstrate prejudice, then the claims above show that, both cumulatively and individually, he was prejudiced by the deficient performance of his trial attorneys.  *See Harris v. Wood*, 64 F.3d 1432, 1438–39 (9th Cir. 1995) (granting habeas relief because the petitioner's separate claims of ineffectiveness cumulatively demonstrated prejudice); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (recognizing the availability of cumulative-prejudice arguments in the Ninth Circuit).  That is, in the absence of trial counsel's errors, there is a reasonable likelihood that Mr. Abdullah would not have been sentenced to death.

### C.   Trial Counsel Rendered Ineffective Assistance With Respect To His Sentencing For The Non-Capital Crimes

225.   Trial counsel rendered ineffective assistance with respect to his non-capital sentencing in the following ways:

#### i.   *Failure To Present Mitigating Evidence*

226.   Nearly all of the evidence recited above that defense counsel could and should have presented at the capital sentencing was also omitted at the non-capital sentencing.  For the same reasons, the Toryanskis were remiss in neglecting it at that stage as well.

#### ii.   *Failure To Adequately Challenge The Non-Capital Pre-Sentencing Report*

227.   Defense counsel failed to adequately challenge the pre-sentencing report filed in relation to sentencing for the non-capital charges.  The pre-sentencing report contained a number of statements by sources that were not tested by cross-examination.  These statements consisted of outlandish speculation and highly prejudicial assertions that were in violation of the Confrontation Clause of the Sixth Amendment.  By not challenging their admission, defense counsel failed to protect Mr. Abdullah's right to confront the declarants.

228.   The preceding error was so pervasive that Mr. Abdullah's defense attorneys failed to subject the prosecution's case to meaningful adversarial testing.  Therefore, Mr. Abdullah need not show prejudice on his non-capital sentencing ineffectiveness claim.  *See United States v. Cronic*, 466 U.S. 648, 659 (1984); *Holloway v. Arkansas*, 435 U.S. 475 (1978); *Geders v. United States*, 425 U.S. 80 (1976); *Powell v. Alabama*, 287 U.S. 45, 53 (1932).  Furthermore, for any ineffective acts or omissions that resulted in a structural error, Mr. Abdullah is not required to establish prejudice.  *See Styers v. Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008).  If Mr. Abdullah is required to demonstrate prejudice, then all the claims above show that, both cumulatively and individually, he was prejudiced by the deficient performance of his trial

attorneys. *See Harris v. Wood*, 64 F.3d 1432, 1438–39 (9th Cir. 1995) (granting habeas relief because the petitioner's separate claims of ineffectiveness cumulatively demonstrated prejudice); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (recognizing the availability of cumulative-prejudice arguments in the Ninth Circuit). That is, in the absence of trial counsel's errors, there is a reasonable likelihood that Mr. Abdullah would not have been sentenced so harshly for the non-capital crimes.

229.     *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Post-Conviction Issues IV–XV in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 2: TRIAL COUNSEL LABORED UNDER AN INSURMOUNTABLE CONFLICT

230.     Trial counsel had an irreconcilable conflict with Mr. Abdullah, which rendered their representation in the case a violation of the Sixth Amendment. *See Mickens v. Taylor*, 535 U.S. 162 (2002); *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Holloway v. Arkansas*, 435 U.S. 475 (1978). Trial counsel's conflict is of such a magnitude that it must be presumed that the conflict undermined the adversarial process, and no prejudice need be shown. In the alternative, the conflict of interest adversely affected trial counsel's performance to such an extent that there was prejudice.

231.     *Supporting Facts*: A number of factors combined to put trial counsel's interests at odds with those of their client, including:

- In order to represent Mr. Abdullah, the Toryanskis entered into a flat-fee arrangement with the Abdullah family, agreeing to accept $105,000 for their services. They did so despite the unequivocal denunciation of that practice by the American Bar Association ("ABA"), which has declared that "[f]lat fees . . . are

improper in death penalty cases." *See* ABA Guidelines for the Appointment and

Performance of Defense Counsel in Death Penalty Cases, reprinted at 31 Hofstra

L. Rev. 913, 933 (2003).  The Toryanskis' belief that $105,000 was adequate to

cover the costs of their representation was based on a gross underestimate of how

long and complicated a capital trial case is, and that under-estimation in turn

stemmed from their complete lack of experience in capital defense.  The

Toryanskis' billing rate was normally $175 per hour, per person.  Based on that

rate, the flat fee from the Abdullah family compensated them for 600 hours of

work, which was way below the hours a competent attorney would devote to a

capital case, and which they had blown through within a few months of their

entrance into the case.  Because of their imprudent arrangement, the Toryanskis

got no financial benefit from Mr. Abdullah's case between October 2003 and

March 2005.  The case further drained their resources when the Toryanskis had to

turn away paying clients in order to spend time on Mr. Abdullah's case.  As a

result of their misguided and unethical acceptance of a flat fee, the Toryanskis put

themselves in a position that was directly at odds with the interest of their client.

While they were, in their own words, "[e]nduring such a financial hardship" due

to their flat fee contract, the Toryanskis had every incentive to feverishly pursue a

plea in order to save themselves from trial expenses and, when that effort fell

short, to rush their work on the case and complete it without any care or attention

to detail.  That is exactly what they did, as discussed throughout this petition.

Before they took on the representation, defense counsel were informed that the

fee was far too low for a capital case by attorneys who actually had—unlike the

PETITION FOR WRIT OF HABEAS CORPUS - 113

Toryanskis—experience in defending death penalty matters. The damage produced by the Toryanskis' unscrupulous financial arrangement was exacerbated by Judge Copsey, who took the position that she would not allow the Toryanskis "to withdraw before trial, period, whether . . . [they were] being paid or not," which effectively saddled Mr. Abdullah with attorneys he could not fire despite numerous irreconcilable differences with them.

- Trial counsel agreed to accept payments from Mr. Abdullah's brother, Zuheir Abdullah. The State had identified Mr. Abdullah's then five-year-old son, Redear Abdullah, as a witness to establish Mr. Abdullah's presence at the crime scene. Accordingly, it was in Mr. Abdullah's interest to challenge the competency, credibility, and reliability of his son's statements. At the time, Zuheir was actively seeking custody of Redear. Therefore, Zuheir had an interest in avoiding any perception that he was manipulating his nephew to assist his brother, or was otherwise allowing or encouraging his brother to subject his nephew to the trauma associated with testifying. As discussed in Claim 1(A)(vi), the Toryanskis decided not to present an alibi defense in part because they did not wish for Redear to be called as a witness. They did not wish for that to happen because they wanted to avoid distressing Zuheir, the source of their funds.

- The money that was remitted to the Toryanskis came in part from contributions the Abdullah family as a whole had gathered. Thus, the Toryanskis were also susceptible to pressure from the family. That pressure was pushing them toward reaching a plea deal, because the Toryanskis' feared that if a plea were not reached, additional investigation would discover involvement in the crime by

PETITION FOR WRIT OF HABEAS CORPUS - 114

other members of the Abdullah family.  As discussed elsewhere, the Toryanskis'
desperate campaign for a plea led them to vastly underprepare for the trial, expose
privileged information to the prosecution, make concessions that were
catastrophic for Mr. Abdullah, and otherwise compromise his case and render his
defense entirely ineffectual.  Defense counsel's sole focus, and only concern,
should have been the benefit of a plea deal for their client, Mr. Abdullah, not the
consequences it might have for others.

- Trial counsel labored under a conflict of interest based on the complete
breakdown in the attorney-client relationship.  The dynamic between Mr.
Abdullah and the Toryanskis started out on a very positive footing, based on
unrealistic expectations promoted by counsel.  It then went from decent to poor to
toxic, as the Toryanskis displayed an increasing level of hostility to their own
client's goal—acquittal—by relentlessly sacrificing everything in pursuit of a plea
and by displaying more and more incompetence and unpreparedness.  There are
numerous areas of conflict that led to the complete breakdown in the relationship
and ultimate betrayal by counsel.  Some of the most notable involved: (1)
counsel's efforts to convince Mr. Abdullah to waive his right to a speedy trial; (2)
their effort to convince him to plead guilty, including by blackmailing Mr.
Abdullah's friends and family into joining the effort by indicating that the case
was hopeless and guaranteeing, falsely, that Mr. Abdullah would be charged
federally if he were not convicted in state court; (3) their attempt to initiate an
interrogation between the FBI and Mr. Abdullah, even though they knew full well
that any statements made by Mr. Abdullah could be used against him at trial, and

PETITION FOR WRIT OF HABEAS CORPUS - 115

their own independent attempt to share opinions about Mr. Abdullah with the FBI that were damaging to him; (4) their efforts to convince Mr. Abdullah to waive his right to testify; (5) their request for lesser-included instructions against Mr. Abdullah's wishes; (6) their closing argument concession and choice of defense against Mr. Abdullah's wishes, in which they also disparaged their client as a liar and a hypocrite; and (7) their false promises to him about which prospective jurors would be removed through peremptories and for-cause challenges.  Most of these facts are discussed in greater detail elsewhere in the petition.  The decision not to present an alibi is a specially strong example of the relationship's collapse.  Trial counsel were determined not to present an alibi defense, even though Mr. Abdullah strongly desired that one be offered.  In light of this disagreement, the Toryanskis should have conferred with their client, spoken honestly to him about the strategy they had settled on, and seen if a consensus could be reached.  Instead, they abandoned an alibi before the jury without consulting with Mr. Abdullah, and in square defiance of his wishes.  Had there been an irreconcilable difference on whether to present an alibi, defense counsel should have so informed the court and moved to withdraw from the case, rather than plowing ahead with a key decision on a course of action they knew their client passionately disapproved of, and which he had a right to direct.  The conflict ultimately reached a point where Mr. Abdullah was forced to choose between his right to testify and his right to counsel.  Defense counsel's concern about their reputation in the community contributed to the breakdown of the attorney-client

relationship. They were so worried about their image that they sacrificed zealous advocacy.

- Defense counsel should have identified the conflict, notified Mr. Abdullah and the court, and withdrew from the case.

232. *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Post-Conviction Issues IV–XV in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

**CLAIM 3: MR. ABDULLAH'S COUNSEL VIOLATED HIS RIGHT TO A FAIR TRIAL AND HIS RIGHT TO HOLD THE STATE TO ITS BURDEN OF PROVING ALL ELEMENTS OF THE OFFENSES BEYOND A REASONABLE DOUBT**

233. Mr. Abdullah's attorneys conceded one of the largest issues in his case—his whereabouts at the time of the crime—and offered no theory in its place, violating his Sixth Amendment rights to a fair trial and his right under the Due Process Clause of the Fourteenth Amendment to hold the State to its burden of proving all elements of their case beyond a reasonable doubt. *See Carella v. California*, 491 U.S. 263 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re Winship*, 397 U.S. 358 (1970). This error is structural, and therefore no prejudice need be shown. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

234. *Statement of Facts*: As discussed earlier, defense counsel conceded that Mr. Abdullah was at the scene of the crime around the time it was committed, even though there was compelling evidence that he was not. *See* Claims 1(A)(iv) and 1(A)(vi). While making this staggering admission, counsel offered no explanation for why Mr. Abdullah was there, and no

PETITION FOR WRIT OF HABEAS CORPUS - 117

explanation for how Ms. Abdullah died, essentially abandoning any defense on the core questions presented by the case.  To the extent that trial counsel contested any of the State's evidence, such as by cross-examining prosecution witnesses, any arguable benefits from those examinations were lost by the concession, and thus any adversarial testing was not meaningful adversarial testing.  Without his advocates giving him a defense of any kind whatsoever, there was not a fair trial within the meaning of the Sixth Amendment, and the State was effectively relieved of its burden to prove Mr. Abdullah guilty beyond a reasonable doubt.

235.    *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Post-Conviction Issues XII in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 4: MR. ABDULLAH WAS DEPRIVED OF HIS RIGHT TO PRESENT A DEFENSE OF HIS OWN CHOOSING

236.    Mr. Abdullah's attorneys refused to offer an alibi, against his wishes, thereby violating his Sixth Amendment right to select the basic course of his own defense and determine the objectives of representation.  *See Faretta v. California*, 422 U.S. 806 (1975).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

237.    *Statement of Facts*: As discussed elsewhere, Mr. Abdullah was adamant that he was not present in Boise on the night of the fire, and he instructed his attorneys to so argue.  They refused to do so and—without consulting him—conceded that he was in the driveway of his home the night it burned down, while offering no explanation for why he was there or how his wife died. In forsaking the alibi, and giving the jury nothing in its place, the Toryanskis effectively conceded their client's guilt and left the State's case entirely untested by an adversarial process.

Mr. Abdullah—who has vigorously protested his innocence from the day of the fire onwards—would never have consented to such a move, something the Toryanskis had been made well aware of through Mr. Abdullah's repeated and energetic attempts to participate in the construction of his defense. It was known to the Toryanskis that the objective of representation for Mr. Abdullah was acquittal on all charges, as evidenced by his rejection of every plea deal conveyed to him and by his insistence that the jury not be instructed on second-degree murder or manslaughter as lesser-included offenses. Defense counsel's concession that their client was in the driveway of his house moments before it burst into flames was clearly inconsistent with that objective. By usurping this decision, defense counsel took from Mr. Abdullah his right to determine the overall defense theory.

238. This claim is further supported by the evidence recited in Claim 19.

239. *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Post-Conviction Issues XII in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 5: HOLDING THE TRIAL IN BOISE WAS UNCONSTITUTIONAL

240. Mr. Abdullah's trial took place in an area where heavy and highly prejudicial media coverage of the case irrevocably tainted the jury pool against him, in violation of the Due Process Clause of the Fourteenth Amendment. *See Irvin v. Dowd*, 366 U.S. 717 (1961). When, as in Mr. Abdullah's case, objectively extreme prejudicial pretrial publicity renders a fair trial by an impartial jury virtually impossible prejudice is presumed. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). Additionally, several jurors were of such fixed opinions resulting from pretrial publicity that a fair trial was impossible and requires guilt and sentencing relief. *See Patton v. Yount*, 467 U.S. 1025 (1984).

PETITION FOR WRIT OF HABEAS CORPUS - 119

241.  *Supporting Facts*: The State tried Mr. Abdullah in state court in Boise, Idaho, the city in which the highly publicized and controversial crime took place.  Before the trial began, the media in Boise was saturated with negative coverage of Mr. Abdullah, including but not limited to the following information:

*Inaccurate and/or inadmissible information*

- False information that Mr. Abdullah purchased gas in Mountain Home, Idaho on the night of the crime, when in fact he did not;

- Inaccurate statements made by Chief Pierce that there was video evidence and transaction records proving Mr. Abdullah was in the Boise area at the time of the fire;

- Information about the death of Mr. Abdullah's first wife, some of which was false, and all of which was later deemed inadmissible at trial;

- Information about Ms. Abdullah's family believing she was murdered;

- Information suggesting that Mr. Abdullah and confederates had allegedly attempted to portray Ms. Abdullah's death as a hate crime in order to deflect blame from Mr. Abdullah, including statements from Boise Police Chief Don Pierce that Mr. Abdullah and his friends perpetuated rumors as a "smokescreen" to divert police;

- Inaccurate information that Mr. Abdullah was accompanied by a woman and a small girl at a Salt Lake City motel on the eve of the fire;

- Information that the prosecution believed Mr. Abdullah had forced Ms. Abdullah to drink a lethal dose of Prozac, a theory that the prosecution abandoned during closing argument;

*Prejudicial information*

- Information that Mr. Abdullah and his wife had been arguing about money and property, and were considering a divorce;

- Information that Mr. Abdullah had an extramarital affair and that Ms. Abdullah had hired a private investigator to follow Mr. Abdullah;

- Statements by Mr. Abdullah's neighbors noting "[h]e wiped out his life as well as his wife's.";

- A letter from a Boise resident to the editor of the local newspaper opining that, "[w]hile it does not meet the current definition of a hate crime, killing one's spouse and endangering four children is truly a hateful crime.";

- An article stating that defense counsel had attempted and failed to close voir dire to the public.

242.     In addition to the specific facts recited above, the stories about the crime in Boise media generally depicted Mr. Abdullah in a negative light.  The coverage was especially prejudicial because Mr. Abdullah is a Muslim from the Middle East, the offense occurred relatively soon after the attacks of September 11, 2001, and the trial took place at a time when the United States was at war with the country in which Mr. Abdullah was born, and in an area where the vast majority of people are white and Christian.  Much of the negative press was orchestrated by the State, through the police, and was left uncountered by Mr. Abdullah's attorneys, who had no media strategy to speak of.  *See* Claim 1(A)(xxvi).  Overall, the local news media coverage created an arc of community betrayal—from sympathy, with pieces on Ms. Abdullah's funeral and Mr. Abdullah's grief, to rancor, with descriptions of Mr. Abdullah as "hateful."

243.     The vast majority of veniremembers had heard about the case through the television, radio, and newspaper coverage. Most remembered specific details of the crime as reported in the media, many were still reading newspaper accounts and listening to radio coverage while waiting for voir dire, and many even admitted to having already formed opinions about Mr. Abdullah's

PETITION FOR WRIT OF HABEAS CORPUS - 121

guilt. One prospective juror, Juror 103, had read about the case and admitted she would have difficulty considering Mr. Abdullah innocent until proven guilty as a result. She said, "I am trying very hard to erase everything that I have read from my mind and I hope that I can do that." Media coverage had so saturated the area that such an equivocal response was considered acceptable.

244.     Other seated jurors were exposed to the media coverage. Juror 28 said, "it would [have been] hard to miss it two years ago." Juror 83 had read accounts of the case and watched television reports at the time of the fire. Juror 98 remembered seeing the coverage and being upset that a mother had died. Juror 98 also assumed, based on the media coverage, there was good reason for Mr. Abdullah's arrest.

245.     Media coverage also infected the jury pool. Veniremembers who admitted to having already formed opinions about Mr. Abdullah's guilt were passed for cause. These prospective jurors even recalled hearing reports that Mr. Abdullah had killed his wife and his children. Some even had detailed memories about the specific timeline of events and remembered creating theories about how Mr. Abdullah had committed the murder. With such exposure to media coverage among the entire jury pool, there was no possibility Mr. Abdullah could receive a fair trial in Boise.

246.     Finally, the prejudicial media coverage resulted in a loss of support for Mr. Abdullah among the Muslim community in Boise, which—had it not been turned against him by the press—would have been an important source of solidarity during the trial and would have produced favorable testimony for him at trial.

247.     *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 6: MR. ABDULLAH'S TRIAL JUDGE WAS BIASED

248.    At the guilt-phase, the penalty-phase, and in post-conviction, Mr. Abdullah's trial judge exhibited extreme bias against him and his counsel, thereby depriving him of the due process he is entitled to under the Fourteenth Amendment of the United States Supreme Court.  *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009); *Bracy v. Gramley*, 520 U.S. 899 (1997); *Gardner v. Florida*, 430 U.S. 349 (1977); *Withrow v. Larkin*, 421 U.S. 35 (1975); *In re Murchison*, 349 U.S. 133 (1955); *Hurles v. Ryan*, 752 F.3d 768 (9th Cir. 2014).  This error is structural, and therefore no prejudice is required.  *See Neder v. United States*, 527 U.S. 1 (1999); *Arizona v. Fulminante*, 499 U.S. 279 (1991); *Gomez v. United States*, 490 U.S. 858 (1989); *Gray v. Mississippi*, 481 U.S. 648 (1987); *Tumey v. Ohio*, 273 U.S. 510 (1927); *Chapman v. California*, 386 U.S. 18 (1967).

249.    *Supporting Facts*: Throughout her time on this case, Mr. Abdullah's trial judge—Cheri C. Copsey—demonstrated extreme and pervasive hostility to him and his attorneys by:

- Treating the attorneys differently, by showing respect to the prosecution while interrupting, berating, and generally abusing defense counsel.  Although this disparate treatment was manifested throughout the trial, one particularly striking example is that Judge Copsey held a court session on February 23, 2004 solely to chastise Mr. Toryanski for addressing her as "ma'am," even though Patrick Owen, the lead prosecutor, had previously done the exactly same thing on more than fifty separate occasions at hearings in the Abdullah case.  After that lecture, it became even clearer that Judge Copsey took offense only when the defense called her "ma'am," not the prosecution.  For following the February 23 hearing, the defense referred to Judge Copsey as "ma'am" a mere eleven times, while Mr. Owen alone did so more than two hundred.  Thus, Judge Copsey's criticism of Mr. Toryanski for using the word "ma'am" was plainly a result of her special

hostility to him and to the defense team  generally, and of her perpetual search for grievances to lodge against them.  It is therefore an illustration of the wildly different standards that she applied to Mr. Abdullah's attorneys as opposed to the State's. Judge Copsey interrupted, ignored, and abused defense counsel several times during voir dire as well.  When venire members began to explain to defense counsel their view that all first degree murderers deserved a death sentence, Judge Copsey would frequently interrupt and cut short the defense's questioning.  Also during voir dire, Judge Copsey would often only ask for the prosecution's opinion and reach her rulings without hearing from the defense.  Judge Copsey's bias against the Toryanskis during voir dire additionally manifested in humiliating them personally, noting, for example, that "husbands and wives don't communicate as well as they should for whatever reason." Judicial bias against the defense also manifested during voir dire when Judge Copsey would dismiss veniremembers opposed to the death penalty for hardship reasons when she would not dismiss similarly situated veniremembers in favor of the death penalty. For example, Juror 30 expressed opposition to the death penalty and was dismissed due to economic hardship even though counsel for the State and defense believed he was not death qualified.  Juror 30 stated that having the afternoons off during trial, as would be the arrangement, would alleviate his hardship concerns.  However, when it became clear that he was opposed to the death penalty and expressed displeasure with the prosecution asking about his son's criminal history in a public forum, the judge excused him under the pretext of hardship.  *See also* Claim 1(B)(vii).

Contrast the judge's treatment of Juror 30 with Juror 85.  Juror 85 affirmed that as an independent contractor jury service would be an undue hardship.  Unlike Juror 30, having

PETITION FOR WRIT OF HABEAS CORPUS - 124

the afternoons off would not ameliorate the hardship for Juror 85. The result, however, was that Juror 85—who supported the death penalty, admitted bias against people from the Middle East, and stated that he would have difficulty in not holding any economic harm resulting from jury service against Mr. Abdullah—was passed for cause.

- Improperly passing for cause members of the venire who would automatically impose the death penalty. The trial court refused Mr. Abdullah's request to excuse for cause Jurors 56 and 85. Both of these venire members believed the death penalty was the only appropriate punishment for murder.

Juror 56 stated, "If the proof is beyond a reasonable doubt and someone did die, then they need to die [] too." As long as there was premeditation, this potential juror believed, the only appropriate punishment was death. The judge, after criticizing defense counsel's attempts to elicit Juror 56's death penalty views, improperly passed for cause and defense counsel was forced to use a peremptory challenge to prevent this constitutionally unqualified juror from automatically sentencing Mr. Abdullah to death.

Juror 85 also expressed strong support for the death penalty for all murderers. When the judge asked if Juror 85 could set his views aside, he responded, "Yeah, I guess. I do feel very strongly that if someone takes someone's life, they should die for it." Juror 85 further elaborated his views when he stated, "if they take someone's life, I think they should die for it." And further characterized his views in the following ways: "if it seems to be premeditated and he takes someone's life, why should he just sit in jail? Why should we as society tolerate that type of person?" In fact, the only reason Juror 85 offered for not imposing the death sentence would be if a defendant was innocent of murder: "I certainly don't want someone to die for something they did not [do]." Short

PETITION FOR WRIT OF HABEAS CORPUS - 125

of innocence, Juror 85 would impose a death sentence for murder.  As with Juror 56, the judge interrupted defense counsel's voir dire and passed Juror 85  over the defense's objection.  Defense counsel had to use another peremptory challenge to block Juror 85 from automatically sentencing Mr. Abdullah to death.

- Exhibiting bias toward Mr. Abdullah as a result of his ethnic and cultural background. For example, in a discussion on cross-racial eyewitness identifications, Judge Copsey suggested that people from the Middle East are Caucasian, and that no cross-racial identification had therefore taken place.  Judge Copsey's classification was not based on any expert testimony or research on her part, and conflicts with the opinion of qualified specialists.  It was grounded only in her kneejerk reaction.  The assumption that people of Middle Eastern descent do not represent a discrete and different community, and one that might be difficult for a white woman in Mountain Home, Idaho to identify with complete precision, is an ill-considered one that reflects a bias toward that community.

Judge Copsey also exhibited ethnic bias against people of Middle Eastern descent during voir dire in Mr. Abdullah's case and in her factual findings in another case a year before Mr. Abdullah's.  During voir dire, a juror noted in her questionnaire that her sister was dating a person from Iraq.  Judge Copsey asked the juror for the Iraqi's name, which the juror did not know, and asked the juror to describe the Iraqi because Judge Copsey was worried that, since he was an Iraqi, he may be involved in the case.  In the Al-Kotrani case, which also involved an Iraqi defendant, Judge Copsey also expressed her suspicions about Middle Easterners.  In that case, which occurred—like this one—in the charged, post-9/11 atmosphere—Judge Copsey made a factual finding that the defendant's employer, who was also of Iraqi descent, was not credible.  Judge Copsey noted in her

PETITION FOR WRIT OF HABEAS CORPUS - 126

finding that the employer's testimony could not be trusted because the "Iraqi community is very close." These two examples of bias indicate that Judge Copsey viewed Middle Easterners as untrustworthy based on their ethnicity.

- Stating at trial: "If you think that this trial is going to be about police methods, it's not going to be about police methods. Do you understand that? It is going to be about evidence. We are not going to do what happened in O.J." In a trial where the police lost and destroyed several pieces of critical evidence, and exhibited an extreme degree of tunnel-vision, it is troubling that the judge would be so resistant to allowing the jury to hear of potential police misconduct and ineptitude, evidence that was quite obviously relevant to the credibility of the numerous police witnesses and relevant to an argument that Mr. Abdullah was an innocent man being railroaded by law enforcement.

- Railing against defendants, prisoners, and defense attorneys, including the specific attorneys and offices involved in Mr. Abdullah's case. For example, Judge Copsey repeatedly and gratuitously cast aspersions on post-conviction counsel by calling attention to the fact that they had never tried a capital case before, even though they were not required to have done so and their lack of capital *trial* work was no impediment to their capital *post-conviction* work on the Abdullah case, which they were deemed eligible to perform by the Idaho Supreme Court.

- Granting numerous recesses for the prosecution and few for the defense, thereby allowing the prosecution more time to prepare for trial, and when ruling on defense requests for recesses accusing the Toryanskis of wasting time.

