Bruce D. Livingston, MO Bar No. 34444
Jonah J. Horwitz, ID Bar No. 10494
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:   Bruce_Livingston@fd.org
          Jonah_Horwitz@fd.org

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AZAD HAJI ABDULLAH,<br>　　　　　Petitioner,<br><br>v.<br><br>KEITH YORDY,[1]<br>Warden, Idaho Maximum Security<br>Institution,<br>　　　　　Respondent. | Case No. 1:17-cv-00098-BLW<br><br>**CAPITAL CASE**<br><br>PETITIONER'S OPENING BRIEF ON<br>THE MERITS OF CLAIMS 24, 30, 38,<br>54, and 55 |

---

[1] Keith Yordy is now Warden of the Idaho Maximum Security Institution. *See* https://www.idoc.idaho.gov/content/locations/prisons/idaho_maximum_security_institution. As such, he should be substituted in as the respondent in this case. *See* Rule 2(a) of the Rules Governing Section 2254 Cases; Fed. R. Civ. P. 25(d).

**Table of Contents**

I.    Standard of Review……………………………………………………………..2

II.   Argument…………………………………………………………………………8

      A. Claim 24: The Jury Was Wrongly Instructed On Willfulness…………………………8

      B. Claim 30: The Idaho Supreme Court Violated Mr. Abdullah's Rights By
      Retroactively Altering The Elements Of Arson………………………………………....29

      C. Claim 38: The Trial Court Impaneled Biased Jurors………………………………...38

      D. Claim 54: There Was No Death Penalty In Effect At The Time Of The Crime……...48

      E. Claim 55: The Aggravators Were Not Charged By Indictment, Not Subject To A
      Finding Of Probable Cause, And Not Supported By The Facts…………………………53

III.  Certificate of Appealability……………………………………………………61

IV.   Conclusion……………………………………………………………………62

Pursuant to this Court's orders, *see* Dkts. 14, 16, Petitioner Azad Haji Abdullah submits this opening brief on the merits of five fully exhausted claims. The issues briefed here do not comprise many of the issues raised in this case, and the posture of the issues being briefed does not allow for consideration of how the record would be different, but for the ineffectiveness of trial counsel. Despite those limitations at this stage of the proceedings, the convictions and sentences in this case are subject to serious challenge.

The case is rife with reasonable doubt. A narrow time line precludes any possible appearance on the scene by Mr. Abdullah until after his wife, the purported murder victim in this case, had ingested a fatal dose of her antidepressant medication, Prozac. While there is evidence of gas purchases by Mr. Abdullah, which the prosecution attempted to connect to an arson that started accidentally in a premature ignition of gasoline in the garage, there is no evidence of any kind that connects Mr. Abdullah to the Prozac in his wife's body. Furthermore, it is undisputed that the fire in the Abdullah garage did not start until after Ms. Abdullah was dead.

Originally, the coroner considered and rejected the possibility of suicide, because the plastic bag was not accompanied by the presence of drugs or alcohol in Ms. Abdullah's body. A-204 at 147–48. The coroner noted that method of suicide was discussed in "Final Exit," a suicide manual by supporters of assisted suicide. *Id.* However, when the fatal dose of Prozac was discovered in Ms. Abdullah's body, the coroner maintained her death was still a homicide and did not revisit the suicide theory. Instead, he just added poisoning as a possible contributor to the cause of death in addition to asphyxiation. *See infra* at 22.

Mr. Abdullah proceeds with his briefing on the issues selected for merits review[2] at this time, encouraging the Court to keep in mind the extensive reasonable doubt that infected the case as a whole and the other pervasive problems with the trial. *See* Dkt. 1 at 1–2 (providing an overview of those problems).

## I.      STANDARD OF REVIEW

> The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action. Its pre-eminent role is recognized by the admonition in the Constitution that: 'The Privilege of the Writ of Habeas Corpus shall not be suspended * * *.' U.S. Const., Art. I, § 9, cl. 2. … The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.

*Harris v. Nelson*, 394 U.S. 286, 290–91 (1969).

Mr. Abdullah explained in his habeas petition why the Antiterrorism and Effective Death Penalty Act ("AEDPA") is unconstitutional and he incorporates that discussion here. *See* Dkt. 1 at 7–9. Because AEDPA is unconstitutional, the claims at issue here should be reviewed de novo. Mr. Abdullah acknowledges that the courts have upheld AEDPA's constitutionality. *See, e.g.*, *Felker v. Turpin*, 518 U.S. 651 (1996). However, that precedent was established before the judicial interpretations had moved AEDPA's bar so high. Changing circumstances have thus rendered AEDPA unconstitutional.

In the event the Court disagrees and applies AEDPA, Mr. Abdullah now addresses the standard of review that should be used under the Act.

---

[2] Upon review, undersigned counsel have determined that Claim 51 is not meritorious and therefore have decided not to brief the issue.

AEDPA places limitations on a federal court's power to grant a state prisoner's federal habeas petition. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). When a state court has adjudicated a claim on the merits, relief may be granted only if the adjudication of that claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). If a claim has been adjudicated on the merits by the state court, the federal court's analysis under § 2254(d) is limited to the record that was before the state court. *Pinholster*, 563 U.S. at 181.

However, when a state court has not adjudicated a federal claim on the merits, but instead relies on a procedural bar, review of the claim is *de novo*. *Cone v. Bell*, 556 U.S. 449, 472 (2009); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). *De novo* review also applies when the state court failed to reach any element of the claim prescribed by federal law, and § 2254(d) is inapplicable to the federal court's analysis of the un-adjudicated portion of the claim. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis."); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins*) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*").

Under § 2254(d), "clearly established Federal law" refers to the holdings of the Supreme Court at the time the state court adjudicated the claim on the merits. *Williams v. Taylor*, 529 U.S. 362, 412 (2000) ("*Terry Williams*") (O'Connor, J., for the Court as to part II of her opinion). In considering whether the state court unreasonably applied clearly established federal

law, the reviewing court is limited to the record before the state court that adjudicated the claim on the merits. *Pinholster*, 563 U.S. at 185. While Supreme Court precedent is the only controlling authority under AEDPA, cases from lower courts can illuminate the contours of the Supreme Court's holdings and provide persuasive authority to aid in determining whether a particular state court opinion is an unreasonable application of the Court's holdings. *Robinson v. Ignacio*, 360 F.3d 1044, 1057 (9th Cir. 2004); *Luna v. Cambra*, 306 F.3d 954, 960 (9th Cir.), *amended on other grounds by* 311 F.3d 928 (9th Cir. 2002); *Padilla v. Blades*, No. 1:17-cv-527-BLW, 2019 WL 1063625, at *5 (D. Idaho Mar. 6, 2019).

An unreasonable application of federal law results where the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Terry Williams*, 529 U.S. at 407-08 (O'Connor, J.). An unreasonable application of clearly established federal law also results "when a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. In those circumstances, when the limitations of § 2254(d) are satisfied, the only obstacle to a grant of the writ is the need for a showing that the petitioner is in custody in violation of the Constitution or laws or treaties of the United States. *Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir 2008) (en banc) (citing § 2254(a)). The "more general-but still limited-provision" of 2254(a) "alone governs, where the other limitations set out in § 2254(d) … are no obstacle to the grant of habeas relief," and § 2254(a) "contains no requirement of deference to state court adjudications." *Frantz*, 533 F.3d at 736. Thus, when the limitations of § 2254(d) do not apply, federal courts "necessarily decide the issues before them de novo, as was done before AEDPA's addition of § 2254(d) in 1996." *Id*. In this case, whenever Mr. Abdullah argues that § 2254(d) does not bar habeas relief, he is arguing at the same time—and for the same reasons—that § 2254(a) requires

the Court to grant the writ.  *See id.* ("[A] holding on habeas review that a state court error meets the § 2254(d) standard will often simultaneously constitute a holding that the § 2254(a) . . . requirement is satisfied as well.").

AEDPA does not require habeas courts to await "some nearly identical factual pattern" before applying a clearly established rule, nor does it prohibit "finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced."  *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (internal quotation marks omitted).  AEDPA's statutory language "recognizes … that even a general standard may be applied in an unreasonable manner."  *Id*.

When a state court's adjudication of the merits of a claim "is dependent on an antecedent unreasonable application of [a] federal law, the requirement set forth in § 2254(d)(1) is satisfied."  *Id*.  A federal court may resolve such claims "without the deference AEDPA otherwise requires."  *Id*.  An unreasonable application of law under § 2254 (d)(1) is one that is "objectively unreasonable."  *Terry Williams*, 529 U.S. at 409.  Transforming the test into a subjective one, because "one of the Nation's jurists has applied the relevant federal law in the same manner the state court did," is inappropriate, and an individual jurist's similar application of the relevant law does not make the state court's application of law objectively reasonable.  *Id*. at 409–10.

This Court may not "find that the state court made an unreasonable determination of the facts" unless it "'could not reasonably conclude that the finding is supported by the record' before the state court."  *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)).

When a state court makes an unexplained decision, even in a "one-sentence summary order," without setting forth its reasons for denying relief, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary….The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Harrington v. Richter*, 562 U.S. 86, 96, 99–100 (2011), *quoted in, James v. Ryan*, 733 F.3d 911, 914 (9th Cir. 2013), *cert. denied,* 134 S. Ct. 2697 (2014). *Richter* "concerned a state-court order that did not address *any* of the defendant's claims," but the *Richter* presumption also applies "when a state-court opinion addresses some but not all of a defendant's claims." *Johnson v. Williams*, 568 U.S. 289, 298 (2013) (emphasis in original). "When a state court rejects a federal claim without expressly addressing that claim," there is, as in *Richter*, a rebuttable presumption "that the federal claim was adjudicated on the merits." *Id.* at 301.

When the state court decision gives an explanation in a reasoned decision, those reasons control the analysis, and when the "reasoning contradict[s] clearly established federal law as determined by the Supreme Court, § 2254(d) is not a barrier to relief." *Avila v. Richardson*, 751 F.3d 534, 537 (7th Cir. 2014). *Johnson v. Williams* only "instructs us to give state courts the benefit of the doubt when the basis for their holdings is unclear. It does not require us to ignore a state court's explicit explanation of its own decision." *James v. Ryan*, 733 F.3d at 916.

Importantly, it is only the actual contents of the state court's decision, and not any *post hoc* reasoning that a respondent may offer as an alternative means for justifying the outcome of the state court proceeding, that is relevant to the § 2254(d) analysis. *See Wiggins*, 539 U.S. at 529–530 (justifications for state court's denial of relief offered by respondent in federal habeas

proceedings but not relied upon in actual state court decision have "no bearing" on federal court's analysis under § 2254(d).

As the Supreme Court demonstrated in *Wiggins* and in *Miller-El v. Dretke*, 545 U.S. 231 (2005), a faithful application of § 2254(d)(2) cannot be accomplished without looking beneath a state court's factual "findings" in order to assess the reasonableness of the conclusions reached by the state court in light of the evidence that was before that court. *Miller-El*, 545 U.S at 240–41; *Wiggins*, 539 U.S. at 528. While the state court's decision is entitled to "substantial deference" under § 2254(d)(2), "'deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (quoting *Miller-el v. Cockrell*, 537 U.S. 322, 340 (2003)). "Under § 2254(d)(2), a state court decision is 'based on an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence.'" *Pruitt v. Neal*, 788 F.3d 248, 263 (7th Cir. 2015) (quoting *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013).

In *Doody v. Ryan*, 649 F.3d 986, 1002–07 (9th Cir. 2011), the en banc Ninth Circuit found § 2254(d)(2) satisfied even though the record was somewhat ambiguous and a dissent disagreed with the majority's reading of the facts. *Cf. id*. at 1029–50 (dissenting opinion of three judges). Section 2254(d)(2) clearly does not require every reasonable jurist to disagree with the state court for the state court's findings or procedures to be unreasonable. State court fact-finding procedures have been found inadequate in various situations. Those include the state court's failure to consider relevant evidence, *Ali v. Hickman*, 584 F.3d 1174, 1193 (9th Cir. 2009), when no hearing was held, *Hurles*, 752 F.3d at 788–89 (findings without a hearing regarding the judge's own conduct), when the state court used the wrong legal standard,

*Caliendo v. Warden*, 365 F.3d 691, 698 (9th Cir. 2004), and when the attorney at a post-conviction relief hearing was associated with the trial counsel being attacked at the hearing. *Nelson v. Washington*, 172 F. App'x 748, 750 (9th Cir. 2006).

Once a petitioner has satisfied § 2254(d), he is no longer limited to the state court record in proving his claim. *See Pinholster*, 563 U.S. at 180 (indicating that its holding concerned only "the scope of the record *for a § 2254(d)(1) inquiry*"). Thus, once an inmate has shown either that the state court's adjudication was an unreasonable application of clearly established federal law or that it unreasonably determined the facts, the inmate is entitled to request an evidentiary hearing. *See Cruz v. Ryan*, No. CV-13-389-TUC-JGZ, 2018 WL 1524026, at *21–30 (D. Ariz. Mar. 27, 2018) (granting an evidentiary hearing on an exhausted claim because the prisoner met the terms of § 2254(d)). A hearing is appropriate when it "could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). In the present case, if the Court concludes that it is unable to grant relief on the basis of the state court record on any claim outlined in this brief, Mr. Abdullah respectfully requests an evidentiary hearing on that claim.[3]

## II.   ARGUMENT

### A.   Claim 24: The Jury Was Wrongly Instructed On Willfulness

The instructions at trial improperly reduced the State's burden to prove beyond a reasonable doubt every fact necessary to establish an element in five of the six charged offenses, including first-degree murder. The jury was given only one definition of willful, which was

---

[3] If the Court denies relief on any of the following claims on the basis of this merits briefing, and if Mr. Abdullah later discovers facts supporting the claim, he reserves the right to argue that the claim should be reopened and the new facts taken into consideration.

wrong for every charged offense except arson, because it did not require a finding of specific intent. The instructions thus violated the Due Process Clause of the Fourteenth Amendment.

