Eric Montroy (PA 90949)
Shawn Nolan (PA 56535)
Federal Community Defender for the
Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
eric_montroy@fd.org
shawn_nolan@fd.org

Craig Durham (ID 6248)
Ferguson Durham PLLC
223 N. 6th Street, Suite 325
Boise, ID 83702
(208) 724-2617
chd@fergusondurham.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| AZAD HAJI ABDULLAH,<br> Petitioner,<br><br>v.<br><br>AL RAMIREZ,<br>Warden, Idaho Maximum Security<br>Institution,<br> Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:17-cv-00098-DCN<br><br>**CAPITAL CASE**<br><br>AMENDED PETITION UNDER 28<br>U.S.C. § 2254 FOR WRIT OF<br>HABEAS CORPUS BY A PERSON IN<br>STATE CUSTODY |

## Table of Contents

I.     Introduction ................................................................................................ 1

II.    Background And Procedural History ........................................................ 3

III.   Challenges To The State Courts' Presumption of Correctness ......................... 7

IV.    AEDPA Is Unconstitutional ...................................................................... 8

V.     Need For Discovery And Fact Development ................................................... 9

VI.    Grounds For Relief ...................................................................................... 10

CLAIM 1: MR. ABDULLAH RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL
COUNSEL .......................................................................................................... 13

   A.     Trial Counsel Rendered Ineffective Assistance At The Guilt Phase ............................ 13

      i.       Misconduct In Getting Retained ..................................................... 13

      ii.      Entering Into an Improper Contract With The Abdullahs ............................. 19

      iii.     Failure To Present Any Theory Of The Case ................................................. 22

      iv.      Conceding Mr. Abdullah's Presence In Boise ................................................ 29

      v.       Failure To Argue That Mr. Abdullah Could Not Have Been Responsible
               For The Prozac That Ms. Abdullah Ingested Due To The State's Own
               Timeline ...................................................................................... 31

      vi.      Failure To Present An Alibi Defense .................................................. 33

      vii.     Failure To Adequately Develop And Present Evidence That Someone
               Other Than Mr. Abdullah Was Responsible For The Crimes ...................... 36

      viii.    Failure To Adequately Present A Suicide Defense And Challenge The
               State's Nonsensical Cause-Of-Death Theory .................................... 39

      ix.      Failure To Adequately Present A Slow Metabolizer Defense ...................... 49

      x.       Failure To Adequately Deal With Gasoline Evidence .................................... 50

      xi.      Failure To Adequately Deal With DNA Evidence ......................................... 51

      xii.     Failure To Adequately Deal With Hair Evidence .......................................... 53

      xiii.    Failure To Adequately Deal With Computer Evidence .................................. 54

      xiv.     Failure To Adequately Challenge The Police Investigation .......................... 56

      xv.      Failure To Discover Evidence ........................................................ 59

      xvi.     Failure To Adequately Deal With Eyewitness Identification Evidence ......... 59

      xvii.    Failure To Adequately Deal With Child Interview Evidence ........................ 61

      xviii.   Failure To Interview Redear Abdullah ....................................................... 63

xix.    Failure To Move To Suppress Confrontation Call ......................................... 64

xx.     Failure To Exclude Unintelligible Police Interviews..................................... 64

xxi.    Failure To Adequately Deal With Honor Killings In Kurdistan.................... 65

xxii.   Failure To Adequately Deal With The Cape And Mask................................ 67

xxiii.  Failure To Move To Sequester The Jury During The Guilt Phase Of The
        Trial................................................................................................................ 67

xxiv.   Failure To Adequately Move For A Change Of Venue................................. 68

xxv.    Failure To Move To Disqualify Judge Copsey And To Move For Her
        Recusal.......................................................................................................... 69

xxvi.   Failure To Deal With Prejudicial Publicity .................................................... 70

xxvii.  Failure To Adequately Deal With The Letter Found By The ACPD At
        The Siesta Residence .................................................................................... 71

xxviii. Failure To Admit A Letter From Ms. Abdullah Regarding The Vending
        Machines ........................................................................................................ 73

xxix.   Improperly Influencing Mr. Abdullah Into Not Testifying ............................ 74

xxx.    Attempting To Persuade Mr. Abdullah To Waive His Rights........................ 75

xxxi.   Failure To Stand Up For Defense Arguments And Act As Advocates ......... 77

xxxii.  Failing To Request A Jury Instruction On The Unreliability Of
        Eyewitness Identifications ............................................................................. 77

xxxiii. Failure To Adequately Deal With Instructions On Willfulness And
        Deliberateness .............................................................................................. 78

xxxiv.  Failure To Object To Instruction That Failed To Include Intent To Kill As
        An Element Of All Attempted First-Degree Murder Offenses...................... 79

xxxv.   Failure To Object To Trial Court's Instruction Defining Reasonable
        Doubt In Both Guilt And Penalty Phases Of Mr. Abdullah's Trial............... 79

xxxvi.  Failure To Object To Definition Of Willful On The Injury-To-A-Child
        Charge ........................................................................................................... 80

xxxvii. Failure To Challenge For Lack Of Evidence Charge Of Committing An
        Injury To A Child........................................................................................... 80

xxxviii. Failure To Adequately Deal With Prosecutorial Misconduct...................... 81

xxxix.  Disclosure Of Privileged Information............................................................. 82

xl.     Failure To Object To Deborah Kristal's Testimony ...................................... 85

xli.    Failure To Establish That Divorce Is Permissible In Islam ........................... 86

xlii.    Failure To Rebut The Assertion That Mr. Abdullah Converted Ms. Abdullah To Islam ........................................................ 87

xliii.   Failure To Adequately Deal With Evidence Relating To Mr. Abdullah's Relationship To Other Women ..................................... 89

xliv.    Failure To Adequately Deal With Evidence Concerning The Nashville Trip ........................................................................ 90

xlv.     Failure To Rebut The State's False Assertion That Naim Abdullah Was Mr. Abdullah's Favorite Child .............................. 91

xlvi.    Failure To Provide Mr. Abdullah With Discovery ......................... 92

xlvii.   Failure To Challenge The Unconstitutional Closure Of The Court To The Public ................................................................ 94

xlviii.  Failure To Behave Appropriately In Court and to Appropriately Prepare Witnesses ........................................................... 94

xlix.    Failure To Seek Assistance From Iraqi And Kurdish Entities ........ 96

l.       Failure To Object To Unlawful Number Of Peremptory Challenges ..... 97

li.      Failure To Act Promptly ........................................... 98

lii.     Failure to Challenge the State's Arson Investigation Inside the House ......... 99

liii.    Failure to Request an Instruction Regarding Bias ........................ 100

liv.     Attorney Chuck Peterson Took Too Long to Decide He Was Unable to Take the Case Thereby Making it Harder for Trial Counsel to Prepare the Case and Develop a Working Relationship With Mr. Abdullah ............. 101

lv.      Failure to Introduce Evidence that the Abdullahs Had Been Considering a Move to South Africa ............................................ 102

lvi.     Failure to Cross-Examine Witnesses Regarding Ms. Abdullah's Family Bias Towards Mr. Abdullah and Islam. ......................... 103

lvii.    Failure to Present Evidence Regarding Mr. Abdullah's State of Mind Regarding Numerous Issues in Dispute Resulting in the Jury Having an Inaccurate and Incomplete Story of the Abdullah's Marriage ................. 104

lviii.   Trial Counsel Misrepresented Numerous Issues to Mr. Abdullah Thereby Denying Him the Ability to Assist in His Own Defense ........................ 106

lix.     Failure to Investigate Whether Jurors Knew the Deceased by Her Prior Married Names ....................................................... 108

lx.      Failure To Object To The Speculative Testimony That Prozac Can Be Dissolved In A Liquid Without It Having A Bitter Taste .......................... 109

lxi.    Failure To Have The Decedent's Liver Tested For Possible Liver Failure As The Cause Of Death ............................................................... 110

lxii.   Failure To Make Objections, Seek Jury Instructions, And Move For A Mistrial After The State Failed To Preserve Evidence. ............................... 111

lxiii.  Failure To Request Jury Instruction Concerning The Foreseeability Of Gasoline Igniting Unintentionally ............................................... 112

lxiv.   Failure to Adequately Cross Examine Police Officers About Inconsistencies In Marjorie Woods's Statements and Testimony ............... 113

lxv.    Failure To Adequately Establish the Height of the Fence in the Back Yard of the Abdullah Residence and to Adequately Challenge the State's Theory Describing How Naim Abdullah Was Found in the Back Yard ...... 115

B.      Trial Counsel Rendered Ineffective Assistance At The Capital Sentencing Phase ..... 117

i.      Failure To Adequately Investigate And Present Mitigating Evidence ......... 117

ii.     Failure To Adequately Deal With Allocution ............................... 128

iii.    Failure To Adequately Challenge Steven Bankhead's Testimony ............... 129

iv.     Stipulating To Strike Jurors On The Sole Basis Of Their Juror Questionnaires ........................................................... 131

v.      Failure To Remove Jurors ................................................. 136

vi.     Failure To Adequately Voir Dire Death-Leaning Jurors ..................... 143

vii.    Failure To Adequately Voir Dire Life-Leaning Venire Members ............... 152

viii.   Failure To Adequately Prepare Life-Leaning Jurors For Capital Jury Service ................................................................. 155

ix.     Failure To Adequately Voir Dire Jurors Whose Opinions About The Death Penalty Were Unknown ............................................. 157

x.      Failure To Combat Premature Juror Decision-Making Through Effective Voir Dire .............................................................. 157

xi.     General Ineffectiveness On Sentencing Instructions ...................... 159

xii.    Requesting An Incorrect Instruction On The Great-Risk Aggravator That Allowed The Prosecution To Prove The Aggravator ...................... 160

xiii.   Failure To Challenge For Lack Of Evidence The Great Risk Aggravator ............................................................... 161

xiv.    Failure To Request An Instruction Regarding Evidence Relating To Multiple Aggravators .................................................... 161

xv.     Failure To Object To Instruction Regarding Juror Unanimity And Duty To Consult ................................................................. 162

xvi.    Failure To Request Instruction Defining The Weighing Process Consistent With Idaho Law ........................................................ 162

xvii.   Proposing An Instruction That Removed Reference To The Sentence That Would Be Imposed If The Jury Did Not Vote Unanimously For Death .......................................................................... 163

xviii.  Failure To Challenge Death Penalty Statute For Containing Conflicting Standards Regarding Consideration Of Mitigation And Aggravation .......... 164

xix.    Failure To Argue That The Instruction On How To Measure Mitigation Against Aggravation Violated The Ex Post Facto Clause ........................... 166

xx.     Failure To Argue That Mr. Abdullah Was A Constitutionally Unsuitable Candidate For Death ................................................... 166

xxi.    Failure To Request An Instruction Requiring A Finding That The Aggravation Outweighed The Mitigation Beyond A Reasonable Doubt ..... 167

xxii.   Eliciting Testimony That Murder Is A Capital Offense Under Islamic Law ...................................................................... 168

xxiii.  Failure to Challenge Improper Victim Witness Testimony ......................... 168

xxiv.  Failure to Request Written Jury Findings ...................................... 169

xxv.   The Prosecutor Committed Misconduct When He Misled The Jury About The Nature And Value Of Mitigating Evidence. Counsel Was Ineffective For Failing To Object. ............................................. 170

xxvi.  Failure To Object To The Court's Rewriting Of The Aggravating Factors ...................................................................... 170

xxvii. Failure To Present Evidence Of Petitioner's Favorable Adjustment To Prison ...................................................................... 171

C.   Trial Counsel Rendered Ineffective Assistance With Respect To His Sentencing For The Non-Capital Crimes .......................................... 173

i.     Failure To Present Mitigating Evidence ...................................... 173

ii.    Failure To Adequately Challenge The Non-Capital Pre- Sentencing Report ...................................................................... 173

CLAIM 2: TRIAL COUNSEL LABORED UNDER AN INSURMOUNTABLE CONFLICT ................................................................ 174

CLAIM 3: MR. ABDULLAH'S COUNSEL VIOLATED HIS RIGHT TO A FAIR TRIAL AND HIS RIGHT TO HOLD THE STATE TO ITS BURDEN OF PROVING ALL ELEMENTS OF THE OFFENSES BEYOND A REASONABLE DOUBT ........................... 182

CLAIM 4: MR. ABDULLAH WAS DEPRIVED OF HIS RIGHT TO PRESENT A DEFENSE OF HIS OWN CHOOSING ...................................................................... 183

CLAIM 5: HOLDING THE TRIAL IN BOISE WAS UNCONSTITUTIONAL..................... 185

CLAIM 6: MR. ABDULLAH'S TRIAL JUDGE WAS BIASED ........................................... 189

CLAIM 7: THE PROSECUTION COMMITTED MISCONDUCT.......................................... 198

CLAIM 8: THE PROSECUTION PRESENTED FALSE TESTIMONY ................................ 207

CLAIM 9: THE STATE LOST, DESTROYED, AND FAILED TO PRESERVE EVIDENCE.................................................................................................................... 208

CLAIM 10: THE STATE SUPPRESSED EVIDENCE ....................................................... 211

CLAIM 11: THE STATE USED UNDULY SUGGESTIVE IDENTIFICATION TECHNIQUES ................................................................................................................ 215

CLAIM 12: THE STATE INTERROGATED MR. ABDULLAH WITHOUT ADVISING HIM OF HIS RIGHTS AND IN THE ABSENCE OF COUNSEL ........................................... 216

CLAIM 13: THE STATE REINITIATED INTERROGATION OF MR. ABDULLAH WITH NO COUNSEL PRESENT AFTER HE INVOKED HIS RIGHT TO A DEFENSE ATTORNEY ............................................................................................................... 219

CLAIM 14: DEATH QUALIFICATION BIASED THE JURY TO CONVICT AND DEPRIVED MR. ABDULLAH OF HIS RIGHT TO A JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY.............................................................. 220

CLAIM 15: MR. ABDULLAH WAS NOT PRESENT AT ALL STAGES OF HIS TRIAL...................................................................................................................... 223

CLAIM 16: THE REQUIREMENT THAT VOIR DIRE BE PERFORMED WAS NOT SATISFIED................................................................................................................ 224

CLAIM 17: THE STATE USED FAULTY AND OUTDATED FORENSIC SCIENCE......... 225

CLAIM 18: MR. ABDULLAH WAS DENIED ACCESS TO EXPERTS................................ 226

CLAIM 19: MR. ABDULLAH WAS PREVENTED FROM PUTTING ON A DEFENSE ................................................................................................................. 230

CLAIM 20: THE STATE COURT'S EVIDENTIARY RULINGS RENDERED THE TRIAL FUNDAMENTALLY UNFAIR ....................................................................... 235

CLAIM 21: THE STATE INFRINGED MR. ABDULLAH'S CONFRONTATION RIGHTS ..................................................................................................................... 239

CLAIM 22: THE TRIAL WAS UNCONSTITUTIONALLY CLOSED TO THE
PUBLIC ................................................................................................ 241

CLAIM 23: MR. ABDULLAH WAS COERCED INTO NOT TESTIFYING ........................ 242

CLAIM 24: THE JURY WAS WRONGLY INSTRUCTED ON WILLFULNESS ................. 244

CLAIM 25: THE JURY WAS WRONGLY INSTRUCTED ON MALICE ............................ 246

CLAIM 26: THE JURY INSTRUCTION ON ENDANGERING CHILDREN
IMPROPERLY REDUCED THE STATE'S BURDEN OF PROOF ........................................ 247

CLAIM 27: THE TRIAL COURT GAVE A CONSTITUTIONALLY IMPROPER
DEFINITION OF REASONABLE DOUBT IN BOTH GUILT AND PENALTY JURY
INSTRUCTIONS.......................................................................................... 247

CLAIM 28: THERE WAS INSUFFICIENT EVIDENCE OF FIRST-DEGREE
MURDER .................................................................................................. 248

CLAIM 29: THERE WAS INSUFFICIENT EVIDENCE OF FIRST-DEGREE ARSON ....... 250

CLAIM 30: THE IDAHO SUPREME COURT VIOLATED MR. ABDULLAH'S
RIGHTS BY RETROACTIVELY ALTERING THE ELEMENTS OF ARSON .................... 251

CLAIM 31: THERE WAS INSUFFICIENT EVIDENCE OF ATTEMPTED FIRST-
DEGREE MURDER...................................................................................... 252

CLAIM 32: THERE WAS INSUFFICIENT EVIDENCE OF INJURY TO A CHILD ............ 253

CLAIM 33: CUMULATIVE GUILT-PHASE ERROR............................................... 254

CLAIM 34: MR. ABDULLAH IS NOT A CONSTITUTIONALLY SUITABLE
CANDIDATE FOR DEATH............................................................................. 255

CLAIM 35: DEATH QUALIFICATION OF THE JURY WAS PER SE
UNCONSTITUTIONAL ................................................................................. 256

CLAIM 36: THE TRIAL COURT IMPROPERLY EXCUSED JURORS WHO HAD
RESERVATIONS ABOUT THE DEATH PENALTY ............................................... 257

CLAIM 37: THE TRIAL COURT FAILED TO ALLOW OR CONDUCT ADEQUATE
VOIR DIRE OF DEATH-PRONE JURORS ......................................................... 261

CLAIM 38: THE TRIAL COURT EMPANELED BIASED JURORS.................................... 265

CLAIM 39: STRIKING PROSPECTIVE JURORS ON THE BASIS OF THEIR RACE,
SKIN COLOR, GENDER, AND RELIGION VIOLATED THE UNITED STATES
CONSTITUTION ......................................................................................... 268

CLAIM 40: THE JURY ENGAGED IN MISCONDUCT........................................... 268

CLAIM 41: MR. ABDULLAH IS INNOCENT OF MURDER ................................... 269

CLAIM 42: THE AGGRAVATING CIRCUMSTANCES ARE UNCONSITUTIONALLY VAGUE AND THERE WAS INSUFFICIENT     EVIDENCE TO PRESENTED TO SUPPORT THEM.................................................................................................. 271

CLAIM 43: THERE WAS INSUFFICIENT EVIDENCE TO FIND THE GREAT RISK OF DEATH AGGRAVATOR.................................................................................. 273

CLAIM 44: MR. ABDULLAH'S RIGHT TO ALLOCUTE WAS VIOLATED ...................... 275

CLAIM 45: MR. ABDULLAH'S RIGHT TO PRESENT LINGERING DOUBT EVIDENCE AT SENTENCING WAS VIOLATED ................................................... 276

CLAIM 46: THE INTRODUCTION OF VICTIM IMPACT EVIDENCE WITHOUT INSTRUCTIONS WAS UNCONSTITUTIONAL ..................................................... 277

CLAIM 47: THE BURDEN OF PROOF ON MITIGATION WAS UNCONSTITUTIONALLY SHIFTED TO MR. ABDULLAH.................................. 277

CLAIM 48: THE TRIAL COURT UNCONSTITUTIONALLY REFUSED TO INSTRUCT JURORS ON THE TYPES OF MITIGATION THEY COULD CONSIDER...... 278

CLAIM 49: THE JURY WAS UNCONSTITUTIONALLY NOT REQUIRED TO FIND BEYOND A REASONABLE DOUBT THAT THE AGGRAVATION OUTWEIGHED THE MITIGATION................................................................................................ 279

CLAIM 50: THE INSTRUCTION ON HOW TO MEASURE MITIGATION AGAINST AGGRAVATION VIOLATED THE EX POST FACTO CLAUSE ......................... 281

CLAIM 51: THE INSTRUCTION ON WHAT WOULD HAPPEN IF THE JURY VOTED FOR LIFE WAS UNCONSTITUTIONAL ................................................................ 282

CLAIM 52: THE ABSENCE OF WRITTEN JURY FINDINGS ON MITIGATION AND WEIGHING WAS UNCONSTITUTIONAL ............................................................ 283

CLAIM 53: UNANIMITY AND CONSULTATION WERE IMPROPERLY REQUIRED ON MITIGATION AND WEIGHING....................................................................... 285

CLAIM 54: THERE WAS NO DEATH PENALTY IN EFFECT AT THE TIME OF THE CRIME............................................................................................................... 286

CLAIM 55: THE AGGRAVATORS WERE NOT CHARGED BY INDICTMENT, NOT SUBJECT TO A FINDING OF PROBABLE CAUSE, AND NOT SUPPORTED BY FACTS ............................................................................................................... 287

CLAIM 56: THE DELAY BETWEEN THE IMPOSITION OF MR. ABDULLAH'S DEATH SENTENCE AND ANY ULTIMATE EXECUTION RENDERS THE EXECUTION UNCONSTITUTIONAL ................................................................... 288

CLAIM 57: EXECUTING MR. ABDULLAH AFTER THE TIME THAT HE WILL SPEND ON DEATH ROW VIOLATES THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT BY IMPOSING TWO PUNISHMENTS FOR ONE OFFENSE ........ 289

CLAIM 58: THE DEATH PENALTY IS UNCONSTITUTIONALLY ARBITRARY ............ 290

CLAIM 59: THE DEATH PENALTY DEPRIVES DEFENDANTS OF THE FUNDAMENTAL RIGHT TO LIFE AND DIGNITY .............................................. 294

CLAIM 60: EVOLVING STANDARDS OF DECENCY RENDER THE DEATH PENALTY *PER SE* UNCONSTITUTIONAL ........................................................... 294

CLAIM 61: CUMULATIVE PENALTY-PHASE ERROR ...................................... 300

CLAIM 62: MR. ABDULLAH WAS DENIED EFFECTIVE ASSISTANCE OF DIRECT-APPEAL COUNSEL ............................................................................ 301

CLAIM 63: DIRECT-APPEAL COUNSEL OPERATED UNDER A CONFLICT OF INTEREST .................................................................................................... 306

CLAIM 64: THE PAGE LIMITS IMPOSED ON MR. ABDULLAH'S APPELLATE BRIEFING WERE UNCONSTITUTIONAL ............................................ 308

CLAIM 65: THE DESTRUCTION OF JURY QUESTIONNAIRES WAS UNCONSTITUTIONAL ................................................................................... 309

CLAIM 66: THE IDAHO SUPREME COURT'S NOVEL STANDARD FOR REVIEWING CAPITAL SENTENCING ERRORS WAS UNCONSTITUTIONALLY APPLIED TO MR. ABDULLAH ............................................................................. 310

CLAIM 67: CUMULATIVE DIRECT-APPEAL ERROR ...................................... 311

CLAIM 68: MR. ABDULLAH'S ATTORNEYS IN HIS INITIAL POST- CONVICTION ACTION RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL .................................. 312

CLAIM 69: THE ATTORNEY WHO ADVISED MR. ABDULLAH ON HIS CONFLICT WITH THE SAPD RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL .................. 314

CLAIM 70: INITIAL POST-CONVICTION COUNSEL OPERATED UNDER A CONFLICT OF INTEREST ............................................................................... 316

CLAIM 71: FIRST SUCCESSIVE POST-CONVICTION COUNSEL WERE INEFFECTIVE ............................................................................................... 320

CLAIM 72: THE IDAHO POST-CONVICTION SCHEME VIOLATES DUE PROCESS AND THE EQUAL PROTECTION CLAUSE ......................................... 321

CLAIM 73: THE POST-CONVICTION COURT UNCONSTITUTIONALLY DENIED MR. ABDULLAH ACCESS TO EVIDENCE ............................................ 322

CLAIM 74: CUMULATIVE POST-CONVICTION ERROR .................................. 322

VII.    CONCLUSION AND PRAYER FOR RELIEF ......................................... 323

# I. Introduction

1.      The State's theory of this case at trial was nonsensical.  It accused Mr. Abdullah of killing his wife through the administration of Prozac, even though its own timeline showed that he was not with her at the time she ingested that Prozac and even though the State presented not one shred of evidence about how Mr. Abdullah was responsible for the ingestion.  Instead of accounting for that gaping hole in its narrative, the State wrote off the problem at closing as a "side issue" and something the jury did not need to "think about."  So that it could prosecute a man for capital murder despite having no coherent explanation for how he caused his victim's death, the State approached this case with tunnel vision, focusing on Mr. Abdullah and ignoring the substantial evidence of his innocence.  To that end, the police managed to "lose" a statement from a credible alibi witness with law enforcement training.  They also refused to collect videotape that the witness told them would support the alibi, allowing it to be destroyed.

2.      Given the fatal flaw at the heart of the State's case, and the serious misconduct its officers committed during the investigation, this trial would have given competent defense attorneys numerous opportunities to win over the jury.  Unfortunately, Mr. Abdullah's attorneys were not competent defense attorneys.  They were unqualified, unprepared, prosecution-oriented disasters, whose only desire was to settle the case at all costs.  When they failed to do so, they were thrown into a trial for which they had no plan and no theory whatsoever, leading them to effectively abandon their client and yield entirely to prosecutors who wanted him sentenced to death.  As a result, trial counsel botched every possible aspect of the case, beginning with jury selection, during which they agreed with the prosecution to strike the most promising jurors for the defense without making any effort to qualify them for service through voir dire, all while receiving nothing from the State in return.  Defense counsel's blunders continued through the

guilt phase, where they catastrophically conceded that Mr. Abdullah was present in Boise at the time of the crime, against his wishes and in the face of powerful alibi evidence. The fiasco of a defense concluded at the sentencing, which counsel were woefully unprepared for, having unnecessarily pulled the plug on their mitigation investigation months earlier in an act of supreme hubris. Forced to present a mitigation case without having done any meaningful legwork in advance, and working with a client and his family whose trust they had destroyed through their perpetual errors, defense counsel made a halfhearted and wholly unpersuasive argument for life. They failed despite Mr. Abdullah's uniquely compelling mitigation story, which involved him helping his family flee from Saddam Hussein's genocidal persecution. Rather than telling that story with enough vividness and detail to capture the attention of the jury and move it toward mercy, defense counsel called a small handful of ill-prepared witnesses, and examined them briefly and incompletely. Defense counsel's lack of interest in saving their client's life is perfectly illustrated by his attorney's decision to cut his mother off at the most emotional point of her testimony, object to the heartfelt statement that she was giving in response to his own questioning, and abruptly terminate the testimony. Having received no real defense from his advocates, Mr. Abdullah was sentenced to death.

3.      In short, Mr. Abdullah is on death row because of prosecutors who never explained his guilt, police who assumed it, and defense attorneys who did nothing to contest it, or to fight for his life at sentencing. To remedy those serious constitutional violations, as well as numerous others, Mr. Abdullah files the instant amended petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254, seeking vacatur of his convictions and his death sentence.

## II.    Background And Procedural History

4.      Azad Haji Abdullah[1] is an indigent petitioner under sentence of death.  He is currently

confined at Idaho Maximum Security Institution ("IMSI") in Kuna, Idaho, as Prisoner Number

76321.  Al Ramirez is the Warden of IMSI and therefore has custody over Mr. Abdullah.  Mr.

Abdullah's conviction and death sentence were imposed by the District Court of the Fourth

Judicial District of Idaho, in the city of Boise and County of Ada.  The case number for Mr.

Abdullah's trial was H0201384.  On February 23, 2004, Mr. Abdullah was charged by amended

indictment with the following offenses:

-    Count I (murder in the first degree, in violation of Idaho Code § 18-4001–03);

-    Count II (arson in the first degree, in violation of Idaho Code § 18-802);

-    Count III (attempted murder in the first degree, in violation of Idaho Code § 18-4001 and
     § 18-306);

-    Count IV (attempted murder in the first degree, in violation of Idaho Code § 18-4001 and
     § 18-306);

-    Count V (attempted murder in the first degree, in violation of Idaho Code § 18-4001 and
     § 18-306);

-    Count VI (injury to children, in violation of Idaho Code § 18-1501(1)).

5.      Mr. Abdullah pled not guilty to each count and a jury trial was held to assess his guilt or

innocence.  He did not testify at any pretrial hearings, at trial, or at any post-trial hearings.

6.      Mr. Abdullah was found guilty by a jury of all counts on November 19, 2004.  On

November 23, 2004, the jury determined that death was the appropriate sentence for Count I.

---

[1] Azad Haji Abdullah will be referred to in this petition as "Mr. Abdullah."  The victim, Angela
Abdullah, will be referred to as "Ms. Abdullah."  All other members of the Abdullah family will
be identified with reference to their first names.

7. The trial court entered judgment on all counts on March 4, 2005, and imposed a death sentence on Count I. On the same day, the trial court rendered the following sentences for Counts II–VI:

- Count II: a minimum period of twenty-five years in prison fixed, running consecutively with the death sentence;

- Count III: a minimum period of fifteen years in prison fixed, running consecutively with the sentence imposed for Count II;

- Count IV: a minimum period of fifteen years fixed, running consecutively with the sentence imposed for Count III;

- Count V: a minimum period of fifteen years fixed, running consecutively with the sentence imposed for Count IV;

- Count VI: a minimum period of ten years fixed, running consecutively with the sentence imposed for Count V.

8. On March 11, 2005, Mr. Abdullah appealed his convictions and sentence to the Idaho Supreme Court.[2] The court assigned case number 31659 to his direct appeal. On April 15, 2005, Mr. Abdullah filed a petition for post-conviction relief ("PCR") in the state trial court. The court assigned case number CR-FE-2002-1384 and SPOT 05-00308 to the PCR action. A final amended PCR petition was filed on August 29, 2008, with an additional amended petition adding one last claim filed on August 11, 2011, and accepted on August 23, 2011.[3] On various days

---

[2] The claims raised on direct appeal are too numerous to recite here. A copy of Mr. Abdullah's final opening brief is available at Dkt. 11, State's Lodging C-10.

[3] The claims raised in the final amended PCR petition are too numerous to recite here. A copy of the petition is available at Dkt. 11, State's Lodging B-7.

between September 2 and September 21, 2010, an evidentiary hearing was held on the PCR petition. The state trial court denied the PCR petition on October 14, 2011. On November 25, 2011, Mr. Abdullah appealed the denial of the PCR petition to the Idaho Supreme Court, later assigned case number 39417.[4]

9.      The Idaho Supreme Court consolidated Mr. Abdullah's direct appeal with his appeal from the denial of post-conviction relief. It affirmed the judgment of the trial court in all regards on March 2, 2015, in a decision reported at 348 P.3d 1. Mr. Abdullah filed a petition for certiorari with the U.S. Supreme Court in case number 15-6669. The Court denied certiorari on February 29, 2016. *See Abdullah v. Idaho*, 136 S. Ct. 1161 (2016).

10.     Mr. Abdullah filed a successive PCR petition in the state trial court on July 15, 2013, in case number CV-PC-1312579. He filed a second amended petition on July 1, 2016. He filed a third and final amended petition on July 11, 2017.[5] Without holding an evidentiary hearing, the state trial court denied the PCR petition on September 19, 2018. Mr. Abdullah appealed the denial of the PCR petition to the Idaho Supreme Court. The appeal was assigned case number 46497-2018. The Idaho Supreme Court affirmed the denial of the PCR petition on April 8, 2021. *See Abdullah v. State*, 503 P.3d 182 (Idaho 2021).

11.     Mr. Abdullah filed a second successive PCR in the state trial court on September 8, 2020, which was assigned case number CV01-20-14291. He filed an amended petition on October 20,

---

[4] The claims raised on direct appeal are too numerous to recite here. A copy of the opening brief is available to Dkt. 11, State's Lodging C-10.

[5] The claims raised in the third amended successive PCR petition are too numerous to recite here. Mr. Abdullah anticipates that the State's lodgings will be supplemented with the pleadings from the successive PCR action.

2020.[6] The state trial court denied the PCR petition on January 27, 2021. On March 5, 2021,

Mr. Abdullah appealed the denial of the PCR petition to the Idaho Supreme Court. The appeal,

assigned case number 48677-2021, remains pending in the Idaho Supreme Court.

12. For each claim in this petition that was not presented to the Idaho state courts, Mr.

Abdullah reserves the right to argue that the lack of exhaustion is excused. His excuses for non-

exhaustion will likely include, but are not limited to, ineffective assistance of counsel in post-

conviction and on direct appeal, the State's destruction and suppression of evidence, inadequate

fact-finding procedures in state court, insufficient funding in state court, overly restrictive

briefing rules in state court, new facts that could not have been discovered earlier, and new cases

that did not exist earlier.

13. On February 24, 2017, Mr. Abdullah filed an initial petition for federal habeas corpus

relief pursuant to 28 U.S.C. § 2254.

14. Mr. Abdullah has not filed any other petition, application, or action in a federal court

regarding the convictions and sentence challenged in this petition.

15. At his arraignment, Mr. Abdullah was represented by August Cahill, of the Ada County

Public Defender, who is currently retired. The Ada County Public Defender is located at 200 W.

Front St., Boise, ID 83702.

16. At trial and at sentencing, Mr. Abdullah was represented by Kim and Mitchell Toryanski.

Mr. Abdullah believes that the Toryanskis have relocated to Florida, and that Ms. Toryanski's

---

[6] The second successive PCR petition asserted that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) when it failed to disclose, among other things, that its lead investigator was suspended from duty during Mr. Abdullah's trial and disciplined for insubordination in connection with an affair he had with one of the prosecutors handling Mr. Abdullah's case. Mr. Abdullah anticipates that the State's lodgings will be supplemented with the pleadings from the second successive PCR action.

bar membership is inactive. According to online records available through the Idaho State Bar, Ms. Toryanski lists her mailing address as 3629 Fair Oaks Place, Longboat Key, FL 34228. The same records show Mr. Toryanski's mailing address as P.O. Box 8631, Longboat Key, FL 34228.

17. On direct appeal and in the initial post-conviction action, Mr. Abdullah was represented by attorneys with the State Appellate Public Defender ("SAPD"), located at 322 E. Front Street, Suite 570, Boise, ID 83702. While the initial post-conviction action was still ongoing at the state trial court, Judge Copsey appointed R. Keith Roark to represent Mr. Abdullah in connection with an alleged conflict between him and the SAPD, and to advise Mr. Abdullah on whether he should waive the conflict or not. Mr. Roark's office is located at 727 Shoshone St., N. Twin Falls, ID 83301.

18. Mr. Abdullah has had three separate attorneys in his first successive state PCR action. The first was Leo Griffard, whose office is believed to be located in Golden, Colorado. The second was David Smethers, whose office is located at 111 N. 11th Ave., Ste. 120, Caldwell, ID 83605. Mr. Abdullah's final attorney in the first successive PCR case is John Kormanik, whose office is located at 206 W. Jefferson St., Boise, ID 83702. Mr. Kormanik also represents Mr. Abdullah in the second successive PCR case.

19. Mr. Abdullah does not have any future sentence to serve after he completes the sentence for the judgment that he is challenging.

### III. Challenges To The State Courts' Presumption of Correctness

20. Mr. Abdullah hereby provides notice of his intention to challenge the presumption of correctness of specific findings of fact made by the state courts in his case under 28 U.S.C. § 2254(e)(1). These include, but are not limited to, factual findings made by the trial court at

trial, sentencing, and post-conviction, and the March 2, 2015 and April 8, 2021 opinions of the

Idaho Supreme Court.  Many such findings are not fairly supported by the record, and subject to

other exceptions to the presumption of correctness, including, but not limited to: that the

procedures employed by the state courts in making findings of fact were not adequate to afford a

full and fair hearing, the material facts were not adequately developed in state court, Mr.

Abdullah did not receive a full, fair, and adequate hearing of his claims in state court, and he was

otherwise denied due process in the state court proceedings.  Mr. Abdullah will elaborate on his

challenges to the state courts' presumption of correctness in subsequent briefing in this case and

may add additional challenges at that time.

### IV.     AEDPA Is Unconstitutional

21.     Because of its filing date, this petition is ostensibly governed by the Antiterrorism and

Effective Death Penalty Act ("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 204 (2003).

However, Mr. Abdullah asserts that AEDPA is unconstitutional and, as a result, that its strictures

should not apply here.

22.     Congress cannot define prisoners' habeas rights so narrowly as to suspend the writ.  *See*

U.S. Const. art. I, § 9, cl. 2.  AEDPA renders federal courts powerless, in certain circumstances,

to grant relief even when it is undisputed that the conviction or sentence was unconstitutional.

As such, it suspends the writ, is unlawful, and cannot be utilized here.

23.     AEDPA strips away any assurance that state criminal processes are full, fair, and

meaningful, while it also creates what is, perhaps, the most deferential standard in all of Supreme

Court jurisprudence.  Even in strong cases with clear state court error, a federal court under

AEDPA will deny relief if the state court's erroneous decision falls short of unreasonableness.

By drastically expanding federal deference to state courts on constitutional errors, AEDPA

erodes incentives for states to afford constitutionally adequate process to criminal defendants. The resulting system under AEDPA allows and encourages violations of defendants' rights in the state courts and prevents meaningful review in federal court.

24.     Furthermore, the writ "is designed to restrain" Congress and is "an indispensable mechanism for monitoring the separation of powers." *Boumediene v. Bush*, 553 U.S. 723, 765–66 (2008). By requiring courts to ignore unlawful detentions, AEDPA runs afoul of the separation of powers and cannot be applied for that reason as well.

25.     In light of AEDPA's unconstitutionality, this petition should be analyzed under pre-AEDPA law. That law compels relief "when a state prisoner carries his burden of proving that his detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Doe v. Ayers*, 782 F.3d 425, 428–29 (9th Cir. 2015) (internal quotation marks omitted). De novo review is applied to the state courts' "determinations of pure questions of law and fact." *Burton v. Davis*, 816 F.3d 1132, 1140 (9th Cir. 2016). Applying that standard, Mr. Abdullah is entitled to habeas relief.

26.     In the event the Court disagrees and regards AEDPA as constitutional, Mr. Abdullah prevails under that law too.

27.     Mr. Abdullah may elaborate on his challenges to AEDPA in subsequent briefing in this case and may add additional challenges at that time.

### V.     Need For Discovery And Fact Development

28.     The claims recited below are based on the information currently available to Mr. Abdullah's undersigned federal habeas counsel. Counsel believe that there are many pieces of information that they cannot discover without access to discovery and other judicially enforced mechanisms for factual development. Mr. Abdullah cannot adequately raise all of the

constitutional defects infecting his convictions and sentences until he is granted access to discovery and those mechanisms. Once he has access, he should be permitted to amend the petition to add any facts and claims that he discovers.

29.     There are statements below regarding facts that Mr. Abdullah has not yet been able to confirm because his counsel have not yet completed their investigation and have not been given access to judicially authorized factual development. Those facts are based on Mr. Abdullah's, and undersigned counsel's, expectation, information, and belief. With respect to prejudice on certain claims, the petition states the consequences flowing from each error to the best of Mr. Abdullah's and counsel's ability, based on the evidence they have so far reviewed. Upon further investigation and discovery, Mr. Abdullah anticipates expanding and specifying his allegations of prejudice.

## VI.     Grounds For Relief

30.     Mr. Abdullah incorporates by reference each and every paragraph of this petition into each and every claim presented as if fully set forth therein. Below, Mr. Abdullah will specifically refer to certain claims in certain other claims. He does so for the clarity of the reader, to illustrate the relationship between various claims. The specific references do not change the fact that all paragraphs in the petition are incorporated into all claims.

31.     Any reference herein to an "Amendment" is a reference to an Amendment to the United States Constitution. Thus, a reference to "the Eighth Amendment," for example, is a reference to the Eighth Amendment to the United States Constitution, which forbids—inter alia—cruel and unusual punishment. Mr. Abdullah will rely herein on Amendments that were incorporated against the States through the Fourteenth Amendment. To avoid needless repetition, Mr.

Abdullah will not note each time when he is citing an Amendment that was incorporated. He is, throughout this petition, invoking the incorporation of any Amendment cited.

32.     The following recitation of Mr. Abdullah's claims satisfies the pleading standard set forth in Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts. Mr. Abdullah will elaborate upon the claims further in subsequent pleadings, including in the merits briefing that he expects and is entitled to.

33.     The claims that follow are loosely organized according to the following categories: (1) those that concern errors that occurred either at both the guilt phase and the sentencing phase, or primarily at the guilt phase; (2) those that concern errors that occurred primarily at the sentencing phase; (3) those that concern errors that occurred primarily during the direct appeal; and (4) those that concern errors that occurred primarily during state post-conviction proceedings. Mr. Abdullah organizes the claims in this manner for ease of reading. By placing a claim in a certain "section," he does not concede that it relates only to that section. Many of the claims in this petition involve errors that occurred primarily at the guilt phase. However, those errors affected Mr. Abdullah at every subsequent proceeding, i.e., at his sentencing phase, on direct appeal, and in his state post-conviction action. For instance, a number of claims related to errors that took place chiefly at the guilt phase made it more likely that Mr. Abdullah would receive a death sentence because, in the absence of those errors, the jury would have harbored more doubt about his guilt at the sentencing phase and that doubt would have resulted in at least one vote against death and a subsequent life sentence. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (explaining that prejudice on a capital habeas claim is shown if "there is a reasonable probability that at least one juror would have struck a different balance" in the absence of the error).

34.     With respect to the prejudice inquiry on all guilt-phase claims, it is relevant that a juror said after the trial that until defense counsel imprudently conceded Mr. Abdullah's presence at the scene, "there was doubt as to whether" Mr. Abdullah was there at the time of the fire.

35.     With respect to the prejudice inquiry on all sentencing claims, it is relevant that a juror said after the trial that "everybody was a little bit tenuous" about the penalty phase.

36.     For every claim below, Mr. Abdullah asserts that the violation also violated his right under the Eighth Amendment to a capital trial and sentencing that met a heightened standard of reliability. *See Ford v. Wainwright*, 477 U.S. 399 (1986); *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Spaziano v. Florida*, 468 U.S. 447 (1984); *California v. Ramos*, 463 U.S. 992 (1983).

37.     Similarly, it would be incorrect to infer that Mr. Abdullah is implying, by characterizing some errors as structural, that any other errors are not.

38.     Each claim set forth below should be considered cumulatively when that claim is analyzed. That is, prejudice on each claim comes from the collective consequences of the various errors that make up each claim.

39.     At trial, Mr. Abdullah was represented largely by Kim and Mitch Toryanski, who were retained by the Abdullah family. Therefore, if Mr. Abdullah refers to "trial counsel" or "defense counsel," he is—unless otherwise indicated—referring to the Toryanskis. Before the Toryanskis entered the case, Mr. Abdullah was represented by the Ada County Public Defender's Office, which was appointed as a result of his indigency. Mr. Abdullah will refer to that agency as "ACPD."

40.     Any statement or claim below relating to Mr. Abdullah's or his family's comprehension of their rights, or lack thereof, is affected by the fact that Mr. Abdullah and his family are not

native speakers of English, and as refugees from the Middle East had limited understanding of the American legal system.

41.     To the extent that the State asserts that Mr. Abdullah has waived any of the rights invoked below, the waiver was not valid, as it was not knowing, voluntary, and intelligent.

42.     The charges against Mr. Abdullah involve events that occurred at 2292 North Siesta Way, in Boise, Idaho.  When Mr. Abdullah refers to the "Siesta residence," "the Siesta home," the "crime scene," the "scene of the crime," and so forth, he is referring to that location.

### CLAIM 1: MR. ABDULLAH RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

43.     Through the numerous deficiencies outlined below, trial counsel rendered ineffective assistance at both the guilt and the penalty phases, thereby violating Mr. Abdullah's rights under the Sixth Amendment.  *See Strickland v. Washington*, 466 U.S. 668 (1984).

### A.     Trial Counsel Rendered Ineffective Assistance At The Guilt Phase

44.     Trial counsel rendered ineffective assistance at the guilt phase in the following ways:

#### i.     *Misconduct In Getting Retained*

45.     Defense counsel's ineffectiveness pervaded every action they took in this case.  It began before they were even on the case, with a series of blatantly unethical moves designed to disguise how ill-equipped they were to handle a capital trial.

46.     The Toryanskis were excited to serve on a high-profile criminal case, even though they were wholly unqualified for the task.  Ms. Toryanski had never defended a client in a capital case, and Mr. Toryanski had never represented any individual charged with a crime at trial.  To secure the assignment despite their lack of aptitude, training, qualifications, and resources, the Toryanskis committed a series of troubling ethical breaches.

47.     To begin, when they convinced Mr. Abdullah to let them represent him, the Toryanskis had very limited experience as criminal defense attorneys, and no experience as capital defense attorneys.  Instead, they had both been prosecutors for far longer than they had been doing any defense work whatsoever.  Defense counsel were not forthcoming about their lack of relevant experience with Mr. Abdullah, his family—which hired them—or the trial court.  Instead, they took active steps to misrepresent their pasts.  For example, an early draft of the Toryanskis' notice of appearance, which effectively served as their motion for appointment as well, stated: "Ms. Toryanski is a former prosecutor with the Criminal Division of the U.S. Department of Justice in Washington, D.C. and a former staff attorney with the U.S. Senate Permanent Subcommittee on Investigations in Washington, D.C."  On this early draft, someone crossed out "prosecutor" and wrote "trial attorney" in its place, a change that was also reflected in the final version of the notice of appearance.  The revision indicates that the Toryanskis were willing to downplay their prosecutorial histories in order to convince Mr. Abdullah and his family to hire them and the trial court to allow them to work on the case despite their lack of qualifications. This conduct is particularly egregious where Mr. Abdullah had expressed concerns about the Public Defender's Office being too friendly with the prosecution.

48.     In their notice of appearance, the Toryanskis noted that: Mr. Abdullah was informed that Kim W. Toryanski has been practicing criminal law in federal and state courts since 1985 and she has previously co-chaired the handling of three jury trials regarding charges of murder in the first degree.  In one of those first-degree murder cases, the prosecution was seeking the death penalty.  Those jury trials were held in Tampa, Florida, in the Thirteenth Judicial Circuit in and for Hillsborough County, Florida.  The State of Florida has a requirement for a bifurcated jury

trial in criminal cases where the death penalty is sought, and the death case handled by Ms. Toryanski was presented to the jury under the bifurcated system.

49.    This passage was carefully drafted to avoid any reference to the capacity in which Ms. Toryanski was involved in the Florida murder cases, i.e., as a prosecutor. The decision to conceal her role in the Florida trials is particularly concerning with respect to a death penalty case. A defendant facing capital charges, and the family supporting him, is going to feel quite differently about an attorney who has tried in the past to keep individuals off death row as opposed to an attorney who has tried in the past to put them there. Throughout their time on the case, the Toryanskis actively perpetuated this false presentation by criticizing prosecutors, often passionately. Mr. Toryanski's prosecutorial career was especially damaging to his loyalty in the Abdullah case, because he had previously worked at the same office that was prosecuting Mr. Abdullah and was therefore especially deferential to his former colleagues. This level of deference would be demonstrated by the Toryanskis decision to withhold an opening statement to avoid making claims that might upset the prosecution and cause them to withhold a plea, despite the fact that Mr. Abdullah was clear about not wishing to accept a plea.

50.    Aside from misrepresenting the role she played in the Florida murder cases, Ms. Toryanski misrepresented their recency. She stated that she had "been practicing criminal law in federal and state courts since 1984 and she has previously co-chaired the handling of three jury trials regarding charges of murder in the first degree." In so doing, she suggested that the cases had spanned the course of the prior eighteen years (1985 to 2003). As it happens, she had not engaged in any capital litigation in the past sixteen or seventeen years (since 1986 or 1987).

51.    These various acts of distortion and dishonesty were more harmful than they would have been in the average case because Mr. Abdullah and his family are not native speakers of English,

and as refugees from the Middle East had limited understanding of the American legal system. They were consequently uniquely vulnerable to the Toryanskis' deception.

52.     Because of their lack of capital experience, the Toryanskis could not satisfy several of the criteria that they would have been forced to satisfy had they been appointed by a non-paying client in a capital case.  In fact, the Toryanskis believed that they did not need to meet ABA Guidelines detailing qualifications of counsel in capital cases because they had been retained, not appointed.  The Toryanskis did not meet the criteria recommended, and Mr. Toryanski admitted that he also did not meet the standards under the Idaho Rules of Criminal Procedure to serve as second chair in the case.  And because of their inexperience, and their inability to become proficient in the relevant areas of law for Mr. Abdullah's trial, they displayed a shocking degree of ignorance on basic principles.  For instance, they indicated in court that they believed the following things: the jury would make a recommendation of sentence to the court, that *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), applied in Idaho state court, that Mr. Abdullah would receive a mandatory fixed life sentence if he were not sentenced to death, and that an amendment to an indictment can be done only by a superseding indictment.  The Toryanskis were corrected on many of these misconceptions by Judge Copsey, which damaged Mr. Abdullah's confidence in their performance and lowered their credibility in the eyes of the court.

53.     In another unscrupulous act that helped the Toryanskis insinuate themselves into Mr. Abdullah's case, they failed to obtain the permission of appointed counsel, the ACPD, before contacting Mr. Abdullah.  That maneuver was starkly at odds with a clear rule of professional conduct, and Ms. Toryanski later admitted that the maneuver was unethical.  At the time that she was desperately trying to get retained by Mr. Abdullah, however, Ms. Toryanski actively

concealed her misconduct. The trial court specifically asked her whether she had obtained consent from the ACPD prior to contacting Mr. Abdullah. She responded, "Your Honor, we had conversations with Mr. Chuck Peterson who was having communication with the Public Defender's Officer (sic) prior to speaking to Mr. Abdullah." Ms. Toryanski offered no further explanation. Her answer was at best non-responsive, and in context was quite misleading. Furthermore, attorney Chuck Peterson would note that he did not, and in fact could not, give the Toryanskis permission to speak with Mr. Abdullah as he did not represent Mr. Abdullah.

54. In addition, the Toryanskis divided their fee with a lawyer outside their firm without Mr. Abdullah's consent. They subcontracted Dennis Benjamin without informing Mr. Abdullah of the arrangement and without memorializing the agreement in the contract. Mr. Benjamin was "hired" as an expert attorney on death penalty jurisprudence but paid from the funds provided through the flat fee contract. Neither Mr. Abdullah, nor his family, were aware that a third attorney was being used to draft motions, the fee agreement never mentions such an arrangement, and the motions were filed under the Toryanskis names, despite the fact that Mr. Benjamin was being paid to draft these motions. Mr. Benjamin charged his usual hourly rate, which was greater than the hourly rate for attorney fees agreed upon in the contract. If trial counsel had informed Mr. Abdullah that they required another attorney's assistance, then Mr. Abdullah would have known that they were not qualified to represent him, and would not have retained their services.

55. Moreover, the Toryanskis made a false promise to honor Mr. Abdullah's request for a speedy trial, which they knew or should have known would be impossible for them to keep. This is particularly true where the Toryanskis entered the case less than 90 days before trial was scheduled. The Toryanskis would go on to seek multiple continuances, over the objection of Mr.

Abdullah, and would note in internal documents that there would be a continuance regardless of Mr. Abdullah's expressed desire.

56.     Finally, in order to get in the trial court's good graces and successfully substitute into the case, the Toryanskis agreed not to withdraw even if continued representation presented a financial hardship.  The trial court instructed the Toryanskis that by taking a limited flat fee, they were proceeding at their own peril.  Nevertheless, due to counsel's extreme confidence in an acquittal, their ignorance of what it takes to handle a capital case, and their desire to take the case, they assured the Court that they would be prepared to go to trial in October 2003.  This created a serious potential for a conflict of interest if the case did not proceed as counsel anticipated, which, of course, it did not.  Additionally, the flat fee contract allowed for $85,000 to be paid up front; however, because the Toryanskis did not understand the scope and nature of capital litigation, they had exhausted that money by September 2003, well before trial.  The Toryanskis were then fronting costs for nearly 18 months creating a conflict in their relationship with Mr. Abdullah and his family.  As noted by Ms. Toryanski, they were losing money, worried about their finances, and turning away cases, which increased their level of conflict and frustration with Mr. Abdullah.

57.     Had the Toryanskis not committed these numerous acts in violation of their professional duties, Mr. Abdullah and his family would not have hired them.  The violations also caused deterioration in the attorney-client relationship and contributed to their constructive abandonment of Mr. Abdullah.  Some examples of this deterioration include the Toryanskis failing to consider the advice of more experienced team members such as their investigator and mitigation specialist; failing to prepare witnesses for trial; failing to prepare a thorough mitigation presentation; seeking a plea agreement despite the fact that Mr. Abdullah did not want

to enter a plea; providing Mr. Abdullah's family with a list of evidence against Mr. Abdullah, absent a signed waiver of attorney-client privilege; trying to convince Mr. Abdullah's family that he should plead guilty; and advising Mr. Abdullah that they would not assist him in preparing to testify, nor would they prepare a direct examination and instead he would be required to just tell his story to the jury without the assistance of counsel.

58.     Additionally, if the Toryanskis had been honest with the trial court about their lack of qualifications, and if the trial court had known about the other misconduct surveyed above, the court would not have allowed the Toryanskis to represent Mr. Abdullah and would instead have insisted that the ACPD remain on the case.  This is especially true because (1) there was no disqualifying conflict of interest that would have justified removing the ACPD, (2) the ACPD were qualified under I.C.R. 44.3, and (3) Mr. Abdullah had asserted his right to a speedy trial.

59.     Trial counsel's failure to understand the significance of the role of capital counsel and their inability to meet these standards resulted in a deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### ii.     *Entering Into an Improper Contract With The Abdullahs*

60.     In order to represent Mr. Abdullah, the Toryanskis entered into a flat-fee arrangement with the Abdullah family, agreeing to accept $105,000 for their services.  They did so despite the unequivocal denunciation of that practice by the American Bar Association ("ABA"), which has declared that "[f]lat fees . . . are improper in death penalty cases."  *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, reprinted at 31 Hofstra L. Rev. 913, 933 (2003).  The Toryanskis' belief that $105,000 would cover the cost of their representation was based on a gross underestimate of how long and complicated a capital trial case is, and that under-estimation in turn stemmed from their complete lack of capital

defense experience. As a result of their misguided and unethical acceptance of a flat fee, the

Toryanskis put themselves in a position that was directly at odds with the interest of their client.

In fact, the Toryanskis had exhausted the upfront fee of $85,000 within three months and then

had to cover costs for the next 18 months of representation. While they were, in their own

words, "[e]nduring such a financial hardship" due to their flat fee contract, the Toryanskis had

every incentive to rush their work on the case and complete it without any care or attention to

detail. That is exactly what they did, as discussed throughout this petition. The damage

produced by the Toryanskis' unscrupulous financial arrangement was exacerbated by Judge

Copsey, who took the position that she would not allow the Toryanskis "to withdraw before trial,

period, whether . . . [they were] being paid or not."

61.     The fee agreement was also inappropriate because it created a conflict with Mr. Abdullah

because his brother was paying the Toryanskis and had an independent interest in the direction of

the defense. *See* Claim 2.

62.     Specifically, Mr. Abdullah's brother was seeking physical custody of the children,

including Mr. Abdullah's 5-year-old son, who had been with Mr. Abdullah at the time of the

house fire. Mr. Abdullah maintained that he was in Salt Lake City when his wife perished in the

early morning hours of October 5, 2002, and that his son was with him. The prosecution

identified that child as a witness, initiated no contact orders between Mr. Abdullah and his son,

and even sought orders regarding family contact during trial. As such, the brother who paid the

Toryanskis also had a personal interest in obtaining custody of his nephew, a potential witness,

creating a conflict as the Toryanskis were then serving two different interests.

63.     This conflict would become clear when the Toryanskis efforts at preparing this case are

reviewed as they never interviewed the child witness and made numerous efforts to have the

child not testify, including begging for pleas, against the wishes of their client, and eventually conceding that Mr. Abdullah was present in Boise at the time of the house fire, a fact that Mr. Abdullah always disputed.

64.     In addition to the fact that the funds were being provided by a family member with a vested interest in a potential state witness, there are additional factors that created a conflict with this arrangement.  Specifically, Kim Toryanski believed that it was possible that other family members of Mr. Abdullah's were involved in the acts, including the brother providing their payment.

65.     The Toryanskis also noted that the family believed they were entitled to information because they had made payment, and the Toryanskis would engage in various levels of family involvement initially providing them detailed memos of the state's evidence against Mr. Abdullah, without obtaining a signed waiver of attorney-client privilege, trying to convince the family to get Mr. Abdullah to enter a guilty plea, and then finally cutting off information to the family such that family members were shocked during trial by the lack of zealous representation and the fact that Mitch Toryanski conceded Mr. Abdullah's presence in Boise on the night in question.

66.     Trial counsel's conflict extended to their continued efforts to engage in plea negotiations up to and including trial despite Mr. Abdullah's expressed interest in proceeding to trial.  Ms. Toryanski noted that she was devoting "all energies in her body" for a plea, and Mr. Toryanski was also trying to secure a plea as he believed that plea negotiations were a decision for counsel, not the client.  The files of trial counsel do not include notes indicating that Mr. Abdullah was even aware of these ongoing plea conversations, and Mr. Abdullah consistently told trial counsel he was opposed to a plea.

67.     Additionally, trial counsel determined that Mr. Abdullah should not testify, over his expressed and repeated desire to do so, and told him that if he chose to testify, they would not ask any questions nor assist him and that he would be left to just speak to the jury.  Mr. Abdullah's trial counsel told him that he could fire them if he wanted to tell his story, despite the fact that the case was mid-trial and counsel knew that the Court would never permit new counsel at such a late stage effectively sabotaging Mr. Abdullah's efforts to defend himself in his own words.  This refusal to prepare Mr. Abdullah to testify is especially egregious as Mr. Abdullah, being foreign born, had limited understanding of the American judicial system, and had to rely on counsel.

68.     Trial counsel failed to address their conflict with either the Court or Mr. Abdullah. Additionally, Ms. Toryanski noted in her 2008 deposition that she became concerned that there was a conflict during her representation and conducted research but never resolved the issue despite continuing her representation.

69.     Trial counsel's failure to address such a conflict resulted in a deficient performance and prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### iii.    *Failure To Present Any Theory Of The Case*

70.     Trial counsel presented no real theory of the case at any point during the guilt phase, thereby failing to perform their most basic duty.  Instead of a clear theory, the Toryanskis offered a totally incoherent series of potential explanations, several of which were obviously inconsistent with each other, and each of which was given in a vague, exceptionally clumsy fashion.

71.     Trial counsel's stumbles in this regard began at the very beginning, when they reserved giving their opening statement until the State rested.  In so doing, they allowed the prosecution to

monopolize a huge amount of trial time with no competing narrative.  Many studies show that the typical juror reaches a strong conclusion about guilt during the early stages of a trial.  By yielding this ground, the defense let the prosecution have almost the entire floor during this crucial stage.  Defense counsel could not have been delaying their opening so as to keep their theory secret, because they never developed any real theory at all.  Nor could they have been reasonably attempting to prevent the State from insight into potential theories, because they had already exposed one of the strongest possible theories at great length through an imprudently detailed and lengthy letter in support of a plea offer.

72.     Additionally, it is clear that this was not a strategic decision to assist their client, but rather a reflection of their utter lack of preparation as Mitch Toryanski noted that he did not know what the defense was prior to the start of trial.  Moreover, Mr. Abdullah had no idea what the defense was and sent notes during court days and letters during trial to the Toryanskis asking them to explain the defense to him.  As late as October 2004, while in the middle of trial, Mr. Abdullah asked the Toryanskis to visit him to explain the defense.

73.     When trial counsel finally gave its opening, it was at best a vague and cryptic statement, which did not address any evidence, give any hint of how Mr. Abdullah would explain his wife's death, and generally offered no guidance to the jury.  By failing to commit to a specific theory at the outset, trial counsel could not make informed and reasonable strategic decisions throughout the case.  Trial counsel's opening statement provided no theory and instead talked about Azad's family coming to America, Angie and Azad's relationship, the Abdullah family moving away, and a vague reference to Angie and Azad's actions that night being related.

74.     This useless opening was designed in part to avoid "upsetting" the prosecution as Ms. Toryanski noted that she wanted to keep the potential for a plea open and believed that it would

upset the state's attorney if an alibi was presented in their opening. This is despite the fact that an alibi witness with law enforcement training had been identified, and that Mr. Abdullah had steadfastly maintained that he was in Salt lake City at the time of his wife's death in Boise, Idaho.

75.     If the opening was a wasted opportunity, the closing was a spectacular act of self-sabotage. In their closing, the Toryanskis conceded to the jury that Mr. Abdullah was present in Boise at the time of the trial. However, they never offered any explanation as to what he was doing when Ms. Abdullah died, giving the jury no answer to the most basic question in the case, and therefore no reason to find him innocent

76.     This concession could only have harmed Mr. Abdullah, because, as the jury knew, he had consistently told the police that he was in Salt Lake City at the time of the fire. In fact, Mr. Abdullah and his family believed that an alibi defense would be presented and were shocked when instead his attorneys, in their last opportunity to address the jury regarding guilt, conceded that Mr. Abdullah was in Boise at the time of the fire. Furthermore, before they conceded his presence, defense counsel had cross-examined numerous witnesses who were called solely to place Mr. Abdullah in Boise at the time of the crime. For example, they did so with Marjorie Wood regarding her identification of Mr. Abdullah at a Mountain Home gas station on the night of the fire, with Stephanie Hobbs regarding his plans for a trip to Salt Lake City the day before the fire, and with Khaja Shuaib-Ud-Din regarding Mr. Abdullah's decision to stay at a motel in Salt Lake City instead of staying at the mosque there. Given counsel's eventual abandonment of an alibi, these cross-examinations made absolutely no sense. They would have succeeded only in convincing the jury that the defense was hapless, deceptive, and confusing.

77.     Defense counsel's closing argument could be used in a textbook as an example of what *not* to do at the end of a trial.  It was essentially devoid of any real content.  There was no explanation of how Ms. Abdullah died, the fundamental issue about which the jury was soon to deliberate.  Nor was there any explanation of what Mr. Abdullah was doing in Boise at the time she died, despite counsel's concession that he was there, which then served as an invitation for the jury to find him guilty.  Indeed, counsel not only conceded that Mr. Abdullah was in Boise, they conceded that he was right outside of the crime scene.  It was therefore especially striking that counsel did not even begin to address what Mr. Abdullah was doing in the driveway of the house in the middle of the night around the time the house burst into flames with his dead wife's body inside of it.  Instead of a theory, there was a rambling series of vague, unclear statements, which either had little or no evidentiary support, often because defense counsel had failed to provide that support at trial.  By offering such a hugely damaging concession, and no theory at all to make up for it, defense counsel might as well have been offering a closing argument for the prosecution.

78.     Turning to the possible causes of death that trial counsel alluded to in their closing, if only very briefly, they intimated at times that Ms. Abdullah may have committed suicide and at other times that she may have died from an accidental overdose, while explaining neither theory fully or persuasively.  Since both could not be true, defense counsel appeared to the jury to be desperately grasping for straws.

79.     Counsel also hinted darkly in their closing that Mr. Abdullah's activities were somehow related to his wife's, though they offered nothing on what those activities might have been and how they were related.  By making statements and offering no support for them whatsoever,

counsel destroyed whatever credibility they might have had left in the eyes of the jury and obliterated any chance of an acquittal

80.     Some aspects of the closing bordered on the bizarre and could only have alienated the jury.  Mr. Toryanski, and not his wife, freely speculated how a woman's breasts must feel when lactating and suggested that because Ms. Abdullah was found in a sports bra, she must have been pouring gas around the house.  It is shocking that Mr. Toryanski would make such a ludicrous point in a case overflowing with reasonable doubt, including a prosecution theory that has one cause of death occurring at a time when the defendant was, by the State's own evidence, hundreds of miles away, a compelling eyewitness who supported the defendant's alibi, and an investigation riddled with the highly suspicious loss and destruction of key pieces of evidence.

81.     Needless to say, the prosecution made the most of trial counsel's train wreck of a closing, encouraging the jury to feel "shocked and outraged" at the Toryanskis' decision to concede the biggest issue of the case and offer nothing in its place, which the jury no doubt did.

82.     Counsel's failure to choose a theory and then articulate it clearly hobbled their entire defense, leading them to examine witnesses in a weak, unfocused, and incomplete way, to call a poorly selected and disjointed group of witnesses, and to give a laughably ineffectual closing statement.  Understood in those terms, the failure was a large force generating and exacerbating many of the other deficient acts outlined below.

83.     For reasons discussed elsewhere in this petition, the strongest theory of death available to the defense was that Ms. Abdullah committed suicide.  Given Ms. Abdullah's lengthy and well-documented history of depression, the stressors in her life, the recent birth of a child after she had previously experienced post-partum depression, and the fact that her manner of death (drugs on board and a bag over her head) resembled a textbook suicide, that theory would have been

extraordinarily compelling. However, as also discussed elsewhere, there were other theories that counsel could likewise have chosen and presented effectively, including that of an accidental drug overdose, a drug-drug interaction, Ms. Abdullah's murder by someone other than Mr. Abdullah, or simply that the State's case was shot full of reasonable doubt. Instead of presenting any of these theories, counsel waffled between all of them, put on comprehensive evidence of none of them, vaguely gestured at them in a halting and incoherent manner at closing, and ultimately chose to essentially present no theory at all, which led to a disastrously ineffectual presentation that only ensured their client's conviction.

84.     Even years after the trial, with time to reflect, defense counsel still could not begin to articulate a theory of the case that was even remotely coherent or comprehensive.

85.     When asked what her theory of the case was more than two years after Mr. Abdullah was convicted, Ms. Toryanski responded as follows:

> Our theory of the case was that Azad was married to a very unstable woman who impacted him, who manipulated him. She had ideas about doing things that she sold to him as being okay. And he just followed right along because that's what he did. He did what people told him to do.

86.     It is anyone's guess how that random non-sequitur of a statement, which does not even purport to address Ms. Abdullah's death, could convince a jury to find Mr. Abdullah not guilty of murder.

87.     The Toryanskis' inability to muster even the semblance of a theory was a special tragedy in this case because the State's own theory was so tenuous. According to that theory, which is elaborated upon in more detail elsewhere, *see, e.g.*, Claim 1(A)(v), Mr. Abdullah, in some unknown manner, convinced Ms. Abdullah to ingest a large quantity of Prozac in Boise at a time when he was hundreds of miles away in Salt Lake City. Then, he traveled from Salt Lake City to Boise and entered the Siesta residence while Ms. Abdullah was incapacitated, whereupon he

asphyxiated her.  Then, he began spreading gasoline in the garage of the house with the intent to burn the house down, with his step-daughter Alyssa, her friend Shelby, his son Naim, and his newborn son, Malik, inside.  The house caught on fire prematurely, at which point Mr. Abdullah grabbed Naim and somehow remained hidden while neighbors and firefighters descended on the house.  After the firefighters completed their first tour with no sign of Mr. Abdullah, he managed to place Naim on a neatly folded blanket with toys and a flowerpot, where he was discovered by firemen who had walked through the area moments before, while Mr. Abdullah melted into the night.  In the process, he presumably vaulted over a six-foot fence twice with a blanket and toys in his arms, despite his small stature, since he could not have been either in the house when it was fully engulfed in flames, or in the yard, where he would have been seen.  He was able to accomplish all of this without being seen by neighbors or firefighters, and promptly returned directly to the Salt Lake City mosque, where no one he encountered that morning detected any odor of gasoline or smoke.

88.     Simply put, the State's case had innumerable holes in it.  Even the barest semblance of a defense theory would have defeated it, but the Toryanskis could not meet even the lowest possible bar.  Trial counsel also failed to take basic steps that any reasonable defense counsel would have taken in a serious case.  For example, despite securing funding from Mr. Abdullah's family for a police practices expert, they failed to prepare and present that expert, and they failed to secure a crime scene expert despite there being numerous questions about the way the scene was processed and maintained.

89.     Trial counsel's failure to prepare and stick to a theory of defense as described in this claim, and to properly respond to the prosecution's evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a

reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been

convicted of the charged offenses and/or would not have been sentenced to death.

### iv. *Conceding Mr. Abdullah's Presence In Boise*

90.     As described in the preceding sub-claim, Mr. Abdullah's defense counsel stated in their

closing argument that their client was in Boise on the night of the fire, without giving any

explanation as to what he was doing there.  In so conceding, the Toryanskis forfeited the most

contested issue in the entire case, destroyed their own client's credibility in the eyes of the jury,

and left them with no reason to acquit.

91.     In making this concession, the defense team essentially conceded guilt, despite the fact

that Mr. Abdullah maintained his innocence.  Counsel is not empowered to concede guilt on

behalf of their client, *McCoy v. Louisiana*, 138 S. Ct. 1500, 1510 (2018), and doing so is

ineffective.

92.     Mr. Abdullah did not agree to such a concession, nor did he know that one would be

made as trial counsel had filed a notice of alibi and other pretrial motions, including a motion to

suppress the identification of Ms. Wood, all of which disputed Mr. Abdullah's presence in Boise.

93.     As late as October 28, 2004, well into trial, Mr. Abdullah sent a letter to his attorneys

asking them what the defense was, he clearly was not aware that his presence would be

conceded, and Mitch Toryanski, who made the concession, has no recollection of discussing it

with Mr. Abdullah.

94.     This concession also failed to make use of available alibi evidence.  The Toryanskis

failed to present evidence from Lance Donnelson.  Mr. Donnelson was a clerk at the Maverick

Country Store in Utah.  Mr. Donnelson would have testified that he saw Mr. Abdullah and

another middle eastern male in his store between 2:30 and 3:30 am on the morning of October 5,

2002.

95.     Mr. Donnelson told Boise Detectives this on October 12, 2002, and told them that there

was a limited window of time in which they could obtain security videos, which of course, Boise

Detectives failed to do.  However, Mr. Donnelson spoke with the defense investigator and was

willing and able to testify; in fact, he was subpoenaed but later told he would not be needed.

96.     Mr. Donnelson would have been a compelling defense witness as he was a certified law

enforcement officer and had completed an eighteen-week training involving eyewitness

identification in November 2001.

97.     Not only was Mr. Donnelson not called to testify but Mr. Toryanski was unsure if the

defense team ever discussed the decision to abandon the alibi theory with Mr. Abdullah.

98.     Mr. Abdullah, his family, and jurors all expressed shock that the closing argument placed

Mr. Abdullah in Boise, at his residence, at the time his wife was dying and the house was

burning.  In fact, one of the jurors (No. 68) later disclosed that the concession by Mr. Toryanski

in his closing argument was like a bombshell as until that point there was doubt as to whether or

not Mr. Abdullah had returned to Boise.

99.     The most appalling part of this concession is that Ms. Toryanski decided to make this

concession near the end of the State's case as she did not want to upset or "burn bridges" with

Mr. Owen, the lead prosecutor.  In fact, she had assured Mr. Owen that she would concede Mr.

Abdullah's presence in Idaho, despite not telling the rest of the team or her client that she had

made such a promise.  Her stated reason was to allow for continued plea negotiations despite the

fact that Mr. Abdullah was not interested in a plea and instead wanted and expected an alibi

defense.

100.    Trial counsel's decision to place Mr. Abdullah at the scene of the crime as described in

this claim, considered by itself and in combination with other acts of deficient performance,

prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

      **v.**      ***Failure To Argue That Mr. Abdullah Could Not Have Been Responsible For The Prozac That Ms. Abdullah Ingested Due To The State's Own Timeline***

101.     One of the largest holes in the State's case was that it presented evidence that Ms. Abdullah ingested a lethal amount of Prozac at a time when, according to its own account, Mr. Abdullah was not in Boise. Bizarrely, defense counsel never pointed out that glaring problem with the State's case. To elaborate, according to the State's evidence, Ms. Abdullah had an acute overdose of Fluoxetine (which goes by the trade name Prozac) poisoning in her blood stream, which was a contributing factor to her death.

102.     At the time of her death, Ms. Abdullah had a full stomach of a partially digested meal of carrots, potatoes, and other vegetables. However, there was very little Fluoxetine in her stomach. According to the State's forensic toxicologists, Dr. Edward Barbieri and Dr. Ronald Backer, the Fluoxetine was administered prior to Ms. Abdullah's last meal, and the last meal occurred approximately an hour and a half before her death. As such, the State maintained that the administration of the Fluoxetine occurred during a narrow window, sometime between 10 PM and midnight.

103.     Additionally, by the State's theory of the case, Mr. Abdullah left Salt Lake City for Boise shortly after 8:10 PM on October 4, 2002; was accurately identified by Marjorie Wood in Mountain Home on his way to Boise sometime after midnight; and arrived in Boise sometime around 1:30 AM. Thus, taking the State's theory as true, it was impossible for Mr. Abdullah to

have administered the Prozac between 10 PM and midnight because Mr. Abdullah had not yet even reached Mountain Home.

104.     Trial counsel completely failed to identify this simple timeline, and never made the obvious argument in any shape or form that Mr. Abdullah could not have administered the Prozac based on the State's own version of events.  Because the evidence reflected that the administration of the Prozac was directly linked to Ms. Abdullah's death, the only logical conclusion is that she either committed suicide or was killed by an unknown third party.  The prosecution illuminated this fatal flaw in its theory at closing, where it described—remarkably— the question of how Mr. Abdullah was able to have Ms. Abdullah ingest the Prozac as a "side issue" on which it did not need to prove him guilty beyond a reasonable doubt.  Later, the prosecution asserted: "How he got her to drink it is not what you need to think about."  Mr. Abdullah was charged in the amended indictment with murdering his wife "by suffocating her and/or by acute Prozac (fluoxetine poisoning)."

105.     Given that the jury was permitted to convict Mr. Abdullah of murder on the *sole* theory that he poisoned her with Prozac, it is astonishing that the State would assert that it did not have to prove that theory beyond a reasonable doubt and went so far as to discourage the jury from even considering this crucial part of the case, and even more astonishing that the defense would acquiesce to such an irresponsible maneuver on the part of the prosecution.  By not exploiting this enormous problem with the State's theory, and by conceding Mr. Abdullah's presence at the scene, defense counsel took a case riddled with reasonable doubt and turned it into a surefire win for the prosecution.

106.     Dr. Susan Rushing, a clinical and forensic psychiatrist would have testified that the Prozac was ingested prior to Ms. Abdullah eating her final meal, that it was ingested and not

injected, and that such a large quantity of Prozac would not be able to be hidden in food or drink as Prozac is delivered in capsules and the powder inside the capsules is extremely bitter. Confirming Dr. Rushing's opinion, Dr. Erik Christensen, a forensic pathologist, would have testified that it would have been practically impossible for someone to surreptitiously poison Ms. Abdullah with the amount of Prozac found in her blood stream.

107.    Trial counsel's failure to challenge the timeline of the Prozac ingestion as described in this claim, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### vi.    *Failure To Present An Alibi Defense*

108.    As with the Prozac timeline discussed above, defense counsel inexplicably failed to present extremely compelling alibi evidence.  First, counsel were well aware that Lance Donnelson, an eyewitness with law enforcement training on identifications, recalled with a high degree of confidence that Mr. Abdullah was present at a store in Utah at a time and place that would have rendered it impossible for him to have committed the alleged crimes.  Specifically, Mr. Donnelson was 90% certain that he observed Mr. Abdullah enter a Maverik Country Store in Farr West, Utah between 2:30 and 3:30 AM on October 5, 2002.

109.    Mr. Donnelson was willing and able to testify at trial and would have made an excellent witness as he has a law enforcement background and had recently attended an eighteen-week course on eyewitness identification.  Nevertheless, defense counsel failed to call him.

110.    They likewise failed to present the testimony of Michael Quintana.  Mr. Quintana was identified as having spent the night at the Dream Inn in Salt Lake City on October 4, 2002, and checking out the following morning.  During a deposition, he testified at around 11 PM on

October 4, he witnessed a man enter room number seven, the room next to his. Mr. Abdullah and his son were the only registered occupants of that room. They had checked into room seven and Mr. Abdullah had told police that he was sleeping there at the time of the fire. In addition, Mr. Quintana further testified that he heard people speaking in a different language in room seven well into the night. Thus, Mr. Quintana's testimony would have bolstered an alibi defense.

111. Third, Shad Mohammad and Abdul Afridi would have testified at trial that they did not smell smoke or gas on Mr. Abdullah or believe he looked tired when they saw him at the Salt Lake City Mosque on the morning of October 5, 2002, which would have added additional weight to a defense theory that had Mr. Abdullah uninvolved in the fire, as the alibi theory would have had.

112. Fourth, counsel failed to present evidence that there were no Halal providers in Boise and, as a result, Muslims from Boise often traveled to Salt Lake City to purchase Halal meat. Such evidence would have provided circumstantial support for the alibi theory discussed in this claim.

113. Finally, Mr. Abdullah himself could have corroborated the alibi with testimony, which was especially important given the Toryanskis' failure to present the other evidence that would have supported an alibi. As noted elsewhere, the failure to call him was not reasonable, and was in fact unconstitutional for reasons other than ineffectiveness as well. *See, e.g.*, Claims 1(A)(xxix) and 23.

114. Instead of presenting this compelling and highly exculpatory alibi evidence, Mr. Toryanski conceded in his closing statement that Mr. Abdullah was in fact in Boise at the time of the fire. That wildly irresponsible act did enormous damage to Mr. Abdullah's defense. Indeed, the prosecution stated early in its closing that there was "not a single witness who has been

located or produced or exists that can tell you that this man was in Salt Lake City" at the time of the fire, a position the defense could easily have undermined if the Toryanskis had been doing their job. There can be no debate about whether the concession prejudiced Mr. Abdullah, because a juror has subsequently said that until counsel admitted their client's presence at the scene there had been "doubt as to whether he had actually come back."

115.    Counsel's post hoc accounts of why they made a concession that sabotaged their client's defense are illogical on their face, objectively unreasonable, and therefore cannot insulate them from ineffectiveness.

116.    First, Mr. Toryanski testified, outlandishly, that he conceded Mr. Abdullah's presence in Boise to preserve his credibility with the jury. It hardly preserved his credibility to offer the preposterous theory that Mr. Abdullah drove back and forth to Salt Lake City three times over the course of two days and was then innocently in his driveway for no apparent reason in the middle of the night while his wife set fire to her own house, in complete disregard for her children's safety, and then committed suicide.

117.    Second, the Toryanskis believed—wrongly—that the proffers they made during plea negotiations could be used to impeach the defense witnesses if they went with an alibi defense. As discussed in Claims 1(A)(xxxix), 2, and 23, these proffers divulged highly sensitive information to the prosecution that gave it a sizable advantage over the defense.

118.    Third, defense counsel have asserted that they did not pursue an alibi defense in part because they did not want Mr. Abdullah's son, Redear, to have to testify, which they believed would have occurred if an alibi defense had been presented. The State could have done so regardless of the alibi defense, though, just as it put on a great deal of other evidence, attempting to place Mr. Abdullah in Boise at the time of the fire. Plus, Redear's past statements were not

that damaging.  He had recalled earlier that he actually saw the house burning and, in an effort to save the house, Alyssa, he, and Mr. Abdullah had all used a fire hose to put out the fire.  This far-fetched account would have greatly diminished the power of any negative testimony, by showing that any statement that Redear made about being at the house during the fire was far more likely to have resulted from a post-hoc reimagining than from his recollection.  In addition, trial counsel could and should have hired an expert in suggestive interview techniques, who would have informed them that the State's interview of Redear diverged sharply from best practices, and that, therefore, Redear's statements during that interview could either be excluded or substantially weakened through expert testimony.  *See* Claim 1(A)(xvii).

119.    Trial counsel's abandonment of the alibi was driven by concerns that made no sense and only reaffirms the unreasonable nature of the decision.  *See* Claim 1(A)(iii).

120.    Some of these concerns included not burning bridges with prosecutor Patrick Owen as Ms. Toryanski, inexplicably, believed that by foregoing an alibi defense she would remain in Mr. Owen's good graces and secure a plea, despite her client's expressed desire to not enter a plea.  The decision to forego an available and compelling alibi defense was not explained to the client, nor was it consistent with his desired defense.

121.    Trial counsel's failure to present an alibi defense as described in this claim, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah.  There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### vii.    *Failure To Adequately Develop And Present Evidence That Someone Other Than Mr. Abdullah Was Responsible For The Crimes*

122.    There were significant pieces of evidence that someone other than Mr. Abdullah was involved in the death of Ms. Abdullah and the fire at the Siesta home.  First, the Prozac was

administered to Ms. Abdullah at a time when it was impossible for it to have been given to her by Mr. Abdullah. Under the state's theory, Mr. Abdullah left Salt Lake City for Boise shortly after 8:10 PM on October 4, 2002; was accurately identified by Marjorie Wood in Mountain Home on his way to Boise sometime after midnight; and arrived in Boise sometime around 1:30 AM. Thus, taking the State's theory as true, it was impossible for Mr. Abdullah to have administered the Prozac between 10 PM and midnight because Mr. Abdullah had not yet even reached Mountain Home

123.     Additionally, several members of the neighborhood told police that they had seen strange men in the neighborhood at and around the time of the fire. For instance, Laura Sanchez, a neighbor of the Abdullah's, saw a man outside her home around 2:00 AM on the night of the fire. Ms. Sanchez testified that the man was not Mr. Abdullah. The defense team made no attempt to interview Ms. Sanchez, even though she was obviously a key witness who could have helped support a theory that another man was the real perpetrator. Defense counsel also made no reference to Ms. Sanchez in their closing argument or opening statement, thereby forfeiting any opportunity to argue to the jury that there was evidence that another person was the culprit. Ms. Sanchez's husband, Mike, also told police he saw a man standing under the street light watching the fire before the man walked off. Mike Sanchez described the man as having short or shaved hair, a goatee, a ball cap, wearing a flannel shirt and baggy pants, and being short and stocky. Mr. Sanchez would later note that he was certain the man was not Mr. Abdullah as he and Abdullah worked at the same company and the man he saw was stockier than Mr. Abdullah.

124.     A similar lapse occurred with respect to Winema Windham, another neighbor of the Abdullah's. Ms. Windham was interviewed by the police the same day as the fire. She told police that she came outside the house after the explosion, at which point she spotted a man who

she did not recognize from the neighborhood in a blue and red Ford Mustang 5.0.  Since the man

was apparently a stranger to the neighborhood, and present in the early morning hours in a

residential area, this report would have raised enormous red flags for a competent defense team,

and cried out for additional investigation.  Trial counsel, however, made no attempt to follow up

with Ms. Windham or determine who the mysterious stranger might have been, and therefore

missed a chance to find another possible suspect and forfeited another opportunity to argue for

reasonable doubt.

125.     Similarly, defense counsel never informed the jury that yet another neighbor, Jamie

Juker, told police that she saw a man close to the Siesta residence around the time of the fire who

did not match Mr. Abdullah's description.  Neighbor Gayle Munson also saw a man walking in

the neighborhood shortly after the fire who appeared to intentionally look away from her; this

man also did not match Mr. Abdullah's description.  Nor did defense counsel present evidence

that two young men in a car with a license plate that read "ARCANGL" had been behaving

oddly around the time of the fire, and that yet another neighbor—David Behunin—was

suspicious enough about the young men that he reported his interaction with them to the police.

126.     Defense counsel likewise made no attempt to follow up on Marjorie Wood's assertion

that Mr. Abdullah was with two other men at the Mountain Home Chevron on the night of the

fire.  For instance, the Toryanskis did not try to collect the receipt and/or transaction report

reflecting the purchase of gas or soda that was supposedly made by the men at the Chevron.  A

thorough investigation would have investigated those other men as the possible culprits, and

defense counsel did not conduct that investigation.

127.     Aside from failing to follow up on potential alternate suspects, defense counsel failed to

present other evidence that Mr. Abdullah was not the culprit.  For instance, Mr. Abdullah's

certificate of nationalization was in the house when it burned down, and was damaged in the fire. Had Mr. Abdullah been the culprit, he would have removed this extremely important document before beginning to perpetrate the arson. The fact that he did not remove it weighs in favor of another actor, and defense counsel should have so argued.

128. These failures were particularly egregious given that the defense theory was supposedly one based on reasonable doubt. The possibility of another murderer and arsonist suggested that the prosecution had not met its burden of proof.

129. Trial counsel's failure to present evidence that someone other than Mr. Abdullah was responsible for the death of Angie Abdullah and the house fire, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

> **viii.** **_Failure To Adequately Present A Suicide Defense And Challenge The State's Nonsensical Cause-Of-Death Theory_**

130. In several respects, trial counsel botched a strong potential theory that Ms. Abdullah committed suicide and failed to attack an explanation of her death by the State that did not add up on its face.

131. First, Ms. Toryanski conducted a woefully inadequate cross-examination of Dr. Glen Groben, neglecting to impeach this crucial prosecution witness with powerful information that would have substantially discredited him in the eyes of the jury. Dr. Groben was the state pathologist who conducted the autopsy of Ms. Abdullah, and testified to the cause and manner of her death. He was the only prosecution witness to testify to the manner of Ms. Abdullah's death and was consequently instrumental to the State's case. As set forth in Claim 28, Dr. Groben based his initial determination that Ms. Abdullah was murdered on his mistaken belief that her

toxicology was normal. At that time, he concluded that she could not have committed suicide because there were no drugs in her system. Dr. Groben testified to this initial conclusion during the grand jury proceedings. When Dr. Groben later discovered that Ms. Abdullah in fact had a lethal amount of Prozac in her body, he simply ignored his previous statement that drugs would support a suicide theory and opined that she was murdered through some mysterious and wholly unexplained combination of poisoning and asphyxiation. As Dr. Groben explained under direct examination at the guilt phase of the trial, he was able to maintain his position despite the tremendous shift in the evidence because of unidentified "investigative reports," which he did not describe, and unspecified "other things that I knew of that precluded anything other than homicide in my opinion." In other words, Dr. Groben dismissed evidence that even he recognized to scientifically weigh against a finding of homicide because of police documents that had nothing to do with his training and expertise as a pathologist. He was plainly altering his medical opinion to suit the prosecution's theory of the case, rather than going where the evidence took him.

132.     Dr. Groben's ill-defined theory failed to take into account several facts inconsistent with homicide, including that (1) the investigation at the scene was minimal, as it failed to uncover the plastic bag that Dr. Groben discovered at the autopsy, (2) homicide by plastic bag suffocation is rare, whereas it is a much more common for such an act to be suicide, (3) the bag was never tested for DNA which may have excluded Mr. Abdullah and demonstrated that Ms. Abdullah placed the bag over her own head, (4) some of the most common drugs used by people who commit suicide by plastic bag are antidepressants (such as Prozac), and (5) there were no injuries or bruises observed at the autopsy indicating no evidence that Ms. Abdullah was held down or fought back when a bag was placed over her head.

133.    Despite this wealth of information calling into significant doubt the reliability and objectivity of Dr. Groben, Ms. Toryanski accomplished virtually nothing with her cross-examination. She did not confront Dr. Groben with the glaring inconsistency between his statements to the grand jury and his testimony at trial. She did not call any attention to the fact that, in determining it was homicide, Dr. Groben was relying on law enforcement materials that had no medical significance, while discounting information that he knew to be scientifically important, and while failing to thoroughly canvass the victim's medical and mental health records. Instead of pursuing these fruitful and permissible avenues for contesting Dr. Groben's testimony, Ms. Toryanski opted to ask him about a letter which the trial court had forbidden any discussion of. After being rebuked sharply by the judge for her egregious violation of a court order, Ms. Toryanski exclaimed, "I am so sorry. I am so sorry," and then abruptly ended her questioning. Thus, Ms. Toryanski not only missed a perfect window to undermine the credibility of a central prosecution witness—she used that examination to make a huge and easily avoided mistake and in the process succeeded in undermining only her own credibility.

134.    As discussed in Claim 7, Dr. Groben improperly based his medical opinion on evidence about the police investigation that had nothing to do with the supposedly scientific inquiry that he was conducting. Trial counsel failed to ask Dr. Groben about this information. Had they done so, they would have exposed Dr. Groben as a severely biased witness who traded in his medical integrity to become a member of the prosecution team.

135.    At closing argument, trial counsel again failed to reference these blatant problems with Dr. Groben's testimony, thereby re-committing all of the same errors. Through these numerous omissions, defense counsel left the jury with the impression that Dr. Groben's dubious conduct was normal and unsuspicious, and that his testimony was credible. Competent defense counsel

would have seized this ready opportunity to show the jury that this key government witness was a tool of law enforcement masquerading as a neutral doctor.

136.    Second, defense counsel failed to adequately use toxicology evidence.  Indeed, defense counsel actively countered the toxicology evidence that was favorable to their case.  They did so by eliciting from Dr. Ashraf Mozayani testimony that she did not believe Ms. Abdullah died of an acute overdose of Prozac, cutting off a suicide defense at the knees.  In light of the fact that Ms. Abdullah was found with a bag over her head, this was an objectively unreasonable decision that had no basis in any valid strategy.

137.    Defense counsel could have called a witness who would have testified that suicide was a likely cause of death, and they could have done so without precluding the possibility of an accidental death, such as one caused by drug-drug interactions or by a long-term buildup of Prozac in Ms. Abdullah's body.  The error described above was compounded by the generally terrible quality of Dr. Mozayani as a witness, as described below.  *See* Claim 1(A)(ix).

138.    Given what a catastrophe Dr. Mozayani was as a witness, defense counsel also should have called someone else to challenge the State's cause-of-death conclusions with actual coherence.  They had that person lined up in the form of Dr. Paul Herrmann, a forensic pathologist for whom trial counsel requested and received funding but failed to call as a witness. Dr. Herrmann could have challenged Dr. Groben's conclusion of homicide as unsupportable, and punched a large hole in the State's case.  Dr. Herrmann could also have rebutted Dr. Charles Backer's suggestion that a person suffering with acute levels of Prozac would necessarily have exhibited symptoms such as seizures.  The available literature indicated that such symptoms were by no means certain, although they "may occur" in some cases, and usually in combination with other drugs, none of which were present in Ms. Abdullah's case.  Trial counsel elected not

to present Dr. Herrmann because they believed he could be impeached by statements trial counsel had made to the prosecutor during the course of plea negotiations. That belief was false, as a cursory amount of legal research would have shown. Since the decision was based on ignorance of the law, it cannot be regarded as a tactical one shielded from ineffectiveness. If they were not going to use Dr. Herrmann, defense counsel could instead have used another toxicologist to testify to the same opinion, who—given the dubiousness of Dr. Groben's view—would have been easy to find. They found no one, and ended up asking questions relating to toxicology of Dr. Craig Beaver and Dr. Ward, neither of whom was qualified to opine on them. Additionally, trial counsel should have had Ms. Abdullah's blood tested for multiple drugs, so as to support their argument that Ms. Abdullah might have died from a drug-drug interaction.

139.    Third, trial counsel failed to present an adequate defense regarding Ms. Abdullah's psychiatric and psychological issues. At trial, the State repeatedly emphasized that Ms. Abdullah's medical health professionals had not seen indications of her being at risk of self-harm. For instance, Gina Wolfe Seybold, a therapist for Ms. Abdullah, testified that people who harm themselves usually have a prior history of it, including previous suicide attempts and self-mutilation. Defense counsel could and should have presented evidence, by cross-examining witnesses like Ms. Seybold, that there are also many people who commit acts of self-harm—including suicide—without having an established track record of such acts and without describing to their counselors the full extent of their depression. Trial counsel also could have presented this sort of evidence through their own witnesses, but they failed to retain the appropriate experts to do so. Rather, they asked Dr. Beaver to look into the issue, even though he advised them that he was not qualified to do so.

140.     A qualified clinical or forensic psychiatrist, such as Dr. Susan Rushing, could have

testified to numerous factors which made suicide likely.  Some of these factors include medical

records which indicate that Ms. Abdullah was in the midst of a major depressive episode during

her pregnancy in 2002.  Her dose of the antidepressant Prozac was increased from 10 mg per day

on March 26, 2002 to the maximum recommended dose of 80 mg daily on 06/18/2002. She was

pregnant at this time and gave birth to a son on September 16, 2002.  Additionally, Dr. Rushing

would have advised the jury that death by suicide or overdose is the leading cause of death

among women in the United State in the first year after they give birth, a relevant fact as Ms.

Abdullah had given birth several weeks prior to her death.  Aside from the history of post-partum

depression, Ms. Abdullah had other significant risk factors for suicide, including a history of

sexual abuse, a previous spouse who had committed suicide, and roughly ten years of therapy

during which she experienced periods of severe depression, per her Beck Inventory score,

including as recently as April 2002, a mere six months before her death.  Finally, on a

Postpartum Adjustment Questionnaire for New Mother' completed on September 16, 2002, Ms.

Abdullah indicated that she had been depressed and anxious during her pregnancy, that she did

not feel in control of her life, that she had financial, housing, or other personal worries that she

often felt angry at her life situation or those around her.  Ms. Abdullah hand wrote on the

paperwork, "Please don't talk to me regarding this with anyone in my room." As such, it is

possible that Ms. Abdullah did not disclose her severe struggles with depression to her husband

or other family members. Dr. Rushing or a similar expert could have also testified that Prozac

has an extremely bitter taste, and that the amount of Prozac required to produce the level

observed in Ms. Abdullah's blood could not have been hidden in food or a liquid.

141.    Had trial counsel obtained a qualified expert in clinical and forensic psychiatry, such as

Dr. Susan Rushing, they could have presented the many factors that made suicide likely

including Ms. Abdullah's longtime history of depression, her sexual abuse as a teenager, the loss

of a prior husband to suicide, the fact that she suffered from a degenerative nerve disease

(Charcot Marie Tooth), and that she had learned in April 2002 that such a condition is genetic

and that she should consider DNA testing to allow for genetic counseling as it related to her

children.

142.    Similarly, trial counsel should have pursued records from Kristine Mors relating to Ms.

Abdullah's mental health.  Dr. Mors treated Ms. Abdullah and prescribed her medications for her

depression between 1997 and 2002.  At trial, Ms. Toryanski submitted an affidavit in support of

a motion to compel Dr. Mors to produce her records, asserting that she had given Dr. Mors a

subpoena but Dr. Mors had failed to respond.  However, defense counsel never asked the trial

court for an order compelling Dr. Mors to disclose her records.  Had they pursued Dr. Mors'

records more diligently, defense counsel would have discovered materials supporting a suicide

theory.

143.    Trial counsel was also ineffective in failing to introduce medical records that showed that

Ms. Abdullah's depression was markedly exacerbated when she stopped taking Prozac.

Specifically, medical records demonstrate that in March 1992, Ms. Abdullah got "real anxious,

irritable, and depressed" after stopping her Prozac prescription. As noted above, in June 2002,

Ms. Abdullah's Prozac prescription was increased to 80 mg.  Ms. Abdullah filled this

prescription in June and August; however, based on medical and prescription records, she would

have run out of the medication on or around September 11, 2002.  The fact that the prescription

was not filled in September, yet an acute dose of Prozac was a contributing factor to her death in

October 2002, indicates that she had stopped taking the Prozac and had a stockpile of the medications available to her prior to her death. This information would have added to the suicide theory as it would have explained Ms. Abdullah's increased depression at the time of her death and demonstrated that such depression was not connected to Mr. Abdullah or a problem marriage, but rather to her stopping necessary prescription medication.

144.    Defense counsel were also remiss in not challenging the reliability of Ms. Abdullah's counselors in their assessment of Ms. Abdullah's risk of self-harm.  They had a promising avenue to do so on the basis that the counselors had only seen her sporadically in the three years preceding her death, and had not seen her at all for more than four months at the time she died. That gap was especially significant because her counselors would not have known if Ms. Abdullah was sinking into greater despair and suffering from post-partum depression during this period.

145.    Along the same lines, defense counsel failed to adequately make the case that Ms. Abdullah's life experiences made her more likely to commit suicide, such as her serious depression, her significant physical pain, the fact that her ex-husband committed suicide, the fact that she had been physically and sexually abused as a child, and the fact that she had been physically and emotionally abused in previous marriages.  Although some of this evidence was presented through Dr. Clay Ward, it was presented in a weak, tentative, and unpersuasive way, and hobbled by counsel's failure to adequately prepare Dr. Ward to testify and review the bases for his opinion.  For example, Dr. Ward did not have at hand scholarly literature to support his statement that the suicide of Ms. Abdullah's ex-husband increased the risk of her committing suicide, even though such literature was available and even though the defense had long been on notice that the prosecution and trial court would be looking for such evidence.  Dr. Ward also

never consulted with Ms. Abdullah's treating/prescribing physicians and never had any contact with her family members. Obviously, these are things competent counsel would have asked an expert to do: follow up with actual care providers and be able to cite authority for the expert's opinion. These omissions greatly undercut the power of Dr. Ward's testimony and of trial counsel's suicide defense, and opened Dr. Ward up to a devastating cross-examination by the prosecution.

146. Defense counsel's failure to put on a halfway plausible suicide theory, despite its ready availability, put Mr. Abdullah in the worst of all positions: his team was blaming the victim, but doing it so poorly and unpersuasively that it was certain to blow up in their faces. Counsel knew of the danger that they would be perceived as vilifying Ms. Abdullah, as they were warned of it by Dr. Beaver and their mitigation specialist Rosanne Dapsauski, but they plunged ahead in their ill-prepared way nevertheless, doing their case immense damage in the process. This is despite the availability of understandable and reasonable ways to explain to the jury that Ms. Abdullah's potential suicide did not make her a bad person, but rather a sympathetic woman who was struggling with a difficult life history and a tendency towards post-partum depression.

147. Trial counsel also never put on evidence that Ms. Abdullah had a troubled childhood full of trauma, which would have likewise supported a suicide defense. In support of this, trial counsel should have presented information from Ms. Abdullah's lengthy history of psychiatric care. On a psychiatric evaluation by Dr. Pedersen on 04/29/1992, there is a section titled sexual abuse notes, "9th grade, 14 y/o assaulted in home, perpetrator caught, wasn't taken seriously." Additionally, Angie's family of origin also had psychiatric and substance abuse issues. She reported to Dr. Pedersen that her mother and sister had depression and that her father, stepfather, sister, and brother struggled with alcohol use. She said that her parents divorced when she was

4. She experienced paternal abandonment and had no further contact with her father. Paternal abandonment is a severe childhood trauma. On examination, Dr. Pedersen found Angie to have "anger, apathy, decreased concentration, depressed mood, fatigue, hopelessness, hypersomnia, inappropriate guilt, irritability, psychomotor retardation, recurrent thoughts of death, intermittent suicidal ideation, and a weight gain of 20 pounds."

148. Having failed to call Dr. Herrmann to present evidence that Ms. Abdullah's death was undetermined, trial counsel failed more broadly to consult *any* forensic pathologist to establish that Ms. Abdullah more likely died from suicide than any other cause. Such testimony could have been offered by a qualified specialist such as Dr. Erik Christensen, who currently serves as the Chief Medical Examiner at the Utah Department of Health in Salt Lake City. Dr. Christensen definitively concludes that Ms. Abdullah's death cannot be ruled a homicide. Instead, Dr. Christensen explains, it is most likely that Ms. Abdullah died from suicide, in light of her mental health history, the high level of fluoxetine in her system, and the fact that she was found with a bag over her head. Dr. Christensen also observes that the autopsy performed by Dr. Groben was haphazard and lacking in the proper methodology.

149. If credited by the jury, Dr. Christensen's opinion of a likely suicide would preclude Mr. Abdullah's conviction of first degree murder, which required proof beyond a reasonable doubt that Ms. Abdullah died as a result of homicide and at her husband's hands.

150. Trial counsel's failure to adequately present a suicide defense or effectively challenge the State's theory of death, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### ix.    *Failure To Adequately Present A Slow Metabolizer Defense*

151.    Defense counsel put on some evidence that Ms. Abdullah may have been a slow metabolizer of Prozac as the result of a genetic defect, and died accidentally from a long-term buildup of the drug.  As referred to above, it was highly counterproductive to put this evidence on at all, since there was much stronger evidence of suicide and the slow metabolizer defense was inconsistent with that theory.  Even taken on its own terms, though, the slow metabolizer defense was horrifically botched.  As their vehicle for the testimony, trial counsel chose Dr. Mozayani, a terrible witness who was unresponsive, rambling, and at times borderline incoherent.  The slow metabolizer theory was summed up by Dr. Mozayani in a few sentences, with little explanation of the implication of Ms. Abdullah being a slow metabolizer.  Dr. Mozayani's testimony was hampered by the fact that trial counsel failed to provide her with all of the information necessary for her to adequately evaluate Mr. Abdullah's case, including materials that she asked them to send.  Instead of calling Dr. Mozayani, defense counsel could have gained more ground by actually challenging the State's experts, including but not limited to Drs. Groben, Barbieri, and Backer.  Indeed, this was Dr. Mozayani's opinion and her expectation.  She understood that trial counsel were going to offer the testimony of a defense pathologist to testify on Mr. Abdullah's behalf, immediately following her testimony.

152.    Given what a catastrophe Dr. Mozayani was as a witness, defense counsel could and should have called someone else to speak to the same issues, albeit with actual coherence.  Relatedly, trial counsel never sought to have the decedent's liver tested for evidence of liver failure which can cause poor metabolization.  *See* Claim 1(A)(lxi).

153.    Trial counsel's failure to adequately present a slow metabolizer defense, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah.

There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

<strong>x.</strong>     <strong><em>Failure To Adequately Deal With Gasoline Evidence</em></strong>

154.    The State relied on the testimony of William Colucci to establish that the gas can found in the driveway of the Siesta residence contained gasoline with the same additive as a sample obtained from a 7-11 in Salt Lake City. This information was used to connect Mr. Abdullah to the crime scene. As it happens, the additive was also present in numerous service stations in Boise. In fact, there was a substantial likelihood that gasoline purchased anywhere in Boise would contain the same additive.

155.    Prior to trial, defense counsel consulted with Dr. John Thornton, an arson expert. They asked him to determine whether gasoline had been used as an accelerant and whether the gasoline in evidence showed a marker of having been purchased in Utah. Dr. Thornton conveyed to trial counsel well in advance of trial that he did not have sufficient information to render an opinion regarding the gasoline marker issue and requested additional discovery materials. Defense counsel did not provide them, and informed Dr. Thornton that they would not be calling him. Had he been given the appropriate documents, and then called, Dr. Thornton could have testified that the gas found at the Siesta house could easily have come from Boise, undermining a key component of the State's case. Or counsel could easily have identified another expert to testify to the same effect.

156.    Defense counsel should also have moved in limine to exclude Mr. Colucci from testifying as an expert because he did not provide any documentation of the data and procedures or methodology he utilized to arrive at his conclusions. At a minimum, defense counsel should have demanded this documentation. If trial counsel had requested this information and were denied based on the proprietary nature of the additives and testing procedures, trial counsel could

have then argued that Mr. Colucci's testimony was inadmissible because the methods he relied upon to reach his conclusion could not be subjected to independent analysis. During state post-conviction proceedings, the court denied Mr. Abdullah's request that the government disclose the data underlying Mr. Colucci's opinion and transfer the gas samples to his expert for independent testing.

157. Trial counsel's failure to investigate and present the evidence described in this claim and to properly respond to the prosecution's evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xi. *Failure To Adequately Deal With DNA Evidence*

158. Defense counsel had at their disposal a powerful counterattack to important DNA evidence offered by the State's expert, Shawn Weiss, with which they did nothing. The problems with the State's DNA evidence are discussed in Claim 18. Defense counsel did not highlight these problems to the jury, either through cross-examination or through their own expert. The latter failure stemmed from defense counsel's inability to adequately demonstrate a need for a defense expert on DNA. Although they sought funds for such an expert, trial counsel failed to submit an affidavit from their chosen specialist, where the expert could have explained how Mr. Weiss's interpretation of the DNA evidence was highly subjective, suspect, misleading and erroneous, and how she could assist the defense in both understanding the DNA evidence and accurately explaining its meaning to the jury, to the great benefit of Mr. Abdullah.

159. Defense counsel also failed to obtain discovery related to the DNA evidence the State sought to present and instead blindly accepted the validity of Mr. Weiss's conclusions. For example, on the *morning* that he was to testify, Mr. Weiss calculated a newly, previously

undisclosed random match probability using what he described as a "Middle Eastern database." Mr. Weiss explained that the database was used by his lab's "paternity department" and consisted of "a combination of Arabic, Egyptian, Jordanian, Lebanese, Palestinian and Moroccan individuals." It does not appear that defense counsel obtained, let alone requested, the allele frequency chart for the database or written information regarding the composition and size of the database. Without an allele frequency chart, defense counsel could not verify that the probability statistic offered by Mr. Weiss was mathematically accurate. Without information regarding the composition and size of the database, defense counsel could not assess whether the database met prevailing scientific standards.

160.    Defense counsel also failed to challenge a highly misleading hypothetical that the prosecution introduced. Mr. Weiss offered the conclusion that the "probability of randomly selecting an unrelated individual with the DNA profile consistent with the reportable DNA profile from the cape prep one is 1 in 16,000 in a Middle Eastern database." The prosecutor then proposed a hypothetical which directed Mr. Weiss to assume that 250,000 people, which he asserted was the population of the Boise metropolitan area, were standing in a stadium. The prosecutor then asked how many people would be left standing if everyone who did not "fit" the profile obtained from the cape sat down. Mr. Weiss replied "[y]ou would expect possibility [sic] of ten people to have this profile." Evoking this line of questioning in his closing, the prosecutor argued that "there are only ten persons in an area of the size of Treasure Valley that would be included. Only one of them with a key to the house. Only one of them bought the gas, only one of them bought the cape, only one of them was in Mountain Horne at 12:00." Defense should have objected to the hypothetical when it was posed to Mr. Weiss and again when the prosecutor relied on it during his closing argument. The hypothetical inappropriately suggested that the

person who contributed the DNA obtained from the cape lived in Boise and that, according to Mr. Weiss's analysis, only ten Middle Eastern men in Boise who could have been the source of the DNA. When the prosecutor returned to this hypothetical in closing, he took the hypothetical one step further and argued that, of the ten people in Boise who matched the profile obtained from the cape, Mr. Abdullah was the only with a key to the house or a connection to other evidence in the case. In doing so, the State told the jury to assume that the random match probability reflected the likelihood that Mr. Abdullah was not the source of the DNA. This assumption, known as the "prosecutor's fallacy," fundamentally misrepresented the significance of the DNA evidence and was highly prejudicial to Mr. Abdullah. Had defense counsel objected, the evidence and argument would have been excluded.

161. Trial counsel's failure to adequately demonstrate the need for a DNA expert, effectively cross-examine Mr. Weiss, obtain necessary discovery, object to the introduction of the prosecutor's fallacy, or challenge the problems with the State's DNA evidence set forth in Claim 18, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xii. *Failure To Adequately Deal With Hair Evidence*

162. At trial, the State introduced the testimony of Dave Laycock, a forensic scientist with the Idaho State Police lab. Mr. Laycock testified that based on his analysis, three hairs from Mr. Abdullah's left arm and three from his right arm had been exposed to high heat. Defense counsel made no attempt to exclude Mr. Laycock's testimony as lacking in scientific methodology or foundation generally, and specifically made no attempt to exclude him as a qualified witness in the area of hair analysis. Given that Mr. Laycock had only been certified to conduct hair

analysis since 2003, had never testified as an expert in Idaho, and had not regularly given hair

testimony since 1992, trial counsel should have challenged both his qualifications and the

science underlying his conclusions. They could have emphasized how limited his recent training

was and the remoteness of his prior experience. At a minimum, defense counsel could and

should have retained their own expert to refute Mr. Laycock's testimony regarding his opinion

that Mr. Abdullah's arm hairs were exposed to high heat. During state post-conviction

proceedings, the court denied Mr. Abdullah's request that the hair evidence in the State's

possession be released to a defense expert for analysis.

163.    Trial counsel's failure to challenge Mr. Laycock's qualifications and methodology or

present their own expert, considered by itself and in combination with other acts of deficient

performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's

failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not

have been sentenced to death.

### xiii.        *Failure To Adequately Deal With Computer Evidence*

164.    Trial counsel made several costly blunders in connection with computer evidence. First,

they failed to have independent testing done of the hard drives recovered from the Siesta house.

Instead, they made arrangements with the prosecution to have testing done jointly, and to share

the bill. That was a dangerously foolish decision fully in keeping with trial counsel's

prosecution-oriented mindset because they had no idea what the computers would reveal and

were inviting the State to be privy to that potentially damaging information. More importantly,

when the laboratory expressed the opinion that the hard drive from the living room computer was

unrecoverable, trial counsel failed to have the hard drive tested by another organization, even

though Jeffrey Gross, their own highly qualified computer expert, repeatedly advised them to

have the hard drive re-tested, recommended a company that could do so, and informed them that

the company had had success in the past with recovering information from computers that the first company was incapable of recovering. Trial counsel were also aware that they had more than enough money set aside for computer forensic work to cover a re-examination of the hard drive. Further testing would have been successful and led to the discovery of exculpatory evidence, including evidence supporting a suicide defense, photographs of his children proving that Naim was not—as the State alleged—his favorite child but rather that he loved all of his children equally, *see* Claim 1(A)(xlv), evidence that the supposed letter from Ms. Abdullah found at the Siesta house by a defense investigator was not on the computer, and thus likely a fraud, and other evidence refuting some of the prejudicial allegations made against Mr. Abdullah at trial and supporting potential defenses. Distressingly, trial counsel appear to have been under the impression that they needed the prosecution to agree to the re-testing. That impression was false. Trial counsel easily could have filed an ex parte motion on their own behalf, which also would have likely lessened the danger of such testing, since they could have then tried to keep any information about the results away from the State, if that information had been negative.

165.    Lastly, trial counsel failed to cross-examine State experts with information indicating that the police or another actor may have planted evidence indicating that there was pornography on Mr. Abdullah's home computer so that the State could impugn his character to the jury. Even though evidence of the pornography was not supposed to be presented to the jury, it was, and the trial judge's ruling to have it struck from the record would not have erased it from the jurors' memories. Therefore, evidence about the pornography being planted would not have harmed Mr. Abdullah and could only have helped him, by explaining its existence to the jury in a way that did not incriminate him.

166. Trial counsel's failure to pursue independent testing of the hard drive recovered from the living room, present the evidence described in this claim, and properly respond to the prosecution's evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xiv.     *Failure To Adequately Challenge The Police Investigation*

167. There were several opportunities for trial counsel to underscore for the jury troubling questions about the quality of the police investigation. Unfortunately, they failed to seize virtually all of them. One example is the failure to turn Ms. Abdullah's body over at the scene of the crime. Any capable, experienced homicide investigator would have done so in an attempt to gather information on how she died. The investigators in Mr. Abdullah's case did not, and defense counsel never brought the issue up at trial. Such an omission is especially damaging in this case, where the cause of death was never satisfactorily explained by the State. Had the police turned over Ms. Abdullah's body, they would have discovered evidence tending to exculpate Mr. Abdullah. Another example of defense counsel's failure to attack the thoroughness and reliability of the investigation is apparent in the absence of any probing questions asked of Detective Tod Littlefield. Detective Littlefield was the lead detective in the case, even though he had never investigated another homicide and had very little training and experience to equip him for a matter of this magnitude. Although he testified several times at trial, the Toryanskis never confronted him with his lack of qualifications, leaving the jury with the impression that he was a trustworthy source, that the investigation was conducted well, and that it led to the right suspect. Had the jury been informed of these facts, as well as the other evidence of State misconduct, a very different impression would have been made.

168.     Defense counsel could additionally have cast doubt on the integrity of the police investigation by pointing to evidence during their cross-examinations of officers suggesting that the investigation was influenced by the pre-existing hostility that Ms. Abdullah's family felt toward Mr. Abdullah.  That hostility was rooted in the family's resentment of Ms. Abdullah's decision to marry a Muslim from the Middle East, and her decision to convert to Islam.  Family members also had a vested financial interest in Mr. Abdullah being found guilty, because they would then have a share of her estate.  The hostility by the family toward Mr. Abdullah surfaced in the officers' early interviews of the family, in which they disparaged Mr. Abdullah's character repeatedly.  These disparaging comments influenced the police to focus on Mr. Abdullah as a suspect, and contributed to their practice of selectively preserving evidence that inculpated him while ignoring, destroying, and losing exculpatory evidence.  *See* Claims 9 and 10.

169.     That error was exacerbated by counsel's failure to aggressively question police about their decision not to follow up on compelling evidence that pointed to other individuals as the possible culprit.  *See* Claim 1(A)(vii).

170.     The Toryanskis also failed to question police officers when they testified about the egregious loss and destruction of evidence that occurred, and the evidence that was never turned over to the defense.  *See* Claims 9 and 10.  They likewise did not move to dismiss the charges on the basis of those violations.  Nor did they seek to exclude exhibits that were compromised by the loss of evidence, such as the still photographs extracted from videotape taken at the Salt Lake City 7-11, which was undermined by the fact that the tape itself went mysteriously missing until after trial along with so many other important evidentiary items.

171.     The Toryanskis did not bring to the jury's attention the fact that police had either made no effort to collect, or collected and then destroyed, the receipt and/or transaction report

reflecting the purchase of gas or soda that was supposedly made by the person Marjorie Wood identified as Mr. Abdullah at the Chevron Station in Mountain Home. The Toryanskis could have used that omission to argue that the record either existed, and was destroyed by police because it did not support their theory, or that the police were too inept to ask for such an obviously important document. In either event, the omission could easily have been turned to the advantage of the defense.

172. Finally, the Toryanskis did not investigate an affair between second-chair prosecutor Erika Klein and lead detective Tod Littlefield, even though the trial court granted them funds to do so. Among other evidence that the Toryanskis did not discover was the fact that Detective Littlefield and Ms. Klein engaged in sex acts at the office (including in the "War Room" of the Ada County Prosecutor's Office); that he had been repeatedly disciplined for defying direct orders (including orders to cut off contact with Ms. Klein); that he harassed and stalked Ms. Klein after she ended the relationship; that Internal Affairs opened an investigation into the relationship on August 25, 2004; that he that he was suspended from duty during Mr. Abdullah's trial; and that command staff were concerned that the affair would result in workplace violence.

173. Mr. Abdullah was prejudiced by trial counsel's failure to investigate and challenge the police investigation in this case. In the absence of trial counsel's errors, there is a reasonable likelihood that Mr. Abdullah would not have been convicted of the charged offenses, or would have been convicted of only some of them. Counsel's errors concerning the police investigation also prejudiced Mr. Abdullah's rights at sentencing, because the police-generated evidence overstated the severity and criminality of Mr. Abdullah's actions and otherwise undermined viable defenses and prevented Mr. Abdullah from offering evidence regarding residual doubt at

the penalty phase, which would have been a powerful reason for the jury to exercise mercy had it been adequately presented and argued to the jury.

### xv.      *Failure To Discover Evidence*

174.    The Toryanskis failed to discover any of the evidence recited in Claims 9 and 10. An adequate investigation would have done so. If the evidence recited in Claims 9 and 10 had been discovered, it would have had substantial exculpatory value for both phases of the trial. Trial counsel's failure to investigate and present the evidence described in this claim, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xvi.      *Failure To Adequately Deal With Eyewitness Identification Evidence*

175.    Marjorie Wood was one of the State's most important witnesses, as she was the only one to supposedly see Mr. Abdullah near Boise at the time of the fire. Any halfway competent defense attorney would have spotted serious defects with Wood's identification. For instance, as explained in Claim 11, Ms. Wood was shown only a single photograph of Mr. Abdullah by detectives who were actively seeking to make a case out against him. At the time of trial, it was well-known that such a methodology is unreliable, as it tends to influence the witness into identifying the suspect. A far superior technique is to show the witness an array of photographs, ideally one at a time. Ms. Wood's identification was made even more unreliable by the fact that she was a Caucasian woman and Mr. Abdullah a Kurdish man of Middle Eastern descent, and Ms. Wood herself testified that Mr. Abdullah was accompanied by two other men who appeared to be of the same ethnicity. Scientists have established that such cross-racial identifications are less trustworthy. Defense counsel obtained funding to call an expert to challenge the reliability of Ms. Wood's identification. However, they then inexplicably failed to call him, or another

expert in the same area, and also failed to oppose the State's motion to exclude the expert, even though eyewitness identification science is widely accepted as legitimate, including by Idaho courts. Counsel's ill-fated approach to this area was made worse by their choice of expert. They selected Charles Honts, even though he had just recently been precluded from testifying on photo lineup issues by a Canyon County judge, due to his lack of expertise on those issues. Experienced criminal defense attorneys would have been aware of that ruling, in part because they would have been plugged in to the criminal defense community as a whole. The Toryanskis, who were essentially prosecutors masquerading as defense attorneys, were unaware. Defense counsel also failed to point out to the jury that the State never had Ms. Wood do an in-person lineup to confirm her identification of Mr. Abdullah.

176.     Finally, defense counsel never cross-examined Ms. Wood about serious discrepancies in the various accounts she gave of the night of the crime. For instance, it appears that Ms. Wood initially told police officers that the person she identified as Mr. Abdullah purchased gas from her with cash. However, at trial, Ms. Wood testified definitively that Mr. Abdullah and the men who were supposedly with him that night did not buy any gas from her. Had the Toryanskis pointed out this difference, they would have substantially diminished Ms. Wood's credibility in the eyes of the jury.

177.     Trial counsel's failure to investigate and present the evidence described in this claim and to properly respond to the prosecution's trial evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xvii.      *Failure To Adequately Deal With Child Interview Evidence*

178.    Redear Abdullah, Mr. Abdullah's son, was interviewed by the Children at Risk

Evaluation Services (CARES) program at the St. Luke's Regional Medical Center, regarding his

recollection of the events of October 4–5, 2002.  Defense counsel did not request or consult with

an expert to review the CARES interview of Redear's grand jury testimony.  Nonetheless, the

Toryanskis made critical decisions regarding how to proceed in Mr. Abdullah's case based on

the assumption that Redear's statements and grand jury testimony was accurate and reliable,

including the decision that Mr. Abdullah would not testify in his own defense.  The assumption

was wrong.  Redear's interview falls short of many standards in the field.  For example, the

interviewer failed to establish rapport with Redear in a systematic way when she allowed him to

engage in a coloring activity during the interview, which distracted him from the account he was

supposed to be giving.  Moreover, the interviewer disregarded professional protocol and failed to

establish any ground rules for the interview.  Specifically,

- She failed to instruct Redear how to respond when he did not know the answer, and she did not provide him with examples of when to say "I don't know" and when to give an answer.

- She failed to instruct Redear how to respond if he did not understand what she meant or what she was saying, and did not provide him with examples.

- She failed to instruct Redear how to respond when she, the interviewer, made a mistake, or said the wrong thing, or how to tell her she was wrong.

- She failed to instruct Redear that she did not know what happened, and that she could not tell him the answers to her questions.

- She failed to use a practice narrative, e.g., "Tell me about your last birthday. Tell me everything that happened. Tell me more."

179.    Instead of following the professional guidelines and establishing ground rules, the interviewer used destructive reinforcement. In addition, the interviewer failed to establish a timeline of events at the beginning of the interview, which resulted in later confusion. During the interview, Redear gave a clear narrative of what happened on his trip. However, the interviewer often expressed her confusion to Redear when his story contradicted the version of events she had in her mind. Whenever Redear's comments did not meet her expectations, the interviewer indirectly rejected his story by expressing confusion.

180.    Another suggestive technique used by the CARES interviewer is repeatedly asking the same question once an answer has already been provided. Such a direct rejection of his answers pressured him to provide an alternative response more pleasing to the interviewer. Specifically, the interviewer, in quick succession, repeated her questions regarding issues relating to the gas can and Redear staying in a hotel. These questions were asked again at a later point in the interview. The interviewer also frequently paraphrased Redear's responses, giving him the signal that he should adopt her gloss on the facts.

181.    Like the CARES interviewer, Detective Littlefield asked Redear a series of questions at the airport interview on October 5, 2002, that were plainly designed to elicit from Redear information that would incriminate his father. These questions were not appropriately framed for someone so young, and were likely to improperly influence Redear into providing inaccurate and damaging information about Mr. Abdullah's movements in the previous days. Detective Littlefield's approach to this conversation demonstrates that even that early in the investigation, the police had already decided—based in large measure on the hostile views of Ms. Abdullah's

family to Mr. Abdullah—that Mr. Abdullah was the culprit, and the police were intent on creating evidence to blame him at all costs.

182.     The Toryanskis likewise failed to challenge the unfair conditions imposed on Redear's visits after Mr. Abdullah was charged.  During that time period, Redear was allowed to visit with Mr. Abdullah's family only in the presence of Tina Perkins, the Victim Witness Coordinator for the Boise Police Department, as well as a representative of the Idaho Department of Health and Welfare and an interpreter.  By contrast, when Redear visited with Ms. Abdullah's family, they were allowed to interact with him without any supervision or observation.  In this way, Ms. Abdullah's family was able to influence Redear into giving an account of October 4, 2002, that was less favorable to Mr. Abdullah.

183.     Had defense counsel retained a qualified expert in child interviews, they would have discovered this host of problems with Redear's interview and his living conditions at the time of trial.  That, in turn, would have prevented them from rashly forfeiting one of their client's most precious rights—to testify in his own defense—on the basis of an erroneous belief that they would be unable to prevent or challenge Redear's testimony.

184.     Trial counsel's failure to investigate and present the evidence described in this claim and to properly respond to the prosecution's evidence at trial, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xviii.     *Failure To Interview Redear Abdullah*

185.     Redear Abdullah was the only person who could have spoken to all of Mr. Abdullah's movements on the night of the crime.  As such, he was potentially the most important witness in the case.  Nevertheless, the Toryanskis did not interview him.  If they had done so, Redear would

have provided highly exculpatory evidence by supporting his father's account of what occurred that evening and proving that he was not at the Siesta residence at the time of the fire.

186.    Trial counsel's failure to investigate and present the evidence described in this claim, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xix.    *Failure To Move To Suppress Confrontation Call*

187.    As discussed in Claim 13, the police violated Mr. Abdullah's Fifth, Sixth, and Fourteenth rights by orchestrating an interrogation through a state actor after Mr. Abdullah invoked his right to counsel.  The Toryanskis should have moved to suppress the evidence obtained from that call, and they ineffectively failed to do so. Trial counsel's failure to move for such suppression, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xx.    *Failure To Exclude Unintelligible Police Interviews*

188.    Police interviewed Mr. Abdullah in the Boise Airport on October 5, 2002.  An audio recording was made of the interview and introduced as evidence at trial, along with a transcript that ostensibly reflected the dialogue on the tape.  That recording, which contained material damaging to Mr. Abdullah's defense, was of such low quality that large portions of it were unintelligible, and the transcript was therefore exceedingly unreliable.  The Toryanskis should have moved for the tape and the transcript to be excluded, as well as other police interviews that were not recorded and played with adequate clarity or transcribed with adequate reliability. Trial counsel's failure to seek exclusion of the tape and transcript, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a

reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxi. *Failure To Adequately Deal With Honor Killings In Kurdistan*

189. At trial, two of Mr. Abdullah's former co-workers at SCP Global, Rod Adams and Ed Reagles, testified for the State. They each testified that when Mr. Abdullah was asked about differences between where he was from and the United States, in the presence of Stephanie Hobbs and Brian Holford, Mr. Abdullah said that it was legal to kill your wife in Kurdistan if she was unfaithful. Defense counsel objected to Mr. Reagles' testimony, but not Rod Adams'. Even in pursuing the objection, defense counsel were woefully inadequate. They failed to make the most obvious point, namely, that there was no evidence that Ms. Abdullah *had* been unfaithful.

190. They also did not question either Ms. Hobbs or Mr. Holford about this alleged comment made by Mr. Abdullah in their presence. Although the State offered Stephanie Hobbs as a witness, they never asked her about this conversation, which she apparently participated in and was a witness to. Defense counsel could and should have elicited from Ms. Hobbs testimony that she did not recall being present for such a conversation and did not recall Mr. Abdullah ever making such a comment. Similarly, the Toryanskis could and should have elicited from Mr. Holford testimony that he did not recall such a conversation and had not ever heard Mr. Abdullah make such a statement. Perhaps most notably, the State did not seek to cross-examine Mr. Holford about Mr. Abdullah's alleged statement, despite the fact that two other witnesses had testified to Mr. Holford's presence when the statement was made. In overview, defense counsel could have introduced evidence that two of the supposed participants in this conversation did not remember it occurring. Given how striking the supposed remark is, that lack of recollection would have strongly undermined the reliability and credibility of Mr. Reagles and Mr. Adams. Moreover, if trial counsel had filed a motion in limine regarding this

evidence, presuming they were aware of it, they could have presented Mr. Holford's and Ms. Hobbs' testimony, which may have tipped the scales in favor of excluding Mr. Reagles' and Mr. Adams' testimony, especially considering the trial court's acknowledgment that admissibility of the evidence was a close call.

191. Trial counsel also failed to object to the fact that Mr. Reagles' testimony conflicted with the proffer given by the prosecutor. Mr. Reagles was supposedly going to testify that Mr. Abdullah said that it is permissible to kill one's wife in Kurdistan if she was unfaithful, but, in fact, he testified that Mr. Abdullah said "it was legal to kill your spouse where he was from as long as you explained it to his – or excuse me, the daughter's family and then made an offering of some sort, of money or something." On redirect examination from the prosecutor, Mr. Reagles testified that Mr. Abdullah had said that is "okay" to kill one's wife "if she was unfaithful." But defense counsel made matters worse on recross, eliciting testimony that the word "unfaithful" meant "If you cheated on your wife or if your wife cheated on you." Mr. Reagles' final testimony, then, suggested that Kurdish law as understood by Mr. Abdullah would allow an unfaithful husband to kill his wife – a damaging statement in light of other evidence that Mr. Abdullah had himself committed adultery.

192. The admission of this statement was highly prejudicial, as it portrayed Mr. Abdullah in a negative light purely on account of his ethnicity and cultural background, and made the jury more likely to consider him guilty just because of where he came from. Trial counsel's failure to investigate and present the evidence described in this claim and to properly respond to the prosecution's trial evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's

failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxii. *Failure To Adequately Deal With The Cape And Mask*

193.    At trial, evidence was presented that Mr. Abdullah bought a cape and mask at a Halloween store in Salt Lake City on October 4, 2002.  A similar cape was discovered at the crime scene.  The prosecution suggested to the jury that Mr. Abdullah could not have purchased the costume for Halloween because religious Muslims do not dress up for the holiday and because Mr. Abdullah had forbidden his own children to celebrate the holiday.  Defense counsel could have rebutted the argument with evidence that Mr. Abdullah himself had participated in costume celebrations of Halloween in the past and had not in fact forbidden his children from doing the same, including through testimony from his supervisor Greg Burk.  They failed to do so, leaving the jury with the impression that he could only have bought the items for a nefarious purpose.  Ensuring that prejudice flowed from the error, the prosecution re-emphasized its false theory at closing, stating: "There's no reason that an adult member of the Islamic faith would ever buy anything like this."  Trial counsel's failure to investigate and present the evidence described in this claim and to properly respond to the prosecution's evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxiii. *Failure To Move To Sequester The Jury During The Guilt Phase Of The Trial*

194.    Defense counsel did not move to sequester the jury despite heavy media coverage of the case.  All parties were on notice that local news outlets were covering the trial closely before the trial began.  During voir dire, almost every member of the venire had had some exposure to the

case through the media.  *See* Claim 5.  Some members candidly admitted to having already judged Mr. Abdullah based on the media accounts.  Several veniremembers also admitted they were having trouble obeying the judge's orders not to follow television, radio, and newspaper coverage because it was everywhere they turned.  Knowing this, defense counsel should have moved to sequester the jury during the guilt phase to avoid a contaminated jury verdict.  Instead, during trial, the jurors were exposed to front-page newspaper headlines like "Judge won't let jury hear about suspect's affair."  Any juror who happened to see such headlines would suspect they were not getting the full facts at trial and would consider the media's "facts" in their decision-making process.  Because such exposure was inevitable, sequestering the jury was the only way to ensure that there was a fair trial.  Accordingly, defense counsel's failure deprived Mr. Abdullah of a fair trial when the jury was exposed to misleading, speculative, and prejudicial information not in evidence. Trial counsel's failure to seek sequestration of the jury, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxiv.        *Failure To Adequately Move For A Change Of Venue*

195.     The ACPD moved for a change of venue on March 26, 2003.  In his motion, Mr. Cahill provided an argument that was three sentences in length, and devoid of any legal citations or substantive analysis.  The State opposed the motion on March 31, 2003.  As the State rightly noted in its opposition, Mr. Cahill's skeletal pleading did not explain how the news coverage had prejudiced Mr. Abdullah's rights, and therefore failed entirely to support his motion.  Mr. Cahill never sought a hearing on the motion, the Toryanskis never renewed the motion or filed their own, and it appears the court never ruled on it.  In light of the extensive and highly prejudicial news coverage of the case, Mr. Cahill should have supported his motion with a legal discussion

that set forth the relevant standards, applied them to the case, and explained in detail how Mr.

Abdullah could not be expected to receive a fair trial in the Boise community, which was

saturated with explosive and incendiary material about the charges, much of which was later

deemed inadmissible at trial or found to be false. *See* Claim 5. He should also have pursued a

hearing, at which he could have presented evidence from experts about how poisoned the jury

pool in Boise would be against Mr. Abdullah. In light of these same concerns, the Toryanskis

ought to have taken the same elemental steps. Instead, all of Mr. Abdullah's attorneys

condemned him to press his cause before a group of people who had spent nearly two years

immersed in tremendously negative pieces about him. Counsel's deficient performance left Mr.

Abdullah with the structural error and prejudice of an unfair jury. In addition, trial counsel's

failure to investigate and present the evidence described in this claim and to properly move for a

change of venue based upon such evidence, considered by itself and in combination with other

acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that,

but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses

and/or would not have been sentenced to death.

###### xxv. *Failure To Move To Disqualify Judge Copsey And To Move For Her Recusal*

196. Pretrial counsel August Cahill of the ACPD failed to disqualify Judge Copsey. Idaho law

at the time allowed a defendant to disqualify a trial judge without cause. Mr. Cahill had decades

of criminal defense experience in Ada County and knew, or should have known, of Judge

Copsey's reputation as biased against criminal defendants in general and particularly those of

Middle Eastern descent. *See* Claim 6. Indeed, Mr. Abdullah himself told Mr. Cahill that Judge

Copsey was considered a highly unfavorable draw by his fellow inmates at Ada County Jail,

providing Mr. Cahill with yet another reason to move for her disqualification. Given Judge

Copsey's reputation for inappropriate bias, Mr. Cahill was ineffective for not filing a motion for automatic disqualification.

197.    The Toryanskis compounded the error by failing to move for Judge Copsey to recuse herself.  Any due diligence, such as simply asking the defense bar about Judge Copsey's reputation, would have put the Toryanskis on notice of the judge's biases and led to a motion for recusal.  Soon after taking over the case, the Toryanskis learned of Judge Copsey's demonstrated bias against Middle Easterners.  Judge Copsey's treatment of both the Toryanskis and Mr. Abdullah put them on notice long before trial that the judge was biased against both the defendant and defense counsel.  Given Judge Copsey's history of bias and her treatment of the defendant and his counsel prior to and during the trial, the Toryanskis should have moved for Judge Copsey's recusal.  *See* Claim 6.  Their failure to do so resulted in Mr. Abdullah receiving an unfair trial before a biased judge.

198.    Trial counsel's failure to disqualify and seek recusal of Judge Copsey, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah.  There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

xxvi.    *Failure To Deal With Prejudicial Publicity*

199.    Both Mr. Cahill of the ACPD and the Toryanskis had no media strategy whatsoever, and made no effort to counter the tremendously negative press that was generated by the police and prosecution, much of which was false and/or included information inadmissible at trial.  In a high-profile case such as Mr. Abdullah's, competent defense counsel would have devised a comprehensive plan for handling the media, including the issuance of statements to journalists, press releases, and so on.  Capable defense attorneys would have emphasized the following themes in their communications with the media: that the law presumed him innocent and that he

was in fact innocent; that the State was circulating false information about him through the media, including the false assertion that video footage placed him in the Boise area at the time of the crime; that the State, through the media, was maligning Mr. Abdullah through highly speculative and prejudicial stories, including stories about the death of his first wife, and that such coverage was based on material that might well be excluded at trial; and that after a full and fair trial, involving the admission only of relevant evidence, Mr. Abdullah would be exonerated by a jury of his peers.  Instead of aggressively protecting Mr. Abdullah from the harshly negative media, his attorneys did nothing, and thereby allowed the State to win the case against him in the newspapers before the actual trial had even begun. Trial counsel's failure to investigate and present the evidence described in this claim and to properly respond to adverse publicity, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

xxvii.    **_Failure To Adequately Deal With The Letter Found By The ACPD At The Siesta Residence_**

200.    At trial, the prosecution admitted into evidence a tremendously damaging typewritten letter allegedly written by Ms. Abdullah and addressed to Mr. Abdullah.  This letter should not have come into the State's possession at all.  It was found by the ACPD's investigator, Glenn Elam, when Mr. Abdullah was still represented by that office.  Mr. Elam viewed the scene at Siesta after being informed it was going to be destroyed.  While there, Mr. Elam found a typewritten letter, out in the open, between the wall and a garbage can in the master bedroom.  Without reviewing the letter or consulting with Mr. Cahill, Mr. Elam picked it up and took it from the scene.  Subsequently, after the ACPD was no longer representing Mr. Abdullah, Mr. Elam disclosed the letter to the lead detective in Mr. Abdullah's case.  The ACPD were

ineffective for disclosing the letter to the State. To begin, the ACPD should not have removed

the letter from the house at all. Had they left it there, which they were ethically entitled to do,

the letter would have never been used against their client. Further, even after removing the

letter, the ACPD had no obligation to disclose it. To begin, it was not clear that the letter was

evidence at all, as there was no indication it was given to Mr. Abdullah or adapted by Ms.

Abdullah, and its location in fact suggests the opposite. Even if considered evidence, the ACPD

was not ethically required to turn the letter over because it was not the instrumentality of a crime.

At a minimum, the ACPD should have requested an ex parte, in camera review of the letter

before handing it over to the State.

201.    Once it was turned over, the letter should not have been admitted, and it was deficient

performance for the Toryanskis to allow that to happen. In the letter, Mr. Abdullah is strongly

castigated as being deceitful and unethical, and told that Ms. Abdullah does not "want my

children (including Redear) to be raised by a hypocrite." The letter was not signed or dated, and

was found days after the fire between a dresser and a trash can, after the house had been

thoroughly combed by numerous law enforcement officers. There were consequently patent

issues with foundation, authenticity, relevance, prejudice, and the right of confrontation. In

challenging the letter, defense counsel could further have pointed out that despite the enormous

amount of evidence the State had in its possession regarding Ms. Abdullah's statements about

her personal life to therapists, friends, and family member, not a single document reflected—and

not a single witness could testify to—the existence of such a letter. Not only did defense counsel

fail to raise those objections, they actually—bafflingly—stipulated to the admission of the letter.

Defense counsel's misstep is especially ironic in light of the fact that a letter they themselves

offered as a document written by Ms. Abdullah was excluded because it was not authenticated,

further underscoring how any qualified defense attorney would have made the same objection with respect to the State's letter. The letter was highly prejudicial, portraying Mr. Abdullah as a hypocrite and liar, and as a selfish and uncaring husband.

202. Finally, even if the letter was to be introduced, the Toryanskis dealt with its admission ineffectively. At trial, the prosecution elicited from Mr. Elam testimony about how he discovered the letter during a walk-through of the scene while he was employed as an investigator for Mr. Abdullah's former counsel, the ACPD. By failing to object to that statement, defense counsel allowed the jury to draw an inference that not only was prior counsel actively working against Mr. Abdullah in gathering evidence unfavorable to him, but also that Mr. Elam may have been tipped off about the letter's existence and placement by Mr. Abdullah. In addition, the jury would have wrongly concluded that the letter must have been reliable and genuinely from Ms. Abdullah, because the defense itself had brought it to the authorities. It was well-established law that the prosecution was not entitled to reveal the source of the letter. An objection to the statement would accordingly have been on solid footing, had the Toryanskis been knowledgeable and zealous enough to make one.

203. Trial counsel's failure to investigate and present the evidence and matters described in this claim and to properly respond to the prosecution's evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxviii. *Failure To Admit A Letter From Ms. Abdullah Regarding The Vending Machines*

204. The letter referred to in the preceding claim that defense counsel failed to get admitted was written by Ms. Abdullah and sent to various people in an attempt to sell the vending

machines that she and Mr. Abdullah owned. Had it been successfully introduced, the letter would have represented compelling evidence that Mr. Abdullah did not wish to destroy the vending machines for the insurance money, since he and his wife were actively involved in efforts to sell them, and that he was therefore not the person responsible for the fire and by extension the death of Ms. Abdullah. If defense counsel had contacted the relative of Mr. Abdullah's who owned the computer on which Ms. Abdullah wrote the letter, they could have obtained electronic evidence that she was the one who drafted it. Or if they had contacted recipients of the letter, they could have found versions that she signed. Instead, they did neither, and the letter was as a result excluded from evidence, and this important piece of exculpatory information never considered by the jury.

205. Likewise, trial counsel failed to challenge other evidence that the State introduced in order to suggest that Mr. Abdullah had planned to destroy the vending machines in a fire for insurance money. One insurance agent testified that Mr. Abdullah expressed interest in purchasing a policy to insure the vending machines solely against fire damage. Trial counsel should have cross examined the agent on the basis that there was no such notation in the database that the company used to document conversations with clients.

206. Trial counsel's failure to investigate and present the evidence described in this claim and to properly respond to the prosecution's evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxix. *Improperly Influencing Mr. Abdullah Into Not Testifying*

207. Claim 23 describes how defense counsel coerced Mr. Abdullah into forfeiting his right to testify in his own defense. They did so through a series of groundless threats. *See* Claim 23.

Counsel's failure to choose a theory of the case at any point in the trial also impaired Mr. Abdullah's decision about whether to testify. *See* Claim 1(A)(iii). In addition, counsel's conflict of interest resulted in a complete breakdown of the attorney-client relationship, which further impaired Mr. Abdullah's decision about whether to testify. *See* Claim 2. Any waiver of Mr. Abdullah's right to testify was rendered invalid because counsel failed to properly advise him of his right to testify and coerced him into not testifying. Trial counsel's failure to properly advise Mr. Abdullah about whether to testify and to allow Mr. Abdullah to make a fully-informed determination of that question, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxx. *Attempting To Persuade Mr. Abdullah To Waive His Rights*

208.    Throughout the trial, defense counsel sought to create a record of Mr. Abdullah waiving important constitutional rights, directly harming Mr. Abdullah's legal interests for no purpose other than to insulate themselves against future ineffectiveness claims. One striking example is a memorandum from both Kim and Mitch Toryanski, dated September 23, 2004. In that memorandum, the Toryanskis wrote a series of statements and provided spaces after them for Mr. Abdullah to initial. Remarkably, one statement posited:

> Today during jury selection, the State used their peremptory challenges to strike all the potential jurors that were *disinclined* to impose the death penalty. There is no information in the record, either in the questionnaire or in the voir dire, that these prospective jurors were struck for reasons related to race, ethnicity, or religious views.

(Emphasis in original). Plainly, this statement was designed to elicit from Mr. Abdullah a waiver of his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986) and any corresponding ineffectiveness claims. There was no legitimate reason for counsel to try to obtain such a waiver

other than to protect their future reputation at the expense of Mr. Abdullah's constitutional rights. Defense counsel have a duty to safeguard their clients' interests, which continues after the representation ends. That duty is even more serious in the capital context. It is a shocking breach of that duty for counsel to go out of their way to sabotage a client's future appellate and collateral actions purely out of fear that their reputation will suffer if a valid ineffectiveness claim is raised against them.

209. Another statement appearing in the September 23, 2004 memo supposedly advises Mr. Abdullah that his attorneys expected him to be found guilty "because the evidence strongly indicates that you were present at the fire scene." It is outrageous that defense attorneys would attempt on their own to obtain such an incriminating statement from their own client, especially in a case where a powerful alibi defense could in fact have been presented. *See* Claim 1(A)(vi).

210. Yet another example of the Toryanskis' adversarial approach to their own client's rights comes in the form of the speedy trial debate. On that issue, Mr. Toryanski stated of his client: "We're going to talk with him about a continuance. Regardless of whether he wants one, he's going to get one."

211. A final example is from a memo dated October 25, 2004, in which the Toryanskis informed Mr. Abdullah that they would not be presenting an alibi, a decision that went to the heart of the defense and thus a decision that Mr. Abdullah was entitled to make for himself.

212. The Toryanskis also improperly pressured Mr. Abdullah into waiving his right to allocute. *See* Claim 44.

213. By conducting themselves in this way, the Toryanskis were acting far more like the prosecutors that both had previously been. In so behaving, defense counsel needlessly caused and perpetuated irreparable damage to the attorney-client relationship, which led to a complete

breakdown in communication and contributed to counsel's failure to present any meaningful

defense at all. Trial counsel's failure to act as advocates for the defense, considered by itself and

in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a

reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been

convicted of the charged offenses and/or would not have been sentenced to death.

### xxxi. *Failure To Stand Up For Defense Arguments And Act As Advocates*

214.    As a general matter, defense counsel were extremely tentative in staking out positions

favorable to Mr. Abdullah and often retreated from those positions at the slightest opposition.

For instance, defense counsel would constantly withdraw objections whenever the prosecution

contested them, where zealous attorneys would simply have defended the objection and awaited

a judicial ruling.  This excessive deference to the prosecution was likely caused in large measure

by the fact that both Toryanskis had spent far more time as prosecutors than as criminal defense

attorneys.  Tellingly, Ms. Toryanski at one point referred to her adversaries in court as "the

defense."  It is also noteworthy in this regard that both of the fact-investigators retained by the

Toryanskis—Terry Murphy and Steven Clark—spent most of their careers as law enforcement

officers, and therefore shared the prosecution-oriented perspective of the Toryanskis. Trial

counsel's failure to act as advocates for the defense, considered by itself and in combination with

other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability

that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged

offenses and/or would not have been sentenced to death.

### xxxii. *Failing To Request A Jury Instruction On The Unreliability Of Eyewitness Identifications*

215.    Defense counsel did not ask the jury to be instructed that eyewitness identifications suffer

from a number of serious flaws, and the jury was not so instructed.  Such an instruction would

have been well-founded, as scientists had proven by the time of Mr. Abdullah's trial that eyewitness identifications are frequently faulty and have led to numerous wrongful convictions. The instruction would have been exceptionally relevant in Mr. Abdullah's case. The eyewitness testimony of a single witness—Marjorie Wood—was instrumental in securing Mr. Abdullah's conviction, and that testimony was rendered even more unreliable than the average eyewitness by the unduly suggestive method the police used to persuade her into identifying Mr. Abdullah. The Idaho Supreme Court has approved the use of instructions on facts that affect the accuracy of identifications, making it more likely that a proposed charge here would have been accepted. Trial counsel's failure to request an appropriate jury instruction on eyewitness identification, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxxiii. *Failure To Adequately Deal With Instructions On Willfulness And Deliberateness*

216. As discussed in Claim 24, the jury was improperly instructed on willfulness. Trial counsel should have requested a separate instruction defining "willfulness" with respect to the non-arson offenses, and should have requested—on the murder charge—an instruction indicating that willfulness and deliberateness had to be found in addition to premeditation. If they had done so, the instruction would presumably have been granted, since it would have been consistent with established Idaho law. Trial counsel's failure to properly address the issues of willfulness and deliberateness in the jury's instructions, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

|       | **Failure To Object To Instruction That Failed To Include Intent To Kill As An Element Of All Attempted First-Degree Murder Offenses** |
|-------|-----|
| xxxiv. | |

217.    Mr. Abdullah was charged with attempting the murder of the three children in the house when the fire began.  The jury was never informed with respect to these charges that it had to find beyond a reasonable doubt that Mr. Abdullah acted with the specific intent to kill the three children.  Moreover, the only instruction relating to the definition of premeditation was contained in Jury Instruction Number 16, which by its plain language applied only to the charge of first-degree murder of Ms. Abdullah.  Under these circumstances, the jury could have found Mr. Abdullah guilty of attempted murder without an intent to kill.  This argument finds support in testimony at trial by the State's witnesses that the fire began due to an accidental ignition, which suggests that the perpetrator did not intend for the children to be in the home at that moment.  Defense counsel should have objected to the instruction and held the prosecution to its burden of proof on all elements. Trial counsel's failure to object to the instructions on attempted first-degree murder, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

|       | **Failure To Object To Trial Court's Instruction Defining Reasonable Doubt In Both Guilt And Penalty Phases Of Mr. Abdullah's Trial** |
|-------|-----|
| xxxv. | |

218.    Defense counsel could and should have made the argument raised in Claim 27, and failed to do so when confronted with the trial court's erroneous instruction on reasonable doubt. Trial counsel's failure to object to the reasonable doubt instructions, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxxvi. *Failure To Object To Definition Of Willful On The Injury-To-A-Child Charge*

219. As discussed, the jury requested guidance on what willful meant with respect to the arson charge. The court responded that an individual can act willfully without intending to injure another. That is the only definition of willful the jury ever received. Such a definition of willful is not correct under Idaho law with respect to the crime of injury to a child. That offense requires that a defendant willfully place a child in a dangerous situation in the sense that he specifically intends to endanger that child. Trial counsel should have taken action to assure that the jury received a proper instruction of what willful meant in relation to the injury-to-a-child offense, rather than allowing the jury to assume that it could apply the definition it was given on the arson charge. Trial counsel's failure to object to the willfulness instruction as described in this claim, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxxvii. *Failure To Challenge For Lack Of Evidence Charge Of Committing An Injury To A Child*

220. Defense counsel failed to move, or to adequately move, the trial court to strike the charge of committing an injury to a child from the indictment. As discussed in Claim 32, the prosecution failed to prove Mr. Abdullah was guilty of injury to a child beyond a reasonable doubt. The child in question was located out of harm's way and suffered no injuries. Defense counsel should have moved the court to dismiss this charge. Failure to do so resulted in an erroneous finding of guilt on this charge and generally prejudiced the jury's guilt and sentencing phase verdicts.

### xxxviii. *Failure To Adequately Deal With Prosecutorial Misconduct*

221.    Defense counsel failed to object to almost all of the acts of prosecutorial misconduct discussed in Claim 7, every one of which would have drawn an objection from competent counsel.  Nor did defense counsel request a mistrial, admonishment, and/or curative instruction with respect to the misconduct.  Defense counsel did object to the State's comments on the fact that Mr. Abdullah had been removed from the courtroom for Ms. Wood's pretrial testimony.  However, it was ineffective for them not to request a mistrial and, in the alternative, a curative instruction.

222.    As discussed in Claim 7, the prosecution committed misconduct by informing the jury that the defense requested the additional testing of Ms. Abdullah's blood, which revealed the excess of Prozac.  With respect to that issue, the Toryanskis were ineffective not only for failing to object to the misconduct, but also for failing to object to the admission of the letter requesting the additional testing, on the ground that its prejudicial effect would outweigh any probative value it might have.  Counsel was also ineffective for failing to object to improper comments by the prosecutor about Mr. Abdullah's removal from the courtroom during a motion to suppress identification by Marjorie Wood; that the State's evidence was "the truth"; that the jury should be shocked and outraged by counsel's argument; by improperly presenting evidence from several state witnesses including Ms. Kristal and Mr. Elam; by improperly influencing Dr. Groben's opinion and testimony with evidence from the police investigation; by misstating the burden of proof; by presenting testimony from witnesses that was irrelevant, speculative, and prejudicial; by improperly inserting negative insinuations about Muslims and people from the Middle East; by misleading the jury about the nature and function of mitigation; improper argument about Islamic law; and asking the jury to sentence Mr. Abdullah death based on improper considerations.

223.     Trial counsel's failure to investigate and present the evidence and matters described in this claim and to properly respond to the prosecution's evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xxxix.     *Disclosure Of Privileged Information*

224.     In late 2003, defense counsel's enthusiasm, confidence, and desire to try Mr. Abdullah's case evaporated, and they began desperately pursuing pretrial settlement negotiations with the State.  The Toryanskis took a "settle at all costs" approach and, rather than preparing for trial, began devoting all of their time, resources, and energy to negotiating a plea offer, even though Mr. Abdullah consistently made clear that he would not accept any offer that left him in prison for a substantial amount of time.  In fact, Ms. Toryanski would later note she was devoting "all energies in her body" to a plea and putting more pressure on Mr. Abdullah day by day to take a plea.  This created a vicious cycle where, because they were focused so intently on plea negotiations, they were not preparing for trial, and because they were not preparing, they more frantically sought a plea.

225.     While the Toryanskis were committed to securing a plea, Mr. Abdullah maintained his innocence and wanted to proceed to trial.  While Mr. Abdullah wanted to be released to tend to his minor children, he was always clear with his counsel that he would not plead to anything that involved him staying in jail as he did not kill his wife, did not pour gasoline in his home or garage, and did not place his children in danger.

226.     The stark difference between the expressed goals of Mr. Abdullah and his counsel's overwhelming desire to secure a plea and avoid trial created an unsustainable conflict.  The result

was that the attorney-client privilege and the work-product privilege were sacrificed, as well as Mr. Abdullah's right to participate in his own defense.

227.   The State was unwilling to settle the case without a proffer of facts from Mr. Abdullah. Defense counsel therefore began a merry-go-round of exchanges with Mr. Abdullah in an attempt to create a proffer that would be acceptable to the State, and coaching Mr. Abdullah on ways to explain the events of that night, none of which were consistent with their client's position that he was in Salt Lake City.

228.   Even though Mr. Abdullah never waived the attorney-client privilege, never gave his lawyers permission to share information about his defense with the State, and never signed any consent form, defense counsel repeatedly violated the attorney-client privilege.  In addition to the proffers, defense counsel also disclosed their theories of the case to the State.  For example, they sent a letter to the prosecutors in which they "laid out all the details" of their defense and "begged" for a plea.  The Toryanskis did all of this without any candid discussions with Mr. Abdullah, electing instead to leave their client in the dark and deceive him.  By handing over on a silver platter to the State valuable information about their case, the Toryanskis gave the prosecution a great advantage and their own client a great disadvantage.

229.   Most concerning was that these ongoing discussions with the State were not disclosed to Mr. Abdullah.  Trial counsel's files maintain no notes indicating they told Mr. Abdullah that they were having these conversations with the prosecution, and Mr. Toryanski does not recall having any conversations with Azad about what was being disclosed to the State for plea negotiations. Additionally, counsel believed that it was their decision, not the client's to seek a plea.

230.   The Toryanskis also provided sensitive information about Mr. Abdullah's case to his family members and family friends, including a detailed list of evidence against Mr. Abdullah in

a last-ditch effort to try to get the family to exert pressure on Mr. Abdullah to enter a plea. They did so despite the fact that Mr. Abdullah did not sign a waiver of the attorney-client privilege that would have permitted the Toryanskis to share privileged information with Mr. Abdullah's family. As discussed in Claim 2, the relatives had different interests than Mr. Abdullah, and the imprudent sharing of information therefore created a conflict between the Toryanskis and their client.

231. The Toryanskis also shared information about the case with other attorneys in an effort to get more people to try to convince Mr. Abdullah to take a plea. The Toryanskis sent in multiple other lawyers including Teresa Hampton, David Leroy, and Chuck Peterson to discuss pleas with Mr. Abdullah despite none of these people being counsel of record or part of the Toryanski Firm.

232. Additionally, the Toryanskis shared trial strategy with the prosecution when Ms. Toryanski made assurances to prosecutor Patrick Owen that the State did not need to call Mr. Abdullah's minor child as a witness.

233. Time and again the Toryanskis disclosed privilege information to others, without the permission of their client, and all while actively keeping their client in the dark about these conversations as well as other critical aspects of the defense, including what actual defense would be presented.

234. It cannot be ignored that these attorneys who focused so heavily on plea negotiations, without the approval or knowledge of their client, had never served as defense counsel in a capital case, and Mitch Toryanski had never represented anyone charged with a crime in a trial. The Toryanskis were in over their heads and instead of admitting their lack of skills and seeking to assist Mr. Abdullah in obtaining counsel with the necessary expertise to handle such a serious

matter, they instead violated the attorney-client privilege in their unending efforts to force a plea on their unsuspecting client.

235.    Trial counsel's disclosure of privileged information to the prosecution, to Mr. Abdullah's family, and to other attorneys as described herein, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xl.    *Failure To Object To Deborah Kristal's Testimony*

236.    In September 2002, Ms. Abdullah sought legal advice from Deborah Kristal.  The State has acknowledged that Ms. Kristal was acting in her role as Ms. Abdullah's attorney during this meeting.  At trial, the prosecuted offered Ms. Kristal's testimony about the meeting.  Although the testimony violated the attorney-client privilege and an attorney's duty of confidentiality, which survive the client's death, the Toryanskis did nothing to stop it.  Ms. Kristal's testimony was extremely damaging and portrayed Mr. Abdullah in a very negative light.  Specifically, she testified about Ms. Abdullah's desire to have a will that covered all of her children, the possibility of getting a divorce, the poor financial status of her family, and Ms. Abdullah's desire to not go home to her husband that night, and that her husband was not a good man or a good Muslim. Perhaps the most damaging aspect of Ms. Kristal's testimony was that it provided the basis for the State to argue that Mr. Abdullah had a motive because "Angie wanted this marriage to end."

237.    Not only did this information violate attorney-client privilege and counsel's duty of confidentiality, but it was improper character evidence of Mr. Abdullah designed to show a jury that he was a bad husband, and bad member of his community in an effort to prejudice Mr.

Abdullah in the eyes of the jury and continue the theme that his background and heritage made him an "other".

238.     Additionally, this evidence was wholly irrelevant as there was no evidence, from any source, that Mr. Abdullah knew that his wife had this meeting.  Ms. Abdullah had specifically had the bill sent to her family and did not share this meeting with Mr. Abdullah.  There was no testimony that Mr. Abdullah knew of this meeting or that his wife was even meeting with a lawyer.  Because Mr. Abdullah was unaware of this, it cannot possibly serve as motive despite the State using it for that exact purpose.  The relevant mental state at trial was Mr. Abdullah's, and he cannot be held to account for information he did not know.  This testimony was particularly damaging as its goal was to show that Mr. Abdullah was angry that his wife might leave him and therefore planned and executed her murder.

239.     Trial counsel's failure to object to this testimony from Ms. Kristal, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xli.     *Failure To Establish That Divorce Is Permissible In Islam*

240.     Furqan Mehmood, the President of the Boise Islamic Center, was called by the defense as a witness at the guilt phase.  During a side bar, Mr. Toryanski indicated that he was planning to ask Mr. Mehmood whether divorce is practiced by Muslims.  Judge Copsey stated that she would allow the question.  Despite that ruling, defense counsel never asked Mr. Mehmood, or any other witness, whether divorce is acceptable in the Islamic faith.  Had they pursued this issue, defense counsel could have presented evidence that members of Mr. Abdullah's own family had previously gotten divorced, thereby proving that divorce was acceptable not only for Muslims generally but for Mr. Abdullah's particular community as well.  Evidence could also have been

presented that Mr. Abdullah himself had been open to divorcing Ms. Abdullah if she insisted upon it, as Evelyn Whittington, Ms. Abdullah's mother, could have confirmed. Defense counsel never provided any of this evidence regarding the permissibility of divorce, even though it could have been easily demonstrated. Given the highly prejudicial evidence about Ms. Abdullah's dissatisfaction with her marriage and inflammatory testimony about supposed honor killings in Kurdistan, this omission on counsel's part had devastating consequences.

241. Additionally, Mr. Abdullah could have testified to his personal views of divorce and would have alerted the jury that divorce is permitted in his religion, and that he personally had told his wife that he would understand and accept divorce when she learned that he had been unfaithful several years prior. Mr. Abdullah could have explained both his religious culture as well as his personal views on divorce.

242. However, in keeping with their refusal to allow their client to testify, the Toryanskis did not allow this information to be presented to the jury which was extremely damaging to Mr. Abdullah as the idea that Ms. Abdullah wanted a divorce and such action was not permitted by Islamic culture was extremely prejudicial to Mr. Abdullah as it was used to establish a motive thereby making the State's theory more credible than it would have been without such a motive.

243. Trial counsel's failure to address these misrepresentations regarding divorce, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xlii. *Failure To Rebut The Assertion That Mr. Abdullah Converted Ms. Abdullah To Islam*

244. At trial, the prosecution suggested that Mr. Abdullah took steps to ensure that Ms. Abdullah converted to Islam. For instance, the State elicited testimony from one witness that

Ms. Abdullah "felt that in order for her to maintain a relationship, perhaps to marry him, to be a part of his life, [Ms. Abdullah] needed to convert." However, other evidence could have been presented, through other witnesses, that Ms. Abdullah was in fact the impetus not only for her own conversion to Islam, but also for Mr. Abdullah's decision to become more religious after being raised in a family that was not particularly devout or spiritual. That evidence would have helped undercut the State's portrait of Mr. Abdullah as a domineering, overbearing husband, and would also have pushed back against the prosecution's improper effort to use Mr. Abdullah's ethnicity and religion as a tool against him. *See* Claim 7.

245.    There was plenty of evidence to show that Ms. Abdullah's conversion had begun prior to her relationship with Mr. Abdullah and had started based on her interest in songwriter Cat Stevens, continued when she traveled to Turkey and experienced their hospitality, and grew as she continued her work at the Refugee Center.

246.    Members of Mr. Abdullah's family, the Boise Muslim Community, and Mr. Abdullah himself all could have testified to Ms. Abdullah's independent conversion to a religion of her choice.

247.    Additionally, counsel failed to effectively cross examine members of Ms. Abdullah's family to demonstrate that it was her family, not Ms. Abdullah, who had issues with the conversion to Islam and held prejudices against the religion and man that Ms. Abdullah chose.

248.    The failure to counter this narrative of Mr. Abdullah being controlling and requiring his wife's conversion aided the State's continued efforts to portray Mr. Abdullah as different, controlling, and violent based on his culture and religion.

249.    Trial counsel's failure to address these misrepresentations regarding Ms. Abdullah's conversion and the role that Mr. Abdullah played, considered by itself and in combination with

other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability

that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged

offenses and/or would not have been sentenced to death.

**xliii.**      ***Failure To Adequately Deal With Evidence Relating To Mr. Abdullah's Relationship To Other Women***

250.      The State falsely insinuated into its case the suggestion that Mr. Abdullah went to Salt

Lake City the day before the fire for a romantic rendezvous.  For instance, Detective Wade Spain

testified that "[t]here was some question over whether Mr. Abdullah was accompanied by an

adult female" and "that issue was one that we had to explore a little further."  The prosecution

further exploited this incorrect notion through the testimony of Sinae Jang, a woman who

worked at the hotel where Mr. Abdullah stayed in Salt Lake City.  Patrick Owen, the lead

prosecutor, asked Ms. Jang several questions about the woman allegedly seen at the hotel with

Mr. Abdullah, including about the color of her hair, the way she was dressed, the dynamic

between her and Mr. Abdullah, and "whether they went to a room" together.  These questions

were posed to Ms. Jang despite the fact that the State was never able to locate any such woman.

The only purpose and effect of such questions would be to inflame the passion of the jurors

against Mr. Abdullah by implying that Mr. Abdullah was having an adulterous tryst the night

before the fire.

251.      In a case where Mr. Abdullah was charged with murdering a wife with whom he had

children and endangering those and other children, this type of evidence is especially prejudicial.

At other times, the prosecution falsely insinuated that a brief act of infidelity Mr. Abdullah

committed two years before the fire was part of an affair that was ongoing at the time of Ms.

Abdullah's death.  Accordingly, the defense had a patent duty to object to the questions and

statements regarding the supposed other woman on the grounds that they were irrelevant,

prejudicial, speculative, and based on alleged facts not in evidence.  The Toryanskis did not do so.

252.    The State investigators leaked this information early on which created conflict in Mr. Abdullah's Muslim community and reduced support for him at a time when he needed the support and assistance of his religious community.  However, at trial, Ms. Jang would testify that she did not know whether they were all together, and she did not see them all enter Room 7 together as she cannot see Room 7 from her office.

253.    The State was so invested in this theory of Mr. Abdullah having an affair that after Ms. Jang's testimony that she did not recall saying that Mr. Abdullah and this woman were together and entered a room together, the State called Detective Vucinich to discredit Ms. Jang.

254.    Trial counsel's failure to address these claims that Mr. Abdullah was in Salt Lake City to engage in an extramarital affair, despite there being no evidence to support such a claim, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

      **xliv.**      ***Failure To Adequately Deal With Evidence Concerning The Nashville Trip***

255.    There was testimony during trial that Ms. Abdullah, while visiting Mr. Abdullah's family in Nashville, experienced complications with her pregnancy.  Deborah Kristal and Charlene Javernick both suggested to the jury that Mr. Abdullah either could not afford to pay for the return of Ms. Abdullah and the children to Boise, or that he did not wish to do so.  As such, the testimony further reinforced the prosecution's portrait of Mr. Abdullah as a callous and oppressive husband who sought to control his wife and her movements, and to separate her from her own family.  In fact, Mr. Abdullah had purchased roundtrip airline tickets for Ms. Abdullah

and the family which could be, and were, changed to accommodate Ms. Abdullah's desires and

medical issues. Defense counsel were ineffective for failing to either discover this document or

utilize it in cross-examination.

256.    Counsel was also ineffective for failing to point out that Mr. Abdullah indeed went to

Nashville to be with his wife while she experienced pregnancy complications.

257.    The failure to counter this narrative, considered by itself and in combination with other

acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that,

but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses

and/or would not have been sentenced to death.

> **xlv.**        ***Failure To Rebut The State's False Assertion That Naim Abdullah Was
> Mr. Abdullah's Favorite Child***

258.    At trial, the State presented evidence that Mr. Abdullah had on his desk a photograph of

Naim Abdullah and used the evidence to suggest that Naim was Mr. Abdullah's favorite child.

That suggestion was damaging to Mr. Abdullah, because Naim was removed from the Siesta

residence before the fire began.  Thus, the notion that Naim was Mr. Abdullah's favorite helped

support the State's theory that Mr. Abdullah was the one who removed him from the house, and

therefore the one who set the fire and killed Ms. Abdullah.  However, that notion was false.

Defense counsel could have pointed out that Mr. Abdullah loved all of his children equally, as

demonstrated by the fact that the photograph of Naim was in fact just a sheet of paper that Mr.

Abdullah printed out only two weeks earlier to test a printer, the fact that Mr. Abdullah had

numerous photographs of his other children on his computer, and the fact that another son's

name was in Mr. Abdullah's personal email address, which was Abu_Redear@hotmail.com, i.e.,

"father of Redear." Instead, defense counsel did nothing to challenge the State's distorted presentation of the photograph and left that key component of its case uncontested.

259. Additionally, trial counsel failed to investigate or call Detective Brett Quilter as a witness despite police reports indicating that Detective Quilter took statements from numerous neighbors regarding the fire and his reports state Ed Kerschensteiner and Brian Wright told him after they had rescued the baby, a second small child walked out on his own and was rescued by firefighters. These statements would have contradicted the State's claim that someone must have moved the child outside.

260. The failure to counter the idea that Naim, the only child removed from the house, was Mr. Abdullah's favorite, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xlvi. *Failure To Provide Mr. Abdullah With Discovery*

261. The Toryanskis failed to share numerous key pieces of discovery with Mr. Abdullah, despite his repeated requests for them, or only shared with him documents with illegible passages. Kim Toryanski later testified that she was prohibited from leaving discovery with Mr. Abdullah because of jail policy, but given that Mr. Cahill did leave discovery with Mr. Abdullah, her justification was not legitimate. Similarly, with respect to audio-visual recordings, defense counsel told Mr. Abdullah that he could not review the evidence because of the Ada County Jail's equipment, which was false. Mr. Abdullah had a right to review the State's evidence against him, and had he been shown all of the discovery he could have contributed more to his attorneys' work and could have more meaningfully effectuated his right to make the decisions essential to his defense.

262.     Instead of providing Mr. Abdullah with discovery materials, trial counsel would simply summarize witness statements, expert reports, and pleadings.  This led to Mr. Abdullah having no clear sense of the evidence against him, how it would be used or countered by his defense team, and often he did not even know why he was being brought to court as counsel did not share discovery and pleadings with him.

263.     Defense Investigator, Terry Murphy, noted that he did not provide discovery to Mr. Abdullah, and he does not recall seeing the Toryanskis provide discovery consistent with the large volume of materials in the case.

264.     This failure was highlighted in 2005 when Mr. Abdullah, in preparation for sentencing, sent his attorneys a letter noting that this was the first time he was seeing all of his discovery materials.

265.     While failing to provide discovery to any client is ineffective as it denies them the right to participate in their own defense, this failure is more significant with a client who immigrated to America as a teenager, does not understand the American legal system, and whose first language is not English.  Mr. Abdullah needed the time with the discovery materials so that he could review them, understand them, and be able to discuss them with counsel.

266.     The failure to provide discovery and allow Mr. Abdullah to participate in his own defense, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xlvii. *Failure To Challenge The Unconstitutional Closure Of The Court To The Public*

267.     Defense counsel failed to object when Judge Copsey closed the court to the public during the competency hearing of Mr. Abdullah's son.  In violation of the First, Sixth, and Fourteenth Amendments, Judge Copsey based her decision to close the courtroom on vague, prejudicial, and wholly unsubstantiated accusations that Mr. Abdullah's family was attempting to influence the child's testimony.  Defense counsel, knowing there was no evidence of any improper influence, should have objected to the judge's decision to ban the public from the courtroom.

268.     The act of closing the courtroom, in part due to false allegations of influence by Mr. Abdullah's family, continued the State's improper narrative of demonizing Mr. Abdullah and his family.  As there were allegations in this case that Mr. Abdullah had placed children in danger with his actions, the idea that his family was trying to intimidate a child was particularly prejudicial and reasonable counsel would have objected.

269.     The failure to object to this unconstitutional closure of the court, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah – in addition to the structural error occasioned by the court's closure. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### xlviii. *Failure To Behave Appropriately In Court and to Appropriately Prepare Witnesses*

270.     The Toryanskis repeatedly violated basic norms of courtroom decorum.  For example, Ms. Toryanski got emotional before the jury several times, and had to be admonished by Judge Copsey to retain her composure.  These lapses were observed by the jury and led the jurors to lose esteem for defense counsel.

271.    Mr. Toryanski was equally unprofessional when questioning his client's sister, Farha Abdullah, when she clearly had additional information to say at the end of cross-examination and instead of using the opportunity to engage in re-direct, he acquiesced to the prosecution and the Court's demeaning comments to force the witness to leave the stand.  The jury was likewise told to ignore whatever Farha was going to say, and the Court then threatened, in the presence of the jury, to hold future defense witnesses in contempt with fines if they tried to say additional things.

272.    The Defense failed to object to this admonishment thereby conceding that both they, and their witnesses, were ill-prepared which resulted in the jury losing respect for counsel as well as defense witnesses, including Mr. Abdullah's family.

273.    Of note, Ms. Farha Abdullah had planned to describe the general conditions about the residence of Angie and Azad Abdullah including the fact that it was often messy, which is why she helped clean it, and that plastic bags were often scattered about the bedroom where Ms. Abdullah was found.  This would have been significant in addressing the State's claim that the specific bag that Mr. Abdullah had obtained from a store was used in this incident by him to suffocate Ms. Abdullah.  This is also something Farha had discussed with trial counsel and believed would be asked; therefore, her efforts to communicate this to the jury was based on her concern that this matter had simply been forgotten and her lack of understanding that she could not just speak, which is an understandable mistake for a witness, especially one from a foreign country.  Counsel's failures to adequately prepare witnesses resulted in a lack of esteem for both counsel and witnesses in the eyes of the jury and prejudiced Mr. Abdullah.

274.    Additionally, Mr. Toryanski failed to adequately prepare his client's mother, Rahan Mustafa to testify, particularly considering that she did not speak English, and also had no formal education in either Kurdistan or America.  As a result, he was unable to elicit information from

her in a meaningful fashion and the jury had to be excused while the Court and the interpreter discussed the difficulties with the testimony, with the interpreter noting that Ms. Mustafa's lack of education was causing difficulties in her response but that she was, in fact, trying to give appropriate answers. This lack of preparation caused the Court to note that jurors may not consider this testimony as they normally would as it was unclear what was being said by Mr. Mustafa versus what the interpreter was saying to the jury. This is a significant failing as this was during the penalty stage of Mr. Abdullah's trial and a compelling mitigation witness, the client's mother, was limited in her testimony due to counsel's failings. Additionally, Mr. Toryanski cut off this witness, the mother of his client, as she was detailing her love for her son and making a request for mercy by objecting to his own questions of her stating "asked and answered" and abruptly announcing that he had no additional questions. Mr. Toryanski had also angrily threatened Ms. Mustafa prior to her testimony that if she cried or said anything she was not supposed to say during her testimony that she would be charged $5,000.

275. The failure to behave appropriately and to prepare family witnesses for their testimony resulted in confusion and admonishments from the Court which caused the jury to view counsel and defense witnesses in an unfavorable light. These failures, considered alone and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

>    **xlix.**     ***Failure To Seek Assistance From Iraqi And Kurdish Entities***

276. The Toryanskis made no effort to obtain assistance from Iraqi or Kurdish entities, even though Mr. Abdullah was born in the Kurdish region of Iraq. Had they contacted such entities, defense counsel would have received valuable additional resources, and Mr. Abdullah would have received valuable legal advice. Trial counsel's failure to seek this assistance, considered by

itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### l.    *Failure To Object To Unlawful Number Of Peremptory Challenges*

277.    Idaho law gave each side in the case ten peremptory challenges.  The trial court allowed the State and the defense fourteen apiece.  By not objecting to that decision, defense counsel allowed a better-prepared prosecution even more advantage, because they were able to cull the jury of even more people who expressed skepticism about the death penalty.  The vast majority of veniremembers were prejudiced in favor of the prosecution and a death sentence, and allowing the parties more peremptory challenges only gave the prosecution an extra tool to remove the few defense-leaning jurors.  *See* Claims 5, 14, 35, 38.  Defense counsel acted ineffectively by not demanding that the court abide by the Idaho Criminal Rules, which resulted in a conviction and death sentence by a biased jury.

278.    The failure to object meant that the State could use its four extra strikes to exclude Jurors like 7, 10, 25, 32, 46, 54, 60, 67, 78, 80, 88, 108 all of whom were not eligible for cause strikes but expressed their beliefs that the death penalty should be used carefully and sparingly.  Each one of these jurors provided answers consistent with the law, which allows for the death penalty to be used only for "the worst of the worst".  Arguably, these jurors were the ones most capable of following the law as it applies to imposing a death sentence and yet the State was able to dismiss all 12 of them, as well as two others.  The ability to exclude all of these jurors, who demonstrated an ability to carefully weigh and consider the death penalty gave the State an advantage.  Even assuming that the State had decided to accept the other two strikes (Jurors 53 and 110), the State would still have had to accept at least two jurors who were able to fairly

weigh the evidence in determining whether or not to apply a death sentence. This would have made a significant difference in jury deliberation.

279. The prosecution took full advantage of these extra, and unwarranted, preemptive strikes to stack the jury against Mr. Abdullah.

280. The failure to object to the unlawful number of preemptory strikes, considered alone and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### li. *Failure To Act Promptly*

281. Defense counsel were perennially late in almost all of the work they did, including but not limited to:

- Securing funds for a psychiatric pharmacologist but failing to act in time to retain the services of such an expert.

- Retaining Dr. Mozayani, a toxicologist, and providing her with necessary materials to review, leading to her disastrously unprepared performance.

- Deciding mid-trial not to call Dr. Herrmann without first securing the assistance of an alternate pathologist.

- Providing an expert report to the trial court *after* Mr. Abdullah was convicted and *after* the jury voted for death, in which the expert indicated that the police may have planted pornography on Mr. Abdullah's home computer in order to impugn his character to the jury.

- Disclosing Katherine Halek as a witness, leading to her being withdrawn.

- Obtaining clean copies of the discovery material that were legible in their entirety.

282.     Trial counsel's failure to act promptly as described in this claim, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failures, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

      **lii.**     ***Failure to Challenge the State's Arson Investigation Inside the House***

283.     The question of whether there was an intent to cause a fire inside the house, as opposed to in the garage, was important at trial. All of the victims were inside the house, and a fire in the garage might have been an act of insurance fraud. The State relied on evidence of various spillings of gasoline inside the house in order to show that the fire was intentionally set to the entire home. Fire investigator Lance Hart testified that gasoline had been poured, and fire intentionally set, in the living room and one of the bedrooms, in addition to the garage.

284.     Trial counsel failed to challenge the State's theory that a fire was intentionally set inside the house and failed to undertake a professionally reasonable investigation that would support such a challenge. Counsel failed to interview Captain Mathew Owen of the Boise Fire Department, who worked as a probationary firefighter at the time of the fire in this case but had previously worked as a firefighter in the Twin Falls Fire Department. Captain Owen could have testified that one of his responsibilities was to teach other firefighters on a variety of topics, including how to preserve evidence of arson when responding to a fire. Captain Owen also could have testified that he entered the home after the fire was out, that arson was not obvious to him when he walked through the living room and kitchen, and that he did not see any pour trails on the floor, which he would have expected to see.

285.     Such testimony by Captain Owen would have been consistent with the trial evidence concerning carpet and pad samples taken from the home. State forensic scientist Susan Williamson testified that samples from the middle bedroom and master bedroom tested negative

for gasoline. A "control" or "comparison" sample taken from under a coffee table in the living room also testified negative. Although Agent Hart claimed to identify specific "pours" of gasoline on the floor of the living room and the southwest bedroom, law enforcement did not remove and test any carpet samples from either of those two rooms (other than the "control" sample), despite testing numerous samples from other rooms and finding them negative.

286.    Counsel's failure to interview Captain Owen prevented them from challenging the State's theory that a fire was intentionally set inside the home. That failure prejudiced the defense in the guilt phase as well as the penalty phase, as the prosecution argued that the death penalty was appropriate and that numerous aggravating circumstances were satisfied because the defendant spread gasoline throughout the house in which children were sleeping.

<h3 align="center">liii.    <i>Failure to Request an Instruction Regarding Bias</i></h3>

287.    Throughout the trial, the prosecution introduced racial themes and sought to exploit anti-Muslim, anti-Middle Eastern sentiment in order to appeal to the jury's fears and anxiety. *See* Claims 1(A)(xlii) and 7. Based on the limited investigation that Mr. Abdullah has been able to undertake, it appears that at least one juror concealed their negative feelings about Mr. Abdullah's religion and status as an immigrant during jury selection. *See* Claim 40. On information and belief – including trial evidence that focused the jury's attention on Mr. Abdullah's religious beliefs and practices – one or more jurors made prejudicial comments about Mr. Abdullah's religion and/or ethnicity during deliberations and based their verdicts on such considerations. In order to counteract the impact of the prosecution's efforts and the jury's receptivity to those efforts, trial counsel should have requested that the jury be instructed that it was not to consider Mr. Abdullah's race, ethnicity, or religion or those factors more generally when deliberating.  Trial counsel's failure to request such an instruction, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a

reasonable probability that, but for counsel's failures, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### liv. *Attorney Chuck Peterson Took Too Long to Decide He Was Unable to Take the Case Thereby Making it Harder for Trial Counsel to Prepare the Case and Develop a Working Relationship With Mr. Abdullah.*

288.    Attorney Chuck Peterson was initially considering taking Mr. Abdullah's case. Mr. Peterson represented Mr. Abdullah in connection with the insurance investigation related to the house fire as Mr. Peterson had an existing relationship with the Abdullah Family.

289.    Mr. Peterson considered the case for a number of months, waffling back and forth on his ability to represent Mr. Abdullah based on concerns about whether the family could come up with sufficient funding. Mr. Peterson met with Mr. Abdullah shortly after the fire, and again when he attended the insurance interview with Mr. Abdullah. Mr. Peterson had drafted a motion to substitute as counsel; however, his waffling continued from the time of the fire in October 2002 until April 2003 when he sent Mr. Abdullah a letter indicating he could not provide representation. During these six months Mr. Peterson did not hire an investigator or begin any real work on the case.

290.    These six months would have been a critical time to begin identifying witnesses, building a relationship with the client, reviewing discovery, strategizing a long-term defense, identifying key components of the State's case, filing motions, and beginning a mitigation investigation. Mr. Peterson's extended involvement placed the Toryanskis at a disadvantage as they entered the case in June 2003, 8 months after the crime, and were constantly playing catch-up. This impacted their ability to try the case in a speedy manner which created conflict with their client who wanted a speedy trial. Their late addition to the case also impacted their ability to determine strategy and prepare for both phases of this capital case. As noted in other claims, the Toryanskis were in over their heads handling a capital case and missing out on the first six

months of investigation and preparation increased their inability to provide effective representation.

291.    Mr. Peterson's failure to clearly exit the case for numerous months, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### lv.    *Failure To Introduce Evidence That The Abdullahs Had Been Considering A Move To South Africa*

292.    The State presented numerous witnesses to create the false impression that Mr. Abdullah was controlling, manipulative, and a liar.  One of the issues that trial counsel failed to counter was the narrative that Ms. Abdullah did not want to move and that this yet another example of Mr. Abdullah's controlling nature.

293.    Trial Counsel could have countered this narrative through the testimony of Mr. Abdullah's sister, Farha Abdullah, who would have testified that Angie Abdullah was aware of the plans to relocate, that both she and Mr. Abdullah had done research into this issue and had explored both Saudi Arabia and South Africa as places where Mr. Abdullah could continue his Islamic studies, and had determined that South Africa would be better for their family.

294.    Counsel also failed to elicit testimony from Khaja Shuaib-Ud-Din that Mr. Abdullah told him that one of the reasons he was in Salt Lake City in October 2002 was to seek advice about whether he should go to a study program in South Africa.  As Mr. Shuaib was an Imam and prominent spiritual leader of Muslims in Utah, it makes sense that Mr. Abdullah would speak with him about his Islamic studies.  Mr. Shuaib was a state witness who testified regarding a confrontation call he made with Mr. Abdullah at the direction of Idaho Detectives.  As such, it

would have been compelling to have a prosecution witness confirm that a move to South Africa was being collectively researched and considered by the Abdullah family.

295.     The failure to introduce this evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

   **lvi.**     ***Failure to Cross-Examine Witnesses Regarding Ms. Abdullah's Family Bias Towards Mr. Abdullah and Islam.***

296.     Trial counsel failed to present testimony or cross-examine witnesses in Ms. Abdullah's family that would demonstrate their bias towards Mr. Abdullah and his religion and culture. Numerous family members testified and painted Mr. Abdullah in a controlling and manipulative light.  Defense counsel failed to cross examine these witnesses or to present evidence of their bias.

297.     For example, Mr. Wally Whittington, the stepfather of Angie Abdullah, sent an email to the Mosque that the Abdullah family attended shortly after the fire stating that his daughter would still be alive if she had not converted to Islam and joined the Muslim community.  It is clear that from the beginning, Ms. Abdullah's family blamed Mr. Abdullah's culture for her death, a theme that would be picked up by the State during trial where they presented evidence that Mr. Abdullah committed this crime as a result of his culture and religion, including implying that this was an "honor killing" in his culture.  Counsel failed to introduce this bias to the jury.

298.     Additionally, both Evelyn Whittington and Charlene Javernick testified at various stages of the trial.  These women are respectively Ms. Abdullah's mother and aunt and testified to various matters including the fact that Ms. Abdullah did not actually plan to sell the house or move, that Mr. Abdullah would not provide transportation for Ms. Abdullah to return from

Nashville, and other prejudicial matters. Neither was cross-examined about their bias towards Mr. Abdullah and their anger that Ms. Abdullah had converted to Islam. The jury should have been alerted that these women refused to attend the wedding between Mr. and Ms. Abdullah and held bias against Mr. Abdullah due to his religion and culture.

299. Ms. Abdullah's family also blamed Mr. Abdullah for converting Angie to Islam. Trial counsel, however, could have elicited from their own witnesses or through cross examination of the State's witnesses information that Ms. Abdullah's interest in Islam and thoughts of conversion began prior to her marriage to Mr. Abdullah, and that she became even more conservative in her views than Mr. Abdullah and his family as Ms. Abdullah would question Mr. Abdullah's oldest sister about why some of the women in the family did not wear head scarves.

300. The failure to introduce this evidence of bias and hostility held by Ms. Abdullah's family, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

**lvii.** *Failure to Present Evidence Regarding Mr. Abdullah's State of Mind Regarding Numerous Issues in Dispute Resulting in the Jury Having an Inaccurate and Incomplete Story of the Abdullah's Marriage*

301. Trial counsel failed to counter the State's narrative that Mr. Abdullah was controlling and manipulative and that Angie Abdullah was unhappy in the marriage. Trial counsel failed to counter numerous erroneous and damaging statements allowing the jury to believe that Ms. Abdullah was killed by her manipulative husband due to troubles in the marriage and Ms. Abdullah's inability to conform to his cultural and religious expectations.

302. The State presented evidence that Mr. Abdullah dictated the family finances, was opposed to sterilization and divorce, was controlling of Ms. Abdullah, violated laws such as driving without a license, and forced Ms. Abdullah to convert to Islam.

303. Trial counsel's decision to not allow Mr. Abdullah to testify, and inform him that if he did testify they would not ask him any questions, made it impossible for Mr. Abdullah to counter these narratives as he could not explain to the jury that the marriage was an equal partnership filled with love and communication.

304. Mr. Abdullah could have testified to his views on each of these matters explaining that he was not opposed to divorce as the Koran allows divorce and he would never go against his religion, that he did have a driver's license, and had spent years helping other immigrants obtain their licenses through the Refugee Program in Boise, that he was not opposed to family decision making about future children, and that Ms. Abdullah's conversion to Islam was her choice and began prior to their relationship.

305. In addition, defense counsel could have called members of Mr. Abdullah's family or his religious community to confirm that Mr. Abdullah did have a driver's license, that they observed a happy and loving marriage and partnership between the Abdullahs, that Mr. Abdullah was not controlling and how he carefully tended to Ms. Abdullah during and after her pregnancy, and to explain general Islamic views on issues such as divorce, family, the role of women in marriage and the community, and to note how committed Ms. Abdullah was to Islam including her desire to learn as much as possible about the Koran and her interest in maintaining modest dress, even asking her sister-in-law to promise that she would always wear a head scarf.

306. Not only did counsel fail to present evidence to counter the State's narrative, but they failed to explain to Mr. Abdullah how critical these issues would be and how necessary it was that Mr. Abdullah be able to explain his marriage, culture, and religion to the jury. As the jury had no counter-narrative, and with anti-Islamic sentiment running high in the wake of the

September 11, 2001 terror attacks, the State was able to easily create a false narrative of the scary foreigner who murdered his wife due to his culture and religion.

307.    The failure to introduce evidence that demonstrated Mr. Abdullah's feelings regarding key issues in dispute, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### lviii.    *Trial Counsel Misrepresented Numerous Issues to Mr. Abdullah Thereby Denying Him the Ability to Assist in His Own Defense*

308.    Many of the actions and inactions of trial counsel described throughout this petition involved trial counsel misrepresenting important issues to Mr. Abdullah such that he could not assist in his own defense.

309.    The misrepresentations began when trial counsel accepted the case with a third-party payer, something they had not previously done, and something that severely handicapped their representation.  Trial counsel never informed Mr. Abdullah that such a contract was unusual, that the agreed upon upfront fee was quickly used up, that they did not have the appropriate experience for such a serious case and would use some of the money to pay other attorneys to conduct work on the case such as filing motions, and that their loyalty to Mr. Abdullah would be limited by the fact that the paying party, Mr. Zuheir Abdullah, had an independent interest in the matter.  Zuheir was providing the Toryanskis's fee; however, he was also trying to obtain guardianship of Mr. Abdullah's young son, a potential state witness, which created a conflict that was not disclosed to Mr. Abdullah.  As the proposed guardian, Zuheir had a vested interest in not doing anything that would harm the child or cause the child stress including having a young child testify in court.  However, that young child was a potential witness who could have assisted trial

counsel in presenting an alibi that Mr. Abdullah was in Salt Lake City at the time of the offense. Trial counsel never interviewed the child and would eventually abandon an alibi defense in part to keep the child from testifying. Mr. Abdullah did not know or understand that a conflict existed or that it impacted the advocacy of his counsel.

310. Counsel also misrepresented their ability to be prepared for trial, promising Mr. Abdullah a speedy trial and that they would not seek extensions despite entering a capital case in June of 2003 for a trial scheduled in October 2003. No reasonable counsel would have believed they could prepare for a capital case in that timeframe. Yet, counsel assured Mr. Abdullah that they would be ready but then made it clear in internal emails that Mr. Abdullah was getting a continuance "whether he wanted one or not" and in fact sought continuances against Mr. Abdullah's express wishes.

311. Counsel also failed to inform Mr. Abdullah that they were devoting "all of their energies" to seeking a plea prior to and even during trial. Mr. Abdullah had repeatedly told his counsel that he did not want to plead guilty, that he did not kill his wife or burn down his home, and that he wanted a trial. However, counsel was busy trying to craft a plea that would require Mr. Abdullah to admit guilt instead of preparing for trial. This decision would ultimately impact the way they selected a jury as well as their advocacy as they were unprepared and continued to make decisions that would not impact their ability to seek a plea. In fact, Ms. Toryanski noted that she decided to abandon an alibi defense to avoid "upsetting" prosecutor Patrick Owen as she was still hoping for a plea.

312. Counsel did in fact abandon an alibi defense unbeknownst to Mr. Abdullah. Mr. Abdullah, his family, and the jurors were all shocked, when during closing argument, Mr.

Toryanski told the jury that Mr. Abdullah had returned to Boise and watched his house burn down and then ran off into the night.

313.    Counsel also misrepresented what evidence would be presented as Mr. Abdullah believed that additional witnesses would be called in his defense including Lance Donnelson, a strong alibi witness, and his family and friends to dispute allegations of a troubled marriage.

314.    Finally, counsel misrepresented the law and rules of professional conduct to Mr. Abdullah when they told him that, if he testified, they would not help him prepare or ask him any questions and that instead he would have to take the stand and speak to the jury with no preparation and no assistance.

315.    Counsel's continued misrepresentations to Mr. Abdullah, as documented above, and throughout this petition, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### lix.    *Failure to Investigate Whether Jurors Knew the Deceased by Her Prior Married Names*

316.    Ms. Abdullah had three marriages prior to marrying Mr. Abdullah and had multiple different last names.  Trial counsel never inquired of prospective jurors, all of whom came from the community in which Ms. Abdullah had lived whether they knew her by any of these prior last names.

317.    Ms. Abdullah married James Gurney in 1985, Boonsoaune Singpraseuth in 1989, and Ludovic Hegyesi in 1991.  That marriage ended in 1996.  During this eleven year period and from ages twenty to thirty-one, Ms. Abdullah was known by last names that were neither

Abdullah nor her maiden name of Jewett. The jury was not asked about these prior last names and, as a result, jurors who knew Ms. Abdullah may have been improperly seated.

318. Counsel's failure to inquire about this issue, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

**lx.** ***Failure To Object To The Speculative Testimony That Prozac Can Be Dissolved In A Liquid Without It Having A Bitter Taste***

319. The State introduced numerous witnesses to address the fact that a lethal level of Prozac was found in Ms. Abdullah's blood. One of the witnesses was Charles Backer, President and lab director of Ameritox Laboratories. During his testimony he noted that the amount of Prozac ingested by Ms. Abdullah could have been dissolved in liquid. This testimony was purely speculative, had no basis in any evidence introduced and was extremely prejudicial.

320. The State knew that their timeline meant that the Prozac was consumed at a time when Mr. Abdullah was not in Boise, Idaho. Under the State's theory, Ms. Abdullah ingested the Prozac well before midnight but Mr. Abdullah was not in the Boise area until sometime after midnight when he was observed by Marjorie Wood at the Mountain Home gas station. As such, the State needed a way to explain the Prozac and still attribute it to Mr. Abdullah. This led to the introduction of improper and speculative testimony which would then be used in the State's closing argument.

321. Trial counsel failed to object to Dr. Backer's purely speculative and damaging testimony that opened the door for Mr. Abdullah to have provided the Prozac even without being present.

322. Defense counsel also failed to object on the grounds that this testimony was not only speculative but inaccurate as Prozac has a bitter taste, and also to refute Dr. Backer's testimony

with such evidence. Prozac is delivered in capsules because the powder inside is extremely bitter and neither food nor liquid would cover the bitter taste of the sheer number of capsules required for Ms. Abdullah to have such a significant level of Prozac in her system. Trial counsel could have presented this evidence through the testimony of experts like Dr. Rushing and Dr. Christensen. *See* Claim 1(a)(v).

323. While the State would later introduce testimony of a jailhouse informant in the guilt phase who testified that Mr. Abdullah had asked him on a prior occasion to administer a liquid to Ms. Abdullah by dissolving it in tea, this evidence was not presented in the guilt phase and, therefore, there was no non-speculative evidence in the guilt phase to support the idea that the Prozac had been dissolved in a liquid.

324. Counsel's failure to object to this speculative and damning evidence, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

> **lxi.** ***Failure To Have The Decedent's Liver Tested For Possible Liver Failure As The Cause Of Death***

325. Counsel was ineffective for failing to request to have Ms. Abdullah's liver tested. As discussed previously and at greater length in this petition, the cause of death was ruled in part to have occurred as a result of fluoxetine (Prozac) overdose. The State's theory was that Mr. Abdullah somehow intentionally administered a lethal dose of fluoxetine to Ms. Abdullah within a couple of hours of her death. The State presented testimony from Dr. Backer that, based on the lack of metabolization of the drug in Ms. Abdullah's body, he believed that the drug had been delivered acutely and orally to Ms. Abdullah.

326.     However, Dr. Backer acknowledged that another explanation for the lack of metabolization is liver failure.  Despite this alternative explanation, which would be exculpatory to Mr. Abdullah, trial counsel never sought to have the decedent's liver tested for evidence of liver failure. On cross examination, Dr. Backer testified that Prozac has a half-life of six to eight days, so it can build up in the blood, and that a non-functioning or improperly functioning liver could cause a buildup of Prozac in the body. Despite the availability to conduct post-mortem tests on the liver to determine if there was liver failure, counsel did not have that done in this case.  Mr. Abdullah was prejudiced by counsel's deficient performance here as there is a reasonable probability that, but for counsel's errors, both individually and cumulatively, Mr. Abdullah would not have been convicted or sentenced to death.  Mr. Abdullah's rights under Sixth, Eighth, and Fourteenth Amendments were violated.

> **lxii.**      *Failure To Make Objections, Seek Jury Instructions, And Move For A Mistrial After The State Failed To Preserve Evidence.*

327.     The facts and arguments raised in Claim 9 are incorporated here.  Trial counsel were ineffective by failing to make objections, seek jury instructions and move for a mistrial after the State failed to preserve several important pieces of evidence prior to the trial. Mr. Abdullah was deprived of his rights under the Sixth amendment as a result of counsel's deficient performance.

328.     Throughout this case, agents of the State allowed key pieces of evidence to be lost and destroyed including but not limited to video surveillance from an Ogden, Utah convenience store; a statement taken from Lance Donnelson, a statement taken from Marjorie Wood, video footage or transaction reports from the gas station where Ms. Wood worked and Ms. Abdullah's diary. Law enforcement also failed to protect the integrity of the crime scene during the course of the investigation.

329.    Despite the State's failure to preserve this critical evidence, trial counsel failed to object to testimony from witnesses that the missing evidence would have called into question.  For instance, counsel should have objected to Ms. Wood's testimony on the basis that state's negligence and bad faith in failing to preserve Ms. Wood's statement to police, the store's video surveillance, and transaction reports deprived Mr. Abdullah the opportunity to confront the evidence being presented against him. This argument is true for all of the evidence listed above and in Claim 9 that the State failed to preserve, lost or destroyed.  Trial counsel also was deficient in failing to seek an instruction that the jury be permitted to consider Ms. Wood's testimony with concern and skepticism in light of the lost and destroyed evidence.  This too, is true for all of the evidence listed above and in Claim 9 that the State failed to preserve, lost, or destroyed.  Lastly, counsel was ineffective for failing to move for a mistrial and to preclude prosecution on the basis that the State lost and/or destroyed key evidence.

330.    Mr. Abdullah was prejudiced by counsel's deficient performance.  Had counsel made the proper objections and motions and/or requested jury instructions there is a reasonable probability that Mr. Abdullah would not have been convicted or sentenced to death.

####       lxiii.      *Failure To Request Jury Instruction Concerning The Foreseeability Of Gasoline Igniting Unintentionally*

331.    Trial counsel were ineffective at the guilt phase for failing to request that the jury be instructed on the foreseeability that gasoline poured in the home would ignite accidentally.  This instruction would have been relevant to the jury's consideration of Mr. Abdullah's culpability on the attempted murder and arson charges, as well as the charge of injury to a child.  Trial counsel were also ineffective for failing to request a jury instruction on foreseeability at the penalty phase. Such an instruction would have been relevant to the jury's consideration of the four aggravating circumstances at issue, as well as the jury's weighing of the aggravation against the

mitigation. Mr. Abdullah was deprived of his right to effective assistance counsel due to counsel's deficient performance for failing to request these instructions.

332. The State presented evidence that gasoline poured on the floor of the garage, accidentally caught fire when vapors from the gasoline were ignited by the pilot-flame of a water heater located in the garage. Mr. Abdullah was charged with arson and the attempted murder of the children who were present at the home at the time of fire. At issue in considering Mr. Abdullah's culpability on these charges was whether Mr. Abdullah intended to cause the fire at the time that it accidentally ignited, and whether Mr. Abdullah would have foreseen the likelihood of the pilot-flame igniting the vapors from the gasoline. If the jury determined that the accidental ignition of the gasoline was not likely foreseeable, it is more likely that the jury would have concluded that the fire was not meant to start at that particular moment when there were children in the home. Counsel's error in failing to request such an instruction is exacerbated by counsel's failure to request an appropriate instruction on specific intent concerning the attempted murder charges. *See* Claim 1(A)(xxxiii).

333. Likewise, at the penalty phase, had the jury been properly instructed and determined that the igniting of the gasoline was unintentional or otherwise unforeseeable, there is a reasonable likelihood that it would have determined that the State did not prove beyond a reasonable doubt the four aggravators, each of which turned on the intentionality of the fire.

### lxiv. *Failure to Adequately Cross Examine Police Officers About Inconsistencies In Marjorie Woods's Statements and Testimony*

334. As noted previously, Marjorie Wood was an important witness for the State. *See* Claims 1(a)(xvi), 11. However, Ms. Wood's statements to the police and her trial testimony contained inaccuracies that were left uncontested by trial counsel. Trial counsel failed to expose serious inconsistencies in Ms. Wood's testimony and statements by failing to cross examine the police

officers who interviewed Wood about those inconsistencies. Mr. Abdullah was deprived of effective assistance pursuant to the Sixth Amendment and was prejudiced by counsel's deficient performance.

335. At a hearing on October 18, 2002 prior to Mr. Abdullah's arrest, police officers Mark Vucinich provided testimony that could have been used by counsel at trial and pre-trial hearings to challenge Ms. Wood's testimony as well as the conduct of the police in conducting their investigation. For example, Detective Vucinich testified that when he interviewed Ms. Wood she indicated that Mr. Abdullah bought gasoline at the Chevron station in Mountain Home and paid for it using cash. Detective Morgan wrote a report following his meeting with Wood, where Wood stated that Mr. Abdullah paid cash for an item but was uncertain whether he purchased gas or not. Morgan's report also makes no mention of Wood stating that Mr. Abdullah was speaking to men in another language.

336. Each of these points were inconsistent with Ms. Wood's trial testimony. At trial, Wood testified that Mr. Abdullah did not buy gas at the station, that he bought a soda, and that he spoke with other men in another language. This testimony was at odds with her previous statements to police. Although Ms. Wood said that she gave a written statement to Detective Morgan, that statement was never produced to the defense.

337. Inconsistencies concerning Wood's identification of Mr. Abdullah and her recollection of that night undermine the accuracy and validity of the State's timeline that placed Mr. Abdullah at the residence at the time of the fire. Counsel was ineffective for failing to highlight these significant inconsistencies at trial.

338. Media report concerning Ms. Wood's identification of Mr. Abdullah at the gas station, and it supposedly being captured on video tape were contaminated the jury pool and influenced

members of the community against Mr. Abdullah. Mr. Abdullah was prejudiced by counsel's deficient performance at trial, because had counsel effectively cross examined Ms. Wood and the police officers who interviewed her, there is a reasonable probability that Mr. Abdullah would not have been convicted and sentenced to death.

### lxv. *Failure To Adequately Establish the Height of the Fence in the Back Yard of the Abdullah Residence and to Adequately Challenge the State's Theory Describing How Naim Abdullah Was Found in the Back Yard*

339.    Trial counsel failed to establish either through cross-examination or direct evidence that the back yard fence was approximately six feet tall and that it would have been impossible for Mr. Abdullah in a very short window of time to climb the fence multiple times, place a baby on the ground, and flee undetected.

340.    The State suggested that Mr. Abdullah discretely managed to place Naim on a neatly folded blanket with toys and a flowerpot, where he was discovered by the firemen who had just walked through the area only moments before. For this to be possible, Mr. Abdullah must have also vaulted over a six-foot fence twice with a blanket and toys in his arms during this very short period of time, without being seen by the firefighters or other onlookers. This theory also presupposes that Mr. Abdullah, after placing Naim on the blanket with the toys, vaulted over the high fence and then promptly returned directly to the Salt Lake City mosque, where no one he encountered that morning detected any odor of gasoline or smoke.

341.    Trial counsel failed to establish that the height of the fence made the State's purported timeline nearly impossible. Instead, the jury was left to believe the prosecutor's inaccurate description of the fence as a short picket-fence. Had counsel challenged the nearly impossible sequence of events, and the height of the fence, there is a reasonable probability that jurors would have found that Mr. Abdullah was not responsible for placing Naim in the backyard and was not present at the scene of the fire at all. Counsel's failure to contest this aspect of the

prosecution's case, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death. The preceding errors as set forth in Claims 1(A) were so pervasive that Mr. Abdullah's defense attorneys failed to subject the prosecution's case to meaningful adversarial testing. Therefore, Mr. Abdullah need not show prejudice on his guilt-phase ineffectiveness claims. *See United States v. Cronic*, 466 U.S. 648 (1984); *Holloway v. Arkansas*, 435 U.S. 475 (1978); *Geders v. United States*, 425 U.S. 80 (1976); *Powell v. Alabama*, 287 U.S. 45 (1932). Furthermore, for any ineffective acts or omissions that resulted in a structural error, Mr. Abdullah is not required to establish prejudice. *See Styers v. Schriro*, 547 F.3d 1026 (9th Cir. 2008).

342. To the extent that Mr. Abdullah is required to demonstrate prejudice, then the claims above show that, both cumulatively and individually, he was prejudiced by the deficient performance of his trial attorneys. *See Harris v. Wood*, 64 F.3d 1432 (9th Cir. 1995); *Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir. 1978). That is, in the absence of trial counsel's errors, there is a reasonable likelihood that Mr. Abdullah would not have been convicted of the charged offenses or would alternatively have been convicted of only some of them. Many of the errors above also prejudiced Mr. Abdullah's rights at sentencing because they undermined viable defenses and thereby prevented Mr. Abdullah from offering evidence regarding residual doubt at the penalty phase, which would have been a powerful reason for the jury to exercise mercy had it been adequately presented and argued to the jury.

### B. Trial Counsel Rendered Ineffective Assistance At The Capital Sentencing Phase

343.    Trial counsel rendered ineffective assistance at the capital sentencing in the following ways:

### i.    *Failure To Adequately Investigate And Present Mitigating Evidence*

344.    Mr. Abdullah has an enormously compelling personal story, involving a childhood in which his town was destroyed by Saddam Hussein as part of an ethnic purge, family members were killed by the Iraqi army, time spent helping his family flee Hussein and live in a refugee camp under appalling conditions, and then transitioning to America where he became a proud and productive citizen and a well-respected member of the Boise community. This story would have been of enormous benefit to Mr. Abdullah at sentencing, where it could have been used effectively to humanize him in the eyes of the jury and make a strong case for mercy. Defense counsel utterly failed to do so, instead making a disastrous decision to suspend their mitigation investigation for a number of critical months, out of a misguided confidence in their ability to prevail, and then presenting an anemic, wholly undeveloped account of Mr. Abdullah's life to the jury at sentencing. The Toryanskis presented an anemic mitigation case in part because they had, by sentencing, reached the false and self-defeating view that it would be impossible for them to win a life verdict given the offense with which Mr. Abdullah was charged. That view was wildly mistaken, as many far more egregious offenses lead to life sentences after competent attorneys made adequate mitigation presentations. One reason why the Toryanskis failed to fulfill their duties on the mitigation front is simply that they did not understand what mitigation was, and in fact never accurately described the concept, even when given the chance years later in post-conviction. In any event, no matter what the causes of their failures were, it is clear that these egregious errors violated Mr. Abdullah's right to an adequate investigation and

presentation of mitigating evidence. *See Sears v. Upton*, 561 U.S. 945 (2010); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). Counsel's numerous failures on the mitigation front included, but are not limited to:

- *Counsel's sporadic and rushed investigation*. At the inception of this case, the ACPD retained the services of Rosanne Dapsauski, a mitigation specialist with fifteen years' experience in conducting mitigation investigations in capital cases. In contrast with Ms. Dapsauski, the Toryanskis and their two fact investigators had collectively participated in zero capital cases on the defense side. When the Toryanskis took over the case, Ms. Dapsauski had only conducted a preliminary mitigation investigation. The Toryanskis proceeded to severely limit Ms. Dapsauski's work. Based on their own misguided confidence in winning an acquittal, defense counsel minimized the importance of the mitigation case and ignored the cardinal rule that mitigation themes must be developed throughout the course of the guilt phase, so as to strengthen the themes and avoid alienating the jury with a mitigation presentation that conflicts with the guilt phase defense. As a result of this attitude, the Toryanskis provided Ms. Dapsauski with very little guidance or direction. During this period, the Toryanskis made the catastrophic decision to tell her that they were no longer in need of her services, as Mr. Abdullah's was not a mitigation case, resulting in the loss of many months in which a comprehensive mitigation investigation could and should have been ongoing. With only a few days left before sentencing, defense counsel finally sought to remedy their colossal mistake, but by then it was too late. Ms. Toryanski approached Ms. Dapsauski at the Ada County Courthouse, where she was assisting

with another trial, and told Ms. Dapsauski, "We are screwed." She asked Ms. Dapsauski to resume her work, even though there was no time at that point to adequately collect records, contact experts, interview witnesses, or prepare witnesses to testify. The Toryanskis then failed to use Ms. Dapsauski to determine which witnesses would testify and in preparing them to testify, even though she was far more qualified to do so than the attorneys.

- *Counsel's failure to weave mitigation into the guilt phase*. Counsel did nothing to begin presenting mitigation themes during the guilt phase, even though that practice is absolutely essential to capital defense and was well-established at the time.

- *Counsel's failure to adequately identify and examine family witnesses*. Although counsel called a handful of witnesses to describe Mr. Abdullah's background, defense counsel did not prepare them sufficiently and failed to ask them enough questions to elicit the rich, powerful stories that were available. Mr. Abdullah comes from a closely integrated family, bound by love, friendship, and shared experience. He is very much loved and revered by his parents, siblings, cousins, and other members of his extended family, all of whom wanted to support Mr. Abdullah and have their voices heard before the jury decided his fate. Numerous family members would have been willing to testify during the penalty phase, but were not asked to, or were told they would testify but never called. Many of the family members were interviewed by Ms. Dapsauski and presumably would have been identified as witnesses, had Ms. Dapsauski not been removed from Mr. Abdullah's case early on. The Toryanskis also failed to move for funds to conduct an investigation in the Middle East, where even more witnesses could have been found. As a result of defense counsel's lack of

preparedness for the penalty phase, only four family members testified: Haji Fetah Abdullah (Mr. Abdullah's father); Nichivan Abdullah (cousin); Dilshad Haji Abdullah (brother); and Rihan Mustafa (mother). A far greater number should have been called.

With the witnesses that were called, the Toryanskis spent a woefully small amount of time preparing them to testify, which was especially problematic in light of their language issues and their lack of familiarity with the American legal system. The Toryanskis did not bother to inform the witnesses beforehand about what questions they would be asked. Once the witnesses were on the stand, the Toryanskis spent less than an hour and a half on their combined testimony, an outrageously insufficient amount of time in any capital case and particularly so when such a wealth of powerful mitigating testimony could have been elicited from the witnesses. Aside from their troubling brevity, the examinations were conducted with excruciating incompetence. It well illustrates defense counsel's complete obliviousness to mitigation that Mr. Toryanski went so far as to interrupt Mr. Abdullah's mother, Rihan Mustafa, at the very point where she was beginning to offer the kind of emotional description of her son's best qualities that would have resonated with the jury. Mystifyingly, Mr. Toryanski objected to his own question, and abruptly ended his examination, thereby preventing Ms. Mustafa from elaborating on aspects of her son that would have weighed strongly in favor of a vote for life. Indeed, Mr. Toryanski was dead set on keeping out the most beneficial evidence, as exemplified by the moment where he angrily told Rahan not to cry during her testimony and warned that she would be charged five thousand dollars if she did. Similarly, Mr. Toryanski's examination of

Haji conveyed that he was disinterested in the responses and wanted only to get it over with. For counsel to expect the jury to be moved by Haji's testimony, he had to at least pretend to be engaged in the exchange and to express some sympathy.

Some of the Toryanskis' questions almost seemed tailor made to harm their client. For instance, Mr. Toryanski repeatedly asked Haji questions intended to elicit an emotional response based on the death of Ms. Abdullah, which likely inflamed the jurors against the man they had just convicted of killing her, as opposed to the loss he and others would feel for Mr. Abdullah after an execution. Along the same lines, Mr. Toryanski repeatedly asked family members about how affectionate Mr. Abdullah was with his wife. It is impossible to fathom why he regarded that tack as helpful, given that the jury had just found Mr. Abdullah guilty of murdering her. Remarkably, Mr. Toryanski also failed to ask either of Mr. Abdullah's parents a single question about what life was like in the refugee camp in Turkey, even though the family's experience there was the seminal, wrenching episode of Mr. Abdullah's youth.

The Toryanskis likewise failed to present evidence that Mr. Abdullah suffered from a head injury, caused in part by his sister striking him with a rock when he was a child. Nor was any evidence presented that Mr. Abdullah might have been affected by malnutrition, either caused by his mother's inability to enjoy a healthy diet while pregnant with him or by his own lack of access to resources as a child.

Defense counsel's unpreparedness was further demonstrated by Nichivan's testimony, where it became clear that Mr. Toryanski thought Nichivan was Mr. Abdullah's brother, when he was actually his cousin.

It is equally striking that at Mr. Abdullah's sentencing for the *non*-capital counts, which followed his capital penalty phase, the Toryanskis presented testimony from several siblings that had not been called earlier. By then, of course, the jury had already voted for death, and the testimony was totally useless.

- *Counsel's failure to adequately investigate and present evidence regarding Mr. Abdullah's childhood in the Middle East.* Had counsel identified more of the readily available family witnesses, and had they competently interviewed and examined them, an incredibly potent mitigation story could have been told. These witnesses could have spoken to Mr. Abdullah's childhood in Kurdistan, the near constant fear that all Kurds felt under Saddam Hussein's regime, and the horrors of living in refugee camps. It would have been a heartfelt account, full of anecdotes and striking details. For instance, the witnesses would have captivatingly described the grimness of the refugee camp, including the open pits used as toilets, the pervasive disease, and the lack of water. They also would have highlighted the profound trauma that Mr. Abdullah personally suffered. In one particularly affecting incident, he saw an uncle with whom he was very close shortly after the Iraq army shot him with over thirty rounds, causing his head to explode. As with so much, this story was not brought to the jury. And they could have talked about Mr. Abdullah's bravery and heroism as a child, when he acted with a maturity well beyond his years to protect his siblings and help his family survive a terrible ordeal. The testimony of the eldest son in the Abdullah family, Musheer, would have been particularly impactful. Musheer was diagnosed with mild intellectual disability and could have explained how Mr.

Abdullah had always looked out for him with compassion, even under the most trying circumstances.

- *Counsel's failure to adequately investigate and present evidence regarding Mr. Abdullah's difficult transition to life in America.* Mr. Abdullah was forced to go from a rural, impoverished life in the Middle East to a middle class, small-town existence in the largely white city of Boise, Idaho. That process of assimilation was extraordinarily difficult, as it involved adjusting from one way of life to an entirely different one. It was complicated by the fact that Mr. Abdullah assumed a leadership role for his family, and helped them navigate their new surroundings in the face of daunting linguistic, cultural, and religious barriers. Counsel failed to interview and call as witnesses numerous individuals who could have testified to the disorienting nature of the Abdullah family's relocation, and to the psychological effect that it had on Mr. Abdullah. Many witnesses could also have testified to positive experiences and conduct in Boise, including his efforts to learn the language, participate and contribute to his community in and out of school, including work to support his family and to benefit his community by assisting refugees and volunteering on behalf of the Islamic Center. As one especially notable acknowledgment of Mr. Abdullah's good works, he received a Spirit of Idaho Award from United States Senator Mike Crapo, which recognized his work in sensitivity training for Boise airport police officers. Another example of Mr. Abdullah's positive influence on the community is that he gave loans to co-workers who were unable to receive them from banks. The witnesses who could have vouched for these laudable deeds were readily available had counsel and their investigators made inquiries at Mr. Abdullah's school, at his

workplaces, and at the Islamic Center, among other places. Testimony about the traumatic nature of moving thousands of miles away as a refugee would have militated strongly in favor of life, and that testimony was not presented.

- *Counsel's failure to properly prepare and present psychologist testimony*. Defense counsel failed to present powerful mitigating evidence that Mr. Abdullah does not present a risk of future dangerousness, and that he suffers from Post-Traumatic Stress Disorder (PTSD), attributable in part to his background as a member of a persecuted minority and refugee from extreme political violence. The Toryanskis obtained funding from the trial court to retain Dr. Craig Beaver, a local neuropsychologist, as an expert who would present testimony about the effects of various factors on Mr. Abdullah's character, including the cruelties he suffered in Kurdistan and his experience in refugee camps. Defense counsel consulted with Dr. Beaver but never called him, even though he was prepared to testify that Mr. Abdullah did not present a risk of future dangerousness and that his moral culpability was diminished by the fact that he suffers from PTSD. The absence of future dangerousness constitutes valuable mitigation, as does a defendant's traumatic upbringing. Here, trauma was directly attributable to someone that most Americans, and presumably a good number of jurors, despised: Saddam Hussein. Indeed, one of the reasons that the U.S. declared war on Iraq was because of the atrocities that Saddam committed against the Kurds. Instead of using Dr. Beaver to present this important testimony, the Toryanskis foolishly focused him on guilt-phase issues, several of which were outside of his expertise. For example, he was asked to analyze Ms. Abdullah's Prozac levels, and her potentially suicidal behaviors, neither of which was he qualified to opine on. Dr.

Beaver was excluded from meetings, preventing him from playing the central role on the team that he should have and creating a disjointed and dysfunctional approach to sentencing. To fully present Mr. Abdullah's background, Dr. Beaver recommended to defense counsel that they follow up on the interplay between his traumatic refugee experience and his cultural values. They failed to do so. When sentencing finally arrived, Dr. Beaver gave defense counsel an outline of the testimony he wished to give. Nevertheless, the Toryanskis never called to the stand this most essential witness. After the fact, Mr. Toryanski first claimed, falsely, that Dr. Beaver had in fact testified, and later indicated that Dr. Beaver had not been called because he would have testified that Mr. Abdullah was a "psychopath," which is clearly contradicted by the record. By virtue of Dr. Beaver's absence, the jury was deprived of compelling evidence that would have illuminated the interplay between Mr. Abdullah's traumatic refugee experience and his cultural values, evidence that he suffered from PTSD, and evidence that he did not present a risk of future dangerousness.

- *Counsel's failure to properly prepare and present cultural expert testimony*. Defense counsel retained Professor Michael Gunter to testify about Mr. Abdullah's experience in the Mardin refugee camp. His testimony lasted twenty-one minutes. During that testimony, he made no reference to Mr. Abdullah or his family. Professor Gunter spent less than three minutes explaining, in the most general terms, the living conditions in the refugee camps, describing them simply as "very marginal" or "submarginal." The Toryanskis did not elicit any details about the living conditions, and failed to elicit any example of clear human rights abuses and traumas experienced

by the detainees.  Defense counsel's failure to elicit any compelling testimony from Professor Gunter is borne out by the fact that the prosecution declined the opportunity to cross-examine him.  Professor Gunter's testimony was hamstrung by the Toryanskis' failure to do any substantive preparation for his time on the stand.  They provided him with very little information about the case to give him a context for his testimony.

While Professor Gunter had some relevant information and would have benefitted the case had he been properly prepared and questioned, he should not have been the only expert to testify about the refugee camp.  The Toryanskis did not do sufficient research to ascertain that they also needed someone who could relate personally with the Kurdish experience and with Mr. Abdullah, and then translate that experience to the jury.  For example, Dr. Asfandiar Shukri works with Physicians for Human Rights (PHR).  As a PHR representative, Dr. Shukri succeeded in entering two refugee camps, including one near the city of Mardin, in 1988.  He testified in the trial against Saddam Hussein about the health of Kurdish refugees fleeing the 1988 Anfal Campaign.  Significantly, he was also born and raised in Kurdistan, which gives him personal insight into Mr. Abdullah's life in addition to professional insight.

Dr. Shukri, or another similarly situated expert, could have informed the jury about the background of the Kurdish people and how that background shaped Mr. Abdullah's life.  In particular, he could have spoken to the perpetual and brutal oppression of the Kurds by the Iraqi government, which murdered them, tortured them, and used chemical weapons against them, causing them all to live constantly in fear.  Dr. Shukri or a peer could also have testified about what the conditions at the

Mardin refugee camp would have been like, including the despondency, helplessness, disease, and violence. His expertise in Kurdish culture would have given depth, explanation, and credibility to properly presented family member testimony about Mr. Abdullah's life in Kurdistan and the refugee camps.

Had defense counsel called someone like Dr. Shukri, and also called a psychologist such as Dr. Beaver, the psychologist could have used the testimony about Mr. Abdullah's background to make a powerful mitigation case based on PTSD. To succeed, that case would not need to have any connection to the crime the jury had convicted Mr. Abdullah of committing. But it would have been more powerful because the psychologist could have drawn such a connection. Specifically, a psychologist could have presented evidence about how a defendant's unwillingness or inability to accept responsibility may be linked to their PTSD, especially if the disorder is related to other considerations, like cultural and religious factors. PTSD patients are frequently emotionally numb as a result of these experiences, and that can affect their ability to own up to mistakes. The jury therefore could have had a solid foundation for exercising mercy, even though they had already been convinced that Mr. Abdullah committed the crimes. Because of the Toryanskis' ineffectiveness in selecting a cultural expert and preparing that witness to testify, the jury was deprived of compelling evidence of his traumatic refugee experience, his cultural history, and evidence that he suffered from PTSD.

- *Counsel's failure to adequately develop testimony about the impact Mr. Abdullah's execution would have on his family*. Had they asked Mr. Abdullah's relatives to speak about how great a wound it would inflict on the family were he to be executed,

they would have spoken up passionately to preserve his life. Many witnesses could have talked to the jury about what a loving, generous family member Mr. Abdullah had been, and what a blow it would be to lose him.

- *Other unpresented mitigation evidence.* Counsel were deficient in not investigating other compelling mitigation themes, including but not limited to evidence of good acts committed while incarcerated, such as saving the lives of two suicidal inmates, as well as evidence of brain damage, intellectual disability, mental health issues, mental illness, and physical and other abuse. Had they done so, they could have found and presented evidence supporting those themes.

### ii. *Failure To Adequately Deal With Allocution*

345. Defense counsel incorrectly advised and misled Mr. Abdullah regarding the scope of statements he could offer during his allocution, in an effort to prevent Mr. Abdullah from testifying during the guilt and penalty phases of his trial. Based on the input he got from the Toryanskis, Mr. Abdullah expected that he would be permitted to give an allocution to the jury that was unlimited in scope. He intended to make statements relating to matters he would have testified to at the guilt and penalty phases of his trial, including statements that would have cast doubt on his guilt. *See also* Claim 44. However, according to the trial court's interpretation of the law, evidence concerning guilt was irrelevant because the jury had already convicted him. Because of these restrictions and other restrictions the trial court placed on the scope of permissible allocution, Mr. Abdullah chose not to allocute. Moreover, by coercing Mr. Abdullah into waiving his right to testify at the guilt-phase, Mr. Abdullah unwittingly waived his right to allocute regarding guilt-phase issues, including residual doubt and innocence. Trial counsel were also ineffective for failing to advocate for a broader interpretation of Mr. Abdullah's right to

allocute. Under the Supreme Court's broad understanding of what constitutes mitigating evidence, Mr. Abdullah's allocution would have qualified.

346.     Trial counsel's failure to accurately advise Mr. Abdullah about his right to allocate and adequately protect that right, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failures, Mr. Abdullah would have allocuted and persuaded the jury to spare his life.

### iii.     *Failure To Adequately Challenge Steven Bankhead's Testimony*

347.     The State elicited testimony from Steven Bankhead, a convicted felon who was incarcerated at the time, that Mr. Abdullah had previously attempted to hire him to rape and kill Ms. Abdullah, suggesting to the jury that Mr. Abdullah had planned to murder his wife long before her actual death. Defense counsel failed to adequately investigate and challenge this enormously prejudicial testimony. The Toryanskis were in possession of records that could have been used to impeach Mr. Bankhead. Those records include, but are not limited to, evidence that Mr. Bankhead had in the past provided false statements to law enforcement. To wit, the Toryanskis knew that Mr. Bankhead had pled guilty to Idaho Code § 18-5413, which prohibits the provision of false information to law enforcement. Defense counsel should have cross examined Mr. Bankhead regarding the incident for which he was convicted of providing false information to law enforcement. Perplexingly, defense counsel made no use of this evidence, even though it was tailor-made to serve as explosive impeachment material. A demonstrated willingness to lie to police officers would have greatly undermined Mr. Bankhead's credibility. Other witnesses who were familiar with Mr. Bankhead could also have testified to his character for untruthfulness, including Shawna Perez, Kerry Stephen Thomas, and Dennis Edward Richardson. Finally, Mr. Abdullah himself would have testified that he did not have any contact

with Mr. Bankhead during the time of their alleged conversation and certainly never hired him to kill and rape his wife.

348.    Mr. Bankhead testified on direct examination that he was in prison following a parole revocation and that he had a sentence of "two to ten years" for grand theft. Defense counsel did not inquire into how many more years in prison Mr. Bankhead would serve if he were unable to regain parole, nor did they ask him about the process for regaining parole after a revocation or whether Mr. Bankhead hoped to eventually regain parole. Likewise, defense counsel did not inquire whether Mr. Bankhead planned on bringing to the Parole Commission's attention the fact that he had provided testimony against Mr. Abdullah once the Parole Commission would reconsider him for parole. These questions would have exposed Mr. Bankhead's reasons for wanting to curry favor with the prosecution.

349.    Mr. Bankhead testified that Mr. Abdullah taught him how to speak Arabic, a language that Mr. Abdullah—a speaker of Kurdish—is not fluent in. The Toryanskis said nothing about the error, which would have further demonstrated Mr. Bankhead's unreliability.

350.    Had defense counsel presented these glaring problems with Mr. Bankhead's testimony, there is a reasonable probability that the trial court would not have permitted him to take the stand. Even if it had, the material would have utterly discredited Mr. Bankhead as an opportunistic liar, and undermined the State's credibility for choosing to rely on him. While the jury did not find that Mr. Abdullah has a propensity to commit murder, it is reasonably likely that the jury considered Mr. Bankhead's highly inflammatory testimony when weighing the remaining aggravators and reaching its decision to impose the death penalty.

351.    Trial counsel's failure to adequately investigate Mr. Bankhead or effectively cross examine him once on the stand, considered by itself and in combination with other acts of

deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failures, Mr. Abdullah would have allocuted and persuaded the jury to spare his life.

### iv. *Stipulating To Strike Jurors On The Sole Basis Of Their Juror Questionnaires[7]*

352. Prior to trial, the prosecution emailed a list of seventeen jurors whom they proposed to be struck by stipulation. Based only on their juror questionnaires, defense counsel stipulated to striking twelve of them. The Defense agreed to strike jurors 12, 15, 50, 58, 64, 69, 75, 82, 109, 117, 133, and 154. Seven of these twelve prospective jurors were opposed to the death penalty according to their questionnaire responses. Defense counsel made this stipulation despite the trial court cautioning both parties against it.

353. Before the email stipulation, the trial court emphasized to counsel the importance of face-to-face voir dire over striking jurors based on their responses to a 45-page questionnaire. Nevertheless, Judge Copsey allowed defense counsel to make this blunder.

354. Later, during voir dire, several veniremembers admitted to being confused by the questionnaire. It turned out that some of the responses did not accurately reflect the prospective jurors' views. Oral voir dire was necessary to clear up any questionnaire mistakes or inaccuracies. The stipulated strikes rendered it impossible for these jurors to clear up any misperceptions resulting from questionnaire confusion.

355. The questionnaires did not contain all of the information necessary to make a reasoned determination about whether they could serve or not. For instance, one item on a list of choices stated: "I am personally, morally, or religiously opposed to the death penalty, and would never vote to impose it, regardless of the facts and the law in the case." Because on the available

---

[7] This jury-selection issue and those that follow affected both the guilt and penalty phases of Mr. Abdullah's trial because they led to a jury that was predisposed both to convict and to vote for a death sentence. *See* Claims 14 and 35.

answers, it is not at all conclusive that a juror who circled this answer would not have chosen a subtly different, but legally significant, answer stating the following: "I am personally, morally, or religiously opposed to the death penalty, but I would base a decision whether to impose it on the circumstances of the case and the law which the court instructs must be applied by the jury." When taking the answers at face value, on a cold record, it is simply impossible to tell whether a juror was disqualified because of which letter they might have circled in a list. In-person voir dire was desperately needed.

356.    There were many inconsistencies in the questionnaires. As prosecutor Patrick Owen said, "I have a lot of instances, Judge, where a juror on one page says one thing and then says something completely unanticipated on another page." Mr. Toryanski agreed and remarked: "in reviewing the questionnaire, it's not at all clear that a lot of jurors really understood the questions that were being asked." This was borne out during the voir dire itself. When questioned about one answer, Juror 28 stated, "I would probably have to redo that if I were to think about it some more." Juror 5 conceded that he did not answer all the questions because he found some confusing and had difficulty expressing his opinions for questions that called for narrative answers. This sort of confusion and inconsistency is precisely why voir dire is essential, and precisely why it was calamitous of defense counsel to forego voir dire on the jurors who were most likely to sympathize with their client.

357.    The prosecution, for their part, did not make the same mistake and refused defense counsel's request to stipulate to strike any members of the venire. Even when the defense suggested striking a potential juror who, based on media coverage, believed the defendant was guilty and should be executed, the prosecution refused and preferred oral voir dire before

stipulating. Unlike the prosecution, defense counsel was content to strike jurors opposed to the death penalty without even getting confirmation that the questionnaire responses were accurate.

358. Defense counsel relied on potentially mistaken questionnaire responses to strike jurors and, as a result, failed to effectively effectuate Mr. Abdullah's constitutional right to question jurors who voiced opposition to the death penalty.

359. Even if some of the jurors that defense counsel stipulated to dismiss had answers on their questionnaires that might have raised concerns from the prosecution and the trial court about their fitness to serve, the Toryanskis had a duty to do their utmost to try to rehabilitate the jurors. After all, the people who had expressed skepticism of the death penalty or appeared otherwise sympathetic to the defense were the individuals that the Toryanskis should have been most eager to have on the jury. Had they questioned the individuals at voir dire, the Toryanskis could have further explored their views and made it more difficult for them to be excused. It is well-known in the capital defense community that attorneys have a duty to do whatever they can to rehabilitate potentially favorable veniremembers, and the Toryanskis failed to take the most basic step to do so: simply asking them additional questions.

360. It was not reasonable of the Toryanskis to assume that none of the jurors would have been empaneled had the Toryanskis taken the trouble to voir dire them.

361. For instance, Juror 12 strongly disagreed that she could impose the death penalty, but indicated that her views in opposition to the death penalty would not prevent or substantially impair her ability to view the facts impartially, and would not prevent or substantially impair her ability to return a guilty verdict on first-degree murder. This juror did, however, note that she was personally, morally, or religiously opposed to the death penalty, and would never vote to impose it, regardless of the facts and the law in the case, and further stated that she would not

impose the death penalty on anyone.  While Juror 12 believed the best argument against the

death penalty was that "murder is wrong even if it's the state doing the murdering," it appears

that the juror's views against the death penalty were not religiously based.  Specifically, the juror

expressed no opinion whether matters of life or death should be left to God, and expressed

agreement that innocent people are often executed.  Based on the questionnaire alone, this juror

was not a per se cause strike.  First, there is inconsistency in her answers, as she indicated that

her views would not prevent or substantially impair her ability to be impartial, but also stated

that she could not impose the death penalty regardless of the facts and law.  Second, based on the

juror's answers, it is reasonable that the juror's personal opposition to the death penalty is based

on the juror's belief that innocent people have been wrongly executed.  For this reason, it would

have been imperative to ask Juror 12 at voir dire some variation of the following question: "I

understand that you believe innocent people have been executed.  If, however, after hearing all

the evidence in this case, you were convinced beyond a reasonable doubt of the defendant's

guilt, would you be able to set aside your views and follow the law as the court instructs?"

362.    The same analysis that is set forth above with respect to Juror 12 also applies to Jurors

15, 82, and 154.  It was even more foolish of defense counsel to forsake an opportunity to

question Juror 82.  That juror never indicated *strong* agreement or *strong* disagreement on any of

the questions relating to views on the death penalty and answered "no opinion" to a large number

of questions, including whether he could vote for the death penalty in some cases if he were on

the jury.  This reflects at least a certain level of ambivalence about the death penalty, which

definitely should have been explored in voir dire.

363.    Under Supreme Court case law, a prospective juror's personal conscientious objection to

the death penalty is not a sufficient basis for excluding that person from jury service in a capital

case. The inquiry is whether the jurors' attitudes will prevent or substantially impair the performance of the juror's duties in accordance with his instructions and oath. Most of the jurors the Toryanskis heedlessly struck from the jury pool by stipulation indicated that their views would not constitute such an impairment. If that were true, these jurors would have been ideal for the defense: skeptical of the death penalty and yet eligible to serve. Defense counsel had a duty to see whether that eligibility could be shown, and they failed miserably in discharging that duty. If the Toryanskis had managed to put a single life-leaning individual on the jury, they would likely have saved their client's life. They did not even try, even though there was no downside to doing so and a huge potential upside.

364.    If the struck jurors could not have been rehabilitated, voir diring them still would likely have required the prosecution to use peremptories, which would have put Mr. Abdullah in a more advantageous position at jury selection. It would also preserve any wrongful exclusions for appellate review, and would have conveyed to Mr. Abdullah that his attorneys were fighting for his rights and his life, instead of letting the prosecution roll over them.

365.    Ms. Toryanski later admitted that she and her husband showed a lesser degree of zealousness by stipulating to the dismissals. She insisted that their lack of diligence was motivated by a desire to appease the prosecution and keep open the prospect of a plea deal, but that motivation was utterly unreasonable, as Mr. Abdullah was plainly not going to take any offer deemed acceptable by the State. *See* Claim 1(A)(xxxix). In reality, the stipulation was driven instead by the fact that the Toryanskis were themselves biased in favor of the prosecution, were completely out of their depth and outmatched, totally unprepared to go to trial, and were conflicted in regard to giving a strong defense by their fixed fee contract.

366.     Ms. Toryanski further admitted that in person voir dire is critical as when you pick jurors it is more than just documents, it is also intangible things like demeanor, the way they interact in person, and getting a feel for the person.  As Ms. Toryanski said, "it is more than just what is on a cold paper".

367.     Additionally, one of the very few things defense counsel did to prepare for this case was attend a training on jury selection in capital cases.  At this training, they learned the value of listening to juror's actual answers and rating them on a scale of 1-7 based on the juror's likelihood of imposing a death sentence.  This process cannot occur when counsel does not actually conduct a voir dire of the jurors.

368.     The failure to conduct voir dire of all potential jurors, considered alone and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

            v.      ***Failure To Remove Jurors***

369.     The Toryanskis ineffectively failed to try to remove a number of jurors, either by challenging them for cause or by exercising peremptory strikes.  These jurors ended up being seated and sentencing Mr. Abdullah to death.

- Juror 103.  Juror 103 admitted to having a social and business relationship with Leslie and Gary Beck.  The Becks were Ms. Abdullah's cousins who both testified during the guilt phase of the trial. Juror 103 stated that she had spoken to Leslie Beck on the phone and that Gary Beck had a business relationship with Juror 103's husband.  The juror noted that in addition to her family's business relationship with the Becks, she would occasionally see the Becks socially. Defense counsel neither asked Juror 103 whether her relationship with the Ms.

Abdullah's family members would affect her ability to be an unbiased juror, nor did defense counsel ask how returning a verdict of not guilty might affect the business relationship that Juror 103 and her husband had with the Becks. Defense counsel was ineffective by allowing a juror with a potentially personal stake in the outcome of trial to serve unchallenged. Additionally, this juror lacked a clear understanding of the two different stages of jury service in a capital case by equating mitigation with something that mitigates the crime itself noting that the death penalty is appropriate if the person is proven guilty with no "wiggle room" because there are no mitigating circumstances. Trial counsel utterly failed to follow-up on these comments despite this juror equating mitigation with a lesser crime. Juror 103's statement, when properly considered, demonstrates that if the juror believes the defendant has committed first degree murder, then death is the only appropriate sentence.

- Juror 59. Defense counsel failed to challenge for cause the seated Juror 59 for bias even though he indicated partiality toward law enforcement and was in the process of becoming a police officer. Juror 59 had interned with the Moscow Police Department and was currently interviewing and testing with the Boise Police Department, the Idaho State Police, and the Meridian Police Department. As was clear from both Juror 59's voir dire and juror questionnaire, he was intent upon becoming a police officer and was biased toward law enforcement. On a scale of one to seven for honesty, one being least honest and seven most honest, Juror 59 rated police officers with a six and criminal defense attorneys with a three. During voir dire, Juror 59 also stated that he believed police officers more

than other witnesses. When asked if he would consider police testimony equal to other witnesses, Juror 59 responded, "I think, yeah, if I was instructed." As noted in Claim 38, Juror 59 was never so instructed. Not only did defense counsel fail to challenge Juror 59 as a biased juror, they also failed to further explore how Juror 59's interest in a career as a police officer would affect his ability to serve impartially on the case. Defense counsel did not ask, for example, if Juror 59 believed serving on a capital case and returning a guilty verdict and a death sentence would improve his chances of becoming a police officer. Like Juror 103, Juror 59 potentially had a personal stake in the outcome of the trial and was, as a result, unqualified to serve on the jury. Additionally, Juror 59 was not an appropriate juror as he indicated that he has issues in cases where children are victims. In this case, while Ms. Abdullah was the only fatality, there were children in the home at the time of the fire, and Mr. Abdullah was charged with numerous crimes involving children including the attempted murder of three children. Defense counsel demonstrated a complete lack of effectiveness by passing for cause Juror 59.

- Juror 83. This juror eventually served as the foreperson so counsel's failure here was highly prejudicial. In Juror 83's questionnaire, he rated himself a nine out of ten in support of the death penalty. He strongly agreed that he supported the death penalty, disagreed that only the worst murderers should be executed, expressed his views that society would be stronger if the death penalty was imposed more frequently, that executions are needed to protect the public, that

those who kill once will kill again, and, perhaps most troublingly in this case, that a murderer's childhood is irrelevant. During voir dire, Juror 83 stated:

> Well, I feel strongly in justice issues that there needs to be a notion of justice in all that we do and if someone takes someone's life, it is reasonable to expect that their life may be taken for that purpose. And I realize there is a lot of mitigating circumstances and that's why under law we have various levels, first degree, second degree, and so forth in which it may not be warranted, but there are some situations that I do believe are heinous enough and with so much malice that it's warranted.

Clearly, Juror 83 believed that mitigating evidence takes first-degree murder down to manslaughter. For this juror, then, if a defendant was convicted of first-degree murder, that would mean that no mitigation was present, and a death sentence would automatically follow. Far from taking the obvious step of establishing this disastrous juror as a proper for-cause challenge, defense counsel took the bizarre step of rehabilitating him, declaring, delusionally: "what I'm hearing you say . . . you'll listen to the aggravators, but you'll also listen to mitigating facts and circumstances as presented by the defense." It is hard to imagine how defense counsel heard that from this juror's responses, especially because it is the exact opposite of what the juror actually said. Instead, this juror made it plain that he believed mitigation only had a place at the guilt phase and was irrelevant to sentencing. The Toryanskis took someone who practically swore his intent was to sentence their client to death and ensured that that person sat on the jury. Additionally, this juror was the Manager at Idaho Bureau of Labs, and while the Lab was no longer connected with the state forensic lab, he knew a number of witnesses and should have been further questioned and challenged for cause on that issue. His knowledge of witnesses, as well as his work at a lab, in

a case that had significant testimony from lab employees made him a biased juror. Prejudice was especially strong here because Juror 83 took on a leadership role as the foreman, and no doubt swayed his peers toward death.

- Juror 92. In her questionnaire, Juror 92 rated herself a six out of ten in favor of the death penalty, disagreed that the death penalty should only be applied to the worst murders, disagreed that it is better to let guilty people go free if it prevents innocent people from being convicted, agreed that executions are needed to protect the public, and agreed that it does not matter what kind of childhood a murderer had. She further indicated that the best argument for the death penalty was an "eye for an eye" and "proof" would be important for her in deciding whether to impose a life or death sentence. During voir dire, when asked specifically about her support for the death penalty, the juror stated, "Well, those are hard to answer. I think if there's no doubt—if there's not a reasonable doubt, then the death penalty—I would not have a problem imposing, but if there is doubt or there's not enough evidence, I would not impose it." As with Juror 83, Juror 92 was quite obviously someone who effectively has no interest in mitigation: "if there's no doubt," i.e., if the defendant is proven guilty, then the defendant gets the death penalty. Juror 92 was a classic automatic death juror, and cried out for a challenge, though defense counsel did not move for one. Defense counsel should also have explained what mitigating evidence was to Juror 92, as she thought it meant "an excuse" and admitted, "I don't understand" what it is. Ms. Toryanski's brief, stumbling response shed no light on the concept,

and left Juror 92 just as confused as she was when voir dire began, and just as unlikely to consider mitigation.

- Juror 1. Juror 1 stated in her questionnaire that she believed defense attorneys to be the least honest (1 of 7), while rating prosecutors and police officers as the most honest (7 of 7). She rated herself an eight out of ten in support of the death penalty, and indicated life in prison without parole is not a harsh enough punishment for murder. For this juror, the best argument for the death penalty is "guilt beyond reasonable doubt" and the best argument against it is "innocent persons wrongly convicted and executed." At voir dire, Juror 1 stated that if she were confronted with a case involving "premeditated and well thought out and children involved, yeah, I would go for the death penalty." She was a virtually certain vote for death and she acknowledged as much with trial counsel. There was no effort made to establish the juror as a for-cause challenge. Juror 1 served as an alternate, and as an automatic-death juror she presumably influenced the other jurors to adopt a similarly closed-minded attitude.

- Juror 100. Juror 100 was biased against Mr. Abdullah. This juror sated that she remembered talking with coworkers about the incident when it first happened and that she thought it was a cruel case and new reports indicated that Mr. Abdullah was responsible. Defense counsel should therefore have taken steps to remove her from the jury. Juror 100 served as an alternate, and as a biased juror she presumably influenced the other jurors to vote against Mr. Abdullah at both phases of trial.

- Juror 8. Juror 8 indicated during voir dire that the death penalty is appropriate when the murder is "predesigned". Simply put, this juror was clear that if it they found the defendant guilty of first-degree murder, then a death sentence would follow as first-degree murder is, by definition, "predesigned". Juror 8 served as an alternate, and as a biased juror he presumably influenced the other jurors to vote against Mr. Abdullah ay both phases of trial.

- Juror 28. Juror 28 noted that the death penalty is appropriate for "the destruction of another human being with forethought". This is again a juror that believes that the death penalty is the only appropriate punishment for first degree murder. Trial counsel failed to explore these statements further, despite it being clear that this juror equates any first-degree murder with a death sentence as a homicide with forethought is first degree murder. The failure to seek to remove this juror for cause is ineffective.

- Juror 36. This juror rated themselves an 8 out of 10 in terms of their support for the death penalty. More concerning, when asked about mitigation and giving weight to mitigating factors, this juror is unable to commit to do so and instead uses phrases like "probably" and "I think so" when asked about her ability to consider mitigating evidence. This is a juror that is not qualified as she is mitigation impaired. Counsel was ineffective for failing to remove this juror who served as a primary juror in deliberations.

- Juror 98. This juror demonstrated bias and should have been removed as she believed that the mere fact that someone was arrested means there must have been cause to do so which makes them a juror incapable of service as they will not

provide a defendant the protection of treating them as innocent until proven guilty. Additionally, this juror was a strong advocate of the death penalty noting that "if there are some really terrible things, that's the way it should end." This juror is incapable of setting aside the crime and considering mitigation. For all of these reasons, counsel was ineffective for failing to remove this juror.

- Any juror listed in the following sub-claim, Claim 1(B)(vi), who does not appear above, also should have been removed for cause for the reasons below.

370. The failure to challenge these jurors for cause, considered alone and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### vi. *Failure To Adequately Voir Dire Death-Leaning Jurors*

371. Defense counsel's failure to adequately voir dire veniremembers resulted in a death-prone pool of jurors and the seating of jurors who would automatically impose the death penalty for first degree murder. Before voir dire, potential jurors filled out a questionnaire that included questions about their death penalty views. Many venire members, including some who sat on the jury, indicated prejudice. Several jurors stated that a life sentence was not sufficient for the crime of murder on the questionnaire—this response suggested these jurors were literally unqualified because they would automatically give a death sentence for murder. Several jurors also stated that they would not consider a defendant's childhood in sentencing—this response should have signaled to defense counsel the need for effective voir dire since, in general, a capital defendant's childhood is one of the most compelling forms of mitigation evidence, and, in particular, Mr. Abdullah's childhood was so bleak as to be barely imaginable to the average juror. Defense counsel, distracted from the importance of voir dire by their ill-placed focus on

non-existent plea negotiations, neglected voir dire, which resulted in an unconstitutionally biased jury in violation of the Sixth, Eighth, and Fourteenth Amendments.

372.    On their distraction from voir dire, the Toryanskis admitted they had allowed their desire to pursue plea negotiations and attempts to convince Mr. Abdullah to seek a plea offer to compromise their advocacy during jury selection.  Ms. Toryanski later stated that her jury selection advocacy was weakened by the defense team's fatigue and desire to appear reasonable to the prosecution.  The resulting inattention to the voir dire process resulted in a jury made up of death-prone jurors who would not hold the prosecution to its burden of proof during the guilt phase and would give an automatic death sentence regardless of any mitigation.

373.    Defense counsel also ostensibly used the Colorado Method scale to rate potential jurors according to death penalty views.  The Toryanskis rated sixteen of the first fifty jurors who were passed for cause as a "six" or "seven."  A six or seven ranking means the potential juror will automatically give a death sentence—both rankings are subject to excusal for cause.  The difference is that a six may be willing to say hypothetically they would "perhaps" consider mitigating evidence.  Defense counsel's ineffective voir dire let these constitutionally unqualified venire members pass for cause.

374.    Defense counsel's attempt to use the Colorado Method failed in the actual questioning of death-prone jurors.  The Colorado Method requires defense counsel to remove any guilt phase defenses from the juror's self-assessed penalty views.  For example, if a juror says he could impose a life sentence if the murder was not provoked or premeditated, defense counsel should ask the juror to imagine the defendant committed an unprovoked, premeditated murder without any defenses whatsoever.  Once such jurors realize there are no defenses in this imaginary scenario, they will truly reveal whether they believe death is the only appropriate penalty for

first-degree murder. The Toryanskis utterly failed to follow what is a standard practice in capital litigation. Instead, they allowed potential jurors who would automatically impose a death sentence to remain in the jury pool and even serve on Mr. Abdullah's jury.

375. For jurors who appear in the following list and in the list of jurors that defense counsel should have struck for cause, Mr. Abdullah argues both that they were ineligible to serve on the existing record and also that defense counsel's voir dire of them was inadequate. Jurors who defense counsel did not adequately voir dire include, but are not limited to, the following:

- Juror 59. This seated juror was interviewing to become a police officer. As noted in Claim 1(B)(v), Juror 59's questionnaire responses indicated he was extremely prone towards a death sentence. He also confessed he would believe law enforcement more than other witnesses. Defense counsel was fully aware of these responses and believed Juror 59 was a "killer." Before voir dire, in fact, the Toryanskis attempted to remove Juror 59 by stipulation based on the questionnaire responses, but the prosecution refused. During voir dire, Juror 59 gave a generalized agreement to consider mitigation, but defense counsel did not explore specifically if the juror would actually consider mitigation evidence. Therefore, not only is it concerning that defense counsel passed Juror 59 for cause after their failed attempt at voir dire, but also defense counsel did not, or forgot to, use a peremptory strike to block this biased juror from sentencing Mr. Abdullah to death.

- Juror 83. As noted above in Claim 1(B)(v), this seated juror was fundamentally disqualified to sit on the jury. Instead of adequately asking questions about this juror's qualifications, defense counsel surmised that he was "kind-hearted" and

passed him for cause.  Asked to explain why, defense counsel provided a vague, non-responsive answer to PCR counsel on the failure to effectively voir dire, challenge, or strike this juror.

- Juror 98.  This seated juror's questionnaire indicated strong support for the death penalty, especially for a homicide that was planned against an innocent person. She also agreed that murder is murder and motives and circumstances are not important, that harsher treatment of criminals has reduced crime, that she would not consider childhood in mitigation.  The juror disagreed that only the worst murderers should be executed, disagreed that it is possible for the worst criminal to turn his life around, and disagreed that forgiveness and redemption are available to all.  In deciding on a sentence, the juror noted she would consider "how the person planned the murder, how cruel they were to the victim" important.

  In voir dire, it became clear Juror 98 had already formed an emotional connection to the case.  She was familiar with the case through the media and was upset because she and victim were both mothers.  She also remembered Mr. Abdullah's arrest, and stated, "when someone's arrested, you assume that there's some cause there . . .  They obviously had reason to arrest him.  They felt like—they knew that there was evidence that showed possibly he had done it."  On this basis alone, Juror 98 was unqualified to sit on the jury.  Her death penalty views also rendered her fundamentally incapable of giving Mr. Abdullah a fair trial.  On the death penalty, she stated, "But what I feel is if there are some really horrible things that people [do].  I think that is the way it should end."  She offered defense counsel a

promise "to try" to keep an open mind until all the evidence was presented. This promise was meaningless, however, from a juror who had already judged the case and would automatically impose a death sentence for murder. As was their pattern, defense counsel failed to question the juror and reveal whether she would automatically impose the sentence or consider any mitigation. Defense counsel recklessly and ineffectively passed this juror for cause.

- Juror 28. This seated juror's questionnaire stated that first degree murder was the strongest argument for the death penalty and the best argument against it was innocence. The juror's questionnaire also indicated a belief that the death penalty was too seldom used and provided "no opinion" on whether he could give meaningful consideration to mitigation.

On voir dire, defense counsel started to ask about Juror 28's death penalty views but abruptly stopped when it was becoming clear this juror would automatically give a death sentence for murder. The juror stated his belief that murder "with aforethought" would warrant a death sentence. This juror also indicated he would believe law enforcement more than other witnesses. Instead of adequately pinning down this juror's death penalty and pro-prosecution views, defense counsel hurried through questioning and, as a result, was unable to challenge this unqualified juror or intelligently exercise their peremptory challenges.

- Juror 2. This alternate juror stated that the best argument against imposing the death penalty would be if the homicide was justified by self-protection or if the defendant suffered diminished capacity. Defense counsel failed to explore if this juror would automatically impose the death penalty for first degree murder.

- Juror 1. This alternate juror believed in "an eye for an eye." He stated that he would not impose the death penalty if the defendant was provoked or acting without intent. Defense counsel failed to explore if this juror would automatically impose the death penalty for first degree murder.

- Juror 36. This seated juror disagreed that only the worst murderers should be executed and believed a murderer's childhood was irrelevant rendering her fundamentally unqualified to serve on a capital jury. The most important circumstance for this juror, in imposing a death penalty, would be if the defendant was aware he was killing another person. A first degree murder conviction in this case would mean the prosecution had proved Mr. Abdullah knew what he was doing.

  Juror 36 also implied during voir dire that she had already decided to give Mr. Abdullah a death sentence: "Quite honestly, I was thinking about this. I would— I would with great remorse go for it. I would vote for the death penalty . . . ." From this statement it is obvious the juror was guaranteed to give Mr. Abdullah a death sentence and, because of defense counsel's inadequate voir dire, she did.

- Juror 44. This seated juror's questionnaire called for vigorous voir dire. He described himself as six out of ten in favor of the death penalty, did not believe a defendant's childhood was relevant, disagreed that only the worst murderers should be executed, and believed it would not be difficult to give someone a death sentence. For this juror the best argument against the death penalty was wrongful conviction and the best argument for the penalty was "an eye for an eye." Defense counsel only asked the juror if he could give value to mitigation—a

vague question to which an affirmative response leads to no insight into whether the juror would automatically impose the death penalty. Defense counsel did not inquire further and due to their inadequate voir dire they were unable to challenge this juror for cause or intelligently use peremptory strikes.

- Juror 45. This seated juror's questionnaire stated he supported the death penalty, but indicated he had no strong feelings. He also stated he would want information about the nature of the crime and the perpetrator prior to supporting the death penalty in any given case. These vague responses invited exploration on voir dire, especially asking which facts about the crime and the perpetrator would matter to this juror. Instead, defense counsel did not ask a single question about the death penalty or the juror's willingness to listen to and give meaningful consideration to mitigation evidence. This failure to question the juror about his death penalty views and openness to mitigation evidence was an abdication of defense counsel's role as Mr. Abdullah's advocate.

- Juror 81. This seated juror's questionnaire showed support for the death penalty. The juror also strongly disagreed that only the worst murderers should be executed, and did not believe jurors should be required to follow the law given in instructions. In voir dire, the juror stated, "there are two types of murderers; one where somebody gets hot headed and loses it for a moment; they do something stupid. And then there are people who think it through. I think everybody feels they are going to get away with it or they wouldn't do it in the first place." Since Mr. Abdullah was charged with first degree murder, trial counsel should have

asked follow-up questions but failed.  Defense counsel did not ask this juror a single question about the death penalty and was, therefore, ineffective.

- Juror 29.  Juror 29 said she would automatically impose the death penalty if so instructed.  Defense counsel did not explain through voir dire that automatic, mandatory death sentences are unconstitutional.  Instead, defense counsel passed for cause a venire member who was under the mistaken impression that the judge would give her an instruction to impose an automatic death sentence.

- Juror 77.  Juror 77 affirmed that he believed the death penalty is the only appropriate sentence for murderers and would not consider absence of a criminal record in mitigation.  Without arguing that Juror 77 was mitigation impaired, defense counsel passed for cause.

- Juror 111.  Juror 111 reported he had no problem with the death penalty and could impose it if Mr. Abdullah was guilty of first degree murder.  On his questionnaire, Juror 111 rated himself eight out of ten as strongly in favor of the death penalty.  Defense counsel passed for cause.

- Juror 8.  Juror 8 indicated in his questionnaire that "[i]n some cases, the death penalty is required.  Pre designed [sic] murder would be one example."  Juror 8 stated that the best argument for the death penalty would be "murder for hire, pre design to murder some one [sic]."  In addition, this juror wrote that the best argument against the death penalty would be accidents, "imparement [sic] of judgment (not drug induced)," neither of which were issues in this case, and both of which would render a homicide less than a first-degree murder in any event.  Juror 8 also stated that it did not matter to him what kind of childhood a murderer

had and rated himself a five out of five in favor of the death penalty. Finally, this juror indicated that the "level of intent & purpose" would be important to him in deciding whether to impose death or give a life sentence. Defense counsel failed to adequately follow up on these responses, which seem to indicate that this juror would impose the death sentence for any premeditated, first-degree murder where there is no evidence of accident or impairment. In the context of Mr. Abdullah's case, this would essentially be an automatic death juror, and therefore defense counsel should have asked the trial court to excuse Juror 8 for cause.

- Juror 56. This juror indicated that she does not like crimes against children, had started to form an opinion about the case when the charges were read, that premeditation makes her inclined towards the death penalty, and in her questionnaire noted that there "is no argument against the death penalty". While counsel did try to strike this juror for cause, the Court denied the request noting that counsel was not asking questions appropriately. As such, the failure to have this juror removed for cause was due to both the Court's refusal to remove biased, improper jurors, as well as trial counsel's inability to effectively conduct voir dire.

- Juror 63. This juror should have been struck for cause and trial counsel's failure to make a cause objection was ineffective. This juror indicated that she believes that not just the worst murderers should be executed, but also other kinds of murderers. This answer is inconsistent with existing law making her an improper juror who should have been struck for cause. Instead, trial counsel made no such request and used a preemptory to remove a juror who was not qualified to serve.

- Juror 72. This juror is not only biased as their cousin is a state witness, but this juror is also mitigation impaired as she believes that the death penalty is used too seldom and when asked about mitigation, she only indicated that she "thinks" she could consider it which is inadequate. The failure to explore this issue to and to make an appropriate cause strike was ineffective.

- Juror 85. This juror was biased towards people from the middle east and expressed an inability to consider any sentence less than death. This jury noted that he feels very strongly that if someone takes a life, they should die for it. Defense counsel did seek to remove this juror for cause, but the Court denied the request. While the Court erred in not excluding a juror who was incapable of following the law, trial counsel was ineffective in making arguments to dismiss this juror.

376. The failure to effectively voir dire these death leaning jurors, considered alone and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death

### vii. *Failure To Adequately Voir Dire Life-Leaning Venire Members*

377. In addition to stipulating to strike seven veniremembers opposed to the death penalty by email, *see* Claim 1(B)(iv), defense counsel provided ineffective assistance when they failed to adequately question prospective jurors during voir dire. Several prospective jurors who appeared opposed to the death penalty were excused for cause without any inquiry into their ability to set their beliefs aside and apply the law. Jurors who expressed concerns about the death penalty and were inadequately questioned by defense counsel include, but are not limited to, the following:

- Juror 30 was a veteran of the Vietnam war and had voted against the death penalty when he lived in Oregon. Nevertheless, Juror 30 indicated he was not so unalterably opposed that he could not consider the death penalty under any circumstances. The prosecution, during its voir dire, asked questions about Juror 30's service in Vietnam and how it would possibly affect his ability to impose the death penalty. Although he expressed anxiety over a death sentence, Juror 30 stated that, although he did not want to be the jury foreman, he could publicly affirm a vote for the death penalty. Defense counsel did not ask Juror 30 a single question. Instead, defense counsel volunteered to join the prosecution in challenging Juror 30 for cause.

- Juror 39 expressed a hesitancy regarding the death penalty; however, he noted that while he had deep reservations, he would consider it. Instead of further exploring this juror's beliefs and aiding in rehabilitating a juror who said he could follow the law, Defense counsel agreed to dismiss this juror for cause.

- Juror 48 was opposed to the death penalty. She indicated that she could impose it in some cases, but that she believed life imprisonment was sufficient most of the time. After the judge finished her questions, the prosecution asked no questions, stating simply that the judge had covered everything sufficiently. Defense counsel, echoing the prosecution, also said the judge had covered everything sufficiently and joined the prosecution in moving to excuse the juror for cause. Defense counsel did not ask Juror 48 a single question.

- Juror 49 wrote that she opposed the death penalty in her questionnaire. Without questioning her, defense counsel joined the prosecution in saying she was

disqualified based on the questionnaire responses. Juror 49 indicated some hardship in serving on the jury, and instead of further questioning to clarify the extent of and identify remedies for any hardship issues, defense counsel collaborated with the prosecution in agreeing the juror was too opposed to the death penalty. Despite the fact that defense counsel ineffectively conceded that Juror 49 was pro-life, the trial court decided to excuse Juror 49 for hardship. The judge justified the hardship excusal by pointing out that it was improper to make death-qualification rulings based simply on the questionnaires, even though that is exactly what the defense along with the prosecution were requesting. If defense counsel had been of a similar mind as the judge and not allowed the questionnaires to be the final word from a juror, they would have actively questioned prospective jurors like Juror 49 in accordance with Supreme Court precedent. Instead, defense counsel failed to effectively represent Mr. Abdullah by allowing the court to strike those opposed to the death penalty without any inquiry and without any challenge.

- Juror 79. This veniremember questioned the utility of the death penalty but committed to following the judge's instructions. He was excused for hardship although the trial court refused to dismiss veniremembers with similar employment concerns. In fact, excusal for hardship was pretextual. The actual reason was due to his criticisms of psychiatry and suspicions about testimony from those psychiatrists who depend on the State of Idaho for client referrals. Despite these opinions, Juror 79 affirmed that he could be fair. But defense counsel failed to adequately voir dire Juror 79, did not fully explore the issue of

hardship, and did not request Juror 79 check with his employer for juror duty coverage as was the practice with most jurors claiming hardship. Instead, defense counsel joined the prosecution and the trial court in not objecting to the pretextual excusal of Juror 79.

378. The failure to effectively voir dire these life leaning jurors, considered alone and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

> **viii.** ***Failure To Adequately Prepare Life-Leaning Jurors For Capital Jury Service***

379. Defense counsel lost a valuable opportunity to prepare life-leaning jurors when they failed to use voir dire to provide guidance and inform jurors of their right to maintain their own opinions and positions during deliberations. Due to defense counsel's failure, two life-leaning jurors were potentially subjected to having their wills overborne by other jurors.

- Juror 68's questionnaire suggested a general opposition to the death penalty but indicated she could vote for it in the right case. She wrote that "everyone deserves a second chance," and indicated a defendant's childhood would be meaningful to her. At voir dire, she promised to "consider" factors at sentencing, but was never asked precisely what it was she would consider, with the exception of the defendant being a good provider. It was also never established that Juror 68 could give *meaningful* consideration to mitigation, which is what a competent voir dire is all about. No effort was made to educate this juror about preserving her personal moral integrity through a jury verdict. She is an example of a juror who would likely be moved by mitigation, but who must be empowered to hold

fast to her judgment in the face of criticism from fellow jurors.  Without that

empowerment, a juror like this one typically submits to the will of the majority

and goes along with a death vote, especially on a jury—like this one—where

defense incompetence has led to a jury highly slanted toward death.  That

dynamic is even more likely when defense counsel fail to emphasize to a juror

that she is not required to articulate, even to herself, her reasons for voting in

favor of life, as an instinctive desire to afford a defendant mercy is sufficient

under the law.  Of course, defense counsel did not convey that lesson to Juror 68

either.  The Toryanskis never even tried to insulate this promising juror from the

pressures of deliberations, and therefore failed to protect her as a valuable defense

asset.

- Juror 96.  This seated juror's questionnaire indicated support for, but no strong

  views on, the death penalty.  For this juror, future dangerousness was the most

  important consideration in deciding whether to impose death.  In voir dire, the

  juror stated she believed the death penalty could be a good thing and was not

  totally against it.  Defense counsel did not take voir dire as an opportunity to ask

  this juror about considering mitigating evidence in relation to the potential for

  future dangerousness.  Doing so could have also prepared this juror for trial by

  informing her that she had a right to stand by her decision and deserved to be

  heard by other jurors.  Counsel made no effort to effectively voir dire and

  consequently lost the opportunity save Mr. Abdullah from a death sentence.

380.    The failure to effectively prepare these life leaning jurors for service, considered alone

and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a

reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### ix. *Failure To Adequately Voir Dire Jurors Whose Opinions About The Death Penalty Were Unknown*

381. In addition to botching the questioning of prospective jurors who tilted toward either life or death, the Toryanskis botched the questioning of prospective jurors who were question marks.

- Juror 14. Juror 14 failed to rank himself on a scale of one to ten in favor of the death penalty. In his questionnaire, he indicated that in deciding between life or death, what was important to him was "[t]hat the evidence indicated beyond a reasonable doubt, person was of sound mind at the time, and crime was purposely done in hideous/heinous [sic] manner." Overall, Juror 14 did not provide more than a surface view into his feelings on the death penalty, and voir dire did not meaningfully illuminate his position. He was a question mark, and defense counsel could not reasonably determine what action to take on him without trying to gather more information, which they failed to do.

382. The failure to adequately voir dire jurors resulting in a juror whose opinion on the death penalty was unknown to be seated, considered alone and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

### x. *Failure To Combat Premature Juror Decision-Making Through Effective Voir Dire*

383. Voir dire is an opportunity for defense counsel to assess a potential juror's ability to consider mitigating evidence by previewing the defense's sentencing case. Effective voir dire previewing can serve to guide jurors away from premature decision-making and signal which

jurors are subject to for-cause excusal or peremptory strike. Mr. Abdullah's trial counsel, by failing to use voir dire effectively, failed to combat premature juror decision-making and to prepare jurors to consider mitigating evidence in sentencing.

384. Both death-leaning and life-leaning jurors need preparation through defense counsel's voir dire. Jurors who are adamantly pro-death often operate under the presumption that unequivocal proof of guilt will justify the death penalty. Such jurors are exceedingly likely to make a sentencing decision despite instructions to the contrary. Effective voir dire of death-prone jurors will avoid premature decision-making. Part of that effective voir dire involves "stripping the facts", a method that is widely used in capital jury selection and would have been taught at the voir dire training attended by trial counsel. This process makes it clear to jurors that the death penalty is only appropriate when a first-degree murder conviction is returned. Through this method, jurors are questioned about their views on the death penalty when all defenses are removed which is the critical inquiry. If a jury determines that there is a defense that mitigates the crime itself to something other than first degree murder, the death penalty is no longer an option. As such, it does no good to question jurors without clearly explaining to them under what limited circumstances they would be making a decision about the death penalty. The failure to take these steps in selecting a capital jury is ineffective.

385. Mitigation preparation is also essential in terms of preparing all jurors to suspend a sentencing decision until they have heard and considered mitigating evidence. This process starts by informing jurors that they would only ever be considering a death sentence if they had determined that a first-degree murder occurred, as noted above. It is then imperative to explain to prospective jurors that, in the limited circumstance that they have determined a first-degree murder occurred, they will then be required to consider mitigating and aggravating factors. It is

necessary to explain this stage to jurors and to explain what some mitigation may be in the case at hand.  By failing to preview mitigation through voir dire of all members of the venire, defense counsel acted ineffectively, and the result was a jury that was unprepared to consider Mr. Abdullah's mitigating circumstances and resulted in an unreliable death sentence.

386.    The failure to effectively explain and prepare jurors to take on such a difficult role resulted in a jury that was inclined to premature decision-making in a way that harmed Mr. Abdullah.  This failure, considered alone and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been convicted of the charged offenses and/or would not have been sentenced to death.

> ### xi.    *General Ineffectiveness On Sentencing Instructions*

387.    Trial counsel's failure to adequately seek appropriate jury instructions at the penalty phase denied Mr. Abdullah of effective assistance of counsel and due process as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.  Counsel failed to ask the court for appropriate instructions and offered no argument in support of any of the proposed instruction that they did offer to the Court, other than to simply assert them. Counsel also repeatedly relied on Florida law, and not Idaho law, as authority for the instructions, thus demonstrating their ignorance of Idaho capital jurisprudence.  Trial counsel's failure to effectively propose proper jury instructions, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr.

Abdullah would not have been would not have been sentenced to death. Below are more specific acts of ineffectiveness in connection with the sentencing instructions.

### xii. Requesting An Incorrect Instruction On The Great-Risk Aggravator That Allowed The Prosecution To Prove The Aggravator

388. Counsel was ineffective for defining the "great-risk" aggravator in a manner that was inconsistent with the plain meaning of the aggravator's language, and in a manner that was directly determinantal to Mr. Abdullah's case, in violation of the Sixth, Eighth, and Fourteenth Amendments. One of the aggravators on which the State relied to pursue a death sentence was that Mr. Abdullah knowingly created a great risk of death to many persons. Defense counsel proposed an instruction defining "many persons" as "more than four people." That instruction was mistaken, as five people would not be considered "many" in everyday speech, as confirmed by popular dictionaries. More to the point, the instruction was also enormously damaging to Mr. Abdullah. The jury had already convicted Mr. Abdullah of arson. Three people were in the Siesta residence when the fire began, one child was found right outside of it during the fire, and one neighbor went into the house during the fire to rescue a child. The prosecution could therefore easily demonstrate that the lives of five people were jeopardized by the fire. In this way, defense counsel suggested an instruction that was engineered to suit the State's case and harm their own client, reflecting the same prosecution-oriented outlook and utter abandonment of Mr. Abdullah that is discussed elsewhere in this petition. Trial counsel's failure to seek an appropriate definition of the aggravator here, considered by itself and in combination with other

acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been sentenced to death.

### xiii. *Failure To Challenge For Lack Of Evidence The Great Risk Aggravator*

389.    Counsel was ineffective for failing to challenge the prosecution's insufficient evidence in support of "the great risk" aggravator. As argued in Claim 43, the prosecution did not prove the great risk of death aggravator.  By failing to challenge the prosecution's evidence, defense counsel deprived Mr. Abdullah of effective representation and as a result the jury was allowed to credit the State's deficient proof and find that the aggravator applied.  Counsel should have objected on the basis that there was insufficient evidence that Mr. Abdullah knowingly created the risk, that "many persons" were endangered, and any great risk of death had no relationship with the cause of Ms. Abdullah's pre-fire death.  *See* Claims 28, 29, 41.  Mr. Abdullah was prejudiced by trial counsel's failure to challenge the prosecution's presentation of insufficient evidence in support of the aggravator.  But for counsel's deficient performance there is a reasonable probability that Mr. Abdullah would not have been sentenced to death.

### xiv. *Failure To Request An Instruction Regarding Evidence Relating To Multiple Aggravators*

390.    In Idaho, the jury is allowed to bring the same piece of evidence to bear on more than one aggravator, so long as no two aggravators are supported solely by the identical evidence.  Given that rule, defense counsel should have requested written findings and an instruction to prohibit improper duplication of evidence in support of multiple aggravators, and in accordance with Mr. Abdullah's right to a public trial.  Without written findings, the record is insufficient to determine whether the jury properly considered additional aggravating evidence to support its finding of each alleged aggravator. As discussed in claim 52, Mr. Abdullah was deprived of his rights to due process, to a public trial, and to be free from cruel and unusual punishment when

the jury was not instructed to make written findings concerning the mitigators and aggravators. Because Mr. Abdullah's constitutional right to a public trial was violated by the court's failure to require the jury to memorialize in writing its findings with respect to mitigation and aggravation, Mr. Abdullah does need not to show prejudice in light of the structural error. However, Mr. Abdullah was nonetheless prejudiced by the failure of trial counsel to request an instruction requiring the jury to make specific findings with respect to each aggravator because the lack of findings precludes meaningful review of the jury's decision imposing a death sentence.

### xv. Failure To Object To Instruction Regarding Juror Unanimity And Duty To Consult

391. Counsel failed to object to the court's unconstitutional instruction requiring the jury to consult and reach unanimity with respect to the determination and weighing of mitigation and aggravation. As discussed in greater detail in Claim 53, the jury was improperly given instructions that suggested they had to be unanimous on the presence of mitigating evidence and on the weighing of mitigation against aggravation, and on their duty to consult with one another about the penalty verdict. Those instructions violated well-established Supreme Court law, and defense counsel should accordingly have objected to them. Mr. Abdullah's rights under the Sixth, Eighth, and Fourteenth Amendments were violated. Trial counsel's failure to object to this unconstitutional instruction, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been sentenced to death.

### xvi. Failure To Request Instruction Defining The Weighing Process Consistent With Idaho Law

392. Counsel was ineffective for failing to object to the trial court's erroneous instruction concerning the process of weighing mitigation and aggravation under Idaho law in violation of Mr. Abdullah's rights under the Sixth, Eighth, and Fourteenth Amendments. Under well-

established Idaho law, a defendant cannot be sentenced to death unless it is found that each

aggravating circumstance outweighs the cumulative mitigating evidence. Mr. Abdullah's jury

was instructed: "If you find that all of the mitigating circumstances are sufficiently compelling to

make the imposition of the death penalty unjust or you cannot unanimously agree on that issue,

then the judge must sentence the defendant." The court did not define "sufficiently compelling"

and did not require the jury to find that each individual aggravating circumstance outweighed the

collective mitigation. Defense counsel should have proposed an instruction informing the jury,

in accordance with clear Idaho precedent, that it would have to weigh each aggravating

circumstance against all of the mitigating evidence taken together. Based on the instructions the

court gave, the jury could have voted for a death sentence because they believed that the

mitigation outweighed the aggravation, but not in such a manner or degree as to make imposition

of the death penalty unjust. That result would be starkly at odds with Idaho law. Trial counsel's

failure to object to this vague and misleading instruction, considered by itself and in combination

with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable

probability that, but for counsel's failure, Mr. Abdullah would not have been sentenced to death.

*See* Claim 1(B)(xviii).

> **xvii.**      ***Proposing An Instruction That Removed Reference To The Sentence That Would Be Imposed If The Jury Did Not Vote Unanimously For Death***

393.      Counsel was ineffective for requesting an instruction that misled the jury about its

function as the ultimate arbiter of whether Mr. Abdullah would be sentenced to life or death; or

whether a far lesser sentence might be imposed if it did not reach a verdict of death, in violation

of the Sixth, Eighth, and Fourteenth Amendments. Before the sentencing instructions were

given, the trial court discussed with the attorneys what the jury would be told about how the case

would proceed if it did not vote unanimously for death. Counsel proposed that the court not tell

the jury what sentences the court would be choosing from in that event.  Instead, they requested

that the court inform the jury that if it could not decide on death, "the judge will sentence the

defendant, and then ending it there."  Counsel stuck with that position even though the judge

reminded them that "if the jury's not sure of what the potentials are for the defendant, . . . they

will err on the side of death."  The court embraced counsel's misguided understanding of the

law, and instructed the jury that if the State failed to prove an aggravator, "the judge must then

sentence the defendant," and if the jury could not agree on mitigation or voted against death,

again, "the judge must sentence the defendant."  No instruction was given informing the jury of

what possible punishments the judge could impose if no death sentence were meted out. The

absence of information likely led jurors to believe that there was a risk that if Mr. Abdullah were

not sentenced to death he could potentially receive a sentence less than life imprisonment.  Such

a conclusion would obviously lead jurors to find death appropriate, rather than risk the

possibility that Mr. Abdullah would one day be released from prison. Trial counsel's misleading

jury instruction, considered by itself and in combination with other acts of deficient performance,

prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr.

Abdullah would not have been sentenced to death.

### xviii.    *Failure To Challenge Death Penalty Statute For Containing Conflicting Standards Regarding Consideration Of Mitigation And Aggravation*

394.    Counsel was ineffective for failing to challenge portions of Idaho's death penalty statute

that allowed for conflicting standards concerning the consideration of mitigation and aggravation

in violation of the Sixth, Eighth, and Fourteenth Amendments.  As discussed in Claim 1(B)( xvi),

Idaho law precludes a sentence of death unless at least one found aggravating circumstance,

considered individually, outweighs the aggregate of all of the evidence presented in mitigation.

Upon such a finding, the death penalty will only be imposed if mitigating circumstances are not

found to be "sufficiently compelling" such that death is unjust. There is no statutory definition of the phrase "sufficiently compelling." Idaho Code § 19-2515(3)(b) states that "[w]here a statutory aggravating circumstance is found, the defendant shall be sentenced to death unless mitigating circumstances which may be presented are found to be sufficiently compelling that the death penalty would be unjust." Subsection (7)(b) of the statute then adds that a jury must be informed that if it

> finds the existence of a statutory aggravating circumstance but finds that the existence of mitigating circumstances makes the imposition of the death penalty unjust or the jury cannot unanimously agree on whether the existence of mitigating circumstances makes the imposition of the death penalty unjust, the defendant will be sentenced to a term of life imprisonment without the possibility of parole.

> In subsection (8), however, the statute provides that:

> Upon the conclusion of the evidence and arguments in mitigation and aggravation: With regard to each statutory aggravating circumstance alleged by the state, the jury shall return a special verdict stating: Whether the statutory aggravating circumstance has been proven beyond a reasonable doubt; and, If the statutory aggravating circumstance has been proven beyond a reasonable doubt, whether all mitigating circumstances, when weighed against the aggravating circumstance, are sufficiently compelling that the death penalty would be unjust.

> If a jury has been waived, subsection (8)(b)(iii) directs that the court shall:

> Upon weighing all mitigating circumstances against each statutory aggravating circumstance separately, determine whether mitigating circumstances are found to be sufficiently compelling that the death penalty would be unjust and detail in writing its reasons for so finding.

395. In reviewing these sections, the only thing that becomes clear is that the statute provides three different standards for considering mitigating evidence, comparing it to aggravating circumstances, and determining whether imposition of the death penalty will be unjust. The jury in Mr. Abdullah's case received inconsistent instructions, which reflect the inconsistencies in the statute.

396.    Studies show that jurors often do not understand instructions regarding mitigation and aggravating circumstances in capital cases.  As a result of defense counsel's deficient performance, Mr. Abdullah's jury was erroneously instructed regarding its consideration of aggravating and mitigating evidence, in a manner that reduced the State's burden of proof. Counsel's failure to challenge the statute resulted in the use of an improper and unconstitutional process, and considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been sentenced to death.

    xix.    ***Failure To Argue That The Instruction On How To Measure Mitigation Against Aggravation Violated The Ex Post Facto Clause***

397.    Trial counsel were ineffective for failing to object to the court's use of a jury instruction concerning the weighing of mitigation and aggravation that post-dated the offense, instead of providing the instruction as it existed at the time of the offense.  Providing the wrong instruction violated the ex post facto clause. The ex post facto violation is more fully presented in Claim 50, which is incorporated here. Counsel was ineffective for failing to object to the post-offense instruction and request that the court provide the appropriate instruction as to how to weigh aggravation and mitigation, which would have benefited Mr. Abdullah as the appropriate instruction placed a higher burden on the prosecution. Trial counsel's failures, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been sentenced to death.

    xx.    ***Failure To Argue That Mr. Abdullah Was A Constitutionally Unsuitable Candidate For Death***

398.    Defense counsel was ineffective for failing to make the arguments that are contained in Claim 34 and incorporated here, namely that Mr. Abdullah was not "the worst of the worst" and

should not have been subjected to a sentence of death, in violation of his rights under the Sixth, Eighth, and Fourteenth amendments. Trial counsel's failure to investigate and present the evidence and matters described in claim 34, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been sentenced to death. This issue is also discussed in Claim 34, which is incorporated here.

### xxi. *Failure To Request An Instruction Requiring A Finding That The Aggravation Outweighed The Mitigation Beyond A Reasonable Doubt*

399.    In violation of Mr. Abdullah's rights under the Sixth, Eighth, and Fourteenth amendments, counsel was ineffective for failing to request the instruction that the must find, beyond a reasonable doubt, that the aggravation outweighed the mitigation in order to proceed with a sentence of death. As discussed in Claim 49, the substance of which is incorporated here, any fact that elevates a life sentence to a death sentence must be found beyond a reasonable doubt. Instead, the trial court instructed the jury to decide "whether all mitigating circumstances presented, when weighed against each statutory aggravating circumstance proven by the State, are sufficiently compelling to make the imposition of the death penalty unjust." This instruction placed the burden on the defense's mitigation to render a death penalty unjust, rather than rightly placing the burden on the prosecution to prove each aggravator outweighed all mitigation beyond a reasonable doubt. By failing to request an appropriate sentencing instruction, defense counsel's mistake allowed the jury to reach an unconstitutionally arbitrary decision to sentence Mr. Abdullah to death. Trial counsel's failure to request this instruction, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failure, Mr. Abdullah would not have been sentenced to death.

xxii.     ***Eliciting Testimony That Murder Is A Capital Offense Under Islamic Law***

400.    At the guilt phase, the prosecution called as a witness Khaja Shuaib -Ud-Din, the imam

of a Salt Lake City mosque.  During cross-examination, defense counsel asked Mr. Shuaib,

"What does the Islamic faith say about killing a human being?"  Mr. Shuaib responded that "the

person will be punished in the hereafter by being put in the hellfire."  Defense counsel then

followed up: "Does it say anything about punishment here on earth?"  "Yes," answered Mr.

Shuaib, "[a]ccording to Islamic law, there is death for death, like the Taliban."  There was no

conceivable strategic justification for defense counsel in a capital first-degree homicide case to

seek, and continue pursuing, testimony from a religious scholar about how murder is punishable

by death in the Muslim tradition.  Although this error occurred at the guilt phase, it would have

been most prejudicial at the penalty phase, where the same jury that heard the testimony

determined whether Mr. Abdullah would live or die. Trial counsel's presentation of this

evidence, considered by itself and in combination with other acts of deficient performance,

prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failures, Mr.

Abdullah would not have been convicted of the charged offenses and/or would not have been

sentenced to death.

xxiii.     ***Failure to Challenge Improper Victim Witness Testimony***

401.    During the penalty phase, Ms. Abdullah's cousin was permitted to present a victim

impact statement on behalf of Alyssa, Ms. Abdullah's daughter. The statement described how

"[t]he night after testifying on her mother's behalf, [Alyssa] quietly crawled into bed, opened a

photo album containing pictures of her and her mother, flipped through the pages. We found her

asleep with her hand touching a photo of Angie."  Learning of the emotional impact that

testifying had on Alyssa invited the jury to hold Mr. Abdullah's decision to exercise his right to go to trial against him.

402.     Although trial counsel were provided with a copy of the statement in advance of its presentation to the jury, they inexplicably did not move to exclude this portion of the statement. If they had, the court would have granted the request because it was plainly outside the scope of permissible victim impact testimony. The admission of this emotionally charged comment on Mr. Abdullah's exercise of his rights was so unduly prejudicial that it rendered the penalty phase proceedings fundamentally unfair. Trial counsel's failure to challenge this testimony, considered by itself and in combination with other acts of deficient performance, also prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failures, Mr. Abdullah would not have been sentenced to death.

xxiv.          ***Failure to Request Written Jury Findings***

403.     As discussed in Claim 52, the absence of written jury findings on mitigation and weighing violated the Eighth Amendment requirements that death sentences be reliable and non-arbitrary and that jurors be guided by objective standards, the Fourteenth Amendment requirements of meaningful appellate review and due process, the ex post facto clauses of Article I, section 9 and Article I, section 10, the Sixth Amendment right to a public trial, and the Eighth Amendment right to be free from cruel and unusual punishments. Trial counsel should have requested written jury findings on mitigation and weighing. Trial counsel's failure to make this request, considered by itself and in combination with other acts of deficient performance, prejudiced Mr. Abdullah. There is a reasonable probability that, but for counsel's failures, Mr. Abdullah would not have been sentenced to death.

**xxv.** ***The Prosecutor Committed Misconduct When He Misled The Jury About The Nature And Value Of Mitigating Evidence. Counsel Was Ineffective For Failing To Object.***

404.     In closing argument at the penalty phase, the prosecutor told the jury that Mr. Abdullah's life and history did not justify or excuse the actions for which he had been convicted.  In other words, the prosecutor told the jury that the mitigation that had been presented on behalf of Mr. Abdullah bore no value at sentencing because it did not excuse, justify, or explain what he had done.  This is a grossly misleading explanation of the purpose and value of mitigation.  It is well established that there need not be a nexus between the mitigation presented and the crime. Mitigation does not need to directly explain why a defendant might have committed a crime. Here, the prosecutor told the jury just that, that the mitigation does not count because it does not explain or excuse the actions for which Mr. Abdullah was convicted. This was a violation of Mr. Abdullah's rights under the Sixth and Eighth Amendments.  Counsel was ineffective for failing to object to the prosecutor's misconduct here.  Mr. Abdullah was prejudiced by counsel's ineffectiveness as there is a reasonable probability that jury would have not sentenced Mr. Abdullah to death but for counsel's deficient performance.

**xxvi.** ***Failure To Object To The Court's Rewriting Of The Aggravating Factors***

405.     Idaho's aggravators are the "functional equivalent" of elements of capital murder. Under the United States Constitution, only the legislative branch is empowered to declare what is a crime and what elements make up that crime.  Courts, as part of the judicial branch, cannot create elements of criminal offenses.  Here, the Idaho Supreme Court effectively defined the

aggravators that were considered by the jury before imposing a sentence of death in violation of the constitution.

406.     Both the "Heinous, Atrocious, and Cruel" (HAC) and "Utter Disregard" aggravators are not just ambiguous, but are void for vagueness. *See supra* Claim 42. The district court used narrowing language, previously set forth by the Idaho Supreme Court, to instruct the jury as to the meaning of HAC and utter disregard. In creating narrowing language for these aggravators rather than deeming them facially unconstitutional, the Idaho Supreme Court did not interpret sections 19-2515(9)(e) and (f),  but rewrote these sections in violation of the separation of powers, to avoid obvious constitutional infirmities with the language chosen by the legislature. Because the Idaho Supreme Court defined HAC and utter disregard, and substituted its own definitions for those provided by the legislature, the jury instructions used in Mr. Abdullah's case represent judicially created elements of capital murder. As a result, both the state courts exceeded their discretion and violated the separation of powers, and the aggravators should be deemed unconstitutional and not relied upon in Mr. Abdullah's case.

407.     To the extent that counsel failed to object to the aggravators on the grounds set forth above, counsel was ineffective.  Mr. Abdullah was prejudiced because there is a reasonable likelihood that he would not have been sentenced to death but for counsel's deficient performance.

      **xxvii.**     ***Failure To Present Evidence Of Petitioner's Favorable Adjustment To Prison***

408.     Mr. Abdullah was deprived his rights under the Sixth, Eighth, and Fourteenth amendment when counsel failed to present evidence of his favorable adjustment to life prison.  Evidence of a

defendant's "adjustability to life in prison" is "unquestionably" mitigating. *Skipper v. South Carolina*, 476 U.S. 1, 7 & n.2 (1986).

409.    Counsel had some idea that prison adjustment could be helpful at sentencing yet failed to adequately present such evidence or contextualize it for the jury. During closing argument counsel told the jury that Mr. Abdullah had been a model prisoner for the two years he spent in jail preceding the trial. Despite seemingly being aware of the mitigating nature of a good prison adjustment, counsel failed to offer any evidence or argument at trial that Mr. Abdullah's good pre-trial prison behavior was mitigating or that the jury could consider it as evidence that Mr. Abdullah would adjust to prison well and would likely be a good prisoner were he to be sentenced to life in prison. Counsel could have presented this evidence through a prison adjustment expert and by introducing jail records which contemporaneously tracked Mr. Abdullah's favorable adjustment, but did neither. Lastly, counsel failed to ensure that the jury could consider positive prison adjustment as mitigation in determining whether to sentence Mr. Abdullah to life or death. The court never instructed the jury on prison adjustment because counsel never asked for such an instruction.

410.    In addition to failing to present a prison adjustment expert, counsel also failed to present the testimony of Robroy Wall, Jr., who was an inmate at the Ada County jail at the same time as Mr. Abdullah. Like Mr. Abdullah, Mr. Wall was awaiting trial for first degree murder. Mr. Wall would have testified at trial that Mr. Abdullah was especially supportive to him as he contemplated the possibility of a life or death sentence. Mr. Wall would have explained that Mr. Abdullah also helped him strengthen his faith. Mr. Wall's testimony would have been especially powerful at sentencing had it been presented and contextualized because it would have presented the jury with a glimpse into the positive manner in which Mr. Abdullah was likely to interact

with other life-sentenced prisoners. Mr. Wall was housed in jail with Mr. Abdullah in part because they were both facing a possible death sentence or life sentence. In that environment, Mr. Abdullah was a positive presence for Mr. Wall. Counsel could have presented Mr. Wall's testimony to demonstrate that he would have very likely been the same with life-sentenced inmates if the jury had sentenced him to life in prison.

411.    Mr. Abdullah was prejudiced by counsel's failure to adequately present favorable prison adjustment evidence, and to seek a jury instruction on the issue. But for trial counsel's deficient performance, there is a reasonable probability that Mr. Abdullah would not have been sentenced to death.

C.    Trial Counsel Rendered Ineffective Assistance With Respect To His Sentencing For The Non-Capital Crimes

412.    Trial counsel rendered ineffective assistance with respect to his non-capital sentencing in the following ways:

i.    *Failure To Present Mitigating Evidence*

413.    Nearly all of the evidence recited above that defense counsel could and should have presented at the capital sentencing was also omitted at the non-capital sentencing.  For the same reasons, the Toryanskis were remiss in neglecting it at that stage as well.

ii.    *Failure To Adequately Challenge The Non-Capital Pre-Sentencing Report*

414.    Defense counsel failed to adequately challenge the pre-sentencing report filed in relation to sentencing for the non-capital charges.  The pre-sentencing report contained a number of statements by sources that were not tested by cross-examination.  These statements consisted of outlandish speculation and highly prejudicial assertions that were in violation of the Confrontation Clause of the Sixth Amendment.  By not challenging their admission, defense counsel failed to protect Mr. Abdullah's right to confront the declarants.

415.    The preceding error was so pervasive that Mr. Abdullah's defense attorneys failed to subject the prosecution's case to meaningful adversarial testing.  Therefore, Mr. Abdullah need not show prejudice on his non-capital sentencing ineffectiveness claim.  *See United States v. Cronic*, 466 U.S. 648, 659 (1984); *Holloway v. Arkansas*, 435 U.S. 475 (1978); *Geders v. United States*, 425 U.S. 80 (1976); *Powell v. Alabama*, 287 U.S. 45, 53 (1932).  Furthermore, for any ineffective acts or omissions that resulted in a structural error, Mr. Abdullah is not required to establish prejudice.  *See Styers v. Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008).  If Mr. Abdullah is required to demonstrate prejudice, then all the claims above show that, both cumulatively and individually, he was prejudiced by the deficient performance of his trial attorneys.  *See Harris v. Wood*, 64 F.3d 1432, 1438–39 (9th Cir. 1995) (granting habeas relief because the petitioner's separate claims of ineffectiveness cumulatively demonstrated prejudice); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (recognizing the availability of cumulative-prejudice arguments in the Ninth Circuit).  That is, in the absence of trial counsel's errors, there is a reasonable likelihood that Mr. Abdullah would not have been sentenced so harshly for the non-capital crimes.

### CLAIM 2: TRIAL COUNSEL LABORED UNDER AN INSURMOUNTABLE CONFLICT

416.    Trial counsel had an irreconcilable conflict with Mr. Abdullah, which rendered their representation in the case a violation of the Sixth Amendment.  *See Mickens v. Taylor*, 535 U.S. 162 (2002); *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Holloway v. Arkansas*, 435 U.S. 475 (1978).  Trial counsel's conflict is of such a magnitude that it must be presumed that the conflict undermined the adversarial process, and no prejudice need be shown.  In the alternative, the conflict of interest adversely affected trial counsel's performance to such an extent that there was prejudice.

417.  *Supporting Facts*: A number of factors combined to put trial counsel's interests at odds with those of their client, including:

- In order to represent Mr. Abdullah, the Toryanskis entered into a flat-fee arrangement with the Abdullah family, agreeing to accept $105,000 for their services.  They did so despite the unequivocal denunciation of that practice by the American Bar Association ("ABA"), which has declared that "[f]lat fees . . . are improper in death penalty cases."  *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, reprinted at 31 Hofstra L. Rev. 913, 933 (2003).  They also did so despite the fact that they had not previously entered third party contracts when making representation decisions. The Toryanskis' belief that $105,000 was adequate to cover the costs of their representation was based on a gross underestimate of how long and complicated a capital trial case is, and that under-estimation in turn stemmed from their complete lack of experience in capital defense.  The Toryanskis' billing rate was normally $175 per hour, per person.  Based on that rate, the flat fee from the Abdullah family compensated them for 600 hours of work, which was way below the hours a competent attorney would devote to a capital case.  This became clear when the Toryanskis had exhausted the initial upfront payment of $85,000 within three months.  Some of this money was used to pay other attorneys, such as Dennis Benjamin, to write motions because the Toryanskis lacked the necessary capital experience to draft such motions.  Because of their imprudent arrangement, the Toryanskis received no financial benefit from Mr. Abdullah's case between October 2003 and March 2005.  The case further drained their

resources when the Toryanskis had to turn away paying clients in order to spend time on Mr. Abdullah's case. Ms. Toryanski noted how worried she was about finances during this time. As a result of their misguided and unethical acceptance of a flat fee, the Toryanskis put themselves in a position that was directly at odds with the interest of their client. While they were, in their own words, "[e]nduring such a financial hardship" due to their flat fee contract, the Toryanskis had every incentive to feverishly pursue a plea, despite the fact that their client wanted a trial, in order to save themselves from trial expenses and, when that effort fell short, to rush their work on the case and complete it without any care or attention to detail. That is exactly what they did, as discussed throughout this petition, to the detriment of their client. Before they took on the representation, defense counsel were informed that the fee was far too low for a capital case by attorneys who actually had—unlike the Toryanskis—experience in defending death penalty matters. The damage produced by the Toryanskis' unscrupulous financial arrangement was exacerbated by Judge Copsey, who took the position that she would not allow the Toryanskis "to withdraw before trial, period, whether . . . [they were] being paid or not," which effectively saddled Mr. Abdullah with attorneys he could not fire despite numerous irreconcilable differences with them.

- Trial counsel agreed to accept payments from Mr. Abdullah's brother, Zuheir Abdullah. The State had identified Mr. Abdullah's then five-year-old son, Redear Abdullah, as a witness to establish Mr. Abdullah's presence at the crime scene. Accordingly, it was in Mr. Abdullah's interest to challenge the competency, credibility, and reliability of his son's statements. At the time, Zuheir was

actively seeking custody of Redear. Therefore, Zuheir had an interest in avoiding any perception that he was manipulating his nephew to assist his brother, or was otherwise allowing or encouraging his brother to subject his nephew to the trauma associated with testifying. As discussed in Claim 1(A)(vi), the Toryanskis decided not to present an alibi defense in part because they did not wish for Redear to be called as a witness. They did not wish for that to happen because they wanted to avoid distressing Zuheir, the source of their funds. The Toryanskis never even bothered to interview the child thereby abdicating one of the key roles of defense counsel.

- The money that was remitted to the Toryanskis came in part from contributions the Abdullah family as a whole had gathered. Thus, the Toryanskis were also susceptible to pressure from the family. That pressure was pushing them toward reaching a plea deal, because the Toryanskis' feared that if a plea were not reached, additional investigation would discover involvement in the crime by other members of the Abdullah family. In fact, Ms. Toryanski noted in her later deposition that she believed that other family members were involved, including possibly Zuheir. This created an impossible situation where counsel's income stream is coming from a person who counsel thinks may be responsible for, or connected to, the crime. Part of any effective defense is exploring other potential suspects and that cannot be done when an alternative suspect is paying the bills.

- As discussed elsewhere, the Toryanskis' desperate campaign for a plea led them to vastly underprepare for the trial, expose privileged information to the prosecution and Mr. Abdullah's family, make concessions that were catastrophic

for Mr. Abdullah, and otherwise compromise his case and render his defense entirely ineffectual. Defense counsel's sole focus, and only concern, should have been the benefit of a plea deal for their client, Mr. Abdullah, not the consequences it might have for others. Additionally, the fact that counsel continued to seek a plea using "all of their energy" when the client was not interested in a plea set up an impossible conflict between the client and counsel.

- Trial counsel labored under a conflict of interest based on the complete breakdown in the attorney-client relationship. The dynamic between Mr. Abdullah and the Toryanskis started out on a very positive footing, based on unrealistic expectations promoted by counsel. It then went from decent to poor to toxic, as the Toryanskis displayed an increasing level of hostility to their own client's goal—acquittal—by relentlessly sacrificing everything in pursuit of a plea and by displaying more and more incompetence and unpreparedness. There are numerous areas of conflict that led to the complete breakdown in the relationship and ultimate betrayal by counsel. Some of the most notable involved: (1) counsel's efforts to convince Mr. Abdullah to waive his right to a speedy trial; (2) their effort to convince him to plead guilty, including by blackmailing Mr. Abdullah's friends and family into joining the effort by indicating that the case was hopeless and guaranteeing, falsely, that Mr. Abdullah would be charged federally if he were not convicted in state court; (3) their attempt to initiate an interrogation between the FBI and Mr. Abdullah, even though they knew full well that any statements made by Mr. Abdullah could be used against him at trial, and their own independent attempt to share opinions about Mr. Abdullah with the FBI

that were damaging to him; (4) their efforts to convince Mr. Abdullah to waive his right to testify; (5) their request for lesser-included instructions against Mr. Abdullah's wishes; (6) their closing argument concession and choice of defense against Mr. Abdullah's wishes, in which they also disparaged their client as a liar and a hypocrite; and (7) their false promises to him about which prospective jurors would be removed through peremptories and for-cause challenges. Most of these facts are discussed in greater detail elsewhere in the petition.

- Counsel's efforts to compel a plea agreement demonstrate the breakdown of the attorney-client relationship. Despite the fact that Mr. Abdullah had clearly informed counsel that he did not wish to take a plea, the Toryanskis continued to engage in plea negotiations without Mr. Abdullah's consent or knowledge. In fact, Mr. Toryanski testified that he does not recall having any conversations with Mr. Abdullah about what was being disclosed to the state. Ms. Toryanski noted that, despite Mr. Abdullah being clear that he did not want a plea, that she continued to spend her energy seeking one, and that she made the decision to not present an alibi in their opening as she wanted to keep a good relationship with prosecutor Patrick Owen to keep plea negotiation open. Ms. Toryanski also noted that she was "day by day" putting more pressure on Mr. Abdullah to enter a plea. While counsel was putting all of their energy into seeking a plea, Mr. Abdullah believed that they were instead putting their energies into his defense so that he could obtain his freedom and be with his children. This lack of communication, coupled with the Toryanskis seeking a plea, against the wishes of their client, created an unresolvable conflict in representation.

- The decision not to present an alibi is another strong example of the relationship's collapse. Trial counsel were determined not to present an alibi defense, even though Mr. Abdullah strongly desired that one be offered, and despite the fact that there were witnesses that supported an alibi defense, including Lance Donnelson who would have testified that he observed Mr. Abdullah in a convenience store, in Utah, at a time that made it impossible for him to have been in Boise committing any of the alleged crimes. Counsel knew that their client wanted, and expected, a defense that did not place him at the scene. In light of this disagreement, the Toryanskis should have conferred with their client, spoken honestly to him about the strategy they had settled on, and seen if a consensus could be reached. Instead, they abandoned an alibi before the jury without consulting with Mr. Abdullah, and in square defiance of his wishes. Worse, they did so without any actual defense planned. The Toryanskis defied their client's wishes, placed him at the scene of the burning home where his dead wife's body would be found, and failed to explain why he was there, or why he did not render aid. It is clear that Mr. Abdullah did not know that this was going to be the ultimate defense as during the course of his trial he passed notes to defense counsel asking what the defense was and sent a letter on October 28, 2004 requesting that counsel visit with him to explain the defense. Mr. Abdullah was unaware that counsel would concede his presence at the scene in their closing argument until the words were said in front of the jury. Counsel had a duty to consult with their client on such a key issue and had there been an irreconcilable difference on whether to present an alibi, defense counsel should have so

informed the court and moved to withdraw from the case, rather than plowing ahead with a key decision on a course of action they knew their client passionately disapproved of, and which he had a right to direct.

- The conflict ultimately reached a point where Mr. Abdullah was forced to choose between his right to testify and his right to counsel. Counsel knew that Mr. Abdullah wished to testify in his own defense; however they sabotaged his right and ability to do so by telling Mr. Abdullah that if he wished to testify he would do so without their assistance in preparing him, they would ask no questions in direct examination and instead Mr. Abdullah would just speak to the jury with no direction or assistance, and by telling Mr. Abdullah that if he wanted to tell his story, he could fire them, despite the fact that they were in the middle of trial. Defense counsel abandoned their client and denied him the right to testify, a decision that rests solely with the client.

- Defense counsel's concern about their reputation in the community contributed to the breakdown of the attorney-client relationship. They were so worried about their image that they sacrificed zealous advocacy. This was made clear by Ms. Toryanski's admission that she was so concerned about currying favor with the prosecution, that she chose to not present an alibi defense for fear of upsetting the very people who were trying to convict and kill her client.

418. Defense counsel should have identified the conflict, notified Mr. Abdullah and the court, and withdrew from the case.

**CLAIM 3: MR. ABDULLAH'S COUNSEL VIOLATED HIS RIGHT TO A FAIR TRIAL AND HIS RIGHT TO HOLD THE STATE TO ITS BURDEN OF PROVING ALL ELEMENTS OF THE OFFENSES BEYOND A REASONABLE DOUBT**

419. Mr. Abdullah's attorneys conceded one of the largest issues in his case—his whereabouts at the time of the crime—and offered no theory in its place, violating his Sixth Amendment right to a fair trial and his right under the Due Process Clause of the Fourteenth Amendment to hold the State to its burden of proving all elements of their case beyond a reasonable doubt. *See Carella v. California*, 491 U.S. 263 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re Winship*, 397 U.S. 358 (1970). This error is structural, and therefore no prejudice need be shown. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

420. *Statement of Facts*: As discussed earlier, defense counsel conceded that Mr. Abdullah was at the scene of the crime around the time it was committed, even though there was compelling evidence that he was not. *See* Claims 1(A)(iv) and 1(A)(vi). While making this staggering admission, counsel offered no explanation for why Mr. Abdullah was there, and no explanation for how Ms. Abdullah died, essentially abandoning any defense on the core questions presented by the case. Mr. Abdullah did not agree to such a concession, nor did he know that one would be made as trial counsel had filed a notice of alibi and other pretrial motions, including a motion to suppress the identification of Ms. Wood, all of which disputed Mr. Abdullah's presence in Boise. To the extent that trial counsel contested any of the State's evidence, such as by cross-examining prosecution witnesses, any arguable benefits from those examinations were lost by the concession, and thus any adversarial testing was not meaningful

adversarial testing. Mr. Abdullah, his family, and jurors all expressed shock that the closing argument placed Mr. Abdullah in Boise, at his residence, at the time his wife was dying, and the house was burning. In fact, one of the primary jurors (No. 68) later disclosed that the concession by Mitch Toryanski in his closing argument was like a bombshell as until that point there was doubt as to whether or not Mr. Abdullah had returned to Boise. This concession was made despite the fact that trial counsel knew of an alibi witness. Counsel failed to present the testimony of Lance Donnelson who said he saw Mr. Abdullah at the Maverick Country Store in Utah with another Middle Eastern male between 2:30 and 3:30 am on the morning of October 5, 2002. Mr. Donnelson was available and would have testified and the defense investigator indicated Mr. Donnelson would be a good witness in part due to his law enforcement background.

421.    Without his advocates giving him a defense of any kind whatsoever, there was not a fair trial within the meaning of the Sixth Amendment, and the State was effectively relieved of its burden to prove Mr. Abdullah guilty beyond a reasonable doubt.

### CLAIM 4: MR. ABDULLAH WAS DEPRIVED OF HIS RIGHT TO PRESENT A DEFENSE OF HIS OWN CHOOSING

422.    Mr. Abdullah's attorneys refused to offer an alibi, against his wishes, thereby violating his Sixth Amendment right to select the basic course of his own defense and determine the objectives of representation. *See Faretta v. California*, 422 U.S. 806 (1975). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

423.    *Statement of Facts*: As discussed elsewhere, Mr. Abdullah was adamant that he was not present in Boise on the night of the fire, and he instructed his attorneys to so argue. They refused

to do so and—without consulting him—conceded that he was in the driveway of his home the night it burned down, while offering no explanation for why he was there or how his wife died. In forsaking the alibi, and giving the jury nothing in its place, the Toryanskis effectively conceded their client's guilt and left the State's case entirely untested by an adversarial process. Mr. Abdullah—who has vigorously protested his innocence from the day of the fire onwards— would never have consented to such a move, something the Toryanskis had been made well aware of through Mr. Abdullah's repeated and energetic attempts to participate in the construction of his defense. It was known to the Toryanskis that the objective of representation for Mr. Abdullah was acquittal on all charges, as evidenced by his rejection of every plea deal conveyed to him and by his insistence that the jury not be instructed on second-degree murder or manslaughter as lesser-included offenses. Defense counsel's concession that their client was in the driveway of his house moments before it burst into flames was clearly inconsistent with that objective. Additionally, this concession ignored strong alibi evidence, evidence consistent with the defense that Mr. Abdullah wanted, and expected. Defense counsel inexplicably failed to present extremely compelling alibi evidence. First, counsel were well-aware that Lance Donnelson, an eyewitness with law enforcement training on identifications, recalled with a high degree of confidence that Mr. Abdullah was present at a store in Utah at a time and place that would have rendered it impossible for him to have committed the alleged crimes. Specifically, Mr. Donnelson was 90% certain that he observed Mr. Abdullah enter a Maverik Country Store in Farr West, Utah between 2:30 and 3:30 AM on October 5, 2002. Mr. Donnelson was willing and able to testify at trial and would have made an excellent witness as he has a law enforcement background and had recently attended an eighteen-week course on eyewitness identification. Nevertheless, defense counsel failed to call him.

424.    They likewise failed to present the testimony of Michael Quintana.  Mr. Quintana was

identified as having spent the night at the Dream Inn in Salt Lake City on October 4, 2002, and

checking out the following morning.  During a deposition, he testified that at around 11 PM on

October 4, he witnessed a man enter room number seven, the room next to his.  Mr. Abdullah

and his son were the only registered occupants of that room.  They had checked into room seven

and Mr. Abdullah had told police that he was sleeping there at the time of the fire.  In addition,

Mr. Quintana further testified that he heard people speaking in a different language in room

seven well into the night.  Thus, Mr. Quintana's testimony would have bolstered an alibi defense.

425.    Third, Shad Mohammad and Abdul Afridi would have testified at trial that they did not

smell smoke or gas on Mr. Abdullah or believe he looked tired when they saw him at the Salt

Lake City Mosque on the morning of October 5, 2002, which would have added additional

weight to a defense theory that had Mr. Abdullah uninvolved in the fire, as the alibi theory would

have had.

426.    By usurping this decision, defense counsel took from Mr. Abdullah his right to determine

the overall defense theory.  This claim is further supported by the evidence recited in Claim 19.

## CLAIM 5: HOLDING THE TRIAL IN BOISE WAS UNCONSTITUTIONAL

427.    Mr. Abdullah's trial took place in an area where heavy and highly prejudicial media

coverage of the case irrevocably tainted the jury pool against him, in violation of the Due

Process Clause of the Fourteenth Amendment.  *See Irvin v. Dowd*, 366 U.S. 717 (1961).  When,

as in Mr. Abdullah's case, objectively extreme prejudicial pretrial publicity renders a fair trial by

an impartial jury virtually impossible prejudice is presumed.  *See Rideau v. Louisiana*, 373 U.S.

723 (1963).  Additionally, several jurors were of such fixed opinions resulting from pretrial

publicity that a fair trial was impossible and requires guilt and sentencing relief.  *See Patton v.

Yount*, 467 U.S. 1025 (1984).

428.   *Supporting Facts*: The State tried Mr. Abdullah in state court in Boise, Idaho, the city in which the highly publicized and controversial crime took place.  Before the trial began, the media in Boise was saturated with negative coverage of Mr. Abdullah, including but not limited to the following information:

*Inaccurate and/or inadmissible information*

- False information that Mr. Abdullah purchased gas in Mountain Home, Idaho on the night of the crime, when in fact he did not;

- Inaccurate statements made by Boise Police Chief Don Pierce that there was video evidence and transaction records proving Mr. Abdullah was in the Boise area at the time of the fire;

- Information about the death of Mr. Abdullah's first wife, some of which was false, and all of which was later deemed inadmissible at trial;

- Information about Ms. Abdullah's family believing she was murdered;

- Information suggesting that Mr. Abdullah and confederates had allegedly attempted to portray Ms. Abdullah's death as a hate crime in order to deflect blame from Mr. Abdullah, including statements from Chief Pierce that Mr. Abdullah and his friends perpetuated rumors as a "smokescreen" to divert police;

- Inaccurate information that Mr. Abdullah was accompanied by a woman and a small girl at a Salt Lake City motel on the eve of the fire;

- Information that the prosecution believed Mr. Abdullah had forced Ms. Abdullah to drink a lethal dose of Prozac, a theory that the prosecution abandoned during closing argument;

*Prejudicial information*

- Information that Mr. Abdullah and his wife had been arguing about money and property, and were considering a divorce;

- Information that Mr. Abdullah had an extramarital affair and that Ms. Abdullah had hired a private investigator to follow Mr. Abdullah;

- Statements by Mr. Abdullah's neighbors noting "[h]e wiped out his life as well as his wife's.";

- A letter from a Boise resident to the editor of the local newspaper opining that, "[w]hile it does not meet the current definition of a hate crime, killing one's spouse and endangering four children is truly a hateful crime.";

- An article stating that defense counsel had attempted and failed to close voir dire to the public.

429.   In addition to the specific facts recited above, the stories about the crime in Boise media generally depicted Mr. Abdullah in a negative light.  The coverage was especially prejudicial because Mr. Abdullah is a Muslim from the Middle East, the offense occurred relatively soon after the attacks of September 11, 2001, and the trial took place at a time when the United States was at war with the country in which Mr. Abdullah was born, and in an area where the vast majority of people are white and Christian.  Much of the negative press was orchestrated by the State, through the police, and was left unchallenged by Mr. Abdullah's attorneys, who had no media strategy to speak of.  *See* Claim 1(A)(xxvi).  Overall, the local news media coverage created an arc of community betrayal—from sympathy, with pieces on Ms. Abdullah's funeral and Mr. Abdullah's grief, to rancor, with descriptions of Mr. Abdullah as "hateful."

430.     The vast majority of veniremembers had heard about the case through the television, radio, and newspaper coverage. Most remembered specific details of the crime as reported in the media, many were still reading newspaper accounts and listening to radio coverage while waiting for voir dire, and many even admitted to having already formed opinions about Mr. Abdullah's guilt.  One prospective juror, Juror 103, had read about the case and admitted she would have difficulty considering Mr. Abdullah innocent until proven guilty as a result.  She said, "I am trying very hard to erase everything that I have read from my mind and I hope that I can do that." Media coverage had so saturated the area that such an equivocal response was considered acceptable.

431.     Other seated jurors were exposed to the media coverage.  Juror 28 said, "it would [have been] hard to miss it two years ago."  Juror 83 had read accounts of the case and watched television reports at the time of the fire.  Juror 98 remembered seeing the coverage and being upset that a mother had died.  Juror 98 also assumed, based on the media coverage, there was good reason for Mr. Abdullah's arrest.

432.     Media coverage also infected the jury pool.  Veniremembers who admitted to having already formed opinions about Mr. Abdullah's guilt were passed for cause.  These prospective jurors even recalled hearing reports that Mr. Abdullah had killed his wife and his children.  Some even had detailed memories about the specific timeline of events and remembered creating theories about how Mr. Abdullah had committed the murder.  With such exposure to media coverage among the entire jury pool, there was no possibility Mr. Abdullah could receive a fair trial in Boise.

433.     Finally, the prejudicial media coverage resulted in a loss of support for Mr. Abdullah among the Muslim community in Boise, which—had it not been turned against him by the

press—would have been an important source of solidarity during the trial and would have produced favorable testimony for him at trial.

### CLAIM 6: MR. ABDULLAH'S TRIAL JUDGE WAS BIASED

434.    At the guilt-phase, the penalty-phase, and in post-conviction, Mr. Abdullah's trial judge exhibited extreme bias against him and his counsel, thereby depriving him of the due process he is entitled to under the Fourteenth Amendment of the United States Supreme Court.  *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009); *Bracy v. Gramley*, 520 U.S. 899 (1997); *Gardner v. Florida*, 430 U.S. 349 (1977); *Withrow v. Larkin*, 421 U.S. 35 (1975); *In re Murchison*, 349 U.S. 133 (1955); *Hurles v. Ryan*, 752 F.3d 768 (9th Cir. 2014).  This error is structural, and therefore no prejudice is required.  *See Neder v. United States*, 527 U.S. 1 (1999); *Arizona v. Fulminante*, 499 U.S. 279 (1991); *Gomez v. United States*, 490 U.S. 858 (1989); *Gray v. Mississippi*, 481 U.S. 648 (1987); *Tumey v. Ohio*, 273 U.S. 510 (1927); *Chapman v. California*, 386 U.S. 18 (1967).

435.    *Supporting Facts*: Throughout her time on this case, Mr. Abdullah's trial judge—Cheri C. Copsey—demonstrated extreme and pervasive hostility to him and his attorneys by:

- Treating the attorneys differently, by showing respect to the prosecution while interrupting, berating, and generally abusing defense counsel.  Although this disparate treatment was manifested throughout the trial, one particularly striking example is that Judge Copsey held a court session on February 23, 2004 solely to chastise Mr. Toryanski for addressing her as "ma'am," even though Patrick Owen, the lead prosecutor, had previously done exactly the same thing on more than fifty separate occasions at hearings in the Abdullah case.  After that lecture, it became even clearer that Judge Copsey took offense only when the defense called her "ma'am," not the prosecution.  For following the February 23 hearing, the defense referred to Judge Copsey as "ma'am" a mere eleven

times, while Mr. Owen alone did so more than two hundred. Thus, Judge Copsey's criticism of Mr. Toryanski for using the word "ma'am" was plainly a result of her special hostility to him and to the defense team generally, and of her perpetual search for grievances to lodge against them. It is therefore an illustration of the wildly different standards that she applied to Mr. Abdullah's attorneys as opposed to the State's.

Judge Copsey interrupted, ignored, and abused defense counsel several times during voir dire as well. When venire members began to explain to defense counsel their view that all first degree murderers deserved a death sentence, Judge Copsey would frequently interrupt and cut short the defense's questioning. Also during voir dire, Judge Copsey would often only ask for the prosecution's opinion and reach her rulings without hearing from the defense. Judge Copsey's bias against the Toryanskis during voir dire additionally manifested in humiliating them personally, noting, for example, that "husbands and wives don't communicate as well as they should for whatever reason." Judicial bias against the defense also manifested during voir dire when Judge Copsey would dismiss veniremembers opposed to the death penalty for hardship reasons when she would not dismiss similarly situated veniremembers in favor of the death penalty. For example, Juror 30 expressed opposition to the death penalty and was dismissed due to economic hardship even though counsel for the State and defense believed he was not death qualified. Juror 30 stated that having the afternoons off during trial, as would be the arrangement, would alleviate his hardship concerns. However, when it became clear that he was opposed to the death penalty and expressed displeasure with the prosecution asking about his son's criminal history in a public forum, the judge excused him under the pretext of hardship. *See also* Claim 1(B)(vii).

Contrast the judge's treatment of Juror 30 with Juror 85. Juror 85 affirmed that as an independent contractor jury service would be an undue hardship. Unlike Juror 30, having the afternoons off would not ameliorate the hardship for Juror 85. The result, however, was that Juror 85—who supported the death penalty, admitted bias against people from the Middle East, and stated that he would have difficulty in not holding any economic harm resulting from jury service against Mr. Abdullah—was passed for cause.

- Improperly passing for cause members of the venire who would automatically impose the death penalty. The trial court refused Mr. Abdullah's request to excuse for cause Jurors 56 and 85. Both of these venire members believed the death penalty was the only appropriate punishment for murder.

Juror 56 stated, "If the proof is beyond a reasonable doubt and someone did die, then they need to die [] too." As long as there was premeditation, this potential juror believed, the only appropriate punishment was death. The judge, after criticizing defense counsel's attempts to elicit Juror 56's death penalty views, improperly passed for cause and defense counsel was forced to use a peremptory challenge to prevent this constitutionally unqualified juror from automatically sentencing Mr. Abdullah to death.

Juror 85 also expressed strong support for the death penalty for all murderers. When the judge asked if Juror 85 could set his views aside, he responded, "Yeah, I guess. I do feel very strongly that if someone takes someone's life, they should die for it." Juror 85 further elaborated his views when he stated, "if they take someone's life, I think they should die for it." And further characterized his views in the following ways: "if it seems to be premeditated and he takes someone's life, why should he just sit in jail? Why should we as society tolerate that type of person?" In fact, the only reason Juror 85

offered for not imposing the death sentence would be if a defendant was innocent of murder: "I certainly don't want someone to die for something they did not [do]."  Short of innocence, Juror 85 would impose a death sentence for murder.  As with Juror 56, the judge interrupted defense counsel's voir dire and passed Juror 85 over the defense's objection.  Defense counsel had to use another peremptory challenge to block Juror 85 from automatically sentencing Mr. Abdullah to death.

- Exhibiting bias toward Mr. Abdullah as a result of his ethnic and cultural background. For example, in a discussion on cross-racial eyewitness identifications, Judge Copsey suggested that people from the Middle East are Caucasian, and that no cross-racial identification had therefore taken place.  Judge Copsey's classification was not based on any expert testimony or research on her part, and conflicts with the opinion of qualified specialists.  It was grounded only in her kneejerk reaction.  The assumption that people of Middle Eastern descent do not represent a discrete and different community, and one that might be difficult for a white woman in Mountain Home, Idaho to identify with complete precision, is an ill-considered one that reflects a bias toward that community.

  Judge Copsey also exhibited ethnic bias against people of Middle Eastern descent during voir dire in Mr. Abdullah's case and in her factual findings in another case a year before Mr. Abdullah's.  During voir dire, a juror noted in her questionnaire that her sister was dating a person from Iraq.  Judge Copsey asked the juror for the Iraqi's name, which the juror did not know, and asked the juror to describe the Iraqi because Judge Copsey was worried that, since he was an Iraqi, he may be involved in the case.  In the Al-Kotrani case, which also involved an Iraqi defendant, Judge Copsey also expressed her suspicions about Middle Easterners.  In that case, which occurred—like this one—in the charged,

post-9/11 atmosphere—Judge Copsey made a factual finding that the defendant's employer, who was also of Iraqi descent, was not credible. Judge Copsey noted in her finding that the employer's testimony could not be trusted because the "Iraqi community is very close." On another occasion, Judge Copsey ordered that Mr. Abdullah refrain from having his Koran with him (which he had with him throughout trial) during the then-forthcoming competency interview of Mr. Abdullah's son Redear, suggesting that Mr. Abdullah would use the Koran's presence to intimidate his son or influence his testimony. These three examples of bias indicate that Judge Copsey viewed Middle Easterners as untrustworthy based on their ethnicity.

- Stating at trial: "If you think that this trial is going to be about police methods, it's not going to be about police methods. Do you understand that? It is going to be about evidence. We are not going to do what happened in O.J." In a trial where the police lost and destroyed several pieces of critical evidence, and exhibited an extreme degree of tunnel-vision, it is troubling that the judge would be so resistant to allowing the jury to hear of potential police misconduct and ineptitude, evidence that was quite obviously relevant to the credibility of the numerous police witnesses and relevant to an argument that Mr. Abdullah was an innocent man being railroaded by law enforcement.

- Railing against defendants, prisoners, and defense attorneys, including the specific attorneys and offices involved in Mr. Abdullah's case. For example, Judge Copsey repeatedly and gratuitously cast aspersions on post-conviction counsel by calling attention to the fact that they had never tried a capital case before, even though they were not required to have done so and their lack of capital *trial* work was no impediment to

their capital *post-conviction* work on the Abdullah case, which they were deemed eligible to perform by the Idaho Supreme Court.

- Granting numerous recesses for the prosecution and few for the defense, thereby allowing the prosecution more time to prepare for trial, and when ruling on defense requests for recesses accusing the Toryanskis of wasting time.

- Adjudicating the case unequally, by granting prosecution motions while denying comparable defense motions, many of which she had clearly prejudged. For example, Judge Copsey allowed the State to present a great deal of evidence about insurance policies, including that Mr. Abdullah obtained an insurance policy on vending machines that were stored in his garage at the residence shortly before the fire and that he was a beneficiary on the homeowner's insurance not because he was a named beneficiary but because he was Ms. Abdullah's husband. This evidence helped the prosecution paint Mr. Abdullah as motivated to burn the house down to collect the proceeds and as alienated from his wife. The defense sought to introduce insurance evidence of its own to support a potential suicide theory, in the form of a life insurance policy that Ms. Abdullah had for $500,000 which would not have benefited Mr. Abdullah in the event of her death, since he was not one of the beneficiaries, which were instead her daughter Alyssa, and her brother, Randy Jewett. Even though such an unusual policy was clearly supportive of a suicide defense, Judge Copsey refused to let the Toryanskis introduce it, deeming it irrelevant, confusing, and a "colossal waste of the jury's time." Remarkably, Judge Copsey dismissed the life insurance policy as having "nothing to do with this case," even though she was permitting the State to introduce insurance evidence of its own. To underscore the imbalance even further, Judge Copsey allowed the *State* to present

evidence regarding Ms. Abdullah's life insurance policy, but only to the extent that it reflected loans taken out on the policy as part of the State's characterization of the Abdullahs as being on shaky financial footing.  It was only when it came to the part of the insurance policy that would have obviously and directly benefited the defense that Judge Copsey excluded it.  The only explanation that makes sense is that Judge Copsey approved of the State's insurance evidence because it would help convict Mr. Abdullah, and disapproved of the defense's because it might lead to his freedom.

On the few rulings that she rendered in favor of the defense, Judge Copsey would often reverse herself as soon as prosecutor Patrick Owen protested her decision.  For instance, Judge Copsey determined after extensive oral argument that Mr. Abdullah's coworker Edgar Reagles would not be allowed to testify that Mr. Abdullah supposedly stated in a conversation that "in Kurdistan it is not illegal to kill your wife if she is . . . unfaithful to you."  Judge Copsey reached that conclusion because whatever probative value it had, that value was "substantially outweighed by the danger of unfair prejudice."  However, as soon as Mr. Owen briefly expressed his displeasure with that well-considered determination, Judge Copsey instantly flipped one hundred and eighty degrees.  She justified her newfound position with the tenuous reasoning that "it is something that is odd for him to pick out in the months leading up to the fire and death of Ms. Abdullah," without addressing the enormous prejudice that would result, the fact that there was no evidence in the record of Ms. Abdullah being unfaithful to Mr. Abdullah, or the troubling proposition that a defendant would be faulted at a murder trial for the customs of his homeland.  Through reversals like these, Judge Copsey exhibited a pervasive deference to the views of the prosecution, and especially those of Mr. Owen, thereby abandoning her

role as a neutral, objective referee to the trial. Similarly, Judge Copsey treated jurors differently depending on whether they were generally skeptical of, or sympathetic to, the death penalty. *See* Claim 1(B)(vii).

Finally, Judge Copsey refused to let Dr. Mozayani, the defense toxicologist, use demonstrative aids, even though she let the State use dozens of them. Her justification was that it would be inappropriate for the aids to go back to the jury, even though defense counsel clearly stated that they were fine with the aids not being taken to the deliberation room.

- Allowing her credibility determinations to be infected by her enmity toward the defense and favoritism toward the prosecution. For example, Judge Copsey described Steven Bankhead, a convicted felon who was at the time incarcerated, as "very believable" at a hearing held shortly after the jury returned a death verdict against Mr. Abdullah. Judge Copsey reached that conclusion despite the fact that Mr. Bankhead told a preposterous story from the stand that was exposed as blatantly untrue. Mr. Bankhead was the witness who testified at sentencing that Mr. Abdullah paid him to kill Ms. Abdullah in 2000. Contrary to Judge Copsey's suggestion that Mr. Bankhead was "very believable," his entire account was undermined by a citation that was served upon him in Boise on November 2, 2000. That citation was entirely inconsistent with his testimony, in which he stated that he fled Boise on November 1, 2000 for Lewiston after failing to carry out the supposed execution that Mr. Abdullah had arranged. Mr. Bankhead's testimony was rendered even more dubious by the inherently implausible nature of his account. Specifically, Mr. Bankhead claimed that he was instructed by Mr. Abdullah to show up at Ms. Abdullah's home by himself while she was alone and ring the doorbell, expecting to

be let in and offered tea, even though Ms. Abdullah would be by herself and would never have met him, and even though he would be wearing black gloves on November 1 and have a seven-inch knife in his back pocket. Mr. Bankhead also admitted during his testimony that he had in the past heard voices. That Judge Copsey would characterize such a transparently questionable witness as "very believable" speaks to her pervasive tendency to favor anything that painted Mr. Abdullah in an unflattering light and might help secure a conviction and death sentence, and to disfavor anything that might help him.

- Giving information to the jury after it was discharged that had been precluded from its consideration and was highly prejudicial to Mr. Abdullah. In so doing, Judge Copsey sabotaged any fair and accurate post-conviction investigation into the jury. Judge Copsey convinced the jury that their decision was the right one, in light of information that was not properly before them, and therefore made it impossible for the jurors to question their decision on the basis of the actual evidence and unlikely that they would ever speak freely with Mr. Abdullah's attorneys.

- Interrupting the post-conviction evidentiary hearing repeatedly in order to pose witnesses questions that were blatantly designed to assist the State and harm Mr. Abdullah. For example, Judge Copsey abruptly spoke up in the middle of Mr. Abdullah's post-conviction counsel's examination of Ms. Toryanski supposedly to summarize the response Ms. Toryanski had just given. Judge Copsey's summary was blatantly leading: "So, in other words, this may have been the result of a strategic decision made by you and your husband?" In addition to the fact that that was not at all what Ms. Toryanski had just said, Judge Copsey's remark illustrates her overwhelming desire to lay a

foundation for the denial of post-conviction relief by influencing Ms. Toryanski to

attribute her many mistakes at trial to strategic considerations, thereby insulating Ms.

Toryanski from a conclusion that she rendered ineffective assistance of counsel. As such,

the statement was typical of Judge Copsey's behavior during the post-conviction hearing.

In that way, to predetermine the result of the post-conviction trial, Judge Copsey

abandoned her role as neutral arbiter and fact-finder, disrupted the adversarial process,

and actively developed the State's case for it.

- Improperly relying in post-conviction on her own flawed and biased memory of what
  took place at trial. For instance, Judge Copsey berated post-conviction counsel for asking
  the court to take judicial notice of the CARES interview of Redear Abdullah, in part
  based on her mistaken recollection that she had never given Redear a competency
  examination. In the process, Judge Copsey lectured post-conviction counsel about how
  the "people who are in the trial usually have a pretty good recollection of what
  happened," and emphasized the irrelevant fact that post-conviction counsel had never
  tried a capital case before.

- Abandoning her role as neutral arbiter and becoming an advocate for the prosecution by
  directing the State to move to strike attachments to the final post-conviction petition that
  the State was stipulating to the admission of.

- Finding that the SAPD had a conflict with Mr. Abdullah before giving the SAPD an
  opportunity to take a position on whether a conflict existed.

### CLAIM 7: THE PROSECUTION COMMITTED MISCONDUCT

436.    At both the guilt phase and penalty phase, the prosecution made numerous

representations that were offensive, inappropriate, overly emotional, racially and culturally

discriminatory, and otherwise impermissible, violating Mr. Abdullah's due process rights under

the Fourteenth Amendment, his right to a fair trial under the Sixth Amendment, and his right to the equal protection of the law under the Fourteenth Amendment. *See Darden v. Wainwright*, 477 U.S. 168 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). Collectively, this misconduct so infected the trial with unfairness as to make the resulting conviction and sentence a denial of due process. Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the verdict of guilt, sentence of death, and denial of post-conviction relief. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

437. The prosecution's misconduct included the following:

- Before trial, a hearing was held on defense counsel's motion to suppress the pretrial identification of Mr. Abdullah. At the outset, and without objection from the State, the court granted counsel's request to have Mr. Abdullah removed from the courtroom during Ms. Wood's testimony. At trial, Ms. Wood testified that she was not 100 percent certain that the person she saw shortly after midnight while working at the Mountain Home gas station was Mr. Abdullah. To bolster her testimony, the State indicated that Mr. Abdullah had not been in the courtroom at an earlier hearing when she could have identified Mr. Abdullah. At the State's request and in front of the jury, the court took judicial notice that the last time Ms. Wood was in the courtroom, "the defendant had actually been removed from the court at that time." That was not good enough for the prosecutor, who then stated, "that was at the request of the defense, neither the State nor the Court motivated that." The State returned to the issue at closing, where it again reminded the jury that Mr. Abdullah had absented himself from the prior hearing. Mr. Abdullah had a due process right not to be subjected to suggestive pretrial identification

procedures, which is what would have occurred had he remained in the courtroom for the pretrial hearing where Ms. Wood testified.  He also had a due process right to demand that the State prove that he was the person Ms. Wood saw in Mountain Home on October 5, 2002.  It was misconduct for the State to use Mr. Abdullah's invocation of his rights as a weapon against him.  Moreover, the State easily could have made arrangements for an in-person lineup with Ms. Wood far closer in time to the night of the fire, which would have been more reliable, and would have obviated the need for the in-court identification. The fact that the State made no attempt to conduct such a lineup suggests that its true intention was not to develop credible evidence about the supposed identification, but instead to cast unwarranted and prejudicial aspersions on Mr. Abdullah's motivations and character.

- The State repeatedly asserted during closing argument that its evidence was "the truth," an invasion of the jury's province and an instance of improper vouching.  Judge Copsey struck the statement sua sponte, but in combination with the prejudice arising from the other acts of prosecutorial misconduct, the damage could not be undone.

- The prosecution began its rebuttal closing argument at the guilt phase by telling the jury, with no objection from Mr. Abdullah's incompetent attorneys, that it "should be shocked and outraged" by opposing counsel's closing argument, thereby appealing to the jury's emotion and improperly inserting the prosecutor's own personal belief into the case.  In the same closing argument, the prosecution referred to Mr. Abdullah's alibi as a "hoax," an inflammatory accusation and one that was particularly unwarranted in light of the fact that defense counsel never presented any such defense.

- The prosecution coerced and otherwise improperly induced Redear Abdullah into giving an account of the night of the fire that was less favorable to Mr. Abdullah, including by conducting an unduly suggestive CARES interview, trying to pressure Redear's psychologist into encouraging Redear to testify for the State, thereby infringing on the psychologist's professional duty to be neutral in the matter, and otherwise manipulating Redear into providing evidence that would support the prosecution's predetermined version of events.

- The trial court admitted a high volume of prejudicial testimony through Ms. Kristal and Mr. Elam, on the ground that it was offered not for its truth but to shed light on Ms. Abdullah's state of mind. After using that justification to get the evidence in, the prosecution relied upon many aspects of that evidence for their truth in closing, including the fact that Ms. Abdullah was not planning on moving abroad with Mr. Abdullah.

- During its case in chief, the State admitted a letter from defense counsel to the prosecution, in which the defense requested additional testing of Ms. Abdullah's blood. That testing revealed the inordinate amount of Prozac in Ms. Abdullah's bloodstream. At closing, the State told the jury that the prosecution had "learned about" the excess of Prozac in Ms. Abdullah's system "when the defendant's lawyers wrote us and asked us to check for that." The State then announced that "everyone connected with the prosecution," including the prosecutors themselves, the state pathologist, and the police, "were shocked to find out about the extreme level of Prozac in the blood of Angie Abdullah." These actions was clearly designed to impress upon the jury that it was the defense that requested the testing, and thereby to imply that Mr. Abdullah knew it would disclose Prozac because he poisoned her with it. The suggestion that a defendant can be

faulted for seeking out a full and proper investigation, where the police are not conducting one, is offensive to elemental notions of justice. It was doubly inappropriate for the prosecution to insinuate that the defense were up to no good when they requested the testing, in light of the fact that the requested testing was not just for Prozac, but for Darvon, Zoloft, and Xanax as well. Defense counsel sought testing for those drugs because—as they stated in their letter to the prosecution—they saw from Ms. Abdullah's medical records that she had a history of taking them. The same records were in the possession of the State, and it could and should have pursued the same testing. It was the height of unfairness for the prosecution to malign the defense for insisting upon such basic investigative steps. Again, defense counsel were too timid or unprepared to object, but the trial court struck the comment. However, as before, the collective prejudice from all of the prosecutorial misconduct remains.

- Dr. Groben, the state pathologist, based his theory of how Ms. Abdullah died to a significant extent on information from the criminal investigation of Mr. Abdullah that was improperly fed to him by the prosecution or by actors within the prosecution's control. When Dr. Groben was testifying about how he came up with his original cause-of-death determination, and about why he decided against suicide, he recounted his rationale as follows:

> Well, with a plastic bag over the head, that's always something that you look into, because there are people who kill themselves with a plastic bag over their head. But the – there were circumstances surrounding the case. The position of the body at the scene was totally inconsistent with suicide. There were no – I found no drugs on board at that point in time to suggest, and no one places a bag over their head without drugs on board. *And there were other things that I used that made me rule out suicide.*

Later in his testimony, Dr. Groben stated that he was "privy to . . . all of [the] police investigations."

In context, therefore, it is apparent that the information that led Dr. Groben to conclude that Ms. Abdullah was murdered, and did not commit suicide, was information from law enforcement's investigation into the crime. That information mostly related to the movements of various people in the time preceding and following the crime, their whereabouts, the credibility of various factual accounts, motive, and so forth. As such, the information had absolutely nothing to do with the supposedly scientific inquiry that Dr. Groben was conducting, which was ostensibly concerned only with the objective medical evidence before him. In this way, the law enforcement evidence corrupted Dr. Groben's assessment and transformed him from a neutral scientist into a tool of the prosecution, conscripted to convict Mr. Abdullah. The evidence from the police investigation either came to Dr. Groben directly from the prosecution, or it came to him from police officers or other state actors who could have been or were under the control of the prosecution. Some of the information was possibly also derived from statements made by the Toryanskis as part of plea bargain negotiations, which should have been protected by the prosecution pursuant to the privilege that attaches to such negotiations. By allowing the information to reach Dr. Groben, the prosecution committed misconduct.

- As discussed in Claim 1(A)(v), the prosecution suggested in its closing statement at the guilt phase that it had no duty to prove beyond a reasonable doubt how Mr. Abdullah was able to get his wife to ingest the Prozac, even though that theory was presented in the indictment as an independent basis on which to find him guilty. That reckless misstatement of its burden of proof was misconduct.

- The prosecution elicited from witnesses inaccurate testimony that Mr. Abdullah was with a woman at the Dream Inn in Salt Lake City the night before the fire, even though such testimony was irrelevant, prejudicial, speculative, and based on alleged facts not in evidence.

- The prosecution improperly insinuated racial themes into the trial, exploiting anti-Muslim and anti-Middle Eastern sentiments in the aftermath of the September 11 attacks to prejudice the judge and jury against Mr. Abdullah. For example, the State refused to provide the defense with identifying information about a number of witnesses—despite the defense's need to contact those witnesses for its investigation—on the ground that Mr. Abdullah might somehow alter the witnesses' testimony through coercion. In making that argument, the State warned ominously that Mr. Abdullah had been seen "speaking in a foreign language with other men just prior to the crimes," clearly implying that Mr. Abdullah was part of some kind of foreign plot with other, presumably Middle Eastern, confederates. The State never presented any evidence to suggest that such a plot existed. Therefore, the true purpose of this passage was plainly to use the pervasive fear of Middle Eastern and Muslim people to damage Mr. Abdullah's standing in the eyes of the court. Given the bias Judge Copsey exhibited against Mr. Abdullah at trial, *see* Claim 6, it is likely that the prosecution's improper strategy worked.

  Similarly, the prosecution strenuously tried—and succeeded—in eliciting testimony about a conversation that Mr. Abdullah had with several co-workers, in which he supposedly stated that it was permissible in Kurdistan for husbands to murder their wives if they committed adultery. The State's basis for its position was that Mr. Abdullah was "acquiescing to [the] appropriateness" of such killings by not actively "separating himself

from it." In other words, the State believed Mr. Abdullah had a burden, because of his birthplace, to show that he did *not* believe in honor killings, even though the jury heard no evidence that his wife had violated anyone's "honor."

In addition, the prosecution used as its DNA expert a man who tested samples found at the scene against a database comprised of a combination of Arabic, Egyptian, Jordanian, Lebanese, Palestinian, and Moroccan individuals. The database relied upon was not sanctioned or approved by the FBI and its application to Mr. Abdullah was unwarranted. Mr. Abdullah belongs to none of those groups. He is Kurdish. And because Kurdistan has been for hundreds of years a strategically invaluable crossroads, Kurds' DNA has been profoundly shaped by intermixing among numerous different groups, including many from Asia and Europe. In using this evidence, the State ignorantly lumped Mr. Abdullah in with a community that he is not a member of, and a community that happened to be a source of intense fear and distrust, in order to stigmatize him and brand him a threat to the jurors' own community.

The prejudice described here reflects a prosecutorial desire to use Mr. Abdullah's heritage as a tool to harm him. Such harm was then actually inflicted when Judge Copsey allowed the testimony and a jury of twelve non-Muslim, non-Middle Eastern individuals living in a time of extreme prejudice against both of those groups was allowed to consider this tremendously prejudicial account.

Finally, at closing argument in the guilt phase, the prosecution used a PowerPoint presentation that included a photograph of Mr. Abdullah wearing a skull cap. At no time during the trial did Mr. Abdullah wear such a head covering, also known as a "kufi." This slide was meant to reemphasize Mr. Abdullah's ethnic, cultural, and religious

background to the jury, and as such to use that background to stigmatize him and secure a guilty verdict. Furthermore, the photo happened to have been taken when Mr. Abdullah was in a state of stress, which produced an expression on his face that made him look uncharacteristically menacing. The photo was also blown up on the screen to a tremendously and unnecessarily large size, and used by the prosecution to frighten the jurors with a frightening, foreign face, and to thereby appeal to their fears and anxieties. The photographed used by the prosecution in the powerpoint also originally included Ms. Abdullah, who was also wearing a middle-eastern style scarf. The prosecution choose to crop Ms. Abdullah from the photo as it was shown to the jury, and instead included a separate photo in the powerpoint of her wearing western clothing. The prosecutor's intent in using these disparate photographs was clear – to have the jury relate to and sympathize with the decedent, while casting Mr. Abdullah as foreign and menacing. The use of this photo was improper and prejudicial.

- In its closing argument at the penalty phase, the prosecution stated that evidence is only mitigating if it justifies or excuses the offense. Specifically, the prosecutor asserted, in the final words of his closing argument: "There is nothing in the hard life that he led, that his family led and his people led from the time that he lived in Kurdistan from 1977 until 1992 that justifies or excuses or mitigates what he did. Put this thing right." The prosecution's suggestion that mitigating evidence must have a nexus to the crime is squarely contradicted by clear and well-established precedent, existing at the time, that defined mitigation far more broadly as anything that might move a jury toward life, regardless of whether it is linked to the crime or not. In misdefining mitigation, the State sought to preclude the jury from considering evidence that weighed heavily against death.

There was no objection and no admonishment from the court, leaving the jury with the impression that this highly damaging mischaracterization of the law was correct.

- Also during its closing argument at sentencing, the prosecution referred to Islamic law, reminding jurors that Islam considers death the appropriate punishment for murder. This argument used Mr. Abdullah's religion against him and also undercut the jurors' sense of responsibility for imposing the death penalty, since it attributed the penalty to Mr. Abdullah's faith instead of their own judgment.

438.    During the closing argument at sentencing, the prosecution also told the jury that it was "the conscience of this community." An appeal to a jury to send a message was plainly forbidden at the time, as the prosecutor doubtlessly knew. Although the court sua sponte struck the statement, the bell could not be unrung, and in any event it was prejudicial in conjunction with the other acts of prosecutorial misconduct arrayed above.

### CLAIM 8: THE PROSECUTION PRESENTED FALSE TESTIMONY

439.    The prosecution knowingly put on false testimony and/or allowed false testimony to go uncorrected, in violation of the Fourteenth Amendment. *See Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the false testimony was material and reasonably likely to have affected the jury's judgment. *See United States v. Agurs*, 427 U.S. 97 (1976).

440.    *Supporting Facts*: At both the guilt and penalty phases, the prosecution elicited testimony that it knew to be false. For example, the State called Steven Bankhead to recount from the stand a ludicrous story about Mr. Abdullah supposedly paying Mr. Bankhead to kill his wife in 2000. As discussed earlier, Mr. Bankhead's account was wildly implausible on its face, contradicted in its entirety by a citation that he received in Boise on a day and time when he swore he was far away, and delivered by someone who had previously admitted to lying to police officers. *See*

Claim 1(B)(iii).  The State was aware of all of these things, either actually or constructively, and yet presented that testimony anyway because it helped secure a death sentence against Mr. Abdullah.

### CLAIM 9: THE STATE LOST, DESTROYED, AND FAILED TO PRESERVE EVIDENCE

441.  State actors lost, destroyed, and otherwise failed to preserve crucial, exculpatory and potentially exculpatory pieces of evidence, depriving Mr. Abdullah of the opportunity to use that evidence in his defense and thereby violating the Due Process Clause of the Fourteenth Amendment.  *See Arizona v. Youngblood*, 488 U.S. 51 (1988); *see also Brady v. Maryland*, 373 U.S. 83 (1963); *California v. Trombetta*, 467 U.S. 479 (1984).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the errors, considered cumulatively, had a substantial and injurious effect or influence in determining the verdict of guilt, sentence of death, and denial of post-conviction relief.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993); *see also Kyles v. Whitley*, 514 U.S. 419 (1995).

442.  Throughout this case, agents of the State have allowed key pieces of evidence to be lost and destroyed.  Such incidents include, but are not limited to:

- The State allowed video surveillance from an Ogden, Utah convenience store to be erased, even though a store employee told police he saw Mr. Abdullah in the premises at a time that would have substantiated an alibi defense, even though the employee told the police that the surveillance footage would be automatically deleted if not retrieved within two weeks, and even though one of the police officer's purported objectives in traveling to Utah was to obtain "any surveillance video" available.  If they obtained the video, the State failed to preserve it.  If they failed to obtain it, the failure was based on bad faith in

purposely declining to preserve exculpatory evidence knowing that its destruction was imminent.

- The State either lost or suppressed the statement taken from Lance Donnelson, an eyewitness with law enforcement training who identified Mr. Abdullah—with a high degree of confidence—in a store in Utah at a time and place that would have rendered it impossible for Mr. Abdullah to have committed the alleged crimes.

- The State allegedly lost a statement taken by police from Marjorie Wood, the State's key eyewitness in the case, in her first interview with law enforcement. Police officers likely deliberately destroyed Ms. Wood's statement, because Detective Chip Morgan wrote in a report of his interview with Ms. Wood that her written statement was attached to the report. The report inexplicably went missing. The State only informed the defense about the report itself when the defense moved to exclude Ms. Wood's testimony because the report was not provided in discovery. Ms. Wood's report was problematic for the State because it contained discrepancies between police officers' description of the original interview with Ms. Wood and the account she later gave. Her statement would have enabled defense counsel to question her credibility on the basis of those discrepancies and/or to argue for Mr. Abdullah's innocence. For example, a detective testified for the State at the probable cause hearing on October 18, 2002 that Mr. Abdullah purchased gasoline with cash at the Chevron station in Mountain Home where Ms. Wood worked, on the night of the crime. However, at trial, Ms. Wood testified that Mr. Abdullah and the men he was supposedly with did not pay her for any gas. This discrepancy demonstrates that Ms. Wood's initial statement contained information indicating that she was describing to police someone other than Mr. Abdullah, someone who *did* purchase

gas from her. The state's loss or intentional destruction of the statement prevented Mr. Abdullah from impeaching Ms. Wood, and rebutting the state's case against him. Ms. Wood's statement would have given a more detailed and accurate account of the events of October 5, 2002, and would have provided a foundation for cross-examination and impeachment of her identification.

- The State failed to obtain video footage or transaction reports from the gas station where Ms. Wood worked. Video footage from the store would have countered Ms. Wood's highly damaging account of seeing Mr. Abdullah in Mountain Home shortly before the fire. Without the presence of any physical evidence that cast doubt on its theory, the State was able to rely entirely on Ms. Wood's questionable recollections, which were exacerbated by cross-racial identification issues and by an unduly suggestive identification method used by the police. *See* Claims 1(A)(xvi) and 11.

- The State failed to turn over to the defense Ms. Abdullah's diary.

- The State failed to protect the integrity of the crime scene during the course of the investigation, including letting representatives of an insurance company remove items from the home before any reliable determination was made about the evidentiary value of those items. A private security company was assigned to guard the home rather than state law enforcement.

- The State has "lost" other material that casts doubt on the integrity of its investigation. For instance, a police report indicates that a necklace of Ms. Abdullah's was taken from a safety deposit box by officers after her death. However, the document reflecting the items logged into police custody after the seizures from the safety deposit box does not include the necklace, suggesting that police officers either stole or misplaced the piece.

443.    The numerous instances here of critical evidence being lost or destroyed while in the possession and exclusive control of the state supports the inference that the state law enforcement officials acted in bad faith.

444.    The State's poor handling of the evidence in Mr. Abdullah's case is consistent with a long track record for the Idaho authorities—and those in Boise in particular—in which they have repeatedly lost or destroyed important evidence in capital cases, another indicator of bad faith.

### CLAIM 10: THE STATE SUPPRESSED EVIDENCE

445.    State actors suppressed evidence, depriving Mr. Abdullah of the opportunity to use that evidence in his defense and thereby violating the Due Process Clause of the Fourteenth Amendment.  *See Brady v. Maryland*, 373 U.S. 83 (1963); *see also United States v. Bagley*, 473 U.S. 667 (1985).  Considering the suppressed items collectively, there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *See Kyles v. Whitley*, 514 U.S. 419 (1995).

446.    *Supporting Facts*: The State failed to disclose evidence that Mr. Abdullah could have used to defend himself at the guilt phase of his trial.  This evidence includes, but is not limited to:

- All of the evidence recited in Claim 9.  In this regard, it was a particularly egregious *Brady* violation that the police failed to provide the written statement of Lance Donnelson, the Utah convenience store employee who gave a highly credible report to officers supporting Mr. Abdullah's alibi defense.

- Evidence relating to the affair between second-chair prosecutor Erika Klein and lead detective Tod Littlefield. Such evidence includes not only the affair itself, but also evidence that (i) Klein and Littlefield performed sex acts in the workplace while both were on duty, including in the "war room" at the Ada County Prosecutor's Office; (ii)

Littlefield repeatedly defied direct orders from his superiors before and during trial, including from the police chief, to break off all contact with Klein; (iii) Littlefield had harassed and stalked Klein after she ended their relationship, for which Klein's husband (who was a deputy sheriff) wished to press criminal charges against Littlefield; (iv) Internal Affairs opened an investigation into the relationship on August 25, 2004; (v) the Command Staff of both the BPD and the Ada County Sheriff's Office had concerns that the affair would generate workplace violence, since both Littlefield and Klein's husband were armed; and (vi) Littlefield was suspended from duty on October 23, 2004, in the midst of the trial.

- Evidence that the Idaho State Police Forensic Services Laboratory, which conducted extensive testing in Mr. Abdullah's case, had for years kept a box of illegal drugs hidden in the ceiling of the laboratory, in violation of Idaho statute as well as its accreditation requirements.

- Related evidence that a forensic scientist who testified for the State in Mr. Abdullah's case knew about the hidden drugs, and had also acquired an amount of drugs in excess of the laboratory's authorized amounts, in violation of several statutory provisions as well as the accreditation requirements governing the laboratory.

- Evidence that Redear Abdullah would be a hostile witness to the State.

- Evidence of prior crimes committed by Furqan Mehmood, a witness for the State, including that he was convicted and incarcerated for grand theft, which could have been used to impeach his credibility.

- Evidence relating to Hala Arnous.  Ms. Arnous allegedly made to Deborah Kristal a series of negative statements about Mr. Abdullah, including Ms. Arnous's belief that he

killed his wife, that he was mistreating her, and that he wanted her belongings. Those

alleged statements were relayed by Ms. Kristal to the police. There is evidence that the

FBI interviewed Ms. Arnous. However, the FBI report reflecting the interview was not

turned over by the State in discovery. Nor was anything disclosed indicating that Boise

Police Department officers spoke with Ms. Arnous, which they most likely did. Reports

of law enforcement interviews with Ms. Arnous included impeachment information that

should have been disclosed.

- Other FBI materials relating to Mr. Abdullah and Ms. Abdullah.

447. The State failed to disclose evidence that Mr. Abdullah could have used to defend

himself at the penalty phase of his trial. This evidence includes, but is not limited to:

- Evidence that Detective Littlefield interviewed Dennis Richardson about Steven

  Bankhead's outlandish account of Mr. Abdullah paying him to kill Ms. Abdullah, and

  that Mr. Richardson contradicted Mr. Bankhead's narrative. Mr. Richardson was

  incarcerated at the Idaho State Correctional Institution ("ISCI") from March 1997 to

  September 2001. During that time, Mr. Abdullah was teaching courses on Islam at ISCI.

  Mr. Bankhead testified at the penalty phase that he met Mr. Abdullah at ISCI through

  those courses between the end of 1999 and the beginning of 2000. In a report, Detective

  Littlefield noted that Mr. Bankhead believed that Mr. Abdullah had probably spoken to

  Mr. Richardson about his plans to kill Ms. Abdullah. Mr. Bankhead also asserted to

  Detective Littlefield that Mr. Abdullah would bring marijuana to Mr. Richardson at ISCI.

  Prior to the penalty phase, Detective Littlefield interviewed Mr. Richardson about Mr.

  Bankhead's allegations. Detective Littlefield was informed in that interview that Mr.

  Richardson could not confirm Mr. Bankhead's story. That piece of information was not

included in any report by Mr. Littlefield, and not shared with the defense. Had it been, the defense could have impeached Mr. Bankhead with information indicating that his account was inaccurate and that he was not a reliable witness. Given that Mr. Bankhead gave highly damaging testimony about a previous attempt by Mr. Abdullah to kill his wife, the value of such impeachment would have been enormous.

- Evidence that Detective Littlefield and lead prosecutor Patrick Owen secured Mr. Bankhead's testimony against Mr. Abdullah through a campaign of threats and promises, none of which were disclosed to defense counsel or the jury. The State told Mr. Bankhead that the parole commission's executive director would be informed if Bankhead refused to testify in Mr. Abdullah case. Mr. Bankhead was also promised a favorable change in his prison housing assignment if he agreed to testify favorably for the State.

- Evidence that Detective Littlefield interviewed three inmates who were housed at the Ada County Jail with Mr. Abdullah, a report of which was deliberately not produced at the request of Mr. Owen, which resulted in the defense not being informed of the interviews.

448. Had the evidence recited above been disclosed, it would have allowed the trial counsel to support key defense theories, including theories of innocence, and would have undermined the prosecution's case, including by casting doubt on the reliability and truthfulness of its witnesses.

449. In addition to the evidence recited above, the State suppressed other exculpatory evidence, including evidence that someone other than Mr. Abdullah committed the crimes, evidence that individuals were improperly induced to inculpate Mr. Abdullah, e.g., by the offering of promises to people in trouble with the law, and evidence that the police and prosecution engaged in misconduct.

## CLAIM 11: THE STATE USED UNDULY SUGGESTIVE IDENTIFICATION TECHNIQUES

450.     To incriminate Mr. Abdullah, police officers used excessively suggestive and unreliable identification methods and those identifications were then introduced at trial, in violation of the Due Process Clause of the Fourteenth Amendment. *See Manson v. Brathwaite*, 432 U.S. 98 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972); *Stovall v. Denno*, 388 U.S. 293 (1967). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

451.     *Supporting Facts*: On October 11, 2002, police officers who were actively attempting to make out a case against Mr. Abdullah showed Marjorie Wood a single photograph—that of Mr. Abdullah—and asked her whether she had seen him on the night of the crime at the Mountain Home, Idaho Chevron where she worked. Ms. Wood asserted that she had, and then became the State's most important eyewitness, and the only witness at trial to place Mr. Abdullah in the vicinity of the crime around the time it was committed. It was well-known at the time of trial that the most reliable method for identifying suspects is for a neutral person, unaffiliated with the investigation into the suspect, to begin by asking questions, eliciting information in a less suggestive manner, and then to show the witness an array of photos, one at a time. The method used instead by the State tends to influence witnesses into identifying the suspect, and thereby leads to biased, unreliable results and wrongful convictions. Further compounding the error, the State never had Ms. Wood do an in-person lineup to confirm her identification of Mr. Abdullah. In addition, detectives failed to retain a contemporaneous statement from Ms. Wood regarding her identification. *See* Claim 9. The statement would have been the best record of her observations at the time, as memory is always susceptible to later input, including the sort of

media coverage that saturated the newspapers and airwaves in the Boise area and poisoned the community against him. Ms. Wood herself testified that there were many details she could not recall while testifying that would have been contained in her written statement.

452. Ms. Wood was the only witness presented by the State who was able to place Mr. Abdullah in Idaho, near Boise, close in time to the death of his wife and the fire in his house. Her testimony was indispensable to the prosecution, and its problems accordingly call its entire case into question. Prejudice from the inappropriate identification technique is heightened by the fact that Ms. Wood told police officers that she was able to remember and identify Mr. Abdullah because she was afraid of him, and identifications are less precise when witnesses are experiencing stress.

### CLAIM 12: THE STATE INTERROGATED MR. ABDULLAH WITHOUT ADVISING HIM OF HIS RIGHTS AND IN THE ABSENCE OF COUNSEL

453. State actors questioned Mr. Abdullah about the crimes without informing him of his rights, in violation of Fifth, Sixth, and Fourteenth Amendments. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

454. *Supporting Facts*: On October 5, 2002, law enforcement officers asked Mr. Abdullah a series of questions to elicit incriminating answers about the death of Ms. Abdullah and the fire at her and Mr. Abdullah's home. This interrogation took place at the Boise Airport, immediately after Mr. Abdullah and his young son stepped off the flight. Detective Littlefield and FBI Agent Scott Mace met Mr. Abdullah and began asking him questions, all while a victim witness coordinator took Mr. Abdullah's 5-year-old son to another area of the airport to look at planes and play video games. Just as Mr. Abdullah and his child were able to return to Boise, after

learning of his wife's death and a fire at his home, Mr. Abdullah was immediately approached by armed law enforcement and asked detailed questions about his whereabouts over the last 36 hours. This interview was audiotaped making it clear that this was not just a casual conversation or an effort to update Mr. Abdullah on what had happened. The officers needed the assistance of airport security to be able to meet Mr. Abdullah at the gate as he landed, and this was a coordinated effort to have an interrogation as there were two officers to speak with Mr. Abdullah, while another state actor separated him from his son. Additionally, Mr. Abdullah's family was waiting for him outside this area and Mr. Abdullah could not see or speak with them during this 40-minute interrogation. Mr. Abdullah was functionally in custody at the time of the interview, did not have the assistance of an attorney, and was not provided *Miranda* rights. To the extent that Mr. Abdullah was given any notice of his rights, that notice was ineffective, in part because he is a refugee from the Middle East, and his lack of English fluency and lack of familiarity with the American legal system prevented him from fully understanding his rights.

455.    On October 7, 2002, Mr. Abdullah was again interrogated, at a temporary residence he was staying at in Boise. Detective Littlefield was armed, and audio recorded this interview as well. During this interview, Mr. Abdullah was asked, again, about many of the issues that were discussed at the airport, including detailing his travels and locations. During this interrogation, Mr. Abdullah was also asked about any arguments he had with his wife, when he and his wife last had sex, whether he had met a woman when he was in Salt Lake City, and whether he had taken gas with him, and how often he stopped for gas. These questions were designed to elicit an incriminating response and no *Miranda* rights were provided.

456.    On October 11, 2002, law enforcement again interrogated Mr. Abdullah, this time at the Criminal Investigation Division (CID). The detectives interrogating him did not inform him of

his *Miranda* rights before beginning their questioning. When Mr. Abdullah arrived at the CID, he was separated from his son, put in a small room with the two detectives sitting on either side of him, and probed for his account of the events for hours. Detective Littlefield admitted he went through many of the same questions he had asked at the prior two sessions and would seek "clarification" or whether or not a prior statement was still true. Mr. Abdullah finally asked that an attorney be present when the detectives asked to examine him physically. Despite the invocation, the detectives continued to ask Mr. Abdullah to submit to a physical examination without an attorney present. Only after Mr. Abdullah repeated that he wanted an attorney thirty minutes later did questioning cease. During the majority of the interrogation, Mr. Abdullah was objectively not free to leave—if he had exercised his freedom to leave, the detectives would have detained him under warrant. Mr. Abdullah was not free to leave as the Detectives had a detention warrant and planned to serve it; this warrant was the reason that Mr. Abdullah was asked to come to the CID in person instead of this conversation occurring at Mr. Abdullah's residence. Furthermore, Detective Littlefield lied to Mr. Abdullah about the purpose of this conversation indicating that it was merely to provide updates on the investigation. Instead, upon his arrival, Mr. Abdullah was subjected to additional questioning, pressured about his prior statements, and ultimately served a warrant that allowed Detectives to photograph his body, remove hair, and engage in a lengthy, and deeply intrusive search of his body which involved removing his clothing for a full body inspection, numerous photographs of his body, and the introduction of multiple police technicians to take photographs and remove hair samples from his body. When viewed under the totality of the circumstances, Mr. Abdullah could not have felt free to leave given the overall context of the questioning.

457. These continued interrogations, all without providing adequate warnings, and which included asking Mr. Abdullah over a thousand questions in total were in violation of Mr. Abdullah's constitutional rights under the Fifth Amendment and violated *Miranda*. These improperly obtained statements should not have been admitted at trial.

### CLAIM 13: THE STATE REINITIATED INTERROGATION OF MR. ABDULLAH WITH NO COUNSEL PRESENT AFTER HE INVOKED HIS RIGHT TO A DEFENSE ATTORNEY

458. Police officers reinitiated an interrogation of Mr. Abdullah without counsel present after he had invoked his right to a defense attorney, in violation of the Fifth Amendment privilege against self-incrimination, his right to counsel under the Fifth and Sixth Amendments, and his right to due process under the Fourteenth Amendment. *See Minnick v. Mississippi*, 498 U.S. 146 (1990); *Edwards v. Arizona*, 451 U.S. 477 (1981); *Massiah v. United States*, 377 U.S. 201 (1964). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

459. *Supporting Facts*: Mr. Abdullah was questioned on October 11, 2002, at the Criminal Investigation Division of the Boise Police Department. That interview was terminated because officers served Mr. Abdullah with a detention order and he requested an attorney. On October 17, 2002, at the request of Boise Police detectives, Khaja Shuaib-Ud-Din placed a phone call to Mr. Abdullah, which the detectives would record. The purpose of the call was to confront Mr. Abdullah with questions the detectives had about his activities in Salt Lake City and to inquire about other evidence relating to their investigation. There is no question that this call was designed to confront Mr. Abdullah as Mr. Shuaib expressly noted that it was a "confrontation call to clarify some questions the Detective had" including questions about a cape that was purchased. Police officers recorded the call for use in their investigation. In making the call,

Mr. Shuaib was acting as an arm of law enforcement. He was therefore a state agent rather than a passive listener. The officers involved were well aware that Mr. Abdullah had already invoked his right to counsel, because the same officers who served him the detention warrant were also responsible for arranging the confrontation call. Mr. Abdullah's attorneys were not informed in advance that Mr. Shuaib would be conducting a police interview, nor were the attorneys given a chance to caution Mr. Abdullah about answering the questions he would be asked. Moreover, the questions Mr. Shuaib asked were provided by the police and were clearly designed to elicit incriminating statements from Mr. Abdullah. It succeeded in eliciting such incriminating statements, and they were then introduced against Mr. Abdullah at his trial.

460.    This was improper police conduct as the Detectives knew that Mr. Abdullah had invoked his right to counsel a week prior and used a person that Mr. Abdullah trusted and respected as a religious leader and confidante to interrogate Mr. Abdullah despite his invocation of his rights. This testimony should not have been admitted as it was improperly obtained.

### CLAIM 14: DEATH QUALIFICATION BIASED THE JURY TO CONVICT AND DEPRIVED MR. ABDULLAH OF HIS RIGHT TO A JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY

461.    Members of the venire were excluded from serving on the jury because of their skepticism of the death penalty. That process, which is sometimes referred to as "death qualification," discriminated disproportionately against women, minorities, and members of certain religious denominations, all of whom are more likely to express suspicion of the death penalty. Death qualification also resulted in a jury that was far more conservative on issues relating to criminal justice, and thus a jury more likely to convict Mr. Abdullah. These distortions violated the Fifth and Sixth Amendment rights to a fair trial before an impartial jury that represents a fair cross-section of the community, the Eighth Amendment right to be free from cruel and unusual punishment, as well as the Fourteenth Amendment right to due process,

the Fourteenth Amendment right to equal protection of the law, the First Amendment's Free Exercise and Establishment Clauses, and the religious tests prohibition of Article IV, Clause 3. This error is structural, and therefore no prejudice need be shown. *See Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

462. *Supporting Facts*: The veniremembers at Mr. Abdullah's trial were winnowed down under a process that calls for the exclusion of any person who harbors hostility to the death penalty. Research shows that such individuals are often women, minorities, and members of certain religious sects, such as Catholics and Quakers. The data also demonstrate that a group of people subjected to this standard ends up strongly skewed in favor of convicting the defendant.

463. Examples of jurors who were wrongfully excused from serving include, but are not limited to, the following members of the venire: Jurors 39, 48, 55, 62, 79, 105, and the seven jurors opposed to the death penalty who were struck by the stipulation of defense counsel which included Jurors 12, 15, 64, 75, 82, 117, and 154 These jurors should not have been excluded, especially without voir dire being conducted.

464. Some examples of the improper exclusion include Juror 39 whose opposition to the death penalty was not absolute—he noted that while he had hesitations he would consider it—yet the Juror was dismissed without defense counsel making any effort to rehabilitate this Juror and without the Court clarifying this Juror's views.

465. Juror 12 was dismissed without any voir dire despite her questionnaire indicating that, although she had objections to the death penalty, her views would not impair her ability to be impartial. Furthermore, her expressed concerns were connected with fears of innocent people

being executed. It was the duty of the Court and counsel to explore these issues to ensure that the jury represents a fair cross section of the community.

466. A similar analysis applies to the other excluded jurors because merely expressing a conscientious objection is not enough to exclude jurors who also indicate they are capable of following the law.

467. Jurors opposed to the death penalty were also treated differently by the trial court. For example, with Juror 49, who was opposed to the death penalty, the judge's questions did not follow her usual prepared statements, and, instead, began by emphasizing the length of the trial and the difficulty of serving as a juror. The judge did not emphasize the length of the trial with pro-death jurors. Ultimately, the judge's cautionary preview of the length of the trial worked and she excused Juror 49 due to hardship rather than for his death penalty views.

468. The prosecution also had special questions of death-penalty-opposed jurors that would frighten and provoke the juror into saying they could not impose a death penalty. For example, the prosecution would direct a pro-life prospective juror to Mr. Abdullah and remind them that the death sentence was not an abstract question in this case. The prosecutor would further ask if the prospective juror could give Mr. Abdullah, "this man" individually, a death sentence. Another tactic the prosecution employed would be to ask these jurors about signing the death sentence and announcing the sentence to the public. Such questions were designed to get the prospective juror to cave if they had earlier stated they could consider the death penalty. The prosecution did not ask similar questions of pro-death jurors.

469. Along with the judge and the prosecution, defense counsel frequently agreed that many jurors were not death-qualified and did not challenge excusing them for cause. Defense counsel made no efforts to rehabilitate these jurors or to make the necessary inquiry as to whether or not

these jurors could and would follow the law.  *See* Claim 1(B)(vii).  The result was a conviction-prone jury.

### CLAIM 15: MR. ABDULLAH WAS NOT PRESENT AT ALL STAGES OF HIS TRIAL

470.     Several veniremembers were dismissed during jury selection by the stipulation of the attorneys and in Mr. Abdullah's absence, violating his right to be present at all stages of his trial.  *See Snyder v. Massachusetts*, 291 U.S. 97 (1934).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

471.     *Supporting Facts*: As discussed in Claim 1(B)(iv), via email, Mr. Abdullah's defense attorneys agreed with the State to excuse a number of veniremembers based purely on their questionnaire answers and without any attempt to rehabilitate them through voir dire.  Because this crucial decision was made through email and outside of the courtroom, Mr. Abdullah was not able to witness it or participate in it.  There is no indication that Mr. Abdullah knew that such an agreement was going to happen or had an opportunity to review the questionnaires or make an informed decision in his own defense regarding the individuals who would sit in judgment of him.  During the portions of jury selection for which Mr. Abdullah was present, he took an active role, requesting his attorneys to ask certain questions and passing notes regarding jurors.  The fact that Mr. Abdullah was excluded from participating in any portion of jury selection denied him the right to a fair trial and due process and resulted in a jury that was prone to convict and sentence him to death.

**CLAIM 16: THE REQUIREMENT THAT VOIR DIRE BE PERFORMED WAS NOT SATISFIED**

472.     Several jurors were dismissed without any voir dire, in violation of the Sixth Amendment requirement of a fair and impartial jury, the Eighth Amendment requirement of a reliable and non-arbitrary death sentence where jurors are guided by objective standards, and the Fourteenth Amendment requirement of due process. *See Wainwright v. Witt*, 469 U.S. 412 (1985); *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

473.     *Supporting Facts*: This claim is based on the facts set forth in Claim 1(B)(iv). As noted in the earlier claim, defense counsel stipulated to striking twelve potential jurors at the request of the State. The Defense agreed to strike jurors 12, 15, 50, 58, 64, 69, 75, 82, 109, 117, 133, and 154. Seven of these jurors expressed concerns about the death penalty in their questionnaires. Defense counsel made this stipulation despite the trial court cautioning both parties against it. Before the email stipulation, the trial court emphasized to counsel the importance of face-to-face voir dire over striking jurors based solely on their responses to the questionnaire. Nevertheless, Judge Copsey allowed for these jurors to be struck without any voir dire. Notably, the State did not make a similar error and refused to stipulate to the removal of any jurors, based on the questionnaires alone, that were proposed by the Defense. The need to conduct voir dire cannot be overstated, and the record in this case bore out the importance of in-person questioning. Both the prosecution and the defense noted early on in jury selection that it was not clear that the prospective jurors had understood the questionnaires as they were seeing a number of inconsistent answers within each juror's response. This was borne out during the voir dire itself

when jurors expressed different answers during voir dire noting that they needed to think about certain issues more than they had when answering them on cold paper; and jurors agreeing that they did not answer all of the questions due to confusion or an inability to fully express their views through the style of the questionnaire.  This sort of confusion and inconsistency is precisely why voir dire is essential, and precisely why it was calamitous of defense counsel to forego voir dire of the jurors who were most likely to sympathize with their client.  Additionally, no series of written questions can truly capture someone's views on complicated issues such as reasonable doubt, burdens of proof, and capital punishment.  These issues need to be addressed in person through voir dire where jurors can more fully express their views and where counsel and the Court can make fully formed decisions about a person's ability to serve.  The failure to conduct voir dire of all jurors violated due process and the right to a fair trial.  Additionally, it resulted in a jury that was more likely to convict and sentence Mr. Abdullah to death.

### CLAIM 17: THE STATE USED FAULTY AND OUTDATED FORENSIC SCIENCE

474.    At trial, the prosecution employed evidence that has since been undermined by subsequent scientific developments, in violation of the Due Process Clause of the Fourteenth Amendment.  *See Gimenez v. Ochoa*, 821 F.3d 1136 (9th Cir.), *cert. denied*, 137 S. Ct. 503 (2016).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

475.    *Supporting Facts*: The scientific evidence that has since been thrown into doubt by evolving scientific standards includes, but is not limited to, the State's DNA theory.  DNA material was found at the scene of the crime and tested by Laboratory Corporation American Holdings.  Shawn Weiss, an employee of that company, was called by the State to educate the

jury about the lab's DNA findings. On direct examination, Mr. Weiss testified that the DNA samples taken from the scene "showed signs of a mixture," which he defined as "a DNA profile from more than one individual." The lab did not know in advance any of the individuals who contributed DNA to the samples. The samples qualify as complex mixtures. Advances in DNA research that have occurred since trial reflect that the methods and technologies used to study complex mixtures from 2002 through 2004 did not satisfy scientific standards for validity. On the contrary, the analysis of complex DNA mixtures at that time were insufficiently precise and excessively subjective, and they regularly led to mistaken conclusions, including the incorrect assertion by the prosecution that Mr. Abdullah "could not be excluded" as a minor contributor to samples taken from the gas can and the cape. *See* Claim 18.

476.    Such subsequent scientific developments undermine the fundamental fairness of the entire trial.

### CLAIM 18: MR. ABDULLAH WAS DENIED ACCESS TO EXPERTS

477.    Mr. Abdullah was denied the court-funded assistance of necessary defense experts, in violation of the Sixth Amendment right to adequate representation, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment. *See Ake v. Oklahoma*, 470 U.S. 68 (1985); *Britt v. North Carolina*, 404 U.S. 226 (1971); *Griffin v. Illinois*, 351 U.S. 12 (1956). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

478.    *Supporting Facts*: Defense counsel were aware that the State was planning on relying upon DNA evidence taken from a gas can and cape that were found at the scene. Even though Mr. Abdullah was excluded as a major contributor to the DNA profiles found on both items, the State's expert testified that Mr. Abdullah could not be excluded as a minor contributor of DNA

obtained from the cape preparations and one of the can preparations. As a result, defense counsel twice moved the trial court to fund a defense DNA expert to refute the anticipated testimony from the State's DNA expert. Twice Judge Copsey denied the request. Defense counsel identified Lisa Calandro, a forensic scientist and DNA specialist, as necessary to discredit and/or explain the conclusions reached by the State's DNA expert, as well as to advise the defense on whether the bag found over Ms. Abdullah's head should be tested for fingerprints or DNA evidence. The trial court denied the request. With respect to the testing of the bag, Judge Copsey directed the defense to simply ask the State to test the bag, which would have required it to disclose its trial strategy and work product to the State.

479. The State's DNA expert, Mr. Weiss, opined that if one took the entire population of Boise, Mr. Abdullah was one of ten people in that group who could have contributed the DNA profile that was obtained from one of the cape preparations. To reach that conclusion, Mr. Weiss used a "Middle Eastern database" that was comprised of a combination of Arabic, Egyptian, Jordanian, Lebanese, Palestinian, and Moroccan individuals.

480. There were several deep-seated problems with Mr. Weiss's analysis and testimony. First, the lab's analysis of various preparations of the samples obtained from the cape and can produced inexplicably conflicting data. Multiple alleles detected in "Preparation I/II" of the can were not detected in "Preparation I/II/III" of the can as would have been expected. Likewise, several alleles detected in "Preparation I" of the cape were not detected in "Preparation I/II/III" of the cape. This lack of reproducibility significantly undermines the reliability of the data upon which Mr. Weiss based his conclusions. Second, Mr. Weiss opined that Mr. Abdullah could not be excluded as a contributor from samples, even where the data obtained was insufficient for inclusionary or exclusionary interpretation. Fourth, Mr. Weiss should have but did not consider

the possibility of allelic drop out, a phenomenon were certain alleles present in a low level sample are not detected, as it could have significantly impacted the calculation of the probability statistic that he offered. Fifth, Mr. Weiss's overall conclusion was deeply flawed. It failed to explain that the DNA testing reveals evidence reaching a reasonable degree of certainty that Mr. Abdullah's DNA was not present on the cape or gas can, and that the data support an alternative interpretation that would have excluded Mr. Abdullah as a contributor to the DNA found on both the cape and the gas can.

481.    Moreover, even the conclusion offered by the State was poorly attacked and explained by the defense, because the inability to exclude as a minor contributor is vastly different from including Mr. Abdullah as a contributor. Had the defense been given a neutral DNA expert witness, it could have rebutted Mr. Weiss's highly inaccurate analogy that only 10 people among 250,000 in the Boise area would have had the DNA profile found on the cape. His analogy inaccurately depicted the likelihood that Mr. Abdullah was the source of the DNA at issue, and Mr. Weiss ignored data within the DNA profile that was obtained which could have either excluded Mr. Abdullah as a minor contributor to the sample or shown that such large numbers of people also "could not be excluded as a minor contributor" that the DNA evidence would have been far less compelling than what was presented or potentially of such marginal probative value that it would have been inadmissible. Furthermore, Mr. Weiss did not offer statistics for the probability of Mr. Abdullah's inclusion in the mixtures where he "could not be excluded" as a minor contributor, because the statistics would not have been helpful to the State's case, nor admissible.

482.	A neutral defense expert could have assisted trial counsel in cross-examining Mr. Weiss effectively to the detriment of the State's case and, likewise, a neutral defense expert could have informed the jury of the inaccuracies and unfounded conclusions in Mr. Weiss's testimony.

483.	Additionally, Mr. Weiss's use of the "Middle Eastern database" was improper. Mr. Abdullah is Kurdish, and because Kurdistan has been for hundreds of years a strategically invaluable crossroads, Kurds' DNA has been profoundly shaped by intermixing among numerous different groups, including many from Asia and Europe. This was a decision borne not out of scientific knowledge but out of ignorance, and quite likely out of prejudice as well. *See* Claim 7. The State hammered away at its misleading approach in closing, where prosecutor Patrick Owen noted, "I asked him to recalculate those based on a different set of population guidelines, not Caucasian, not Hispanic, not African American, but I asked him to recalculate them with a set of the Middle Eastern population frequency." The defense could have made these points through an expert, had the court permitted one.

484.	DNA evidence was an important component of the prosecution's case because it purported to link Mr. Abdullah directly to the crime scene. The denial of a neutral defense expert to rebut the prosecution's DNA evidence was extremely prejudicial. There were areas of the State's presentation that were highly subjective and unrealistically presented given the underlying data. A neutral defense expert could have given the jury a more accurate presentation that showed just how misleading the prosecution's portrayal was, to great benefit to Mr. Abdullah, not just for the DNA evidence but also to show the extent of over-reaching by the prosecution, which would have affected the jury's evaluation of the entire case.

485.	The prosecution had resources to retain numerous expert witnesses, including a DNA expert. The failure to make similar resources available to the defense for its own neutral expert

was a denial of the fundamental federal constitutional rights to present a defense, to the effective assistance of counsel, and to due process and equal protection.

### CLAIM 19: MR. ABDULLAH WAS PREVENTED FROM PUTTING ON A DEFENSE

486. Judge Copsey issued a series of biased and unwarranted rulings forbidding his defense counsel from educating the jury about a number of key facts that weighed against his guilt. At the same time, she allowed the prosecution to introduce almost every fact it wished, including improper material and highly prejudicial facts that would have been rebutted or counterbalanced by the facts she barred defense counsel from introducing. Other evidence that would have assisted the defense was lost or destroyed by the police. Finally, Mr. Abdullah's own attorneys prevented him from presenting a viable alibi defense. Due to this confluence of factors, Mr. Abdullah was prevented from putting on a defense, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. *See Chambers v. Mississippi*, 410 U.S. 284 (1973); *see also Crane v. Kentucky*, 476 U.S. 683 (1986). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

487. *Supporting Facts*: Mr. Abdullah was prevented from telling the jury about numerous facts that militated in favor of his innocence, including but not limited to:

- The defense was ordered not to reveal to the jury a substantial amount of information that tended to support a theory that Ms. Abdullah committed suicide, including but not limited to evidence about her life insurance policy which would have shown that Mr. Abdullah had no financial benefit in the event of Ms. Abdullah's death, instead Ms. Abdullah maintained a $500,000 life insurance policy with the listed beneficiaries being her minor daughter, and her adult brother, Randy Jewett. This evidence is relevant and compelling

as the factfinder had a right to know that Mr. Abdullah would not benefit financially from the death of his wife. It was also improper to exclude this evidence where the prosecution was permitted to use other insurance policies against Mr. Abdullah, including those connected to the vending machines.

- The defense was denied the ability to present information about her previous suicidal ideation, and evidence of her lengthy struggle with depression, including evidence that her depression likely became more severe due to the pregnancy she experienced shortly before her death. There were medical records which indicate that Ms. Abdullah was in the midst of a major depressive episode during her pregnancy in 2002. Her dose of the antidepressant Prozac was increased from 10 mg per day on March 26, 2002 to the maximum recommended dose of 80 mg daily on June 18, 2002. She was pregnant at this time and gave birth to a son on September 16, 2002. Additionally, experts could have testified that death by suicide or overdose is the leading cause of death among women in the US in the first year after they give birth, a relevant fact as Ms. Abdullah had just given birth weeks prior to her death. Aside from the history of post-partum depression, Ms. Abdullah had other significant risk factors for suicide, including a history of sexual abuse, a prior spouse who had committed suicide, and roughly ten years of therapy during which she experienced periods of severe depression, per her Beck Inventory score, including as recently as April 2002, or merely six months before her death. Finally, on the Postpartum Adjustment Questionnaire for New Mother's on September 16, 2002, Ms. Abdullah indicated that she has been depressed and anxious during her pregnancy, that she does not feel in control of her life, that she has financial, housing, or other personal worries that she often feels angry at her life situation or those around her. Ms. Abdullah

hand wrote on the paperwork, "Please don't talk to me regarding this with anyone in my room." As such, it is possible that Ms. Abdullah did not disclose her severe struggles with depression to her husband or to her family members.

- Judge Copsey prevented the defense from conveying to the jury evidence that would have enabled a compelling argument that Ms. Abdullah died as a result of an accidental interaction between prescription drugs, including but not limited to evidence about how different prescription drugs interact with one another, evidence that Ms. Abdullah had extensively taken prescription drugs over the course of many years, and evidence that she had manipulated doctors so as to obtain drugs. Ms. Abdullah suffered from a painful medical condition, Charcot Marie-Tooth, and had numerous surgeries for this condition and had historically taken pain pills for this condition.

- The defense was precluded from playing the entirety of the videotape of the interrogation Mr. Abdullah was subjected to on October 11, 2002, at the Boise Police Department Annex. Part of the tape that was kept away from the jury reflected police officers falsely telling Mr. Abdullah that they wished only to exclude him as a suspect, when in fact law enforcement was already intent on blaming Mr. Abdullah for the crimes. Thus, the censored material would have bolstered a challenge to the police officers' credibility, in a case where numerous officers testified against Mr. Abdullah, and a case rife with serious deficiencies in the investigation. The full tape would therefore have strongly supported a reasonable doubt defense. Additionally, the tape would have shown how long Mr. Abdullah was at the Annex, how many questions were asked, how often he was asked if he wished to change his story, and the lengthy and intrusive search of his person which

included removing all of his clothing and having numerous photographs taken by multiple personnel as well as having hairs removed.

- The extensive loss and destruction of crucial evidence by state actors further prevented Mr. Abdullah from defending himself. *See* Claim 9. For instance, by failing to preserve material that indicated he could not have been at the scene of the crime when it was committed, the State's mishandling of the evidence severely impaired Mr. Abdullah's ability to present an alibi defense. Mr. Lance Donnelson was a clerk at the Maverick Country Store in Utah. Mr. Donnelson would have testified that he saw Azad and another middle eastern male in his store between 2:30 and 3:30 am on the morning of October 5, 2002. Mr. Donnelson told Boise Detectives this on October 12, 2002 and told them that there was a limited window of time in which they could obtain security videos, which of course, Boise Detectives failed to do.

- Similarly, by failing to preserve the sole eyewitness's statement, the State severely impaired Mr. Abdullah's ability to challenge that eyewitness's testimony. Detectives surveyed clerks at various convenience stores and gas stations between Boise and Salt Lake City and encountered Marjorie Wood who indicated she had seen Mr. Abdullah in her store at Mountain Home Idaho at a time that defeated his alibi defense. Detectives took a statement from Ms. Wood but then lost the statement making it impossible to question her about any inconsistencies in her original written statement.

- Mr. Abdullah's attorneys prevented him from putting on a viable alibi defense. It was known to trial counsel that the objective of representation for Mr. Abdullah was acquittal on all charges, as evidenced by his rejection of every plea deal conveyed to him and by his insistence that the jury not be instructed on second-degree murder or manslaughter as

lesser-included offenses. Despite this knowledge, trial counsel failed to present existing evidence of an alibi. First, counsel were well-aware that Lance Donnelson, an eyewitness with law enforcement training on identifications, recalled with a high degree of confidence that Mr. Abdullah was present at a store in Utah at a time and place that would have rendered it impossible for him to have committed the alleged crimes. Specifically, Mr. Donnelson was 90% certain that he observed Mr. Abdullah enter a Maverik Country Store in Farr West, Utah between 2:30 and 3:30 AM on October 5, 2002. Mr. Donnelson was willing and able to testify at trial and would have made an excellent witness as he has a law enforcement background and had recently attended an eighteen-week course on eyewitness identification. Nevertheless, defense counsel failed to call him. They likewise failed to present the testimony of Michael Quintana. Mr. Quintana was identified as having spent the night at the Dream Inn in Salt Lake City on October 4, 2002 and checking out the following morning. During a deposition, he testified at around 11 PM on October 4, he witnessed a man enter room number seven, the room next to his. Mr. Abdullah and his son were the only registered occupants of that room. They had checked into room seven and Mr. Abdullah had told police that he was sleeping there at the time of the fire. In addition, Mr. Quintana further testified that he heard people speaking in a different language in room seven well into the night. Thus, Mr. Quintana's testimony would have bolstered an alibi defense. Third, Shad Mohammad and Abdul Afridi would have testified at trial that they did not smell smoke or gas on Mr. Abdullah or believe he looked tired when they saw him at the Salt Lake City Mosque on the morning of October 5, 2002, which would have added additional weight to a defense theory that had Mr. Abdullah uninvolved in the fire, as the alibi theory would have had. Fourth, the defense failed to call witnesses who would have

testified that it was not unusual for members of the Muslim community in Boise to travel to Salt Lake City to purchase Halal meat.

488.    Further facts relating to this issue are set forth in Claim 6.

**CLAIM 20: THE STATE COURT'S EVIDENTIARY RULINGS RENDERED THE TRIAL FUNDAMENTALLY UNFAIR**

489.    Through numerous egregiously incorrect evidentiary rulings, the state court injected fundamental unfairness into the trial, in violation of Mr. Abdullah's rights under the Eighth and Fourteenth Amendments. *See Estelle v. McGuire*, 502 U.S. 62 (1991). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

490.    *Supporting Facts*: Judge Copsey made a number of state-law rulings that were exceedingly incorrect, biased, and prejudicial. Several of those rulings are recited elsewhere, including in Claims 6 and 19.

491.    Of particular note, Judge Copsey precluded the jury from considering the fact that Ms. Abdullah had a $500,000 life insurance policy to which Mr. Abdullah was not a beneficiary and which would not have benefited him financially in the event of her death, even though that evidence was strongly and directly supportive of a suicide theory. *See* Claim 6.

492.    Similarly, Judge Copsey allowed in to evidence an unsigned, undated, tremendously prejudicial letter supposedly written by Ms. Abdullah to Mr. Abdullah. There was no indication when this letter was written, or even whether it was actually written by Ms. Abdullah. This was a type written letter found behind a dresser. The letter was not authenticated and contained disparaging commentary about Mr. Abdullah calling him a liar and a hypocrite which would unduly influence the jury. It was also improper to introduce the fact that this letter had been

obtained and turned over by prior defense counsel thereby creating the appearance that prior counsel believed that Mr. Abdullah was guilty and collected evidence against him. Additionally, Judge Copsey refused to allow the defense to introduce a letter attributed to Ms. Abdullah regarding her interest in selling the vending machines which would have supported Mr. Abdullah's claims that the family was planning a move overseas, that Ms. Abdullah was supportive of such a plan, and that Ms. Abdullah was not being controlled or manipulated by her husband but rather was an independent woman assisting in major life decisions. The fact that the Court admitted and unauthenticated letter disparaging Mr. Abdullah while denying the admission of a separate letter that supported the defense demonstrates the fundamental unfairness of this trial. *See* Claim 1(A)(xxvii).

493.    Moreover, Judge Copsey allowed Mr. Bankhead to testify, even though he presented an account that was ludicrous on its face and clearly contradicted by documentary evidence. Those records include, but are not limited to, evidence that Mr. Bankhead had in the past provided false statements to law enforcement and had a reputation for being dishonest. *See* Claim 1(B)(iii).

494.    In addition to those rulings, Judge Copsey improperly allowed a great deal of other evidence. Much of that evidence was hearsay. For instance, Judge Copsey permitted Dr. Brenda Williams to testify that Ms. Abdullah told her that Mr. Abdullah would not have a vasectomy. Dr. Williams was permitted to further testify that it was Ms. Abdullah's decision to get sterilized, not the decision of the Abdullahs as a couple, and that Mr. Abdullah was not present after Ms. Abdullah's tubal ligation surgery.

495.    Velma Seabolt, a nurse practitioner who worked with Dr. Williams and provided medical treatment to Ms. Abdullah, also testified. Over a defense objection, the trial court allowed Ms. Seabolt to testify about a conversation she had with Ms. Abdullah regarding the condition of her

marriage. Ms. Seabolt testified that she treated Ms. Abdullah during the last trimester of her pregnancy with Malik, and that Ms. Abdullah said "she was going to get a divorce, but she had to stay married until after the pregnancy because she didn't have any health insurance, and she was a housewife at that time so she couldn't afford the children."

496. Similarly, Gina Wolfe Seybold, a therapist who treated Ms. Abdullah, testified at trial. Ms. Seybold testified that she saw Ms. Abdullah in the Spring of 2002, and Ms. Abdullah told her, "there had been events that she had experienced with Mr. Abdullah that led her to believe that he was being unfaithful. And she was very concerned about her relationship with him. I think she struggled for a couple of years with issues of infidelity, and I believe toward the last when I saw her there was concern that he was bringing pornography through the computer." Although the court struck the statement on pornography, it did not strike the statement regarding Mr. Abdullah's alleged infidelity.

497. About four weeks before her death, Ms. Abdullah made an appointment and met with attorney Deborah Kristal for about an hour. Over defense objections, Ms. Kristal testified that Ms. Abdullah made the following statements to her during their hour-long meeting:

- Ms. Abdullah's mother thought she was there about a divorce, but Ms. Abdullah was not sure whether she was ready for that.

- Ms. Abdullah was worried about her financial status and Mr. Abdullah was not trustworthy with money.

- Mr. Abdullah was not the religious person that he portrayed himself to be.

- Mr. Abdullah did not want Ms. Abdullah to return to Boise when she went into preterm labor in Nashville, and they had to borrow money from her family to get her back to Boise.

- The house was still in Ms. Abdullah's name but she was concerned because Mr. Abdullah had listed it for sale.

- Given the state of her marriage, Ms. Abdullah was not sure she wanted to go with Mr. Abdullah to South Africa.

- Ms. Abdullah was worried that Mr. Abdullah would take the children out of the country if they divorced.

- Mr. Abdullah was not a good or nice man, but was rather very controlling and could not be trusted.

- When Ms. Abdullah was pregnant with Naim, Mr. Abdullah cheated on her with two women.

- Mr. Abdullah's reputation in the Muslim community was very important to him and Ms. Abdullah was going to contact an elder who Mr. Abdullah respected to see if the elder could talk some sense into Mr. Abdullah or save their marriage.

- Mr. Abdullah did not have a driver's license, "an illustration of how he was irresponsible and didn't think laws applied to him."

- Ms. Abdullah did not want to make a decision about divorce while she was pregnant.

- Ms. Abdullah had left Mr. Abdullah earlier to stay with out-of-state friends and Mr. Abdullah "had come and made her come back."

- Ms. Abdullah wanted to create a formal will that would cover Naim and Malik.

- Ms. Abdullah wanted the bill sent to her mother because she did not wish for Mr. Abdullah to know she had met with an attorney.

498.    All of these hearsay statements were admitted on the basis that they rebutted a defense theory of suicide.  However, when they were offered, the defense had not yet presented any

suicide theory. In fact, the defense never truly did present a suicide theory, aside from a few scattered and totally incoherent statements that gestured in the general direction of suicide. Therefore, it was error to admit this hearsay testimony. Additionally, these are protected attorney-client communications, a privilege that extends past the client's death and therefore their admission was improper.

499.    Another category of hearsay came in through Mr. Abdullah's former co-workers. Ed Reagles and Rod Adams testified that Mr. Abdullah claimed that in Kurdistan it was acceptable to kill one's wife if she was unfaithful so long as one offered the wife's family something in return. This grouping of statements was deemed admissible on the ground that it was "relevant because it certainly goes to Mr. Abdullah's state of mind, especially in the months leading up to what occurred in October." That rationale was thoroughly groundless, since none of the co-workers suggested that Mr. Abdullah endorsed honor killings in any way, or that he suspected his wife of infidelity, which would have been an obvious precondition to such a killing by the accounts of the witnesses themselves.

500.    The erroneously admitted hearsay was highly prejudicial, as it painted Mr. Abdullah as a bad husband and dangerous foreigner. Collectively, the evidence therefore undermined Mr. Abdullah's right to a fundamentally fair trial.

### CLAIM 21: THE STATE INFRINGED MR. ABDULLAH'S CONFRONTATION RIGHTS

501.    At several junctures during the guilt and sentencing phases, statements were introduced against Mr. Abdullah without him having any opportunity to cross-examine the speaker. Mr. Abdullah was also prevented from cross-examining witnesses of the State with evidence that would have undermined their credibility and persuasiveness in the eyes of the jury. All of this was done in violation of the Confrontation Clause of the Sixth Amendment. *See Crawford v.*

*Washington*, 541 U.S. 36 (2004); *see also Giles v. California*, 554 U.S. 353 (2008); *Olden v. Kentucky*, 488 U.S. 227 (1988) (per curiam); *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987); *Delaware v. Van Arsdall*, 475 U.S. 673 (1986); *Delaware v. Fensterer*, 474 U.S. 15 (1985) (per curiam); *Davis v. Alaska*, 415 U.S. 308 (1974). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

323.    At trial, the State presented the jury with a number of statements whose speakers were not made available for the defense to question on the stand. These statements include, but are not limited to:

- An unauthenticated letter, purportedly written by Ms. Abdullah and addressed to Mr. Abdullah, in which highly prejudicial comments are made about their relationship and Mr. Abdullah's behavior;

- Statements that Ms. Abdullah supposedly made to mental health providers and to her attorney about Mr. Abdullah, many of which painted Mr. Abdullah's character in an unflattering and inflammatory light;

324.    In addition, Mr. Abdullah's counsel were prohibited by Judge Copsey from challenging prosecution experts with material that would have undercut the power of their testimony. Those incidents include, but are not limited to:

- Judge Copsey prevented the defense from rebutting the State's DNA expert with its own DNA expert;

- Judge Copsey refused to allow the defense to cross-examine Detective Tod Littlefield with findings from an internal affairs investigation that showed mistakes he had made in

the Abdullah case and misconduct that he committed by having an affair with second-chair prosecutor Erika Klein.

325.    Moreover, Mr. Abdullah was not able to confront witnesses with all of the evidence described in Claim 19, which in incorporated herein.

326.    Additionally, Mr. Abdullah was not able to confront Redear during his competency examination.

502.    Finally, Mr. Abdullah was not given an opportunity to cross-examine the sources for the huge number of statements attached to his pre-sentence investigation report, many of which were wildly speculative and highly prejudicial. Had these sources been confronted, their credibility would have been substantially undermined, and Mr. Abdullah would have received more lenient sentences on the non-capital offenses.

### CLAIM 22: THE TRIAL WAS UNCONSTITUTIONALLY CLOSED TO THE PUBLIC

503.    Judge Copsey closed the court to the public for a competency hearing of Redear Abdullah, on the basis of an unfounded and biased view that Mr. Abdullah's family were trying to intimidate Redear Abdullah, in violation of the First, Sixth, and Fourteenth Amendments. *See Waller v. Georgia*, 467 U.S. 39 (1984). The unconstitutional closure of a courtroom constitutes structural error. *See id.* at 49. As such, it is not subject to harmless error analysis, and prejudice is presumed. Additionally, Mr. Abdullah need not make any specific showing of prejudice to obtain relief on this claim. *See id.*

504.    *Supporting Facts*: Judge Copsey refused to let the public observe a hearing to determine whether Redear Abdullah was competent to testify. She did so because of a false, unproven, and disputed accusation by the prosecution that the Abdullah family was attempting to coerce Redear into testifying favorably for the defense. Rather than making any effort to ascertain the

legitimacy of the accusation, Judge Copsey assumed its truth and used it as an excuse to shut the public out of the proceeding.

## CLAIM 23: MR. ABDULLAH WAS COERCED INTO NOT TESTIFYING

505.    Mr. Abdullah was effectively prevented from exercising his right to testify in his own defense at both the guilt phase and the penalty phase by his attorneys, who coerced him with a series of legally and factually baseless threats, in violation of the Fifth Amendment guarantee against compelled testimony, the Compulsory Process Clause of the Sixth Amendment, the Sixth Amendment right to personally make one's own defense, the Sixth Amendment right to effective assistance of counsel, and the Due Process Clause of the Fourteenth Amendment. *See Rock v. Arkansas*, 483 U.S. 44 (1987); *Faretta v. California*, 422 U.S. 806 (1975); *Harris v. New York*, 401 U.S. 222 (1971). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

506.    *Supporting Facts*: This violation was committed at the guilt phase in the following ways:

507.    Prior to trial, defense counsel knew that Mr. Abdullah wished to testify. However, Mr. Abdullah's trial attorneys told him that if he took the stand to recount his version of events they would refuse to elicit his testimony through questioning, and would instead force him to address the jury in a monologue. This, in and of itself, significantly impaired Mr. Abdullah's ability to testify, as he had never testified before and had no idea how to do it without the assistance of counsel. Later, trial counsel informed Mr. Abdullah that if he testified they would withdraw from the case entirely. The attorneys did so on the ground that his testimony would be false, even though the attorneys had no actual knowledge that it was false and in fact had alibi evidence that was consistent with the account Mr. Abdullah wished to outline from the stand. Moreover, by this time, the Toryanskis had already met with bar counsel and been informed that

they could not require Mr. Abdullah to testify in narrative form. Defense counsel also told Mr. Abdullah that if he took the stand, the State would cross-examine him about his first wife's death. Contrary to counsel's assertions, the State had already agreed that it would not present evidence relating to Mr. Abdullah's first wife, so long as the defense did not open the door, which they easily could have avoided doing during a direct examination of Mr. Abdullah. Defense counsel further sought to intimidate Mr. Abdullah into silence by guaranteeing him that the proffers they made during plea negotiations would come out if he testified. Pursuant to the rules of evidence, though, none of the proffers would have been admissible.

Lastly, defense counsel falsely advised Mr. Abdullah that if he relinquished his right to testify, he could still address guilt-phase issues in his allocution statement at sentencing, which the court later ordered him not to do.

Because of his trial attorneys' baseless threats and plainly erroneous advice, Mr. Abdullah did not testify, and the compelling alibi he could have supported was not presented to the jury. A decision about whether to testify relates to a defendant's fundamental rights, and should consequently be within the defendant's control. Counsel's failure to choose a theory of the case at any point in the trial also impaired Mr. Abdullah's decision about whether to testify. *See* Claim 1(A)(iii).

508. Any waiver of Mr. Abdullah's right to testify was rendered invalid because counsel failed to properly advise him of his right to testify and coerced him into not testifying.

509. Further facts relating to this issue are set forth in Claims 1(A)(vi) and 1(A)(xxix).

510. The issue of whether Mr. Abdullah was in Boise was a critical question at the guilt phase, heavily emphasized by the State, and Mr. Abdullah's testimony could have answered the question in his favor. The error also prejudiced Mr. Abdullah's rights at sentencing because it

prevented Mr. Abdullah from offering evidence regarding residual doubt, which would have been a powerful reason for the jury to exercise mercy.

511.    Mr. Abdullah's right to testify was violated at the penalty phase in the following ways:

512.    At sentencing, Mr. Abdullah again wished to testify.  And defense counsel again pressured him not to.  As part of their lobbying, they indicated, wrongly, that Mr. Abdullah would have the opportunity to discuss anything he wanted in his allocution.  When deciding whether to testify at the penalty phase, Mr. Abdullah was not receiving competent and unbiased advice from his counsel, and was being given confusing and inconsistent information.  For instance, the trial court was telling Mr. Abdullah that his lawyers had to ask him questions if he testified, while his lawyers were telling him that they would not.  Similarly, the court told Mr. Abdullah that the State could not cross-examine him about matters that he did not address in his direct examination, while his lawyers told him that the State would cross-examine him about his first wife's death.

513.    During this process, a bench conference was held outside Mr. Abdullah's presence, at which the court stated that it would allow the defense to reopen their mitigation case to permit Mr. Abdullah the opportunity to testify to matters presented at the penalty phase if he so chose. Defense counsel never informed Mr. Abdullah of the court's offer.

514.    Mr. Abdullah could have offered through his testimony mitigating evidence including evidence that would have demonstrated that he loved his wife and his children, that he regretted his infidelity and believed his wife had forgiven him, his feelings about divorce, Kurdish cultural beliefs, his experiences in Kurdistan, and his family's journey to Turkey and the United States.

### CLAIM 24: THE JURY WAS WRONGLY INSTRUCTED ON WILLFULNESS

515.    The jury was given a definition of willful that reduced its burden of proof on every charge except arson, relieving it of its duty to prove Mr. Abdullah guilty beyond a reasonable

doubt and violating the Fourteenth Amendment. *See Carella v. California*, 491 U.S. 263 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re Winship*, 397 U.S. 358 (1970). This error is structural, and therefore no prejudice need be shown. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

516.     *Supporting Facts*: To convict Mr. Abdullah of first-degree murder, the State had to prove that the killing was willful, deliberate, and premeditated, and the jury was so informed. However, while the jury was given the definition of "premeditation," it was never given a definition for "deliberate" or "willful." On the contrary, the jury was specifically informed that if it found only premeditation, it was obligated to return a guilty verdict. As a result of this omission, the jury was never instructed that the State had to prove beyond a reasonable doubt that Mr. Abdullah specifically intended to commit the crimes with which he was charged.

517.     The prejudice from the error was compounded by the exchange between the jury and the court on the meaning of the instructions. After deliberations began, the jury submitted a question to the court, asking for a definition of willfulness in the context of the arson charge. The court responded that "an act is willful or done willfully when done on purpose. One can act willfully without intending to violate the law to injure another or to acquire any advantage." This is the only definition of willful that the jury ever received. And while it was correct with respect to arson, it was incorrect with respect to every other charge in the indictment, including first-degree murder, each of which required either the specific intent to kill or the specific intent to harm. Under these circumstances, the jury was allowed to convict Mr. Abdullah of those charges absent a finding of specific intent, and was allowed to convict Mr. Abdullah of murder absent a finding

of deliberateness and willfulness, thereby omitting an essential element of the crimes and lessening the prosecution's burden of proof.

518.    Mr. Abdullah's assertion of Claim 24 within this amended petition is not intended to waive or supplant the arguments set forth in previous briefing that the Court directed the parties to file. *See* Dkt. 17 at 8–29 (opening brief); Dkt. 26 at 7-17 (reply brief).

## CLAIM 25: THE JURY WAS WRONGLY INSTRUCTED ON MALICE

519.    The jury instruction defining malice lessened the State's burden of proof, in violation of the Fourteenth Amendment. *See Carella v. California*, 491 U.S. 263 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re Winship*, 397 U.S. 358 (1970). This error is structural, and therefore no prejudice need be shown. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

520.    *Supporting Facts*: Mr. Abdullah's jury was instructed that malice "is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart, which means a condition of heart and mind which has no regard for social or moral obligation." This non-pattern instruction failed to recognize that the killing must result from an intentional act. It also failed to require that the evidence establish both knowledge of the danger to, and conscious disregard for, human life. The first omission relieved the State of its burden of proving the killing resulted from intentional, rather than inadvertent, conduct. The second omission relieved the State of its burden to prove a knowing and conscious disregard for human life.

## CLAIM 26: THE JURY INSTRUCTION ON ENDANGERING CHILDREN IMPROPERLY REDUCED THE STATE'S BURDEN OF PROOF

521.     The jury instructions regarding the charge of injuring a child improperly lessened the State's burden of proof, in violation of the Fourteenth Amendment. *See Carella v. California*, 491 U.S. 263 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re Winship*, 397 U.S. 358 (1970). This error is structural, and therefore no prejudice need be shown. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

522.     *Supporting Facts*: On the charge that Mr. Abdullah unlawfully injured a child, the jury was told by Judge Copsey that he was guilty if he "may have endangered the child's person or health." The instruction lessened the State's burden of proof on that count from the constitutionally required one of beyond a reasonable doubt.

## CLAIM 27: THE TRIAL COURT GAVE A CONSTITUTIONALLY IMPROPER DEFINITION OF REASONABLE DOUBT IN BOTH GUILT AND PENALTY JURY INSTRUCTIONS

523.     Mr. Abdullah's jury received a constitutionally deficient instruction defining reasonable doubt that impermissibly lowered the prosecution's burden of proof, invited juror speculation beyond the evidence, discouraged the jury from scrutinizing the evidence for reasonable doubt, and confused the jury by requiring a search for truth as opposed to doubt. This deficient instruction violated Mr. Abdullah's right to due process under the Fourteenth Amendment. *See In re Winship*, 397 U.S. 358 (1970). This error is structural, and therefore no prejudice need be shown. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence

in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).  This error affected both the guilt and penalty phases of the trial.

524.    Jury instructions that invite the jury to seek the truth rather than reasonable doubt violate the Constitution because they reduce the trial to a competition between whose account of the facts is more likely true, and thereby impose a weaker, preponderance-of-the-evidence standard on the prosecution.  Instructions that guide juries away from reasonable doubt in favor of searches for the truth also invite juries to speculate beyond the evidence, explicitly tell the jury their duty is to arrive at the truth of the matter rather than to scrutinize the evidence for reasonable doubt.  Inviting juries to search for truth endangers the accuracy of criminal trials, instead of holding the prosecution to the exacting burden of proving the defendant guilty beyond a reasonable doubt.

525.    *Supporting Facts*:  In the guilt and penalty phase instructions defining reasonable doubt, the trial court first instructed jurors not to look for "mere possible doubt" but to instead ask themselves whether they "feel an abiding conviction, to a moral certainty, of the truth of the charge."  This definition turned the jurors' attention away from a concern with reasonable doubt by first offering a negative definition: do not look for possible doubt.  Then the instruction gave its only positive definition in terms of seeking a state of "moral certainty" and "truth."  By emphasizing truth-seeking over testing the prosecution's case for reasonable doubt, the trial court's instruction unconstitutionally reduced the State's burden and rendered the guilty verdict and death sentence unreliable.

### CLAIM 28: THERE WAS INSUFFICIENT EVIDENCE OF FIRST-DEGREE MURDER

526.    No rational trier of fact could have found Mr. Abdullah guilty of first-degree murder beyond a reasonable doubt.  His murder conviction therefore violates the Due Process Clause of

the Fourteenth Amendment. *See Jackson v. Virginia*, 443 U.S. 307 (1979). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

527.   Prior to trial, the State's pathology expert, Dr. Groben, testified at Grand Jury proceedings that he dismissed the possibility of suicide because Ms. Abdullah had no history of suicidal ideation and because there were no alcohol or drugs in her system. Evidence would later emerge that the decedent both, 1) had a history of suicidal ideation; and 2), had a potentially lethal amount of Fluoxetine (Prozac) in her system at the time of her death.

528.   At trial, Dr. Groben amended his determination on Ms. Abdullah's cause of death to "acute Fluoxetine poisoning associated with asphyxiation due to bag over her head." Dr. Groben, however, did not change his determination that the manner of death was homicide. The State's theory at trial was that Ms. Abdullah was incapacitated by her murderer through the administration of Prozac and then asphyxiated with a shopping bag. However, according to the State's forensic toxicologists, Drs. Edward Barbieri and Dr. Ronald Backer, the Fluoxetine was administered prior to Ms. Abdullah's last meal, and the last meal occurred approximately an hour and a half before her death. The State took the position that the administration of the Fluoxetine occurred during a narrow window, sometime between 10 PM and midnight. By the State's theory of the case, Mr. Abdullah left Salt Lake City for Boise shortly after 8:10 PM on October 4, 2002; was accurately identified by Marjorie Wood in Mountain Home on his way to Boise sometime after midnight; and arrived in Boise sometime around 1:30 AM. Thus, taking the State's theory as true, it was impossible for Mr. Abdullah to have administered the Prozac

between 10 PM and midnight because Mr. Abdullah had not yet even reached Mountain Home, let alone Boise.

529.     The State's theory of the cause of death, and all of the evidence elicited in support of that theory, required a showing that Mr. Abdullah was responsible for both the poisoning and the asphyxiation/suffocation.  Viewed in the light most favorable to the verdict, the State failed to produce sufficient evidence beyond a reasonable doubt on either point.  Rather, the State's own evidence suggests that it would have been impossible for Mr. Abdullah to have both poisoned his wife and asphyxiated her, and that more likely cause of  death was suicide. Regardless, no rational trier of fact could have found that the State proved the murder charge beyond a reasonable doubt.

### CLAIM 29: THERE WAS INSUFFICIENT EVIDENCE OF FIRST-DEGREE ARSON

530.     No rational trier of fact could have found Mr. Abdullah guilty of arson beyond a reasonable doubt.  His arson conviction therefore violates the Due Process Clause of the Fourteenth Amendment.  *See Jackson v. Virginia*, 443 U.S. 307 (1979).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

531.     Mr. Abdullah was charged with first-degree arson.  The State's evidence indicated that the fire was caused by an accidental ignition not intended by the person pouring the gasoline.  To convict Mr. Abdullah of first-degree arson, the State had to prove that he willfully damaged a dwelling by fire or explosion.  The State showed only that the perpetrator accidentally caused an explosion, not willfully.  Therefore, the evidence was insufficient to prove that Mr. Abdullah committed first-degree arson.

532.     Additionally, assuming arguendo that the State did present sufficient evidence of an attempt by Mr. Abdullah to commit arson (it did not), Mr. Abdullah could have at most been convicted of general "attempt" and not attempted arson.  Contemplating a change in the Idaho arson statute in 1993, where attempted arson was specifically removed from the arson statute, Mr. Abdullah at most could be guilty of general "attempt" since attempted arson in the first degree is not a crime under Idaho law.

### CLAIM 30: THE IDAHO SUPREME COURT VIOLATED MR. ABDULLAH'S RIGHTS BY RETROACTIVELY ALTERING THE ELEMENTS OF ARSON

533.     The Idaho Supreme Court added an element to arson in Mr. Abdullah's case, violating his right to be free from unexpected and retroactive expansions of the law under the Due Process Clause of the Fourteenth Amendment and his right to have every element of the offense proven by the State beyond a reasonable doubt under the Due Process Clause of the Fourteenth Amendment.  *See Bouie v. City of Columbia*, 378 U.S. 347 (1964); *see also Carella v. California*, 491 U.S. 263 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510 (1979); *In re Winship*, 397 U.S. 358 (1970).  This error is structural, and therefore no prejudice need be shown.  *See Sullivan v. Louisiana*, 508 U.S. 275 (1993).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

534.     Several other convictions fall with the arson count. Aside from the first-degree murder charge, each of those counts was premised on the arson. That includes the three counts of attempted murder regarding the children inside the house, as well as the single count of injury to a child. All four of those counts relied upon Mr. Abdullah committing the arson. Therefore, all four of the corresponding convictions must be set aside along with that for arson.

535.   *Supporting Facts*: In the indictment, the first-degree arson count accused Mr. Abdullah of "willfully and unlawfully by fire or explosion, damag[ing] a dwelling."  The indictment tracked the language of the statute, which did not include any language about causation.  Prior to Mr. Abdullah's case, the Idaho appellate courts had never read a causation element into the arson statute.  In its March 2, 2015 opinion, the Idaho Supreme Court rejected Mr. Abdullah's challenge to the sufficiency of the evidence on arson.  It did so on the basis that Mr. Abdullah "caused the intended result—the damage of a dwelling by fire."  The Idaho Supreme Court further reasoned that "the fire would not have occurred but for his conduct and the fire was the foreseeable, probable, and intended result of his conduct."  In suggesting that arson could be committed in such a way, the Idaho Supreme Court was adding a novel element to the statute.  Because Mr. Abdullah had no notice of that element, it could not be applied retroactively to him.

536.   Moreover, if causation is an element of arson in Idaho, then the State was required to prove it beyond a reasonable doubt.  The jury was not instructed that causation was an element of arson, and therefore did not make that finding.

537.   Mr. Abdullah's assertion of Claim 30 within this amended petition is not intended to waive or supplant the arguments set forth in previous briefing that the Court directed the parties to file.  *See* Dkt. 17 at 29-37 (opening brief); Dkt. 26 at 17-26 (reply brief).

### CLAIM 31: THERE WAS INSUFFICIENT EVIDENCE OF ATTEMPTED FIRST-DEGREE MURDER

538.   No rational trier of fact could have found Mr. Abdullah guilty of attempted first-degree murder beyond a reasonable doubt.  His convictions for that offense therefore violates the Due Process Clause of the Fourteenth Amendment.  *See Jackson v. Virginia*, 443 U.S. 307 (1979).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a

substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

539.    370.    As discussed above, there was insufficient evidence that Mr. Abdullah was in Boise at the time of the fire.  *See* Claim 1(A)(vi).  If there was insufficient evidence that he was present, that means there was insufficient evidence that he attempted to murder the children in the house.  The insufficiency of the evidence is further confirmed by the fact that the State's evidence did not show that the perpetrator had a specific intent to set the fire, and consequently a specific intent to kill the children inside of it.  Instead, the prosecution's own witnesses testified that the fire began accidentally.  Therefore, by the State's account, there was no willful, deliberate, premeditated attempt to kill the children.  It follows that there was insufficient evidence of attempted first-degree murder.  Even if there was evidence to support the conclusion that Mr. Abdullah intended to commit arson, there is no evidence that he intended to harm the children.  In fact, the evidence that Naim was found outside of the home would lead to the opposite inference: that Mr. Abdullah was attempting to remove the children from the home immediately after the accidental ignition, but was unable to get all of the children out of the home before the fire spread.

### CLAIM 32: THERE WAS INSUFFICIENT EVIDENCE OF INJURY TO A CHILD

540.    No rational trier of fact could have found Mr. Abdullah guilty of injury to a child beyond a reasonable doubt.  His conviction for that offense therefore violates the Due Process Clause of the Fourteenth Amendment.  *See Jackson v. Virginia*, 443 U.S. 307 (1979).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

541.     *Supporting Facts*: Mr. Abdullah was charged in the indictment with committing an injury

to a child in violation of Idaho Code § 18-1501(1) by placing his son Naim in "a situation

endangering his health or person."  Viewed in the light most favorable to the State, Naim was

found by a firefighter in the backyard of his home, sitting atop a folded comforter, surrounded by

a potted plant and toys.  According to testimony, he was clean, had no soot on him, and was

quiet and content.  He had no injuries of any kind and no one observed any signs that he was

exposed to fire.  Furthermore, the timing of his discovery suggested that he was only in the yard

for a very short period of time.

### CLAIM 33: CUMULATIVE GUILT-PHASE ERROR

542.     Mr. Abdullah's convictions violate the Fifth, Sixth, and Fourteenth Amendments because

of the cumulative impact of the errors that occurred throughout the guilt-or-innocence phase of

his trial.  *See Chambers v. Mississippi*, 410 U.S. 284 (1973); *Parle v. Runnels*, 505 F.3d 922 (9th

Cir. 2007); *Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992).  Insofar as Mr. Abdullah is required to

demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence

in determining the jury's verdict of guilt and sentence of death.  *See Brecht v. Abrahamson*, 507

U.S. 619 (1993).

543.     *Supporting Facts*: The constitutional violations set forth in each individual guilt-phase

claim alone mandate relief.  Even if not, relief is required when each claim is considered

cumulatively with the other claims.  The cumulative impact of these combined errors violated

many of Mr. Abdullah's rights, including the rights to effective assistance of counsel, due

process, a fair trial, a fair and impartial jury, an unbiased judge, and the right to confront the

evidence against him, and the right to a fair and reliable guilt-phase result.

## CLAIM 34: MR. ABDULLAH IS NOT A CONSTITUTIONALLY SUITABLE CANDIDATE FOR DEATH

544.    Given his experiences, character, and offense of conviction, Mr. Abdullah is far from the "worst of the worst," and the imposition of a death sentence on him therefore violates the Sixth, Eighth, and Fourteenth Amendments.  *See Miller v. Alabama*, 132 S. Ct. 2455 (2012); *Graham v. Florida*, 560 U.S. 48 (2010); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304 (2002); *Godfrey v. Georgia*, 446 U.S. 420 (1980).

545.    As discussed in greater length elsewhere (*see* Claim 1(B)(i)), Mr. Abdullah has a powerfully compelling mitigation story.  He experienced profound trauma as a child when his village was destroyed and his family was relentlessly persecuted by Saddam Hussein as part of a genocidal campaign against the Kurds.  During the family's flight from Hussein, Mr. Abdullah witnessed horrific acts of violence and—despite his young age—acted heroically to protect and lead his family.

546.    The facts of the offense with which Mr. Abdullah was charged likewise do not place him among the worst of the worst.  He was convicted of killing a single, adult victim, not of murdering multiple people or children.  There was no allegation that he committed any sexual offenses as part of the crime of conviction.  Prior to this case, he had never been charged with, or convicted of committing, any other felonies, or any other acts of violence.  He had a good record in jail and presented no risk whatsoever of committing murder while incarcerated.  Simply put, Mr. Abdullah's case cannot plausibly be considered one of the more egregious first-degree murders.  Many murder cases with far more reprehensible facts have led to sentences less than death.

547.     Finally, there remains doubt about Mr. Abdullah's culpability, as demonstrated most prominently by the fact that the State accused him of committing murder through the administration of Prozac even though its own timeline shows that he was not present when the victim ingested that Prozac (*see* Claim 1(a)(v)).  Executing Mr. Abdullah would therefore pose a great risk of killing an innocent man.

548.     Considering the potency of Mr. Abdullah's mitigating evidence, the relative lack of aggravation in his case, and the serious holes in the State's theory of his guilt, he is not among the worst of the worst, and it was therefore unconstitutional to sentence him to death.

### CLAIM 35: DEATH QUALIFICATION OF THE JURY WAS PER SE UNCONSTITUTIONAL

549.     The jury selection process made the jury far more likely to sentence Mr. Abdullah to death, regardless of the facts presented at trial.  In that respect, the death qualification process as a whole violated Mr. Abdullah's right to a fair and impartial jury under the Sixth Amendment, his right to a reliable and non-arbitrary death sentence where jurors are guided by objective standards under the Eighth Amendment, and his right to due process under the Fourteenth Amendment.  *See Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

550.     *Supporting Facts*: A capital jury drawn under the standards set forth by the United States Supreme Court's caselaw is a jury predisposed to vote for death under any circumstances.  The process of death qualifying a jury requires jurors to be able to consider all sentencing options including a death sentence.  This thereby eliminates jurors based on their moral views and results in a jury that does not adequately reflect the community at large, and a jury that is more inclined

to find a defendant guilty. Numerous research studies, including those done by the Capital Jury Project demonstrate that "death qualification" results in a jury that excludes numerous people. Members of minority groups, women, Catholics, and other subgroups are more likely to oppose the death penalty than the population at large. As a result, fewer people belonging to these groups serve on a capital jury than on a typical jury. The process of jury selection itself, which focuses heavily on potential punishment prior to the jurors hearing a single piece of evidence, also results in jurors who are more likely to convict as the extended questioning about punishment and death penalty standards implies that there will be a sentencing phase, all but presuming guilt. The jury selection process itself, based on current Supreme Court guidance, results in a jury that is more likely to convict and sentence to death than a jury that has not undergone death qualification. Mr. Abdullah's jury was selected under those standards.

551.    Complicating this already problematic system, Judge Copsey insisted on conducting the death qualification process herself, did so in a very perfunctory and inadequate manner, and would chastise defense counsel when they tried to ask additional questions to either demonstrate that a juror was so pro-death that they should be struck for cause, or when they attempted to rehabilitate jurors who expressed concerns about the death penalty. Notably, no such admonishment was ever given to the prosecution.

### CLAIM 36: THE TRIAL COURT IMPROPERLY EXCUSED JURORS WHO HAD RESERVATIONS ABOUT THE DEATH PENALTY

552.    The trial court unconstitutionally deprived Mr. Abdullah of a fair and impartial trial under the Sixth and Fourteenth Amendments, and violated his right to be free from cruel and unusual punishment under the Eighth Amendment, by excluding jurors who indicated reservations about the death penalty. *See Wainwright v. Witt*, 469 U.S. 412 (1985); *Witherspoon v. Illinois*, 391 U.S. 510 (1968). Because the trial court improperly excused jurors who had conscientious

scruples about the death penalty, Mr. Abdullah's Sixth Amendment right to an impartial jury was violated and he was ultimately sentenced by a "tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 521. The judge had an independent duty to ensure that such jurors were not improperly excused, regardless of what actions were taken or not taken by defense counsel. A structural error occurs when a trial court excuses a juror who, despite expressing criticism of the death penalty, is willing to set their views aside and consider a death sentence. *See Gray v. Mississippi*, 481 U.S. 648 (1987). *Witherspoon* error requires automatic reversal, and, therefore, Mr. Abdullah need not make a showing of prejudice. *See id.*

553.     *Supporting Facts*:  The trial court excused several jurors who expressed reservations about the death penalty even after assurances from the jurors that they could set these reservations aside and follow the court's instructions.

554.     With some of these excusals, the trial court improperly found that the juror could not follow the court's instructions despite the juror's assurances. For example, Juror 23 told the trial judge she had mixed feelings about the death penalty, but that she could give a death sentence depending on the circumstances and severity of the crime. During the prosecution's questioning, Juror 23 began to express uncertainty about whether she was up to the task of participating in a capital trial. When asked if she would be able to follow the law as instructed, however, Juror 23 maintained that she "could follow it" even while expressing uncertainty about the death penalty. The trial judge excused Juror 23 over the defense's objection, thus excluding a thoughtful juror who approached deciding life or death with appropriate caution and had willingness, however reluctant, to serve on the jury.

555.     In another example, Juror 105 was willing to consider the death penalty if there was aggravation but would not commit to imposing it. This prospective juror assured the court that if

she found the aggravators to outweigh the mitigators she would be able to impose the death sentence; she also affirmed she would "absolutely" be able to follow the judge's instructions. Even when asked if she would be willing to sign the death sentence, Juror 105 responded that she was willing to do so if there was a unanimous decision. While it is true that, with the prosecution's probing, Juror 105 expressed reservations and at one point said she could not impose the death sentence, she still maintained, as the judge noted, that she would be willing to impose the sentence if the facts justified it. Even though Juror 105's death penalty views mirrored statutory aggravator requirements, Judge Copsey dismissed her for cause. Here, the judge commented that being able to consider the penalty was not enough, and, instead, a juror must commit to imposing the penalty when it is required by law. The judge then gave the following description of law: If the aggravators "outweigh the mitigating circumstances, then you need to – then the law would instruct you to impose the death sentence." Mandatory death sentences, as Judge Copsey should well know, are unconstitutional, *see Woodson v. North Carolina*, 428 U.S. 280 (1976), and requiring a juror to commit to giving a mandatory death sentence is not the proper standard for dismissal, especially when the juror promises to set her views aside and impose the death penalty when there are aggravating circumstances.

556. In addition to Jurors 23 and 105, the trial court improperly struck for cause seven other veniremembers who expressed reluctance but were willing to consider the death penalty. These potential jurors were either struck without objection by defense counsel or under the pretext of economic hardship. *See* Claim 1(B)(vii). The trial court improperly allowed defense counsel to stipulate to striking the following death-opposed veniremembers: Juror 30 was struck even though he committed to considering the death penalty despite his opposition to it in the past; Juror 39 did not unalterably oppose the death sentence, but was struck after saying he was

unwilling to be the foreman of the jury and sign a death sentence; Juror 48 assured the trial court

she could impose the sentence even though for the most part she believed life in prison was

sufficient; and Juror 62 told the court he could consider the death penalty for egregious cases

involving children, but did not want the foreman's responsibility of signing the sentence. For

three other members opposed but willing to consider the sentence—Jurors 49, 51, and 55—the

trial judge cited the pretext of hardship in striking them. For example, Judge Copsey altered her

usual set of opening statements with Juror 49, and emphasized how long the trial would take.

With Juror 51, a nurse who said working outside trial hours was a possibility and whose children

were in college, the judge found a hardship excuse based on the fact that the juror would miss

some work. As the judge pointed out while denying many other jurors' hardship excuses,

"almost everybody comes in and they have some job-related issues." The judge would

occasionally be strict about not excusing other veniremembers for hardship—Juror 85, for

example, ran his own business and his and his son's livelihoods depended on him running the

business, but the judge refused a hardship excusal. On another occasion, she excused for

hardship when the real problem was the juror's dishonesty. Juror 89 stated he could make up any

hours he missed due to jury service but, after the prosecution alleged Juror 89 had

misrepresented his criminal background, the judge dismissed him for hardship. Overall, there

was a troubling pattern that when one expressed any conscientious scruples about the death

penalty, the strict requirements for hardship excuses that the judge otherwise would enforce gave

way to a lenient standard to excuse death-opposed jurors.

557.    There were also seven members of the jury pool—Jurors 12, 15, 64, 75, 82, 117, and

154—who did not participate in voir dire at all. Instead these seven were struck after an email

stipulation from defense counsel, *see* Claim 1(B)(iv). By allowing the stipulation, Judge Copsey

made the unwise and improper decision to strike jurors based only on responses to what many jurors believed was a confusing questionnaire. The decision here was particularly unwise because in an earlier hearing, Judge Copsey had noted the serious need for face-to-face life and death qualification. But instead of requiring counsel to question these veniremembers, the trial court let perceived efficiency trump Mr. Abdullah's right to an impartial jury. Effectively, the trial court bypassed any *Witherspoon* analysis and allowed for automatic disqualification from jury service.

558.    By striking these veniremembers and encouraging and allowing the email stipulation, Judge Copsey violated Mr. Abdullah's Sixth Amendment right to an impartial jury and unconstitutionally organized a collection of death-prone jurors guaranteed to return a death sentence. As discussed in Claim 38, not only did she prevent jurors critical of the death penalty from serving, Judge Copsey also refused to excuse those who would automatically give a death sentence for murder and would not consider mitigation. Consequently, the jury that sentenced Mr. Abdullah was unconstitutionally made up of members predisposed to both finding guilt and giving death.

### CLAIM 37: THE TRIAL COURT FAILED TO ALLOW OR CONDUCT ADEQUATE VOIR DIRE OF DEATH-PRONE JURORS

559.    The trial court violated Mr. Abdullah's Sixth, Eighth, and Fourteenth Amendment rights when it did not allow adequate voir dire of jurors who believed death was the only appropriate sentence for murder. *See Morgan v. Illinois*, 504 U.S. 719 (1992). The failure to allow defense counsel to ask questions that would actually identify unqualified jurors rendered Mr. Abdullah's trial fundamentally unfair, *see Mu'Min v. Virginia*, 500 U.S. 415 (1991), by infecting the jury venire with members who believed the death penalty was the only appropriate punishment for murder and who would not consider mitigating circumstances. Moreover, a judge has a

responsibility to remove prospective jurors who are biased, regardless of who the attorneys object to or not. *See Morgan v. Illinois*, 504 U.S. 719 (1992). If Judge Copsey was not going to permit the necessary questioning from defense counsel, she should have asked the questions herself. Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

560.    *Supporting Facts*: Prior to voir dire, Judge Copsey issued an order in which she directed that she, and she alone, would be asking the death-qualification questions. That ruling was highly problematic standing alone, in light of Judge Copsey's extreme bias against Mr. Abdullah. *See* Claim 6. It was even more problematic considering how incomprehensible her death-qualification questions were. Here is an example: "Are you of the opinion that death is the only appropriate penalty for murder in the first degree and that opinion is so strong that you could not consider not imposing a death sentence as a penalty under any circumstances?" With that single, convoluted sentence, Judge Copsey managed to create a conjunctive question (that consequently could never be answered unambiguously) with a double negative (that was therefore inevitably going to confuse jurors) and so much unnecessary verbiage and legalese that no lay person could possibly know what she was talking about. Such questions do nothing to meaningfully sift between partial and impartial jurors, and therefore do nothing to effectuate a defendant's right to a panel that will fairly consider life.

561.    As was clear from the juror questionnaires, most veniremembers did not understand that murder must include a premeditation element. When jurors stated that they would consider the circumstances before imposing the death penalty, many of them meant they would not impose the death penalty if the "murder" were committed in self-defense or without premeditation. For

example: Juror 1 stated that if the crime was "premeditated and well thought" that they would vote for the death penalty; Juror 8 gave a similar answer noting that if the murder was "predesigned" then the death penalty is appropriate; Juror 28 says that the death penalty is appropriate where there is "destruction of another human being with forethought"; and Jurors 81 and 83 who both provided answers indicating that they believed that mitigation went to degree of murder. All of these jurors were seated in Mr. Abdullah's trial. Given such misunderstandings, counsel must be allowed to explain this during voir dire in order to assess whether a juror will automatically give a death sentence for first degree murder. The trial court improperly curtailed questioning that would have actually elicited informed responses about the jurors' death penalty views.

562.    Initially, defense counsel attempted to educate jurors by proposing that the judge ask individual jurors a hypothetical question involving the definition of murder. The judge rejected this hypothetical but said she "anticipated" explaining the definition of first degree murder to each individual juror during voir dire, including that murder requires the element of premeditation and lack of self-defense. Both the prosecution and defense agreed it would be best if the judge defined murder for each juror. In practice, however, the judge neither gave any explanation of the elements of murder nor did she allow counsel to present a definition that would lead to informed responses from the jurors.

563.    As a result of the judge's decisions, defense counsel did not adequately voir dire the seated jurors whose questionnaire responses suggested they would automatically impose a death sentence. This, combined with defense counsel's ineffective voir dire, *see* Claim 1(B)(vi), led to the seating of numerous problematic jurors. Juror 1 believed in "an eye for an eye" and suggested the death penalty was appropriate when the defendant was not provoked or lacked

intent. Juror 2's questionnaire responses suggested he would impose the death penalty if there were no doubt of guilt and the defendant neither acted in self-defense nor suffered diminished capacity. Juror 8 would impose the death penalty where the murder was "predesigned". Juror 28 said the best argument for the death penalty was first degree murder and the best argument against was that the defendant was innocent of murder, they also noted that the death penalty is appropriate where the murder is done with "forethought". Juror 36 when asked if death was the only appropriate penalty for murder, only said "not necessarily." This juror also seemed to have prejudged the case when she said she would give a death sentence but would also want to pray with the defendant at his execution. This juror was also non-committal on her ability to consider mitigation using phrases such as "I think so" and "probably" when asked if she could consider mitigation. Juror 44 noted the best argument for the death penalty was "an eye for an eye," and the best argument against it was if the defendant was innocent. Juror 83 believed the best argument for the death penalty was a "life for a life," and the best argument against was if the defendant was innocent and also believed that mitigation went to the degree of murder instead of being information to consider only after a finding of first-degree murder. Juror 92 stated that if there was no reasonable doubt that the defendant was guilty of murder then she would impose the death penalty. Without adequate voir dire it is unclear how many of these jurors would, and did in fact, automatically give Mr. Abdullah a death sentence.

564. The trial court improperly denied defense strikes for cause forcing the defense to use preemptory strikes to remove biased jurors. For instance, Juror 56 noted that "crimes against women are a huge thing to me. It just sets my teeth on edge". She also noted that she had started forming a slight opinion about the case when the charges were read, and alarmingly noted that "if the proof is beyond a reasonable doubt and someone did die, then they need to die too".

When the defense sought to remove this juror for cause Judge Copsey yelled at counsel (a recurring theme) claiming they were not asking questions properly and just getting personal opinions. It is entirely unclear how one's opinion that someone who commits first degree murder must die, and who also has a bias when crimes involve women was deemed an appropriate potential juror in this case.

565. The trial court also blocked questions about whether a juror would consider mitigation before imposing a death sentence. For example, after Juror 77 mentioned that he would not consider absence of a criminal record prior to giving a death sentence, the judge interrupted defense counsel's questioning and stated her belief that the juror would follow instructions. The judge also interrupted defense counsel's questioning of Juror 85 on mitigation. When asked why he supported the death penalty, Juror 85 responded, "Because if they take someone's life, I think they should die." When Juror 85 began to indicate he would not consider mitigation the judge stopped defense voir dire again to express her belief that the juror would follow her instructions. *See also* Claim 1(B)(vi).

566. Without adequate voir dire, it is impossible to tell if these jurors could actually follow instructions to consider mitigation or if they were inclined to give the death penalty automatically once there was a murder conviction. It is clear, however, that, given the number of problematic jurors, Mr. Abdullah did not receive a fair trial. Consequently, Mr. Abdullah's right to an impartial jury was violated and his trial was rendered fundamentally unfair.

### CLAIM 38: THE TRIAL COURT EMPANELED BIASED JURORS

567. Mr. Abdullah's right to an impartial jury under the Sixth and Fourteenth Amendments, and his right to be free from cruel and unusual punishment under the Eighth Amendment, was violated when the trial judge empaneled several biased jurors. *See Remmer v. United States*, 347 U.S. 227 (1954); *Chandler v. Florida*, 449 U.S. 560 (1981) The jurors in Mr. Abdullah's trial

suffered from both actual and implied bias.  A judge has a responsibility to remove prospective jurors who are biased, regardless of whether the attorneys object or not.  *See Morgan v. Illinois*, 504 U.S. 719 (1992).  This error is structural, and therefore no prejudice need be shown.  *See United States v. Martinez-Salazar*, 528 U.S. 304 (2000); *Ross v. Oklahoma*, 487 U.S. 81 (1988); *Morgan v. Illinois*, 504 U.S. 719 (1992); *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998).

568.     *Supporting Facts*: The majority of jurors in Mr. Abdullah's case were biased in several ways, including through their connections with law enforcement, trial witnesses, and members of Ms. Abdullah's family.  Some of the jurors even had their own potential stake in the outcome of the trial through social and business relationships with witnesses and through their own career hopes to join law enforcement.  Almost all of the jurors had also been exposed to prejudicial news coverage, *see* Claim 5, both by the news coverage just after the fire and death of Ms. Abdullah and the coverage taking place during the pretrial proceedings.  Finally, the questionnaire and voir dire responses revealed several of the jurors would automatically give a death sentence for murder and would not consider mitigating evidence.

569.     *Personally and professionally biased Jurors 59 and 103*: Juror 59 was in the process of testing for a position as a police officer and had interned with the Moscow Police Department.  He also noted that he would believe testimony from law enforcement more than other witnesses.  When questioned about his partiality towards law enforcement testimony by defense counsel, Juror 59 said he thought he might be able to set his partiality aside if the judge so instructed.  Judge Copsey's jury instructions contained absolutely no instruction to this effect.

570.     Juror 103 is another example of a juror that should have been excused due to bias.  During voir dire, Juror 103 admitted to having a fifteen-year social and business relationship with Ms. Abdullah's cousin Leslie Beck and her husband Gary Beck.  Both of the Becks testified

during the trial for the prosecution. None of the parties engaged in any concrete inquiry into how having a social and business relationship with Ms. Abdullah's family members might affect Juror 103's ability to be impartial.

571.    *Jurors biased by media exposure*: Additionally, almost all the jurors had been exposed to the case through media portrayals. Examples include Juror 28 noting that it would have been hard to miss all the coverage, Juror 45 admitting he had heard about the case and that it was "awful," and Juror 100 remembering that she had discussed the "cruelty" of the defendant with her coworkers. Juror 100's memory was so strong that she recalled speculating about what the children had seen and knew of Ms. Abdullah's death, and recalled that "it looked like it was Mr. Abdullah" who committed the crime. This exposure likely continued through trial as well. *See* Claim 1(A)(xxiii).

572.    *Automatic-death-for-murder and mitigation-impaired jurors*. Several jurors were seated on the jury who would automatically give a death sentence for murder or were severely mitigation impaired, including Jurors 8, 28, 59, 83, and 98 and alternate Jurors 1 and 2. *See* Claim 1(B)(vi). Several of the seated jurors also reported in their questionnaires that they did not believe a murderer's childhood should matter (Jurors 36, 44, 83, 92, 98, 100) and two alternate jurors stated that life without parole was not a sufficient punishment. As noted in Claim 1(B)(vi), these responses signal severe mitigation impairment in refusing to consider a defendant's childhood and a view that all murderers should be executed. Jurors with such views constituted a biased jury and should have been excused for cause.

573.    On the whole, Mr. Abdullah was sentenced to death by a jury that had been exposed to prejudicial media coverage, including two jurors with personal interests in the outcome of the trial, and several who would not consider mitigation and would automatically impose a death

sentence for murder. A jury with this collective background could not have offered Mr.

Abdullah an impartial and fair trial.

### CLAIM 39: STRIKING PROSPECTIVE JURORS ON THE BASIS OF THEIR RACE, SKIN COLOR, GENDER, AND RELIGION VIOLATED THE UNITED STATES CONSTITUTION

574. Mr. Abdullah's conviction, confinement, and sentence are illegal and unconstitutional under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments because of the systematic exclusion of veniremembers on the basis of race, skin color, gender, and religion violated the Equal Protection Clause's prohibition on striking jurors on the basis of their race, gender, and religion. *See Batson v. Kentucky*, 476 U.S. 79 (1986). This error is structural, and therefore no prejudice need be shown. *See Powers v. Ohio*, 499 U.S. 400 (1991).

575. *Supporting Facts*: Mr. Abdullah has been prevented from fully investigating potential misconduct relating to the jury, and has no way of ascertaining the race, skin color, and religion of the veniremembers. Individuals who attended the trial describe a jury of all white members. However, without the ability to investigate, Mr. Abdullah is not able at present to determine whether he has a viable *Batson* claim. In fact, Judge Copsey issued Orders in 2007 and again in 2016 prohibiting Mr. Abdullah's former attorneys from contacting jurors making an investigation of this issue impossible. For the sake of preservation, Mr. Abdullah asserts that the prosecution intentionally struck jurors on the basis of race, skin color, gender, and religion.

### CLAIM 40: THE JURY ENGAGED IN MISCONDUCT

576. Jurors engaged in misconduct at Mr. Abdullah's trial, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. *See Smith v. Phillips*, 455 U.S. 209 (1982); *Irvin v. Dowd*, 366 U.S. 717 (1961); *Parker v. Gladden*, 385 U.S. 363 (1966).

577. *Supporting Facts*: Mr. Abdullah has been prevented from fully investigating potential misconduct relating to the jury. Therefore, he is not able at present to identify the full extent of

potentially viable juror-misconduct claims. As such, for the sake of preservation, Mr. Abdullah

asserts that jurors engaged in misconduct, including but not limited to lying at voir dire, hiding

criminal histories, suffering from actual and implied conflicts, and considering inappropriate,

extraneous material during trial and deliberations, such as religious material and media coverage

of the case, as well as considering and discussing ethnic and religious biases while deliberating

during both phases of trial

578.    The limited investigation that Mr. Abdullah has been able to undertake confirms the

existence of jury misconduct. For example, on her juror questionnaire, Juror 36 indicated that she

did not "have any feelings about [Mr. Abdullah's] ancestry." However, the same juror espoused

strong anti-Muslim and anti-Immigrant views on social media, including a post which reads

"DID YOU KNOW THE QURAN SAYS TO KILL EVERYONE WHO IS NOT A MUSLIM?"

### CLAIM 41: MR. ABDULLAH IS INNOCENT OF MURDER

579.    Mr. Abdullah is innocent of murder, and the execution of an innocent man violates the

Eighth and Fourteenth Amendments. *See Herrera v. Collins*, 506 U.S. 390 (1993).  Insofar as

Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and

injurious effect or influence in determining the jury's verdict of guilt and sentence of death.  *See*

*Brecht v. Abrahamson*, 507 U.S. 619 (1993).

580.    *Supporting Facts*: As recited in Claim 1(A)(v), the State's evidence indicated that Ms.

Abdullah died in part from the ingestion of a fatal amount of Prozac, and she ingested that

Prozac at a time when the State's own account places Mr. Abdullah hundreds of miles from the

scene.  At the time of her death, Ms. Abdullah had a full stomach of a partially digested meal of

carrots, potatoes, and other vegetables.  However, there was very little Fluoxetine in her

stomach.  According to the State's forensic toxicologists, Drs. Edward Barbieri and Dr. Ronald

Backer, the Fluoxetine was administered prior to Ms. Abdullah's last meal, and the last meal

occurred approximately an hour and a half before her death. The State took the position that the administration of the Fluoxetine occurred during a narrow window, sometime between 10 PM and midnight. Additionally, by the State's theory of the case, Mr. Abdullah left Salt Lake City for Boise shortly after 8:10 PM on October 4, 2002; was accurately identified by Marjorie Wood in Mountain Home on his way to Boise sometime after midnight; and arrived in Boise sometime around 1:30 AM. Thus, taking the State's theory as true, it was impossible for Mr. Abdullah to have administered the Prozac between 10 PM and midnight because Mr. Abdullah had not yet even reached Mountain Home.

581. Furthermore, as recited in Claim 1(A)(vi), a credible, compelling witness saw Mr. Abdullah at a time and place that disqualified him from being present at the time of the fire. Lance Donnelson, an eyewitness with law enforcement training on identifications, recalled with a high degree of confidence that Mr. Abdullah was present at a store in Utah at a time and place that would have rendered it impossible for him to have committed the alleged crimes. Specifically, Mr. Donnelson was 90% certain that he observed Mr. Abdullah enter a Maverik Country Store in Farr West, Utah between 2:30 and 3:30 AM on October 5, 2002.

582. Finally, from the accounts of neighbors, there is extensive evidence that another person was responsible for the crimes. *See* Claim 1(A)(vii). Several members of the neighborhood told police that they had seen strange men in the neighborhood at and around the time of the fire. For instance, Laura Sanchez, a neighbor of the Abdullah's, saw a man outside her home around 2:00 AM on the night of the fire. Ms. Sanchez testified that the man was not Mr. Abdullah. The defense team made no attempt to interview Ms. Sanchez, even though she was obviously a key witness who could have helped support a theory that another man was the real perpetrator. Defense counsel also made no reference to Ms. Sanchez in their closing argument or opening

statement, thereby forfeiting any opportunity to argue to the jury that there was evidence another person was the culprit. Ms. Sanchez's husband, Mike, also told police he saw a man standing under the street light watching the fire before the man walked off. Mike Sanchez described the man as having short or shaved hair, a goatee, a ball cap, wearing a flannel shirt and baggy pants, and being short and stocky. Mike Sanchez would later tell defense investigators who took the time to speak with him that the man he saw was not Mr. Abdullah. Mr. Sanchez worked at the same company as Mr. Abdullah and was certain the man he saw standing outside, staring at the fire in the early morning of October 5, 2002, was not Mr. Abdullah. These facts, as well as those laid out elsewhere in the instant petition, establish that Mr. Abdullah is actually innocent of murder.

### CLAIM 42: THE AGGRAVATING CIRCUMSTANCES ARE UNCONSITUTIONALLY VAGUE AND THERE WAS INSUFFICIENT EVIDENCE TO PRESENTED TO SUPPORT THEM

583. The four statutory aggravating factors alleged and presented by the State are unconstitutionally vague. To the extent that the aggravators are not vague, the State failed to present sufficient evidence in support of them. This violated the Eighth and Fourteenth Amendments. *See Lewis v. Jeffers*, 497 U.S. 764 (1990); *Jackson v. Virginia*, 443 U.S. 307 (1979). Given the evidentiary deficiencies, no rational trier of fact could have found Mr. Abdullah guilty of the aggravators beyond a reasonable doubt. Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

584. *Great Risk of Death Aggravator*: The State made Mr. Abdullah eligible for a death sentence by charging him with the aggravator that he knowingly created a great risk of death to many persons. The term "great risk" is undefined and subject to many interpretations. Similarly,

the term "many persons" could implicate six people, or a thousand. The aggravator can be construed as requiring knowledge of the commission of an act, but not its consequences; or it can be construed as requiring knowledge that the commission of an act will likely create great risk of death to many persons. Neither does the aggravator clearly define or appropriately limit the act to which a "great risk" of death applies – that is, the murder itself (if any) that occurred before the fire was started, as opposed to the fire that began after Ms. Abdullah was dead. Even if not vague for judge-sentencing purposes, the aggravator is vague now that jury sentencing is compelled, as jurors have very little basis to compare one case to another and ascertain when there is a great risk of death to many persons.

585. *Heinous, Atrocious, or Cruel*: Here, the court, without necessary limiting instructions or the ability to carry out a comparative analysis with other murder cases in Idaho, instructed the jury to determine whether the crime in this case was "heinous, atrocious, and cruel" such that it warranted a death sentence rather one of life imprisonment. The jury had no ability to conduct such an analysis. This aggravator is vague and unconstitutional under the Eighth Amendment. Furthermore, the State presented no evidence by which the jury could compare this case with others to determine whether it could meet such a standard.

586. *Utter disregard*: The aggravator lacks objective standards, and creates a scheme where a jury utilizes a completely subjective standard to determine whether a defendant might be subject to a death sentence.

587. *Propensity to Commit Murder*: This aggravator is vague and misleading because it requires a finding that the defendant: 1) exhibits a propensity to commit murder based on conduct exhibited, before, during or after the murder at hand; and 2) that the defendant's propensity to commit murder will "probably constitute a threat to society." The scheme causes

confusion as to what standard the jury should apply. While the jury is compelled to find an aggravator "beyond a reasonable doubt" the second element of this aggravator confusingly appears to lower the standard to "propensity" by instructing the jury to determine whether the defendant "probably" constitutes an ongoing threat. This aggravator too, is vague and misleading.

### CLAIM 43: THERE WAS INSUFFICIENT EVIDENCE TO FIND THE GREAT RISK OF DEATH AGGRAVATOR

588. The state failed to present sufficient evidence in support of the great risk of death aggravator. This violated the Eighth and Fourteenth Amendments of the constitution. *See Lewis v. Jeffers*, 497 U.S. 764 (1990); *Jackson v. Virginia*, 443 U.S. 307 (1979). Given the evidentiary deficiencies, no rational trier of fact could have found Mr. Abdullah guilty of this aggravator beyond a reasonable doubt. Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's verdict of guilt and sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

589. The State pursued a death penalty against Mr. Abdullah partly on the basis of the great risk of death aggravator. That aggravator requires that the defendant knowingly create a great risk of death to many persons.

590. First, the aggravator is inappropriate here because it is unrelated to the death of the decedent. The fire occurred at some point after Ms. Abdullah had died, and did not cause the death of Ms. Abdullah. For the great risk aggravator to be relevant and appropriate to Mr. Abdullah's sentencing, the State would needed to have proven beyond a reasonable doubt that the act of killing Ms. Abdullah created a great risk of death to others. In argument, the prosecution inappropriately confabulated the cause of death with the arson for the purposes of proving the aggravator despite its own evidence at trial demonstrating that the fire played no role

in Ms. Abdullah's death. Because the great risk of death had no relationship to the cause of death, it was inappropriately applied to Mr. Abdullah in violation of his constitutional rights. Counsel was ineffective for failing to object to this erroneous and inappropriate use of the aggravator and Mr. Abdullah was prejudiced as a result.

591. Furthermore, assuming arguendo that the aggravator was appropriately presented to the jury, the State's evidence was insufficient for the jury to have found beyond a reasonable doubt that Mr. Abdullah set the fire. *See* Claim 29. Those facts demonstrate for the same reason that no rational trier of fact could have found beyond a reasonable doubt that Mr. Abdullah was guilty of the great-risk aggravator.

592. Additionally, because only three people were present in the Siesta residence when the fire began, there were not "many persons" facing a great risk of death. Per the court's instructions to the jury "more than four people" must be at risk for the aggravator to be considered.

593. Even accepting that the fire endangered more than three people, the fact remains that it did not endanger "many persons." One child was found on the yard outside the Siesta residence. If that child was included in the list of those at great risk of death, there were only four such people, and Mr. Abdullah was innocent of the aggravator under the jury instruction.

594. Three neighbors approached the house during the fire, and one of them entered it to rescue a child. However, those individuals are too far removed from the danger caused by the act of setting the fire for them to count as people subjected to a great risk of death. Accordingly, no reasonable juror could have found beyond a reasonable doubt that Mr. Abdullah was guilty of exposing more than four people to a great risk of death, and thus no reasonable juror could have found him guilty of the aggravator.

# CLAIM 44: MR. ABDULLAH'S RIGHT TO ALLOCUTE WAS VIOLATED

595.    The trial court imposed unreasonable restrictions on the scope of Mr. Abdullah's

allocution at the penalty phase, in violation of his right to allocute under the Due Process Clause

of the Fourteenth Amendment and his right to present mitigating evidence under the Eighth and

Fourteenth Amendments.  *See Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438

U.S. 586 (1978); *United States v. Behrens*, 375 U.S. 162 (1963); *Green v. United States*, 365

U.S. 301 (1961); *Schwab v. Berggren*, 143 U.S. 442 (1892); *Ball v. United States*, 140 U.S. 118

(1891); *Boardman v. Estelle*, 957 F.2d 1523 (9th Cir. 1992).  This error is structural because it

undermines the fairness of the judicial proceeding.  As such, no prejudice need be shown.

Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a

substantial and injurious effect or influence in determining the jury's verdict of guilt and

sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

596.    *Supporting Facts*: At the conclusion of the State's presentation of victim impact evidence

in the penalty phase, the trial court confirmed that Mr. Abdullah intended to exercise his right to

allocute and then advised him that anything he said in allocution could be used against him.  The

court further advised Mr. Abdullah that allocution "should be confined to those matters which

have to do with the mitigation of the punishment," and that allocution could not effectively

constitute testimony.  Thereafter, Judge Copsey required that Mr. Abdullah's allocution

statement be made in writing so that counsel could review it beforehand.  She explicitly

prohibited him from discussing anything related to the guilt phase or offering "statements of

fact" in his allocution.  Mr. Abdullah presented a list to the court of areas he wanted to address in

his allocution statement, as well as photographs he wanted introduced during allocution.  After

reviewing Mr. Abdullah's written statement, the court told him he could not touch upon any of

the following at allocution: (1) anything about the family's plan to move overseas, to the extent it

was related to testimony in the guilt phase; (2) Ms. Abdullah's wishes that her family would accept her as she was, i.e., Muslim; (3) Mr. Abdullah's state of mind regarding divorce, adultery, and the rights of men and women, to the extent he was suggesting that evidence received in the guilt phase on these topics was wrong; (4) things he wished could have happened in trial; (5) his religious teachings in prison, who attended the classes, and the purpose of the teachings to the extent that it constituted an attack on Mr. Bankhead or involved Mr. Bankhead's testimony; and (6) anything else constituting argument regarding the guilt phase. After the court advised Mr. Abdullah of the restrictions it was placing on his right to allocute, defense counsel asked for a brief recess to talk to Mr. Abdullah, who later returned to the courtroom and announced that he would not allocute. He explained his frustration with the constraints placed on allocution by the court as his reason for declining.

### CLAIM 45: MR. ABDULLAH'S RIGHT TO PRESENT LINGERING DOUBT EVIDENCE AT SENTENCING WAS VIOLATED

597. Mr. Abdullah was deprived of his right to present evidence of his innocence at sentencing, in violation of his Eighth and Fourteenth Amendment rights. *See Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978); *see also Sawyer v. Whitley*, 505 U.S. 333 (1992); *Penry v. Lynaugh*, 492 U.S. 302 (1989). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

598. *Supporting Facts*: Judge Copsey ruled that Mr. Abdullah was prohibited from arguing to the jury at sentencing that it should vote for life due to lingering doubt about his guilt. Given the serious problems with the State's theory, that evidence would have given the jury a powerful reason to spare Mr. Abdullah's life.

**CLAIM 46: THE INTRODUCTION OF VICTIM IMPACT EVIDENCE WITHOUT INSTRUCTIONS WAS UNCONSTITUTIONAL**

599.    The introduction of victim impact evidence in the absence of any instruction to the jury on how it was to consider the evidence violated Mr. Abdullah's rights under the Sixth, Eighth, and Fourteenth Amendments. *See Bosse v. Oklahoma*, 137 S. Ct. 1 (2016) (per curiam); *South Carolina v. Gathers*, 490 U.S. 805 (1989); *Booth v. Maryland*, 482 U.S. 496 (1987); *see also Lowenfield v. Phelps*, 484 U.S. 231 (1988); *Sawyer v. Whitley*, 505 U.S. 333 (1992); *Gregg v. Georgia*, 428 U.S. 153 (1976).

600.    *Supporting Facts*: Several relatives of Ms. Abdullah offered victim impact statements at the sentencing phase. These statements were poignant reflections on the tragedy of Ms. Abdullah's death and the devastation it wrought on her family. As such, the statements were likely to motivate the jury to impose a death sentence on Mr. Abdullah, who they had just found guilty.

601.    The jury was given no instruction offering it any guidance on how it was to consider the victim impact evidence. As a result, the jury likely regarded the evidence as non-statutory aggravation. The consideration of non-statutory aggravation undermines any narrowing accomplished by the aggravators enacted by the Idaho legislature.

602.    By statute, there is a specific statutory process in Idaho by which capital juries determine whether the death penalty should be imposed. That process does not provide for the consideration of victim impact evidence. Therefore, when the jury did consider this evidence in its penalty-phase determination, Mr. Abdullah was not treated in accordance with state law.

**CLAIM 47: THE BURDEN OF PROOF ON MITIGATION WAS UNCONSTITUTIONALLY SHIFTED TO MR. ABDULLAH**

603.    Idaho law imposes on a capital defendant the burden of proving, by an unknown quantum of evidence, the existence of mitigating circumstances sufficient to preclude a death penalty.

That deprives the defendant of adequate notice of the allocation of duties at the capital sentencing hearing and lessens the State's burden to prove that death is a just punishment, in violation of the Eighth and Fourteenth Amendments. *See Lankford v. Idaho*, 500 U.S. 110 (1991); *Gardner v. Florida*, 430 U.S. 349 (1977); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Mullaney v. Wilbur*, 421 U.S. 684 (1975); *Mills v. Maryland*, 486 U.S. 367 (1988); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

604.    *Supporting Facts*: Mr. Abdullah's jury was instructed that once an aggravating circumstance was found he had to be sentenced to death unless the defendant produced sufficient mitigation to outweigh the aggravation.

### CLAIM 48: THE TRIAL COURT UNCONSTITUTIONALLY REFUSED TO INSTRUCT JURORS ON THE TYPES OF MITIGATION THEY COULD CONSIDER

605.    The trial court refused to instruct the sentencing jurors on the types of mitigation available for consideration, in violation of the Eighth and Fourteenth Amendments. *See Penry v. Johnson*, 532 U.S. 782 (2001); *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Eddings v. Oklahoma*, 455 U.S. 104 (1984).

606.    *Supporting Facts*: Defense counsel requested and the trial court refused to instruct the jury on the types of mitigating evidence available for consideration. The court's refusal was particularly problematic and prejudicial because defense counsel's wholly inadequate presentation of mitigation left the jury with no instruction on mitigation that was specific to Mr. Abdullah's circumstances. *See* Claim 1(B)(i). When combined with defense counsel's lack of thorough investigation and presentation of mitigating evidence, the trial judge's ruling made it

questionable whether the jury did in fact consider mitigating evidence. Thus, without a proper instruction, Mr. Abdullah's resulting death sentence is unconstitutionally unreliable.

**CLAIM 49: THE JURY WAS UNCONSTITUTIONALLY NOT REQUIRED TO FIND BEYOND A REASONABLE DOUBT THAT THE AGGRAVATION OUTWEIGHED THE MITIGATION**

607. The jury was not required to find beyond a reasonable doubt that the aggravation outweighed the mitigation, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

608. Under the Fifth, Sixth, and Fourteenth Amendments, any fact that exposes a defendant to a harsher sentence must be found by a jury beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Jones v. United States*, 526 U.S. 227 (1999). That includes any fact that elevates a life sentence to a death sentence. *See Ring v. Arizona*, 536 U.S. 584 (2002). Pursuant to the capital statute under which Mr. Abdullah was punished, an Idaho defendant cannot be given a death sentence until the jury determines that the aggravation outweighs the mitigation. *See* Idaho Code § 19-2515(3). Therefore, the jury's weighing determination increases the severity of the potential sentence, and it must be found beyond a reasonable doubt. *See v. Hurst Florida*, 136 S. Ct. 616 (2016). That did not occur in Mr. Abdullah's case.

609. The absence of a reasonable-doubt standard also violates the Eighth Amendment. That amendment requires that states narrow the class of defendants eligible for capital punishment by guiding jurors' discretion through objective, legislatively-crafted criteria. *See Lowenfield v. Phelps*, 484 U.S. 231 (1988); *Sawyer v. Whitley*, 505 U.S. 333 (1992); *Gregg v. Georgia*, 428 U.S. 153 (1976). In Mr. Abdullah's case, the jury was never required to find beyond a reasonable doubt that the aggravation outweighed the mitigation. Quite the opposite: the burden was actually placed on Mr. Abdullah to prove that the mitigation outweighed the aggravation. *See State v. Hoffman*, 851 P.2d 934, 943 (Idaho 1993). With such a low standard at a critical stage of the sentencing determination, the weighing process in Idaho does not perform any

meaningful narrowing function and does not lead to death sentences being reserved only for the worst of the worst.  Rather, because capital juries weigh according to such a diluted standard, they mete out death sentences arbitrarily.  *See* Claim 58 (incorporated herein).

610.    The arbitrary results generated by the lowness of Idaho's standard is exacerbated by its vagueness.  "[C]apital punishment [must be] imposed fairly, and with reasonable consistency, or not at all."  *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *accord Proffitt v. Florida*, 428 U.S. 242 (1976); *Mills v. Maryland*, 486 U.S. 367 (1988).  In accordance with the governing statute, Mr. Abdullah's jury was asked whether "all mitigating circumstances, when weighed against [each] aggravating circumstance, are sufficiently compelling that the death penalty would be unjust."  Idaho Code § 19-2515(8)(ii).  The "sufficiently compelling" language is utterly devoid of any discernible content that could guide a jury's discretion.  There is consequently a reasonable likelihood that different juries will impose different standards of proof in deciding whether to impose a sentence of death.  As a result, death sentences are doled out with no rhyme or reason, in contravention of the Eighth Amendment.

611.    Moreover, the deprivation of a reasonable-doubt standard offends the Eighth Amendment because it is contrary to the evolving standards of decency.  *See Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304 (2002); *Trop v. Dulles*, 356 U.S. 86 (1958).  A substantial number of capital jurisdictions require juries to conduct the weighing process under the reasonable-doubt standard.  The trend continues to move in that direction, as more death penalty states recognize that juries have to perform their weighing function with reference to a reasonable-doubt standard.  Therefore, the evolving standards of decency condemn Idaho's non-reasonable-doubt standard as cruel and unusual.

612.    Finally, a defendant who is told that he can only save his life by meeting such an amorphous test as the "sufficiently compelling" standard is a defendant who has not been given adequate notice of the rules governing his penalty phase, in violation of his due process rights.

613.    The errors described above are structural, because depriving a defendant of a reasonable-doubt standard affects the framework within which the trial proceeds, and thus infects the entire trial process. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993). As a result, harmless error analysis is inappropriate. *See id.* Nonetheless, if harmless error analysis is applied, the violation is prejudicial. Had the jury been given the proper reasonable-doubt instruction, it would not have voted for death in light of the mitigating evidence presented at sentencing and the relative weakness of the aggravating evidence. Consequently, in the absence of the error, the result would have been different, and prejudice is apparent.

614.    Mr. Abdullah's jury was instructed that if it found an aggravating factor, it was to "consider whether any mitigating circumstances exist that make the imposition of the death penalty unjust." The instructions further directed the jury that if it concluded "that all mitigating circumstances do not make the imposition of the death penalty unjust, then the defendant will be sentenced to death." No standard of proof was given to the jury to apply in making this weighing determination, other than the nebulous "sufficiently compelling" test described above.

### CLAIM 50: THE INSTRUCTION ON HOW TO MEASURE MITIGATION AGAINST AGGRAVATION VIOLATED THE EX POST FACTO CLAUSE

615.    Mr. Abdullah's jury was instructed to measure mitigation against aggravation in a manner that was inconsistent with, and harsher than, the statutory standard that existed at the time of his offense, in violation of the ex post facto clauses of Article I, section 9 and Article I, section 10. *See Weaver v. Graham*, 450 U.S. 24 (1981).

616.     Mr. Abdullah's jury was instructed: "If you find that all of the mitigating circumstances are sufficiently compelling to make the imposition of the death penalty unjust or you cannot unanimously agree on that issue, then the judge must sentence the defendant." This instruction was given in accordance with Idaho Code § 19-2515 as it read at the time of Mr. Abdullah's trial.

617.     However, the instruction was inconsistent with Idaho Code § 19-2515 as it read at the time of Mr. Abdullah's *offense*. At that time, the statute and binding caselaw required the State to show *both* that a death sentence was not "unjust," and also that the mitigating circumstances did not "outweigh the gravity of any aggravating circumstances found." Under the later version of the statute, that requirement was eliminated.

618.     The newer version of the statute imposed a lesser burden on the State, and allowed the State to present less or different evidence than what was required by the statute in effect at the time of the offense.

### CLAIM 51: THE INSTRUCTION ON WHAT WOULD HAPPEN IF THE JURY VOTED FOR LIFE WAS UNCONSTITUTIONAL

619.     The jury was not informed about what potential sentences would be given to Mr. Abdullah if it did not vote for death, in violation of the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment. *See Simmons v. South Carolina*, 512 U.S. 154 (1994); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Gardner v. Florida*, 430 U.S. 349 (1977). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

620.     The trial court instructed the jury that if the State failed to prove an aggravator, "the judge must then sentence the defendant," and if the jury found an aggravator but could not agree on mitigation or voted against death, again, "the judge must sentence the defendant." No

instruction was given informing the jury of what possible punishments the judge could impose if no death sentence were meted out. As it happened, the judge could have imposed a sentence with a minimum of ten years and the potential of up to life imprisonment. *See* Claim 6. The absence of information likely led jurors to believe that there was a risk that if Mr. Abdullah were not sentenced to death he would be quickly released and receive no punishment for his crimes. Such a conclusion would obviously lead jurors to find death appropriate, rather than risk the possibility that Mr. Abdullah would quickly gain his freedom.

### CLAIM 52: THE ABSENCE OF WRITTEN JURY FINDINGS ON MITIGATION AND WEIGHING WAS UNCONSTITUTIONAL

621. The absence of written jury findings on mitigation and weighing violated the Eighth Amendment requirement that death sentences be reliable and non-arbitrary and that jurors be guided by objective standards, the Fourteenth Amendment requirements of meaningful appellate review and due process, the ex post facto clauses of Article I, section 9 and Article I, section 10, the Sixth Amendment guarantee to a public trial, and the Eighth Amendment right to be free of cruel and unusual punishments. *See Hurst v. Florida*, 136 S. Ct. 616 (2016); *Smith v. Robbins*, 528 U.S. 259 (2000); *Weaver v. Graham*, 450 U.S. 24 (1981); *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

622. *Supporting Facts*: Before jury sentencing in capital cases was mandated by the Supreme Court, Idaho judges decided the sentence in death penalty cases. At that time, judges were required to make written findings, setting forth any statutory aggravating circumstance found and any mitigating factors considered. The written findings served two purposes: (1) they helped ensure that the imposition of the sentence of death was reasoned and objective, as

constitutionally required, and (2) they protected a capital defendant's right to meaningful appellate review of his sentence. Without such findings, the reviewing court could not determine whether the fact-finder overlooked or ignored mitigation that was presented, whether the evidence supported the aggravating factors found, and whether the fact-finder properly weighed all factors. The failure to make such written findings constituted reversible error. Pursuant to the current version of the statute, if a defendant waives the right to a jury at his sentencing, the judge is required to make those written findings. However, if a jury is not waived, the jury is only required to indicate on special verdict forms whether a statutory aggravating circumstance has been proven beyond a reasonable doubt, and "whether all mitigating circumstances, when weighed against the aggravating circumstance, are sufficiently compelling that the death penalty would be unjust." As a result, a defendant who exercises his constitutional right to jury sentencing must relinquish his constitutional right to have his sentencing meaningfully reviewed by the district court and the Idaho Supreme Court, both on direct appeal and as part of its mandatory sentencing review. Without a complete record, the district court and the Idaho Supreme Court are precluded from conducting a meaningful review, which includes a determination of whether imposition of the death sentence was reasoned and objective, or instead was the result of arbitrariness and passion. At the time the offense in this case was committed, an Idaho defendant had a right to written findings from the sentencer on mitigation and weighing. Thus, the absence of those findings at Mr. Abdullah's trial violated his ex post facto rights.

623. The court's failure to require the jury to document in writing its findings also violated Mr. Abdullah's constitutional right to a public trial. The jury's conclusions regarding mitigation

and weighing are essential components of its verdict. As such, these findings, like a jury's final verdict, must be memorialized and delivered in an open courtroom.

### CLAIM 53: UNANIMITY AND CONSULTATION WERE IMPROPERLY REQUIRED ON MITIGATION AND WEIGHING

624.    The jury was told in its instruction that it had to unanimously agree on whether mitigation existed and whether the mitigation outweighed the aggravation, and that jurors had to consult with one another before making a decision on the sentence, in violation of the Sixth Amendment right to a jury trial, Eighth Amendment's requirement that death sentences be non-arbitrary and that jurors be guided by objective standards, and the Fourteenth Amendment's due process requirement.  *See Hurst v. Florida*, 136 S. Ct. 616 (2016); *McKoy v. North Carolina*, 494 U.S. 433 (1990); *Mills v. Maryland*, 486 U.S. 367 (1988); *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

625.    The jurors were informed that they had a "duty to discuss the case with one another and to deliberate in any effort to reach a just verdict.  Each of you must decide the case for yourself, but only after you've considered the evidence impartially with your fellow jurors."  They were also told that "[i]f you find that all mitigating circumstances are sufficiently compelling to make the imposition of the death penalty unjust, or you cannot unanimously agree on that issue, then the judge must sentence the Defendant."  The same instruction explained that "[a]ny finding by you that the mitigating circumstances do or do not make the imposition of the death penalty unjust must be unanimous."  Finally, another instruction dictated to jurors that they "ha[d] a duty to consult with one another" and "consider each other's views, and deliberate with the objective of reaching an agreement."

626.     The instructions directing jurors that findings with respect to mitigating circumstances must be unanimous were mistaken.  An inquiry into mitigation is a profoundly individual process, not a collective one.  The instruction stating that jurors had a duty to consult with one another was erroneous for the same reason.  Jurors are tasked only with consulting their own consciences in making the determination as to whether someone should live or die.  These confusing instructions misled jurors who would otherwise have been hold-outs for life into giving up on their convictions under pressure from other jurors.

### CLAIM 54: THERE WAS NO DEATH PENALTY IN EFFECT AT THE TIME OF THE CRIME

627.     At the time of the offense, there was no death penalty in effect, rendering it unconstitutional under the Due Process Clause of the Fourteenth Amendment and the cruel-and-unusual-punishments clause of the Eighth Amendment, as well as the ex post facto clauses of Article I, section 9 and Article I, section 10, to sentence Mr. Abdullah to death.  *See United States v. Lanier*, 520 U.S. 259 (1997); *Weaver v. Graham*, 450 U.S. 24 (1981).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

628.     *Supporting Facts*: On June 24, 2002, the U.S. Supreme Court found a constitutional right to jury sentencing in capital cases.  The Idaho Supreme Court noted on August 6, 2002, that the state's death penalty scheme was likely invalid as a result.  Ms. Abdullah died on October 5, 2002.  Approximately two months later, on December 3, 2002, the State filed its notice of intent to seek death.  A new death penalty act was signed into law on February 13, 2003.  At the time of the offense, Idaho law provided: "Subject to the provisions of section 19-2515, Idaho Code, every person guilty of murder of the first degree shall be punished by death or by imprisonment

for life." Idaho Code § 18-4004 (2002). Because the death penalty was "subject to" § 19-2515, and because § 19-2515 was unconstitutional at the time of the offense, there was no death penalty in force when Ms. Abdullah died. Mr. Abdullah, therefore, could not have had notice that first-degree murder was punishable by death on October 5, 2002. Furthermore, any attempt to apply the new scheme against him would be retroactive, and thus in violation of the ex post facto clause.

629. Mr. Abdullah's assertion of Claim 54 within this amended petition is not intended to waive or supplant the arguments set forth in previous briefing that the Court directed the parties to file. *See* Dkt. 17 at 48-53 (opening brief); Dkt. 26 at 36-40 (reply brief).

### CLAIM 55: THE AGGRAVATORS WERE NOT CHARGED BY INDICTMENT, NOT SUBJECT TO A FINDING OF PROBABLE CAUSE, AND NOT SUPPORTED BY FACTS

630. The aggravators that made Mr. Abdullah eligible for death were not alleged in the indictment or proven by probable cause, and the notice of intent to seek death did not provide adequate notice of what facts and evidence the State intended to rely upon to prove them, in violation of the Due Process Clause of the Fourteenth Amendment, the Sixth Amendment right to be informed of the nature of the accusation, and the Eighth Amendment right to be free from cruel and unusual punishment. *See Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003); *Ring v. Arizona*, 536 U.S. 584 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Powell v. Alabama*, 287 U.S. 45 (1932). Under Supreme Court law, aggravating circumstances are now the functional equivalent of elements of an offense. They must therefore meet the constitutional requirements that attach to elements, such as inclusion in the indictment, proof by probable cause, and adequate notice. Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the jury's sentence of death. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

631.    *Supporting Facts*: Mr. Abdullah's indictment did not allege the aggravators the State intended to use to obtain a death sentence against him.  The notice of intent to seek death quoted the statutory language of the aggravators, but provided no factual support for any of them.  Based on this notice, the State was allowed to proceed to the penalty phase even though the aggravators had never been subjected to any threshold finding that they were validly alleged or proven by probable cause.

632.    Mr. Abdullah's jury could not reach a unanimous decision on two of the charged aggravators, demonstrating the very real problem that results when the State is not required to meet a threshold burden of proof prior to a penalty-phase proceeding.  The mere allegation of the circumstances becomes a vehicle for the State to prejudice a defendant by making the behavior seem more horrific.  The two aggravators not found by the jury were that the murder was heinous, atrocious, or cruel, and that he had a propensity to commit murder.  Neither aggravator would have survived a judicial probable-cause determination, as there was insufficient evidence of either.  Nevertheless, they were used by the prosecution to disparage Mr. Abdullah's character, and ensure a death sentence.

### CLAIM 56: THE DELAY BETWEEN THE IMPOSITION OF MR. ABDULLAH'S DEATH SENTENCE AND ANY ULTIMATE EXECUTION RENDERS THE EXECUTION UNCONSTITUTIONAL

633.    Pursuing an execution of Mr. Abdullah many years after he was convicted and sentenced violates his right to be free from cruel and unusual punishment under the Eighth Amendment, his right to due process under the Fourteenth Amendment, which includes a right not to be given a punishment unauthorized by statute, his right to dignity under the Eighth and Fourteenth Amendments, and the rights he is guaranteed under standards of international law and treaties to which the United States is subject and which are enforceable against Idaho through the Supremacy Clause in Article VI, section 2 of the U.S. Constitution.  *See Lackey v. Texas*, 514

U.S. 1045 (1995) (Stevens, J., dissenting from denial of certiorari); *Brooks v. Florida*, 389 U.S.

413 (1967); International Covenant on Civil and Political Rights, Articles 6, 7, and 14; American

Declaration of the Rights and Duties of Man, Article XXVI; Convention Against Torture and

Other Cruel, Inhuman or Degrading Treatment or Punishment; American Convention of Human

Rights; Vienna Convention on the Law of Treaties; Vienna Convention on Consular Relation;

*see also Obergefell v. Hodges*, 135 S. Ct. 2584 (2015); *United States v. Windsor*, 133 S. Ct. 2675

(2013); *Lawrence v. Texas*, 539 U.S. 558 (2003).

634.    *Supporting Facts:* As Mr. Abdullah's time on death row lengthens, any justification for

the imposition of the death penalty weakens, and the Eighth Amendment concerns continue to

grow.  Further facts supporting this claim are recited in Claims 57 and 58.

### CLAIM 57: EXECUTING MR. ABDULLAH AFTER THE TIME THAT HE WILL SPEND ON DEATH ROW VIOLATES THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT BY IMPOSING TWO PUNISHMENTS FOR ONE OFFENSE

635.    Executing Mr. Abdullah after the time that he will ultimately spend on death row will

result in him suffering from two separate punishments, and will therefore violate the Double

Jeopardy Clause of the Fifth Amendment.  *See Ex parte Lange*, 85 U.S. 163 (1873).

636.    *Supporting Facts:* If Mr. Abdullah is executed, that execution will only come after he has

spent a great deal of time in harsh death row conditions, which include significant restrictions in

visitation, educational programming, contact with other prisoners, exercise, time outdoors, etc..

Mr. Abdullah's long confinement in these conditions coupled with his death sentence constitute

two sentences: years on death row plus his execution.  Given the daily confined isolation and a

deferred but always impending death sentence, any human being on death row would experience

psychological and physiological deterioration over and above the punishment of death.

## CLAIM 58: THE DEATH PENALTY IS UNCONSTITUTIONALLY ARBITRARY

637.    For the reasons that follow, capital punishment in both the United States and Idaho is arbitrary and thus unconstitutional. *See Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).

638.    Mr. Abdullah's death sentence is unconstitutional because capital schemes throughout the United States and in Idaho do not sufficiently narrow the class of persons eligible for the death penalty. Statutory schemes are overly broad and inclusive, containing so many aggravating circumstances—or their equivalents—that they fail to perform the constitutionally required narrowing function. Such schemes therefore violate the Eighth Amendment's prohibition against cruel and unusual punishment and the Fifth and Fourteenth Amendments' requirement of due process of law.

639.    Every state's capital scheme has to provide rational, meaningful, and objective criteria that narrow the class of persons eligible for the death penalty from the larger group of murder defendants who would not be eligible, so that those sentenced to death are the worst of the worst. *See Gregg v. Georgia*, 428 U.S. 153 (1976).

640.    *Supporting Facts*: The statutorily defined death-eligible class in capital jurisdictions around the United States and in Idaho is so large that the statutory schemes perform no narrowing of the death-eligible class. A recent study indicates that between 93 and 98% of all murder cases filed in Idaho between 2002 and 2019 were eligible for the death penalty under the existing statutory scheme.

641.    The defendants sentenced to death are not the worst of the worst. They are placed on death row not because of the egregiousness of their crime, but as a result of arbitrary factors that include but are not limited to the county in which they are prosecuted, the competence of their attorneys, the resources allotted to the defense, financial concerns of prosecutors' offices, the

ideological values of the prosecutors involved, the publicity surrounding the trial, the personal views of the trial and appellate judges, the race or ethnicity of the accused, and the race or ethnicity of the victim. Because of the capaciousness of the aggravating circumstances, prosecutors nationwide have been allowed to present as aggravation—or as its equivalent— almost every conceivable circumstance of a murder, even those that are radically inconsistent with one another.

642. As shown above, capital schemes nationwide and in Idaho do nothing to effectively narrow the pool of potential defendants to those most deserving of death. This failure to narrow is exacerbated by the fact that capital regimes lack safeguards to guard against the arbitrary imposition of death. Due to the absence of such safeguards, the death penalty is imposed arbitrarily and capriciously in violation of the Eighth Amendment. *See Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).

643. Many death penalty schemes, including Idaho's, do not require a trial or appellate court to undertake a comparison between the capital case at hand and other similar cases to ensure that the death sentence is imposed in a proportional manner. In other capital jurisdictions, a comparative analysis is nominally required by law, but state appellate courts conduct the analysis in such a shallow, perfunctory manner that it performs no function in practice.

644. Death penalty schemes nationwide and in Idaho also violate the Equal Protection Clause of the Fourteenth Amendment, in that they do not provide for specific, state-wide standards to ensure that prosecutorial charging decisions are fairly and even-handedly made.

645. In Idaho, for example, the decision of whether or not to pursue death in a murder case is made by the prosecuting attorney of the county in which the case is pending. Idaho has forty-four counties, each with its own Prosecuting Attorney. There are no standards by which the

choice to seek death is made, giving prosecuting attorneys unbounded discretion in determining who lives and who dies. The failure to provide such standards results in disparate treatment of similarly situated death-eligible defendants in violation of the Equal Protection Clause.

646. The death penalty is also unconstitutionally arbitrary and capricious, in violation of the Eighth and Fourteenth Amendments, due to excessive delays in carrying out executions nationwide and in Idaho.

647. Since the U.S. Supreme Court reinstated the death penalty in 1976, a large number of offenders have been sentenced to death but a small percentage have been executed. In the same time period, large numbers of inmates on death rows have died of natural causes before their sentences could be carried out. Rather than being the fault of the petitioners, the delays in Idaho's death penalty system have resulted chiefly from delays necessitated by the complexity of post-conviction and habeas procedures, and from the lengthy period of time it requires to subject capital convictions and death sentences to adequately searching judicial review.

648. Capital juries, as currently composed in the United States and Idaho, have been empirically shown to reach arbitrary decisions in violation of the Eighth and Fourteenth Amendments. Empirical studies show the following: many capital juries routinely engage in premature decision making in violation of *Lockett v. Ohio*, 438 U.S. 586 (1978); capital jury selection fails to remove many death-biased jurors and leads to an overall biasing effect through death qualification; many capital jurors fail to comprehend or follow penalty instructions; many capital jurors believe they are required to return a verdict of death; many capital jurors do not view themselves as primarily responsible for sentencing in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985); and race continues to influence juror decision-making.

649.     Studies show that nearly half of capital jurors make their sentencing decisions before the penalty phase begins.  For example, many jurors even when *Morgan*–qualified believe death is the only appropriate penalty for certain murders.  Sentences given by these jurors are effectively mandatory rather than individualized death sentences.  Many of these jurors also fail to understand or see a point in the penalty phase of capital trials.

650.     One of the most troubling aspects of jury selection is the way it actually primes the jury to return a guilty verdict and a death sentence.  Studies show that many capital jurors believe that the subtext of voir dire is not about whether the defendant committed murder, but actually about what punishment the defendant ought to receive.  Spending significant amounts of time discussing sentencing with jurors before a guilty verdict gives jurors the impression that the judge and lawyers already believe the defendant is guilty and the only thing left to decide is the sentence.

651.     Jury selection generally, and death qualification in particular, lead to an inevitably biased body of jurors who will fail to understand the concept or point of mitigation, and will fail to understand the penalty phase entirely.  American juries are accustomed to finding facts such as whether a weapon was used or whether a theft was committed—American juries are not accustomed to deciding what weight to give a capital defendant's unimaginably harsh upbringing, serious psychiatric disorder, or brain damage.  The net result is that these jurors are skewed towards choosing a death sentence without considering individual circumstances.

652.     Jurors also often believe they are required to return a verdict of death.  A survey of voir dire in Mr. Abdullah's case features many venire members attempting to prove to the judge that they would impose a death sentence as required.

653.    Studies show that race matters in the jury selection process—the race of the jury

members, the race of the defendant, and the race of the victim.  Arbitrariness based on race

means, for example, the outcome of a capital jury's verdict is greatly dependent on how many

white males serve on the jury, and whether there are any minority groups represented.  There is

perhaps nothing more arbitrary than a death sentence that hinged on the racial composition of the

jury, the race of the defendant, and the race of the victim.  And yet, studies show that racial

factors such as these often determine the outcome of a capital trial.

654.    Finally, the decision to pursue death nationwide and in Idaho is often driven by extra-

legal concerns, making the penalty even more arbitrary.  Often that concern is financial.

Decisions driven by budgets are not decisions that lead to consistent results.

### CLAIM 59: THE DEATH PENALTY DEPRIVES DEFENDANTS OF THE FUNDAMENTAL RIGHT TO LIFE AND DIGNITY

655.    The death penalty deprives defendants of their constitutionally protected dignity interests

and fundamental right to life, and therefore violates the Eighth and Fourteenth Amendments.  *See*

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015); *United States v. Windsor*, 133 S. Ct. 2675 (2013);

*Lawrence v. Texas*, 539 U.S. 558 (2003).

656.    *Supporting Facts*: The death penalty is inconsistent with the fundamental right to life as

well as the dignity of man, the individual, and society as a whole.

### CLAIM 60: EVOLVING STANDARDS OF DECENCY RENDER THE DEATH PENALTY *PER SE* UNCONSTITUTIONAL

657.    Mr. Abdullah's sentence violates the Eighth Amendment because the death penalty is

categorically unconstitutional due to evolving standards of decency nationwide and in Idaho.

*See Trop v. Dulles*, 356 U.S. 86 (1958); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2755–80

(2015) (Breyer, J., dissenting).  While the Supreme Court has ruled that the death penalty is not

unconstitutional *per se*, *see Gregg v. Georgia*, 428 U.S. 153 (1976), the Eighth Amendment is

"not static" and instead "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," *Trop*, 356 U.S. at 101. Accordingly, punishments that may have once been considered constitutionally permissible may now become prohibited by the Eighth Amendment if those punishments conflict with society's current moral and ethical standards. *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304 (2002).

658. In determining whether a punishment conflicts with the evolving standards of decency, a court must consult both (1) objective indicia of society's standards, and (2) its own independent judgment. *See Roper v. Simmons*, 543 U.S. 551 (2005).

659. Inquiry into the objective indicia of society's standards involves the consultation of many sources. These include, but are not limited to, the following: legislation, high-level executive actions (such as moratoria and commutations), lower court opinions, prosecutorial decision-making, the gross number of sentences imposed, the gross number of sentences actually carried out, the rate at which the punishment is imposed in cases where it is available, and consistency in the direction of change in official actions. *See Hall v. Florida*, 134 S. Ct. 1986 (2014); *Graham v. Florida*, 560 U.S. 48 (2010); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Atkins v. Virginia*, 536 U.S. 304 (2002); *Thompson v. Oklahoma*, 487 U.S. 815 (1988).

660. Now, objective indicia of society's standards—and in particular the consistency in the direction of change—supports holding that the death penalty is unconstitutional *per se*.

661. At the broadest level, violence in human societies—including torture and killing perpetrated by sovereign states and their criminal justice systems—has tended to decline over the course of history with particular rapidity over the last forty years. More specifically, there have been long-term declines in capital punishment. Executions in the United States and Europe have

steadily and rapidly declined since the founding of this country. The evolving standards of the Western world since the Enlightenment have tended toward a progressive abolition of capital punishment.

662.	The number of death sentences initially imposed has also plummeted in recent years. Prosecutors seek, and judges and juries impose, the death penalty in only a miniscule percentage of cases in which it is available.

663.	This sharp decline in both death sentences and executions stems from a growing moral and ethical disapproval of the death penalty by regular American citizens.

664.	A gathering revolt against the death penalty has prompted many states to abolish.

665.	The executive branches of United States jurisdictions have also made concrete moves away from the death penalty.

666.	As with the nation as a whole, the low number of executions and dwindling number of death sentences imposed indicate that Idaho is tending toward effective abolition of the death penalty. Between 2002 and 2019, prosecutors in Idaho filed a notice of intent to seek the death penalty in thirty-two cases. The State pursued the death penalty *at trial* in only seven of those cases and death sentences were ultimately returned in four cases.

667.	The foregoing establishes that objective indicia of society's standards support prohibiting the death penalty. As shown above, the trend is unmistakable. Capital punishment is no longer consistent with our evolving standards of decency.

668.	Whether or not the Court agrees that objective indicia of society's standards support ending the death penalty, it must proceed to exercise its independent judgment on the matter. In exercising independent judgment, a court should consider many factors. These include, but are not limited to, the following: the views of experts and respected professional organizations on

the issue in question; the laws and practices of other nations (particularly those that share a cultural heritage with the United States); the culpability of the offenders at issue in light of their personal characteristics; the severity of the punishment in question; how well the challenged sentencing practice serves legitimate penological goals; the effect on crime victims and their families of keeping or prohibiting the punishment; and whether there are workable ways to decide who deserves the sentence. *See Hall v. Florida*, 134 S. Ct. 1986 (2014); *Graham v. Florida*, 560 U.S. 48 (2010); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304 (2002).

669.    For the reasons that follow, this Court should exercise its independent judgment to determine that the death penalty violates the Eighth Amendment.

670.    The death penalty, as currently practiced, does not meaningfully advance the possible legitimate purposes of capital punishment—which are deterrence and retribution. *See Kennedy*, 554 U.S. at 420.

671.    There is no reliable evidence that the death penalty deters. Indeed, states with the death penalty generally have higher, not lower, rates of murder.

672.    The death penalty as actually practiced in the United States is highly unlikely to have any deterrent effect given the infrequency of its application and the long delay between the offense and the punishment. As established above, the death penalty is very infrequently applied. Furthermore, the time between the offense and the offender's execution has skyrocketed over recent decades.

673.    In addition, the death penalty is frequently imposed on people with mental disabilities and other characteristics that make deterrence especially unlikely.

674. Under these circumstances, it is unsurprising that the death penalty fails to deter any more than a long prison sentence deters.

675. For similar reasons, the death penalty as currently practiced in the United States fails to meaningfully advance the penological goal of retribution. As an initial matter, retribution is suspect *per se* as a legitimate rationale for the death penalty. *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407 (2008).

676. Moreover, the death penalty does not serve the goal of retribution because capital trials in the United States have proven unable to distinguish those who deserve the death penalty from those who do not.

677. Furthermore, far from providing justice to victims' families, the death penalty disserves these families because the appellate process is arduous and, for many families, traumatic. Both retribution generally and, more specifically, victims' families would be better served by a system in which the maximum penalty were life imprisonment—a punishment which the prisoner begins enduring as soon as trial is over.

678. In short, the death penalty as practiced in the United States does not meaningfully advance either of its potentially legitimate purposes.

679. The following other considerations support finding the death penalty unconstitutional.

680. No nations that share our cultural heritage retain capital punishment. The last execution in the United Kingdom was in 1964, and the U.K. abolished capital punishment for murder in 1965, and in all circumstances in 1998.

681. No Western or Northern European country retains the death penalty, meaning that Germany, France, Italy, Spain, and Greece, among numerous others, have all abolished it. Likewise, the vast majority of other English-speaking nations (across four continents), including,

but not limited to, Australia, Ireland, South Africa, New Zealand, and Canada, have abolished

the death penalty. Our other North-American neighbor, Mexico, has likewise abolished the

death penalty, as have the overwhelming majority of Spanish- and Portuguese-speaking nations.

682. In all, there are a great many more abolitionist countries than there are retentionist

countries. The countries that conduct the most executions are China, Iran, Iraq, and Saudi

Arabia. All of these countries have poor human rights records. In fact, the United States'

retention of capital punishment is one reason why many credible international organizations

place it below some other countries in terms of the country's commitment to human rights.

683. These facts should weigh heavily in the Court's exercise of its independent judgment.

684. The Court should also weigh the fact that important organizations consider the death

penalty unworkable, immoral, or both. The United Nations has officially called for a

moratorium on capital punishment worldwide, and its Secretary General has called on all nations

to abolish the death penalty on the ground that it is cruel and inhumane. The ABA has called for

a moratorium on the death penalty based on the risk of executing an innocent person and the

persistent racial disparity in the use of capital punishment. The American Law Institute has

officially pronounced that there are currently "intractable institutional and structural obstacles to

ensuring a minimally adequate system for administering capital punishment." The Catholic

Church (which has more than 1.2 billion adherents worldwide and over 78 million adherents in

the U.S.) declares that capital punishment is permissible only "if this is the only possible way of

effectively defending human lives against an unjust aggressor," and in the United States, the

National Conference of Bishops has faithfully campaigned against the death penalty as

inconsistent with the sanctity of human life and the dignity of the human person.

685.    Just as the nation's peers are abandoning the death penalty, so are Idaho's, beginning

with its neighbors.  There are moratoria in Washington and Oregon.  Nevada, Montana,

Wyoming, and Utah have executed no one in recent years.  Wyoming recently resentenced the

last person on its death row.

686.    The fact that Idaho's neighbors are abandoning the death penalty, along with objective

indicia that Idaho's social morals and values no longer tolerate death sentences and executions,

this Court should exercise its independent judgment in favor of ruling the death penalty in Idaho

is unconstitutional under the Eighth Amendment due to evolving standards of decency.

687.    For the foregoing reasons, this Court should exercise its independent judgment in favor of

barring the death penalty for the crime of murder.

### CLAIM 61: CUMULATIVE PENALTY-PHASE ERROR

688.    Mr. Abdullah's sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments

because of the cumulative impact of the errors that occurred throughout the sentencing phase of

his trial, as compounded by the errors that occurred at the guilt phase.  *See Chambers v.*

*Mississippi*, 410 U.S. 284 (1973); *Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007). Insofar as Mr.

Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and

injurious effect or influence in determining the jury's sentence of death.  *See Brecht v.*

*Abrahamson*, 507 U.S. 619 (1993).

689.    *Supporting Facts*: The constitutional violations set forth in each individual claim alone

mandate relief.  Even if not, relief is required when each claim is considered cumulatively with

the other penalty-phase claims and with the guilt-phase claims.  The cumulative impact of these

combined errors violated many of Mr. Abdullah's rights, including his right to effective

assistance of counsel, due process, a fair trial, a fair and impartial jury, an unbiased judge, the

right to confront the evidence against him, and a fair and reliable sentencing result.

**CLAIM 62: MR. ABDULLAH WAS DENIED EFFECTIVE ASSISTANCE OF DIRECT-APPEAL COUNSEL**

690.    Through the numerous deficiencies outlined below, Mr. Abdullah's direct-appeal counsel rendered ineffective assistance, thereby violating his rights under the Fourteenth Amendment. *See Smith v. Robbins*, 528 U.S. 259 (2000); *Evitts v. Lucey*, 469 U.S. 387 (1985); *Douglas v. California*, 372 U.S. 353 (1963).  Considering the errors both cumulatively and individually, Mr. Abdullah was prejudiced by the deficient performance of his direct-appeal attorneys.  *See Harris v. Wood*, 64 F.3d 1432 (9th Cir. 1995) (granting habeas relief because the petitioner's separate claims of ineffectiveness cumulatively demonstrated prejudice); *Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir. 1978) (recognizing the availability of cumulative-prejudice arguments in the Ninth Circuit).  That is, in the absence of appellate-counsel's errors, there is a reasonable likelihood that the Idaho Supreme Court would not have denied Mr. Abdullah guilt-phase, penalty-phase, and post-conviction relief.

691.    *Supporting Facts*: Mr. Abdullah's direct-appeal attorneys at the SAPD failed to raise at the Idaho Supreme Court a variety of compelling challenges related primarily to the guilt phase. Those challenges include the issues described above as Claims 5 (unconstitutional to hold trial in Boise), 6 (biased trial judge), 8 (prosecution presented false testimony), 9 (prosecution lost, destroyed, and failed to preserve evidence), 10 (*Brady* violations), 12 (*Miranda*), 13 (interrogation re-initiated after invocation of right to counsel), 15 (defendant absent from portions of trial), 17 (state used faulty and outdated forensic evidence), 20 (evidentiary rulings violated Eighth and Fourteenth Amendments), 21 (confrontation violations), 22 (closure of trial to public), 25 (erroneous instruction on malice), 26 (erroneous instruction on unlawfully injuring a child), and 27 (erroneous instructions on reasonable doubt).

692.     SAPD counsel also failed to raise numerous meritorious guilt-related claims of trial

counsel's ineffectiveness. Those claims are enumerated in this petition as follows: Claim 1(A)(i)

(misconduct in getting retained), (ii) (improper contract with Mr. Abdullah's family), (vii)

(failure to develop and present evidence that someone other than Mr. Abdullah was responsible

for the crimes), (ix) (failure to adequately present a slow metabolizer defense), (xi) (failures

involving DNA evidence), (xii) (failures involving hair evidence), (xiii) (failures involving

computer evidence), (xv) (failure to discover evidence relating to Claim 9 (the State lost,

destroyed, and failed to preserve evidence) and Claim 10 (the State suppressed evidence)), (xvii)

(failures involving child interview evidence), (xxviii) (failure to interview Redear Abdullah),

(xxxi) (failure to stand up for defense arguments; maintain a prosecution-oriented outlook),

(xxxiii) (failures concerning instructions on willfulness and deliberateness), (xxxiv) (failure to

object to instruction on attempted first-degree murder), (xxxv) (failure to object to reasonable

doubt instructions), (xxxvii) (failure to challenge charge of committing injury to a child),

(xxxviii) (failures concerning acts of prosecutorial misconduct), (xxxix) (disclosure of privileged

information), (xl) (failure to object to Deborah Kristal's testimony), (xli) (failure to establish that

divorce is permissible under Islam), and (xlvi) (failure to provide Mr. Abdullah with discovery).

693.     The SAPD also failed to adequately develop or brief a number of challenges related

primarily to the guilt phase.  Those challenges include the issues described above as Claims 2

(trial counsel's conflict of interest), 3 (counsel violated Mr. Abdullah's right to a fair trial and to

hold the prosecution to its burden of proof beyond a reasonable doubt), 4 (Mr. Abdullah was

deprived of the right to present a defense of his own choosing), 7 (prosecutorial misconduct,

including, but not limited to, the prosecutor's use of a PowerPoint presentation featuring an

inflammatory photograph of Mr. Abdullah wearing a "skull cap," a slide describing the defense's

"Alibi Hoax," and a slide improperly stating that Mr. Abdullah is "Guilty [of] Murder in the First Degree" ), 11 (state used unduly suggestive identification techniques), 14 (death qualification), 16 (voir dire not conducted on numerous jurors and/or venire members), and 19 (Mr. Abdullah was prevented from putting on a defense).

694.    SAPD counsel also failed to adequately develop or brief numerous meritorious claims of trial counsel's ineffectiveness relating to the guilt phase, which claims are enumerated in this petition as follows: Claim 1(A)(iii) (failure to present a theory of the case), (iv) (conceding Mr. Abdullah's presence in Boise), (v) (failure to argue that Mr. Abdullah could not have been responsible for Angie Abdullah's ingestion of Prozac, in light of the prosecution's timeline), (vi) (failure to present an alibi defense), (viii) (failure to present a suicide defense and to challenge the state's theory on cause-of-death), (x) (failures concerning gasoline evidence), (xiv) (failure to adequately challenge the police investigation), (xv) (failure to discover evidence relating to Claim 9 (the State lost, destroyed, and failed to preserve evidence) and Claim 10 (the State suppressed evidence)), (xxix) (improperly influencing Mr. Abdullah into not testifying), (xxx) (attempting to persuade Mr. Abdullah to waive his rights), and (xxxii) (failures regarding instructions on willfulness and deliberateness).

695.    In failing to make or sufficiently litigate the aforementioned guilt-related arguments, the SAPD's performance fell below an objective standard of reasonableness.  The SAPD were unable to adequately investigate and litigate this case in part because they did not have sufficient resources to do so.  Absent the errors, there is a reasonable probability that the Idaho Supreme Court would have reversed Mr. Abdullah's convictions.

696.    The SAPD also failed to raise at the Idaho Supreme Court a variety of compelling challenges related primarily to sentencing.  Those challenges include the issues described above

as Claims 34 (Mr. Abdullah is not a constitutionally suitable candidate for the death penalty) , 35 (death qualification was per se unconstitutional), 39 (striking of jurors due to race, ethnicity, gender, and religion), 40 (jury misconduct), 41 (Mr. Abdullah is innocent of murder), 45 (denial of right to present evidence of lingering doubt), 46 (victim impact evidence admitted without instructions), 48 (failure to instruct jurors on the types of mitigating evidence they could consider), 50 (ex post facto violation based on instruction governing weighing of aggravating and mitigating circumstances), 52 (absence of written findings on mitigation), 56 (delay between sentencing and execution), 57 (double jeopardy), and 59 (death penalty deprives defendants of dignity in violation of the Eighth and Fourteenth Amendments).

697.    SAPD counsel also failed to raise the meritorious penalty-related claim of trial counsel's ineffectiveness enumerated above as Claim 1(B)(iii) (failure to challenge Steven Bankhead's testimony).

698.    SAPD counsel failed to adequately develop or brief several challenges related primarily to the penalty phase.  Those challenges include the issues described above as Claims 36 (trial court improperly excused jurors who expressed reservations about the death penalty), 37 (failure to allow or conduct adequate voir dire of death-prone jurors), 38 (trial court empaneled biased jurors), and 49 (jurors were not required to find beyond a reasonable doubt that aggravating circumstances outweighed mitigating circumstances).

699.    SADP counsel also failed to adequately develop or brief several meritorious claims of trial counsel's ineffectiveness relating to the penalty phase of trial. Those claims are enumerated above as Claim 1(B)(i) (failure to adequately investigate and present mitigating evidence), (ii) (failure to adequately deal with allocution), (v) (failure to remove unqualified jurors), (vi) (failure to adequately voir dire death-leaning jurors), (vii) (failure to adequate voir dire life-

leaning venire members), (viii) (failure to adequately prepare life-leaning jurors for capital trial service), (ix) (failure to adequately voir dire jurors with unknown opinions about the death penalty), (x) (failure to combat jurors' premature decisionmaking through effective voir dire), (xi) (general ineffectiveness on sentencing instructions), and (xvi) (failure to request instruction defining the weighing process consistent with Idaho law).

700.    By failing to make or sufficiently litigate the aforementioned arguments, direct-appeal counsel's performance fell below an objective standard of reasonableness.

701.    Aside from the failures just noted, the SAPD did not appeal Judge Copsey's decision to strike a huge amount of material from the numerous addenda attached to the final amended petition. Judge Copsey's decision prevented Mr. Abdullah from relying on a large number of facts that would have strongly supported his petition. The decision was vulnerable to attack on appeal, especially because a number of Judge Copsey's rulings on the motion to strike were based on her biased and pre-determined opinions about the merits of Mr. Abdullah's claims.

702.    Several of the claims the SAPD *did* raise on appeal were far weaker than the claims it failed to raise. For instance, the SAPD argued on direct appeal that the record failed to "affirmatively show the district court *properly* swore the bailiffs who took custody of [Mr. Abdullah's] sequestered jury during the guilt and penalty phase trials." (Emphasis in original.) The SAPD took that position even though the transcript clearly stated that the oath was given to the bailiffs, on the theory that the transcript did not indicate *what* oath was given. However, the SAPD had no evidence that an incorrect oath was given and no evidence of prejudice. In the absence of those facts, this claim was wholly frivolous.

703.    Another example of a tenuous SAPD claim is their assertion on direct appeal that two aggravators were void for vagueness: (1) the heinous, atrocious, or cruel aggravator; and (2) the

propensity to commit murder aggravator. These claims were totally irrelevant, as the jury did not find either of them. In essence, the SAPD was attacking aggravators that no longer had anything to do with the case. It appears the SAPD missed this basic fact from the case, for with respect to both aggravators, it argued to the Idaho Supreme Court that it should not rely on the aggravator to support the death sentence, even though it obviously would not have done so, since the aggravators had never been found by the jury.

704.    Having used up valuable space in a page-limited brief to argue weak and pointless claims, while omitting compelling ones, the SAPD was ineffective.

### CLAIM 63: DIRECT-APPEAL COUNSEL OPERATED UNDER A CONFLICT OF INTEREST

705.    The attorneys who represented Mr. Abdullah in his direct appeal were impaired by a serious conflict of interest, thereby violating the Sixth and Fourteenth Amendments. *See Mickens v. Taylor*, 535 U.S. 162 (2002); *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Due to the conflict, counsel were actively representing conflicting interests, and prejudice is therefore presumed. In the alternative, Mr. Abdullah can demonstrate that the conflict actually affected the adequacy of his representation, and prejudice is accordingly apparent.

706.    *Supporting Facts*: Mr. Abdullah was represented in his direct appeal by the SAPD. Prior to and during trial, the SAPD advised defense counsel about how they should conduct their work. That advice led to an irreconcilable conflict because those same attorneys at the SAPD were then responsible for litigating issues about which they had interacted with trial counsel. For example, Ms. Toryanski spoke on the phone with SAPD employees about the affair between Erika Klein, the original second-chair prosecutor, and Tod Littlefield, the lead detective. There was litigation in the district court regarding the affair, which included the Toryanskis filing an unsuccessful motion for a continuance to investigate its impact on the case. The affair was

therefore part of the trial-court record and could have been litigated in the direct appeal to the Idaho Supreme Court. However, because the SAPD employees had discussed the affair with trial counsel, they would likely have been compromised in their ability to look at the matter dispassionately and with an eye to advocating for Mr. Abdullah's interests.

707. The SAPD refused to acknowledge the conflict because the office did not have the money to pay for an outside attorney.

708. There was not even an arguable waiver of this claim. Any waiver that was entered in relation to the SAPD's representation of Mr. Abdullah was limited to their representation in the post-conviction action, and did not address their involvement in the direct appeal. To the extent that any purported waiver of the conflict by Mr. Abdullah impacts this claim, the waiver was invalid. Such a waiver was not knowing, intelligent, and voluntary. Mr. Abdullah was not provided with all of the facts he needed to make an informed decision about whether to allow the SAPD to continue representing him. He was also coerced into the waiver because no qualified attorney could have represented him if the SAPD was removed from the case, and SAPD-employed counsel repeatedly pressured Mr. Abdullah to waive the conflict. The SAPD stated in court that the only attorney with whom they had a contract and who was on the capital case roster was Dennis Benjamin, who was involved in the trial and thus could not take over Mr. Abdullah's representation. It was further revealed that the SAPD did not have the money to pay for anyone with whom it did not have a contract. Thus, the SAPD's conduct created a serious conflict that had no solution, forcing Mr. Abdullah to remain in the office's care despite its compromised position. Insofar as it was possible to obtain another attorney, a lawyer who was not properly qualified would likely have been appointed and an undue delay in the case would have been created, both of which Mr. Abdullah reasonably wished to avoid.

## CLAIM 64: THE PAGE LIMITS IMPOSED ON MR. ABDULLAH'S APPELLATE BRIEFING WERE UNCONSTITUTIONAL

709. Mr. Abdullah was prevented by page limitations from filing an opening appellate briefing long enough to sufficiently argue his case, in violation of his right to adequate and effective appellate review under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *See Smith v. Robbins*, 528 U.S. 259 (2000). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in the Idaho Supreme Court's denial of relief. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

710. *Supporting Facts*: At the time of Mr. Abdullah's direct appeal, the Idaho Appellate Rules required that opening briefs to the Idaho Supreme Court be limited to fifty pages. In the consolidated proceeding in which Mr. Abdullah litigated his direct appeal as well as his appeal from the trial court's denial of post-conviction relief, he sought permission from the Idaho Supreme Court to file a brief of 356 pages. The court denied his motion, and later allowed him to file a brief of 210 pages. In his request for leave to submit the original, 356-page brief, Mr. Abdullah explained in detail why a brief of that length was necessary under the circumstance of the case. His reasons included the following:

- The clerk's record in the underlying criminal case was over 1,600 pages;

- The transcripts from the underlying criminal case were approximately 7,000 pages;

- The post-conviction clerk's record was 8,621 pages;

- The post-conviction transcripts were thousands of pages;

- The trial court's order denying post-conviction relief was 231 pages, using 1.5 line spacing.

711. It is also relevant that Mr. Abdullah was able to file in the state trial court a final amended petition for post-conviction relief of 345 pages. Because the trial court permitted so

many pages, and the supreme court refused them, Mr. Abdullah was forced to raise numerous issues below and then to either abandon them or brief them inadequately on appeal. Some of the issues that were either abandoned or deficiently briefed were meritorious, and if raised effectively would have led to guilt-phase or sentencing-phase relief from the Idaho Supreme Court. Other claims could not be raised on appeal due to the page limit, which prevented Mr. Abdullah from exhausting them at the Idaho Supreme Court. Some of those claims may not be reviewable on the merits in federal court, and they would otherwise have led to the granting of habeas relief.

### CLAIM 65: THE DESTRUCTION OF JURY QUESTIONNAIRES WAS UNCONSTITUTIONAL

712. Jury questionnaires containing important notes by defense counsel were improperly destroyed by the trial court, depriving Mr. Abdullah his right to adequate and effective appellate review under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, *see Smith v. Robbins*, 528 U.S. 259, (2000), his due process right to be treated in accordance with governing state law, *see Bunkley v. Florida*, 538 U.S. 835 (2003) (per curiam); *Fiore v. White*, 531 U.S. 225 (2001), and his due process right to a fundamentally fair post-conviction proceeding, *see Pennsylvania v. Finley*, 481 U.S. 551 (1987).

713. *Supporting Facts*: The Toryanskis returned defense copies of the jury questionnaires to the court without objection, even though Judge Copsey made it clear that those copies would be destroyed. Ms. Toryanski also admitted that the defense team wrote notes about jurors on their questionnaire copies to aid with jury selection, including reasons why the defense team liked, did not like, wanted to keep, or wanted to remove potential jurors. The destruction of counsel's questionnaire notes deprives Mr. Abdullah of critical information needed to support a number of

his claims, including asserted errors involving ineffective assistance of counsel and jury selection. Idaho law required that all records in capital cases be retained indefinitely.

### CLAIM 66: THE IDAHO SUPREME COURT'S NOVEL STANDARD FOR REVIEWING CAPITAL SENTENCING ERRORS WAS UNCONSTITUTIONALLY APPLIED TO MR. ABDULLAH

714. The Idaho Supreme Court applied to Mr. Abdullah a standard for reviewing capital sentencing errors that did not exist at the time his offense was committed, and that improperly limited appellate review of such errors, violating Mr. Abdullah's right to be free from unexpected and retroactive changes to the law under the Due Process Clause of the Fourteenth Amendment, his right to meaningful appellate review under the Due Process Clause of the Fourteenth Amendment, his due process right to be treated in accordance with governing state law, and the prohibition against arbitrary and capricious imposition of death sentences unguided by objective standards under the Eighth and Fourteenth Amendments. *See Bunkley v. Florida*, 538 U.S. 835 (2003) (per curiam); *Fiore v. White*, 531 U.S. 225 (2001); *Parker v. Dugger*, 498 U.S. 308 (1991); *Clemons v. Mississippi*, 494 U.S. 738 (1990); *Lewis v. Jeffers*, 497 U.S. 764 (1990); *Pulley v. Harris*, 465 U.S. 37 (1984); *Zant v. Stephens*, 462 U.S. 862 (1983); *Godfrey v. Georgia*, 446 U.S. 420 (1980); *Dobbert v. Florida*, 432 U.S. 282 (1977); *Bouie v. City of Columbia*, 378 U.S. 347 (1964). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in the Idaho Supreme Court's denial of relief. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

715. *Supporting Facts*: On August 27, 2013, the Idaho Supreme Court held that it would apply the fundamental error doctrine to claims that were raised on appeal in capital cases and not preserved by objection below. *See State v. Dunlap*, 313 P.3d 1, 19 (Idaho 2013). Under that doctrine, the *Dunlap* court held that the defendant had the burden of proving that an error occurred and that the error was not harmless, meaning that the defendant must show that there is

reasonable probability of a different outcome.  In its March 2, 2015 opinion, the Idaho Supreme Court applied this standard to Mr. Abdullah's case.  Prior to *Dunlap*, the Idaho Supreme Court had held that for errors not raised below in capital cases, the State had the burden of proving the error harmless.  Mr. Abdullah had a reasonable expectation that the old rule concerning the burden on harmlessness would be applied to him.

716.    Furthermore, in Mr. Abdullah's appeal, the Idaho Supreme Court stated for the first time that appellate review of unobjected to sentencing errors in capital cases is limited to *constitutional* error.  Mr. Abdullah had a reasonable expectation that non-constitutional errors could be considered on appeal even if they were not objected to below.

717.    Reviewing capital sentencing errors only for fundamental, constitutional error, and placing the burden of proving harmfulness on the defendant, is not meaningful review and leads to the arbitrary and capricious infliction of the death penalty.

### CLAIM 67: CUMULATIVE DIRECT-APPEAL ERROR

718.    The denial of relief to Mr. Abdullah in his direct appeal violates his rights to adequate and effective appellate review under the Equal Protection and Due Process Clauses of the Fourteenth Amendment because of the cumulative impact of the errors that occurred during his direct appeal, as compounded by the errors at the guilt-phase and penalty-phase of his trial.  *See Smith v. Robbins*, 528 U.S. 259 (2000).  Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the Idaho Supreme Court's decision to deny guilt relief.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

719.    *Supporting Facts*: The constitutional violations set forth in each individual direct-appeal claim alone mandate relief.  Even if not, relief is required when each claim is considered collectively with the other direct-appeal claims, as well as with all of the guilt-phase and penalty-

phase claims. The cumulative impact of these combined errors violated Mr. Abdullah's right to adequate and effective appellate review.

### CLAIM 68: MR. ABDULLAH'S ATTORNEYS IN HIS INITIAL POST-CONVICTION ACTION RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL

720. The attorneys who represented Mr. Abdullah in his initial post-conviction action rendered ineffective assistance of counsel, in violation of the Fourteenth Amendment. *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Coleman v. Thompson*, 501 U.S. 722 (1991). Absent the errors, there is a reasonable probability that the Idaho Supreme Court would have vacated Mr. Abdullah's convictions and sentence or remanded for further post-conviction proceedings.

721. *Supporting Facts*: Mr. Abdullah's initial post-conviction attorneys failed to raise a variety of compelling challenges related primarily to the guilt phase. Those challenges include the issues described above as Claim 1(A)(xviii), (xix), (xx), (xxi), (xxii), (xxiii), (xxiv), (xxv), (xxvi), (xviii), (xli), (xlii), (xliii), (xliv), (xlv), (xlvii), (xlviii), (xlix), (l), (li), and Claims 5, 6, 9, 10, 17. In failing to make the aforementioned arguments, post-conviction counsel's performance fell below an objective standard of reasonableness. Absent the errors, there is a reasonable probability that the Idaho Supreme Court would have vacated Mr. Abdullah's conviction or remanded for further post-conviction proceedings.

722. Mr. Abdullah's initial post-conviction attorneys also failed to raise a variety of compelling challenges related primarily to sentencing. Those challenges include the issues described above as Claim 1(B)(xix), (xx), (xxi),(xxii), and Claim 1(C)(i) and (ii). In addition to those claims, post-conviction counsel failed to adequately develop and brief Claim 1(B)(i). By failing to make or sufficiently litigate the aforementioned arguments, post-conviction counsel's performance fell below an objective standard of reasonableness.

723.	With respect to sentencing issues, post-conviction counsel were especially remiss in failing to explore facts relating to Mr. Abdullah's transition to America, and the dislocation and isolation caused by that experience.

724.	At the evidentiary hearing, post-conviction counsel presented numerous witness statements through affidavits.  It would have been far more effective for counsel to bring these witnesses in to testify in person, where they could have made a better impression on the trial court by responding to questions and establishing their credibility.

725.	Post-conviction counsel were unable to adequately investigate and litigate this case in part because they did not have sufficient resources to do so.

726.	Counsel and their staff were also impeded by an unfamiliarity with, or an unwillingness to use, best practices in the investigation.  For example, post-conviction counsel's investigators conducted numerous interviews, including interviews of people based in Boise, by telephone.  As all competent capital investigators know, telephone interviews are never preferable.  Telephone interviews are easily avoided by reluctant subjects.  Even if they occur, they are inferior to in-person interviews because the interviewer misses key non-verbal signs from the subject, the subjects tend to be more suspicious and less candid, and they do not permit the interviewer to form sufficient connections with the subject to allow the subject to feel comfortable disclosing difficult, sensitive information.

727.	Post-conviction investigators also approached Mr. Abdullah's family in an overly rushed manner, forcing them to run hastily through the most difficult experiences of their lives, without creating in advance any rapport, without having nearly enough sessions, and without asking nearly enough questions to gather the full breadth of the material the family had at its disposal, despite the apparent need for follow-up interviews.

728.    Had the post-conviction investigators used better practices in approaching subjects, they would have obtained more and better information.

729.    Post-conviction counsel refused to allege a series of facts in their final petition that could have supported ineffectiveness claims, justifying their refusal on the ground that each fact—standing alone—was insufficient to change the story and lead to relief.  In so refusing, counsel failed to recognize that the prejudice on ineffectiveness claims is considered cumulatively.  That proposition is especially important in a case like this, where trial counsel made such a huge array of errors.  Moreover, post-conviction counsel should have realized that one of their principal duties was to preserve claims for federal habeas proceedings, even if relief was unlikely in state court.  In federal habeas, these omitted facts strongly indicate the presence of cumulative prejudice on Mr. Abdullah's ineffectiveness claims.

730.    Similarly, post-conviction counsel failed to argue to the Idaho Supreme Court that prejudice from ineffectiveness is assessed cumulatively.  As a result, the court rejected the claims in isolation, without considering their collective impact.

### CLAIM 69: THE ATTORNEY WHO ADVISED MR. ABDULLAH ON HIS CONFLICT WITH THE SAPD RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL

731.    The attorney who advised Mr. Abdullah on his conflict with the SAPD rendered ineffective assistance of counsel, in violation of the Fourteenth Amendment.  *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Coleman v. Thompson*, 501 U.S. 722 (1991).  Absent the errors, there is a reasonable probability that the Idaho Supreme Court would have vacated Mr. Abdullah's convictions and sentence or remanded for further post-conviction proceedings.

732.    *Supporting Facts*:  While the direct appeal to the Idaho Supreme Court was stayed for the litigation of the initial post-conviction petition at the trial court, Judge Copsey appointed R. Keith Roark to represent Mr. Abdullah in connection with an alleged conflict between him and

the SAPD, and to advise Mr. Abdullah on whether he should waive the conflict or not. Mr. Roark recognized that if Mr. Abdullah refused to waive the conflict, the SAPD would likely be removed from the direct appeal. As such, the conflict had clear repercussions for the direct appeal, and Mr. Roark therefore effectively served as Mr. Abdullah's direct-appeal counsel during the period of his appointment.

733.    In carrying out his charge, Mr. Roark rendered ineffective assistance of counsel.

734.    First, Mr. Roark misled Mr. Abdullah into accepting his services. Mr. Roark never told Mr. Abdullah that he had previously served as a prosecutor, and had obtained an Idaho death sentence while working for the State. Had Mr. Abdullah known about Mr. Roark's history, he would not have shared any information with him or allowed him to advise Mr. Abdullah on the conflict. This was an especially egregious act of omission since Mr. Roark's investigation was related to the Toryanskis' ineffectiveness, and the Toryanskis themselves were both former prosecutors who deceived Mr. Abdullah about their work for the State.

735.    Furthermore, Mr. Roark deliberately destroyed all of the notes that he generated with respect to the Abdullah case, in stark violation of his continuing duty to his client. As a result, he substantially impaired the ability of successive state post-conviction counsel and federal habeas counsel to determine how he conducted his work and how he reached the conclusions that he did.

736.    That omission is particularly troubling given that Mr. Roark took the unusual and totally unexplained position that Mr. Abdullah's waiver "would be final . . . in later federal habeas proceedings." Mr. Roark did not cite any law to support that view, so it would be valuable to know where—if anywhere—he got his understanding of the law from, which is now nearly impossible to do since he destroyed his notes.

737.     Apparently without doing any research, Mr. Roark believed that even if the SAPD gave advice to the Toryanskis on how to conduct the trial, that conflict could only have impaired them in litigating the post-conviction petition, and not in litigating the direct appeal.  As discussed earlier, that belief was mistaken.

### CLAIM 70: INITIAL POST-CONVICTION COUNSEL OPERATED UNDER A CONFLICT OF INTEREST

738.     The attorneys who represented Mr. Abdullah in his initial post-conviction proceeding were impaired by a serious conflict of interest, thereby violating the Sixth and Fourteenth Amendments.  *See Mickens v. Taylor*, 535 U.S. 162 (2002); *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Holloway v. Arkansas*, 435 U.S. 475 (1978); *see also Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Coleman v. Thompson*, 501 U.S. 722 (1991).  Post-conviction counsel's conflict is of such a magnitude that it must be presumed that the conflict undermined the adversarial process, and no prejudice need be shown.  In the alternative, the conflict of interest adversely affected post-conviction counsel's performance to such an extent that there was prejudice.

739.     *Supporting Facts*: Mr. Abdullah was represented in his initial post-conviction proceeding by the SAPD.  Prior to and during trial, the SAPD advised defense counsel about how they should conduct their work.  To the extent the SAPD gave the Toryanskis flawed advice that they took, there is an actual conflict, because to meaningfully litigate the case the SAPD would then be forced to allege their own ineffectiveness, which no attorneys can credibly do, or reasonably be expected to do.  Furthermore, even if the SAPD gave arguably correct advice on some issues, there is a potential conflict that requires further investigation, given the volume of interactions between the two parties, the fact that the interactions involved concrete questions about an ongoing case, the possibility of the SAPD omitting certain claims to prevent embarrassment, the loss in credibility that the SAPD suffered in the eyes of the state trial court as a result of the

conflict, and the personal relationship between the SAPD's fact investigator and potential witnesses.

740. As one example of the potential conflict, the SAPD discussed with the Toryanskis the possibility of the latter filing a motion to recuse Judge Copsey. In those discussions, the SAPD informed the Toryanskis about comments that Judge Copsey had made in another case expressing suspicions about Middle Easterners, and Iraqis in particular. *See* Claim 6. The Toryanskis ultimately did not file a motion for Judge Copsey to recuse herself. In the initial post-conviction action, the SAPD chose not to allege that the Toryanskis were ineffective for failing to file such a motion. That claim could and should have been raised, given the ample grounds on which to seek disqualification of Judge Copsey and the fact that her bias against Mr. Abdullah caused numerous problems at trial. *See* Claims 1(A)(xxv) and 6.

741. When the communications between the SAPD and the Toryanskis were discovered during post-conviction proceedings, their attorneys took the position that there was no conflict. To defend that position, one SAPD attorney explained that because there was no claim of trial ineffectiveness for failure to file a motion to recuse, the discussions about recusal could *not* have created a conflict, since it would not affect how the SAPD litigated the petition. That logic is backwards, and underscores the likelihood that a prejudicial conflict existed. The damage done by the communications is that a viable ineffectiveness claim was *omitted* in the initial post-conviction petition. And it appears from the SAPD's later defense of their actions, that it was likely omitted for the very reason that such omission would allow the SAPD to deny the existence of a conflict. In other words, the conflict itself led to the SAPD's decision not to raise a colorable claim, thereby demonstrating the prejudice caused by the conflict.

742.     As another example of the conflict, SAPD attorneys sat in on some of the jury selection in Mr. Abdullah's case.  In light of their observations, the SAPD contacted Ms. Toryanski to suggest how she and her co-counsel might phrase questions to veniremembers, and to excerpt for her a passage from a Supreme Court case on the subject.  The conversations between the SAPD and the Toryanskis were not general brainstorming sessions on abstract issues of law.  Rather, they were discussions about specific actions for trial counsel to take or refrain from taking in a pending case.  After Mr. Abdullah was convicted and sentenced, SAPD attorneys drafted the petition for post-conviction relief.  That petition included ineffectiveness claims related to voir dire, but the SAPD could not approach the issue objectively and with an eye only to zealously representing Mr. Abdullah's interests because they had themselves played a role in how the Toryanskis' approached voir dire.  Therefore, the conflict could well have compromised the SAPD's ability to properly litigate the issue.

743.     Furthermore, the SAPD's entanglement with the trial undermined their credibility with the state courts, and damaged the office's representation in that way as well.  That is especially true given that the SAPD stated in their original petition for post-conviction relief that they "have limited knowledge of and had no participation in the criminal case leading to the conviction and sentences herein challenged."  That statement was incorrect, for—as just noted—the SAPD had been involved in making recommendations to defense counsel on their management of the litigation.  Judge Copsey repeatedly remarked on the discrepancy, demonstrating that it damaged the SAPD's standing with the court and thereby prejudiced Mr. Abdullah's rights.

744.     The conflict further undermined the SAPD's ability to effectively advocate for Mr. Abdullah in the trial court because the materials relating to the conflict included a note in which

an SAPD attorney essentially called Judge Copsey a racist. That note would inevitably have made Judge Copsey even more antagonistic toward the SAPD than she already was.

745. During the inquiry into the SAPD's conflict, it emerged that if Mr. Abdullah declined to waive the conflict, the SAPD would likely have contested his decision in court. That admission indicates that the SAPD was not acting entirely with Mr. Abdullah's interests at heart and instead had its own ax to grind.

746. The conflict involving the SAPD attorneys was exacerbated by a conflict involving the SAPD's lead fact investigator, Michael Shaw. Mr. Shaw was friends with both Mr. and Ms. Abdullah before the crime, and collaborated with them on civic projects. In addition, Mr. Shaw had a professional and personal acquaintanceship with many of the members of the Muslim community in Boise, including with several leaders at the Boise Islamic Center. These associations brought Mr. Shaw into the Abdullah case when he was called by Furqan Mehmood, the President of the Islamic Center, around 4 AM on October 5, 2002, less than three hours after Ms. Abdullah's body was found. In that conversation, Mr. Mehmood informed Mr. Shaw about Ms. Abdullah's death and the fire and attempted to discuss with Mr. Shaw hate crimes against Muslims in Boise. The phone call rendered Mr. Shaw a potential witness in the case, and made it inappropriate for him to later serve as an investigator in Mr. Abdullah's post-conviction action.

747. Mr. Shaw continued to be publicly involved with the Boise Islamic Center well into the period in which he was working on Mr. Abdullah's post-conviction case. For example, in October 2006, Mr. Shaw was listed as the primary contact person for a cultural workshop that included a visit to the Islamic Center, where participants were promised that they would "hear about the experiences of today's immigrants from refugee service providers, members of Boise's Muslim community, and an expert in interfaith conflict resolution."

748.    It is apparent from these relationships and experiences that Mr. Shaw had with people connected to the major players in the case that he was far too close to have carried out an objective investigation.  Instead, his background knowledge inevitably colored his view of the case, and influenced his decisions on which investigative avenues to explore and which to pass over, thereby giving rise to the ineffectiveness issues asserted above.  For example, Mr. Shaw did not interview Mr. Mehmood or anyone who worked with Ms. Abdullah and/or Mr. Abdullah at Mountain States Refugee Center, even though those individuals could have shed crucial light on what happened on the night of the crime, as well as on Ms. Abdullah's mental health and her relationship with Mr. Abdullah, and could therefore have helped support a suicide defense or otherwise rebutted the State's theory that Mr. Abdullah murdered his wife.  Presumably, Mr. Shaw did not interview such people because he either did not feel comfortable interviewing them in such circumstances and potentially jeopardizing his relationship with them by asking difficult question, or felt he already knew what they would say.  Whatever the precise cause, it is plain that a serious potential conflict existed and that it seriously compromised the integrity of the post-conviction investigation.

749.    To the extent that any purported waiver of the conflict by Mr. Abdullah impacts this claim, the waiver was invalid for the reasons stated in Claim 63.

### CLAIM 71: FIRST SUCCESSIVE POST-CONVICTION COUNSEL WERE INEFFECTIVE

750.    The attorneys who represented Mr. Abdullah in his first successive post-conviction action rendered ineffective assistance of counsel, in violation of the Fourteenth Amendment.  *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Coleman v. Thompson*, 501 U.S. 722 (1991).  Absent the errors, there is a reasonable probability that the Idaho Supreme Court would have vacated Mr. Abdullah's convictions and sentence or remanded for further post-conviction proceedings.

751. *Supporting Facts*: Mr. Abdullah's first successive post-conviction proceeding was the first opportunity that he was afforded in state court to challenge the effectiveness of his counsel on direct appeal. In that proceeding, Mr. Abdullah has been represented by Leo Griffard, David Smethers, and John Kormanik.

## CLAIM 72: THE IDAHO POST-CONVICTION SCHEME VIOLATES DUE PROCESS AND THE EQUAL PROTECTION CLAUSE

752. Idaho's post-conviction scheme is unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *See Pennsylvania v. Finley*, 481 U.S. 551 (1987).

753. *Supporting Facts*: Idaho law provides that in death penalty matters a post-conviction petitioner must file any legal or factual challenge to the sentence or conviction that is known or reasonably should be known within forty-two days of the entry of judgment. This procedure is significantly distinct from post-conviction proceedings for all non-capital cases. Consequently, capital inmates are deprived of the equal protection of the law under the Fourteenth Amendment. Furthermore, the forty-two day period is unduly restrictive and prevents capital petitioners from adequately developing their cases, thus violating their due process rights.

754. Further, successive petitions raising claims that were omitted from the initial post-conviction petition also must be filed within forty-two days of when the claim was known or should have been known. That regime requires piecemeal litigation each time a new fact of any significance is found, even if all facts needed to adequately support the claim, together with admissible evidence to confirm those facts, is not yet known and available. The requirements of this system are unconstitutional or at a minimum improperly frustrate the ability to raise federal constitutional claims.

## CLAIM 73: THE POST-CONVICTION COURT UNCONSTITUTIONALLY DENIED MR. ABDULLAH ACCESS TO EVIDENCE

755.    Judge Copsey's refusal to allow initial post-conviction counsel to test key evidence violated Mr. Abdullah's due process right to a fundamentally fair post-conviction proceeding. *See Pennsylvania v. Finley*, 481 U.S. 551 (1987).

756.    *Supporting Facts*: Judge Copsey denied the SAPD's requests to have tested several critical pieces of evidence, including hair from Mr. Abdullah's arms that supposedly showed he had been exposed to high heat around the time of the fire, gasoline samples and other items containing gas that supposedly linked Mr. Abdullah to the alleged arson, and a sample of the vitreous humor collected during the autopsy of Ms. Abdullah. These were crucial pieces of evidence used by the State to secure convictions against Mr. Abdullah. They were never adequately and comprehensively tested, due in part to trial counsel's incompetence. If they were tested, exculpatory evidence would be discovered, including evidence that Mr. Abdullah did not engage in arson around the time of the fire, evidence that gas from Salt Lake City was not discovered at the Siesta residence, and evidence that Ms. Abdullah died from suicide rather than from murder.

757.    Judge Copsey also refused to give the SAPD nearly any discovery whatsoever. Her reasoning was based on her pre-determined opinion that the SAPD's claims were meritless, even though the SAPD could not support the claims without the discovery.

## CLAIM 74: CUMULATIVE POST-CONVICTION ERROR

758.    The denial of relief to Mr. Abdullah in his initial post-conviction action violated his right to fundamental fairness under the Due Process Clause of the Fourteenth Amendment because of the cumulative impact of the errors that occurred in his post-conviction case, as compounded by the errors at the guilt phase, penalty phase, and direct appeal. *See Pennsylvania v. Finley*, 481

U.S. 551 (1987). Insofar as Mr. Abdullah is required to demonstrate prejudice on this claim, the error had a substantial and injurious effect or influence in determining the state court's denial of post-conviction relief. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

759. *Supporting Facts*: The constitutional violations set forth in each post-conviction claim alone mandate relief. Even if not, relief is required when each claim is considered collectively with the other post-conviction claims, as well as with the guilt phase, penalty phase, and direct appeal claims. The cumulative impact of these combined errors violated Mr. Abdullah's right to a fundamentally fair post-conviction process.

## VII. Conclusion And Prayer For Relief

760. Mr. Abdullah is on death row because he was abandoned. He was abandoned by police officers who prejudged him guilty, losing and destroying any evidence to the contrary. He was abandoned by prosecutors who charged him with capital murder despite having no evidence that he was responsible for the presence of the fatal drug in his wife's body. And he was abandoned by his own attorneys, who conceded the most important issue of the guilt phase, presented no theory of defense, and utterly flopped at the sentencing even though Mr. Abdullah's mitigation package involved a story of childhood bravery in the face of persecution so moving that any competent trial team would have easily been able to move at least a single jury to mercy. To right those constitutional wrongs, Petitioner Azad Haji Abdullah prays that the Court, after full consideration of the issues raised in this petition:

761. Issue a writ of habeas corpus so that Mr. Abdullah is discharged from his unconstitutional confinement and relieved of his unconstitutional convictions;

762. If guilt-phase relief is not granted on all convictions, vacate the convictions that are unconstitutional;

763.    If guilt-phase relief is not granted, issue a writ of habeas corpus and set aside Mr. Abdullah's sentence;

764.    If neither guilt-phase nor penalty-phase relief is granted, issue a writ of habeas corpus and order the state courts to reinstitute Mr. Abdullah's direct appeal;

765.    If neither guilt-phase nor penalty-phase nor direct-appeal relief is granted, issue a writ of habeas corpus and order the state courts to reinstitute Mr. Abdullah's post-conviction proceeding.

766.    Regardless of what relief is or is not ultimately granted, Mr. Abdullah also prays that the Court:

767.    Grant an order to preserve the evidence, so as to ensure that Mr. Abdullah is able to fully and fairly litigate and amend this habeas petition, *see* Dkts. 13, 19, 20;

768.    Order the State to answer this amended petition by specifically admitting or denying each allegation and claim herein;

769.    Conduct an evidentiary hearing on the State's procedural default defenses and Mr. Abdullah's arguments for overcoming the defaults;

770.    Conduct an evidentiary hearing on any claims that are reviewable on the merits for which a hearing is permitted;

771.    Grant Mr. Abdullah the authority to conduct discovery, including the authority to obtain subpoenas and depose witnesses;

772.    Permit Mr. Abdullah to amend this petition;

773.    Allow for full briefing on the procedural status and the merits of every claim;

774.    Make any other orders necessary regarding Mr. Abdullah's medical care and housing as necessary to prevent violations of the Eighth Amendment's ban on cruel and unusual punishment

and to preserve his right to the assistance of counsel in this habeas action, *see* 18 U.S.C.

§ 3599(a)(2); and

775.    Grant such other and further relief as may be appropriate and necessary to resolve the

matter as justice may require.

DATED this 29th day of June 2022.

Shawn Nolan
Eric Montroy
Craig Durham

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of June 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

L. LaMont Anderson
lamont.anderson@ag.idaho.gov

_____
Eric Montroy