- Adjudicating the case unequally, by granting prosecution motions while denying comparable defense motions, many of which she had clearly prejudged. For example,

PETITION FOR WRIT OF HABEAS CORPUS - 127

Judge Copsey allowed the State to present a great deal of evidence about insurance policies, including that Mr. Abdullah obtained an insurance policy on vending machines that were stored in his garage at the residence shortly before the fire and that he was a beneficiary on the homeowner's insurance not because he was a named beneficiary but because he was Ms. Abdullah's husband.  This evidence helped the prosecution paint Mr. Abdullah as motivated to burn the house down to collect the proceeds and as alienated from his wife.  The defense sought to introduce insurance evidence of its own to support a potential suicide theory, in the form of a life insurance policy that Ms. Abdullah had for $500,000 which would not have benefited him in the event of her death, since he was not one of the beneficiaries, which were instead her daughter from a previous marriage, Alyssa, and her brother, Randy Jewett.  Even though such an unusual policy was clearly supportive of a suicide defense, Judge Copsey refused to let the Toryanskis introduce it, deeming it irrelevant, confusing, and a "colossal waste of the jury's time."  Remarkably, Judge Copsey dismissed the life insurance policy as having "nothing to do with this case," even though she was permitting the State to introduce insurance evidence of its own.  To underscore the imbalance even further, Judge Copsey allowed the *State* to present evidence regarding Ms. Abdullah's life insurance policy, but only to the extent that it reflected loans taken out on the policy as part of the State's characterization of the Abdullahs as being on shaky financial footing.  It was only when it came to the part of the insurance policy that would have obviously and directly benefited the defense that Judge Copsey excluded it.  The only explanation that makes sense is that Judge Copsey approved of the State's insurance evidence because it would help convict Mr. Abdullah, and disapproved of the defense's because it might lead to his freedom.

On the few rulings that she rendered in favor of the defense, Judge Copsey would often reverse herself as soon as Ada County Prosecutor Patrick Owen protested her decision. For instance, Judge Copsey determined after extensive oral argument that Edgar Reagles, a colleague of Mr. Abdullah's, would not be allowed to testify that Mr. Abdullah supposedly stated in a conversation that "in Kurdistan it is not illegal to kill your wife if she is . . . unfaithful to you." Judge Copsey reached that conclusion because whatever probative value it had, that value was "substantially outweighed by the danger of unfair prejudice." However, as soon as Mr. Owen briefly expressed his displeasure with that well-considered determination, Judge Copsey instantly flipped one hundred and eighty degrees. She justified her newfound position with the tenuous reasoning that "it is something that is odd for him to pick out in the months leading up to the fire and death of Ms. Abdullah," without addressing the enormous prejudice that would result, the fact that there was no evidence in the record of Ms. Abdullah being unfaithful to Mr. Abdullah, or the troubling phenomenon that a defendant would be faulted at a murder trial for the customs of his homeland. Through reversals like these, Judge Copsey exhibited a pervasive deference to the views of the prosecution, and especially those of Mr. Owen, thereby abandoning her role as a neutral, objective referee to the trial. Similarly, Judge Copsey treated jurors differently depending on whether they were generally skeptical of, or sympathetic to, the death penalty. *See* Claim 1(B)(vii).

Finally, Judge Copsey refused to let Dr. Ashraf Mozayani, the defense toxicologist, use demonstrative aids, even though she let the State use dozens of them. Her justification was that it would be inappropriate for the aids to go back to the jury, even though defense

counsel clearly stated that they were fine with the aids not being taken to the deliberation room.

- Allowing her credibility determinations to be infected by her enmity toward the defense and favoritism toward the prosecution. For example, Judge Copsey described Steven Bankhead, a convicted felon who was at the time incarcerated, as "very believable" at a hearing held shortly after the jury returned a death verdict against Mr. Abdullah. Judge Copsey reached that conclusion despite the fact that Mr. Bankhead told a preposterous story from the stand that was exposed as blatantly untrue. Mr. Bankhead was the witness who testified at sentencing that Mr. Abdullah paid him to kill Ms. Abdullah in 2000. Contrary to Judge Copsey's suggestion that Mr. Bankhead was "very believable," his entire account was undermined by a citation that was served upon him in Boise on November 2, 2000. That citation was entirely inconsistent with his testimony, in which he stated that he fled Boise on November 1, 2000 for Lewiston after failing to carry out the supposed execution that Mr. Abdullah had arranged. Mr. Bankhead's testimony was rendered even more dubious by the inherently implausible nature of his account. Specifically, Mr. Bankhead claimed that he was instructed by Mr. Abdullah to show up at Ms. Abdullah's home by himself while she was alone and ring the door bell, expecting to be let in and offered tea, even though Ms. Abdullah would be by herself and would never have met him, and even though he would be wearing black gloves on November 1 and have a seven-inch knife in his back pocket. Mr. Bankhead also admitted during his testimony that he had in the past heard voices. That Judge Copsey would characterize such a transparently questionable witness as "very believable" speaks to her pervasive tendency to favor anything that painted Mr. Abdullah in an unflattering light and might

help secure a conviction and death sentence, and to disfavor anything that might help him.

- Giving information to the jury after it was discharged that had been precluded from its consideration and was highly prejudicial to Mr. Abdullah. In so doing, Judge Copsey sabotaged any fair and accurate post-conviction investigation into the jury. Judge Copsey convinced the jury that their decision was the right one, in light of information that was not properly before them, and therefore made it impossible for the jurors to question their decision on the basis of the actual evidence and unlikely that they would ever speak freely with Mr. Abdullah's attorneys.

- Interrupting the post-conviction evidentiary hearing repeatedly in order to pose witnesses questions that were blatantly designed to assist the State and harm Mr. Abdullah. For example, Judge Copsey abruptly spoke up in the middle of Mr. Abdullah's post-conviction counsel's examination of Kim Toryanski, lead trial defense attorney, supposedly to summarize the response Ms. Toryanski had just given. Judge Copsey's summary was blatantly leading: "So, in other words, this may have been the result of a strategic decision made by you and your husband?" In addition to the fact that that was not at all what Ms. Toryanski had just said, Judge Copsey's remark illustrates her overweening desire to lay a foundation for the denial of post-conviction relief by influencing Ms. Toryanski to attribute her many mistakes at trial to strategic considerations, thereby insulating Ms. Toryanski from a conclusion that she rendered ineffective assistance of counsel. As such, the statement was typical of Judge Copsey's behavior during the post-conviction trial. In that way, to predetermine the result of the

post-conviction trial, Judge Copsey abandoned her role as neutral arbiter and fact-finder, disrupted the adversarial process, and actively developed the State's case for it.

- Improperly relying in post-conviction on her own flawed and biased memory of what took place at trial.  For instance, Judge Copsey berated post-conviction counsel for asking the court to take judicial notice of the CARES interview of Redear Abdullah, in part based on her mistaken recollection that she had never given Redear a competency examination.  In the process, Judge Copsey lectured post-conviction counsel about how the "people who are in the trial usually have a pretty good recollection of what happened," and emphasized the irrelevant fact that post-conviction counsel had never tried a capital case before.

- Abandoning her role as neutral arbiter and becoming an advocate for the prosecution by directing the State to move to strike attachments to the final post-conviction petition that the State was stipulating to the admission of.

- Finding that the SAPD had a conflict with Mr. Abdullah before giving the SAPD an opportunity to take a position on whether a conflict existed.

250.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

**CLAIM 7: THE PROSECUTION COMMITTED MISCONDUCT**

251.    At both the guilt phase and the penalty phase, the prosecution made numerous representations that were offensive, inappropriate, overly emotional, racially and culturally discriminatory, and otherwise impermissible, violating Mr. Abdullah's due process rights under the Fourteenth Amendment, his right to a fair trial under the Sixth Amendment, and his right to the equal protection of the law under the Fourteenth Amendment.  *See Darden v. Wainwright*, 477 U.S. 168 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).  Collectively, this

misconduct so infected the trial with unfairness as to make the resulting conviction and sentence a denial of due process.  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the verdict of guilt, sentence of death, and denial of post-conviction relief.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

252.    *Supporting Facts*: The prosecution's misconduct included the following:

- Before trial, a hearing was held on defense counsel's motion to suppress the pretrial identification of Mr. Abdullah.  At the outset, and without objection from the State, the court granted counsel's request to have Mr. Abdullah removed from the courtroom during Ms. Wood's testimony.  At trial, Ms. Wood testified that she was not 100 percent certain that the person she saw shortly after midnight while working at the Mountain Home gas station was Mr. Abdullah.  To bolster her testimony, the State indicated that Mr. Abdullah had not been in the courtroom at an earlier hearing when she could have identified Mr. Abdullah.  At the State's request, in front of the jury, the court took judicial notice that the last time Ms. Wood was in the courtroom, "the defendant had actually been removed from the court at that time."  That was not good enough for the prosecutor, who then stated, "that was at the request of the defense, neither the State nor the Court motivated that."  The State returned to the issue at closing, where it again reminded the jury that Mr. Abdullah had absented himself from the prior hearing.  Mr. Abdullah had a due process right not to be subjected to suggestive pretrial identification procedures, which is what would have occurred had he remained in the courtroom for the pretrial hearing where Ms. Wood testified.  He also had a due process right to demand that the State prove that he was the person Ms. Wood saw in Mountain Home on October

PETITION FOR WRIT OF HABEAS CORPUS - 133

5, 2002. It was misconduct for the State to use Mr. Abdullah's invocation of his rights as a weapon against him. Moreover, the State easily could have made arrangements for an in-person lineup with Ms. Wood far closer in time to the night of the fire, which would have been more reliable, and would have obviated the need for the in-court identification. The fact that the State made no attempt to conduct such a lineup suggests that its true intention was not to develop credible evidence about the supposed identification, but instead to cast unwarranted and prejudicial aspersions on Mr. Abdullah's motivations and character.

- The State repeatedly asserted during closing argument that its evidence was "the truth," an invasion of the jury's province and an instance of improper vouching. Judge Copsey struck the statement sua sponte, but in combination with the prejudice arising from the other acts of prosecutorial misconduct, the damage could not be undone.

- The prosecution began its rebuttal closing argument at the guilt phase by telling the jury, with no objection from Mr. Abdullah's incompetent attorneys, that it "should be shocked and outraged" by opposing counsel's closing argument, thereby appealing to the jury's emotion and improperly inserting the prosecutor's own personal belief into the case. In the same closing argument, the prosecution referred to Mr. Abdullah's alibi as a "hoax," an inflammatory accusation and one that was particularly unwarranted in light of the fact that defense counsel never presented any such defense.

- The prosecution coerced and otherwise improperly induced Redear Abdullah into giving an account of the night of the fire that was less favorable to Mr. Abdullah, including by conducting an unduly suggestive CARES interview, trying to pressure Redear's psychologist into encouraging Redear to testify for the State, thereby infringing on the

psychologist's professional duty to be neutral in the matter, and otherwise manipulating Redear into providing evidence that would support the prosecution's predetermined version of events.

- The trial court admitted a high volume of prejudicial testimony through Ms. Kristal and Mr. Elam, on the ground that it was offered not for its truth but to shed light on Ms. Abdullah's state of mind.  After using that justification to get the evidence in, the prosecution relied upon many aspects of that evidence for their truth in closing, including the fact that Ms. Abdullah was not planning on moving abroad with Mr. Abdullah.

- During its case in chief, the State admitted a letter from defense counsel to the prosecution, in which the defense requested additional testing of Ms. Abdullah's blood. That testing revealed the inordinate amount of Prozac in Ms. Abdullah's bloodstream.  At closing, the State told the jury that the prosecution had "learned about" the excess of Prozac in Ms. Abdullah's system "when the defendant's lawyers wrote us and asked us to check for that."  The State then announced that "everyone connected with the prosecution," including the prosecutors themselves, the state pathologist, and the police, "were shocked to find out about the extreme level of Prozac in the blood of Angie Abdullah."  These actions was clearly designed to impress upon the jury that it was the defense that requested the testing, and thereby to imply that Mr. Abdullah knew it would disclose Prozac because he poisoned her with it.  The suggestion that a defendant can be faulted for seeking out a full and proper investigation, where the police are not conducting one, is offensive to elemental notions of justice.  It was doubly inappropriate for the prosecution to insinuate that the defense were up to no good when they requested the testing, in light of the fact that the requested testing was not just for Prozac, but for

Darvon, Zoloft, and Xanax as well.  Defense counsel sought testing for those drugs

because—as they stated in their letter to the prosecution—they saw from Ms. Abdullah's

medical records that she had a history of taking them.  The same records were in the

possession of the State, and it could and should have pursued the same testing.  It was the

height of unfairness for the prosecution to malign the defense for insisting upon such

basic investigative steps.  Again, defense counsel were too timid or unprepared to object,

but the trial court struck the comment.  However, as before, the collective prejudice from

all of the prosecutorial misconduct remains.

- Dr. Groben, the state pathologist, based his theory of how Ms. Abdullah died to a

  significant extent on information from the criminal investigation of Mr. Abdullah that

  was improperly fed to him by the prosecution or by actors within the prosecution's

  control.  When Dr. Groben was testifying about how he came up with his original cause-

  of-death determination, and about why he decided against suicide, he recounted his

  rationale as follows:

> Well, with a plastic bag over the head, that's always something that you
> look into, because there are people who kill themselves with a plastic bag
> over their head.  But the – there were circumstances surrounding the case.
> The position of the body at the scene was totally inconsistent with suicide.
> There were no – I found no drugs on board at that point in time to suggest,
> and no one places a bag over their head without drugs on board.  *And there
> were other things that I used that made me rule out suicide.*

Later in his testimony, Dr. Groben stated that he was "privy to . . . all of [the] police

investigations."

In context, therefore, it is apparent that the information that led Dr. Groben to conclude

that Ms. Abdullah was murdered, and did not commit suicide, was information from law

enforcement's investigation into the crime.  That information mostly related to the

PETITION FOR WRIT OF HABEAS CORPUS - 136

movements of various people in the time preceding and following the crime, their whereabouts, the credibility of various factual accounts, motive, and so forth. As such, the information had absolutely nothing to do with the supposedly scientific inquiry that Dr. Groben was conducting, which was ostensibly concerned only with the objective medical evidence before him. In this way, the law enforcement evidence corrupted Dr. Groben's assessment and transformed him from a neutral scientist into a tool of the prosecution, conscripted to convict Mr. Abdullah. The evidence from the police investigation either came to Dr. Groben directly from the prosecution, or it came to him from police officers or other state actors who could have been or were under the control of the prosecution. Some of the information was possibly also derived from statements made by the Toryanskis as part of plea bargain negotiations, which should have been protected by the prosecution pursuant to the privilege that attaches to such negotiations. By allowing the information to reach Dr. Groben, the prosecution committed misconduct.

- As discussed in Claim 1(A)(v), the prosecution suggested in its closing statement at the guilt phase that it had no duty to prove beyond a reasonable doubt how Mr. Abdullah was able to get his wife to ingest the Prozac, even though that theory was presented in the indictment as an independent basis on which to find him guilty. That reckless misstatement of its burden of proof was misconduct.

- The prosecution elicited from witnesses inaccurate testimony that Mr. Abdullah was with a woman at the Dream Inn in Salt Lake City the night before the fire, even though such testimony was irrelevant, prejudicial, speculative, and based on alleged facts not in evidence.

PETITION FOR WRIT OF HABEAS CORPUS - 137

- The prosecution improperly insinuated racial themes into the trial, exploiting anti-Muslim and anti-Middle Eastern sentiments in the aftermath of the September 11 attacks to prejudice the judge and jury against Mr. Abdullah.  For example, the State refused to provide the defense with identifying information about a number of witnesses—despite the defense's need to contact those witnesses for its investigation—on the ground that Mr. Abdullah might somehow alter the witnesses' testimony through coercion.  In making that argument, the State warned ominously that Mr. Abdullah had been seen "speaking in a foreign language with other men just prior to the crimes," clearly implying that Mr. Abdullah was part of some kind of foreign plot with other, presumably Middle Eastern, confederates.  The State never presented any evidence to suggest that such a plot existed.  Therefore, the true purpose of this passage was plainly to use the pervasive fear of Middle Eastern and Muslim people to damage Mr. Abdullah's standing in the eyes of the court.  Given the bias Judge Copsey exhibited against Mr. Abdullah at trial, *see* Claim 6, it is likely that the prosecution's improper strategy worked.

Similarly, the prosecution strenuously tried—and succeeded—in eliciting testimony about a conversation that Mr. Abdullah had with several co-workers, in which he supposedly stated that it was permissible in Kurdistan for husbands to murder their wives if they committed adultery.  The State's basis for its position was that Mr. Abdullah was "acquiescing to [the] appropriateness" of such killings by not actively "separating himself from it."  In other words, the State believed Mr. Abdullah had a burden, because of his birthplace, to show that he did *not* believe in honor killings, even though the jury heard no evidence that his wife had violated anyone's "honor."

In addition, the prosecution used as its DNA expert a man who tested samples found at the scene against a database comprised of a combination of Arabic, Egyptian, Jordanian, Lebanese, Palestinian, and Moroccan individuals.  The database relied upon was not sanctioned or approved by the FBI and its size and its application to Mr. Abdullah was unwarranted.   Mr. Abdullah belongs to none of those groups.  He is Kurdish.  And because Kurdistan has been for hundreds of years a strategically invaluable crossroads, Kurds' DNA has been profoundly shaped by intermixing among numerous different groups, including many from Asia and Europe.  In using this evidence, the State ignorantly lumped Mr. Abdullah in with a community that he is not a member of, and a community that happened to be a source of intense fear and distrust, in order to stigmatize him and brand him a threat to the jurors' own community.

The prejudice described here reflects a prosecutorial desire to use Mr. Abdullah's heritage as a tool to harm him.  Such harm was then actually inflicted when Judge Copsey allowed the testimony and a jury of twelve non-Muslim, non-Middle Eastern individuals living in a time of extreme prejudice against both of those groups was allowed to consider this tremendously prejudicial account.

Finally, at closing argument in the guilt phase, the prosecution used a PowerPoint presentation that included a photograph of Mr. Abdullah wearing a skull cap.  At no time during the trial did Mr. Abdullah wear such a head covering, also known as a "kufi."  This slide was meant to reemphasize Mr. Abdullah's ethnic, cultural, and religious background to the jury, and as such to use that background to stigmatize him and secure a guilty verdict.  Furthermore, the photo happened to have been taken when Mr. Abdullah was in a state of stress, which produced an expression on his face that made him look

PETITION FOR WRIT OF HABEAS CORPUS - 139

uncharacteristically menacing.  The photo was also blown up on the screen to a tremendously and unnecessarily large size, and used by the prosecution to frighten the jurors with a frightening, foreign face, and to thereby appeal to their fears and anxieties.

- In its closing argument at the penalty phase, the prosecution stated that evidence is only mitigating if it justifies or excuses the offense.  Specifically, the prosecutor asserted, in the final words of his closing argument: "There is nothing in the hard life that he led, that his family led and his people led from the time that he lived in Kurdistan from 1977 until 1992 that justifies or excuses or mitigates what he did.  Put this thing right."  The prosecution's suggestion that mitigating evidence must have a nexus to the crime is squarely contradicted by clear and well-established precedent, existing at the time, that defined mitigation far more broadly as anything that might move a jury toward life, regardless of whether it is linked to the crime or not.  In misdefining mitigation, the State sought to preclude the jury from considering evidence that weighed heavily against death. There was no objection and no admonishment from the court, leaving the jury with the impression that this highly damaging mischaracterization of the law was correct.

- Also at closing argument at sentencing, the prosecution referred to Islamic law, reminding jurors that Islam considers death the appropriate punishment for murder.  This argument used Mr. Abdullah's religion against him and also undercut the jurors' sense of responsibility for imposing the death penalty, since it attributed the penalty to Mr. Abdullah's faith instead of their own judgment.

- During the closing argument at sentencing, the prosecution told the jury that it was "the conscience of this community."  An appeal to a jury to send a message was plainly forbidden at the time, as the prosecutor doubtlessly knew.  Although the court sua sponte

PETITION FOR WRIT OF HABEAS CORPUS - 140

struck the statement, the bell could not be unrung, and in any event it was prejudicial in conjunction with the other acts of prosecutorial misconduct arrayed above.

253.    *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Guilt Phase Issue XI and Penalty Phase Issue VIII in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

## CLAIM 8: THE PROSECUTION PRESENTED FALSE TESTIMONY

254.    The prosecution knowingly put on false testimony and/or allowed false testimony to go uncorrected, in violation of the Fourteenth Amendment. *See Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the false testimony was material and reasonably likely to have affected the jury's judgment. *See United States v. Agurs*, 427 U.S. 97 (1976).

255.    *Supporting Facts*: At both the guilt and penalty phases, the prosecution elicited testimony that it knew to be false.  For example, the State called Steven Bankhead to recount from the stand a ludicrous story about Mr. Abdullah supposedly paying Mr. Bankhead to kill his wife in 2000. As discussed earlier, Mr. Bankhead's account was wildly implausible on its face, contradicted in its entirety by a citation that he received in Boise on a day and time when he swore he was far away, and delivered by someone who had previously admitted to lying to police officers.  *See* Claim 1(B)(iii).  The State was aware of all of these things, either actually or constructively, and yet presented that testimony anyway, because it helped secure a death sentence against Mr. Abdullah.

256.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

## CLAIM 9: THE STATE LOST, DESTROYED, AND FAILED TO PRESERVE EVIDENCE

257.    State actors lost, destroyed, and otherwise failed to preserve crucial, exculpatory and potentially exculpatory pieces of evidence, depriving Mr. Abdullah of the opportunity to use that evidence in his defense and thereby violating the Due Process Clause of the Fourteenth Amendment.  *See Arizona v. Youngblood*, 488 U.S. 51 (1988); *see also Brady v. Maryland*, 373 U.S. 83 (1963); *California v. Trombetta*, 467 U.S. 479 (1984).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the errors, considered cumulatively, had a substantial and injurious effect or influence in determining the verdict of guilt, sentence of death, and denial of post-conviction relief.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993); *see also Kyles v. Whitley*, 514 U.S. 419 (1995).

258.    *Supporting Facts*: Throughout this case, agents of the State have allowed key pieces of evidence to be lost and destroyed.  Such incidents include, but are not limited to:

- The State either allowing video surveillance from an Ogden, Utah convenience store to be erased, even though a store employee told police he saw Mr. Abdullah in the premises at a time that would have substantiated an alibi defense, even though the employee told the police that the surveillance footage would be automatically deleted if not retrieved within two weeks, and even though one of the police officer's purported objectives in traveling to Utah was to obtain "any surveillance video" available.  If they obtained the video, the State failed to preserve it.  If they failed to obtain it, the failure was based on bad faith in purposely declining to preserve exculpatory evidence knowing that its destruction was imminent.

- The State either losing or suppressing the statement taken from Lance Donnellson, an eyewitness with law enforcement training who identified Mr. Abdullah—with a high

degree of confidence—in a store in Utah at a time and place that would have rendered it impossible for Mr. Abdullah to have committed the alleged crimes.

- The State supposedly losing a statement taken by police from Marjorie Wood, the State's key eyewitness in the case, in her first interview with law enforcement. There is compelling evidence that police officers deliberately destroyed Ms. Wood's statement, because Detective Chip Morgan wrote in a report of his interview with Ms. Wood that her written statement was attached to the report. Plainly, the report was attached at one point and, when it became inconvenient to the State, it was deep-sixed. The State only informed the defense about the report itself when the defense moved to exclude Ms. Wood's testimony because the report was not provided in discovery. That the State would wait so long to disclose such a critical piece of evidence further suggests that it was attempting to conceal the fact that the attached statement had disappeared. There were discrepancies between police officers' description of the original interview with Ms. Wood and the account she later gave. Her statement would have enabled defense counsel to question her credibility on the basis of those discrepancies and/or to argue for Mr. Abdullah's innocence. For example, a detective testified for the State at the probable cause hearing on October 18, 2002 that Mr. Abdullah purchased gasoline with cash at the Chevron station in Mountain Home where Ms. Wood worked, on the night of the crime. However, at trial, Ms. Wood testified, unreservedly, that Mr. Abdullah and the men he was supposedly with did not pay her for any gas. That striking difference suggests that Ms. Wood's initial statement contained information indicating that she was describing to police someone other than Mr. Abdullah, someone who *did* purchase gas from her. When that person turned out not to be the suspect they wanted to saddle with the crime,

PETITION FOR WRIT OF HABEAS CORPUS - 143

the police decided to lose her statement and reshape her account to drop the gas purchase, so that evidence conflicting with their story would disappear.

Moreover, Ms. Wood's statement would have given a more detailed and accurate account of the events of October 5, 2002, and would have provided a foundation for cross-examination and impeachment of her identification, including how sure she was of her identification at the time, as well as any physical description she provided of the person she saw in the store.

- The State failing to seek any video footage or transaction reports from the gas station where Ms. Wood worked.  That failure was significant, as it suggests that the physical evidence would not have confirmed Ms. Wood's highly damaging account of seeing Mr. Abdullah in Mountain Home shortly before the fire.  Without the presence of any physical evidence that cast doubt on its theory, the State was able to rely entirely on Ms. Wood's questionable recollections, which were exacerbated by cross-racial identification issues and by an unduly suggestive identification method used by the police.  *See* Claims 1(A)(xvi) and 11.

- The State losing or destroying videotape evidence showing Mr. Abdullah and his son Redear inside the 7-11 store in Salt Lake City on the evening of October 4, 2002.

- The State failing to turn over to the defense Ms. Abdullah's diary.

- The State being careless in the security measures taken to protect the integrity of the crime scene, including by letting representatives of an insurance company remove items from the home before any reliable determination was made about those items' evidentiary value and by allowing a private security company to guard the home rather than using State employees.

- The State has "lost" other material that casts doubt on the integrity of its investigation. For instance, a police report indicates that a necklace of Ms. Abdullah's was taken from a safety deposit box by officers after her death.  However, the document reflecting the items logged into police custody after the seizures from the safety deposit box does not include the necklace, suggesting that police officers either stole or misplaced the piece.

259.    There is evidence that the State destroyed evidence, or allowed it to be destroyed, because it did not fit with police officers' preconceived conviction that Mr. Abdullah was guilty. Rather than searching for the truth, the officers were searching for evidence against Mr. Abdullah and ignoring everything else, which further supports an inference that they acted in bad faith.

260.    The State's poor handling of the evidence in Mr. Abdullah's case is consistent with a long track record for the Idaho authorities—and those in Boise in particular—in which they have repeatedly lost or destroyed important evidence in capital cases, another indicator of bad faith.

261.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

**CLAIM 10: THE STATE SUPPRESSED EVIDENCE**

262.    State actors suppressed evidence, depriving Mr. Abdullah of the opportunity to use that evidence in his defense and thereby violating the Due Process Clause of the Fourteenth Amendment.  *See Brady v. Maryland*, 373 U.S. 83 (1963); *see also United States v. Bagley*, 473 U.S. 667 (1985).  Considering the suppressed items collectively, there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *See Kyles v. Whitley*, 514 U.S. 419 (1995).