In a criminal trial, the Due Process Clause requires the State to prove every fact necessary to establish the elements of the offense beyond a reasonable doubt. *Sandstrom v. Montana*, 442 U.S. 510, 520–21 (1979); *In re Winship*, 397 U.S. 358, 364 (1970). A jury instruction violates due process if it fails to give effect to that requirement. *Sandstrom*, 442 U.S. at 521. If a "possible" interpretation of a jury instruction relieves the State of its "burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind," then the instruction "represents constitutional error." *Id*.

Of course, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Boyde v. California*, 494 U.S. 370, 378 (1990). "[W]hether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." *Sandstrom*, 442 U.S. at 514. If the charge as a whole is ambiguous, the question is whether there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Importantly, the state courts are "not the final authority on the interpretation which a jury could have given the instruction." *Sandstrom*, 442 U.S. at 516–17.

At trial all of the charged counts included the element of whether the defendant's conduct was willful. *State v. Abdullah*, 348 P.3d 1, 45 (Idaho 2015). Initially, the instructions did not provide a definition for willful. *Id*. However, before returning a verdict on any of the counts, the jury submitted a question regarding the definition of "willfully," in connection with that term's use in Instruction 20, which pertained to the elements of arson. *Id*. In response to that question,

the trial judge provided the following definition to the jury: "An act is 'wilful' or done 'wilfully' when done on purpose. One can act wilfully without intending to violate the law, to injure another, or to acquire any advantage." *Id*. *See* A-9 at 70. No other definition of willful was ever given to the jury. *Abdullah*, 348 P.3d at 45. *See generally* A-46 (guilt phase jury instructions).

On appeal, Mr. Abdullah argued that arson did not require a specific intent finding and therefore the instruction defining willful was correct for that count. C-10 at 30 & n.11 (citing *State v. Leferink*, 992 P.2d 775, 778–79 (Idaho 1999)). However, Mr. Abdullah argued that all the other crimes for which he was convicted required a finding of specific intent. C-10 at 29–39. Therefore, Mr. Abdullah argued, the willful definition given to the jury, A-9 at 70, required a lesser degree of intent and "was wrong for every other offense charged in the indictment, including first degree murder, each of which required either the specific intent to kill or the specific intent to harm." C-10 at 30. *See* A-4 at 700–02 (amended indictment); A-46, Instructions 2 (restating indictment), 16 (first-degree murder), 21–26 (three counts of attempted first-degree murder), 27–28 (felony injury to a child). *See generally* C-10 at 29–39 (detailed argument as to the requirement that the jury find specific intent for each of these other offenses). Mr. Abdullah therefore argued that the given definition of willful, which did not require such a finding, improperly reduced the State's burden to prove every element of the charged offenses in violation of due process. C-10 at 30.

The Idaho Supreme Court addressed the claim and rejected it, finding that the definition of willful, which was given to the jury for the crime of arson, was not shown to have been applied by the jury to the other charged offenses. *Abdullah*, 348 P.3d at 46. The court did not even attempt to suggest what alternative definition was applied by the jury for those other charges. *See id*. The state court's decision was contrary to law, an unreasonable application of

the law to the facts, and an unreasonable determination of fact.  *See* 28 U.S.C. § 2254(d)(1) and (2).

Initially, the court characterized Mr. Abdullah's argument as follows:  "Abdullah argues that it must be presumed that the jury applied the definition of willful not only to arson, but also to every offense containing a willful element."  *Abdullah,* 348 P.3d at 46.  It added later: "Abdullah contends that we must presume the jury applied the only definition of willful they were given to the other charges of first-degree murder, attempted first-degree murder, and felony injury to a child."  *Id.*

The court then concluded that there was no proof that the jury actually considered and applied the given definition of willful—with its lower standard of general intent—to the other charged offenses.  *Id.*  The court announced that because the jury was not provided the willful instruction "at the outset of deliberations," there was no presumption "that the jury applied the willful definition to all occurrences of that term."  *Id.*  The court stated that "[t]here is no evidence to support a presumption that the jury applied the willful definition for arson to the remaining charges."  *Id.*  The state supreme court noted, first, that the trial court provided the jury with the instruction defining willful  in response to the jury's question about the definition of "willful" in the arson instruction, and, second, that the trial court physically attached that instruction to the jury's question before giving it to the jury.  *Id.*  The state supreme court then opined that the "nature of the jury's request logically narrows the application of the district court's response to their request."  *Id.*  Accordingly, the court refused to consider the possibility that the jury applied the only definition of willful it received to the many uses of "willful" in the other charged offenses.  *Id.*  Instead, the court required actual evidence that the jury applied the given willful definition to the other charged offenses:  "*Without any evidence to the contrary,*

*this Court will not assume* the jury went beyond the scope of their question to the judge and applied the willful definition for arson to the other offenses." *Id*. (emphasis added). Despite the use of willful in the instructions setting forth the other charged offenses, the court concluded that "the willful instruction for arson did not alter or affect the other jury instructions for the crimes charged," and accordingly Mr. "Abdullah's challenges to the guilt phase instructions fail." *Id*.

The Idaho Supreme Court's decision was contrary to law, an unreasonable application of the law to the facts, and an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). In requiring evidence of what the jury actually did, the state court contravened clearly established Supreme Court precedent. The test is how "a reasonable juror *could* have interpreted the instruction," *Sandstrom*, 442 U.S. at 514 (emphasis added), not what the jurors actually did in their deliberations. If a "possible" interpretation of a jury instruction relieves the State of its "burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind," then the instruction "represents constitutional error." *Id*. at 521. *See also Estelle*, 502 U.S. at 72 (whether there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution").

The Idaho Supreme Court's decision did not address the concern that Mr. Abdullah's jury reasonably *could* have applied the only definition of willful that it was given to all of the charged offenses that contained that term. Instead, the court ignored that likely possibility, refusing to consider it because Mr. Abdullah had not brought forth evidence showing that the jurors actually applied the given, inadequate definition of willful in their deliberations. Such a requirement not only violates the mode of analysis clearly established by the Supreme Court of the United States for jury instruction challenges, *supra*, but it also contravenes the Idaho Supreme Court's own rule of evidence and the long held rule that evidence of deliberations may not be introduced to

impeach or overturn the verdict.  "During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  I.R.E. 606(b).  *See Levinger v. Mercy Med. Ctr., Nampa*, 75 P.3d 1202, 1206–07 (Idaho 2003).  While Mr. Abdullah is not alleging an error of state law in this federal habeas claim, the unreasonableness of the Idaho Supreme Court's rejection of the constitutional analysis mandated by the U.S. Supreme Court is highlighted by how far into foul territory the state court was willing to venture to avoid *Sandstrom*.

By imposing a burden on Mr. Abdullah to put forward evidence of how the jury actually interpreted "willful" and applied the jury instructions during their deliberations, something that was not even allowed under state law, the state court ran afoul of *Sandstrom* and *Estelle*.  Those cases require that the court analyze how a reasonable juror *could*, not did, interpret the challenged instructions as a whole, *Sandstrom*, 442 U.S. at 514, whether a "possible" interpretation of a jury instruction relieved the State of its burden of proof "on the critical question of petitioner's state of mind," *id*. at 521, and whether there is a "reasonable likelihood that the jury … applied the challenged instruction in a way that violates the Constitution." *Estelle*, 502 U.S. at 72.  In requiring actual evidence that the jury applied the instruction defining willful not just to arson but to the remaining charges, including murder, the Idaho Supreme Court decision was contrary to the clearly established law of the Supreme Court.  Accordingly, Mr. Abdullah has satisfied § 2254(d)(1), the state court decision is not entitled to AEDPA deference, and Claim 24 is entitled to de novo review.

Moreover, in deciding that there was "no evidence to support a presumption that the jury applied the willful definition for arson to the remaining charges," *Abdullah*, 348 P.3d at 46, the

Idaho Supreme Court made both an unreasonable determination of fact and an unreasonable application of the law to the facts.  The jury was only given one definition of "willful" and "willfully."  A-9 at 70 (subsequent instruction providing definition in response to jury question).  The terms "willful" and "willfully" were used in each of the six charged crimes.  *See supra* at 10–11.  While the definition of willful was provided in connection with its use in establishing the crime of arson, nothing in the instructions limited that definition to arson.  *See generally* A-46 (guilt phase jury instructions).  Without any other definition of willful at its disposal, it must be presumed that the jury applied that lone definition of willful to all of the other charged offenses.[4]  What other definition would the jury have used, when it had no other definition?  The instructions explicitly forbade researching another definition.  A-46, Instruction 9 ("You must not consult any books, dictionaries, encyclopedias, public records, internet, law books, statutes or any other source of information unless I specifically authorize you to do so.").

Further, for multiple separate and specific reasons, Instruction 4 plainly mandated that the definitions of willful and willfully, A-9 at 70, had to be applied and used whenever and wherever those terms appeared in the jury instructions.  First, Instruction 4 commanded the jury "to apply the law set forth in my instructions."  A-46, Instruction 4.  Therefore, the jury was required to apply the definitions of willful and willfully that were contained in the only instruction defining those terms that had been given to the jury; any other definition of those terms would be without support and contrary to the only definition that the judge provided.  Second, Instruction 4 dictated that "you must follow my instructions regardless of your own opinion of what the law

---

[4] *Cf. Gustafson v. Alloyd Co.*, 513 U.S. 561, 573 (1995) (invoking the canon of statutory construction that presumes a word means the same thing when used in multiple places in an act); *St. Luke's Magic Valley Reg'l Med. Ctr. v. Bd. of Cty. Comm'rs of Gooding Cty.*, 237 P.3d 1210, 1215 (Idaho 2010) (same).

should be." *Id.*  Even if the jury thought that some other definition might apply to the use of willful and willfully, with respect to the other charged offenses, the jury was expressly forbidden to substitute its own definition for the one given to it by the judge in response to the jury's question about arson.  *See* A-9 at 69–70.  Third, Instruction 4 required the jury to consider the instructions "as a whole, not picking out one and disregarding others." A-46, Instruction 4. Having only one instruction that defined willful and willfully, the jury could not choose to apply those definitions to arson while disregarding the places in the remaining charges where willful and willfully also appeared.

Fourth and most significantly, Instruction 4 made explicit that "[t]he order in which the instructions are given has no significance as to their relative importance."  *Id.*  The Idaho Supreme Court appeared to place significant weight on the fact that the definition of willful was given to the jury later, and separately from the other instructions.  *Abdullah*, 348 P.3d at 46 ("the jury was not provided an instruction of willful at the outset of deliberations").  But Instruction 4 explicitly told the jury that the order in which the instructions were received "has no significance."  A-46, Instruction 4.  Accordingly, once the jury had an instruction defining willful and willfully, it was bound to apply those definitions wherever those terms appeared. The state supreme court's isolated focus on the instruction defining willful in the limited context of the arson instruction both ignored Instruction 4's mandate that the order of instructions was not significant and Supreme Court case law that a single instruction "must be viewed in the context of the overall charge" and not "in artificial isolation."  *See Boyde*, 494 U.S. at 378.  In concluding that "the willful instruction for arson did not … affect the other jury instructions for the crimes charged," *Abdullah*, 348 P.3d at 46, the Idaho Supreme Court made an unreasonable

determination of fact and an unreasonable application of the law to the facts.  For those reasons, too, AEDPA deference does not apply.  *See* 28 U.S.C. § 2254(d).

Applying de novo review to Mr. Abdullah's claim, that the given definition of willful improperly lowered the burden of proof by substituting a lower standard of intent than was required for the offenses other than arson, this Court must find that the instruction violated due process, as interpreted by *Sandstrom*, and *Winship*.

The instructions in this case first explained the constituent elements of murder to the jury without elaborating on the degree of murder.  A-46, Instruction 13.  The instruction comported with the governing statute.  *See* I.C. § 18-4001 ("Murder is the unlawful killing of a human being…with malice aforethought.").  One of the elements of murder was that the defendant acted with malice aforethought.  A-46, Instruction 13.  The jury was instructed that malice "may be express or implied."  A-46, Instruction 15.  But only express malice required a specific intent to "take away the life of a fellow creature."  *Id*.  Implied malice had no such requirement, and instead was described as existing "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart, which means a condition of the heart and mind which has no regard for social or moral obligation."  *Id*.  These instructions, too, comported with the statutory language.  *See* I.C. § 18-4002.  Because the jury could convict of simple murder on an implied malice theory, without distinguishing between degrees of murder, it was not required to find intent to take a life at that initial stage of its deliberations.  *See State v. Porter*, 128 P.3d 908, 911 (Idaho 2005) (second-degree murder conviction established by implied malice alone, as "the deliberate intent to kill is not a necessary element of murder since an abandoned and malignant heart satisfies the mental element for killing").