PETITION FOR WRIT OF HABEAS CORPUS - 145

263. *Supporting Facts*: The State failed to disclose evidence that Mr. Abdullah could have used to defend himself at the guilt phase of his trial. This evidence includes, but is not limited to:

- All of the evidence recited in Claim 9. In this regard, it was a particularly egregious *Brady* violation that the police failed to provide the written statement of Lance Donnelson, the Utah convenience store employee who gave a highly credible report to officers supporting Mr. Abdullah's alibi defense.

- Evidence relating to the affair between second-chair prosecutor Erika Klein and lead detective Tod Littlefield.

- Evidence relating to the Boise Police Department's Internal Affairs investigation into Detective Littlefield.

- Evidence that the Idaho State Police Forensic Services Laboratory, which conducted extensive testing in Mr. Abdullah's case, had for years kept a box of illegal drugs hidden in the ceiling of the laboratory, in violation of Idaho statute as well as its accreditation requirements.

- Related evidence that a forensic scientist who testified for the State in Mr. Abdullah's case knew about the hidden drugs, and had also acquired an amount of drugs in excess of the laboratory's authorized amounts, in violation of several statutory provisions as well as the accreditation requirements governing the laboratory.

- Evidence that Redear Abdullah would be a hostile witness to the State.

- Evidence of prior crimes committed by Furqan Mehmood, a witness for the State, including that he was convicted and incarcerated for grand theft, which could have been used to impeach his credibility.

PETITION FOR WRIT OF HABEAS CORPUS - 146

- Evidence relating to Hala Arnous. Ms. Arnous allegedly made to Deborah Kristal a series of negative statements about Mr. Abdullah, including Ms. Arnous's belief that he killed his wife, that he was mistreating her, and that he wanted her belongings. Those alleged statements were relayed by Ms. Kristal to the police. There is evidence that the FBI interviewed Ms. Arnous. However, the FBI report reflecting the interview was not turned over by the State in discovery. Nor was anything disclosed indicating that Boise Police Department officers spoke with Ms. Arnous, which they most likely did. Reports of law enforcement interviews with Ms. Arnous included impeachment information that should have been disclosed.

- Other FBI materials relating to Mr. Abdullah and Ms. Abdullah.

264.    The State failed to disclose evidence that Mr. Abdullah could have used to defend himself at the penalty phase of his trial. This evidence includes, but is not limited to:

- Evidence that Detective Littlefield interviewed Dennis Richardson about Steven Bankhead's outlandish account of Mr. Abdullah paying him to kill Ms. Abdullah, and that Mr. Richardson contradicted Mr. Bankhead's narrative. Mr. Richardson was incarcerated at the Idaho State Correctional Institution ("ISCI") from March 1997 to September 2001. During that time, Mr. Abdullah was teaching courses on Islam at ISCI. Mr. Bankhead testified at the penalty phase that he met Mr. Abdullah at ISCI through those courses between the end of 1999 and the beginning of 2000. In a report, Detective Littlefield noted that Mr. Bankhead believed that Mr. Abdullah had probably spoken to Mr. Richardson about his plans to kill Ms. Abdullah. Mr. Bankhead also asserted to Detective Littlefield that Mr. Abdullah would bring marijuana to Mr. Richardson at ISCI. Prior to the penalty phase, Detective Littlefield interviewed Mr. Richardson about Mr.

PETITION FOR WRIT OF HABEAS CORPUS - 147

Bankhead's allegations.  Detective Littlefield was informed in that interview that Mr.

Richardson could not confirm Mr. Bankhead's story.  That piece of information was not

included in any report by Mr. Littlefield, and not shared with the defense.  Had it been,

the defense could have impeached Mr. Bankhead with information indicating that his

account was inaccurate and that he was not a reliable witness.  Given that Mr. Bankhead

gave highly damaging testimony about a previous attempt by Mr. Abdullah to kill his

wife, the value of such impeachment would have been enormous.

- Evidence that Detective Littlefield interviewed three inmates who were housed at the Ada County Jail with Mr. Abdullah, a report of which was deliberately not produced at the request of lead prosecutor Patrick Owen, which resulted in the defense not being informed of the interviews.

265.    Had the evidence recited above been disclosed, it would have allowed the trial counsel to

support key defense theories, including theories of innocence, and would have undermined the

prosecution's case, including by casting doubt on the reliability and truthfulness of its witnesses.

266.    In addition to the evidence recited above, the State suppressed other exculpatory

evidence, including evidence that someone other than Mr. Abdullah committed the crimes,

evidence that individuals were improperly induced to inculpate Mr. Abdullah, e.g., by the

offering of promises to people in trouble with the law, and evidence that the police and

prosecution engaged in misconduct.

267.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently

unexhausted.

## CLAIM 11: THE STATE USED UNDULY SUGGESTIVE IDENTIFICATION TECHNIQUES

268.    To incriminate Mr. Abdullah, police officers used excessively suggestive and unreliable identification methods and those identifications were then introduced at trial, in violation of the Due Process Clause of the Fourteenth Amendment.  *See Manson v. Brathwaite*, 432 U.S. 98 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972); *Stovall v. Denno*, 388 U.S. 293 (1967).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

269.    *Supporting Facts*: On October 11, 2002, police officers who were actively attempting to make out a case against Mr. Abdullah showed Marjorie Wood a single photograph—that of Mr. Abdullah—and asked her whether she had seen him on the night of the crime at the Mountain Home, Idaho Chevron where she worked.  Ms. Wood asserted that she had, and then became the State's most important eyewitness, and the only witness at trial to place Mr. Abdullah in the vicinity of the crime around the time it was committed.  It was well-known at the time of trial that the most reliable method for identifying suspects is for a neutral person, unaffiliated with the investigation into the suspect, to begin by asking questions, eliciting information in a less suggestive manner, and then to show the witness an array of photos, one at a time.  The method used instead by the State tends to influence witnesses into identifying the suspect, and thereby leads to biased, unreliable results and wrongful convictions.  Further compounding the error, the State never had Ms. Wood do an in-person lineup to confirm her identification of Mr. Abdullah.  In addition, detectives failed to retain a contemporaneous statement from Ms. Wood regarding her identification.  *See* Claim 9.  The statement would have been the best record of her observations at the time, as memory is always susceptible to later input, including the sort of

media coverage that saturated the newspapers and airwaves in the Boise area and poisoned the community against him.  Ms. Wood herself testified that there were many details she could not recall while testifying that would have been contained in her written statement.

270.    Ms. Wood was the only witness presented by the State who was able to place Mr. Abdullah in Idaho, near Boise, close in time to the death of his wife and the fire in his house. Her testimony was indispensable to the prosecution, and its problems accordingly call its entire case into question.  Prejudice from the inappropriate identification technique is heightened by the fact that Ms. Wood told police officers that she was able to remember and identify Mr. Abdullah because she was afraid of him, and identifications are less precise when witnesses are experiencing stress.

271.    *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Guilt Phase Issue XI in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 12: THE STATE INTERROGATED MR. ABDULLAH WITHOUT ADVISING HIM OF HIS RIGHTS AND IN THE ABSENCE OF COUNSEL

272.    State actors questioned Mr. Abdullah about the crimes without informing him of his rights, in violation of Fifth, Sixth, and Fourteenth Amendments.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

273.    *Supporting Facts*: On October 5, 2002, law enforcement officers asked Mr. Abdullah a series of questions to elicit incriminating answers about the death of Ms. Abdullah and the fire at her and Mr. Abdullah's home.  Mr. Abdullah was functionally in custody at the time of the interview, did not have the assistance of an attorney, and was not told in advance of his *Miranda*

rights. To the extent that Mr. Abdullah was given any notice of his rights, that notice was ineffective, in part because he is a refugee from the Middle East, and his lack of English fluency and lack of familiarity with the American legal system prevented him from fully understanding his rights.

274.   On October 11, 2002, law enforcement again interrogated Mr. Abdullah, this time at the Criminal Investigation Division (CID). The detectives interrogating him did not inform him of his *Miranda* rights before beginning their questioning. When Mr. Abdullah arrived at the CID, he was separated from his son, put in a small room with the two detectives sitting on either side of him, and probed for his account of the events for hours. Mr. Abdullah finally asked that an attorney be present when the detectives asked to examine him physically. Despite the invocation, the detectives continued to ask Mr. Abdullah to submit to a physical examination without an attorney present. Only after Mr. Abdullah repeated that he wanted an attorney thirty minutes later did questioning cease. During the majority of the interrogation, Mr. Abdullah was objectively not free to leave—if he had exercised his freedom to leave, the detectives would have detained him under warrant. Additionally, when viewed under the totality of the circumstances, Mr. Abdullah could not have felt free to leave given the overall context of the questioning.

275.   *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 13: THE STATE REINITIATED INTERROGATION OF MR. ABDULLAH WITH NO COUNSEL PRESENT AFTER HE INVOKED HIS RIGHT TO A DEFENSE ATTORNEY

276.   Police officers reinitiated an interrogation of Mr. Abdullah without counsel present after he had invoked his right to a defense attorney, in violation of the Fifth Amendment privilege against self-incrimination, his right to counsel under the Fifth and Sixth Amendments, and his right to due process under the Fourteenth Amendment. *See Minnick v. Mississippi*, 498 U.S. 146

(1990); *Edwards v. Arizona*, 451 U.S. 477 (1981); *Massiah v. United States*, 377 U.S. 201 (1964). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

277. *Supporting Facts*: Mr. Abdullah was questioned on October 11, 2002, at the Criminal Investigation Division of the Boise Police Department. That interview was terminated because officers served Mr. Abdullah with a detention order and he requested an attorney. On October 17, 2002, at the request of Boise Police detectives, Khaja Shuab-Ud-Din placed a phone call to Mr. Abdullah, which the detectives would record. The purpose of the call was to confront Mr. Abdullah with questions the detectives had about his activities in Salt Lake City and to inquire about other evidence relating to their investigation. Police officers recorded the call for use in their investigation. In making the call, Mr. Shuaib was acting as an arm of law enforcement. He was therefore a state agent rather than a passive listener. The officers involved were well aware that Mr. Abdullah had already invoked his right to counsel, since the same officers who served him the detention warrant were also responsible for arranging the confrontation call. Mr. Abdullah's attorneys were not informed in advance that Mr. Shuaib would be conducting a police interview, nor were the attorneys given a chance to caution Mr. Abdullah about answering the questions he would be asked. Moreover, the questions Mr. Shuaib asked were provided by the police and were clearly designed to elicit incriminating statements from Mr. Abdullah. It succeeded in eliciting such incriminating statements, and they were then introduced against Mr. Abdullah at his trial.

278. *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

PETITION FOR WRIT OF HABEAS CORPUS - 152

### CLAIM 14: DEATH QUALIFICATION BIASED THE JURY TO CONVICT AND DEPRIVED MR. ABDULLAH OF HIS RIGHT TO A JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY

279.    Members of the venire were excluded from serving on the jury because of their skepticism of the death penalty.  That process, which is sometimes referred to "death qualification," discriminated disproportionately against women, minorities, and members of certain religious denominations, all of whom are more likely to express suspicion of the death penalty.  Death qualification also resulted in a jury that was far more conservative on issues relating to criminal justice, and thus a jury more likely to convict Mr. Abdullah.  These distortions violated the Fifth and Sixth Amendment rights to a fair trial before an impartial jury that represents a fair cross-section of the community, the Eighth Amendment right to be free from cruel and unusual punishment, as well as the Fourteenth Amendment right to due process, the Fourteenth Amendment right to equal protection of the law, the First Amendment's Free Exercise and Establishment Clauses, and the religious tests prohibition of Article IV, Clause 3.  This error is structural, and therefore no prejudice need be shown.  *See Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

280.    *Supporting Facts*: The veniremembers at Mr. Abdullah's trial were winnowed down under a process that calls for the exclusion of any person who harbors hostility to the death penalty.  Research shows that such individuals are often women, minorities, and members of certain religious sects, such as Catholics and Quakers.  The data also demonstrate that a group of people subjected to this standard ends up strongly skewed in favor of convicting the defendant.

PETITION FOR WRIT OF HABEAS CORPUS - 153

281.    Examples of jurors who were wrongfully excused from serving include, but are not limited to, the following members of the venire: Jurors 39, 55, 62, 79, 105, and the seven jurors opposed to the death penalty who were struck by the stipulation of defense counsel.

282.    Jurors opposed to the death penalty were also treated differently by the trial court.  For example, with Juror 49, who was opposed to the death penalty, the judge's questions did not follow her usual prepared statements, and, instead, began by emphasizing the length of the trial and the difficulty of serving as a juror.  The judge did not emphasize the length of the trial with pro-death jurors.  Ultimately, the judge's cautionary preview of the length of the trial worked and she excused Juror 49 due to hardship rather than for his death penalty views.

283.    The prosecution also had special questions of death-penalty-opposed jurors that would frighten and provoke the juror into saying they could not impose a death penalty.  For example, the prosecution would direct a pro-life prospective juror to Mr. Abdullah and reminded them that the death sentence was not an abstract question in this case.  The prosecutor would further ask if the prospective juror could give Mr. Abdullah, "this man" individually, a death sentence.  Another tactic the prosecution employed would be to ask these jurors about signing the death sentence and announcing the sentence to the public.  Such questions were designed to get the prospective juror to cave if they had earlier stated they could consider the death penalty.  The prosecution did not ask similar questions of pro-death jurors.

284.    Along with the judge and the prosecution, defense counsel frequently agreed that many jurors were not death-qualified, and did not challenge excusing them for cause.  *See* Claim 1(B)(vii).  The result was a conviction-prone jury.

PETITION FOR WRIT OF HABEAS CORPUS - 154

285.   *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Guilt Phase Issue II and Post-Conviction Issue XIV in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 15: MR. ABDULLAH WAS NOT PRESENT AT ALL STAGES OF HIS TRIAL

286.   Several veniremembers were dismissed during jury selection by the stipulation of the attorneys and in Mr. Abdullah's absence, violating his right to be present at all stages of his trial. *See Snyder v. Massachusetts*, 291 U.S. 97 (1934).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

287.   *Supporting Facts*: As discussed in Claim 1(B)(iv), via email, Mr. Abdullah's defense attorneys agreed with the State to excuse a number of veniremembers based purely on their questionnaire answers and without any attempt to rehabilitate them through voir dire.  Because this crucial decision was made through email and outside of the courtroom, Mr. Abdullah was not able to witness it or participate in it.

288.   *Exhaustion of Claim:* At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 16: THE REQUIREMENT THAT VOIR DIRE BE PERFORMED WAS NOT SATISFIED

289.   Several jurors were dismissed without any voir dire, in violation of the Sixth Amendment requirement of a fair and impartial jury under the Sixth Amendment, the Eighth Amendment requirement of a reliable and non-arbitrary death sentence where jurors are guided by objective standards, and the Fourteenth Amendment requirement of due process.  *See Wainwright v. Witt*, 469 U.S. 412 (1985); *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153

(1976).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had

a substantial and injurious effect or influence in determining the jury's verdict of guilt and

sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

290.    *Supporting Facts*: This claim is based on the facts set forth in Claim 1(B)(iv).

291.    *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Post-Conviction Issue

XIV in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January

8, 2014.

### CLAIM 17: THE STATE USED FAULTY AND OUTDATED FORENSIC SCIENCE

292.    At trial, the prosecution employed evidence that has since been undermined by

subsequent scientific developments, in violation of the Due Process Clause of the Fourteenth

Amendment.  *See Gimenez v. Ochoa*, 821 F.3d 1136 (9th Cir.), *cert. denied*, 137 S. Ct. 503

(2016).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had

a substantial and injurious effect or influence in determining the jury's verdict of guilt and

sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

293.    *Supporting Facts*: The scientific evidence that has since been thrown into doubt by

evolving scientific standards includes, but is not limited to, the State's DNA theory.  DNA

material was found at the scene of the crime and tested by Laboratory Corporation American

Holdings.  Shawn Weiss, an employee of that company, was called by the State to educate the

jury about the lab's DNA findings.  On direct examination, Mr. Weiss testified that the DNA

samples taken from the scene "showed signs of a mixture," which he defined as "a DNA profile

from more than one individual."  The lab did not know in advance any of the individuals who

contributed DNA to the samples.  The samples qualify as complex mixtures.  Advances in DNA

research that have occurred since trial reflect that the methods and technologies used to study

complex mixtures from 2002 through 2004 did not satisfy scientific standards for validity. On the contrary, the analysis of complex DNA mixtures at that time were insufficiently precise and excessively subjective, and they regularly led to mistaken conclusions, including the incorrect assertion by the prosecution that Mr. Abdullah "could not be excluded" as a minor contributor to the samples taken from the gas can and the cape. *See* Claim 18.

294.     Such subsequent scientific developments undermine the fundamental fairness of the entire trial.

295.     *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 18: MR. ABDULLAH WAS DENIED ACCESS TO EXPERTS

296.     Mr. Abdullah was denied the court-funded assistance of necessary defense experts, in violation of the Sixth Amendment right to adequate representation, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment. *See Ake v. Oklahoma*, 470 U.S. 68 (1985); *Britt v. North Carolina*, 404 U.S. 226 (1971); *Griffin v. Illinois*, 351 U.S. 12 (1956). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

297.     *Supporting Facts*: Defense counsel were aware that the State was planning on relying upon DNA evidence taken from a gas can and cape that were found at the scene. Even though Mr. Abdullah was excluded as a major contributor to the DNA profiles found on both items, the State's expert could not exclude Mr. Abdullah as a minor contributor. As a result, the defense counsel twice moved the trial court to find a defense DNA expert to refute the anticipated testimony from the State's DNA expert. Twice Judge Copsey denied the request. Defense counsel identified Lisa Calandro, a forensic scientist and DNA specialist, as necessary to

PETITION FOR WRIT OF HABEAS CORPUS - 157

discredit and/or explain the conclusions reached by the State's DNA expert, as well as to advise the defense on whether the bag found over Ms. Abdullah's head should be tested for fingerprints or DNA evidence.  The trial court denied the request.  With respect to the testing of the bag, Judge Copsey directed the defense to simply ask the State to test the bag, which would have required it to disclose its trial strategy and work product to the State.

298.     The State's DNA expert, Mr. Weiss, opined that if one took the entire population of Boise, Mr. Abdullah was one of ten people in that group who could have contributed the DNA. To reach that conclusion, Mr. Weiss used a Middle Eastern origin database that was comprised of a combination of Arabic, Egyptian, Jordanian, Lebanese, Palestinian, and Moroccan individuals.

299.     There were several deep-seated problems with Mr. Weiss's testimony.  First, Mr. Weiss's overall conclusion was deeply flawed.  It failed to explain that the DNA testing reveals evidence reaching a reasonable degree of certainty that Mr. Abdullah's DNA was not present on the cape or gas can, and that the data support an alternative interpretation that would have excluded Mr. Abdullah as a contributor to the DNA found on both the cape and the gas can.   Moreover, even the conclusion offered by the State was poorly attacked and explained by the defense, because the inability to exclude as a minor contributor is vastly different from including Mr. Abdullah as a contributor.  Had the defense been given a neutral DNA expert witness, it could have rebutted Mr. Weiss's highly inaccurate analogy that only 10 people among 250,000 in the Boise area would have had the DNA profile found on the gas can and cape.  Mr. Weiss did not offer statistics for the probability of Mr. Abdullah's inclusion in the mixtures where he "could not be excluded" as a minor contributor, because the statistics would not have been helpful to the State's case, nor admissible.  His analogy inaccurately depicted the likelihood of inclusion of Mr.

Abdullah, and Mr. Weiss ignored data within the DNA profile that was obtained which could have either excluded Mr. Abdullah as a minor contributor to the sample or shown that such large numbers of people also "could not be excluded as a minor contributor" that the DNA evidence would have been far less compelling than what was presented.  A neutral defense expert could have assisted trial counsel in cross-examining Mr. Weiss effectively to the detriment of the State's case and, likewise, a neutral defense expert could have informed the jury of the inaccuracies and unfounded conclusions in Mr. Weiss's testimony.

300.    Second, Mr. Weiss's use of the Middle Eastern database was improper.  Mr. Abdullah is Kurdish, and because Kurdistan has been for hundreds of years a strategically invaluable crossroads, Kurds' DNA has been profoundly shaped by intermixing among numerous different groups, including many from Asia and Europe.  This was a decision borne not out of scientific knowledge but out of ignorance, and quite likely out of prejudice as well.  *See* Claim 7.  The State hammered away at its misleading approach in closing, where prosecutor Patrick Owen noted, "I asked him to recalculate those based on a different set of population guidelines, not Caucasian, not Hispanic, not African American, but I asked him to recalculate them with a set of the Middle Eastern population frequency."

301.    The defense could have made these points through an expert, had the court permitted one.

302.    DNA evidence was an important component of the prosecution's case, because it purported to link Mr. Abdullah directly to the crime scene.   The denial of a neutral defense expert to rebut the prosecution's DNA evidence was extremely prejudicial.  There were areas of the State's presentation that were highly subjective and unrealistically presented given the underlying data.  A neutral defense expert could have given the jury a more accurate presentation that showed just how misleading the prosecution's portrayal was, to great benefit to Mr.

PETITION FOR WRIT OF HABEAS CORPUS - 159

Abdullah, not just for the DNA evidence but also to show the extent of over-reaching by the prosecution, which would have affected the jury's evaluation of the entire case.

303.    The prosecution had resources to retain numerous expert witnesses, including a DNA expert.  The failure to make similar resources available to the defense for its own neutral expert was a denial of the fundamental federal constitutional rights to present a defense, to the effective assistance of counsel and to due process and equal protection.

304.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Guilt Phase Issue I in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

## CLAIM 19: MR. ABDULLAH WAS PREVENTED FROM PUTTING ON A DEFENSE

305.    Judge Copsey issued a series of biased and unwarranted rulings forbidding his defense counsel from educating the jury about a number of key facts that weighed against his guilt.  At the same time, she allowed the prosecution to introduce almost every fact it wished, including improper material and highly prejudicial facts that would have been rebutted or counterbalanced by the facts she barred defense counsel from introducing.  Other evidence that would have assisted the defense was lost or destroyed by the police.  Finally, Mr. Abdullah's own attorneys prevented him from presenting a viable alibi defense.  Due to this confluence of factors, Mr. Abdullah was prevented from putting on a defense, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  *See Chambers v. Mississippi*, 410 U.S. 284 (1973); *see also Crane v. Kentucky*, 476 U.S. 683 (1986).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

306.    *Supporting Facts*: Mr. Abdullah was prevented from telling the jury about numerous facts that militated in favor of his innocence, including but not limited to:

PETITION FOR WRIT OF HABEAS CORPUS - 160

- The defense was ordered not to reveal to the jury a substantial amount of information that tended to support a theory that Ms. Abdullah committed suicide, including but not limited to evidence about her life insurance policy (even though the prosecution was permitted to use other insurance policies against Mr. Abdullah), evidence about her previous suicidal ideation, and evidence of her lengthy struggle with depression, including evidence that her depression likely became more severe due to the pregnancy she experienced shortly before her death.

- Judge Copsey prevented the defense from conveying to the jury evidence that would have enabled a compelling argument that Ms. Abdullah died as a result of an accidental interaction between prescription drugs, including but not limited to evidence about how different prescription drugs interact with one another, evidence that Ms. Abdullah had extensively taken prescription drugs over the course of many years, and evidence that she had manipulated doctors so as to obtain drugs.

- The defense was precluded from playing the entirety of the videotape with the interrogation he was subjected to on October 11, 2002, at the Boise Police Department Annex.  Part of the tape that was kept away from the jury reflected police officers falsely telling Mr. Abdullah that they wished only to exclude him as a suspect, when in fact law enforcement was already intent on blaming Mr. Abdullah for the crimes.  Thus, the censored material would have bolstered a challenge to the police officers' credibility, in a case where numerous officers testified against Mr. Abdullah, and a case rife with serious deficiencies in the investigation.  The full tape would therefore have strongly supported a reasonable doubt defense.

PETITION FOR WRIT OF HABEAS CORPUS - 161

- The extensive loss and destruction of crucial evidence by state actors further prevented Mr. Abdullah from defending himself. *See* Claim 9. For instance, by failing to preserve material that indicated he could not have been at the scene of the crime when it was committed, the State's mishandling of the evidence severely impaired Mr. Abdullah's ability to present an alibi defense. Similarly, by failing to preserve the sole eyewitness's statement, the State severely impaired Mr. Abdullah's ability to challenge that eyewitness's testimony.

- Mr. Abdullah's attorneys prevented him from putting on a viable alibi defense. *See* Claim 4.

307.    Further facts relating to this issue are set forth in Claim 6.

308.    *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Guilt Phase Issue X in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 20: THE STATE COURT'S EVIDENTIARY RULINGS RENDERED THE TRIAL FUNDAMENTALLY UNFAIR

309.    Through numerous egregiously incorrect evidentiary rulings, the state court injected fundamental unfairness into the trial, in violation of Mr. Abdullah's rights under the Eighth and Fourteenth Amendments. *See Estelle v. McGuire*, 502 U.S. 62 (1991). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

310.    *Supporting Facts*: Judge Copsey made a number of state-law rulings that were exceedingly incorrect, biased, and prejudicial. Several of those rulings are recited elsewhere, including in Claims 6 and 19.

311.    Of particular note, Judge Copsey precluded the jury from considering the fact that Ms. Abdullah had a $500,000 life insurance policy to which Mr. Abdullah was not a beneficiary and which would not have benefited him financially in the event of her death, even though that evidence was strongly and directly supportive of a suicide theory.  *See* Claim 6.

312.    Similarly, Judge Copsey allowed in to evidence an unsigned, undated, tremendously prejudicial letter supposedly written by Ms. Abdullah to Mr. Abdullah.  *See* Claim 1(A)(xxvii).

313.    Moreover, Judge Copsey allowed Mr. Bankhead to testify, even though he presented an account that was ludicrous on its face and clearly contradicted by documentary evidence.  *See* Claim 1(B)(iii).

314.    In addition to those rulings, Judge Copsey improperly allowed a great deal of other evidence.  Much of that evidence was hearsay.  For instance, Judge Copsey permitted Dr. Brenda Williams to testify that Ms. Abdullah told her that Mr. Abdullah would not have a vasectomy. Dr. Williams was permitted to further testify that it was Ms. Abdullah's decision to get sterilized, not the decision of the Abdullahs as a couple, and that Mr. Abdullah was not present after Ms. Abdullah's tubal ligation surgery.

315.    Velma Seabolt, a nurse practitioner who worked with Dr. Williams and provided medical treatment to Ms. Abdullah, also testified.  Over a defense objection, the trial court allowed Ms. Seabolt to testify about a conversation she had with Ms. Abdullah regarding the condition of her marriage.  Ms. Seabolt testified that she treated Ms. Abdullah during the last trimester of her pregnancy with Malik, and that Ms. Abdullah said "she was going to get a divorce, but she had to stay married until after the pregnancy because she didn't have any health insurance, and she was a housewife at that time so she couldn't afford the children."