PETITIONER'S OPENING MERITS BRIEF - 16

As pertinent to this case, first-degree murder is "[a]ll murder … which is perpetrated by any kind of willful, deliberate and premeditated killing." I.C. § 18-4003(a). Mr. Abdullah's jury was so instructed: "the state must prove that the murder: was a willful, deliberate, and premeditated killing." A-46, Instruction 16. While the jury received a definition of premeditated,[5] no definition of willful was given until the judge responded to the jury question, A-9 at 69–70, and deliberate was never defined. *See generally* A-46 (guilt phase jury instructions).

However, the "willful" element of first-degree murder requires proof that the murder was done with "a clear intent to take life." *State v. Aragon*, 690 P.2d 293, 297 (Idaho 1984). In *Aragon*, the Idaho Supreme Court expressly approved of that definition of willfulness for the crime of first-degree murder. *Id.* (noting that the quoted "intent to take a life" definition of willfulness "was not error"). Indeed, the court expressly defined the willful conduct needed to

---

[5] The remainder of Instruction 16 failed to define willful and deliberate, though it did define premeditation:

> Premeditation means to consider beforehand whether to kill or not to kill, and then to decide to kill. There does not have to be any appreciable period of time during which the decision to kill was considered, as long as it was reflected upon before the decision was made. A mere unconsidered and rash impulse, even though it includes an intent to kill, it [sic] not premeditation.

> If you unanimously agree that the state has proven the above special circumstance beyond a reasonable doubt, then you must find the defendant guilty of first degree murder.

> All other murder is murder of the second degree. If you unanimously agree that the defendant is guilty of murder but the special circumstance of premeditation has not been proven beyond a reasonable doubt, you must find the defendant guilty of second degree murder.

A-46, Instruction 16.

distinguish first-degree murder from second-degree murder as "the intent to take life." *See id*. at 298 ("Malice, the intent to act feloniously, was properly distinguished from willfulness, the intent to take life"), *quoted with approval in*, *Porter*, 128 P.3d at 911.

In contrast, the instruction defining willfulness to Mr. Abdullah's jury did not include this level of specific intent "to take a life." *Compare* A-9 at 70. Instead, the given instruction on willful conduct required only that the act be "done on purpose," while explicitly providing that a willful act could be done "*without intending to* violate the law, to *injure another*, or to acquire any advantage." *Id*. (emphasis added). The reduction in the State's burden of proof from a "clear intent to take a life" to an act "done on purpose …without intending to violate the law" or "injure another" could not be more stark.

The same error, giving a general intent instruction when one for specific intent is required, exists for the other charged offenses. *See, e.g., State v. Young*, 64 P.3d 296, 298–99 (Idaho 2002) (felony injury to a child requires a specific intent to injure the child). In *Young*, the use of the standard general intent instruction improperly lowered the burden of proof. *See id*. (finding the same language as was given to Mr. Abdullah's jury, that willfully means doing an act without any intent to violate the law or injure another, A-9 at 70, is a misstatement of the law that was not harmless error and required reversal).

It is highly significant that the only definition of willful that was given to Mr. Abdullah's jury was the less restrictive, general intent definition, which does not require specific intent to commit the crime or injure another. In light of that instruction, the jury could not have understood "willful" to encompass specific intent, as the given instruction expressly contravened that possibility.

PETITIONER'S OPENING MERITS BRIEF - 18

*State v. Draper*, 261 P.3d 853 (Idaho 2011), illustrates the problem with giving the lower, general intent, or legal, definition of "willful."  *See* I.C. § 18-101(1) (the legal definition of "willful" in Idaho, which was given to Mr. Abdullah's jury, *see* A-9 at 70).  *Draper* approved of not defining "willful" in connection with a first-degree murder instruction that the murder had to be "willful, deliberate, and premeditated," but it approved because no definition of "willful" was given to the jury at all.  *Id*. at 866.  Although *Draper* stated that "willful" did not need to be defined in that case, because the generally accepted meaning of "willful" was "an intention to commit the particular act," the court noted that using a legal definition of willful would not be appropriate.  *Id*.  The *Draper* court rejected an argument that the jury understood willful to comprise a lesser level of intent, mere intent to stab, *id*. at 866 n.2, and remonstrated Draper for attempting to "insert legal definitions where the common definition is the appropriate one."  *Id*.

But that is exactly what the judge did in Mr. Abdullah's case:  inserted the inapposite legal definition.  *See* I.C. §18-101(1) (legal definition).  *Cf*. A-9 at 70 (virtually verbatim language of §18-101(1) given by judge in response to jury's question about meaning of willful).  The trial court instructed the jury with the legal definition of willful from the arson context, one which lacked the specific intent to take a life, and told the jury the opposite of what the murder counts called for:  that "[o]ne can act wilfully without intending [either] to violate the law [or] to injure another."  A-9 at 70.  Having instructed the jury that "willful" had a particular and specific definition, which did not include any intent to "violate the law" or "to injure another," the jury necessarily understood that meaning applied to all the crimes that included a "willful" element.  Accordingly, the jury's verdict did not have to include a finding that Mr. Abdullah even intended to injure anyone, much less kill them.

PETITIONER'S OPENING MERITS BRIEF - 19

The given instruction's definition of willful conduct seriously and prejudicially reduced the State's burden of proof, allowed the prosecution to obtain a conviction for first-degree murder without having to prove every element of the offense, specifically the intent to take a life, and therefore violated the Due Process Clause, *Sandstrom*, and *Winship*.  The jury could have convicted Mr. Abdullah of murder under the implied malice standard and then found the killing was done "willfully," based on an erroneous instruction that allowed conviction without ever finding a specific intent to kill or "take a life."

The error in this instruction was not harmless.  Mr. Abdullah contends that lowering the burden of proof on an element of the offense is structural error and cannot be harmless.  *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993) ("the essential connection to a 'beyond a reasonable doubt' factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings") (emphasis in original).

Mr. Abdullah recognizes that the Supreme Court has found harmless error where an instruction omitted an element of the offense.  *See Neder v. United States*, 527 U.S. 1, 15 (1999).  That case, however, involved the complete omission of an element because the issue was not contested and was supported by overwhelming evidence.  *Id.* (where the omitted element was materiality, petitioner had underreported $5 million on his tax returns and did not contest the element at trial).  In this case, the element of willful conduct was instructed upon incorrectly for all of the charged offenses but arson, in a way that erroneously lowered the burden of proof and vitiated the jury's findings, and the willful element *was* contested.  *See* A-17 at 126–70 (defense closing argument).  As set forth below, this was an exceedingly thin case, rife with reasonable doubt, so *Neder* is distinguishable and structural error should apply.

Even if harmless error applies, the error in lowering the burden of proof by eliminating the requirement that the jury find specific intent caused "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). The failure to instruct on the specific intent required by the first-degree murder, attempted first-degree murder and injury to a child charges was not harmless. All of these charges were seriously contested at trial with admitted evidence. The amended indictment charged Mr. Abdullah with murdering his wife "by suffocating her and/or by acute Prozac (fluoxetine) poisoning from which she died." A-46, Instruction 2. Substantial admitted evidence did not support the charged alternative and combined theories, and the defense contested any notion that Mr. Abdullah murdered his wife or intended to murder her. *See infra* at 21–24. Likewise, it was undisputed that the fire ignited accidentally, *Abdullah*, 348 P.3d at 42–43 & n.19, and from that fact alone, a jury could find that the arson was premature and that Mr. Abdullah never intended to harm the children in the home. *See infra* at 25–28.

The findings of the coroner, Dr. Glen Groben, were wildly inconsistent and contained evidence supporting the defense theory that Ms. Abdullah committed suicide. Initially, Dr. Groben found the cause of death to be "asphyxiation due to a plastic bag over the head. *Abdullah*, 348 P.3d at 25. He ruled out suicide because, while there was a plastic bag over Ms. Abdullah's head, she had no drugs in her body that might suggest suicide. *Id*. He also noted she had no signs of strangulation, blunt force trauma or defensive wounds. *Id*. Subsequently, Dr. Groben discovered a fatal dose of Ms. Abdullah's antidepressant medication in her body, Prozac, generically known as fluoxetine, and found no indication of injection into her body. *Id*. However, Dr. Groben did not rule the death a suicide, even though he had previously stated that suicide was indicated by a bag over the head and "drugs on board." *Id*. Dr. Groben merely

amended his cause of death to "acute fluoxetine poisoning associated with asphyxiation due to a bag over the head." *Id*.

The defense denied the murder and contested any attempt to show that Mr. Abdullah murdered or intended to murder his wife. The defense argued against the poisoning theory on the ground that Mr. Abdullah could not have been present at the time that Ms. Abdullah ingested the fluoxetine, a point that was consistent with the State's own timeline. *Abdullah*, 348 P.3d at 41 (Mr. Abdullah argued that Ms. Abdullah ingested fluoxetine before her last meal and no later than midnight, while Mr. Abdullah could not have arrived in Boise "until 1:00 a.m. or later"). Mr. Abdullah also argued against the theory that he poisoned his wife, because Prozac was a strange choice for poison and was not something that could be slipped unnoticed into a drink due to its strong, harsh taste. *See* A-17 at 151 (arguing "Prozac is not a poison of choice"); *id*. (arguing that Dr. Mozayani testified that Prozac had a very bitter taste that could not be masked); *id*. at 153 ("no fact in evidence connecting Azad to the Prozac"). The Idaho Supreme Court implicitly acknowledged the strength of this defense, in not sustaining the verdict on the ground that poisoning had been shown. *Abdullah*, 348 P.3d at 41–42. Instead, the court sustained the conviction against a sufficiency of the evidence challenge on the ground that a "rational trier of fact could have found Abdullah killed Angie by suffocating her with a plastic bag." *Id*. at 42. Of course, that finding was made under the prosecution-slanted standard of review for such challenges, viewing the evidence in the light most favorable to the prosecution under *Jackson v. Virginia*, 443 U.S. 307 (1979). *Abdullah*, 348 P.3d at 40, 42.

Significantly, Dr. Groben had himself acknowledged that suicide was indicated by the combination of a plastic bag over the head and the presence of drugs in the body. *Id*. at 25. The defense put on evidence that Ms. Abdullah "had suicidal thoughts and displayed suicide risk

factors." *Id*. at 27.  The defense argued that Dr. Groben's findings didn't point to strangulation, as he found "no scratches on her, no scrapes, no bruises, no cuts, no wounds, no abrasions, no injuries to the neck, no pressure points on the back where somebody might sit on somebody's back and then perhaps pull a bag over." A-17 at 153.  The defense argued that there was no petechial hemorrhaging, a hallmark of strangulation, and no signs of a defensive struggle, "[n]o nothing except that plastic bag." *Id*.  The defense noted that there was no DNA nor fingerprints on the plastic bag, *id*., and "there's nothing that has anybody putting that on her head." *Id*. at 155.

The defense argued the undisputed point that Angela Abdullah was dead before the fire started in the garage in an accidental ignition.  A-17 at 127; *Abdullah*, 348 P.3d at 25.  But the defense further argued that she was connected to the arson, emphasizing that she was found without a shirt on, and her t-shirt had gas on it.  A-17 at 157–58, 165–66.  The defense argued that "there was one adult in that house with some physical items linking her to activity, linking her to gas.  And that adult is not Azad Abdullah." *Id*. at 166. The defense noted that there was "no report of soot being in the van, no smell of fire or smoke in the van." *Id*. at 167.  The defense argued that Mr. Abdullah was not seen or heard in or outside of the house, that neither he nor his van were seen in the neighborhood, and that no facts "show that he poured any gas in that house." *Id*.

This evidence, marshalled by the defense to contest the murder and any willful conduct in furtherance of it, proves that the willful instruction was not harmless.  The case was closely contested and not overwhelming.  The instruction on general intent, an act merely done on purpose which did not require intent to kill, lowered the burden of proof and did not require the jury to find all facts necessary to convict Mr. Abdullah.  Even if the jury rejected Mr. Abdullah's

denial of participating in a planned arson, the jury could have concluded that he spread the gas as part of an insurance fraud, and that under the lessened general intent instruction the willful requirement for murder was not met.  The defense acknowledged at closing argument that the "focus of any gas activity appears to be those vending machines in the garage."  A-17 at 170.  While the defense argued that there was no evidence to establish that Mr. Abdullah entered the house or garage or actually poured the gas, it did advance the argument that Mr. Abdullah's lies to the police were to "save face for his role and to avoid the shame that the disclosure of his activities would bring to his family."  *Id*.  Given the incorrect general intent instruction that was given, the jury could reasonably have convicted him of first-degree murder under the contested asphyxiation theory, regardless of whether the jury concluded that he, or his wife, or both were a participant in the arson, finding that even if she purposely drank the fatal dose of Prozac, that he intentionally procured the plastic bag for her.  *See* A-17 at 94 (prosecution arguing that Mr. Abdullah had obtained the bag from India Emporium that was found on Ms. Abdullah); A-15 at 391–92 (testimony that Mr. Abdullah purchased an item that was placed in a bag from India Emporium).  The prosecution's poisoning theory in this case was quite speculative.  *See, e.g., Abdullah*, 348 P.3d at 26 (ingestion in a liquid "was a *possible* manner of administration" that "*may* have debilitated her," but likely was not a competent cause of her death) (emphasis added).  Even if Mr. Abdullah contrived to put the Prozac in a drink for his wife, which he denies, a jury could have concluded he was only trying to incapacitate her, not kill her, as part of an arson and insurance fraud scheme.  The willfulness instruction was not harmless.