316.    Similarly, Gina Wolfe Seybold, a therapist who treated Ms. Abdullah, testified at trial. Ms. Seybold testified that she saw Ms. Abdullah in the Spring of 2002, and Ms. Abdullah told her, "there had been events that she had experienced with Mr. Abdullah that led her to believe that he was being unfaithful.  And she was very concerned about her relationship with him.  I think she struggled for a couple of years with issues of infidelity, and I believe toward the last when I saw her there was concern that he was bringing pornography through the computer." Although the court struck the statement on pornography, it did not strike the statement regarding Mr. Abdullah's alleged infidelity.

317.    About four weeks before her death, Ms. Abdullah made an appointment and met with attorney Deborah Kristal for about an hour.  Over defense objections, Ms. Kristal testified that Ms. Abdullah made the following statements to her during their hour-long meeting:

- Ms. Abdullah's mother thought she was there about a divorce, but Ms. Abdullah was not sure whether she was ready for that.

- Ms. Abdullah was worried about her financial status and Mr. Abdullah was not trustworthy with money.

- Mr. Abdullah was not the religious person that he portrayed himself to be.

- Mr. Abdullah did not want Ms. Abdullah to return to Boise when she went into preterm labor in Nashville, and they had to borrow money from her family to get her back to Boise.

- The house was still in Ms. Abdullah's name but she was concerned because Mr. Abdullah had listed it for sale.

- Given the state of her marriage, Ms. Abdullah was not sure she wanted to go with Mr. Abdullah to South Africa.

- Ms. Abdullah was worried that Mr. Abdullah would take the children out of the country if they divorced.

- Mr. Abdullah was not a good or nice man, but was rather very controlling and could not be trusted.

- When Ms. Abdullah was pregnant with Naim, Mr. Abdullah cheated on her with two women.

- Mr. Abdullah's reputation in the Muslim community was very important to him and Ms. Abdullah was going to contact an elder who Mr. Abdullah respected to see if the elder could talk some sense into Mr. Abdullah or save their marriage.

- Mr. Abdullah did not have a driver's license, "an illustration of how he was irresponsible and didn't think laws applied to him."

- Ms. Abdullah did not want to make a decision about divorce while she was pregnant.

- Ms. Abdullah had left Mr. Abdullah earlier to stay with out-of-state friends and Mr. Abdullah "had come and made her come back."

- Ms. Abdullah wanted to create a formal will that would cover Naim and Malik.

- Ms. Abdullah wanted the bill sent to her mother because she did not wish for Mr. Abdullah to know she had met with an attorney.

318.   All of these hearsay statements were admitted on the basis that they rebutted a defense theory of suicide.  However, when they were offered, the defense had not yet presented any suicide theory.  In fact, the defense never truly did present a suicide theory, aside from a few scattered and totally incoherent statements that gestured in the general direction of suicide.  Therefore, it was error to admit this hearsay testimony.

PETITION FOR WRIT OF HABEAS CORPUS - 165

319.    Another category of hearsay came in through Mr. Abdullah's former co-workers.  Ed Reagles and Rod Adams testified that Mr. Abdullah claimed that in Kurdistan it was acceptable to kill one's wife if she was unfaithful so long as one offered the wife's family something in return.  This grouping of statements was deemed admissible on the ground that it was "relevant because it certainly goes to Mr. Abdullah's state of mind, especially in the months leading up to what occurred in October."  That rationale was thoroughly groundless, since none of the co-workers suggested that Mr. Abdullah endorsed honor killings in any way, or that he suspected his wife of infidelity, which would have been an obvious precondition to such a killing by the accounts of the witnesses themselves.

320.    The erroneously admitted hearsay was highly prejudicial, as it painted Mr. Abdullah as a bad husband and dangerous foreigner.  Collectively, the evidence therefore undermined Mr. Abdullah's right to a fundamentally fair trial.

321.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

## CLAIM 21: THE STATE INFRINGED MR. ABDULLAH'S CONFRONTATION RIGHTS

322.    At several junctures during the guilt and sentencing phases, statements were introduced against Mr. Abdullah without him having any opportunity to cross-examine the speaker.  Mr. Abdullah was also prevented from cross-examining witnesses of the State's with evidence that would have undermined their credibility and persuasiveness in the eyes of the jury.  All of this was done in violation of the Confrontation Clause of the Sixth Amendment.  *See Crawford v. Washington*, 541 U.S. 36 (2004); *see also Giles v. California*, 554 U.S. 353 (2008); *Olden v. Kentucky*, 488 U.S. 227 (1988) (per curiam); *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987); *Delaware v. Van Arsdall*, 475 U.S. 673 (1986); *Delaware v. Fensterer*, 474 U.S. 15 (1985) (per

curiam); *Davis v. Alaska*, 415 U.S. 308 (1974).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

323.    *Supporting Facts*: At trial, the State presented the jury with a number of statements whose speakers were not made available for the defense to question on the stand.  These statements include, but are not limited to:

- A letter supposedly written by Ms. Abdullah and addressed to Mr. Abdullah, in which highly prejudicial comments are made about their relationship and Mr. Abdullah's behavior;

- Statements that Ms. Abdullah supposedly made to mental health providers and to her attorney about Mr. Abdullah, many of which painted Mr. Abdullah's character in an unflattering and inflammatory light;

324.    In addition, Mr. Abdullah's counsel were prohibited by Judge Copsey from challenging prosecution experts with material that would have undercut the power of their testimony.  Those incidents include, but are not limited to:

- Judge Copsey prevented the defense from rebutting the State's DNA expert with its own DNA expert;

- Judge Copsey refused to allow the defense to cross-examine Detective Tod Littlefield with findings from an internal affairs investigation that showed mistakes he had made in the Abdullah case and misconduct that he committed by having an affair with second-chair prosecutor Erika Klein.

PETITION FOR WRIT OF HABEAS CORPUS - 167

325.    Moreover, Mr. Abdullah was not able to confront witnesses with all of the evidence described in Claim 19.

326.    Additionally, Mr. Abdullah was not able to confront Redear during his competency examination.

327.    Finally, Mr. Abdullah was not given an opportunity to cross-examine the sources for the huge number of statements attached to his pre-sentence investigation report, many of which were wildly speculative and highly prejudicial.  Had these sources been confronted, their credibility would have been substantially undermined, and Mr. Abdullah would have received more lenient sentences on the non-capital offenses.

328.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

## CLAIM 22: THE TRIAL WAS UNCONSTITUTIONALLY CLOSED TO THE PUBLIC

329.    Judge Copsey closed the court to the public for a competency hearing of Redear Abdullah, on the basis of an unfounded and biased view that Mr. Abdullah's family were trying to intimidate Redear Abdullah, in violation of the First, Sixth, and Fourteenth Amendments.  *See Waller v. Georgia*, 467 U.S. 39 (1984).  The unconstitutional closure of a courtroom constitutes structural error.  *See id.* at 49.  As such, it is not subject to harmless error analysis, and prejudice is presumed.  Therefore, Mr. Abdullah's conviction must be set aside.  To the extent that the proper remedy for the violation is instead a new competency hearing, the Court should order one be held.  Additionally, Mr. Abdullah need not make any specific showing of prejudice to obtain relief on this claim.  *See id.*

330.    *Supporting Facts*: Judge Copsey refused to let the public observe a hearing to determine whether Redear Abdullah was competent to testify.  She did so because of a false, unproven, and

PETITION FOR WRIT OF HABEAS CORPUS - 168

disputed accusation by the prosecution that the Abdullah family was attempting to coerce Redear

Abdullah into testifying favorably for the defense.  Rather than making any effort to ascertain the

legitimacy of the accusation, Judge Copsey assumed its truth and used it as an excuse to shut the

public out of the proceeding.

331.     *Exhaustion of Claim:* At present, Mr. Abdullah believes this claim is currently

unexhausted.

### CLAIM 23: MR. ABDULLAH WAS COERCED INTO NOT TESTIFYING

332.     Mr. Abdullah was effectively prevented from exercising his right to testify in his own

defense at both the guilt phase and the penalty phase by his attorneys, who coerced him with a

series of legally and factually baseless threats, in violation of the Fifth Amendment guarantee

against compelled testimony, the Compulsory Process Clause of the Sixth Amendment, the Sixth

Amendment right to personally make one's own defense, the Sixth Amendment right to effective

assistance of counsel, and the Due Process Clause of the Fourteenth Amendment.  *See Rock v.

Arkansas*, 483 U.S. 44 (1987); *Faretta v. California*, 422 U.S. 806 (1975); *Harris v. New York*,

401 U.S. 222 (1971).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim,

the error had a substantial and injurious effect or influence in determining the jury's verdict of

guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

333.     *Supporting Facts*: This violation was committed at the guilt phase in the following ways:

334.     Prior to trial, defense counsel knew that Mr. Abdullah wished to testify.  However, Mr.

Abdullah's trial attorneys told him that if he took the stand to recount his version of events they

would refuse to elicit his testimony through questioning, and would instead force him to address

the jury in a monologue.  This, in and of itself, significantly impaired Mr. Abdullah's ability to

testify, as he had never testified before and had no idea how to do it without the assistance of

counsel.  Later, the attorneys informed Mr. Abdullah that if he testified they would withdraw

PETITION FOR WRIT OF HABEAS CORPUS - 169

from the case entirely.  The attorneys did so on the ground that his testimony would be false, even though the attorneys had no reasonable basis to be certain that it was false and in fact had alibi evidence that was consistent with the account Mr. Abdullah wished to outline from the stand.  Moreover, by this time, the Toryanskis had already met with bar counsel and been informed that they could not require Mr. Abdullah to testify in narrative form.  Defense counsel also told Mr. Abdullah that if he took the stand, the State would cross-examine him about his first wife's death.  Contrary to counsel's assertions, the State had already agreed that it would not present evidence relating to Mr. Abdullah's first wife, so long as the defense did not open the door, which they easily could have avoided doing during a direct examination of Mr. Abdullah.  Defense counsel further sought to intimidate Mr. Abdullah into silence by guaranteeing him that the proffers they made during plea negotiations would come out if he testified.  Pursuant to the rules of evidence, though, none of the proffers would have been admissible.

Lastly, defense counsel falsely advised Mr. Abdullah that if he relinquished his right to testify, he could still address guilt-phase issues in his allocution statement at sentencing, which the court later ordered him not to do.

335.    Because of his trial attorneys' baseless threats, Mr. Abdullah did not testify, and the compelling alibi he could have supported was not presented to the jury.  A decision about whether to testify relates to a defendant's fundamental rights, and should consequently be within the defendant's control.  Counsel's failure to choose a theory of the case at any point in the trial also impaired Mr. Abdullah's decision about whether to testify.  *See* Claim 1(A)(iii).

336.    Any waiver of Mr. Abdullah's right to testify was rendered invalid because counsel failed to properly advise him of his right to testify and coerced him into not testifying.

337.    Further facts relating to this issue are set forth in Claims 1(A)(vi) and 1(A)(xxix).

PETITION FOR WRIT OF HABEAS CORPUS - 170

338.    The issue of whether Mr. Abdullah was in Boise was a critical question at the guilt phase, heavily emphasized by the State, and Mr. Abdullah's testimony could have answered the question in his favor.  The error also prejudiced Mr. Abdullah's rights at sentencing, because it prevented Mr. Abdullah from offering evidence regarding residual doubt, which would have been a powerful reason for the jury to exercise mercy.

339.    Mr. Abdullah's right to testify was violated at the penalty phase in the following ways:

340.    At sentencing, Mr. Abdullah again wished to testify.  And defense counsel again pressured him not to.  As part of their lobbying, they indicated, wrongly, that he would have the opportunity to discuss anything he wanted in his allocution.  When deciding whether to testify at the penalty phase, Mr. Abdullah was not receiving competent and unbiased advice from his counsel, and was being given confusing and inconsistent information.  For instance, the trial court was telling Mr. Abdullah that his lawyers had to ask him questions if he testified, while his lawyers were telling him that they would not.  Similarly, the court told Mr. Abdullah that the State could not cross-examine him about matters that he did not address in his direct examination, while his lawyers told him that the State would cross-examine him about his first wife's death.

341.    During this process, a bench conference was held outside Mr. Abdullah's presence, at which the court stated that it would allow the defense to reopen their mitigation case to permit Mr. Abdullah the opportunity to testify to matters presented at the penalty phase if he so chose.  Defense counsel never informed Mr. Abdullah of the court's offer.

342.    Mr. Abdullah could have offered through his testimony mitigating evidence that would have demonstrated that he loved his wife and his children, that he regretted his infidelity and

PETITION FOR WRIT OF HABEAS CORPUS - 171

believed his wife had forgiven him, his feelings about divorce, Kurdish cultural beliefs, his experiences in Kurdistan, and his family's journey to Turkey and the United States.

343.   *Exhaustion of Claim*: Arguably, this claim was exhausted by Post-Conviction Issue XIII in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

## CLAIM 24: THE JURY WAS WRONGLY INSTRUCTED ON WILLFULNESS

344.   The jury was given a definition of willful that reduced its burden of proof on every charge except arson, relieving it of its duty to prove Mr. Abdullah guilty beyond a reasonable doubt and violating the Fourteenth Amendment.  *See Carella v. California*, 491 U.S. 263 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re Winship*, 397 U.S. 358 (1970). This error is structural, and therefore no prejudice need be shown.  *See Sullivan v. Louisiana*, 508 U.S. 275 (1993).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

345.   *Supporting Facts*: To convict Mr. Abdullah of first-degree murder, the State had to prove that the killing was willful, deliberate, and premeditated, and the jury was so informed. However, while the jury was given the definition of "premeditation," it was never given a definition for "deliberate" or "willful."  On the contrary, the jury was specifically informed that if it found only premeditation, it was obligated to return a guilty verdict.  As a result of this omission, the jury was never instructed that the State had to prove beyond a reasonable doubt that Mr. Abdullah specifically intended to commit the crimes with which he was charged.

346.   The prejudice from the error was compounded by the exchange between the jury and the court on the meaning of the instructions.  After deliberations began, the jury submitted a question to the court, asking for a definition of willfulness in the context of the arson charge.  The court

responded that "an act is willful or done willfully when done on purpose. One can act willfully without intending to violate the law to injure another or to acquire any advantage." This is the only definition of willful that the jury ever received. And while it was correct with respect to arson, it was incorrect with respect to every other charge in the indictment, including first-degree murder, each of which required either the specific intent to kill or the specific intent to harm. Under these circumstances, the jury was allowed to convict Mr. Abdullah of those charges absent a finding of specific intent, and was allowed to convict Mr. Abdullah of murder absent a finding of deliberateness and willfulness, thereby omitting an essential element of the crimes and lessening the prosecution's burden of proof.

347. *Exhaustion of Claim*: Arguably, this claim was exhausted by Guilt Phase Issue VII in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 25: THE JURY WAS WRONGLY INSTRUCTED ON MALICE

348. The jury instruction defining malice lessened the State's burden of proof, in violation of the Fourteenth Amendment. *See Carella v. California*, 491 U.S. 263 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re Winship*, 397 U.S. 358 (1970). This error is structural, and therefore no prejudice need be shown. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

349. *Supporting Facts*: Mr. Abdullah's jury was instructed that malice "is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart, which means a condition of heart and mind which has no regard for social or moral obligation." This non-pattern instruction failed to recognize that the killing must result from an intentional act. It also failed to require that the evidence establish both

PETITION FOR WRIT OF HABEAS CORPUS - 173

knowledge of the danger to, and conscious disregard for, human life.  The first omission relieved the State of its burden of proving the killing resulted from intentional, rather than inadvertent, conduct.  The second omission relieved the State of its burden to prove a knowing and conscious disregard for human life.

350.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

## CLAIM 26: THE JURY INSTRUCTION ON ENDANGERING CHILDREN IMPROPERLY REDUCED THE STATE'S BURDEN OF PROOF

351.    The jury instructions regarding the charge of injuring a child improperly lessened the State's burden of proof, in violation of the Fourteenth Amendment.  *See Carella v. California*, 491 U.S. 263 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re Winship*, 397 U.S. 358 (1970).  This error is structural, and therefore no prejudice need be shown.  *See Sullivan v. Louisiana*, 508 U.S. 275 (1993).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

352.    *Supporting Facts*: On the charge that Mr. Abdullah unlawfully injured a child, the jury was told by Judge Copsey that he was guilty if he "may have endangered the child's person or health."  The instruction lessened the State's burden of proof on that count from the constitutionally required one of beyond a reasonable doubt.

353.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

**CLAIM 27: THE TRIAL COURT GAVE A CONSTITUTIONALLY IMPROPER DEFINITION OF REASONABLE DOUBT IN BOTH GUILT AND PENALTY JURY INSTRUCTIONS**

354.    Mr. Abdullah's jury received a constitutionally deficient instruction defining reasonable doubt that impermissibly lowered the prosecution's burden of proof, invited juror speculation beyond the evidence, discouraged the jury from scrutinizing the evidence for reasonable doubt, and confused the jury by requiring a search for truth as opposed to doubt. This deficient instruction violated Mr. Abdullah's right to due process under the Fourteenth Amendment. *See In re Winship*, 397 U.S. 358 (1970). This error is structural, and therefore no prejudice need be shown. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993). This error affected both the guilt and penalty phases of the trial.

355.    Jury instructions that invite the jury to seek the truth rather than reasonable doubt violate the Constitution because they reduce the trial to a competition between whose account of the facts is more likely true, and thereby impose a weaker, preponderance-of-the-evidence standard on the prosecution. Instructions that guide juries away from reasonable doubt in favor of searches for the truth also invites juries to speculate beyond the evidence, explicitly tell the jury their duty is to arrive at the truth of the matter rather than to scrutinize the evidence for reasonable doubt. Inviting juries to search for truth endangers the accuracy of criminal trials, instead of holding the prosecution to the exacting burden of proving the defendant guilty beyond a reasonable doubt.

356.    *Supporting Facts*: In the guilt and penalty phase instructions defining reasonable doubt, the trial court first instructed jurors not to look for "mere possible doubt" but to instead ask themselves whether they "feel an abiding conviction, to a moral certainty, of the truth of the

charge." This definition turned the jurors' attention away from a concern with reasonable doubt by first offering a negative definition: do not look for possible doubt. Then the instruction gave its only positive definition in terms of seeking a state of "moral certainty" and "truth." By emphasizing truth-seeking over testing the prosecution's case for reasonable doubt, the trial court's instruction unconstitutionally reduced the State's burden and rendered the guilty verdict and death sentence unreliable.

357.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 28: THERE WAS INSUFFICIENT EVIDENCE OF FIRST-DEGREE MURDER

358.    No rational trier of fact could have found Mr. Abdullah guilty of first-degree murder beyond a reasonable doubt. His murder conviction therefore violates the Due Process Clause of the Fourteenth Amendment. *See Jackson v. Virginia*, 443 U.S. 307 (1979). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

359.    *Supporting Facts*: As discussed elsewhere, the State accused Mr. Abdullah of committing murder by "by suffocating her and/or by acute Prozac (fluoxetine poisoning)." At trial, the State's theory was that Ms. Abdullah was incapacitated by her murderer through the administration of Prozac and then asphyxiated with a shopping bag. However, according to the State's forensic toxicologists, Drs. Edward Barbieri and Dr. Ronald Backer, the Fluoxetine was administered prior to Ms. Abdullah's last meal, and the last meal occurred approximately an hour and a half before her death. The State took the position that the administration of the Fluoxetine occurred during a narrow window, sometime between 10 PM and midnight. By the State's

PETITION FOR WRIT OF HABEAS CORPUS - 176

theory of the case, Mr. Abdullah left Salt Lake City for Boise shortly after 8:10 PM on October 4, 2002; was accurately identified by Marjorie Wood in Mountain Home on his way to Boise sometime after midnight; and arrived in Boise sometime around 1:30 AM. Thus, taking the State's theory as true, it was impossible for Mr. Abdullah to have administered the Prozac between 10 PM and midnight because Mr. Abdullah had not yet even reached Mountain Home.

360.    Viewed in the light most favorable to the verdict, the facts recited above show that the State never came remotely close to proving that Mr. Abdullah committed murder. Rather, the State's own evidence pointed far more strongly in favor of suicide. At a bare minimum, given these glaring omissions in the State's case, no rational trier of fact could have found it to have proven the murder charge beyond a reasonable doubt.

361.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Guilt Phase Issue III in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

## CLAIM 29: THERE WAS INSUFFICIENT EVIDENCE OF FIRST-DEGREE ARSON

362.    No rational trier of fact could have found Mr. Abdullah guilty of arson beyond a reasonable doubt. His arson conviction therefore violates the Due Process Clause of the Fourteenth Amendment. *See Jackson v. Virginia*, 443 U.S. 307 (1979). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

363.    *Supporting Facts*: Mr. Abdullah was charged with first-degree arson. The State's evidence indicated that the fire was caused by an accidental ignition not intended by the person pouring the gasoline. To convict Mr. Abdullah of first-degree arson, the State had to prove that he willfully damaged a dwelling by fire or explosion. The State showed only that the perpetrator

accidentally caused an explosion, not willfully.  Therefore, the evidence was insufficient to prove

that Mr. Abdullah committed first-degree arson.

364.   *Exhaustion of Claim*: Arguably, this claim was exhausted by Guilt Phase Issue IV in the

SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

## CLAIM 30: THE IDAHO SUPREME COURT VIOLATED MR. ABDULLAH'S RIGHTS BY RETROACTIVELY ALTERING THE ELEMENTS OF ARSON

365.   The Idaho Supreme Court added an element to arson in Mr. Abdullah's case, violating his

right to be free from unexpected and retroactive expansions of the law under the Due Process

Clause of the Fourteenth Amendment and his right to have every element of the offense proven

by the State beyond a reasonable doubt under the Due Process Clause of the Fourteenth

Amendment.  *See Bouie v. City of Columbia*, 378 U.S. 347 (1964); *see also Carella v.*

*California*, 491 U.S. 263 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re*

*Winship*, 397 U.S. 358 (1970).  This error is structural, and therefore no prejudice need be

shown.  *See Sullivan v. Louisiana*, 508 U.S. 275 (1993).  Insofar as Mr. Abdullah is required to

demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence

in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507

U.S. 619 (1993).

366.   *Supporting Facts*: In the indictment, Mr. Abdullah's first-degree arson count accused him

of "willfully and unlawfully by fire or explosion, damag[ing] a dwelling."  The indictment

tracked the language of the statute, which did not include any language about causation.  Prior to

Mr. Abdullah's case, the Idaho appellate courts had never read a causation element into the arson

statute.  In its March 2, 2015 opinion, the Idaho Supreme Court rejected Mr. Abdullah's

challenge to the sufficiency of the evidence on arson.  It did so on the basis that Mr. Abdullah

"caused the intended result—the damage of a dwelling by fire."  The Idaho Supreme Court

further reasoned that "the fire would not have occurred but for his conduct and the fire was the foreseeable, probable, and intended result of his conduct." In suggesting that arson could be committed in such a way, the Idaho Supreme Court was adding a novel element to the statute. Because Mr. Abdullah had no notice of that element, it could not be applied retroactively to him.

367.    Moreover, if causation is an element of arson in Idaho, then the State was required to prove it beyond a reasonable doubt. The jury was not instructed that causation was an element of arson, and therefore did not make that finding.

368.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Issue I in the SAPD's brief in support of its petition for rehearing, filed with the Idaho Supreme Court on May 18, 2015.

## CLAIM 31: THERE WAS INSUFFICIENT EVIDENCE OF ATTEMPTED FIRST-DEGREE MURDER

369.    No rational trier of fact could have found Mr. Abdullah guilty of attempted first-degree murder beyond a reasonable doubt. His convictions for that offense therefore violates the Due Process Clause of the Fourteenth Amendment. *See Jackson v. Virginia*, 443 U.S. 307 (1979). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

370.    *Supporting Facts*: As discussed above, there was insufficient evidence that Mr. Abdullah was in Boise at the time of the fire. *See* Claim 1(A)(vi). If there was insufficient evidence that he was present, that means there was insufficient evidence that he attempted to murder the children in the house. The insufficiency of the evidence is further confirmed by the fact that the State's evidence did not show that the perpetrator had a specific intent to set the fire, and consequently a specific intent to kill the children inside of it. Instead, the prosecution's own witnesses testified that the fire began accidentally. Therefore, by the State's account, there was

no willful, deliberate, premeditated attempt to kill the children. It follows that there was insufficient evidence of attempted first-degree murder. Even if there was evidence to support the conclusion that Mr. Abdullah intended to commit arson, there is no evidence that he intended to harm the children. In fact, the evidence that Naim was found outside of the home would lead to the opposite inference: that Mr. Abdullah was attempting to remove the children from the home immediately after the accidental ignition, but was unable to get all of the children out of the home before the fire spread.

371.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Guilt Phase Issue V in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 32: THERE WAS INSUFFICIENT EVIDENCE OF INJURY TO A CHILD

372.    No rational trier of fact could have found Mr. Abdullah guilty of injury to a child beyond a reasonable doubt. His conviction for that offense therefore violates the Due Process Clause of the Fourteenth Amendment. *See Jackson v. Virginia*, 443 U.S. 307 (1979). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

373.    *Supporting Facts*: Mr. Abdullah was charged in the indictment with committing an injury to a child in violation of Idaho Code § 18-1501(1) by placing his son Naim into "a situation endangering his health or person." Viewed in the light most favorable to the State, Naim was found by a firefighter in the backyard of his home, sitting atop a folded comforter, surrounded by a potted plant and toys. According to testimony, he was clean, had no soot on him, and was quiet and content. He had no injuries of any kind and no one observed any signs that he was

exposed to fire.  Furthermore, the timing of his discovery suggested that he was only in the yard for a very short period of time.

374.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Guilt Phase Issue VI in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 33: CUMULATIVE GUILT-PHASE ERROR

375.    Mr. Abdullah's convictions violate the Fifth, Sixth, and Fourteenth Amendments because of the cumulative impact of the errors that occurred throughout the guilt-or-innocence phase of his trial.  *See Chambers v. Mississippi*, 410 U.S. 284 (1973); *Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007); *Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

376.    *Supporting Facts*: The constitutional violations set forth in each individual guilt-phase claim alone mandate relief.  Even if not, relief is required when each claim is considered cumulatively with the other claims.  The cumulative impact of these combined errors violated many of Mr. Abdullah's rights, including the rights to effective assistance of counsel, due process, a fair trial, a fair and impartial jury, an unbiased judge, and the right to confront the evidence against him, and the right to a fair and reliable guilt-phase result.