Likewise, based upon the erroneous instruction, the jury could have found Mr. Abdullah guilty for the other charged crimes of attempted murder of the children inside the house at the time of the fire or injury to the child left outside the house in the yard.  As it was undisputed that

the fire started by an accidental ignition, the defense argued that there were no facts that

supported the charges of attempted murder or that Mr. Abdullah "ever intended to harm any

child." A-17 at 168.  Even if the jury concluded that Mr. Abdullah spread the gasoline despite

his denial, he still could have been planning to wake his wife before the fire started, and have her

remove the children to safety on the pretext that she smelled gas or heard something.  The

absence of an intent to kill requirement in the instruction for attempted first-degree murder,

based on the improper instructional definition of willful, improperly lowered the burden of proof

in violation of *Sandstorm*, just as it did for first-degree murder itself.

The indictment for attempted murder of the three sleeping children in the house charged

that Mr. Abdullah "did willfully, unlawfully, deliberately, with premeditation, and with malice

aforethought, attempt to kill and murder [three children] by setting fire to a residence…while

[the children were] asleep inside."  A-46, Instruction 2 (Counts III, IV, V).  The instructions

defining attempted murder for the three children required that the jury find beyond a reasonable

doubt that Mr. Abullah "did some act which was a step toward committing the crime of Murder

in the First Degree of [the children]," and that "when doing so the Defendant intended to commit

that particular crime."  A-46, Instructions 21, 23, 25.  The instruction also defined a "step

towards committing the crime" as "more than merely preparing to commit the crime," and

instead required that "the act must be something done beyond mere preparation which shows that

the defendant began carrying out the plan to commit the crime."  *Id*.  The instructions also

informed the jury that the crime of first-degree murder of the children would be committed if a

person did each of the following: "engaged in conduct which caused the death of [the children]";

"acted without justification or excuse"; "with malice aforethought" and "the murder was willful,

deliberate and premeditated."  A-46, Instructions 22, 24, 26.

The jury was never told that in order to find Mr. Abdullah guilty of attempted first-degree murder that it had to find beyond a doubt that he acted with a specific intent to kill the children. While the instructions advised that the murder must be willful, deliberate and premeditated, the jury was instructed that willful meant only that Mr. Abdullah intended to commit the act, i.e., arson, and specifically instructed the jury it need not find he acted with any intent to cause injury.  A-9 at 70.

For these reasons, the jury could have found Mr. Abdullah guilty of attempted first-degree murder under a theory of implied malice without an express intent to kill.  *See Aragon*, 690 P.2d at 298 (instructing on both express and implied malice is not error in a first-degree murder case if an additional instruction required the jury to find three other elements: premeditation, deliberation and "willfulness, the intent to take life").  The trial court's definition of willful did not require a finding or an intent to kill and explicitly informed jurors they could find Mr. Abdullah guilty of attempted first-degree murder of the children in the house in Counts III-V if they merely concluded that he acted willfully because he intended the act of arson, and even if he had no intent to injure anyone.  *See* A-9 at 70.  However, given that definition, the instructions improperly omitted the essential element of "intent to kill" and reduced the prosecution's burden of proof, by allowing an implied malice theory to constitute willful conduct and thus removing the "intent to take a life" element necessary for first-degree murder.  *See supra* at 18.  The instruction defining willful improperly lowered the State's burden of proof on the attempted first-degree murder instruction to attempted second-degree murder.

The error was not harmless.  Mr. Abdullah could have had a plan to awaken and remove the children before the fire was started or grew beyond the garage.  That plan would not have involved any intent to harm the children, but assuming *arguendo* that Mr. Abdullah intended to

start a fire, he could have been convicted under the given instructions without the necessary criminal intent.  The removal of the eighteen-month-old child from the house, who was found outside on a blanket, *Abdullah*, 348 P.3d at 23, supports the argument that the accidental ignition of the gasoline interrupted a plan to remove the children from the house.  The improper willfulness instruction had a substantial and injurious effect on the verdict, per *Brecht*, and was not harmless.

The same result obtains for the felony injury to a child instruction, which necessarily applied the wrong definition of willfully, A-9 at 70, to the elements of that offense.  The indictment for that charge alleged that "by unlawfully and willfully causing or permitting the child to be placed in a situation endangering his health or person," Mr. Abdullah injured his child by "setting fire to his residence," and "fleeing to avoid capture, while leaving the child in the backyard of the burning residence unsupervised."  A-46, Instruction 2 (Count VI).  The pertinent instruction for injury to a child likewise required that the jury find beyond a reasonable doubt that Mr. Abdullah had the care and custody of his child, that he "willfully caused or permitted the child to be placed in a situation that may have endangered the child's person or health," and that he "knew that the situation into which the child was placed would endanger the person or health of the child."  A-46, Instruction 27 (Injury to a child).  Instruction 28 required that if the jury found Mr. Abdullah guilty of injury to a child that it must then decide whether to find beyond a reasonable doubt whether that "offense occurred under circumstances or conditions likely to produce great bodily harm or death to the child."  A-46, Instruction 28.

The crime of injury to a child requires a specific intent to injure the child.  *Young*, 64 P.3d at 298–99.  In *Young*, instructing the jury with the legal definition of willful, I.C. § 18-101(1), improperly lowered the burden of proof.  *Id*. at 299 (finding the same language as was

given to Mr. Abdullah's jury, that willfully means doing an act without any intent to violate the law or injure another, is a misstatement of the law that is not harmless error). *See also State v. Sohm*, 95 P.3d 76, 78–79 (Idaho Ct. App. 2004) (finding similar willful instruction, that did not require specific intent to harm, was prejudicial for "diminish[ing] the state's burden of proof on the mental element of the offense," and citing *Young* in finding the error harmless). The improper definition of willful improperly lowered the burden of proof on the crime of felony injury to a child, in violation of *Sandstrom* and the Due Process Clause. And like the other charges in this claim, it was not harmless.

The Idaho Supreme Court reviewed this claim for fundamental error. *Abdullah*, 348 P.3d at 45. The court had previously determined that improperly reducing the State's burden to prove every element of the charged offenses beyond a reasonable doubt necessarily constituted fundamental error. *Draper*, 261 P.3d at 865. In Draper, the court stated that if "jury instructions relieved the State of its duty to prove all elements of the charges beyond a reasonable doubt," then a defendant who "did not object" to the challenged instructions at trial or "submit a definition of willfulness in his proposed jury instructions," has "been denied his right to due process and those errors would rise to the level of fundamental error." *Id.* Consequently, if Mr. Abdullah's claimed error is meritorious, which he establishes here, then it constitutes fundamental error.

For all of these reasons the trial court's incorrect definition of willful improperly and erroneously lowered the State's burden of proof, which required the jury to find every fact necessary to establish the crimes of first-degree murder, three counts of attempted first-degree murder and felony injury to a child. The improper definition allowed the jury to convict without finding the facts necessary to establish the elements of specific intent to kill or to harm the

PETITIONER'S OPENING MERITS BRIEF - 28

victims for each of those charged offenses.  That error requires the grant of the writ and reversal of the guilty verdict for those five convictions.

> **B.** **Claim 30: The Idaho Supreme Court Violated Mr. Abdullah's Rights By Retroactively Altering The Elements of Arson**

The Idaho Supreme Court suddenly changed the definition of arson in Mr. Abdullah's case, adding a theory of liability that had no foundation in the statute or the caselaw.  In so doing, the court violated Mr. Abdullah's due process rights.

The Due Process Clause forbids state high courts from unexpectedly expanding criminal law and then applying the expanded law retroactively.  *See Bouie v. City of Columbia*, 378 U.S. 347, 353–54 (1964).  A *Bouie* inquiry turns on whether a defendant had "fair warning of the conduct which [the state] prohibits," *id.* at 350, and "the crucial test" is "whether the construction actually given the statute was foreseeable," *McSherry v. Block*, 880 F.2d 1049, 1053 (9th Cir. 1989).  Due to the necessity of fair warning, "[i]f a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, it must not be given retroactive effect."  *Bouie*, 378 U.S. at 354.  It is an objective test, "made on the basis of the statute itself and the other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants."  *Id.* at 355 n.5.  At bottom, the rule flows from "[t]he fundamental principle that the required criminal law must have existed when the conduct in issue occurred."  *Id.* at 354.

The Idaho Supreme Court ran afoul of that principle when it held for the first time in Mr. Abdullah's appeal that a defendant could be convicted of arson under a causation theory.

Mr. Abdullah was charged with one count of first-degree arson in violation of Idaho Code § 18-802.[6]  *See* A-4, at 700.  Tracking the statute, the arson count alleged that he "did willfully and unlawfully by fire or explosion[] damage a dwelling."  A-4, at 701.  At trial, the State's main expert on the cause of the fire was an agent with the Bureau of Alcohol, Tobacco and Firearms named Lance Hart.  *See* A-15, at 157–246.  Agent Hart testified that he believed the perpetrator was pouring gasoline in order to start a fire when the fumes caused an accidental ignition after coming into contact with the pilot light on the water heater.  *See* A-15, at 234.  At the close of trial, the jury was instructed that first-degree arson required proof that the defendant willfully, by fire or explosion, damaged a dwelling.  *See* A-46, Instruction 20.  Applying that instruction, the jury convicted Mr. Abdullah of first-degree arson.  *See* A-8, at 1492.  For the arson conviction, the district court sentenced Mr. Abdullah to twenty-five years in prison, to run consecutively with the punishment imposed for murder.  *See* A-8, at 1555.

On appeal, Mr. Abdullah argued that the evidence on this count was insufficient to sustain a conviction because the inadvertent nature of the explosion showed that the perpetrator was at most guilty of attempted arson.  *See* C-10, at 22–25.  The Idaho Supreme Court disagreed, holding that Mr. Abdullah was guilty of first-degree arson because the "statute requires only that a person willfully *cause* damage by fire or explosion."  *Abdullah*, 348 P.3d at 42.  That requirement was satisfied, in the court's view, on the reasoning that his "conduct caused the intended result—the damage of a dwelling by fire."  *Id.*  Elaborating, the court stated that "the fire would not have occurred but for his conduct and the fire was the foreseeable, probable, and intended result of his conduct."  *Id.*

---

[6] The version of Idaho Code § 18-802 in effect during Mr. Abdullah's trial proceedings is still in force.

Mr. Abdullah filed a petition for rehearing, in support of which he maintained that the Idaho Supreme Court had grafted a new causation element onto first-degree arson that had not been there before, thereby contravening the Due Process Clause as interpreted by *Bouie* and its progeny. *See* C-15, at 24–29. He further submitted that by creating a new element where the jury had not been instructed on it the state high court had unconstitutionally relieved the prosecution of proving Mr. Abdullah guilty beyond a reasonable doubt. *See* C-15, at 21–24. The Idaho Supreme Court denied the petition for rehearing in a one-sentence summary order. *See* C-16.

"Where a state court's decision is unaccompanied by an explanation," the question under AEDPA is whether there was "no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98. Here, there is no reasonable basis for the Idaho Supreme Court to have rejected Mr. Abdullah's *Bouie* claim.[7]

"The beginning point for a *Bouie* analysis is the statutory language at issue." *Clark v. Brown*, 450 F.3d 898, 912 (9th Cir. 2006). Idaho's contemporary arson statute does not make it a crime for a defendant to *cause* a fire, or to do something that resulted in a fire. It only makes it illegal to damage a dwelling by fire. *See* Idaho Code § 18-802. This is "narrow and precise statutory language," and it was impermissible for the Idaho Supreme Court to retroactively bend it to encompass causation. *Bouie*, 378 U.S. at 352. Simply put, Mr. Abdullah "did not have fair warning that a court, when faced with an unambiguous statute, would reject the literal interpretation." *Magwood v. Warden, Ala. Dep't of Corr.*, 664 F.3d 1340, 1349 (11th Cir. 2011).

---

[7] Because Mr. Abdullah cannot know what bases the State might assert to justify the Idaho Supreme Court's unexplained order, he reserves the right to respond to any such defenses in his reply brief.

The Idaho Supreme Court actually appeared to indirectly acknowledge the novelty of its position.  It wrote: "Based on our interpretation of Idaho's arson statute, we recognize that in *subsequent* arson prosecutions an instruction on causation may be necessary depending on the facts of the case."  *Abdullah*, 348 P.3d at 43.  The fact that such instructions were not being given earlier strongly suggests that the *Abdullah* court's call for them was not rooted in the statute or prior precedent.  Consequently, such a construction could not constitutionally be used against Mr. Abdullah, who had no way of divining that the court would create a new rule in his case.

The legislative history of the arson statute confirms that the Idaho Supreme Court abruptly expanded the offense in the Abdullah appeal.  *See Bouie*, 378 U.S. at 361 (relying upon legislative history in construing state law).  Notably, the arson statutes *used* to include causation, and the element was then deliberately taken out.  Between 1939 and 1993, Idaho arson had four statutory degrees.  *See* Exs. 1, 2.[8]  The first three were distinguished primarily by the type of property damaged by the fire.  *See* Exs. 1, 2.  In all three of them, the provisions targeted individuals who "cause[d] to be burned" those types of property.  *See* Exs. 1, 2.  The fourth degree then criminalized attempted arson, which was present when someone placed combustible materials "with intent to eventually willfully and maliciously set fire to" the property.  *See* Exs. 1, 2.