377.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Guilt Phase Issue XV in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 34: MR. ABDULLAH IS NOT A CONSTITUTIONALLY SUITABLE CANDIDATE FOR DEATH

378.    Given his experiences, character, and offense of conviction, Mr. Abdullah is far from the "worst of the worst," and the imposition of a death sentence on him therefore violates the Sixth,

Eighth, and Fourteenth Amendments. *See Miller v. Alabama*, 132 S. Ct. 2455 (2012); *Graham v. Florida*, 560 U.S. 48 (2010); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304 (2002); *Godfrey v. Georgia*, 446 U.S. 420 (1980).

379.    *Supporting Facts*: As discussed in greater length elsewhere, Mr. Abdullah has a powerfully compelling mitigation story.  He experienced profound trauma as a child, when his village was destroyed and his family relentlessly persecuted by Saddam Hussein as part of a genocidal campaign against the Kurds.  During the family's flight from Hussein, Mr. Abdullah witnessed horrific acts of violence and—despite his young age—acted heroically to protect and lead his family.

380.    The facts of the offense with which Mr. Abdullah was charged likewise do not place him among the worst of the worst.  He was convicted of killing a single, adult victim, not of murdering multiple people or children.  There was no allegation that he committed any sexual offenses as part of the crime of conviction.  Prior to this case, he had never been charged with, or convicted of committing, any other felonies, or any other acts of violence.  He had a good record in jail and presented no risk whatsoever of committing murder while incarcerated.  Simply put, Mr. Abdullah's case cannot plausibly be considered one of the more egregious first-degree murders.  Many murder cases with far more reprehensible facts have led to sentences less than death.

381.    Finally, there is a tremendous amount of reasonable doubt about Mr. Abdullah's guilt, as demonstrated most prominently by the fact that the State accused him of committing murder through the administration of Prozac even though its own timeline shows that he was not present

PETITION FOR WRIT OF HABEAS CORPUS - 182

when the victim ingested that Prozac.  Executing Mr. Abdullah would therefore pose a great risk of killing an innocent man.

382.    Considering the potency of Mr. Abdullah's mitigating evidence, the relative lack of aggravation in his case, and the serious holes in the State's theory of his guilt, he is not among the worst of the worst, and it was therefore unconstitutional to sentence him to death.

383.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 35: DEATH QUALIFICATION OF THE JURY WAS PER SE UNCONSTITUTIONAL

384.    The jury selection process made the jury far more likely to sentence Mr. Abdullah to death, regardless of the facts presented at trial.  In that respect, the death qualification process as a whole violated Mr. Abdullah's right to a fair and impartial jury under the Sixth Amendment, his right to a reliable and non-arbitrary death sentence where jurors are guided by objective standards under the Eighth Amendment, and his right to due process under the Fourteenth Amendment.  *See Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

385.    *Supporting Facts*: A capital jury drawn under the standards set forth by the U.S. Supreme Court's caselaw is a jury predisposed to vote for death under any circumstances.  Mr. Abdullah's jury was selected under those standards.

386.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

PETITION FOR WRIT OF HABEAS CORPUS - 183

## CLAIM 36: THE TRIAL COURT IMPROPERLY EXCUSED JURORS WHO HAD RESERVATIONS ABOUT THE DEATH PENALTY

387.   The trial court unconstitutionally deprived Mr. Abdullah of a fair and impartial trial under the Sixth and Fourteenth Amendments, and violated his right to be free from cruel and unusual punishment under the Eighth Amendment, by excluding jurors who indicated reservations about the death penalty.  *See Wainwright v. Witt*, 469 U.S. 412 (1985); *Witherspoon v. Illinois*, 391 U.S. 510 (1968).  Because the trial court improperly excused jurors who had conscientious scruples about the death penalty, Mr. Abdullah's Sixth Amendment right to an impartial jury was violated and he was ultimately sentenced by a "tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 521.  The judge had an independent duty to ensure that such jurors were not improperly struck, regardless of what actions were taken or not taken by defense counsel.  A structural error occurs when a trial court trikes a juror who, despite expressing criticism of the death penalty, is willing to set their views aside and consider a death sentence. *See Gray v. Mississippi*, 481 U.S. 648 (1987).  *Witherspoon* error requires automatic reversal, and, therefore, Mr. Abdullah need not make a showing of prejudice. *See id.*

388.   *Supporting Facts*:  The trial court excused several jurors who expressed reservations about the death penalty even after assurances from the jurors that they could set these reservations aside and follow the court's instructions.

389.   With some of these excusals, the trial court improperly found that the juror could not follow the court's instructions despite the juror's assurances.  For example, Juror 23 told the trial judge she had mixed feelings about the death penalty, but that she could give a death sentence depending on the circumstances and severity of the crime.  During the prosecution's questioning, Juror 23 began to express uncertainty about whether she was up to the task of participating in a capital trial.  When asked if she would be able to follow the law as instructed, however, Juror 23

maintained that she "could follow it" even while expressing uncertainty about the death penalty. The trial judge excused Juror 23 over the defense's objection, thus excluding a thoughtful juror who approached deciding life or death with appropriate caution and had willingness, however reluctant, to serve on the jury.

390.    In another example, Juror 105 was willing to consider the death penalty if there was aggravation but would not commit to imposing it.  This prospective juror assured the court that if she found the aggravators to outweigh the mitigators she would be able to impose the death sentence; she also affirmed she would "absolutely" be able to follow the judge's instructions. Even when asked if she would be willing to sign the death sentence, Juror 105 responded that she was willing to do so if there was a unanimous decision.  While it is true that, with the prosecution's probing, Juror 105 expressed reservations and at one point said she could not impose the death sentence, she still maintained, as the judge noted, that she would be willing to impose the sentence if the facts justified it.  Even though Juror 105's death penalty views mirrored statutory aggravator requirements, Judge Copsey dismissed her for cause.  Here, the judge commented that being able to consider the penalty was not enough, and, instead, a juror must commit to imposing the penalty when it is required by law.  The judge then gave the following description of law:  If the aggravators "outweigh the mitigating circumstances, then you need to – then the law would instruct you to impose the death sentence."  Mandatory death sentences, as Judge Copsey should well know, are unconstitutional, *see Woodson v. North Carolina*, 428 U.S. 280 (1976), and requiring a juror to commit to giving a mandatory death sentence is not the proper standard for dismissal, especially when the juror promises to set her views aside and impose the death penalty when there are aggravating circumstances.

PETITION FOR WRIT OF HABEAS CORPUS - 185

391.    In addition to Jurors 23 and 105, the trial court improperly struck for cause seven other veniremembers who expressed reluctance but were willing to consider the death penalty.  These potential jurors were either struck without objection by defense counsel or under the pretext of economic hardship.  *See* Claim 1(B)(vii).  The trial court improperly allowed defense counsel to stipulate to striking the following death-opposed veniremembers: Juror 30 was struck even though he committed to considering the death penalty despite his opposition to it in the past; Juror 39 did not unalterably oppose the death sentence, but was struck after saying he was unwilling to be the foreman of the jury and sign a death sentence; Juror 48 assured the trial court she could impose the sentence even though for the most part she believed life in prison was sufficient; and Juror 62 told the court he could consider the death penalty for egregious cases involving children, but did not want the foreman's responsibility of signing the sentence.  For three other members opposed but willing to consider the sentence—Jurors 49, 51, and 55—the trial judge cited the pretext of hardship in striking them.  For example, Judge Copsey altered her usual set of opening with Juror 49, and emphasized how long the trial would take.  With Juror 51, a nurse who said working outside trial hours was a possibility and whose children were in college, the judge found a hardship excuse based on the fact that the juror would miss some work.  As the judge pointed out while denying many other jurors' hardship excuses, "almost everybody comes in and they have some job-related issues."  The judge would occasionally be strict about not excusing other veniremembers for hardship—Juror 85, for example, ran his own business and his and his son's livelihoods depended on him running the business, but the judge refused a hardship excusal.  On another occasion, she excused for hardship when the real problem was the juror's dishonesty. Juror 89 stated he could make up any hours he missed due to jury service but, after the prosecution alleged Juror 89 had misrepresented his criminal

background, the judge dismissed him for hardship.  Overall, there was a troubling pattern that when one expressed any conscientious scruples about the death penalty, the strict requirements for hardship excuses that the judge otherwise would enforce gave way to a lenient standard to excuse death-opposed jurors.

392.    There were also seven members of the jury pool—Jurors 12, 15, 64, 75, 117, and 154— who did not participate in voir dire at all. Instead these seven were struck after an email stipulation from defense counsel, *see* Claim 1(B)(iv).  By allowing the stipulation, Judge Copsey made the unwise and improper decision to strike jurors based only on responses to what many jurors believed was a confusing questionnaire.  The decision here was particularly unwise because in an earlier hearing, Judge Copsey had noted the serious need for face-to-face life and death qualification.  But instead of requiring counsel to question these veniremembers, the trial court let perceived efficiency trump Mr. Abdullah's right to an impartial jury.  Effectively, the trial court bypassed any *Witherspoon* analysis and allowed for automatic disqualification from jury service.

393.    By striking these veniremembers and encouraging and allowing the email stipulation, Judge Copsey violated Mr. Abdullah's Sixth Amendment right to an impartial jury and unconstitutionally organized a collection of death-prone jurors guaranteed to return a death sentence.  As discussed in Claim 38, not only did she prevent jurors critical of the death penalty from serving, Judge Copsey also refused to strike those who would automatically give a death sentence for murder and would not consider mitigation.  Consequently, the jury that sentenced Mr. Abdullah was unconstitutionally made up of members predisposed to both finding guilt and giving death.

394. *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Post-Conviction

Issues XIV in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on

January 8, 2014.

### CLAIM 37: THE TRIAL COURT FAILED TO ALLOW OR CONDUCT ADEQUATE VOIR DIRE OF DEATH-PRONE JURORS

395. The trial court violated Mr. Abdullah's Sixth, Eighth, and Fourteenth Amendment rights

when it did not allow adequate voir dire of jurors who believed death was the only appropriate

sentence for murder. *See Morgan v. Illinois*, 504 U.S. 719 (1992). The failure to allow defense

counsel to ask questions that would actually identify unqualified jurors rendered Mr. Abdullah's

trial fundamentally unfair, *see Mu'Min v. Virginia*, 500 U.S. 415 (1991), by infecting the jury

venire with members who believed the death penalty was the only appropriate punishment for

murder and who would not consider mitigating circumstances. Moreover, a judge has a

responsibility to remove prospective jurors who are biased, regardless of who the attorneys

object to or not. *See Morgan v. Illinois*, 504 U.S. 719 (1992). If Judge Copsey was not going to

permit the necessary questioning from defense counsel, she should have asked the questions

herself. Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had

a substantial and injurious effect or influence in determining the jury's verdict of guilt and

sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

396. *Supporting Facts*: Prior to voir dire, Judge Copsey issued an order in which she directed

that she, and she alone, would be asking the death-qualification questions. That ruling was

highly problematic standing alone, in light of Judge Copsey's extreme bias against Mr. Abdullah.

*See* Claim 6. It was even more problematic considering how incomprehensible her death-

qualification questions were. Here is an example: "Are you of the opinion that death is the only

appropriate penalty for murder in the first degree and that opinion is so strong that you could not

consider not imposing a death sentence as a penalty under any circumstances?"  With that single, convoluted sentence, Judge Copsey managed to create a conjunctive question (that consequently could never be answered unambiguously) with a double negative (that was therefore inevitably going to confuse jurors) and so much unnecessary verbiage and legalese that no lay person could possibly know what she was talking about.  Such questions do nothing to meaningfully sift between partial and impartial jurors, and therefore do nothing to effectuate a defendant's right to a panel that will fairly consider life.

397.    As was clear from the juror questionnaires, most veniremembers did not understand that murder must include a premeditation element.  When jurors stated that they would consider the circumstances before imposing the death penalty, many of them meant they would not impose the death penalty if the "murder" were committed in self-defense or without premeditation.  Given such misunderstandings, counsel must be allowed to explain this during voir dire in order to assess whether a juror will automatically give a death sentence for first degree murder.  The trial court improperly curtailed questioning that would have actually elicited informed responses about the jurors' death penalty views.

398.    Initially, defense counsel attempted to educate jurors by proposing that the judge ask individual jurors a hypothetical question involving the definition of murder.  The judge rejected this hypothetical but said she "anticipated" explaining the definition of first degree murder to each individual juror during voir dire, including that murder requires the element of premeditation and lack of self-defense.  Both the prosecution and defense agreed it would be best if the judge defined murder for each juror.  In practice, however, the judge neither gave any explanation of the elements of murder nor did she allow counsel to present a definition that would lead to informed responses from the jurors.

PETITION FOR WRIT OF HABEAS CORPUS - 189

399.     As a result of the judge's decisions, defense counsel did not adequately voir dire the seated jurors whose questionnaire responses suggested they would automatically impose a death sentence. This, combined with defense counsel's ineffective voir dire, *see* Claim 1(B)(vi), led to the seating of at least six problematic jurors. Juror 1 believed in "an eye for an eye" and suggested the death penalty was appropriate when the defendant was not provoked or lacked intent. Juror 2's questionnaire responses suggested he would impose the death penalty if there were no doubt of guilt and the defendant neither acted in self-defense nor suffered diminished capacity. Juror 28 said the best argument for the death penalty was first degree murder and the best argument against was that the defendant was innocent of murder. Juror 36 when asked if death was the only appropriate penalty for murder, only said "not necessarily." This juror also seemed to have prejudged the case when she said she would give a death sentence but would also want to pray with the defendant at his execution. Juror 44 noted the best argument for the death penalty was "an eye for an eye," and the best argument against it was if the defendant was innocent. Juror 83 believed the best argument for the death penalty was a "life for a life," and the best argument against was if the defendant was innocent. Juror 92 stated that if there was no reasonable doubt that the defendant was guilty of murder then she would impose the death penalty. Without adequate voir dire it is unclear how many of these jurors would, and did in fact, automatically give Mr. Abdullah a death sentence.

400.     The trial court also blocked questions about whether a juror would consider mitigation before imposing a death sentence. For example, after a Juror 77 mentioned that he would not consider absence of a criminal record prior to giving a death sentence, the judge interrupted defense counsel's questioning and stated her belief that the juror would follow instructions. The judge also interrupted defense counsel's questioning of Juror 85 on mitigation. When asked why

PETITION FOR WRIT OF HABEAS CORPUS - 190

he supported the death penalty, Juror 85 responded, "Because if they take someone's life, I think they should die." When Juror 85 began to indicate he would not consider mitigation the judge stopped defense voir dire again to express her belief that the juror would follow her instructions. *See also* Claim 1(B)(vi).

401.    Without adequate voir dire, it is impossible to tell if these jurors could actually follow instructions to consider mitigation or if they were inclined to give the death penalty automatically once there was a murder conviction. It is clear, however, that, given the number of problematic jurors, Mr. Abdullah did not receive a fair trial. Consequently, Mr. Abdullah's right to an impartial jury was violated and his trial was rendered fundamentally unfair.

402.    *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Guilt Phase Issue II and Post-Conviction Issue XIV in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

## CLAIM 38: THE TRIAL COURT EMPANELED BIASED JURORS

403.    Mr. Abdullah's right to an impartial jury under the Sixth and Fourteenth Amendments, and his right to be free from cruel and unusual punishment under the Eighth Amendment, was violated when the trial judge empaneled several biased jurors. *See Remmer v. United States*, 347 U.S. 227 (1954); *Chandler v. Florida*, 449 U.S. 560 (1981) The jurors in Mr. Abdullah's trial suffered from both actual and implied bias. A judge has a responsibility to remove prospective jurors who are biased, regardless of whether the attorneys object or not. *See Morgan v. Illinois*, 504 U.S. 719 (1992). This error is structural, and therefore no prejudice need be shown. *See United States v. Martinez-Salazar*, 528 U.S. 304 (2000); *Ross v. Oklahoma*, 487 U.S. 81 (1988); *Morgan v. Illinois*, 504 U.S. 719 (1992); *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998).

404.    *Supporting Facts*: The majority of jurors in Mr. Abdullah's case were biased in several ways, including through their connections with law enforcement, trial witnesses, and members of

Ms. Abdullah's family.  Some of the jurors even had their own potential stake in the outcome of the trial through social and business relationships with witnesses and through their own career hopes to join law enforcement.  Almost all of the jurors had also been exposed to prejudicial news coverage, *see* also Claim 5, both by the news coverage just after the fire and death of Ms. Abdullah and the coverage taking place during the pretrial proceedings.  Finally, the questionnaire and voir dire responses revealed several of the jurors would automatically give a death sentence for murder and would not consider mitigating evidence.

405.    *Personally and professionally biased Jurors 59 and 103*: Juror 59 was in the process of testing for a position as a police officer and had interned with the Moscow Police Department.  He also noted that he would believe testimony from law enforcement more than other witnesses.  When questioned about his partiality towards law enforcement testimony by defense counsel, Juror 59 said he thought he might be able to set his partiality aside if the judge so instructed.  Judge Copsey's jury instructions contained absolutely no instruction to this effect.

406.  Juror 103 is another example of a juror that should have been excused due to bias.  During voir dire, Juror 103 admitted to having a fifteen-year social and business relationship with Ms. Abdullah's cousin Leslie Beck and her husband Gary Beck.  Both of the Becks testified during the trial for the prosecution.  None of the parties engaged in any concrete inquiry into how having a social and business relationship with Ms. Abdullah's family members might affect Juror 103's ability to be impartial.

407.    *Jurors biased by media exposure*: Additionally, almost all the jurors had been exposed to the case through media portrayals.  Examples include Juror 28 noting that it would've been hard to miss all the coverage, Juror 45 admitting he'd heard about the case and that it was "awful, " and Juror 100 remembering that she had discussed the "cruelty" of the defendant with her

PETITION FOR WRIT OF HABEAS CORPUS - 192

coworkers.  Juror 100's memory was so strong that she recalled speculating about what the children had seen and knew of Ms. Abdullah's death, and stated recalled that "it looked like it was Mr. Abdullah" who committed the crime.  This exposure likely continued through trial as well.  *See* Claim 1(A)(xxiii).

408.    *Automatic-death-for-murder and mitigation-impaired jurors*.  Several jurors were seated on the jury who would automatically give a death sentence for murder or were severely mitigation impaired, including Jurors 28, 59, 83, and 98 and alternate Jurors 1 and 2. *See* Claim 1(B)(vi).  Several of the seated jurors also reported in their questionnaires that they did not believe a murderer's childhood should matter (Jurors 36, 44, 83, 92, 98, 100) and two alternate jurors stated that life without parole was not a sufficient punishment.  As noted in Claim 1(B)(vi), these responses signal severe mitigation impairment in refusing to consider a murderer's childhood and a view that all murderers should be executed.  Jurors with such views constituted a biased jury and should have been excused for cause.

409.    On the whole, Mr. Abdullah was sentenced to death by a jury that had been exposed to prejudicial media coverage, including two jurors with personal interests in the outcome of the trial, and several who would not consider mitigation and would automatically impose a death sentence for murder.  A jury with this collective background could not have offered Mr. Abdullah an impartial and fair trial.

410.    *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Guilt Phase Issue II and Post-Conviction Issue XIV in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 39: STRIKING PROSPECTIVE JURORS ON THE BASIS OF THEIR RACE, SKIN COLOR, GENDER, AND RELIGION VIOLATED THE UNITED STATES CONSTITUTION

411.    Mr. Abdullah's conviction, confinement, and sentence are illegal and unconstitutional under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments because of the systematic exclusion of veniremembers on the basis of race, skin color, gender, and religion violated the Equal Protection Clause's prohibition on striking jurors on the basis of their race, gender, and religion.  *See Batson v. Kentucky*, 476 U.S. 79  (1986).  This error is structural, and therefore no prejudice need be shown.  *See Powers v. Ohio*, 499 U.S. 400 (1991).

412.    *Supporting Facts*: Mr. Abdullah has been prevented from fully investigating potential misconduct relating to the jury, and has no way of ascertaining the race, skin color, and religion of the veniremembers.  He is therefore not able at present to determine whether he has a viable *Batson* claim.  For the sake of preservation, Mr. Abdullah asserts that the prosecution intentionally struck jurors on the basis of race, skin color, gender, and religion.

413.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 40: THE JURY ENGAGED IN MISCONDUCT

414.    Jurors engaged in misconduct at Mr. Abdullah's trial, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.  *See Smith v. Phillips*, 455 U.S. 209 (1982); *Irvin v. Dowd*, 366 U.S. 717 (1961); *Parker v. Gladden*, 385 U.S. 363 (1966).

415.    *Supporting Facts*: Mr. Abdullah has been prevented from fully investigating potential misconduct relating to the jury.  He is therefore not able at present to determine whether he has a viable juror-misconduct claim.  For the sake of preservation, Mr. Abdullah asserts that jurors engaged in misconduct, including but not limited to lying at voir dire, hiding criminal histories,

suffering from actual and implied conflicts, and considering inappropriate, extraneous material during trial and deliberations, such as religious material and media coverage of the case.

416.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

## CLAIM 41: MR. ABDULLAH IS INNOCENT OF MURDER

417.    Mr. Abdullah is innocent of murder, and the execution of an innocent man violates the Eighth and Fourteenth Amendments.  *See Herrera v. Collins*, 506 U.S. 390 (1993).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

418.    *Supporting Facts*: As recited in Claim 1(A)(v), the State's evidence indicated that Ms. Abdullah died in part from the ingestion of a fatal amount of Prozac, and she ingested that Prozac at a time when the State's own account places Mr. Abdullah hundreds of miles from the scene.  Furthermore, as recited in Claim 1(A)(vi), a credible, compelling witness saw Mr. Abdullah at a time and place that disqualified him from being present at the time of the fire.  Finally, from the accounts of neighbors, there is extensive evidence that another person was responsible for the crimes.  *See* Claim 1(A)(vii).  These facts, as well as those laid out elsewhere in the instant petition, establish that Mr. Abdullah is actually innocent of murder.

419.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

## CLAIM 42: THE GREAT RISK OF DEATH AGGRAVATOR IS UNCONSTITUTIONALLY VAGUE

420.    The great risk of death aggravator fails to adequately direct a jury's discretion to minimize the risk of arbitrary and capricious sentencing decisions, and is void for vagueness, in

PETITION FOR WRIT OF HABEAS CORPUS - 195

violation of the Eighth and Fourteenth Amendments.  *See Lewis v. Jeffers*, 497 U.S. 764 (1990); *Maynard v. Cartwright*, 486 U.S. 356 (1988); *Kolender v. Lawson*, 461 U.S. 352 (1983); *Godfrey v. Georgia*, 446 U.S. 420 (1980); *Smith v. Goguen*, 415 U.S. 566 (1974).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

421.    *Supporting Facts*: The State made Mr. Abdullah eligible for a death sentence by charging him with two aggravators, one of which was that he knowingly created a great risk of death to many persons.  The term "great risk" is undefined and subject to many interpretations.  Similarly, the term "many persons" could implicate six people, or a thousand.  The aggravator can be construed as requiring knowledge of the commission of an act, but not its consequences, or it can be construed as requiring knowledge that the commission of an act will likely create great risk of death to many persons.  Even if not vague for judge-sentencing purposes, the aggravator is vague now that jury sentencing is compelled, as jurors have very little basis to compare one case to another and ascertain when there is a great risk of death to many persons.

422.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Penalty Phase Issue IV in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 43: THERE WAS INSUFFICIENT EVIDENCE TO FIND THE GREAT RISK OF DEATH AGGRAVATOR

423.    The State did not adequately prove that the great risk of death aggravator was appropriate, in violation of the Eighth and Fourteenth Amendments.  *See Lewis v. Jeffers*, 497 U.S. 764 (1990); *Jackson v. Virginia*, 443 U.S. 307 (1979).  Given the evidentiary deficiencies, no rational trier of fact could have found Mr. Abdullah guilty of the aggravator beyond a

reasonable doubt.  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

424.    *Supporting Facts*: The State pursued a death penalty against Mr. Abdullah partly on the basis of the great risk of death aggravator.  That aggravator requires that the defendant knowingly create a great risk of  death to many persons.  The facts recited above indicate that no rational trier of fact could have found beyond a reasonable doubt that Mr. Abdullah set the fire. *See* Claim 29.  Those facts demonstrate for the same reason that no rational trier of fact could have found beyond a reasonable doubt that Mr. Abdullah was guilty of the great-risk aggravator.

425.    Furthermore, there were only three people in the Siesta residence when the fire began. By any reasonable standard, those were the only people truly in great risk of death as a result of the fire.  Three people do not constitute "many persons" under the aggravator according to the instruction given to the jury, which required a great risk of death to "more than four people."

426.    Even accepting that the fire endangered more than three people, the fact remains that it did not endanger "many persons."  One child was found on the yard outside the Siesta residence. If that child were counted in the list of those at great risk of death, there were only four such people, and Mr. Abdullah was innocent of the aggravator under the jury instruction.

427.    Three neighbors approached the house during the fire, and one of them entered it to rescue a child.  However, those individuals are too far removed from the danger caused by the act of setting the fire for them to count as people subjected to a great risk of death.  Accordingly, no reasonable juror could have found beyond a reasonable doubt that Mr. Abdullah was guilty of exposing more than four people to a great risk of death, and thus no reasonable juror could have found him guilty of the aggravator.

PETITION FOR WRIT OF HABEAS CORPUS - 197

428.    To the extent that a great risk of death was created, it had no relationship to the murder.
Here, the great risk was created by the fire, not by the murder of Ms. Abdullah.  The great risk
was also not knowingly created, since the evidence established that it began accidentally.

429.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Penalty Phase Issues V and
IX in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January
8, 2014.

### CLAIM 44: MR. ABDULLAH'S RIGHT TO ALLOCUTE WAS VIOLATED

430.    The trial court imposed unreasonable restrictions on the scope of Mr. Abdullah's
allocution at the penalty phase, in violation of his right to allocute under the Due Process Clause
of the Fourteenth Amendment and his right to present mitigating evidence under the Eighth and
Fourteenth Amendments.  *See Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438
U.S. 586 (1978); *United States v. Behrens*, 375 U.S. 162 (1963); *Green v. United States*, 365
U.S. 301 (1961); *Schwab v. Berggren*, 143 U.S. 442 (1892); *Ball v. United States*, 140 U.S. 118
(1891); *Boardman v. Estelle*, 957 F.2d 1523 (9th Cir. 1992).  This error is structural, because it
undermines the fairness of the judicial proceeding.  As such, no prejudice need be shown.
Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a
substantial and injurious effect or influence in determining the jury's verdict of guilt and
sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

431.    *Supporting Facts*: At the conclusion of the State's presentation of victim impact evidence
in the penalty phase, the trial court confirmed that Mr. Abdullah intended to exercise his right to
allocute and then advised him that anything he said in allocution could be used against him.  The
court further advised Mr. Abdullah that allocution "should be confined to those matters which
have to do with the mitigation of the punishment," and that allocution could not effectively
constitute testimony.  Thereafter, Judge Copsey required that Mr. Abdullah's allocution

PETITION FOR WRIT OF HABEAS CORPUS - 198

statement be made in writing so that counsel could review it beforehand. She explicitly prohibited him from discussing anything related to the guilt phase in his allocution. Mr. Abdullah presented a list to the court of areas he wanted to address in his allocution statement, as well as photographs he wanted introduced during allocution. After reviewing Mr. Abdullah's written statement, the court told him he could not touch upon any of the following at allocution: (1) anything about the family's plan to move overseas, to the extent it was related to testimony in the guilt phase; (2) Ms. Abdullah's wishes that her family would accept her as she was, i.e., Muslim; (3) Mr. Abdullah's state of mind regarding divorce, adultery, the rights of men and women, to the extent he was suggesting that evidence received in the guilt phase on these topics was wrong; (4) things he wished could have happened in trial; (5) his religious teachings in prison, who attended the classes, and the purpose of the teachings to the extent that it constituted an attack on Mr. Bankhead or involved Mr. Bankhead's testimony; and (6) anything constituting argument regarding the guilt phase. After the court advised Mr. Abdullah of the restrictions it was placing on his right to allocute, defense counsel asked for a brief recess to talk to Mr. Abdullah, who later returned to the courtroom and announced that he would not allocute. He explained his frustration with the constraints placed on allocution by the court as his reason for declining.