In 1993, Idaho substantially modified this statutory scheme and placed the crime of first-degree arson in a simplified provision that removed the causation language.  *See* Ex. 3.[9]  The

---

[8] Exhibits 1 and 2 contain the two codifications of the arson statute that were in effect between 1939 and 1993.

[9] Exhibit 3 contains the 1993 amendment to the arson statutes, including the legislative statement of purpose.

new statute announced that first-degree arson occurs when a person damages property by fire or explosion, period.  *See* Idaho Code § 18-802.  In its statement of purpose for the revision, the legislature noted that the bill "deletes certain acts, such as attempting or aiding and abetting an arson, which are covered in other areas of the Idaho Criminal Code."  Ex. 3, at 3.  Importantly, attempts to commit any crime were addressed in a separate statute, as they still are today.  *See* Idaho Code § 18-305.

In short, the legislature specifically removed the causation language from the statute, and did so as part of an effort to make clear that attempted arson was covered elsewhere in the code. Under those circumstances, a defendant in Mr. Abdullah's shoes would have had no notice that it remained first-degree arson to take an action that later caused a fire.  That is especially true when the act Mr. Abdullah was accused of committing was spreading gasoline through a garage with the plan of setting it on fire, which is practically a textbook example of either *attempted* arson or *causing* a fire under the old regime.  *See* Exs. 1, 2.  How could an Idaho resident have been aware that when lawmakers were striking those very words they were somehow silently incorporating them into first-degree arson, despite the legislature's proclamation that it was doing the exact opposite?  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

Precedent certainly would not have provided that guidance.  Between 1993 and the state supreme court's issuance of the *Abdullah* opinion, Idaho appellate courts released twelve

decisions citing Idaho Code § 18-802.[10]  Not a single one of them suggested that a defendant can be convicted of first-degree arson for causing a fire.  Indeed, when the cases quote jury instructions given on first-degree arson, the language is likewise devoid of any reference to causation.  *See Shackelford*, 247 P.3d at 605; *Payne*, 3 P.3d at 1253.  Thus, caselaw would have further convinced a reasonable defendant that no such type of liability existed.  *See Bouie*, 378 U.S. at 356–59 (considering the history of state supreme court cases in the area of law); *cf. Clark*, 450 F.3d at 912 (making a similar point in the course of granting habeas relief on a *Bouie* claim).

A *Bouie* inquiry properly takes into account other statutes in addition to the one expanded by the state appellate court.  *See Douglas v. Buder*, 412 U.S. 430, 432 (1973) (per curiam).  In the present case, those statutes strengthen Mr. Abdullah's claim.  When the Idaho legislature wishes to make causation a part of criminal offenses, it has no difficulty in clearly doing so.  *See, e.g.*, Idaho Code § 18-903(c) (including the causing of bodily harm in the definition of battery); Idaho Code § 18-2305 (including the causing of a person to change her vote in the definition of election fraud); Idaho Code § 18-4001 (including the causing of suffering in the definition of torture).  Had the legislature wanted to give prosecutors a causation route to first-degree arson convictions, it would have said as much in the statute, much as it did in these other provisions. *Cf. Epic Sys. v. Lewis*, 138 S. Ct. 1612, 1626 (2018) ("[W]hen Congress wants to mandate particular dispute resolution procedures it knows exactly how to do so," as it has done so "often

---

[10] *See State v. McNeil*, 313 P.3d 48 (Idaho Ct. App. 2013); *State v. Shackelford*, 314 P.3d 136 (Idaho 2013); *State v. Norton*, 254 P.3d 77 (Idaho Ct. App. 2011); *State v. Keyes*, 248 P.3d 1278 (Idaho Ct. App. 2011); *State v. Shackelford*, 247 P.3d 582 (Idaho 2010); *Thomas v. State*, 185 P.3d 921 (Idaho Ct. App. 2008); *State v. Sanchez*, 127 P.3d 212 (Idaho Ct. App. 2005); *State v. Thomas*, 97 P.3d 1021 (Idaho Ct. App. 2004); *Brown v. State*, 50 P.3d 1024 (Idaho Ct. App. 2002); *State v. Payne*, 3 P.3d 1251 (Idaho 2000); *State v. Leferink*, 992 P.2d 775 (Idaho 1999); *State v. Smith*, 942 P.2d 574 (Idaho Ct. App. 1997) (per curiam)

and clearly" "in statute after statute."). Instead, the legislature went so far as to excise the causation language. No one could sensibly have predicted that the Idaho Supreme Court would later ignore that deliberate choice and put the words back in on its own initiative.

Along the same lines, it is telling that other states do in fact have first-degree arson statutes with causation prongs, just as Idaho used to. *See* Cal. Penal Code § 451 (containing "causes to be burned" in an arson statute); Colo. Rev. Stat. § 18-4-102(1) (same); Miss. Code Ann. § 97-17-1(1) (same); Nev. Rev. Stat. Ann. § 205.010 (same); Vt. Stat. Ann. tit. 13 § 502 (same); W. Va. Code § 61-3-1(a) (same); *Appeal in Pima Cnty. Juvenile Action*, 570 P.2d 206, 208–09 (Ariz. Ct. App. 1977) (referring to a similar statute). These clauses play a distinct role. Namely, when they are present, it means the statute requires not a specific intent but only a general intent "to do the act that causes the harm." *People v. Atkins*, 18 P.3d 660, 667 (Cal. 2001).

When a defendant is charged with arson in a jurisdiction with a statute of that sort, on the basis of evidence that he spread gas which was ignited by a pilot light, the jury must be instructed on "the law concerning supervening causes." *People v. Bowman*, 669 P.2d 1369, 1373, 1379 (Colo. 1983) (en banc). Per such instructions, the defendant can be convicted if "the fire was the natural and probable consequence of spreading the gasoline." *Id.* at 1379. But Mr. Abdullah was not indicted under such a statute. The Idaho legislature deliberately took another path from these jurisdictions, and it was not constitutionally permissible for the state supreme court to reverse course in order to preserve a conviction. *See Rogers v. Tennessee*, 532 U.S. 451, 462–67 (2001) (looking to law from outside the state in question while dealing with a *Bouie* claim).

Finally, standard jury instructions serve as "one of the strongest indications of foreseeability" in a *Bouie* analysis. *Clark*, 450 F.3d at 915. Idaho's form jury instruction on arson does not recite any language about causation, nor did it do so at the time of trial. *See* Ex. 4 (current jury instruction); *see also* A-46, Instruction 20 (instruction given at trial); A-17, at 57 (indicating that the pattern instruction on arson was delivered at trial). Rather, the model instructions simply state the elements in the statute, which do not include any such requirement. "Given the existence and wide publication of this standard instruction, it was foreseeable that it would be applied." *Clark*, 450 F.3d at 915. The reasonable defendant would have had no inkling that the Idaho Supreme Court would call for an addition to the instruction in the Abdullah appeal, and this criterion, like the others, reflects a swerve in the law.

Because the Idaho Supreme Court unaccountably broadened the definition of first-degree arson in Mr. Abdullah's case, its opinion on direct appeal transgressed the Due Process Clause. Furthermore, when the court denied the meritorious due process claim that Mr. Abdullah then asserted in his petition for rehearing, it contravened *Bouie*. It thereby acted in a way that was contrary to, or involved an unreasonable application of, clearly established federal law set forth by the Supreme Court. *See* 28 U.S.C. § 2254(d).

No harmless-error inquiry for this violation is called for. When a defendant is convicted of a crime under a statute that did not forbid his conduct, the Due Process Clause is violated without any further showing of prejudice. *See Fiore v. White*, 531 U.S. 225, 228–29 (2001). That is what took place here.

If the harmless-error test must be utilized, Mr. Abdullah can pass it. As demonstrated above, the *Bouie* violation consisted of the Idaho Supreme Court inventing a causation angle in first-degree arson where it had never been before under the modern statute. It follows that Mr.

Abdullah could not, under the law as it stood at the time of his conduct and trial, have been properly convicted of first-degree arson.  At most, Mr. Abdullah could have been convicted of attempted arson, a separate offense with lesser penalties[11] that was not charged.  *See supra* at 33.  Accordingly, the error "had a substantial and injurious effect or influence in determining the jury's" guilty verdict on arson, *Clark*, 450 F.3d at 916, and the writ of habeas corpus should issue vacating that conviction.

For similar reasons, the arson conviction also violates Mr. Abdullah's due process right to have all of the elements of his crime proven beyond a reasonable doubt.  *See Carella v. California*, 491 U.S. 263, 265 (1989) (per curiam); *Sandstrom*, 442 U.S. at 520; *In re Winship*, 397 U.S. at 361.  As set forth earlier, the Idaho Supreme Court affirmed Mr. Abdullah's arson conviction on a causation theory.  *See supra* at 30.  However, as also set forth earlier, the jury was never instructed on such a theory and was therefore never asked to find Mr. Abdullah guilty on it beyond a reasonable doubt.  *See supra* at 30.  Furthermore, the defense contested Mr. Abdullah's guilt on the arson.  *See* A-17 at 126–70.  Therefore, the error is structural, and deemed automatically prejudicial.  *See Sullivan*, 508 U.S. at 281–82; *see also supra* at 20.  The arson conviction is unconstitutional under that reasoning as well.

In addition, several other convictions fall with the arson count.  Aside from the first-degree murder charge, each of those counts was premised on the arson.  That includes the three counts of attempted murder regarding the children inside the house, as well as the single count of injury to a child.  All four of those counts relied upon Mr. Abdullah committing the arson.  *See* A-4, at 701–02.  Therefore, all four of the corresponding convictions must be set aside along with that for arson.

---

[11] *See* Idaho Code § 18-306 (setting forth the punishments for attempted offenses).

PETITIONER'S OPENING MERITS BRIEF - 37

### C.      Claim 38: The Trial Court Impaneled Biased Jurors

The trial court's failure to remove two biased jurors, Jurors 59 and 83, for cause violated Mr. Abdullah's right to an impartial jury under the Sixth and Fourteenth Amendments.[12]

The Idaho Supreme Court addressed the merits of Mr. Abdullah's claim that Jurors 59 and 83 were improperly impaneled.  *See Abdullah*, 348 P.3d at 35–40.  Therefore, the portions of Claim 38 covering these two jurors, *see* Dkt. 1 at ¶¶ 403–06, 408–10, are subject to AEDPA deference.  *See* 28 U.S.C. § 2254(d).  However, the state court's decision affirming the removal of Jurors 59 and 83 for cause was based on an unreasonable application of clearly established federal law under the Sixth and Fourteenth Amendments pursuant to § 2254(d)(1).  *See generally Morgan v. Illinois*, 504 U.S. 719 (1992).  Moreover, the state court's finding that Jurors 59 and 83 were impartial or correctly instructed to set aside their bias misconstrued the state court record and therefore represented an unreasonable determination of the facts under § 2254(d)(2).

The Sixth and Fourteenth Amendments require a defendant be tried before a fair and impartial jury.  *See Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).  In a capital trial, a fair and impartial jury must consist of jurors who will not automatically vote for the death penalty and will, instead, fairly and genuinely consider mitigating evidence after a guilty verdict.  *See Morgan*, 504 U.S. at 729.  A juror must be excused for cause when the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).  Further, a juror's biased views need not "be proved with unmistakable clarity" because "many veniremen simply may not know how they will react when faced with imposing the death sentence, or may be

---

[12] The instant briefing is limited to Juror 59 and Juror 83 as exhausted before the Idaho Supreme Court.  Mr. Abdullah does not waive future arguments that the other jurors covered in Claim 38 of his petition were improperly impaneled.  *See* Dkt. 1 at ¶¶ 403–10.

unable to articulate, or may wish to hide their true feelings." *Id.* at 424–25. More generally, a jury member must also hold no biases or prejudices that would automatically work against a defendant. *See, e.g.*, *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."); *Glasser v. United States*, 315 U.S. 60, 86 (1942) (cautioning against seating jurors who "from training or otherwise, acquire a bias in favor of the prosecution").

Contrary to the findings of the trial court and the Idaho Supreme Court, Juror 59 was substantially impaired both because of his bias towards law enforcement officers and his death penalty views. That Juror 59's bias would affect deliberations was unavoidable.

Juror 59 stated that he would automatically believe a law enforcement witness over other witnesses. *See* A-11 at 864–65. His background and current employment situation further supported this statement.

A high school class with the local sheriff's department ignited Juror 59's interest in becoming a police officer and gave him the idea to seek a criminal justice degree in college. *See* A-11 at 857. In 1996, Juror 59 obtained this degree from the University of Idaho, where he had interned with the Moscow Police Department as part of his studies. *See* A-263 at 6; A-11 at 850–51, 855. Immediately out of college, Juror 59 began looking for work in law enforcement, but could not find anything. *See* A-11 at 857. Instead, he worked as a hotel security guard, *see* A-11 at 855, and then as a trainer at Micron, *see* A-11 at 846. Juror 59 still wanted to become either a patrol officer or a detective with the police. *See* A-11 at 857. At the time of trial, Juror 59 was in the process of testing and interviewing for employment with the Boise Police Department, the Idaho State Police, and the Meridian Police Department. *See* A-11 at 852; A-263 at 45. At the time of his jury service, Juror 59 admitted that he was still continuing his quest

for work in law enforcement so he would not later regret failing to pursue his dream.  *See* A-11 at 865.