432. *Exhaustion of Claim*: Arguably, this claim was exhausted by Penalty Phase Issue X in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

## CLAIM 45: MR. ABDULLAH'S RIGHT TO PRESENT LINGERING DOUBT EVIDENCE AT SENTENCING WAS VIOLATED

433. Mr. Abdullah was deprived of his right to present evidence of his innocence at sentencing, in violation of his Eighth and Fourteenth Amendment rights. *See Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978); *see also Sawyer v.*

PETITION FOR WRIT OF HABEAS CORPUS - 199

*Whitley*, 505 U.S. 333 (1992); *Penry v. Lynaugh*, 492 U.S. 302 (1989).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

434.    *Supporting Facts*: Judge Copsey ruled that Mr. Abdullah was prohibited from arguing to the jury at sentencing that it should vote for life due to lingering doubt about his guilt.  Given the serious problems with the State's theory, that evidence would have given the jury a powerful reason to spare Mr. Abdullah's life.

435.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 46: THE INTRODUCTION OF VICTIM IMPACT EVIDENCE WITHOUT INSTRUCTIONS WAS UNCONSTITUTIONAL

436.    The introduction of victim impact evidence in the absence of any instruction to the jury on how it was to consider the evidence violated Mr. Abdullah's rights under the Sixth, Eighth, and Fourteenth Amendments.  *See Bosse v. Oklahoma*, 137 S. Ct. 1 (2016) (per curiam); *South Carolina v. Gathers*, 490 U.S. 805 (1989); *Booth v. Maryland*, 482 U.S. 496 (1987); *see also Lowenfield v. Phelps*, 484 U.S. 231 (1988); *Sawyer v. Whitley*, 505 U.S. 333 (1992); *Gregg v. Georgia*, 428 U.S. 153 (1976).

437.    *Supporting Facts*: Several relatives of Ms. Abdullah offered victim impact statements at the sentencing phase.  These statements were poignant reflections on the tragedy of Ms. Abdullah's death and the devastation it wrought on her family.  As such, the statements were likely to motivate the jury to impose a death sentence on Mr. Abdullah, who they had just found guilty.

PETITION FOR WRIT OF HABEAS CORPUS - 200

438.     The jury was given no instruction offering it any guidance on how it was to consider the victim impact evidence.  As a result, the jury likely regarded the evidence as non-statutory aggravation.  The consideration of non-statutory aggravation undermines any narrowing accomplished by the aggravators enacted by the Idaho legislature.

439.     By statute, there is a specific statutory process in Idaho by which capital juries determine whether the death penalty should be imposed.  That process does not provide for the consideration of victim impact evidence.  Therefore, when the jury did consider this evidence in its penalty-phase determination, Mr. Abdullah was not treated in accordance with state law.

440.     *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 47: THE BURDEN OF PROOF ON MITIGATION WAS UNCONSTITUTIONALLY SHIFTED TO MR. ABDULLAH

441.     Idaho law imposes on a capital defendant the burden of proving, by an unknown quantum of evidence, the existence of mitigating circumstances sufficient to preclude a death penalty. That deprives the defendant of adequate notice of the allocation of duties at the capital sentencing hearing and lessens the State's burden to prove that death is a just punishment, in violation of the Eighth and Fourteenth Amendments.  *See Lankford v. Idaho*, 500 U.S. 110 (1991); *Gardner v. Florida*, 430 U.S. 349 (1977); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Mullaney v. Wilbur*, 421 U.S. 684 (1975); *Mills v. Maryland*, 486 U.S. 367 (1988); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

442.    *Supporting Facts*: Mr. Abdullah's jury was instructed that once an aggravating

circumstance was found he had to be sentenced to death unless the defendant produced sufficient

mitigation to outweigh the aggravation.

443.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Penalty Phase Issue IX in

the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8,

2014.

### CLAIM 48: THE TRIAL COURT UNCONSTITUTIONALLY REFUSED TO INSTRUCT JURORS ON THE TYPES OF MITIGATION THEY COULD CONSIDER

444.    The trial court refused to instruct the sentencing jurors on the types of mitigation

available for consideration, in violation of the Eighth and Fourteenth Amendments.  *See Penry v.*

*Johnson*, 532 U.S. 782 (2001); *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Eddings v.*

*Oklahoma*, 455 U.S. 104 (1984).

445.    *Supporting Facts*: Defense counsel requested and the trial court refused to instruct the

jury on the types of mitigating evidence available for consideration.  The court's refusal was

particularly problematic and prejudicial because defense counsel's wholly inadequate

presentation of mitigation left the jury with no instruction on mitigation that was specific to Mr.

Abdullah's circumstances.  *See* Claim 1(B)(i).  When combined with defense counsel's lack of

thorough investigation and presentation of mitigating evidence, the trial judge's ruling make it

questionable whether the jury did in fact consider mitigating evidence.  Thus, without a proper

instruction, Mr. Abdullah's resulting death sentence is unconstitutionally unreliable.

446.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently

unexhausted.

**CLAIM 49: THE JURY WAS UNCONSTITUTIONALLY NOT REQUIRED TO FIND BEYOND A REASONABLE DOUBT THAT THE AGGRAVATION OUTWEIGHED THE MITIGATION**

447.     The jury was not required to find beyond a reasonable doubt that the aggravation outweighed the mitigation, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

448.     Under the Fifth, Sixth, and Fourteenth Amendments, any fact that exposes a defendant to a harsher sentence must be found by a jury beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Jones v. United States*, 526 U.S. 227 (1999). That includes any fact that elevates a life sentence to a death sentence. *See Ring v. Arizona*, 536 U.S. 584 (2002). Pursuant to the capital statute under which Mr. Abdullah was punished, an Idaho defendant cannot be given a death sentence until the jury determines that the aggravation outweighs the mitigation. *See* Idaho Code § 19-2515(3). Therefore, the jury's weighing determination increases the severity of the potential sentence, and it must be found beyond a reasonable doubt. *See Hurst v. Florida*, 136 S. Ct. 616 (2016). That did not occur in Mr. Abdullah's case.

449.     The absence of a reasonable-doubt standard also violates the Eighth Amendment. That amendment requires that states narrow the class of defendants eligible for capital punishment by guiding jurors' discretion through objective, legislatively-crafted criteria. *See Lowenfield v. Phelps*, 484 U.S. 231 (1988); *Sawyer v. Whitley*, 505 U.S. 333 (1992); *Gregg v. Georgia*, 428 U.S. 153 (1976). In Mr. Abdullah's case, the jury was never required to find beyond a reasonable doubt that the aggravation outweighed the mitigation. Quite the opposite: the burden was actually placed on Mr. Abdullah to prove that the mitigation outweighed the aggravation. *See State v. Hoffman*, 851 P.2d 934, 943 (Idaho 1993). With such a low standard at a critical stage of the sentencing determination, the weighing process in Idaho does not perform any meaningful narrowing function and does not lead to death sentences being reserved only for the

worst of the worst. Rather, because capital juries weigh according to such a diluted standard, they mete out death sentences arbitrarily. *See* Claim 58.

450.    The arbitrary results generated by the lowness of Idaho's standard is exacerbated by its vagueness. "[C]apital punishment [must be] imposed fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *accord Proffitt v. Florida*, 428 U.S. 242 (1976); *Mills v. Maryland*, 486 U.S. 367 (1988). In accordance with the governing statute, Mr. Abdullah's jury was asked whether "all mitigating circumstances, when weighed against [each] aggravating circumstance, are sufficiently compelling that the death penalty would be unjust." Idaho Code § 19-2515(8)(ii). The "sufficiently compelling" language is utterly devoid of any discernible content that could guide a jury's discretion. There is consequently a reasonable likelihood that different juries will impose different standards of proof in deciding whether to impose a sentence of death. As a result, death sentences are doled out with no rhyme or reason, in contravention of the Eighth Amendment.

451.    Moreover, the deprivation of a reasonable-doubt standard offends the Eighth Amendment because it is contrary to the evolving standards of decency. *See Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304 (2002); *Trop v. Dulles*, 356 U.S. 86 (1958). A substantial number of capital jurisdictions require juries to conduct the weighing process under the reasonable-doubt standard. The trend continues to move in that direction, as more death penalty states recognize that juries have to perform their weighing function with reference to a reasonable-doubt standard. Therefore, the evolving standards of decency condemn Idaho's non-reasonable-doubt standard as cruel and unusual.

452.     Finally, a defendant who is told that he can only save his life by meeting such an amorphous test as the "sufficiently compelling" standard is a defendant who has not been given adequate notice of the rules governing his penalty phase, in violation of his due process rights.

453.     The errors described above are structural, because depriving a defendant of a reasonable-doubt standard affects the framework within which the trial proceeds, and thus infects the entire trial process.  *See Sullivan v. Louisiana*, 508 U.S. 275 (1993).  Harmless error analysis is as a result inappropriate.  *See id.*  If harmless error analysis is applied, the violation is prejudicial.  Had the jury been given the proper reasonable-doubt instruction, it would not have voted for death in light of the mitigating evidence presented at sentencing and the relative weakness of the aggravating evidence.  Consequently, in the absence of the error, the result would have been different, and prejudice is apparent.

454.     *Supporting Facts*: Mr. Abdullah's jury was instructed that if it found an aggravating factor, it was to "consider whether any mitigating circumstances exist that make the imposition of the death penalty unjust."  The instructions further directed the jury that if it concluded "that all mitigating circumstances do not make the imposition of the death penalty unjust, then the defendant will be sentenced to death."  No standard of proof was given to the jury to apply in making this weighing determination, other than the nebulous "sufficiently compelling" test described above.

455.     *Exhaustion of Claim*: Arguably, this claim was partly exhausted by Penalty Phase Issue IX in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

PETITION FOR WRIT OF HABEAS CORPUS - 205

## CLAIM 50: THE INSTRUCTION ON HOW TO MEASURE MITIGATION AGAINST AGGRAVATION VIOLATED THE EX POST FACTO CLAUSE

456.   Mr. Abdullah's jury was instructed to measure mitigation against aggravation in a manner that was inconsistent with, and harsher than, the statutory standard that existed at the time of his offense, in violation of the ex post facto clauses of Article I, section 9 and Article I, section 10.  *See Weaver v. Graham*, 450 U.S. 24 (1981).

457.   *Supporting Facts*: Mr. Abdullah's jury was instructed: "If you find that all of the mitigating circumstances are sufficiently compelling to make the imposition of the death penalty unjust or you cannot unanimously agree on that issue, then the judge must sentence the defendant."  This instruction was given in accordance with Idaho Code § 19-2515 as it read at the time of Mr. Abdullah's trial.

458.   However, the instruction was inconsistent with Idaho Code § 19-2515 as it read at the time of Mr. Abdullah's *offense*,.  At that time, the statute and binding caselaw required the State to show *both* that a death sentence was not "unjust," and also that the mitigating circumstances did not "outweigh the gravity of any aggravating circumstances found."  Under the later version of the statute, that requirement was eliminated.

459.   The newer version of the statute imposed a lesser burden on the State, and allowed the State to present less or different evidence than what was required by the statute in effect at the time of the offense.

460.   *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

## CLAIM 51: THE INSTRUCTION ON WHAT WOULD HAPPEN IF THE JURY VOTED FOR LIFE WAS UNCONSTITUTIONAL

461.   The jury was not informed about what potential sentences would be given to Mr. Abdullah if it did not vote for death, in violation of the Due Process Clause of the Fourteenth

Amendment and the Eighth Amendment. *See Simmons v. South Carolina*, 512 U.S. 154 (1994); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Gardner v. Florida*, 430 U.S. 349 (1977). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

462. *Supporting Facts*: The trial court instructed the jury that if the State failed to prove an aggravator, "the judge must then sentence the defendant," and if the jury found an aggravator but could not agree on mitigation or voted against death, again, "the judge must sentence the defendant." No instruction was given informing the jury of what possible punishments the judge could impose if no death sentence were meted out. As it happened, the judge could have imposed a sentence with a minimum of ten years and the potential of up to life imprisonment. Had the jury known this, it would have assumed that—if death were not imposed—Judge Copsey would likely have given Mr. Abdullah the harshest sentence available. That assumption would have been based on the extreme hostility that Judge Copsey manifested toward the defense, which the jury would have seen throughout the trial. *See* Claim 6. And it is an assumption that would have almost certainly been correct, as demonstrated by the fact that Judge Copsey has in other cases erred on the side of such draconian punishments. It is also demonstrated by the fact that in the one area where she was given sentencing discretion—on the non-capital counts—she *did* dole out the stiffest possible sentences. The absence of information likely led jurors to believe that there was a risk that if Mr. Abdullah were not sentenced to death he would be quickly released and receive no punishment for his crimes. Such a conclusion would obviously lead jurors to find death appropriate, rather than risk the possibility that Mr. Abdullah would quickly gain his freedom.

PETITION FOR WRIT OF HABEAS CORPUS - 207

463.   *Exhaustion of Claim*: Arguably, this claim was exhausted by Penalty Phase Issue IX in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 52: THE ABSENCE OF WRITTEN JURY FINDINGS ON MITIGATION AND WEIGHING WAS UNCONSTITUTIONAL

464.   The absence of written jury findings on mitigation and weighing violated the Eighth Amendment requirement that death sentences be reliable and non-arbitrary and that jurors be guided by objective standards, violated the Fourteenth Amendment requirements of meaningful appellate review and due process, and violated the ex post facto clauses of Article I, section 9 and Article I, section 10.  *See Hurst v. Florida*, 136 S. Ct. 616 (2016); *Smith v. Robbins*, 528 U.S. 259 (2000); *Weaver v. Graham*, 450 U.S. 24 (1981); *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

465.   *Supporting Facts*: Before jury sentencing in capital cases was mandated by the Supreme Court, Idaho judges decided the sentence in death penalty cases.  At that time, judges were required to make written findings, setting forth any statutory aggravating circumstance found and any mitigating factors considered.  The written findings served two purposes: (1) they helped ensure that the imposition of the sentence of death was reasoned and objective, as constitutionally required, and (2) they protected a capital defendant's right to meaningful appellate review of his sentence.  Without such findings, the reviewing court could not determine whether the fact-finder overlooked or ignored mitigation that was presented, whether the evidence supported the aggravating factors found, and whether the fact-finder properly weighed all factors.  The failure to make such written findings constituted reversible error.  Pursuant to

the current version of the statute, if a defendant waives the right to a jury at his sentencing, the judge is required to make those written findings. However, if a jury is not waived, the jury is only required to indicate on special verdict forms whether a statutory aggravating circumstance has been proven beyond a reasonable doubt, and "whether all mitigating circumstances, when weighed against the aggravating circumstance, are sufficiently compelling that the death penalty would be unjust." As a result, a defendant who exercises his constitutional right to jury sentencing must relinquish his constitutional right to have his sentencing meaningfully reviewed by the district court and the Idaho Supreme Court, both on direct appeal and as part of its mandatory sentencing review. Without a complete record, the district court and the Idaho Supreme Court are precluded from conducting a meaningful review, which includes a determination of whether imposition of the death sentence was reasoned and objective, or instead was the result of arbitrariness and passion. At the time the offense in this case was committed, an Idaho defendant had a right to written findings from the sentencer on mitigation and weighing. Thus, the absence of those findings at Mr. Abdullah's trial violated his ex post facto rights.

466.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 53: UNANIMITY AND CONSULTATION WERE IMPROPERLY REQUIRED ON MITIGATION AND WEIGHING

467.    The jury was told in its instruction that it had to unanimously agree on whether mitigation existed and whether the mitigation outweighed the aggravation, and that jurors had to consult with one another before making a decision on the sentence, in violation of the Sixth Amendment right to a jury trial, Eighth Amendment's requirement that death sentences be non-arbitrary and that jurors be guided by objective standards, and the Fourteenth Amendment's due process

requirement.  *See Hurst v. Florida*, 136 S. Ct. 616 (2016); *McKoy v. North Carolina*, 494 U.S. 433 (1990); *Mills v. Maryland*, 486 U.S. 367 (1988); *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

468.    *Supporting Facts*: The jurors were informed that they had a "duty to discuss the case with one another and to deliberate in any effort to reach a just verdict.  Each of you must decide the case for yourself, but only after you've considered the evidence impartially with your fellow jurors."  They were also told that "[i]f you find that all mitigating circumstances are sufficiently compelling to make the imposition of the death penalty unjust, or you cannot unanimously agree on that issue, then the judge must sentence the Defendant."  The same instruction explained that "[a]ny finding by you that the mitigating circumstances do or do not make the imposition of the death penalty unjust must be unanimous."  Finally, another instruction dictated to jurors that they "ha[d] a duty to consult with one another" and "consider each other's views, and deliberate with the objective of reaching an agreement."

469.    The instructions directing jurors that findings with respect to mitigating circumstances must be unanimous were mistaken.  An inquiry into mitigation is a profoundly individual process, not a collective one.  The instruction stating that jurors had a duty to consult with one another was erroneous for the same reason.  Jurors are tasked only with consulting their own consciences in making the determination as to whether someone should live or die.  These confusing instructions misled jurors who would otherwise have been hold-outs for life into giving up on their convictions under pressure from other jurors.

PETITION FOR WRIT OF HABEAS CORPUS - 210

470.   *Exhaustion of Claim*: Arguably, this claim was exhausted by Penalty Phase Issue IX in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

## CLAIM 54: THERE WAS NO DEATH PENALTY IN EFFECT AT THE TIME OF THE CRIME

471.   At the time of the offense, there was no death penalty in effect, rendering it unconstitutional under the Due Process Clause of the Fourteenth Amendment and the cruel-and-unusual-punishments clause of the Eighth Amendment, as well as the ex post facto clauses of Article I, section 9 and Article I, section 10, to sentence Mr. Abdullah to death.  *See United States v. Lanier*, 520 U.S. 259 (1997); *Weaver v. Graham*, 450 U.S. 24 (1981).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

472.   *Supporting Facts*: On June 24, 2002, the U.S. Supreme Court found a constitutional right to jury sentencing in capital cases.  The Idaho Supreme Court noted on August 6, 2002, that the state's death penalty was likely invalid as a result.  Ms. Abdullah died on October 5, 2002.  Approximately two months later, on December 3, 2002, the State filed its notice of intent to seek death.  A new death penalty act was signed into law on February 13, 2002.  At the time of the offense, Idaho law provided: "Subject to the provisions of section 19-2515, Idaho Code, every person guilty of murder of the first degree shall be punished by death or by imprisonment for life."  Idaho Code § 18-4004 (2002).  Because the death penalty was "subject to" § 19-2515, and because § 19-2515 was unconstitutional at the time of the offense, there was no death penalty in force when Ms. Abdullah passed away.  Mr. Abdullah therefore could not have had notice that first-degree murder was punishable by death on October 5, 2002.  Furthermore, any attempt to

PETITION FOR WRIT OF HABEAS CORPUS - 211

apply the new act against him would be retroactive, and thus in violation of the ex post facto clause.

473.     *Exhaustion of Claim*: Arguably, this claim was exhausted by Penalty Phase Issue I in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 55: THE AGGRAVATORS WERE NOT CHARGED BY INDICTMENT, NOT SUBJECT TO A FINDING OF PROBABLE CAUSE, AND NOT SUPPORTED BY FACTS

474.     The aggravators that made Mr. Abdullah eligible for death were not alleged in the indictment or proven by probable cause, and the notice of intent to seek death did not provide adequate notice of what facts and evidence the State intended to rely upon to prove them, in violation of the Due Process Clause of the Fourteenth Amendment, the Sixth Amendment right to be informed of the nature and cause of the accusation, and the Eighth Amendment right to be free from cruel and unusual punishment.  *See Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003); *Ring v. Arizona*, 536 U.S. 584 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Powell v. Alabama*, 287 U.S. 45 (1932).  Under Supreme Court law, aggravating circumstances are now the functional equivalent of elements of an offense.  They must therefore meet the constitutional requirements that attach to elements, such as inclusion in the indictment, proof by probable cause, and adequate notice.  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

475.     *Supporting Facts*: Mr. Abdullah's indictment did not allege the aggravators the State intended to use to obtain a death sentence against him.  The notice of intent to seek death quoted the statutory language of the aggravators, but provided no factual support for any of them.  Based on this notice, the State was allowed to proceed to the penalty phase even though the aggravators

had never been subjected to any threshold finding that they were validly alleged or proven by probable cause.

476.     Mr. Abdullah's jury could not reach a unanimous decision on two of the charged aggravators, demonstrating the very real problem that results when the State is not required to meet a threshold burden of proof prior to a penalty-phase proceeding.  The mere allegation of the circumstances becomes a vehicle for the State to prejudice a defendant by making the behavior seem more horrific.  The two aggravators not found by the jury were that the murder was heinous, atrocious, or cruel, and that he had a propensity to commit murder.  Neither aggravator would have survived a judicial probable-cause determination, as there was insufficient evidence of either.  Nevertheless, they were used by the prosecution to disparage Mr. Abdullah's character, and ensure a death sentence.

477.     *Exhaustion of Claim*: Arguably, this claim was exhausted by Penalty Phase Issue III in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 56: THE DELAY BETWEEN THE IMPOSITION OF MR. ABDULLAH'S DEATH SENTENCE AND ANY ULTIMATE EXECUTION RENDERS THE EXECUTION UNCONSTITUTIONAL

478.     Pursuing an execution of Mr. Abdullah many years after he was convicted and sentenced violates his right to be free from cruel and unusual punishment under the Eighth Amendment, his right to due process under the Fourteenth Amendment, which includes a right not to be given a punishment unauthorized by statute, his right to dignity under the Eighth and Fourteenth Amendments, and the rights he is guaranteed under standards of international law and treaties to which the United States is subject and which are enforceable against Idaho through the Supremacy Clause in Article VI, section 2 of the U.S. Constitution.  *See Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., dissenting from denial of certiorari); *Brooks v. Florida*, 389 U.S.

PETITION FOR WRIT OF HABEAS CORPUS - 213

413 (1967); International Covenant on Civil and Political Rights, Articles 6, 7, and 14; American Declaration of the Rights and Duties of Man, Article XXVI; Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; American Convention of Human Rights; Vienna Convention on the Law of Treaties; Vienna Convention on Consular Relation; *see also Obergefell v. Hodges*, 135 S. Ct. 2584 (2015); *United States v. Windsor*, 133 S. Ct. 2675 (2013); *Lawrence v. Texas*, 539 U.S. 558 (2003).

479. *Supporting Facts:* As Mr. Abdullah's time on death row lengthens, any justification for the imposition of the death penalty weakens, and the Eighth Amendment concerns continue to grow. Further facts supporting this claim are recited in Claims 57 and 58.

480. *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

### CLAIM 57: EXECUTING MR. ABDULLAH AFTER THE TIME THAT HE WILL SPEND ON DEATH ROW VIOLATES THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT BY IMPOSING TWO PUNISHMENTS FOR ONE OFFENSE

481. Executing Mr. Abdullah after the time that he will ultimately spend on death row will result in him suffering from two separate punishments, and will therefore violate the Double Jeopardy Clause of the Fifth Amendment. *See Ex parte Lange*, 85 U.S. 163 (1873).

482. *Supporting Facts:* If Mr. Abdullah is executed, that execution will only come after he has spent a great deal of time in harsh death row conditions, which include significant restrictions in visitation, educational programming, contact with other prisoners, exercise, time outdoors, etc.. Mr. Abdullah's long confinement in these conditions coupled with his death sentence constitute two sentences: years on death row plus his execution. Given the daily confined isolation and a deferred but always impending death sentence, any human being on death row would experience psychological and physiological deterioration over and above the punishment of death.

483.    *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently
unexhausted.

## CLAIM 58: THE DEATH PENALTY IS UNCONSTITUTIONALLY ARBITRARY

484.    For the reasons that follow, capital punishment in both the United States and Idaho is
arbitrary and thus unconstitutional.  *See Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v.
Georgia*, 428 U.S. 153 (1976).

485.    Mr. Abdullah's death sentence is unconstitutional because capital schemes throughout the
United States and in Idaho do not sufficiently narrow the class of persons eligible for the death
penalty.  Statutory schemes are overly broad and inclusive, containing so many aggravating
circumstances—or their equivalents—that they fail to perform the constitutionally required
narrowing function.  Such schemes therefore violate the Eighth Amendment's prohibition against
cruel and unusual punishment and the Fifth and Fourteenth Amendments' requirement of due
process of law.

486.    Every state's capital scheme has to provide rational, meaningful, and objective criteria
that narrow the class of persons eligible for the death penalty from the larger group of murder
defendants who would not be eligible, so that those sentenced to death are the worst of the worst.
*See Gregg v. Georgia*, 428 U.S. 153 (1976).

487.    *Supporting Facts*: The statutorily defined death-eligible class in capital jurisdictions
around the United States and in Idaho is so large that the statutory schemes perform no
narrowing of the death-eligible class.  The defendants sentenced to death are not the worst of the
worst.  They are placed on death row not because of the egregiousness of their crime, but as a
result of arbitrary factors that include but are not limited to the county in which they are
prosecuted, the competence of their attorneys, the resources allotted to the defense, financial
concerns of prosecutors' offices, the ideological values of the prosecutors involved, the publicity

surrounding the trial, the personal views of the trial and appellate judges, the race or ethnicity of

the accused, and the race or ethnicity of the victim.  Because of the capaciousness of the

aggravating circumstances, prosecutors nationwide have been allowed to present as

aggravation—or as its equivalent—almost every conceivable circumstance of a murder, even

those that are radically inconsistent with one another.

488.    As shown above, capital schemes nationwide and in Idaho do nothing to effectively

narrow the pool of potential defendants to those most deserving of death.  This failure to narrow

is exacerbated by the fact that capital regimes lack safeguards to guard against the arbitrary

imposition of death.  Due to the absence of such safeguards, the death penalty is imposed

arbitrarily and capriciously in violation of the Eighth Amendment.  *See Furman v. Georgia*, 408

U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).