Given the fact that Juror 59 had such a professional interest in obtaining employment with the same police department involved in Mr. Abdullah's case, it was inappropriate for him to sit on the jury and the trial court should have removed him for cause.  *Cf. Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring) (observing that implied bias exists when a juror is an employee of a prosecuting agency); *Brooks v. Dretke*, 418 F.3d 430, 435 (5th Cir. 2005) (granting habeas relief on a juror bias claim where the individual was subject to prosecution by the same district attorney's office involved in the case, giving him a reason to favor the prosecution).  The error was further compounded by the fact that Juror 59 admitted he would be more inclined to believe law enforcement officers over other witnesses.  *See* A-11 at 864–65.

Juror 59's death penalty views, as reported in his juror questionnaire and during voir dire, also required that trial court dismiss him for cause.  He rated himself a nine out of ten in support of the death penalty, ten being the strongest; he agreed executions are necessary to protect the public; he agreed society would be stronger if the death penalty was imposed more often; he disagreed that only the worst murderers should be executed; he strongly disagreed that it would be hard to vote to kill someone; and he disagreed that it is better for society to let someone guilty go free than to risk convicting an innocent person.  *See* A-263 at 13–16, 18.

Before voir dire, defense counsel attempted to obtain a stipulation from the prosecution that Juror 59 should be removed for cause.  In an email to the prosecution, defense counsel cited the fact that Juror 59 was applying for employment with the Boise Police Department as the basis for the stipulation.  *See* B-12 at 3372.  It appears that the prosecution did not agree to defense counsel's request.

While Juror 59 did tell the trial court on voir dire that he could set his law-enforcement bias aside, he did so ambiguously and with the caveat that he would have to be instructed: "I think, yeah, if I was instructed." A-11 at 864–65. But the court never issued any such instruction.

Moreover, in Juror 59's view, the best argument for the death penalty would be "multiple homicide or children." A-263 at 18. The criminal charges against Mr. Abdullah included attempting to kill three children and intentionally endangering a fourth. *See Abdullah*, 348 P.3d at 20.

As a result of his questionnaire and voir dire responses, Juror 59 should have been removed for cause. The prosecution's case against Mr. Abdullah would rely on the testimony of at least thirty law enforcement officers, including firefighters. *See generally* A-13–A-16. Thirteen of these officers were from the same police department—i.e., the Boise Police Department—that was evaluating whether to employ Juror 59, and they included key witnesses, such as lead detective Tod Littlefield. *See id.* Both Juror 59's professional interest and his automatic privileging of police officer testimony over other witnesses should have resulted in his removal.

Juror 83, who became the foreperson of the jury, *see* A-8 at 1491–99, was unconstitutionally biased as well. This juror would automatically impose the death penalty on Mr. Abdullah, and, like Juror 59, professionally as a state employee he would have been more likely to favor the prosecution. The trial court erred in failing to dismiss Juror 83 for cause due to this juror's admitted bias. Contrary to the findings of the trial court and the Idaho Supreme Court, Juror 83 was substantially impaired by his strong preference for a death sentence and his

apparent belief that a death sentence was warranted simply because the prosecution was seeking it.

Juror 83's questionnaire responses signaled that he would automatically impose the death penalty on Mr. Abdullah.  He rated himself a nine out of ten in support of the death penalty.  *See* A-287 at 18.  He strongly agreed that he supported the death penalty; disagreed that only the worst murderers should be executed; believed society would be stronger if the death penalty were imposed more often; believed that executions are needed to protect the public; believed that those who kill once will kill again; and considered the childhood of a person convicted of murder irrelevant to the sentence.  *See id.* at 13–18.  Juror 83 further noted in his questionnaire that the best argument for the death penalty is "life for a life," and the intent of the killer would be most important to him in deciding whether to impose death or a life sentence.  *Id.* at 18.  Intent to commit murder was a deciding factor for this juror: "I believe [death] is appropriate in certain heinous crimes.  Intent to do the act would certainly be required."  *Id.* at 16.  But if there was no intent to commit murder, the death penalty would almost certainly have been off the table altogether.  *See supra* at 17–18.  *See generally Enmund v. Florida*, 458 U.S. 782 (1982).  Effectively, then, Juror 83 was incapable of considering a sentence less than death at the penalty phase proceedings, as the Constitution required him to.

Juror 83's view that childhood was irrelevant to sentencing was especially disqualifying.  Jurors have a constitutional obligation to consider all mitigating evidence.  *See Eddings v. Oklahoma*, 455 U.S. 104, 114–15 (1982) (reiterating that a capital sentencer may not "refuse to consider . . . any relevant mitigating evidence" or "disregard the mitigating evidence [the defendant] proffer[s] on his behalf" and emphasizing that while the sentencer "may determine the weight to be given relevant mitigating evidence," "they may not give it no weight by

excluding such evidence from their consideration"). As a result, a juror who cannot do so is constitutionally prohibited from serving on a capital jury. *See, e.g.*, *State v. Mickelson*, 149 So.3d 178, 187–94 (La. 2014) (reversing a capital conviction because a juror acknowledged that he was incapable of considering intoxication mitigating). A disadvantaged childhood is classic mitigating evidence, as reflected by the numerous decisions finding ineffective assistance of counsel for failure to present such material. *See, e.g.*, *Hamilton v. Ayers*, 583 F.3d 1100, 1114, 1115 (9th Cir. 2009); *Lambright v. Schriro*, 490 F.3d 1103, 1107 (9th Cir. 2007) (per curiam); *Douglas v. Woodford*, 316 F.3d 1079, 1085–93 (9th Cir. 2003); *Ainsworth v. Woodford*, 268 F.3d 868, 873–78 (9th Cir. 2001). And even though he is not obligated to demonstrate as much because the error here is structural, this only reinforces the gravity of the error in Mr. Abdullah's case since his attorneys did in fact offer evidence at trial of significant adversity during his childhood: when Mr. Abdullah's town was destroyed by Saddam Hussein, he was then forced into a squalid refugee camp, and ended up exiled to a foreign country across the world. *See* A-17 at 269–377.

Before voir dire, as with Juror 59, defense counsel attempted to obtain a stipulation from the prosecution that Juror 83 should be removed for cause. To this end, defense counsel sent an email citing the fact that Juror 83 worked for a state laboratory. *See* B-12 at 3372. The prosecutor appears to have refused.

During voir dire, Juror 83, reaffirmed his bias in favor of the death penalty. When asked to explain why he believed the best argument for the death penalty was a "life for a life," Juror 83 responded, "Well, I feel strongly in justice issues that there needs to be notion of justice in all that we do and if someone takes someone's life, it is reasonable to expect that their life may be taken for that purpose." A-12 at 339. Juror 83 further explained his interpretation of the various

levels of criminal homicide and how they related to the death penalty: "And I realize there is a lot of mitigating circumstances and that's why under law we have various levels, first degree, second degree, and so forth in which it may not be warranted, but there are some situations that I do believe are heinous enough and with so much malice that it is warranted." *Id.* Here, Juror 83's statement shows he was under the misimpression that mitigating evidence applied during the guilt phase and would determine whether a homicide was manslaughter or second or first degree murder. Juror 83's view went uncorrected. Given his misunderstanding of the role of mitigating evidence, Juror 83 would have already opted for a death sentence at the conclusion of the guilt phase before hearing any mitigating evidence. That is inconsistent with U.S. Supreme Court precedent. *See, e.g.*, *Eddings*, 455 U.S. at 114–15.

Not only was Juror 83 mitigation impaired and an extreme supporter of the death penalty, but he appeared to have already decided Mr. Abdullah's sentence based on the prosecution's charges. When asked about his nine-out-of-ten support for the death penalty, Juror 83 revealed that because the prosecution was seeking the death penalty he believed this, in itself, already demonstrated the sentence was appropriate in Mr. Abdullah's case: "Well, I just—I believe it is warranted in heinous situations and that the State of Idaho now has agreed that there is a death penalty warranted, so I agree with that." A-12 at 338. From this response—especially when combined with the fact that Juror 83 was already familiar with and had discussed Mr. Abdullah's case after exposure to media reports, *see* A-12 at 340—it is clear that Juror 83 had already prejudged the case.

As one who would automatically impose the death sentence once a person was convicted of first-degree murder, rather than second-degree murder or manslaughter; as one who was

mitigation impaired; and as one who had already decided the appropriate sentence for Mr. Abdullah was death, Juror 83 should have been excused for cause.

The trial court's error in failing to remove biased Jurors 59 and 83 for cause violated Mr. Abdullah's right to a fair and impartial jury.  Even if "only one juror is unduly biased or prejudiced," a defendant's constitutional right to an impartial jury will have been violated. *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979).   Such error can never be harmless. *See Morgan*, 504 U.S. at 729.

In deciding the merits of whether impaneling these two jurors was unconstitutional, the Idaho Supreme Court concluded there was no violation because neither of these two jurors were biased, or if there was bias it was cured by a willingness to follow the trial court's instructions. The court decided that "both jurors . . . stated that they would base a decision to impose the death penalty on the facts and law in the case." *Abdullah* 348 P.3d at 39.  This was an unreasonable conclusion unsupported by the record.

With regard to Juror 59, he admitted his bias towards law enforcement officers and provided no unequivocal assurance that he could be impartial.  Any assurance was conditioned upon the trial court instructing him to set his bias aside.  *See* A-11 at 865 (Juror 59 stating that he could consider witnesses' testimony equally only if instructed).  Standing alone, that is enough to render Juror 59 unconstitutionally biased.  *See United States v. Kechedzian*, 902 F.3d 1023, 1028–30 (9th Cir. 2018) (vacating a conviction on direct appeal because a juror's promises to be impartial were too equivocal).

And, in any event, no instruction corrected the bias.  Before the Idaho Supreme Court, Mr. Abdullah argued that there was no such instruction.  *See* C-10 at 16.  The Idaho Supreme Court erroneously rejected this argument in a footnote by quoting Jury Instruction 4.  *See*

*Abdullah*, 348 P.3d at 40 n.17.[13]  According to that decision, the language of this instruction "counter[ed] Juror 59's witness credibility predispositions."  *Id.*

In actuality, Jury Instruction 4 would have had the opposite effect.  The state court ignored the context of the instruction, despite clearly established law requiring it to consider the instructions as a whole.  *See Boyde*, 494 U.S. at 378 ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.").  In context, the instruction told jurors they need not believe all evidence, but instead "must determine what evidence you believe and what weight you attach to it."  B-12 at 3289.  This was followed by the guidance to use "all of the experience and background of your lives" in assessing

---

[13] The Idaho Supreme Court quoted the following portions of Jury Instruction 4:

> Your duties are to determine the facts, to apply the law set forth in my instructions to those facts, and in this way to decide the case.  In doing so, you must follow my instructions regardless of your own opinion of what the law is or should be . . . .  The law requires that your decision be made solely upon the evidence before you.  Neither sympathy nor prejudice should influence you in your deliberations . . . .
>
> In determining the facts, you may consider only the evidence admitted in this trial . . . .
>
> There is no magical formula by which one may evaluate testimony.  You bring with you to this courtroom all of the experience and background of your lives.  In your everyday affairs you determine for yourselves whom you believe, what you believe, and how much weight you attach to what you are told.  The same considerations that you use in your everyday dealings in making these decisions are the considerations which you should apply in your deliberations.
>
> In deciding what you believe, do not make your decision simply because more witnesses may have testified one way than the other. Your role is to think about the testimony of each witness you heard and decide how much you believe of what the witness had to say.

*Abdullah*, 348 P.3d at 40 n.17 (quoting B-12 at 3288–89).

a witness's credibility.  *Id.*  Contrary to instructing Juror 59 that he must set his own biases aside, the trial court actually gave him permission to rely on his biased experience, which for Juror 59 was to automatically favor law enforcement testimony.  Thus, the Idaho Supreme Court unreasonably determined the facts in finding that Juror 59 was adequately instructed to set aside his bias.

The Idaho Supreme Court's conclusions on Juror 83 were equally flawed.  The finding that Juror 83 was not biased in terms of sentencing was both inaccurate and an unreasonable application of constitutional law to the underlying facts.  The Idaho Supreme Court cited the correct federal law, and quoted *Morgan*: "[a]ny juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law."  *See Abdullah*, 348 P.3d at 37 (quoting *Morgan*, 504 U.S. at 735).  However, it misapplied this law to Juror 83, especially since Juror 83 stated, "[death] is warranted in heinous situations and that the State of Idaho now has agreed that there is a death penalty warranted, so I agree with that."  A-12 at 338.  This language from Juror 83, which was also quoted in the state court's decision, *see Abdullah*, 348 P.3d at 39, demonstrates that Juror 83 had already reached his decision and would impose death regardless of the circumstances.  A juror who would automatically impose the death penalty simply because the State of Idaho brought capital charges should have been removed for cause.

Because the Idaho Supreme Court unreasonably determined the facts and unreasonably applied clearly established federal law, its ruling is subject to de novo review.  *See Frantz*, 533 F.3d at 735.  And for the reasons already mentioned, the seating of the two jurors was unconstitutional.  Consequently, habeas relief must be granted.