489.    Many death penalty schemes, including Idaho's, do not require a trial or appellate court

to undertake a comparison between the capital case at hand and other similar cases to ensure that

the death sentence is imposed in a proportional manner.  In other capital jurisdictions, a

comparative analysis is nominally required by law, but state appellate courts conduct the analysis

in such a shallow, perfunctory manner that it performs no function in practice.

490.    Death penalty schemes nationwide and in Idaho also violate the Equal Protection Clause

of the Fourteenth Amendment, in that they do not provide for specific, state-wide standards to

ensure that prosecutorial charging decisions are fairly and even-handedly made.

491.    In Idaho, for example, the decision of whether or not to pursue death in a murder case is

made by the prosecuting attorney of the county in which the case is pending.  Idaho has forty-

four counties, each with its own Prosecuting Attorney.  There are no standards by which the

choice to seek death is selected, giving prosecuting attorneys unbounded discretion in

determining who lives and who dies.  The failure to provide such standards results in disparate treatment of similarly situated death-eligible defendants, in violation of the Equal Protection Clause.

492.    The death penalty is also unconstitutionally arbitrary and capricious, in violation of the Eighth and Fourteenth Amendments, due to excessive delays in carrying out executions nationwide and in Idaho.

493.    Since the U.S. Supreme Court reinstated the death penalty in 1976, a large number of offenders have been sentenced to death but a small percentage have been executed.  In the same time period, large numbers of inmates on death rows have died of natural causes before their sentences could be carried out.  Rather than being the fault of the petitioners, the delays in Idaho's death penalty system have resulted chiefly from delays necessitated by the complexity of post-conviction and habeas procedures, and from the lengthy period of time it requires to subject capital convictions and death sentences to adequately searching judicial review.

494.    Capital juries, as currently composed in the United States and Idaho, have been empirically shown to reach arbitrary decisions in violation of the Eighth and Fourteenth Amendments.  Empirical studies show the following: many capital juries routinely engage in premature decision making in violation of *Lockett v. Ohio*, 438 U.S. 586 (1978); capital jury selection fails to remove many death-biased jurors and leads to an overall biasing effect through death qualification; many capital jurors fail to comprehend or follow penalty instructions; many capital jurors believe they are required to return a verdict of death; many capital jurors do not view themselves as primarily responsible for sentencing in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985); and race continues to influence juror decision-making.

PETITION FOR WRIT OF HABEAS CORPUS - 217

495.     Studies show that nearly half of capital jurors make their sentencing decisions before the penalty phase begins.  For example, many jurors even when *Morgan*–qualified believe death is the only appropriate penalty for certain murders.  Sentences given by these jurors are effectively mandatory rather than individualized death sentences.  Many of these jurors also fail to understand or see a point in the penalty phase of capital trials.

496.     One of the most troubling aspects of jury selection is the way it actually primes the jury to return a guilty verdict and a death sentence.  Studies show that many capital jurors believe that the subtext of voir dire is not about whether the defendant committed murder, but actually about what punishment the defendant ought to receive.  Spending significant amounts of time discussing sentencing with jurors before a guilty verdict gives jurors the impression that the judge and lawyers already believe the defendant is guilty and the only thing left to decide is the sentence.

497.     Jury selection generally, and death qualification in particular, lead to an inevitably biased body of qualified jurors who will fail to understand the concept or point of mitigation, and will fail to understand the penalty phase entirely.  American juries are accustomed to finding facts such as whether a weapon was used or whether a theft was committed—American juries are not accustomed to deciding what weight to give a capital defendant's unimaginably harsh upbringing, serious psychiatric disorder, or brain damage.  The net result is that these jurors are skewed towards choosing a death sentence without considering individual circumstances.

498.     Jurors also often believe they are required to return a verdict of death.  A survey of voir dire in Mr. Abdullah's case features many venire members attempting to prove to the judge that they would impose a death sentence as required.

PETITION FOR WRIT OF HABEAS CORPUS - 218

499.     Studies show that race matters in the jury selection process—the race of the jury members, the race of the defendant, and the race of the victim.  Arbitrariness based on race means, for example, the outcome of a capital jury's verdict is greatly dependent on how many white males serve on the jury, and whether there are any minority groups represented.  There is perhaps nothing more arbitrary than a death sentence that hinged on the racial composition of the jury, the race of the defendant, and the race of the victim.  And yet, studies show that racial factors such as these often determine the outcome of a capital trial.

500.     Finally, the decision to pursue death nationwide and in Idaho is often driven by extra-legal concerns, making the penalty even more arbitrary.  Often that concern is financial.  In Idaho, for instance, counties are given monetary rewards for pursuing death sentences by the Capital Crimes Defense Fund.  Decisions driven by budgets are not decisions that lead to consistent results.

## CLAIM 59: THE DEATH PENALTY DEPRIVES DEFENDANTS OF DIGNITY

501.     The death penalty deprives defendants of their constitutionally protected dignity interests, and therefore violates the Eighth and Fourteenth Amendments.  *See Obergefell v. Hodges*, 135 S. Ct. 2584 (2015); *United States v. Windsor*, 133 S. Ct. 2675 (2013); *Lawrence v. Texas*, 539 U.S. 558 (2003).

502.     *Supporting Facts*: The death penalty is inconsistent with the dignity of man, the individual, and society as a whole.

503.     *Exhaustion of Claim*: At present, Mr. Abdullah believes this claim is currently unexhausted.

## CLAIM 60: EVOLVING STANDARDS OF DECENCY RENDER THE DEATH PENALTY *PER SE* UNCONSTITUTIONAL

504.    Mr. Abdullah's sentence violates the Eighth Amendment because the death penalty is

categorically unconstitutional due to evolving standards of decency nationwide and in Idaho.

*See Trop v. Dulles*, 356 U.S. 86 (1958); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2755–80

(2015) (Breyer, J., dissenting).  While the Supreme Court has ruled that the death penalty is not

unconstitutional *per se*, *see Gregg v. Georgia*, 428 U.S. 153 (1976), the Eighth Amendment is

"not static" and instead "must draw its meaning from the evolving standards of decency that

mark the progress of a maturing society," *Trop*, 356 U.S. at 101.  Accordingly, punishments that

may have once been considered constitutionally permissible may now become prohibited by the

Eighth Amendment if those punishments conflict with society's current moral and ethical

standards.  *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304

(2002).

505.    In determining whether a punishment conflicts with the evolving standards of decency, a

court must consult both (1) objective indicia of society's standards, and (2) its own independent

judgment.  *See Roper v. Simmons*, 543 U.S. 551 (2005).

506.    Inquiry into the objective indicia of society's standards involves the consultation of many

sources.  These include, but are not limited to, the following: legislation, high-level executive

actions (such as moratoria and commutations), lower court opinions, prosecutorial decision-

making, the gross number of sentences imposed, the gross number of sentences actually carried

out, the rate at which the punishment is imposed in cases where it is available, and consistency in

the direction of change in official actions.  *See Hall v. Florida*, 134 S. Ct. 1986 (2014); *Graham

v. Florida*, 560 U.S. 48 (2010); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Atkins v. Virginia*,

536 U.S. 304 (2002); *Thompson v. Oklahoma*, 487 U.S. 815 (1988).

507.    Now, objective indicia of society's standards—and in particular the consistency in the direction of change—supports holding the death penalty is unconstitutional *per se*.

508.    At the broadest level, violence in human societies—including torture and killing perpetrated by sovereign states and their criminal justice systems—has tended to decline over the course of history with particular rapidity over the last forty years.  More specifically, there have been long-term declines in capital punishment.  Executions in the United States and Europe have steadily and rapidly declined since the founding of this country.  The evolving standards of the Western world since the Enlightenment have tended toward a progressive abolition of capital punishment.

509.    The number of death sentences initially imposed has also plummeted in recent years.  Prosecutors seek, and judges and juries impose, the death penalty in only a miniscule percentage of cases in which it is available.

510.    This sharp decline in both death sentences and executions stems from a growing moral and ethical disapproval of the death penalty by regular American citizens.

511.    A gathering revolt against the death penalty has prompted many states to abolish.

512.    The executive branches of United States jurisdictions have also made concrete moves away from the death penalty.

513.    As with the nation as a whole, the low number of executions and dwindling number of death sentences imposed indicate that Idaho is tending toward effective abolition of the death penalty.

514.    The foregoing establishes that objective indicia of society's standards support prohibiting the death penalty.  As shown above, the trend is unmistakable.  Capital punishment is no longer consistent with our evolved standards of decency.

PETITION FOR WRIT OF HABEAS CORPUS - 221

515.     Whether or not the Court agrees that objective indicia of society's standards support ending the death penalty, it must proceed to exercise its independent judgment on the matter.  In exercising independent judgment, a court should consider many factors.  These include, but are not limited to, the following: the views of experts and respected professional organizations on the issue in question; the laws and practices of other nations (particularly those that share a cultural heritage with the United States); the culpability of the offenders at issue in light of their personal characteristics; the severity of the punishment in question; how well the challenged sentencing practice serves legitimate penological goals; the effect on crime victims and their families of keeping or prohibiting the punishment; and whether there are workable ways to decide who deserves the sentence.  *See Hall v. Florida*, 134 S. Ct. 1986 (2014); *Graham v. Florida*, 560 U.S. 48 (2010); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304 (2002).

516.     For the reasons that follow, this Court should exercise its independent judgment to determine that the death penalty violates the Eighth Amendment.

517.     The death penalty, as currently practiced, does not meaningfully advance the possible legitimate purposes of capital punishment—which are deterrence and retribution.  *See Kennedy*, 554 U.S. at 420.

518.     There is no reliable evidence that the death penalty deters.  Indeed, states with the death penalty generally have higher, not lower, rates of murder.

519.     The death penalty as actually practiced in the United States is highly unlikely to have any deterrent effect given the infrequency of its application and the long delay between the offense and the punishment.  As established above, the death penalty is very infrequently applied.

Furthermore, the time between the offense and the offender's execution has skyrocketed over recent decades.

520.  In addition, the death penalty is frequently imposed on people with mental disabilities and other characteristics that make deterrence especially unlikely.

521.  Under these circumstances, it is unsurprising that the death penalty fails to deter any more than a long prison sentence deters.

522.  For similar reasons, the death penalty as currently practiced in the United States fails to meaningfully advance the penological goal of retribution.  As an initial matter, retribution is suspect *per se* as a legitimate rationale for the death penalty.  *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407 (2008).

523.  Moreover, the death penalty does not serve the goal of retribution because capital trials in the United States have proven unable to distinguish those who deserve the death penalty from those who do not.

524.  Furthermore, far from providing justice to victims' families, the death penalty disserves these families because the appellate process is arduous and, for many families, traumatic.  Both retribution generally and, more specifically, victims' families would be better served by a system in which the maximum penalty were life imprisonment—a punishment which the prisoner begins enduring as soon as trial is over.

525.  In short, the death penalty as practiced in the United States does not meaningfully advance either of its potentially-legitimate purposes.

526.  The following other considerations support finding the death penalty unconstitutional.

527.    No nations that share our cultural heritage retain capital punishment.  The last execution

in the United Kingdom was in 1964, and the U.K. abolished capital punishment for murder in

1965, and in all circumstances in 1998.

528.    No Western or Northern European country retains the death penalty, meaning that

Germany, France, Italy, Spain, and Greece, among numerous others, have all abolished it.

Likewise, the vast majority of other English-speaking nations (across four continents), including,

but not limited to, Australia, Ireland, South Africa, New Zealand, and Canada, have abolished

the death penalty.  Our other North-American neighbor, Mexico, has likewise abolished the

death penalty, as have the overwhelming majority of Spanish- and Portuguese-speaking nations.

529.    In all, there are a great many more abolitionist countries than there are retentionist

countries.  The most prominent retentionist countries are among the furthest from our cultural

heritage.  The countries that conduct the most executions are China, Iran, Iraq, and Saudi Arabia.

All of these countries have poor human rights records.  In fact, the United States' retention of

capital punishment is one reason why many credible international organizations place it below

some other countries in terms of the country's commitment to human rights.

530.    These facts should weigh heavily in the Court's exercise of its independent judgment.

531.    The Court should also weigh the fact that important organizations consider the death

penalty unworkable, immoral, or both.  The United Nations has officially called for a

moratorium on capital punishment worldwide, and its Secretary General has called on all nations

to abolish the death penalty on the ground that it is cruel and inhumane.  The ABA has called for

a moratorium on the death penalty based on the risk of executing an innocent person and

persistent racial disparity in the use of capital punishment.  The American Law Institute has

officially pronounced that there are currently "intractable institutional and structural obstacles to

PETITION FOR WRIT OF HABEAS CORPUS - 224

ensuring a minimally adequate system for administering capital punishment." The Catholic Church (which has more than 1.2 billion adherents worldwide and over 78 million adherents in the U.S.) declares that capital punishment is permissible only "if this is the only possible way of effectively defending human lives against an unjust aggressor," and in the United States, the National Conference of Bishops has faithfully campaigned against the death penalty as inconsistent with the sanctity of human life and the dignity of the human person.

532.    Just as the nation's peers are abandoning the death penalty, so are Idaho's, beginning with its neighbors. There are moratoria in Washington and Oregon. Nevada, Montana, Wyoming, and Utah have executed no one in recent years.

533.    The fact that Idaho's neighbors are abandoning the death penalty, along with objective indicia that Idaho's social morals and values no longer tolerate death sentences and executions, this Court should exercise its independent judgment in favor of ruling the death penalty in Idaho is unconstitutional under the Eighth Amendment due to evolving standards of decency.

534.    For the foregoing reasons, this Court should exercise its independent judgment in favor of barring the death penalty for the crime of murder.

535.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Penalty Phase Issue II in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

## CLAIM 61: CUMULATIVE PENALTY-PHASE ERROR

536.    Mr. Abdullah's sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments because of the cumulative impact of the errors that occurred throughout the sentencing phase of his trial, as compounded by the errors that occurred at the guilt phase. *See Chambers v. Mississippi*, 410 U.S. 284 (1973); *Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and

injurious effect or influence in determining the jury's sentence of death.  *See Brecht v.*

*Abrahamson*, 507 U.S. 619 (1993).

537.    *Supporting Facts*: The constitutional violations set forth in each individual claim alone

mandate relief.  Even if not, relief is required when each claim is considered cumulatively with

the other penalty-phase claims and with the guilt-phase claims.  The cumulative impact of these

combined errors violated many of Mr. Abdullah's rights, including his right to effective

assistance of counsel, due process, a fair trial, a fair and impartial jury, an unbiased judge, the

right to confront the evidence against him, and a fair and reliable sentencing result.

538.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Penalty Phase Issue XI in

the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8,

2014.

### CLAIM 62: MR. ABDULLAH WAS DENIED EFFECTIVE ASSISTANCE OF DIRECT-APPEAL COUNSEL

539.    Through the numerous deficiencies outlined below, Mr. Abdullah's direct-appeal counsel

rendered ineffective assistance, thereby violating his rights under the Fourteenth Amendment.

*See Smith v. Robbins*, 528 U.S. 259 (2000); *Evitts v. Lucey*, 469 U.S. 387 (1985); *Douglas v.*

*California*, 372 U.S. 353 (1963).  Considering the errors both cumulatively and individually, Mr.

Abdullah was prejudiced by the deficient performance of his direct-appeal attorneys.  *See Harris*

*v. Wood*, 64 F.3d 1432 (9th Cir. 1995) (granting habeas relief because the petitioner's separate

claims of ineffectiveness cumulatively demonstrated prejudice); *Cooper v. Fitzharris*, 586 F.2d

1325 (9th Cir. 1978) (recognizing the availability of cumulative-prejudice arguments in the

Ninth Circuit).  That is, in the absence of appellate-counsel's errors, there is a reasonable

likelihood that Mr. Abdullah would not have had guilt, penalty-phase, and post-conviction relief

denied by the Idaho Supreme Court.

540.     *Supporting Facts*: Mr. Abdullah's direct-appeal attorneys at the SAPD failed to raise at the Idaho Supreme Court a variety of compelling challenges related primarily to the guilt phase. Those challenges include the issues described above as Claims 5, 6, 8, 9, 10, 12, 13, 15, 17, 20, 21, 22, 25, 26, 27.  They also include the issues contained in the trial-ineffectiveness sub-claims enumerated above as Claim 1(A)(i), (ii), (vii), (ix), (xi), (xii), (xiii), (xv), (xvii), (xxviii), (xxxi), (xxxiii), (xxxiv), (xxxv), (xxxvii), (xxxviii), (xxxix), (xl), (xli), and (xlvi).  The SAPD also failed to adequately develop or brief a number of challenges related primarily to the guilt phase.  Those challenges include the issues described above as Claims 2, 3, 4, 7, 11, 14, 16, and 19.  They also include the trial-ineffectiveness sub-claims enumerated above as Claim 1(A)(iii), (iv), (v), (vi), (viii), (x), (xiv), (xv), (xxix), (xxx), and (xxxii).  In failing to make or sufficiently litigate the aforementioned arguments, the SAPD's performance fell below an objective standard of reasonableness.  The SAPD were unable to adequately investigate and litigate this case in part because they did not have sufficient resources to do so.  Absent the errors, there is a reasonable probability that the Idaho Supreme Court would have reversed Mr. Abdullah's convictions.

541.     The SAPD also failed to raise at the Idaho Supreme Court a variety of compelling challenges related primarily to sentencing.  Those challenges include the issues described above as Claims 34, 35, 39, 40, 41, 45, 46, 48, 50, 52, 56, 57, and 59.  They also include the trial-ineffectiveness sub-claim enumerated above as Claim 1(B)(iii).  In addition to those claims, the SAPD failed to adequately develop or brief several challenges related primarily to the penalty phase.  Those challenges include the issues described above as Claims 36, 37, 38, and 49. They also include the trial ineffectiveness sub-claims enumerated above as Claim 1(B)(i), (ii), (v), (vi), (vii), (viii), (ix), (x), (xi), (xvi).  By failing to make or sufficiently litigate the aforementioned

arguments, direct-appeal counsel's performance fell below an objective standard of reasonableness.

542.    Aside from the failures just noted, the SAPD did not appeal Judge Copsey's decision to strike a huge amount of material from the numerous addenda attached to the final amended petition.  Judge Copsey's decision prevented Mr. Abdullah from relying on a large number of facts that would have strongly supported his petition.  The decision was vulnerable to attack on appeal, especially because a number of Judge Copsey's rulings on the motion to strike were based on her biased and pre-determined opinions about the merits of Mr. Abdullah's claims.

543.    Several of the claims the SAPD *did* raise on appeal were far weaker than the claims it failed to raise.  For instance, the SAPD argued on direct appeal that the record failed to "affirmatively show the district court *properly* swore the bailiffs who took custody of [Mr. Abdullah's] sequestered jury during the guilt and penalty phase trials."  (Emphasis in original.) The SAPD took that position even though the transcript clearly stated that the oath was given to the bailiffs, on the theory that the transcript did not indicate *what* oath was given.  However, the SAPD had no evidence that an incorrect oath was given and no evidence of prejudice.  In the absence of those facts, this claim was wholly frivolous.

544.    Another example of a tenuous SAPD claim is their assertion on direct appeal that two aggravators were void for vagueness: (1) the heinous, atrocious, or cruel aggravator; and (2) the propensity to commit murder aggravator.  These claims were totally irrelevant, as the jury did not find either of them.  In essence, the SAPD was attacking aggravators that no longer had anything to do with the case.  It appears the SAPD missed this basic fact from the case, for with respect to both aggravators it argued to the Idaho Supreme Court that it should not rely on the

aggravator to support the death sentence, even though it obviously would not have done so, since the aggravators had never been found by the jury.

545.    Having used up valuable space in a page-limited brief to argue weak and pointless claims, while omitting compelling ones, the SAPD was ineffective.

546.    *Exhaustion of Claim*: This claim is currently unexhausted.

### CLAIM 63: DIRECT-APPEAL COUNSEL OPERATED UNDER A CONFLICT OF INTEREST

547.    The attorneys who represented Mr. Abdullah in his direct appeal were impaired by a serious conflict of interest, thereby violating the Sixth and Fourteenth Amendments.  *See Mickens v. Taylor*, 535 U.S. 162 (2002); *Cuyler v. Sullivan*, 446 U.S. 335 (1980).  Due to the conflict, counsel were actively representing conflicting interests, and prejudice is therefore presumed.  In the alternative, Mr. Abdullah can demonstrate that the conflict actually affected the adequacy of his representation, and prejudice is accordingly apparent.

548.    *Supporting Facts*: Mr. Abdullah was represented in his direct appeal by the SAPD.  Prior to and during trial, the SAPD advised defense counsel about how they should conduct their work.  That advice led to an irreconcilable conflict, because those same attorneys at the SAPD were then responsible for litigating issues about which they had interacted with trial counsel.  For example, Kim Toryanski spoke on the phone with SAPD employees about the affair between Erika Klein, the original second-chair prosecutor, and Tod Littlefield, the lead detective.  There was litigation in the district court regarding the affair, which included the Toryanskis filing an unsuccessful motion for a continuance to investigate its impact on the case.  The affair was therefore part of the trial-court record and could have been litigated in the direct appeal to the Idaho Supreme Court.  However, because the SAPD employees had discussed the affair with

trial counsel, they would likely have been compromised in their ability to look at the matter dispassionately and with an eye to advocating for Mr. Abdullah's interests.

549.    The SAPD refused to acknowledge the conflict because the office did not have the money to pay for an outside attorney.

550.    There was not even an arguable waiver of this claim.  Any waiver that was entered in relation to the SAPD's representation of Mr. Abdullah was limited to their representation in the post-conviction action, and did not address their involvement in the direct appeal.  To the extent that any purported waiver of the conflict by Mr. Abdullah impacts this claim, the waiver was invalid.  Such a waiver was not knowing, intelligent, and voluntary.  Mr. Abdullah was not provided with all of the facts he needed to make an informed decision about whether to allow the SAPD to continue representing him.  He was also coerced into the waiver because no qualified attorney could have represented him if the SAPD was removed from the case.  The SAPD stated in court that the only attorney with whom they had a contract and who was on the capital case roster was Dennis Benjamin, who was involved in the trial and thus could not take over Mr. Abdullah's representation.  It was further revealed that the SAPD did not have the money to pay for anyone with whom it did not have a contract.  Thus, the SAPD's conduct created a serious conflict that had no solution, forcing Mr. Abdullah to remain in the office's care despite its compromised position.  Insofar as it was possible to obtain another attorney, a lawyer who was not properly qualified would likely have been appointed and an undue delay in the case would have been created, both of which Mr. Abdullah reasonably wished to avoid.

551.    *Exhaustion of Claim*: This claim is currently unexhausted.

PETITION FOR WRIT OF HABEAS CORPUS - 230

## CLAIM 64: THE PAGE LIMITS IMPOSED ON MR. ABDULLAH'S APPELLATE BRIEFING WERE UNCONSTITUTIONAL

552.     Mr. Abdullah was prevented by page limitations from filing an opening appellate briefing long enough to sufficiently argue his case, in violation of his right to adequate and effective appellate review under the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  *See Smith v. Robbins*, 528 U.S. 259 (2000).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in the Idaho Supreme Court's denial of relief.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

553.     *Supporting Facts*: At the time of Mr. Abdullah's direct appeal, the Idaho Appellate Rules required that opening briefs to the Idaho Supreme Court be limited to fifty pages.  In the consolidated proceeding in which Mr. Abdullah litigated his direct appeal as well as his appeal from the trial court's denial of post-conviction relief, he sought permission from the Idaho Supreme Court to file a brief of 356 pages.  The court denied his motion, and later allowed him to file a brief of 210 pages.  In his request for leave to submit the original, 356-page brief, Mr. Abdullah explained in detail why a brief of that length was necessary under the circumstance of the case.  His reasons included the following:

- The clerk's record in the underlying criminal case was over 1,600 pages;

- The transcripts from the underlying criminal case were approximately 7,000 pages;

- The post-conviction clerk's record was 8,621 pages;

- The post-conviction transcripts were thousands of pages;

- The trial court's order denying post-conviction relief was 231 pages, using 1.5 line spacing.

554.     It is also relevant that Mr. Abdullah was able to file in the state trial court a final amended petition for post-conviction relief of 345 pages.  Because the trial court permitted so

many pages, and the supreme court refused them, Mr. Abdullah was forced to raise numerous issues below and then to either abandon them or brief them inadequately on appeal. Some of the issues that were either abandoned or deficiently briefed were meritorious, and if raised effectively would have led to guilt-phase or sentencing-phase relief from the Idaho Supreme Court. Other claims could not be raised on appeal due to the page limit, which prevented Mr. Abdullah from exhausting them at the Idaho Supreme Court. Some of those claims may not be reviewable on the merits in federal court, and they would otherwise have led to the granting of habeas relief.

555. *Exhaustion of Claim*: Arguably, this claim was partly exhausted in the SAPD's motion for excess pages, filed with the Idaho Supreme Court on April 25 or 26, 2013.

## CLAIM 65: THE DESTRUCTION OF JURY QUESTIONNAIRES WAS UNCONSTITUTIONAL

556. Jury questionnaires containing important notes by defense counsel were improperly destroyed by the trial court, depriving Mr. Abdullah his right to adequate and effective appellate review under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, *see Smith v. Robbins*, 528 U.S. 259, (2000), his due process right to be treated in accordance with governing state law, *see Bunkley v. Florida*, 538 U.S. 835 (2003) (per curiam); *Fiore v. White*, 531 U.S. 225 (2001), and his due process right to a fundamentally fair post-conviction proceeding, *see Pennsylvania v. Finley*, 481 U.S. 551 (1987).

557. *Supporting Facts*: The Toryanskis returned defense copies of the jury questionnaires to the court without objection, even though Judge Copsey made it clear that those copies would be destroyed. Ms. Toryanski also admitted that the defense team wrote notes about jurors on their questionnaire copies to aid with jury selection, including reasons why the defense team liked, did not like, wanted to keep, or wanted to remove, potential jurors. The destruction of counsel's

questionnaire notes deprives Mr. Abdullah of critical information needed to support a number of his claims, including asserted errors involving ineffective assistance of counsel and jury selection.  Idaho law required that all records in capital cases be retained indefinitely.

558.    *Exhaustion of Claim*: Arguably, this claim was exhausted by Post-Conviction Issue III in the SAPD's second revised opening brief, filed with the Idaho Supreme Court on January 8, 2014.