Juror 59's bias partly stemmed from his predisposition in favor of law enforcement officers, and particularly employees of the Boise Police Department, many of whom testified for

the State at the guilt phase of Mr. Abdullah's trial.  *See supra* at 39–41.  The juror thus suffered

from a bias that impacted the guilt-phase proceedings.  Moreover, a jury more likely to vote for

death is also a jury more likely to convict.  *See, e.g.*, Brandon Garrett et al., *Capital Jurors in an

Era of Death Penalty Decline*, 126 Yale L.J. Forum 417, 422–23 (2017).  Therefore, Mr.

Abdullah's convictions should be vacated.  If the Court disagrees, at least the death sentence

must be set aside.

       **D.**      **Claim 54: There Was No Death Penalty In Effect At The Time Of The Crime**

      Mr. Abdullah was sentenced to death at a time when the death penalty statute in Idaho

was unconstitutional, in violation of due process and the Ex Post Facto Clause.

      The Idaho Supreme Court addressed the merits of Mr. Abdullah's ex-post-facto claim.

*See Abdullah*, 348 P.3d at 65–70.  Therefore, that claim is subject to AEDPA deference.  *See* 28

U.S.C. § 2254(d).  However, the court refused to analyze his due-process claim on the basis that

Mr. Abdullah had not offered "sufficient argument or authority" for that assignment of error.

*See Abdullah*, 348 P.3d at 70 n.25.  That was not accurate.

      In his opening brief on appeal, Mr. Abdullah submitted that the death sentence violated

the federal Due Process Clause because capital punishment was not authorized at the time of the

offense.  *See* C-10, at 64.  He explained that this was so because "[a] defendant may be punished

only under the law existing at the time of the crime," based on the principle of "fair warning,"

and because only the legislature "possesses the power to define crimes and their punishment."

*Id.* at 63.  The brief cited *Bouie* and *United States v. Lanier*, 520 U.S. 259 (1997), two decisions

that in turn clearly rest on the Due Process Clause in the U.S. Constitution.  *Id*.  *See Lanier*, 520

U.S. at 265–71; *Bouie*, 378 U.S. at 349–62.  Mr. Abdullah then expounded at length on why he

did not receive that fair warning with respect to the death penalty in his case.  *See* C-10, at 62–

66.  Consequently, Mr. Abdullah fully raised the due process issue and, since the Idaho Supreme Court declined to take it up, de novo review is appropriate for that component of the claim.  *See Pirtle*, 313 F.3d at 1167 ("[W]hen it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo.").

Applying those respective standards of review, Mr. Abdullah is entitled to relief.

On June 24, 2002, the U.S. Supreme Court announced that the Sixth Amendment does not permit a judge, acting without a jury, to find the aggravating circumstances rendering a defendant eligible for a death sentence.  *See Ring v. Arizona*, 536 U.S. 584, 609 (2002).  The Court specifically identified Idaho as one of the few states with a statute that directed judges to sentence defendants to death, contrary to the new rule.  *See id.* at 608 n.6.  Shortly thereafter, Idaho's own supreme court later confirmed that the state's capital statute was unlawful under *Ring*.  *See State v. Fetterly*, 52 P.3d 874, 875 (Idaho 2002).  The Idaho legislature did not fix the constitutional deficiency until February 13, 2003, when it provided for jury sentencing in capital cases.  *See* S.B. 1001, Sess. Laws Ch. 19 [attached as Ex. 5].  In the meantime, i.e., after *Ring* but before the statutory amendment, Angela Abdullah died, in early October 2002.  *See* A-4, at 701. Stated differently, the crime occurred after Idaho's statute had been revealed as unconstitutional but before it had been revised to conform with the Sixth Amendment.

The Ex Post Facto Clause prohibits a state from passing a law that "imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."  *Weaver v. Graham*, 450 U.S. 24, 28 (1981). Furthermore, a sentence violates due process when the defendant had no fair warning that he could face it at the time his offense was committed.  *See Bouie*, 378 U.S. at 353–54; *Clark*, 450

F.3d at 904, 911.  By upholding a death sentence for a crime that occurred when such

punishments were not allowed in Idaho, the Idaho Supreme Court failed to honor that caselaw.

In ruling to the contrary, the state high court purported to invoke *Dobbert v. Florida*, 432

U.S. 282 (1977), *see Abdullah*, 348 P.3d at 67–69, but its interpretation of the case was unsound.

The murders in *Dobbert* were committed before any court had deemed the capital statute

unconstitutional.  432 U.S. at 287–88.  That is quite unlike Mr. Abdullah's situation, where the

statute had already been invalidated at the time of the offense.  *See supra* at 49.  Although the

Idaho Supreme Court described this as a "distinction without a difference," *Abdullah*, 348 P.3d

at 69, it apparently made a difference to then-Justice Rehnquist and his colleagues in the *Dobbert*

majority, who took care to mention the timeline twice in the course of a brief section on the

argument, *see Dobbert*, 432 U.S. at 297 (remarking that the capital statute "was, *after the time*

[*the defendant*] *acted*, found by the Supreme Court of Florida to be invalid"); *id.* ("[w]hether or

not the old statute would *in the future*, withstand constitutional attack, it clearly" provided notice

(emphases added)).  Indeed, when the issue is whether a defendant has notice of a punishment, it

is quite significant whether the statute allowing the penalty has already been nullified by a court

or not.  It would not be reasonable for a man to suggest that he had no idea he was subject to the

death penalty for murder because he felt it possible a court might at some later date strike the

statute down.  But why would it be unreasonable for him to believe that he was not subject to the

death penalty when the highest court in the country had already declared that his state's capital

statute was unconstitutional?

To say that Mr. Abdullah was on notice that he was eligible for death because of an

unconstitutional statute that remained on the books, as the Idaho Supreme Court did, is

substantively the same as saying that a defendant in New York today has such notice.  In New

York now, as in Idaho at the time of the crime here, there is a statute authorizing capital punishment.  *See* N.Y. Crim. Proc. § 400.27.  In New York now, as in Idaho at the time of the crime here, that statute has been rendered unconstitutional by a judicial opinion.  *See People v. Lavalle*, 817 N.E.2d 341, 356–68 (N.Y. 2004).  And yet it would be odd to suggest that a New Yorker has fair warning that he could be sentenced to death for murder, when no legislation has yet been enacted to remedy the constitutional deficiency in the statute.  In fact, New York is routinely listed among the states that have abandoned the death penalty, including by the U.S. Supreme Court.  *See Hall v. Florida*, 572 U.S. 701, 717 (2014); *State v. Santiago*, 122 A.3d 1, 52 (Conn. 2015).  Idaho was effectively in the same posture at the time of the offense here, and Mr. Abdullah consequently had no fair warning of the death penalty's viability.

The Idaho Supreme Court also concluded that *Ring* was procedural in nature, and consequently that it did not implicate the Ex Post Facto Clause under *Dobbert*.  *See Abdullah*, 348 P.3d at 68.  Again, though, that misses a key feature of Mr. Abdullah's situation.  In Idaho, the punishments for murder are set forth in § 18-4004, which states: "*Subject to the provisions of sections 19-2515* and 19-2515A, Idaho Code, every person guilty of murder of the first degree shall be punished by death or by imprisonment for life . . . ."[14]  And it was § 19-2515 that required judge sentencing in capital cases until the Supreme Court condemned the practice.  *See* Ex. 5, at 2–5.  That interplay has existed since 1977.  *See* Ex. 6.  Thus, in Idaho, the provision that sanctioned the death penalty has been expressly conditioned for many years on the provision that empowered judges to mete it out, which is exactly what made the scheme unconstitutional. The *Dobbert* opinion does not reflect any similar feature of the Florida regime under review

---

[14] That language was in the statute at the time of the offense here.  *See* Ex. 5, at 1.

there.  So, regardless of what might be the case in other jurisdictions, *Ring* did eliminate a whole category of punishment in Idaho.

Notably, the Idaho Supreme Court inadvertently reinforced the same conclusion when it emphasized that importance of § 18-4004, writing that the provision had "prescribed a punishment of death for first-degree murder since its enactment in 1972."  *Abdullah*, 348 P.3d at 69.  That is just the point.  It was § 18-4004 that provided notice of the death penalty as a potential punishment, and it was § 18-4004 that was overtly made subject to a statute nullified by the U.S. Supreme Court.

Searching further for a shortcoming in Mr. Abdullah's ex post facto theory, the Idaho Supreme Court brought up the precedent finding *Ring* procedural rather than substantive for purposes of retroactivity.  *See id.* at 66–67.  But those cases are inapposite.

Courts draw a line between substantive and procedural rules in the retroactivity context because of reliability concerns—that is, a substantive rule restricting the scope of a criminal statute means the defendant is basically innocent, whereas a new procedural rule often does not have those ramifications.  *See Bousley v. United States*, 523 U.S. 614, 620 (1998).  By contrast, the substance/procedure line is drawn in the ex post facto context because of fair-notice concerns.  *Weaver*, 450 U.S. at 30 ("Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the *lack of fair notice* and government restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.").

That is, an exclusively procedural change does not trigger ex post facto problems because defendants remain advised that the crime or sentence is in force, even if the mechanism for enforcing it has evolved.  In the present case, though, the statute creating the punishment had

itself been voided, and Mr. Abdullah accordingly did not have adequate notice.  With that distinction in mind, it is unsurprising that the decisions deeming *Ring* non-retroactive do not speak to fair notice at all.  *See, generally*, *Schriro v. Summerlin*, 542 U.S. 348 (2004); *Rhoades v. State*, 233 P.3d 61 (Idaho 2010); *Hoffman v. State*, 121 P.3d 958 (Idaho 2005).  By the same token, the decisions shed no light on the ex post facto issue, because *Ring* was not an exclusively procedural change in *Idaho*, as it substantively eliminated the death penalty by invalidating § 19-2515.

In overview, Mr. Abdullah's rights under the Ex Post Facto and Due Process Clauses were violated when he was given a death sentence that was not legally justified at the time of the offense.  Applying AEDPA deference, vacatur of the death sentence is appropriate for the Idaho Supreme Court's rejection of the ex post facto claim because it was contrary to the principles in *Weaver* and related cases.  And exercising de novo review, the same result is appropriate for Mr. Abdullah's due process claim.

### E.   Claim 55: The Aggravators Were Not Charged By Indictment, Not Subject To A Finding Of Probable Cause, And Not Supported By Facts

The State gave inadequate notice of the aggravating circumstances and their underlying facts, by not charging them in the indictment and obtaining a finding that those facts supported a finding of probable cause.  This failure violated the Due Process Clause of the Fourteenth Amendment, the Sixth Amendment right to be informed of the nature and cause of the accusation, and the Eighth Amendment right to be free from cruel and unusual punishment.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be informed of the nature and cause of the accusation…."  U.S. Const., Amend. VI.   "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge … are

among the constitutional rights of every accused in a criminal proceeding  in all courts, state or federal."  *Cole v. Arkansas*, 333 U.S. 196, 201 (1948).

In *Ring v. Arizona,* the United States Supreme Court held that the aggravating circumstances of Arizona's capital sentencing scheme "operate as 'the functional equivalent of an element of a greater offense'" and must be found by a jury, not a judge, under the Sixth Amendment.  *Ring,* 536 U.S. at 609 (quoting *Apprendi v. New Jersey,* 530 U.S. 466, 494 n.19 (2000)).  One year later, the Court explained that "the underlying offense of 'murder' is a distinct, lesser included offense of 'murder plus one or more aggravating circumstances': whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death."  *Sattazahn v. Pennsylvania*, 537 U.S. 101, 111 (2003).  Idaho's capital sentencing scheme was identical to Arizona's when *Ring* was issued, *Ring*, 536 U.S. at 608 n.6; *Fetterly*, 52 P.3d at 875, and Idaho retained their same role when it adopted jury sentencing in 2003.  *See* I.C. § 19-2515.  Aggravating circumstances in Idaho's current capital punishment scheme thus must be found by the jury beyond a reasonable doubt, *id*. § 19-2515(8)(a), and are still the functional equivalent of elements of the greater offense of capital murder as they were under *Ring*.  *See Abdullah*, 348 P.3d at 73–74 (under the post-*Ring* statute applied to Abdullah's case, characterizing aggravating circumstances as mere sentence enhancements and not elements, notwithstanding *Ring*'s instruction that they are the functional equivalent of elements).  Where aggravators constitute the elements of a death-eligible first-degree murder, they must meet the constitutional requirements that attach to the trial of the elements of the offense.  *See, e.g., Sattazahn*, 537 U.S. at 111; *Apprendi,* 530 U.S. at 478; *Jones v. United States,* 526 U.S. 227 (1999).

Aggravating circumstances in Idaho therefore must be treated as elements of the offense of capital murder, *Sattazahn*, 537 U.S. at 111; *Ring*, 536 U.S. at 609, and due process requires that defendants be informed of the nature and the cause of the accusation.  *Cole*, 333 U.S. at 201.