### CLAIM 66: THE IDAHO SUPREME COURT'S NOVEL STANDARD FOR REVIEWING CAPITAL SENTENCING ERRORS WAS UNCONSTITUTIONALLY APPLIED TO MR. ABDULLAH

559.    The Idaho Supreme Court applied to Mr. Abdullah a standard for reviewing capital sentencing errors that did not exist at the time his offense was committed, and that improperly limited appellate review of such errors, violating Mr. Abdullah's right to be free from unexpected and retroactive changes to the law under the Due Process Clause of the Fourteenth Amendment, his right to meaningful appellate review under the Due Process Clause of the Fourteenth Amendment, his due process right to be treated in accordance with governing state law, and the prohibition against arbitrary and capricious imposition of death sentences unguided by objective standards under the Eighth and Fourteenth Amendments.  *See Bunkley v. Florida*, 538 U.S. 835 (2003) (per curiam); *Fiore v. White*, 531 U.S. 225 (2001); *Parker v. Dugger*, 498 U.S. 308 (1991); *Clemons v. Mississippi*, 494 U.S. 738 (1990); *Lewis v. Jeffers*, 497 U.S. 764 (1990); *Pulley v. Harris*, 465 U.S. 37 (1984); *Zant v. Stephens*, 462 U.S. 862 (1983); *Godfrey v. Georgia*, 446 U.S. 420 (1980); *Dobbert v. Florida*, 432 U.S. 282 (1977); *Bouie v. City of Columbia*, 378 U.S. 347 (1964).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in the Idaho Supreme Court's denial of relief.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

560.     *Supporting Facts*: On August 27, 2013, the Idaho Supreme Court held that it would apply

the fundamental error doctrine to claims that were raised on appeal in capital cases and not

preserved by objection below.  *See State v. Dunlap*, 313 P.3d 1, 19 (Idaho 2013).  Under that

doctrine, the *Dunlap* court held that the defendant had the burden of proving that an error

occurred and that the error was not harmless.  In its March 2, 2015 opinion, the Idaho Supreme

Court applied this standard to Mr. Abdullah's case.  Prior to *Dunlap*, the Idaho Supreme Court

had held that for errors not raised below in capital cases, the State had the burden of proving the

error harmless.  Mr. Abdullah had a reasonable expectation that the old rule concerning the

burden on harmlessness would be applied to him.

561.     Furthermore, in Mr. Abdullah's appeal, the Idaho Supreme Court stated for the first time

in a capital case that only *constitutional* errors could be considered on appeal if they were not

objected to below.  Mr. Abdullah had a reasonable expectation that non-constitutional errors

could be considered on appeal even if they were not objected to below.

562.     Reviewing capital sentencing errors only for fundamental, constitutional error, and

placing the burden of proving harmfulness on the defendant, is not meaningful review and leads

to the arbitrary and capricious infliction of the death penalty.

563.     *Exhaustion of Claim*: Arguably, this claim was exhausted by Issue V in the SAPD's brief

in support of its petition for rehearing, filed with the Idaho Supreme Court on May 18, 2015.

### CLAIM 67: CUMULATIVE DIRECT-APPEAL ERROR

564.     The denial of relief to Mr. Abdullah in his direct appeal violates his rights to adequate

and effective appellate review under the Equal Protection and Due Process Clauses of the

Fourteenth Amendment because of the cumulative impact of the errors that occurred during his

direct appeal, as compounded by the errors at the guilt-phase and penalty-phase of his trial.  *See*

*Smith v. Robbins*, 528 U.S. 259 (2000).  Insofar as Mr. Abdullah is required to demonstrate

prejudice on this claim, the error had a substantial and injurious effect or influence in determining the Idaho Supreme Court's decision to deny guilt relief.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

565.    *Supporting Facts*: The constitutional violations set forth in each individual direct-appeal claim alone mandate relief.  Even if not, relief is required when each claim is considered collectively with the other direct-appeal claims, as well as with all of the guilt-phase and penalty-phase claims.  The cumulative impact of these combined errors violated Mr. Abdullah's right to adequate and effective appellate review.

566.    *Exhaustion of Claim*: This claim is currently unexhausted.

### CLAIM 68: MR. ABDULLAH'S ATTORNEYS IN HIS INITIAL POST-CONVICTION ACTION RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL

567.    The attorneys who represented Mr. Abdullah in his initial post-conviction action rendered ineffective assistance of counsel, in violation of the Fourteenth Amendment.  *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Coleman v. Thompson*, 501 U.S. 722 (1991).  Absent the errors, there is a reasonable probability that the Idaho Supreme Court would have vacated Mr. Abdullah's convictions and sentence or remanded for further post-conviction proceedings.

568.    *Supporting Facts*: Mr. Abdullah's initial post-conviction attorneys failed to raise a variety of compelling challenges related primarily to the guilt phase.  Those challenges include the issues described above as Claim 1(A)(xviii), (xix), (xx), (xxi), (xxii), (xxiii), (xxiv), (xxv), (xxvi), (xviii), (xli), (xlii), (xliii), (xliv), (xlv), (xlvii), (xlviii), (xlix), (l), (li), and Claims 5, 6, 9, 10, 17.  In failing to make the aforementioned arguments, post-conviction counsel's performance fell below an objective standard of reasonableness.  Absent the errors, there is a reasonable probability that the Idaho Supreme Court would have vacated Mr. Abdullah's conviction or remanded for further post-conviction proceedings.

PETITION FOR WRIT OF HABEAS CORPUS - 235

569.   Mr. Abdullah's initial post-conviction attorneys also failed to raise a variety of compelling challenges related primarily to sentencing.  Those challenges include the issues described above as Claim 1(B)(xix), (xx), (xxi),(xxii), and Claim 1(C)(i) and (ii).  In addition to those claims, post-conviction counsel failed to adequately develop and brief Claim 1(B)(i).  By failing to make or sufficiently litigate the aforementioned arguments, post-conviction counsel's performance fell below an objective standard of reasonableness.

570.   With respect to sentencing issues, post-conviction counsel were especially remiss in failing to explore facts relating to Mr. Abdullah's transition to America, and the dislocation and isolation caused by that experience.

571.   At the evidentiary hearing, post-conviction counsel presented numerous witness statements through affidavits.  It would have been far more effective for counsel to bring these witnesses in to testify in person, where they could have made a better impression on the trial court by responding to questions and establishing their credibility.

572.   Post-conviction counsel were unable to adequately investigate and litigate this case in part because they did not have sufficient resources to do so.

573.   Counsel and their staff were also impeded by an unfamiliarity with, or an unwillingness to use, best practices in the investigation.  For example, post-conviction counsel's investigators conducted numerous interviews, including interviews of people based in Boise, by telephone.  As all competent capital investigators know, telephone interviews are never preferable.  Telephone interviews are easily avoided by reluctant subjects.  Even if they occur, they are inferior to in-person interviews because the interviewer misses key non-verbal signs from the subject, the subjects tend to be more suspicious and less candid, and they do not permit the interviewer to

form sufficient connections with the subject to allow the subject to feel comfortable disclosing difficult, sensitive information.

574.    Post-conviction investigators also approached Mr. Abdullah's family in an overly rushed manner, forcing them to run hastily through the most difficult experiences of their lives, without creating in advance any rapport, without having nearly enough sessions, and without asking nearly enough questions to gather the full breadth of the material the family had at its disposal, despite the apparent need for follow-up interviews.

575.    Had the post-conviction investigators used better practices in approaching subjects, they would have obtained more and better information.

576.    Post-conviction counsel refused to allege a series of facts in their final petition that could have supported ineffectiveness claims, justifying their refusal on the ground that each fact—standing alone—was insufficient to change the story and lead to relief.  In so refusing, counsel failed to recognize that the prejudice on ineffectiveness claims is considered cumulatively.  That proposition is especially important in a case like this, where trial counsel made such a huge array of errors.  Moreover, post-conviction counsel should have realized that one of their principal duties was to preserve claims for federal habeas proceedings, even if relief was unlikely in state court.  In federal habeas, these omitted facts strongly indicate the presence of cumulative prejudice on Mr. Abdullah's ineffectiveness claims.

577.    Similarly, post-conviction counsel failed to argue to the Idaho Supreme Court that prejudice from ineffectiveness is assessed cumulatively.  As a result, the court rejected the claims in isolation, without considering their collective impact.

578.    *Exhaustion of Claim*: This claim is currently unexhausted.

PETITION FOR WRIT OF HABEAS CORPUS - 237

**CLAIM 69: THE ATTORNEY WHO ADVISED MR. ABDULLAH ON HIS CONFLICT WITH THE SAPD RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL**

579.     The attorney who advised Mr. Abdullah on his conflict with the SAPD rendered ineffective assistance of counsel, in violation of the Fourteenth Amendment.  *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Coleman v. Thompson*, 501 U.S. 722 (1991).  Absent the errors, there is a reasonable probability that the Idaho Supreme Court would have vacated Mr. Abdullah's convictions and sentence or remanded for further post-conviction proceedings.

580.     *Supporting Facts*:  While the direct appeal to the Idaho Supreme Court was stayed for the litigation of the initial post-conviction petition at the trial court, Judge Copsey appointed R. Keith Roark to represent Mr. Abdullah in connection with an alleged conflict between him and the SAPD, and to advise Mr. Abdullah on whether he should waive the conflict or not.  Mr. Roark recognized that if Mr. Abdullah refused to waive the conflict, the SAPD would likely be removed from the direct appeal.  As such, the conflict had clear repercussions for the direct appeal, and Mr. Roark therefore effectively served as Mr. Abdullah's direct-appeal counsel during the period of his appointment.

581.     In carrying out his charge, Mr. Roark rendered ineffective assistance of counsel.

582.     First, Mr. Roark misled Mr. Abdullah into accepting his services.  Mr. Roark never told Mr. Abdullah that he had previously served as a prosecutor, and had obtained an Idaho death sentence while working for the State.  Had Mr. Abdullah known about Mr. Roark's history, he would not have shared any information with him or allowed him to advise Mr. Abdullah on the conflict.  This was an especially egregious act of omission since Mr. Roark's investigation was related to the Toryanskis' ineffectiveness, and the Toryanskis themselves were both former prosecutors who deceived Mr. Abdullah about their work for the State.

583.     Furthermore, Mr. Roark deliberately destroyed all of the notes that he generated with respect to the Abdullah case, in stark violation of his continuing duty to his client.  As a result, he substantially impaired the ability of successive state post-conviction counsel and federal habeas counsel to determine how he conducted his work and how he reached the conclusions that he did.

584.     That omission is particularly troubling given that Mr. Roark took the unusual and totally unexplained position that Mr. Abdullah's waiver "would be final . . . in later federal habeas proceedings."  Mr. Roark did not cite any law to support that view, so it would be valuable to know where—if anywhere—he got his understanding of the law from, which is now nearly impossible to do since he destroyed his notes.

585.     Apparently without doing any research, Mr. Roark believed that even if the SAPD gave advice to the Toryanskis on how to conduct the trial, that conflict could only have impaired them in litigating the post-conviction petition, and not in litigating the direct appeal.  As discussed earlier, that belief was mistaken.

586.     *Exhaustion of Claim*: This claim is currently unexhausted.

### CLAIM 70: INITIAL POST-CONVICTION COUNSEL OPERATED UNDER A CONFLICT OF INTEREST

587.     The attorneys who represented Mr. Abdullah in his initial post-conviction proceeding were impaired by a serious conflict of interest, thereby violating the Sixth and Fourteenth Amendments.  *See Mickens v. Taylor*, 535 U.S. 162 (2002); *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Holloway v. Arkansas*, 435 U.S. 475 (1978); *see also Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Coleman v. Thompson*, 501 U.S. 722 (1991).  Post-conviction counsel's conflict is of such a magnitude that it must be presumed that the conflict undermined the adversarial process, and no prejudice need be shown.  In the alternative, the conflict of interest adversely affected post-conviction counsel's performance to such an extent that there was prejudice.

588.   *Supporting Facts*: Mr. Abdullah was represented in his initial post-conviction proceeding by the SAPD.  Prior to and during trial, the SAPD advised defense counsel about how they should conduct their work.  To the extent the SAPD gave the Toryanskis flawed advice that they took, there is an actual conflict, because to meaningfully litigate the case the SAPD would then be forced to allege their own ineffectiveness, which no attorneys can credibly do, or reasonably be expected to do.  Furthermore, even if the SAPD gave arguably correct advice on some issues, there is a potential conflict that requires further investigation, given the volume of interactions between the two parties, the fact that the interactions involved concrete questions about an ongoing case, the possibility of the SAPD omitting certain claims to prevent embarrassment, the loss in credibility that the SAPD suffered in the eyes of the state trial court as a result of the conflict, and the personal relationship between the SAPD's fact investigator and potential witnesses.

589.   As one example of the potential conflict, the SAPD discussed with the Toryanskis the possibility of the latter filing a motion to recuse Judge Copsey.  In those discussions, the SAPD informed the Toryanskis about comments that Judge Copsey had made in another case expressing suspicions about Middle Easterners, and Iraqis in particular.  *See* Claim 6.  The Toryanskis ultimately did not file a motion for Judge Copsey to recuse herself.  In the initial post-conviction action, the SAPD chose not to allege that the Toryanskis were ineffective for failing to file such a motion.  That claim could and should have been raised, given the ample grounds on which to seek disqualification of Judge Copsey and the fact that her bias against Mr. Abdullah caused numerous problems at trial.  *See* Claims 1(A)(xxv) and 6.

590.   When the communications between the SAPD and the Toryanskis were discovered during post-conviction proceedings, their attorneys took the position that there was no conflict.

PETITION FOR WRIT OF HABEAS CORPUS - 240

To defend that position, one SAPD attorney explained that because there was no claim of trial ineffectiveness for failure to file a motion to recuse, the discussion about recusals could *not* have created a conflict, since it would not affect how the SAPD litigated the petition.  That logic is backwards, and underscores the likelihood that a prejudicial conflict existed.  The damage done by the communications is that a viable ineffectiveness claim was *omitted* in the initial post-conviction petition.  And it appears from the SAPD's later defense of their actions, that it was likely omitted for the very reason that such omission would allow the SAPD to deny the existence of a conflict.  In other words, the conflict itself led to the SAPD's decision not to raise a colorable claim, thereby demonstrating the prejudice caused by the conflict.

591.    As another example of the conflict, SAPD attorneys sat in on some of the jury selection in Mr. Abdullah's case.  In light of their observations, the SAPD contacted Kim Toryanski to suggest how she and her co-counsel might phrase questions to veniremembers, and to excerpt for her a passage from a Supreme Court case on the subject.  The conversations between the SAPD and the Toryanskis were not general brainstorming sessions on abstract issues of law.  Rather, they were discussions about specific actions for trial counsel to take or refrain from taking in a pending case.  After Mr. Abdullah was convicted and sentenced, SAPD attorneys drafted the petition for post-conviction relief.  That petition included ineffectiveness claims related to voir dire, but the SAPD could not approach the issue objectively and with an eye only to zealously representing Mr. Abdullah's interests because they had themselves played a role in how the Toryanskis' approached voir dire.  Therefore, the conflict could well have compromised the SAPD's ability to properly litigate the issue.

592.    Furthermore, the SAPD's entanglement with the trial undermined their credibility with the state courts, and damaged the office's representation in that way as well.  That is especially

PETITION FOR WRIT OF HABEAS CORPUS - 241

true given that the SAPD stated in their original petition for post-conviction relief that they "have limited knowledge of and had no participation in the criminal case leading to the conviction and sentences herein challenged." That statement was incorrect, for—as just noted—the SAPD had been involved in making recommendations to defense counsel on their management of the litigation. Judge Copsey repeatedly remarked on the discrepancy, demonstrating that it damaged the SAPD's standing with the court and thereby prejudiced Mr. Abdullah's rights.

593.    The conflict further undermined the SAPD's ability to effectively advocate for Mr. Abdullah in the trial court because the materials relating to the conflict included a note in which an SAPD attorney essentially called Judge Copsey a racist. That note would inevitably have made Judge Copsey even more antagonistic toward the SAPD than she already was.

594.    During the inquiry into the SAPD's conflict, it emerged that if Mr. Abdullah declined to waive the conflict, the SAPD would likely have contested his decision in court. That admission indicates that the SAPD was not acting entirely with Mr. Abdullah's interests at heart and instead had its own ax to grind.

595.    The conflict involving the SAPD attorneys was exacerbated by a conflict involving the SAPD's lead fact investigator, Michael Shaw. Mr. Shaw was friends with both Mr. and Ms. Abdullah before the crime, and collaborated with them on civic projects. In addition, Mr. Shaw had a professional and personal acquaintanceship with many of the members of the Muslim community in Boise, including with several leaders at the Boise Islamic Center. These associations brought Mr. Shaw into the Abdullah case when he was called by Furqan Mehmood, the President of the Islamic Center, around 4 AM on October 5, 2002, less than three hours after Ms. Abdullah's body was found. In that conversation, Mr. Mehmood informed Mr. Shaw about Ms. Abdullah's death and the fire and attempted to discuss with Mr. Shaw hate crimes against

Muslims in Boise.  The phone call rendered Mr. Shaw a potential witness in the case, and made it inappropriate for him to later serve as an investigator in Mr. Abdullah's post-conviction action.

596.    Mr. Shaw continued to be publicly involved with the Boise Islamic Center well into the period in which he was working on Mr. Abdullah's post-conviction case.  For example, in October 2006, Mr. Shaw was listed as the primary contact person for a cultural workshop that included a visit to the Islamic Center, where participants were promised that they would "hear about the experiences of today's immigrants from refugee service providers, members of Boise's Muslim community, and an expert in interfaith conflict resolution."

597.    It is apparent from these relationships and experiences that Mr. Shaw had with people connected to the major players in the case that he was far too close to have carried out an objective investigation.  Instead, his background knowledge inevitably colored his view of the case, and influenced his decisions on which investigative avenues to explore and which to pass over, thereby giving rise to the ineffectiveness issues asserted above.  For example, Mr. Shaw did not interview Mr. Mehmood or anyone who worked with Ms. Abdullah and/or Mr. Abdullah at Mountain States Refugee Center, even though those individuals could have shed crucial light on what happened on the night of the crime, as well as on Ms. Abdullah's mental health and her relationship with Mr. Abdullah, and could therefore have helped support a suicide defense or otherwise rebutted the State's theory that Mr. Abdullah murdered his wife.  Presumably, Mr. Shaw did not interview such people because he either did not feel comfortable interviewing them in such circumstances and potentially jeopardizing his relationship with them by asking difficult question, or felt he already knew what they would say.  Whatever the precise cause, it is plain that a serious potential conflict existed and that it seriously compromised the integrity of the post-conviction investigation.

PETITION FOR WRIT OF HABEAS CORPUS - 243

598.   To the extent that any purported waiver of the conflict by Mr. Abdullah impacts this claim, the waiver was invalid for the reasons stated in Claim 63.

599.   *Exhaustion of Claim*: This claim is currently unexhausted.

### CLAIM 71: FIRST SUCCESSIVE POST-CONVICTION COUNSEL WERE INEFFECTIVE

600.   The attorneys who represented Mr. Abdullah in his first successive post-conviction action rendered ineffective assistance of counsel, in violation of the Fourteenth Amendment.  *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Coleman v. Thompson*, 501 U.S. 722 (1991).  Absent the errors, there is a reasonable probability that the Idaho Supreme Court would have vacated Mr. Abdullah's convictions and sentence or remanded for further post-conviction proceedings.

601.   *Supporting Facts*: Mr. Abdullah's first successive post-conviction proceeding was the first opportunity that he was afforded in state court to challenge the effectiveness of his counsel on direct appeal.  In that proceeding, Mr. Abdullah has been represented by Leo Griffard, David Smethers, and John Kormanik.  The first successive post-conviction proceeding is currently ongoing.  Therefore, Mr. Abdullah is not at present able to bring forward the facts supporting this claim.  He raises the claim for preservation purposes, and asserts that a competent attorney would raise in the successive proceeding at least some of the direct-appeal ineffectiveness claims contained in this petition.

602.   *Exhaustion of Claim*: This claim is currently unexhausted.

### CLAIM 72: THE IDAHO POST-CONVICTION SCHEME VIOLATES DUE PROCESS AND THE EQUAL PROTECTION CLAUSE

603.   Idaho's post-conviction scheme is unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  *See Pennsylvania v. Finley*, 481 U.S. 551 (1987).

604.    *Supporting Facts*: Idaho law provides that in death penalty matters a post-conviction petitioner must file any legal or factual challenge to the sentence or conviction that is known or reasonably should be known within forty-two days of the entry of judgment. This procedure is significantly distinct from post-conviction proceedings for all non-capital cases. Consequently, capital inmates are deprived of the equal protection of the law under the Fourteenth Amendment. Furthermore, the forty-two day period is unduly restrictive and prevents capital petitioners from adequately developing their cases, thus violating their due process rights.

605.    Further, successive petitions raising claims that were omitted from the initial post-conviction petition also must be filed within forty-two days of when the claim was known or should have been known. That regime requires piecemeal litigation each time a new fact of any significance is found, even if all facts needed to adequately support the claim, together with admissible evidence to confirm those facts, is not yet known and available. The requirements of this system are unconstitutional or at a minimum improperly frustrate the ability to raise federal constitutional claims.

606.    *Exhaustion of Claim*: This claim is currently unexhausted.

### CLAIM 73: THE POST-CONVICTION COURT UNCONSTITUTIONALLY DENIED MR. ABDULLAH ACCESS TO EVIDENCE

607.    Judge Copsey's refusal to allow initial post-conviction counsel to test key evidence violated Mr. Abdullah's due process right to a fundamentally fair post-conviction proceeding. *See Pennsylvania v. Finley*, 481 U.S. 551 (1987).

608.    *Supporting Facts*: Judge Copsey denied the SAPD's requests to have tested several critical pieces of evidence, including hair from Mr. Abdullah's arms that supposedly showed he had been exposed to high heat around the time of the fire, gasoline samples and other items containing gas that supposedly linked Mr. Abdullah to the alleged arson, and a sample of the

PETITION FOR WRIT OF HABEAS CORPUS - 245

vitreous humor collected during the autopsy of Ms. Abdullah.  These were crucial pieces of evidence used by the State to secure convictions against Mr. Abdullah.  They were never adequately and comprehensively tested, due in part to trial counsel's incompetence.  If they were tested, exculpatory evidence would be discovered, including evidence that Mr. Abdullah did not engage in arson around the time of the fire, evidence that gas from Salt Lake City was not discovered at the Siesta residence, and evidence that Ms. Abdullah died from suicide rather than from murder.

609.    Judge Copsey also refused to give the SAPD nearly any discovery whatsoever.  Her reasoning was based on her pre-determined opinion that the SAPD's claims were meritless, even though the SAPD could not support the claims without the discovery.

610.    *Exhaustion of Claim*: This claim is currently unexhausted.

### CLAIM 74: CUMULATIVE POST-CONVICTION ERROR

611.    The denial of relief to Mr. Abdullah in his initial post-conviction action violated his right to fundamental fairness under the Due Process Clause of the Fourteenth Amendment because of the cumulative impact of the errors that occurred in his post-conviction case, as compounded by the errors at the guilt phase, penalty phase, and direct appeal.  *See Pennsylvania v. Finley*, 481 U.S. 551 (1987).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the state court's denial of post-conviction relief.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

612.    *Supporting Facts*: The constitutional violations set forth in each post-conviction claim alone mandate relief.  Even if not, relief is required when each claim is considered collectively with the other post-conviction claims, as well as with the guilt phase, penalty phase, and direct appeal claims.  The cumulative impact of these combined errors violated Mr. Abdullah's right to a fundamentally fair post-conviction process.

613.    *Exhaustion of Claim*: This claim is currently unexhausted.

**VII.    Conclusion And Prayer For Relief**

614.    Mr. Abdullah is on death row because he was abandoned.  He was abandoned by police officers who prejudged him guilty, losing and destroying any evidence to the contrary.  He was abandoned by prosecutors who charged him with capital murder despite having no evidence that he was responsible for the presence of the fatal drug in his wife's body.  And he was abandoned by his own attorneys, who conceded the most important issue of the guilt phase, presented no theory of defense, and utterly flopped at the sentencing even though Mr. Abdullah's mitigation package involved a story of childhood bravery in the face of persecution so moving that any competent trial team would have easily been able to move a single jury to mercy.  To right those constitutional wrongs, Petitioner Azad Haji Abdullah prays that the Court, after full consideration of the issues raised in this petition:

615.    Issue a writ of habeas corpus so that Mr. Abdullah is discharged from his unconstitutional confinement and relieved of his unconstitutional convictions;

616.    If guilt-phase relief is not granted on all convictions, vacate the convictions that are unconstitutional;

617.    If guilt-phase relief is not granted, issue a writ of habeas corpus and set aside Mr. Abdullah's sentence;

618.    If neither guilt-phase nor penalty-phase relief is granted, issue a writ of habeas corpus and order the state courts to reinstitute Mr. Abdullah's direct appeal;

619.    If neither guilt-phase nor penalty-phase nor direct-appeal relief is granted, issue a writ of habeas corpus and order the state courts to reinstitute Mr. Abdullah's post-conviction proceeding.

620.     Regardless of what relief is or is not ultimately granted, Mr. Abdullah also prays that the Court:

621.     Grant an order to preserve the evidence, so as to ensure that Mr. Abdullah is able to fully and fairly litigate and amend this habeas petition, *see* Dkts. 13, 19, 20;

622.     Order the State to answer this petition by specifically admitting or denying each allegation and claim herein;

623.     Conduct an evidentiary hearing on the State's procedural default defenses and Mr. Abdullah's arguments for overcoming the defaults;

624.     Conduct an evidentiary hearing on any claims that are reviewable on the merits for which a hearing is permitted;

625.     Grant Mr. Abdullah the authority to conduct discovery, including the authority to obtain subpoenas and depose witnesses;

626.     Permit Mr. Abdullah to amend this petition;

627.     Allow for full briefing on the procedural status and the merits of every claim;

628.     Make any other orders necessary regarding Mr. Abdullah's medical care and housing as necessary to prevent violations of the Eighth Amendment's ban on cruel and unusual punishment and to preserve his right to the assistance of counsel in this habeas action, *see* 18 U.S.C. § 3599(a)(2); and

629.     Grant such other and further relief as may be appropriate and necessary to resolve the matter as justice may require.

DATED this 24th day of February 2017.


                              _____/s/_____
                              Bruce D. Livingston
                              Jonah J. Horwitz


PETITION FOR WRIT OF HABEAS CORPUS - 248

## **VERIFICATION**

I, Azad Haji Abdullah, declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed and signed on February 24, 2017.

_____
Petitioner Azad Haji Abdullah

SUBSCRIBED AND SWORN TO before me this 24th day of February, 2017.

_____
NOTARY PUBLIC FOR Ada County, Idaho
My commission expires: 8/24/19

GREG WORTHEN
NOTARY
PUBLIC
STATE OF IDAHO

PETITION FOR WRIT OF HABEAS CORPUS - 249

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 24th day of February 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

L. LaMont Anderson
lamont.anderson@ag.idaho.gov

/s/
_____
Joy L. Fish

PETITION FOR WRIT OF HABEAS CORPUS - 250