Mr. Abdullah was not informed of the aggravating circumstances in the indictment.  A-1 at 20

(Count I only gave notice of the element of first-degree murder, but not of the aggravating

circumstances necessary to make the defendant death-eligible).  The State's notice of intent to seek the

death penalty was not presented to the grand jury, unlike the indictment, and nothing in the filing

established probable cause or purported to give notice of any facts regarding the offense that could

elucidate on what basis the aggravating circumstances would be established.  *See* A-1 at 44–45 (giving

notice of an intent to rely upon four identified aggravating circumstances without notice of any

underlying supporting facts).  Mr. Abdullah objected to the State's notice on the ground that it lacked

"fair notice of the facts which the state intends to prove in support of the listed statutory aggravating

circumstances," in violation of the Sixth, Eighth and Fourteenth Amendments.  A-3 at 506–07.  Mr.

Abdullah moved to strike the notice of intent to seek death on the ground that it was "an inadequate

charging document as it is neither a complaint nor an indictment and because it violates Defendant's

right to have every element of the crime for which he is charged found by either a judge at preliminary

hearing or by the grand jury and to have each and every [one] of those elements set forth in the charging

document," in violation of the Fourteenth Amendment.  A-3 at 497.

The Idaho Supreme Court rejected Mr. Abdullah's arguments.  *Abdullah*, 348 P.3d at 71–76.  It

found that under both the Due Process Clause and the fair notice clause of the Sixth Amendment, the

right "to be informed of the nature and cause of the accusation," had not been violated.  *Id*. at 75

("Idaho's statutory procedures fully satisfy these constitutional protections" because they notify the

defendant "of the nature of the aggravating circumstances" and provide "a meaningful opportunity to

respond and prepare").  The court further held that "there is no due process right to be informed of the

specific evidence or factual basis underlying each aggravating circumstance alleged by the State."  *Id*.

*See also id*. at 76 (the Due Process Clause does not require the State "to submit a factual basis for each

aggravating circumstance").  The basis of the court's decision was its conclusion, following *Porter v. State*, 102 P.3d 1099, 1103 (Idaho 2004), that the "statutory aggravating circumstances are not elements of a crime." *Abdullah*, 348 P.3d at 73.  Accordingly, the state court held that aggravating circumstances, despite being the functional equivalent of elements, did not have to be alleged in the indictment or information and were not entitled to the constitutional requirements pertaining to an indictment or information.

The Idaho Supreme Court's decision was contrary to clearly established law of the U.S. Supreme Court and an unreasonable application of the law to the facts, because no adequate notice of the elements of the offense and the underlying supporting facts was made in the charging papers.  While the form of charging papers in state courts may be by either information or indictment, that is true only because the substance is the same and the "same notice [is] given" in each. *Hurtado v. California*, 110 U.S. 516, 538 (1884).  *See Cole*, 333 U.S. at 197–201 (examining the charge in the information, before concluding that due process requires notice of the "specific charge" in state or federal courts).  Here, the indictment gave no notice of the aggravating circumstances element of capital, death-eligible murder. A-1 at 20.  The notice of intent to seek death likewise did not give notice of the facts supporting the aggravating circumstance elements of the offense.  A-1 at 45.  Moreover, the notice of intent to seek death was simply written and filed by the prosecutor and unlike the indictment was not reviewed for probable cause by a judge or grand jury.  Accordingly, the notice of the aggravating circumstance elements of the capital offense was inadequate and violated the Sixth, Eighth and Fourteenth Amendments.  *See Russell v. United States*, 369 U.S. 749, 763–64 (1962) (charging papers must contain elements of the offense intended to be charged and apprise the defendant of what he must be prepared to meet); *id*. at 765–66 (charging papers "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense," and anything less does not comport

with "these basic principles of fundamental fairness").

Here, the indictment did not identify or cite the aggravating circumstances alleged by the State which rendered Mr. Abdullah death-eligible.  The four aggravators were not alleged by the State until it filed its notice of intent to seek death on December 3, 2002, with the State simply quoting the statutory language for each, without providing any factual support.

> The State of Idaho gives further notice of its intent to rely upon the following aggravating circumstances under I.C. §§ 19-2515(h):
>
> (3) The defendant knowingly created a great risk of death to many persons;
> (5) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity;
> (6) By the murder or circumstances surrounding its commission, the defendant exhibited utter disregard for human life; and
> (8) The defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

A-1 at 45.  This post-indictment filing is the entirety of the notice Mr. Abdullah received regarding the statutory aggravating circumstances.  Based on this notice, the State was allowed to proceed to the penalty-phase alleging these four aggravating circumstances even though no supporting facts were alleged and notwithstanding that the aggravating circumstances themselves had never been subjected to any threshold finding that they were validly alleged given the facts of Mr. Abdullah's case.

In failing to apprise Mr. Abdullah of the facts supporting the aggravating circumstances, the death notice violated both the Fourteenth and Sixth Amendments.  Aggravating circumstances are the functional equivalent of elements of the offense and are the only thing standing between life and death for a defendant charged with first-degree murder.  *Ring*, 536 U.S. 609.  At a minimum, to comply with fair notice, as elements, the aggravators must be alleged by criminal complaint or indictment and the State must present evidence demonstrating there is probable cause to support each aggravator.  *Russell*, 369 U.S. at 764–66; *Cole*, 333 U.S. at 201.  Just as underlying offenses must be subject to a threshold

screening mechanism, such as a preliminary hearing or grand jury, before a defendant can be held to answer for the offenses before a jury at trial, so too must aggravators, which carry the heavy burden of deciding who lives and who dies.  The failure to subject aggravators to this basic, fundamental threshold finding violated the notice requirements of the Sixth Amendment and due process principles in the Fourteenth Amendment.  *See Apprendi*, 530 U.S. at 483 n.10 ("The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury.").

In failing to treat the aggravating circumstances as elements of the offense to which the defendant had a right to notice in the indictment or information, the Idaho Supreme Court opinion also violated Article I, § 8 of the Idaho Constitution, as well as I.C.R. 7(b) and I.C. § 19-1409(2).  *See, e.g., State v. McMahan*, 65 P.2d 156, 157 (Idaho 1937) (noting that requirements of indictment also applied to information, insofar as the State must allege "acts constituting the offense in ordinary and concise language", quoting the statute prescribing form of indictment); *id*. at 158–60 (holding that required notice in information or indictment includes "*statement of the acts constituting the offense* in ordinary and concise language," and giving "these facts, for the first time when [defendant's] trial is in progress, is to deprive him of the protection the statute was designed to give" as well as due process of law) (emphasis in original).  The failure to comply with these state law notice requirements in either the indictment or the notice of intent to seek death, in which Mr. Abdullah had a liberty interest, likewise violated due process.  *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (arbitrary deprivations of liberty interest created under state law violates the Fourteenth Amendment).

This violation was not harmless and had a substantial and injurious effect upon the verdict. *Brecht*, 507 U.S. at 637–38.

Mr. Abdullah's jury could not reach a unanimous decision as to the "heinous, atrocious or cruel," or the "propensity to commit murder" aggravators, demonstrating the very real problem that results

when the State is not required to meet a threshold burden of proof prior to a penalty phase jury trial.  A-8 at 1497–98.  The mere allegation of aggravating circumstances by the State became a vehicle for the State to prejudice a defendant by making the behavior seem that much more horrific by simply alleging multiple aggravators which had no support in evidence.  The taint of these aggravating circumstances, which were brought by the prosecutor without notice of any supporting facts, likely impacted deliberations on the weighing of mitigation against the aggravating circumstances that were found.  In determining whether to impose death, the jury likely was impacted in favor of death, knowing that an experienced authority figure like the prosecutor thought that Mr. Abdullah was a future danger who had committed a heinous, atrocious and cruel act.  Charging Mr. Abdullah with such conduct and without any supporting facts likely had a substantial and damaging effect upon the verdict.

For example, in closing argument, the State argued Mr. Abdullah was guilty of the heinous, atrocious or cruel, manifesting exceptional depravity aggravator because "[t]he murder was especially heinous, atrocious or cruel manifesting exceptional depravity.  What else?  Killed his wife, poured gas, set fire to his home and ran.  What's appropriate justice?  What is the measure of justice?"  A-17 at 505.  This aggravator has been interpreted to require "the murder must be accompanied by acts setting it apart from the norm of murders and that its commission manifests such depravity as to offend all standards of morality and intelligence[.]"  *State v. Osborn,* 631 P.2d 187, 200 (Idaho 1981).  Specifically, this aggravator requires the intentional infliction of a high degree of pain with utter indifference to or actual enjoyment of the suffering of others, and must include additional conscienceless or pitiless acts, aside from the murder, which are unnecessarily torturous to the victim.  *Id.*

Considered in light of the specific requirements of this aggravator, it is unclear how the evidence elicited at trial or the State's presentation of testimony from Steven Bankhead that Azad paid him to kill Angie in September of 2000, the only aggravating evidence it submitted at the penalty phase, could

demonstrate reasonable suspicion, let alone probable cause, for this aggravator.  Thus, in the absence of the error, the jury would not have been tainted by the invocation of this inflammatory aggravator.

With respect to the propensity aggravator, in closing, the State first told jurors they were the conscience of the community.  A-17 at 506.  The court admonished the prosecutor and advised jurors to disregard the statement.  *Id*.  The prosecutor then told jurors they would decide what justice is, and then asked:

> What does he have to do? What else? If not this, what? At every stage of the development of the plan that resulted in the murder of his wife, the arson of his home, the attempted murder of three children and the placement of his other son outside of the residence, he could have stopped.

*Id*.  The propensity aggravator applies to "that person who is a willing, predisposed killer, a killer who tends toward destroying the life of another, one who kills with less than the normal amount of provocation . . . [P]ropensity assumes a proclivity, a susceptibility, and even an affinity toward committing the act of murder."  *State v. Creech*, 670 P.2d 463, 472 (Idaho 1983).  Again, Steven Bankhead's penalty phase testimony coupled with the evidence at trial, was completely insufficient to support a finding of probable cause to support this aggravator.  Again, therefore, the error is what allowed the prosecution to infect the jury with an unjustified and damaging aggravator.  And the fact that the jury rejected two aggravators confirms that this was a close case at the penalty phase, in which the prosecution tipped the jury towards death by endorsing two impactful aggravators that were not founded in the evidence, thereby reinforcing the harmfulness of the error.  *See Silva v. Woodford*, 279 F.3d 825, 849 (9th Cir. 2002) (granting habeas relief on an ineffectiveness claim in part because it was "not a case in which a death sentence was inevitable because of the enormity of the aggravating circumstances").

Similarly, because the State failed to commit to a theory in the charging papers and the death notice, Mr. Abdullah was unable to defend against the penalty phase arguments until the last moment

PETITIONER'S OPENING MERITS BRIEF - 60

upon hearing them.  *See Gautt v. Lewis*, 489 F.3d 993, 1009 (9th Cir. 2007) (non-charging-document sources cannot be used to satisfy the Constitution's notice requirement when the defense is that the underlying charge was never given with sufficient notice).

For all of these reasons, this Court should grant the writ on Claim 55.

## III.    CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal the denial of habeas relief on any claim unless he has obtained a certificate of appealability ("COA") for that claim.  *See* 28 U.S.C. § 2253(c)(1)(A) (requiring a petitioner to secure a COA before appealing the denial of habeas relief); *see also* § 2253(c)(3) (providing that a COA must "indicate which specific issue or issues satisfy the showing required by" the COA standard).  Pursuant to Rule 11(a) of the Rules Governing 2254 Cases in the United States District Courts ("Rule 11(a)"), "[t]he district court must issue or deny a [COA] when it enters a final order adverse to the applicant."  A COA should be granted where the habeas petitioner "has made a substantial showing of the denial of a constitutional right."  § 2253(c)(2).  When a district court denies a claim on the merits, the COA inquiry examines whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  "Although not dispositive, in a capital case, the nature of the penalty is a proper consideration in determining whether to issue a [COA]."  *Williams v. Woodford*, 384 F.3d 567, 583 (9th Cir. 2002) (alterations omitted).  "Where the petitioner faces the death penalty, any doubts as to whether a COA should issue must be resolved in the petitioner's favor.  *Rhoades v. Davis*, 852 F.3d 422, 427 (5th Cir. 2017).

Although a formal ruling on a COA is not required until a final decision on the petition is forthcoming, Mr. Abdullah believes it would be appropriate for the Court to indicate whether any claims being denied on their merits now will be certified for appeal.  That would be especially

salutary because the claims are being addressed in the present litigation and the Court will therefore have them fully in focus, whereas a final ruling on the remaining claims will not be rendered for some time. *See Duncan v. United States*, No. 2:17-cv-091, 2019 WL 1320039, at *28 (D. Idaho March 22, 2019) (ruling on a COA while deferring a final decision on other claims). Accordingly, and for the same reasons laid out in the argument section above, Mr. Abdullah respectfully asks the Court to state in its order that a COA will issue for any claim upon which it is denying relief. If the Court is not prepared to grant a COA at that time, Mr. Abdullah requests in the alternative that the Court defer its decision on the COA until it is releasing a final judgment on the petition as a whole.

## IV. CONCLUSION

In light of the above, Mr. Abdullah respectfully asks the Court to grant the writ of habeas corpus and vacate his convictions and sentences, or provide whatever lesser form of relief is required by any claim that it deems meritorious.

DATED this 10th day of April 2019.


_____/s/_____
Bruce D. Livingston
Jonah J. Horwitz
Federal Defender Services of Idaho

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of April 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

L. LaMont Anderson
lamont.anderson@ag.idaho.gov

/s/
_____
L. Hollis Ruggieri
